EXHIBIT 5(a)

OFFICIAL REPORT OF PROCEEDINGS

BEFORE THE

NATIONAL LABOR RELATIONS BOARD

REGION 19 SUBREGION 36

In the Matter of:

| | |
|---|---|
| National Association Of Broadcast Employees & Technicians, the Broadcasting and Cable Television Workers Sector of the Communications Workers of America, Local 51, AFL-CIO, | Case Nos.  19-CA-248735 19-CA-255180 19-CA-259398 19-CA-262203 |

Charging Party/Union,

and

Nexstar Broadcasting, Inc.
d/b/a KOIN-TV,

Respondent.

_____

_____

Place: Seattle, Washington (Via Zoom Videoconference)

Dates: November 12, 2020

Pages: 1 Through 198

Volume: 1

OFFICIAL REPORTERS
eScribers, LLC
E-Reporting and E-Transcription
7227 North 16th Street, Suite 207
Phoenix, AZ 85020
(602) 263-0885



www.escribers.net | 800-257-0885

**UNITED STATES OF AMERICA**

**BEFORE THE NATIONAL LABOR RELATIONS BOARD**

**REGION 19 SUBREGION 36**

| | |
|---|---|
| In the Matter of:<br><br>NATIONAL ASSOCIATION OF<br>BROADCAST EMPLOYEES &<br>TECHNICIANS, THE BROADCASTING<br>AND CABLE TELEVISION WORKERS<br>SECTOR OF THE COMMUNICATIONS<br>WORKERS OF AMERICA, LOCAL 51,<br>AFL-CIO,<br><br>       Charging Party/Union,<br><br>and<br><br>NEXSTAR BROADCASTING, INC.<br>D/B/A KOIN-TV,<br><br>       Respondent. | Case Nos.  19-CA-248735<br>19-CA-255180<br>19-CA-259398<br>19-CA-262203 |

The above-entitled matter came on for hearing, via Zoom
Videoconference, pursuant to notice, before **AMITA B. TRACY**,
Administrative Law Judge, at the National Labor Relations
Board, Region 19, Subregion 36, 915 2nd Ave., Ste. 2948,
Seattle, Washington 98174, on **Thursday, November 12, 2020, 9:12
a.m.**

1                              **APPEARANCES**

2       **On behalf of the Respondent:**

3           **CHARLES P. ROBERTS, III, ESQ.**
            CONSTANGY, BROOKS, SMITH & PROPHETE, LLP
4           100 N. Cherry Street
            Suite 300
5           Winston Salem, NC 27101-4016
            Tel. (336)721-6852
6
            **TIMOTHY A. DAVIS, ESQ.**
7           CONSTANGY BROOKS SMITH & PROPHETE, LLP
            2600 Grand Boulevard
8           Suite 750
            Kansas City, MO 64108-4628
9
            **CHARLES W. PAUTSCH, ESQ.**
10          Vice President of Labor and Employment
            Nexstar Media Group, Inc.
11          545 E. John Carpenter Freeway, Suite 700
            Irving, TX 75062
12          Email: cpautsch@nexstar.ty

13      **On behalf of the General Counsel:**

14          **ELIZABETH H. DEVLEMING, ESQ.**
            **SARAH BURKE, ESQ.**
15          NATIONAL LABOR RELATIONS BOARD
            915 2nd Avenue
16          Suite 2948
            Seattle , WA 98174-1006
17          Tel. (206)220-6291

18      **On behalf of the Charging Party/Union:**

19          **ANNE I. YEN, ESQ.**
            WEINBERG, ROGER & ROSENFELD
20          1001 Marina Village Parkway
            Suite 200
21          Alameda, CA 94501-6430
            Tel. (510)224-7687
22

23

24

25



1

## **INDEX**

2

3

| **WITNESS** | **DIRECT** | **CROSS** | **REDIRECT** | **RECROSS** | **VOIR DIRE** |
| --- | --- | --- | --- | --- | --- |

4

Carrie Biggs-Adams    41

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



1                                   **EXHIBITS**

2

3       **EXHIBIT**                              **IDENTIFIED**      **IN EVIDENCE**

4       **Joint:**

5           J 1-59                                   8                   11

6

7       **General Counsel:**

8           GC-1(a) - 1(ff)                          9                   10

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                                    <u>PROCEEDINGS</u>

2          JUDGE TRACY:  All right.  So this is a formal hearing

3    before the National Labor Relations Board in Nexstar

4    Broadcasting, Inc., doing business as KOIN, K-O-I-N, dash TV,

5    cases 19-CA-248735, 19-CA-255180, 19-CA-259398, 19-CA-262203.

6          So the complaint was issued by the Regional office in -- I

7    guess this would be Region 19, so Seattle, Washington.  My name

8    is Anita Bamon Tracy and I'm the administrative law judge who

9    will be presiding over the hearing and issuing a decision in

10   this case.  All right.

11         And so pursuant to an order I issued on -- let's see, what

12   was the date of my order?  I knew I should have had this ready

13   to check that.  All right.  So pursuant to an order that I

14   issued, I believe it was October 23rd, 2020, this hearing is

15   being conducted via videoconference due to the continued risk

16   presented by the COVID-19 pandemic.

17         The procedure and protocols for this new hearing were

18   previously discussed with the parties during our pre-hearing

19   conferences along with the instructions that I issued with that

20   order.  And I expect everyone to comply with them.

21         Now, unless we are very unfortunate, one or more of us may

22   occasionally experience some technical problems with our audio

23   or the video feeds.  So however, there are various ways to deal

24   with them and they can usually be resolved fairly quickly with

25   a little cooperation and patience, which is why I wanted to



1    make sure that we have everybody's alternative phone numbers.

2          And for those of you who have joined us only to observe

3    the hearing, you must keep both your audio and video output

4    turned off at all times.  We should neither see nor hear you at

5    any time.  And if we do, you will immediately be removed and

6    possibly barred from any future meetings or hearings.  That's a

7    bit extreme, that probably wouldn't happen, but we just want to

8    make sure that we can also just are not hearing other people's

9    business.  So just to make sure that the red line is crossed

10   off on both your video and your audio output there.

11         And I want to remind everybody again, both participants

12   and observers, that no video taking or audio recording is

13   permitted.  Only the court reporter may record the hearing in

14   order to prepare the official record.  Again, any violations

15   may result in sanctions or removal from the hearing.

16         So if the parties could state their appearances for the

17   record along with your party representatives that you intend to

18   be present during the entire hearing or at least portions of

19   it.  We'll start with the General Counsel.

20         MS. DEVLEMING:  This is Elizabeth DeVleming for the

21   General Counsel and I'm joined by my co-counsel Sarah Burke.

22   And I will defer to Ms. Yen to introduce the party rep.

23         JUDGE TRACY:  Okay.  Go ahead for the Charging Party.

24         MS. YEN:  All right.  Anne Yen, Weinberg, Roger, &

25   Rosenfeld, for the Charging Party, NABET Local 51.  And my



1    party representative who will be present during the entire

2    hearing is Carrie Biggs-Adams, the president of the Union.

3         JUDGE TRACY:  Okay.  And then for the Respondent.

4         MR. ROBERTS:  Yes.  Charles Roberts with the firm of

5    Constangy, Brooks, Smith & Prophete in Winston Salem, North

6    Carolina.  I'm joined by my partner Timothy Davis, out of our

7    Kansas City office.  We have a party representative here,

8    Charles Pautsch, who's in-house counsel for Nexstar/KOIN.

9         And I also have in the room an assistant, a legal

10   assistant, Michelle Gregory (phonetic) who is here simply to

11   help with documents for any uploading that may be necessary.

12        JUDGE TRACY:  And Mr. Roberts, if you wouldn't mind,

13   please, if you could just turn your camera so we can see them

14   and they can identify themselves for us all.

15        MR. DAVIS:  Good morning.  This is Tim Davis.

16        MR. ROBERTS:  Oh, it's hard for me to -- oh, there you

17   are, okay.  This is Mr. Pautsch and this is Ms. Gregory.

18        JUDGE TRACY:  All right.  Thank you so much.  Thank you.

19        All right.  So now before -- let me see.  Okay.  So before

20   we go through the formal papers, I just want you guys for the

21   record to just explain how you all have shared your documents

22   and where they're at, just so that way the record is clear

23   about that, and how the court reporter will be getting them.

24   I'll leave it to Ms. DeVleming to discuss that for the record.

25        MS. DEVLEMING:  Sure, Your Honor.  Prior to the hearing,



1    the parties have discussed and agreed to 59 total joint

2    exhibits, all of which have been previously uploaded to our

3    SharePoint website.

4        The first of those is a motion for a partial Stipulation

5    of Fact, which is Joint Exhibit 1.  And in that, it

6    acknowledges that we all stipulate to the authenticity and

7    admissibility of the remaining exhibits marked as J Ex. 2

8    through 59.  And those are all uploaded and available on

9    SharePoint.

10       JUDGE TRACY:  Okay.  And then were there any other --

11   well, of course, we have the General Counsel's exhibits.  And

12   are there going to be any other exhibits that are uploaded to

13   that SharePoint site, if you all know?  Because I don't see any

14   at this point.

15       MS. DEVLEMING:  Well, ultimately, right there.  The formal

16   papers are already uploaded to the GC exhibit file.  And as we

17   go, there aren't going to be all that many GC exhibits and we

18   probably won't get to them today.  So I was going to wait until

19   we get to that point and then upload them as we go, if that's

20   all right.

21       JUDGE TRACY:  Yeah.  That's fine.  That's fine.  And so

22   that way if you could just keep in mind with the -- with the

23   court reporter to make sure that she has all of the admitted

24   exhibits into the record so that she can be sure of that.  And

25   I know that before we went on the record she received Mr.



1    Schiff's email address so that way he can make sure to give her

2    access to that SharePoint site.

3         MR. ROBERTS:  And we might have some.  We'll have some

4    exhibits.  I don't expect they will be voluminous, but not --

5    not at this stage right now.

6         JUDGE TRACY:  That's fine.  That's fine.  Just as long as

7    we make sure that the court reporter receives them.  All right.

8    So I'm going to go ahead and start with the formal papers if --

9    Ms. DeVleming, if you want to go ahead and seek to admit those

10   into evidence.

11        MS. DEVLEMING:  Yes, Your Honor.  Counsel for the General

12   Counsel offers into evidence the formal papers, which have been

13   marked for identification as General Counsel Exhibit 1(a)

14   through 1(ff), inclusive.  Exhibit 1(ff), which happens to be

15   located at the very end of these documents is the index and

16   description of the entire exhibits.

17        And as with the other joint exhibits, that exhibit has

18   been uploaded to the -- actually, in this case, the GC exhibit

19   file on the SharePoint website.  The parties have reviewed and

20   I understand we're on the same page and those should be good

21   still.  So General Counsel offers those into evidence.

22        JUDGE TRACY:  All right.  And then any objections?

23        MR. ROBERTS:  None from Respondent.

24        MS. YEN:  No objection.

25        JUDGE TRACY:  All right.  So General Counsel's Exhibits



1    1(a) through 1(ff) are admitted into evidence.

2    **(General Counsel Exhibit Numbers 1(a) - 1(ff) Received into**

3    **Evidence)**

4        JUDGE TRACY:  And then do you guys -- you know, Ms.

5    DeVleming, if you want to go ahead and introduce the joint

6    exhibits into evidence, including J Ex. 1, which is that

7    Stipulation of Fact, and we can go ahead and admit those into

8    evidence as well.

9        MS. DEVLEMING:  Sure, Your Honor.  The parties, as I

10   mentioned before, have prepared a joint stipulation which is

11   uploaded into SharePoint as J Ex. 1.  With the parties'

12   blessing, I have electronically signed on behalf of both Mr.

13   Roberts and Ms. Yen.

14       The joint exhibit had a few factual stipulations and set

15   forth several of the joint exhibits, 2 through 59, that have

16   also been uploaded to SharePoint acknowledges that the parties

17   not only stipulate to the authenticity and admissibility of

18   those exhibits, there may well be arguments about relevance or

19   other arguments to be made about those documents.

20       So we jointly, if I can speak on behalf of all three

21   parties, we would offer Joint Exhibits 1 through 59 into

22   evidence.

23       JUDGE TRACY:  All right.  And any objections?

24       MR. ROBERTS:  None.

25       MS. YEN:  None.



1    JUDGE TRACY:  All right.  Great.  And so I can see from

2    the SharePoint that they've all -- I mean, they've come in and

3    there are -- some of them are out of order, but there are 1

4    through 59 and there aren't any missing numbers or anything

5    like that.  Is that correct, Ms. DeVleming?

6    MS. DEVLEMING:  I just double checked.  We did replace a

7    few this morning.  Even when I uploaded them all in the correct

8    order on Tuesday, they didn't stay in the correct order.  So --

9    but we've replaced a few and I've double checked that all of

10   those have been properly replaced.

11   JUDGE TRACY:  All right.  Great.  Well, so Joint Exhibits

12   1 through 59 are admitted into evidence.

13   **(Joint Exhibit Numbers 1-59 Received into Evidence)**

14   JUDGE TRACY:  All right.  So we come now to the

15   sequestration of witnesses.  So is there any party that is

16   requesting a sequestration of the witnesses?

17   MR. ROBERTS:  Respondent does, yes.

18   MS. DEVLEMING:  So does the General Counsel.

19   JUDGE TRACY:  All right.  All right.  So at the request of

20   the parties, I'm going to issue a sequestration order

21   consistent with a model order that's set forth by the Board in

22   Greyhound Lines, which is 319 NLRB 554, 1995.  And so this

23   order, because it's essentially two restrictions that all

24   witnesses or potential witnesses in this proceeding:  One, they

25   may not observe or listen to the testimony of other witnesses.



1    And two, they may not discuss their own testimony with other

2    witnesses until the hearing is over.

3          The only exceptions are going to be for these party

4    representatives so they can observe or listen to the entire

5    hearing.  If you guys, just for the record, could you identify

6    who your party representatives are who will be testifying, but

7    they're going to just remain for the entire record.  I know

8    that you did that before, but just to be clear that they're

9    going to be exempt from this sequestration order.

10         Ms. DeVleming?

11         MS. DEVLEMING:  Yes.  The Charging Party Union's party

12    representative is Local 51 president, Carrie Biggs-Adams.

13         JUDGE TRACY:  Okay.  And then, Mr. Roberts, I'm sorry.

14         MR. ROBERTS:  Yes.  Mr. Pautsch, Charles Pautsch, is the

15    in-house counsel and he will be a witness.  He's here as a

16    party representative.

17         JUDGE TRACY:  All right.  That's great.  All right.  So

18    you know, I want to make sure that counsel basically needs to

19    monitor this.  So counsel may not inform any witness about the

20    testimony given by other witnesses for the same side and

21    counsel will be expected to advise their witnesses of the

22    sequestration order, and otherwise police it.  Obviously, this

23    is going to be a multiday hearing and so if you could make sure

24    that your witnesses know not to discuss their testimony with

25    anyone else, and also that they -- until after the hearing and

1    just make sure that they -- if they show up on this list, the

2    participant list, that you would alert us immediately so that

3    way Mr. Schiff can put them into a waiting room.

4        All right.  So let's see.  Are there any -- is there

5    anyone present here, I can't any -- I can't see it.  But anyone

6    present already that we need to put into a waiting room?

7        MS. DEVLEMING:  I don't believe so.  I see Regional

8    Attorney Pomerantz and an NLRB observer who I assume is a

9    Region 19 or other agency colleague here, but those are the

10   only names not involved in the hearing that I see.

11       JUDGE TRACY:  Yeah.  I think so, too.  I think so, too.

12   Mr. Roberts or Ms. Yen, do you see anything differently?  I

13   don't think so.

14       MS. YEN:  No.  But I must have missed something.  I don't

15   know who the phone participant is.

16       JUDGE TRACY:  Okay.  I believe that's the court reporter,

17   Claudine.  Is that your phone that you're using to play audio?

18       THE COURT REPORTER:  Yes, ma'am.

19       MS. YEN:  Okay.  Thank you.

20       JUDGE TRACY:  All right.  So we can now get moving.  Like

21   I discussed before we went on the record, there was enough

22   issues with the subpoenas.  I don't like to put those into the

23   record.  I like the parties to work them out.  And certainly,

24   though, if it becomes an issue, then we can discuss it on the

25   record.  But we'll kind of hold off on all of that at this



1    point.

2        Now, I just want to remind everybody that Zoom allows the

3    host to create breakout rooms if you need to confer privately

4    with your co-counsel or party representatives any time during

5    the hearing.  Just let us know -- Mr. Schiff or I about your

6    need and then we can go ahead and create the breakout room for

7    you to join.  No one else can hear you and you can return to

8    the full hearing when you're ready.  Obviously, we would likely

9    be off the record at that point.

10       All right.  So let's see.  I'm going to go ahead and if

11   there's nothing else, we're going to go ahead and start with

12   the opening statement.  So we'll start with the General

13   Counsel.  And also, Ms. Yen, do you intend to have an opening

14   statement yourself?

15       MS. YEN:  Not at this time.  I think I will just join in

16   the General Counsel's opening.

17       JUDGE TRACY:  And then, Mr. Roberts, you're more than

18   welcome to do your opening statement now or you can defer until

19   your case in chief begins.  It's up to you.

20       MR. ROBERTS:  Yes.  I prefer to do it now.

21       JUDGE TRACY:  Okay.  That's fine.  Great.  So let's go

22   ahead and start with the General Counsel's opening statement.

23       MS. DEVLEMING:  Your Honor, before we dive into that, I

24   think we have a couple of amendments that we need to admit --

25       JUDGE TRACY:  Oh, okay.  I'm sorry.



1      MS. DEVLEMING:  -- on the record here.

2      JUDGE TRACY:  That's right.  That's right.  You said

3  something about that.  Yeah.

4      MS. DEVLEMING:  Yeah.  The first is we had sent a notice

5  of intention to amend the complaint last week on November 4.

6  This one is about paragraph 4 naming the 211 supervisors and

7  213 agents.  I believe we included the new full list, which

8  includes several names that were already admitted in

9  Respondent's answer to the second consolidated complaint.

10      So the only new names in this document are Tim Busch, the

11  president of Nexstar, unnamed agent in-house counsel.  Which I

12  can explain if you like, but that's a courtesy to not name a --

13  you know, an attorney involved in the matter.  Travis Teich,

14  the executive sports producer, Bill Cortez is the chief video

15  journalist, Kohr Harlan, a news reporter.  And actually, I'd

16  add one more name which is Matthew Rosenfeld, the senior

17  vice-president and regional manager for Nexstar.

18      So we would like to just also allege those individuals as

19  either 211 supervisors and/or 213 agents in paragraph 4.

20      JUDGE TRACY:  And what did you say Mr. Rosenfeld, Matthew

21  Rosenfeld, what's his title?

22      MS. DEVLEMING:  Senior vice-president and regional manager

23  for Nexstar.

24      JUDGE TRACY:  Okay.  So any objections to amending

25  paragraph 4 of the consolidated amended complaint?  I'm looking

1   for the last complaint, yeah.

2       MR. ROBERTS:  Respondent does not object to amending the

3   complaint.  We do deny that the news reporter is either a

4   supervisor or agent.  To the extent that's being alleged, we

5   would deny that.

6       JUDGE TRACY:  Okay.  All right.  So yeah, so let's --

7   let's first -- Ms. Yen, any objections?

8       MS. YEN:  No.  No objections.

9       JUDGE TRACY:  All right.  So the General Counsel's request

10  to amend paragraph 4 of the consolidated complaint is granted.

11  And then, in terms of Mr. Roberts, your response, would you

12  admit to these individuals as being either section 211

13  supervisors or 213 agents as defined by the Act.  Would you

14  admit to paragraph 4?

15      MR. ROBERTS:  Except -- yes, except with respect to the

16  news reporter.  I don't know that -- we would deny that.

17      JUDGE TRACY:  This person identified as Kohr Harlan; is

18  that correct?

19      MR. ROBERTS:  Yes.

20      JUDGE TRACY:  Is that what, Ms. DeVleming, you're saying?

21  That's the -- is that the news reporter that you're denying?

22      MS. DEVLEMING:  It sounded like Respondent is denying the

23  status of Kohr Harlan currently.

24      JUDGE TRACY:  Okay.  All right.  Okay.  All right.  Thank

25  you.  So you're -- basically your answer to that is on the



1    records for that, so there's a file of Mr. Harlan as 211 or 213

2    status there.  And then -- and then the other amendments.  I

3    forgot about that one, yeah.

4        MS. DEVLEMING:  Yeah.  So the second matter would be that

5    at the direction of the General Counsel, we are withdrawing

6    specifically paragraphs 9 and 11 from the second consolidated

7    complaint.

8        I will note that we are not withdrawing paragraph 12,

9    which is the overall surface bargaining allegations, which

10   requires working at the totality of all circumstances at and

11   away from the bargaining table.

12       JUDGE TRACY:  All right.  And obviously, Mr. Roberts is

13   going to object.

14       MR. ROBERTS:  Yes.

15       JUDGE TRACY:  But if you want -- Ms. Yen, if you wanted to

16   state your position on it for the record.

17       MS. YEN:  Well, I mean, as Charging Party, I don't get to

18   write the complaint, but I simply reserve the right to present

19   the underlying facts behind those allegations as part of the

20   totality of the circumstances relevant to the surface

21   bargaining charge.

22       JUDGE TRACY:  Okay.  All right.  And yeah, go ahead.

23       MS. DEVLEMING:  Sorry.  I don't know if this is a good

24   time or later to just note that, of course, there's quite a

25   judicial history here of prior cases, some of which have been



1    listed in the complaint.  And I think that each one of which

2    was alluded to in the answer.  So I wonder if Your Honor might

3    just take judicial notice of the three decisions in the

4    complaint and the one decision, which I'm not sure the site is

5    included in the answer, but I can provide now, if you like, of

6    the ALJD that was auto adopted by the Board involving a CB in

7    the request.

8         JUDGE TRACY:  Yeah.  So let's do that.  But first let me,

9    you know -- I'm not going ask you why you're withdrawing these

10   paragraphs in the complaint since it's at the direction of the

11   General Counsel.  I also don't have any say so in that.  So I

12   will grant the General Counsel's request to amend the complaint

13   further by removing paragraphs 7 -- not 7, I'm so sorry --

14   paragraphs 9 and 11 of the consolidated complaint.  Is that

15   correct?  Right?

16        MS. DEVLEMING:  Right, the second consolidated complaint.

17        JUDGE TRACY:  The second consolidated complaint, yes.

18   Second consolidated, okay.  All right.  So those two amendments

19   are received and granted.

20        And then, yes, go ahead if you could, please, and identify

21   the cases and/or case numbers of what you would like for me to

22   take judicial notice of.  Yes, and some of them were cited and

23   I'm -- I did look for them and I was able to find the one JD

24   that was listed here.  But go ahead if you could, please.

25        MS. DEVLEMING:  Sure.  So I don't know, do you need the



1     three that are cited in the complaint again?  I'm happy to --

2          JUDGE TRACY:  Well, just --

3          MS. DEVLEMING:  -- if Your Honor --

4          JUDGE TRACY:  -- to be clear.  Just to be clear.

5          MS. DEVLEMING:  Yeah, sure.  So the three cited in the

6     second consolidated complaint are Board Decision 367 NLRB

7     Number 117, a 2019 information request case.

8          JUDGE TRACY:  Okay.

9          MS. DEVLEMING:  And the second -- the second one is 369

10    NLRB Number 61, a 2020 unilateral changes case.

11         JUDGE TRACY:  Okay.

12         MS. DEVLEMING:  And the third and final is an ALJD, which

13    can be found at JD 2620.  And I didn't pull the Westlaw cite,

14    though, so we can find it from that.  It's case 19-CA-232897

15    and the ALJD is dated June 3rd, 2020 about a discriminatory

16    written warning issued to primary employee bargaining

17    representative Ellen Hanson, who will also be a General Counsel

18    witness --

19         JUDGE TRACY:  Okay.

20         MS. DEVLEMING:  -- today, during this hearing.

21         JUDGE TRACY:  Okay.  And then, any other cases?

22         MS. DEVLEMING:  And I can defer to Mr. Roberts, but I do

23    have the case cite for the ALJD that the Board recently auto

24    adopted in March, 2020, involving an information request case

25    against the Union.  That is found at JD SF 0820.  And the



1    Westlaw cite that I do have is 2020 WL 1156844 and that was

2    case 19-CB-234944.

3         JUDGE TRACY:  Okay.  And that was in March 20 -- this past

4    March?

5         MS. DEVLEMING:  March 10th, 2020.

6         JUDGE TRACY:  Okay.  All right.  So these four cases.  Any

7    objections to that or any issues where I shouldn't take

8    judicial notice of the history of this case?

9         MR. ROBERTS:  No, not really.  I mean, they are what they

10   are.  I mean, I would just note for the record that I believe

11   the two Board decisions are all appealed to the Ninth Circuit

12   and pending at this time.  And the JD decision is an exception

13   to the court -- there may be further -- one way or the other,

14   further additional opinions regarding those, but not --

15   whatever relevance they may have, I'll reserve that until I

16   write a brief as to what the relevance is.

17        JUDGE TRACY:  Right, right.

18        MS. YEN:  Just --

19        JUDGE TRACY:  Go ahead.

20        MS. YEN:  Just to clarify and I'm sorry that I don't have

21   the case numbers handy right now, but I can get them for you.

22   My understanding is that the cases that counsel for the General

23   Counsel just listed are not the ones that are currently on

24   appeal to the Ninth Circuit.

25        That there are -- I believe that the ones that are



1    currently on appeal to the Ninth Circuit are a couple of the

2    unilateral change charges, which were consolidated into one

3    hearing or one stipulated record hearing.

4        MR. ROBERTS:  I'm not 100 percent certain.  But whatever

5    they are, they may or may not be on appeal.  I mean, obviously,

6    if the decision comes down from the Court of Appeals or from

7    the Board, then that will clarify the matter.  I just wanted to

8    point out that some of these may not be final decisions, at

9    least at this point in time.

10       JUDGE TRACY:  Yeah.  So you know, when I looked up the

11   three that were listed here, I noticed that it appeared -- I

12   could be wrong -- that the information request at that 367 NLRB

13   Number 117 was closed.  I didn't any appeal of that one.

14       But I did see that the 369 NLRB Number 61, the unilateral

15   change, is before the Ninth Circuit and that there are brief

16   that are due by the people at the General Counsel's side that

17   are due in December.  So that one is outstanding from what my

18   own limited research just to find out where these cases were

19   at.  And then, of course, exceptions filed on this JD.

20       And I didn't know about the CB, so I'll just look that one

21   up as well, you know, at some point just to have that there.

22   And then, obviously, you all will be making the relevance of

23   these prior decisions which we're not going to be relitigating

24   here today, but perhaps provide as back ground material for the

25   allegations that the General Counsel makes, okay.

1        Anything else before the opening statements?  Starting

2    with the General Counsel.

3        MS. DEVLEMING:  Let me double-check, but I think that

4    covered it, Your Honor.  That sounds good.

5        JUDGE TRACY:  Okay.  And Ms. Yen, anything we should talk

6    about before the opening statement?  Anything else?

7        MS. YEN:  No, thank you.

8        JUDGE TRACY:  Okay.  And Mr. Roberts?

9        MR. ROBERTS:  Just one.  I think I may have noted earlier,

10   but there have been some individual employees who have been

11   subpoenaed.  Some of them seem to be under the impression that

12   they need to be on standby for all -- for, like, multiple days.

13   And I was wondering whether in order not to have people, you

14   know, out of work unnecessarily, whether there would be any

15   kind of accommodation that could be made, you know.

16        If they're not going to appear today whether, you know,

17   some -- they could be let know that.  It may help with our

18   scheduling of our operations.

19        MS. DEVLEMING:  I don't think we're going to need

20   employee -- well, some of the employees until next week.  I

21   think I already alluded to Ellen Hanson being a General Counsel

22   witness.  We may well need her by tomorrow, but nobody else, I

23   don't think.

24        JUDGE TRACY:  So what I would suggest is that you guys

25   offline, you know, at the end of today just discuss where



1     you're thinking, what they'll -- who they'll need for the next

2     day.  Because certainly, again, this is a multiple day hearing.

3          So Mr. Roberts, these employees don't need to be on

4     standby every single day.  But I think that as the General

5     Counsel does their case in chief, they have a better idea who

6     they think they'll be able to get to.  And then, that way, that

7     employee should be waiting, but the other employees can be

8     working.  So I'd just leave that to you guys to work that out.

9     It happens all the time, of course.

10         All right.  Well, let's starts then with the opening

11    statement from the General Counsel, which I understand that Ms.

12    Burke is going to be doing.  Go ahead, please.

13         MS. BURKE:  Thank you, Your Honor.  Good morning.  This

14    case involves Respondent's unlawful withdrawal of recognition

15    from a long-time incumbent Union, surface bargaining, threats,

16    and the unilateral changes all of which were aimed at

17    frustrating Respondent's employed for the Court for the

18    Charging Party Union, NABET Local 51.

19         When the Respondent purchased the Portland, Oregon, based

20    telephone station, KOIN-TV, in 2017, it inherited a collective

21    bargaining agreement with NABET.  When that collective

22    bargaining agreement expired in June, 2017, the parties began

23    bargaining for a successor contract and those negotiations

24    continued for two-and-a-half years.  Respondent's actions

25    during those negotiations and immediately thereafter have



1  denied and continue to deny employees their rights under the

2  National Labor Relations Act.

3      During the course of negotiations, Respondent failed to

4  provide information, made unilateral changes to employees'

5  working conditions, and discriminatorily disciplined a Union

6  executive board member and primary employee bargaining

7  representative Ellen Hanson.

8      In fact, in prior cases, the Board has already

9  specifically found Respondent violated section CA 1, 3, and 5

10 of the Act by engaging in this conduct.

11     In addition to the above-described conduct, the

12 negotiations reached a boiling point at the beginning of 2019.

13 Respondent's now former vice-president, Patrick Nevin, began

14 issuing defamatory memos about the Union to unit employees,

15 which he disguised as bargaining updates.

16     Respondent's team also then began to raise a busy

17 negotiator defense stating that it was unavailable to meet for

18 bargaining in May, July, or November, 2019.  When Respondent

19 did agree to meet, it consistently delayed in responding to the

20 Union's good faith proposal on important issues such as health

21 insurance, refused to make proposals of its own, and engaged in

22 further stall tactics, and insisted on discussing nonmandatory

23 subjects ad nauseam.

24     Respondent was also pointedly hostile to Union bargaining

25 team members, often engaging in name calling.  Despite the



1    above, the Union attempted to bargain to the best of its

2    ability.  While Respondent engaged in this conduct at the

3    bargaining table, Respondent also raged a war against the Union

4    in the workplace.  In fact, at the very same time the

5    negotiations were breaking down, the Respondent began a direct

6    attack on the photographer unit employees' working conditions.

7         Not coincidentally, this group of employees includes Ms.

8    Hanson and the two Union stewards, Matthew Rashleigh and Robert

9    Dingwall.  Specifically, Respondent intentionally reassigned

10   targets of bargaining unit work away from the Union's work to

11   nonbargaining employees and made unilateral changes to

12   establish policies regarding the 2020 vacation schedules all

13   without first notifying or bargaining with the Union.

14        When I say a course of conduct at and away from the

15   bargaining table following the parties' last session in

16   December 2019, Respondent abruptly withdrew recognition from

17   the Union and canceled all future bargaining sessions.

18   Respondent formally asked to withdraw recognition at a series

19   of meetings by Former Vice-President Nevin held with unit

20   employees on January 8th of 2020.

21        During those meetings, Mr. Nevin announced that unit

22   employees could perhaps soon expect an across-the-board wage

23   increase, explicitly timing withdrawal recognition in an award

24   of a wage increase.

25        When Respondent was due recognition, it did not have



1     objective evidence of an actual loss of majority support for

2     the Union.  In fact, the Union had not lost majority support.

3          When the Union filed the instant charge alleging that

4     Respondent had unlawfully withdrawn recognition and had a

5     neutral third party present Respondent with objective evidence,

6     the Union still has the support of the majority of the unit

7     employees, the Respondent chose to ignore this evidence.

8     Instead, Respondent doubled down, refused to respond to Union's

9     request to discuss the matter or return to the bargaining

10    table.

11         Shortly thereafter, believing itself to be free of the

12    constraints of the Union, Respondent was uninhibited in swiftly

13    removed the Union's long-standing bulletin boards, canceling

14    additional previously-scheduled bargaining sessions, and

15    instituting its promised unilateral wage increases.

16         In addition, Operations Manager Rick Brown told unit

17    employees to stop discussing the Union or handing out Union

18    bulletins, and instructed them to stop discussing their wages,

19    and threatened them with revocation of the new wage increase

20    that the Respondent had provided after it's withdrawal of

21    recognition if they continued such discussions.

22         To date and despite prior findings of unlawful conduct,

23    and objective evidence by a neutral third party establishing

24    continued majority support for the Union, Respondent remains

25    boldly to violate the Act.  In fact, just last week, Respondent

1    solicited vacation schedules for 2021 for unit photographers

2    and again, failed to follow the established past practice.

3    Such egregious disregard for employees' rights under the

4    National Labor Relations Act cannot stand.

5          Thank you, Your Honor.  Counsel for the General Counsel is

6    ready to proceed.

7          JUDGE TRACY:  All right.  Thank you.

8          And then, Ms. Yen, just to formally ask you, do you have

9    an opening statement at this time?

10         MS. YEN:  No.  At this time, I do not have a separate

11   opening statement, but I will join in the counsel for General

12   Counsel's opening statement.

13         JUDGE TRACY:  All right.  Thank you.

14         And then, Mr. Roberts, would the Respondent like to go

15   ahead with the opening statement or defer till later?

16         MR. ROBERTS:  Yes, I would prefer to go ahead and respond

17   now, if I may.

18         JUDGE TRACY:  Go ahead, please.

19         MR. ROBERTS:  It would not surprise you obviously that we

20   have a diametrically opposed view of this.  The background is

21   relatively undisputed.  Nexstar, which is the largest American

22   television -- local owner of local television media company,

23   has almost 200 stations across the country.  It acquired -- in

24   January of 2017, Nexstar acquired KOIN-TV in Portland, Media

25   General.



1         At the time, the KOIN employees were represented in two

2    separate bargaining units by way of the CWA -- excuse me, the

3    CWA.

4         Now, upon requiring the KOIN location, the company adopted

5    the CBA that was in place, but it was set to expire in July of

6    that year.  So it's only for about a six-month period.  I

7    should note that the company has roughly 42 Union contracts

8    across the nation.  This was but one of those.

9         So in June of 2017, the parties began negotiating sort of

10   a new contract.  They would eventually meet 42 days over a

11   30-month period, between June of 2017 and December of 2019.  It

12   won't really be disputed that the negotiations were difficult

13   and challenging at times.  And to some degree, it was fueled by

14   the differences, if you will, in the personalities and

15   bargaining styles of the negotiators.

16        From the Company's perspective, Ms. Biggs-Adams, who was

17   the negotiator for the Union, was unfocused and volatile at

18   times, prone to outbursts.  I've heard from the opening

19   statement from General Counsel that Respondent's negotiator

20   supposedly used names and epitaphs, and stuff of that nature.

21   We dispute that and we argue or will present evidence to the

22   contrary that it was the other way around.

23        In any event, as a result of this, the progress in 2017

24   and 2018 was somewhat slow.  A mediator was asked -- the

25   Company requested a mediator.  She did appear, I believe,

1    sometime around the spring or so of 2018, and participated in

2    all the sessions thereafter.

3        The evidence will reflect that with her involvement things

4    seemed to -- at least for a time seemed to pick up speed and by

5    the -- and things seemed to be more focused.  And by the end of

6    2018, essentially every noneconomic issue had been resolved,

7    except for approximately two.

8        And the parties had agreed in advance to, as is typical,

9    to negotiate noneconomic issues first and then to defer

10   economic issues primarily to the end.  So by the end of 2018,

11   the only outstanding non- -- truly noneconomic issues that were

12   still outstanding were Union security and Union business, also

13   known as dues checkoff.  I'll get to those in a couple of

14   minutes.

15       You know, the economic issues were essentially what your

16   typical economic issues are:  Wages, benefits, and also there

17   were issues regarding overtime, over eight hours in a day, and

18   overtime on sixth and seventh consecutive workdays.

19       In 2019, the parties began discussing the economics.  As I

20   noted earlier, the Union's -- the Union's security and Union

21   checkoff remained issues.  As you know, we just heard that

22   there's been a modification to the complaint, although the

23   surface bargaining allegations remain.  One of the major

24   theories that we understood in this complaint initially was

25   that the Company had unlawfully insisted upon essentially

1     bargaining the impasse over mandatory -- nonmandatory substance

2     of bargaining.  Those allegations have now been withdrawn.

3          And what -- it will be clear, however, that these issues

4     remain, to some extent, the elephant in the room that precluded

5     the parties from ever being able to bridge the remaining

6     differences on the economic terms.  Specifically, the issue had

7     to do with -- the Company had raised an objection.  The Union's

8     initiation fees which were under the contract, subject to the

9     deduction or dues deduction by the Company or collection by the

10    Company were roughly three weeks of pay, which was for most

11    employees in the neighborhood of $3,000.

12         The Company was experiencing considerable -- considerable

13    difficulties hiring new employees because of this what they

14    viewed as out of -- inordinately high initiation fees.  So

15    there was extended discussion of the collection of the Union

16    initiation fees.

17         The Union took the position that -- which is true, that

18    the amount of the initiation fees, of course, is a nonmandatory

19    subject of bargaining.  And the Company acknowledged that, but

20    made the point that our -- if we're going to collect them, then

21    we need to discuss them.  So eventually, it came to the point

22    where the Company said, okay, we just -- we'll deduct Union

23    dues, but we're not going to collect -- we're not going to

24    assist in collecting your initiation fees.

25         The belief was that that would eliminate the issue about



1    the amount.  The Union could still charge whatever it wanted to

2    charge, but the Company would not assist in collecting them.

3    The Union's representative continued to take the position that

4    this was an issue they weren't going to discuss, even though

5    the Company was not insisting that they reduce or change their

6    initiation fees.  It was simply saying it wasn't going to

7    collect them.  So that issue would, in essence, permeate the

8    bargaining through the end of 2019.

9        And toward the end of 2019, the negotiations became rather

10   unproductive and little was being accomplished because of the

11   inability to get past that -- past that issue.  Now, there's an

12   allegation in the complaint that the Company refused to bargain

13   over healthcare or delayed, that's totally unsupported by what

14   we believe the record evidence will show.  There was -- the

15   Company did make a proposal.  In fact, under the existing

16   contract, the Company's health insurance program was the

17   contractual plan and the Company proposed to continue that

18   plan.

19       The Union raised issues with regard to the coverage of

20   that plan, particularly with regard to the certain health

21   issues, such as abortion and gender dysphoria.  And so there

22   was extended discussion over that.  And even in the latter part

23   of 2019, the parties were looking at alternative plans.  The

24   Union presented evidence of -- or provided documentation of

25   certain other plans.  So there's -- it's totally untrue to say



1    that the Company refused to bargain about health insurance.

2         There's an allegation or several allegations in the

3    complaint that the Company -- and I heard in the opening

4    statement that the Company supposedly relied upon the busy

5    negotiator defense to try to avoid meeting.  That, too, is

6    totally untrue.  As I said, they met 42 times over 30 months.

7         The fact of the matter is, is that when the mediator came

8    in, there were three schedules to accommodate: the mediator's

9    schedule, the Union representative's schedule, and the

10   company's schedule.  And the evidence will reflect that all of

11   the sessions were agreed to mutually by the parties.  Yes, each

12   party at times had difficulty in working around other things,

13   but they -- but there were efforts on both parts to -- both

14   parties or all parties to make that work out.

15        And I think the evidence will reflect that all of the

16   negotiation sessions were by mutual agreement with no

17   complaint, no objection from the Union that, hey, you're

18   refusing to meet at reasonable times or places.

19        As I indicated perhaps off the record, the Company does

20   intend to present evidence regarding the Union's bad faith.

21   The Board has -- in the complaint and as Ms. DeVleming

22   indicated, there are several Board decisions involving the

23   Company.  There's also the one Board decision involving the

24   Union, a refusal to furnish information.  But in addition,

25   there are at least four other occasions where the Union refused



1    to furnish information, resulting in charges that have been

2    settled, but the evidence relating to those is going to be --

3    and in some cases on the very issues that were most affecting

4    the negotiations, unit security and dues checkoff.  The Union

5    refused to furnish information regarding that.

6         On healthcare, the other major issue that's highlighted in

7    the complaint, the Union refused to furnish information on

8    that.  So we believe that -- obviously, negotiations are a

9    bilateral process and you know, each parties' conduct has to be

10   observed in light of the other parties' conduct.  So that's --

11   you know, we will be presenting evidence regarding that.

12        In the end, I'd like to think that, you know, the parties

13   did overall make efforts to reach an agreement.  But it came

14   down to these two issues, particularly unit security and dues

15   checkoff, that in the end made it very difficult for the

16   parties to reach agreement.  So that brings us really to the

17   latter part, December of 2019 and early January of 2020.

18        During that time period, the Company began receiving a

19   number of complaints from employees indicating dissatisfaction

20   with the Union.  These were not solicited by the Company.  It

21   made no effort -- in fact, the Company had -- as I said, they

22   had 42 Union contracts across the country.  There was -- there

23   was no preconceived plan or anything to -- and you're talking

24   about Portland, Oregon, which is not -- not what you would

25   call -- I come from the southeast, which is obviously, you



1   know, a less union friendly area than what you would say up

2   here.  So there was no intent.

3       But at the same time, the Company was not going to ignore

4   when employees started indicating that they no longer supported

5   the Union.  And we believe that we did obtain, you know,

6   objective evidence, so an actual loss of majority status in

7   each unit.  It was untainted and unsolicited.  And based on

8   that, on January 8th of 2020, the Company notified the Union

9   that it was withdrawing recognition.

10      It is true that they made the various changes alluded to

11  by the General Counsel in her opening statement thereafter.

12  But those will all rise or fall with the -- with the withdrawal

13  of recognition.  I mean, if the withdrawal of recognition was

14  lawful, then those changes will be lawful.  If it was not

15  lawful, then those changes will not be lawful.

16      So I don't believe you're going to hear any real dispute

17  over the post-withdrawal facts.  It's more going to be a

18  question of, you know, what are the legal consequences, you

19  know, of that.  So that's the Company's position and we will

20  obviously be presenting evidence to support that.  Thank you.

21      JUDGE TRACY:  All right.  Well, thank you so much.  So

22  now, we will -- after these opening statements, we would go on

23  to our first witness, which would be for the General Counsel.

24      Before we do that, we're going to take a quick break

25  because it's been about an hour and so we can sort of regroup.



1        Ms. DeVleming, who will be your first witness?

2        MS. DEVLEMING:  Ms. Carrie Biggs-Adams.

3        JUDGE TRACY:  Okay.  So is there anything else that we

4   should discuss before we go off the record?

5        MS. DEVLEMING:  I don't think so.  Right.

6        JUDGE TRACY:  Okay.  So what we'll do is let's go off the

7   record.  You know, for some reason, I don't know why my

8   clock -- the NLRB computer system is, like, off.  I don't know

9   why.  So let's take a -- and I'm assuming she's going to be

10  pretty lengthy of a witness, yes.  And she might even go past

11  lunch, like so we would have to take a lunch break.

12       MS. DEVLEMING:  I would assume she will take all day

13  today, at a minimum.

14       JUDGE TRACY:  Okay.  So why don't we do this, let's take a

15  15-minute break.  We'll start at 10:15.  I'll go by my phone,

16  my phone.  It says it's 9:59.  My computer says 10:03.  I'm

17  like, I don't know what.  But we'll start at 10:15.

18       And then what we'll do is we'll aim to -- because I know I

19  have a note, Ms. Yen, wanted to take a break tomorrow at noon

20  tomorrow, if possible.  So let's try to -- at least for these

21  first two days, we'll take a break at noon for about an hour

22  and then we'll resume.  So that way the morning is about three

23  hours, the afternoon is about three hours, and kind of move us

24  along that way.

25       And so we'll just take a break until 10:15.  And so what



1    I'm going to do is I'm just going to turn off my video, put it

2    on mute, and then I'll kind of flick all that stuff back on at

3    10:15.  Okay.  All right.

4         And then, also, I failed to mention for the court

5    reporter.  You know, please do chime in or let us know if at

6    any point you can't hear a witness.  Please do let us know

7    because we should immediately stop and figure out what the

8    problem is.  All right, Claudine?

9         THE COURT REPORTER:  Yes, ma'am.

10        JUDGE TRACY:  All right.  Thank you so much.  All right.

11   So we're going to go off the record until about 10:15, okay.

12   Thank you.

13   (Off the record at 10:01 a.m.)

14        JUDGE TRACY:  So let's go ahead and go back on the record.

15        THE COURT REPORTER:  We are on the record.

16        JUDGE TRACY:  All right.  Ms. DeVleming, did you want to

17   go ahead and call your first witness?

18        MS. DEVLEMING:  Yes, Your Honor.  And just briefly, I'll

19   flag that while we were off the record, Mr. Schiff noted that

20   in our shuffle of joint exhibits, two were missing, and those

21   are now properly uploaded, so.  So if anyone notes the 10:16

22   a.m. timestamp of -- I think they were Joint Exhibit 20 and 49,

23   those are now in.  All right.

24        Your Honor, our first witness is Ms. Biggs-Adams, who is

25   already here to take the witness stand.  Are you going to -- do



1   you need to swear her in?

2        JUDGE TRACY:  Yes, of course.  Yeah.  All right.  Right,

3   thank you.

4        Okay.  So Ms. Biggs, I don't know if you could just state

5   your name for the record.

6        MS. BIGGS-ADAMS:  Carrie, C-A-R-R-I-E, Biggs-Adams,

7   B-I-G-G-S dash A-D-A-M-S.

8        JUDGE TRACY:  Okay.  And if you could go ahead and raise

9   your right hand so we can all see your right hand.  Thank you

10  so much.

11  Whereupon,

12                       **CARRIE BIGGS-ADAMS**

13  having been duly sworn, was called as a witness herein and was

14  examined and testified as follows:

15       JUDGE TRACY:  Okay.  Great.  Thank you so much.  So

16  there's just a few things that I want to remind you about.  You

17  know, I'm not sure if you've testified before at an in-person

18  hearing, but this is really no different.  It's via Zoom.

19  However, there's just some important things that you need to

20  do.

21       Just please be mindful of waiting to respond to a question

22  once it's being finished being asked.  That can be difficult at

23  times if the question sort of trails off or what have you.  But

24  do the best you can because we are having a transcript made of

25  this hearing and I hate for the question and the responses to



1    be cut off in the transcript as inaudible.

2        If someone objects to a question, please don't answer the

3    question and wait for me to rule on it as to whether you should

4    respond or not.

5        The other thing is, if you're having any trouble with your

6    audio or your video, please do not hesitate at all to let us

7    know immediately so we can try to troubleshoot to figure out

8    where the problem is.  And you know, if you -- we can't hear

9    you or what have you, you just wave your hands or do something

10   so that way we know, you know.

11       And the other thing is, if somehow you have a power outage

12   or something happens, try to reboot your computer.  Let's see

13   if you can kind of get back on, leave the hearing, try to come

14   back.  Those are just some tips.  Hopefully, none of that

15   happens.

16       I understand that, prior to the break, that your testimony

17   will be long.  So if there's a point where you need a break,

18   please just ask for a break if you need to.  I'll try to kind

19   of give breaks five minutes here and there, but sometimes it

20   can be difficult as we kind of move along.  Time passes kind of

21   quickly.

22       Now, let me ask you, is there anybody else in the room

23   with you there?

24       THE WITNESS:  No, there is not.  I live in a tiny San

25   Francisco apartment.  I can assure you another life form



1    wouldn't fit.

2         JUDGE TRACY:  Okay.  Do you have anything in front of you?

3         THE WITNESS:  I have a pad of paper which started out

4    blank.  It's the notes I'm taking.

5         JUDGE TRACY:  Okay.  All right.  So you know, I just want

6    to make sure that there's nobody else that's present with you

7    there and that your testimony will be unassisted.  If you have

8    any phones or anything like that, I don't -- I expect that

9    you're not to receive any text messages or corresponding with

10   people in that format.  So your testimony is just as if we were

11   all there in person with you where I have sworn you in.  You're

12   going to be testifying and there would be no assistance

13   provided at all by anybody else, okay.

14        THE WITNESS:  No problem, Your Honor.  I am still having a

15   problem getting into the SharePoint site.  We're corresponding

16   with the contractor who's giving me permission, but so far it

17   hasn't worked.  But I did want to alert you to that.  We worked

18   on it during the break.  He just sent me an email, said try it

19   again, didn't work.

20        JUDGE TRACY:  All right.  Well, in lieu of that for the

21   documents that you'll need to be testifying from, do you -- do

22   you have the documents?  Have they been emailed to you?

23        THE WITNESS:  They have not been emailed to me, so I don't

24   know what their exhibit numbers would be.  The documents --

25   most of the documents probably came from me in the beginning.



1      JUDGE TRACY:  You're right.

2      THE WITNESS:  If they can refer me.  But I'm perfectly

3  happy with using them in a share screen model until we can get

4  this sorted out so that we don't delay the proceeding.

5      JUDGE TRACY:  So Mr. Schiff, are you able to sort of

6  intervene and really kind of elevate it so that way they can

7  work on that so -- to give her access?  And maybe, during a

8  break, she can try again.  If you can send -- you know, just

9  take a moment to send an email or something like that to figure

10 out what -- why she's having trouble?

11     MR. SCHIFF:  Yes, Your Honor.

12     JUDGE TRACY:  Thank you so much.

13     MR. SCHIFF:  Yup.

14     JUDGE TRACY:  All right.  Well, we'll try to keep working

15 on that.  I would just also remind everybody that when

16 you're -- when we take a break or anything like that, just

17 please put mute and turn off your video, don't like leave the

18 meeting or anything like that because then that is a bit of a

19 problem if you leave the meeting and you have to come back in.

20     Now, I'm getting this email from Mr. Schiff.  There is a

21 problem with 49(b) because it's password protected, joint

22 exhibit.

23     MS. DEVLEMING:  I think both it's (b) and (c) are password

24 protected.  I didn't know that it would have to be further

25 manipulated in that way.  I was forced to save it as subparts



1    like that.  It's readable, but it's not editable, because it's

2    secured but I --

3          JUDGE TRACY:  Okay.

4          MS. DEVLEMING:  I'm getting us an unsecured version by the

5    time we get there, which won't be any time soon.

6          JUDGE TRACY:  Okay.  So just keep that, so that way,

7    everybody has access to that document when it's -- when the

8    time comes.  Okay.  All right.

9          And also, Ms. DeVleming, I'm noticing that your audio kind

10   of faded out a little bit there.  So let's hopefully just --

11   whatever you switched it to, hopefully it can kind of sustain

12   itself.  I'll let you know though if I'm -- if somehow you

13   become garbled or something like that, okay?

14         MS. DEVLEMING:  Yes, please.  I changed to the faster

15   internet option, but I'm still having some issues.  So please

16   let me know.

17         JUDGE TRACY:  All right.  Well, so Ms. Biggs-Adams, if you

18   could -- if Ms. DeVleming, if you could go ahead, please.

19         MS. DEVLEMING:  Thank you, Your Honor.

20                         **DIRECT EXAMINATION**

21   Q    BY MS. DEVLEMING:  Good morning, Carrie.  How are you?

22   A    I'm fine.  Thank you.

23   Q    Ready for this marathon of a testimony here?

24   A    I'm ready.  It's a sunny day in San Francisco.  It makes

25   it easier.



1    Q      Great.  So what do you do for a living?

2    A      I'm a union official.

3    Q      What type of union official?

4    A      I represent the members in broadcasting of NABET-CWA Local

5    51 as their local president.

6    Q      How long have you been the local president?

7    A      I've been the local president since October 1 of 2018.

8    Q      And what did you do before October 1 of 2018?

9    A      For two years, I worked with -- with the same local.

10   Q      I don't know if it cut out on anyone else's end, but I

11   didn't hear the -- what you did for the same local --

12   A      I'm sorry.

13   Q      -- here?

14   A      I was a part-time business representative for the local.

15   Q      Perfect.  And it very well might be on my end, so forgive

16   me if I ask for you to repeat things that everybody else has

17   heard.  And before that, what did you do for a living?

18   A      I was a staff representative for the Communications

19   Workers of America.  I worked from the Washington D.C. offices

20   or headquarters of CWA from January of 2001 through August of

21   2016.  I started out as their international affairs

22   representative.  Then I worked for the new skilled CWA and

23   then, my last eight years, I worked for NABET-CWA.

24   Q      And what about even before that?

25   A      Before that, I was an engineer at NBC Burbank.  That's how



1    I started my career in broadcasting.  And I was at different

2    times a local president, a part-time business representative.

3    I had served on national negotiations and then I would take

4    part-time assignments bargaining contracts for other locals.

5    Q    And while you worked in the industry, did you ever receive

6    any recognition for that work?

7    A    I did.  I was honored with two Emmy nominations and one

8    daytime Emmy win as an editor.

9    Q    So let's circle back to today, your role as local

10   president of NABET Local 51 and the Charging Party in this

11   matter.  In your own words, what are your day-to-day duties as

12   local president?

13   A    So we have a small staff and a large number of members and

14   contracts.  I am the only full-time representative

15   administering contracts, negotiating contracts, handling

16   grievances.

17         And then, on the business side of the Union, I supervise

18   our office staff of two clericals.  A lot more fun during a

19   pandemic when we can't all be together in the same place.  So

20   it's keeping track of things while we don't see each other and

21   continue the business of collecting dues, doing financial

22   statements.

23         This year I got to learn how to apply for a PPP loan,

24   something I've never done before.  I guess nobody had to do

25   before 2020.



1          We have contracts with ABC and ESPN for the 18 western

2     states.  So we have a lot of contact with members who are quite

3     remote to us.  Our office is located in San Francisco.  And we

4     have contracts from KOIN in Portland, Oregon, to here in the

5     bay area, as both public broadcasting, commercial broadcasting,

6     Spanish language broadcasting.  I am bilingual, so I handle

7     those issues as well.

8          And then, ABC in Southern California through their own

9     operations, Univision statement -- station in Bakersfield, and

10    a Scripps station in San Louis Obispo.

11    Q    And over your long career, how long have you been involved

12    in drafting bargaining, collective bargaining agreements?

13    A    I became a steward with NABET-CWA the year I was hired at

14    NBC in 1976.  I started going to negotiations on the national

15    level in 1978.  I've been bargaining contracts since then,

16    sometimes by myself, sometimes as larger -- as part of larger

17    committees.

18    Q    If you were to estimate, about how many contracts have you

19    bargained in your career?

20    A    Well over 50.

21    Q    How many of those have been television contracts?

22    A    I did a few in the -- in the newspaper industry when I was

23    assigned to that sector and I have some that are in radio, but

24    I would say at least 40 are broadcast related.

25    Q    In your personal experience, is there any difference



1    between television bargaining and nontelevision bargaining in

2    terms of tones or context?

3    A    Well, television, as you can imagine, is a quite technical

4    industry.  We end up with jurisdictional questions or

5    contractual questions that tie to very specific issues, and

6    maybe technology changes.

7        There may be, does this piece of equipment replace that

8    piece of equipment, is it the same kind of work or has the work

9    changed with the change in technology.

10   Q    And what about personality?  Is there any difference in --

11   at the bargaining table for television bargaining, in your

12   experience?

13   A    In my experience, those newspaper people were much easier

14   because they just weren't quite the same personalities.  In

15   television, we tend to be a lot bigger.  We're a lot more

16   intense because we're working on things down to the 30th of a

17   second.  People -- I represent news photographers who run into

18   burning buildings instead of away from them, as they were

19   logically hopefully taught from childhood.

20       So we're big characters.  We're big people.  There are a

21   lot of emotion that runs through how people feel they're being

22   treated and it's an intense industry.

23   Q    Carrie, have you personally been involved in bargaining

24   for contracts with Respondent in this matter, Nexstar d/b/a

25   KOIN-TV?



1    A    Yes, I have.  I was the spokesperson starting when we

2    opened the contract with Nexstar at KOIN-TV in June of '17 and

3    was the spokesperson throughout.  I was joined by other people.

4    I was joined by a bargaining unit member.  I was -- I was

5    joined for two bargaining dates by the then local president,

6    that's when I was serving as the business representative.  And

7    I was even joined by Ms. Yen for a couple of sessions.

8    Q    Who is Ms. Yen?

9    A    She's our attorney from Weinberg, Roger & Rosenstein

10   (sic).

11   Q    And we'll circle back to the other participants on the

12   Union's bargaining team.  Before we get there, what kind of a

13   business does Respondent run, if you haven't already answered

14   that?

15   A    They are -- they are a television station, KOIN-TV and

16   they have a series of television stations all around the

17   country.  They run mostly by merger and acquisition in most

18   recent years.  So KOIN came to them in the merger from Media

19   General.  KOIN had been part of LIN Media.  It merged with

20   Media General.  Media General merged with Nexstar and that's

21   how they became part of Nexstar.

22   Q    And how many contracts have you personally bargained with

23   KOIN?

24   A    With KOIN, I think I have done five of them.

25   Q    Which ones are those, do you remember the years?



1    A    Well, so I didn't do the initial one.  I didn't organize

2    the unit, Mr. Wilson did.  And then, I came in on the first

3    renewal, which was in 2008.  That was about four owners ago,

4    maybe five.

5    Q    Who's Mr. Wilson?

6    A    Kevin Wilson, our now business representative and local

7    president emeritus.

8    Q    And any others, other than them?

9    A    I did attend the '13, '14, '15 bargaining.  I think there

10    was about two years of bargaining.  It was a two-year contract

11    that got us to 2017.

12    Q    Have you bargained with Nexstar in other locations?

13    A    Yes, I have.  Because my most recent job before taking

14    this job with the local, based in San Francisco, was as a

15    national staff representative for NABET-CWA based in Washington

16    D.C.

17         So I bargained with Nexstar in Connecticut in the New

18    Haven area where there were three contracts at one station.

19    Nexstar purchased a station that I was bargaining with in

20    Wheeling, West Virginia.  So I bargained with them almost

21    immediately before I retired from my position in D.C. and moved

22    back to California.

23    Q    Anywhere else?

24    A    I don't think I bargained any of the others directly.

25    I -- I am aware of them, but I didn't bargain with them while



1    Nexstar owned them.

2    Q    And can you describe for us the unit or units of

3    Respondent's employees involved in the most recent

4    contract-related issues?

5    A    So when KOIN organized, which was done by then Local

6    President Wilson, there was an election and a unit agreed to

7    that voted, and then there was a stipulated unit that was

8    worked out between the parties.  So while they are listed as

9    separate in the contract, many of the members don't even know

10   that they were ever even in two separate bargaining units

11   because it simply didn't impact their working conditions or

12   their work they did.

13       So one unit that -- the larger and technical unit would

14   have the maintenance engineers, the news photographers,

15   editors, master control, although that's a position no longer

16   billed because that work is no longer done in Portland, the

17   maintenance engineers who go up to the transmitter or keep the

18   equipment operating, the folks who do graphics or Teleprompter

19   work that are studio-related work, most of the studio work is

20   now automated but there are some things that still fall to our

21   folks if they need to be done.  So that's the technical unit.

22       And the other unit is a news or production unit.  And so

23   it has the position of content producer.  They are the folks

24   who put the information -- generate and put information up on

25   the website.  They take a news story as it's happening, maybe

1    from the field or maybe from other written coverage, and make

2    sure that the station gets it out to the internet, gets it out

3    to their followers that way.

4        And then we have the commercial production unit that has

5    people who do graphics, also a photographer, but not unused

6    photographer.  So these are people who go out and videotape

7    commercials, editors.  So there are editors on the news side

8    and there are editors on the commercial production side.  I may

9    have missed somebody along in there, but those are the two

10   basic units.

11   Q    Just so the record is really clear, did you just describe

12   three units?  I heard technical.  I heard news or production

13   and then I heard production engineer.

14   A    No.  The news folks are generally in the technical -- do

15   the technical work.

16   Q    So those two are combined?

17   A    That are those two.

18   Q    Okay.  And which one of the -- between the technical unit

19   and the news production unit, which one was the certified and

20   one which was the voluntarily recognized?

21   A    The -- the news unit is the one -- the newsroom unit, the

22   producers assignment desk folk, that was the one that was

23   recognized.

24   Q    Okay.  And so for purposes of -- our purposes during this

25   hearing and for collective bargaining, we're talking about both



1  units and so we might call them one combined unit; is that --

2  A    We really do.  I think that's why some of the members were

3  surprised when they learned there were two units because

4  they're not spelled out in any contract provisions as separate.

5  They are listed as they were certified at the front of the

6  contract, but that (audio interference).

7  Q    Okay.  And I don't know if it broke up for anybody else,

8  but at the very end there it broke up for me.  If you could

9  just repeat maybe the last sentence of what your answer was, if

10  you can remember.  Okay.

11      What's the reason that the employees consider it as a

12  combined unit versus two separate?

13  A    Oh, because the contract provisions that apply to them

14  when they take a meal, when they have lunch, when they go on

15  vacation are applicable to all, all employees.  They're not

16  spelled out separately.

17  Q    And how large is this combined bargaining unit, roughly?

18  A    Roughly 40 to 43 people depending on how many positions

19  there are vacant at any moment.

20  Q    And I'm not sure if we got this clear, so just to make

21  sure it is.  About how long has Local 51 represented the two

22  combined bargaining units?

23  A    Since 2005.

24  Q    Okay.  What has been the typical term of each of the

25  collective bargaining agreements covering these individuals?



1    A    Normally, they've been three-year terms.  The last

2    contract which expired in 2017 was a two-year contract.

3    Q    And was that last contract extended at all?

4    A    It was extended a couple of times in one-month increments.

5    So instead of expiring in July, it expired in September.

6    Q    Of 2017?

7    A    2017.

8    Q    Okay.  So the parties have stipulated in Joint Exhibit

9    1 -- and that's the most recent route of successor contracts

10   already began on June 21st, 27 -- 2017 and the parties then met

11   a total of 42 times in 21 sets of two consecutive dates

12   through -- between that date and December 10th, 2019.

13       So what have the parties practices been rounding

14   scheduling for those bargaining dates?

15   A    Well, over time, I have learned that meeting rooms in

16   Portland can be almost as hard as syncing the calendars of the

17   people who are going to be participating.

18       So from the time we added the federal mediator in 2018,

19   that she came into the process, we had her scheduled, the

20   company schedules, my schedule, and then we had finding a place

21   to meet.  And at certain times of the year, it's almost

22   impossible to get conference rooms in Portland.

23       So I would try to set a date two times out.  So if this is

24   January and we're meeting in January, before I leave there, we

25   would have already had the next set for February, and then the



1    following one after that on the horizon.  So that most often

2    our office manager from our office in San Francisco would be

3    the one reaching out to the hotels to book the conference

4    rooms.

5        We split off who paid for the joint meeting room.  So the

6    Union would pay one time, the Company would pay the other time

7    for the joint session room where we also caucus.  And the

8    Company would have a separate caucus room available for which

9    they pay.  So our office manager, Dee Dee Morua, M-O-R-U-A,

10   would try to reach out to the hotels that I pointed her

11   towards.

12       We met for quite a while at the Marriott, which is about a

13   block from the station, block and a half.  And then, they were

14   in major construction, so they had to come off the list.  We

15   sometimes ended up at the downtown Hilton, which I preferred

16   not to use because it was so far from the station that members

17   couldn't drop in on their lunch hour or their off time to

18   participate.

19       And then a new hotel, called the Porter, during the

20   bargaining, opened up about half a block from KOIN.  And we

21   would try to use them as much as possible, although they had

22   some challenges.  They were not always great about confirming

23   whether a room was available.  And some of their meeting rooms,

24   astonishing for a new hotel in the 21st century, had bad WiFi

25   reception.  So you might not be able to get your cellular

1    service or even with a WiFi hotspot be able to get online, and

2    that doesn't work in this day and age for most of us to be out

3    of touch all day while we're bargaining.

4    Q    Where -- did the parties generally schedule bargaining at

5    the bargaining table or through emails or through phone calls?

6    A    My preference was to discuss it in person at the

7    bargaining table.  So I would try when I could on the first day

8    of bargaining to say, all right, we have next month set or next

9    time set.  What about the one after that?  Can we meet the

10   following month?  This is what I have open.  What do you have

11   open?

12        I find it to be easier if we all do it in person with our

13   books and say, I can do this or I have a conference than to do

14   in person to set it up.  But there were times when something

15   changed or a hotel backed out on us that we would do that by

16   email as well.

17   Q    And as I alluded to, there's a stipulation that you met

18   and set two dates at a time.  Generally, what time would

19   bargaining start on those dates?

20   A    The goal would be to start by 9 a.m.  And the idea is both

21   days, unless the parties said, well, I have a conference call

22   tomorrow or I'm going to be late tomorrow, or we have something

23   else going on tomorrow.

24   Q    And generally, if there was a pattern, what time did

25   bargaining end on those dates?



1    A     Well, on the first day, we would generally stay and try to

2    hold a unit meeting after people got done doing the news.  So

3    at about 6:30 in the evening, we would -- so the Union team

4    would stay in the conference room, meet with members at the end

5    of the day.

6          On the second day, we would be ending in order to travel

7    home.  Portland is -- it's closer visually than it is sometimes

8    for flying from San Francisco.  So there would be times when it

9    got to winter where the last flight out would be at 6 p.m., was

10   the last direct flight back to San Francisco.

11         Otherwise, I'd have to change planes someplace or stop

12   someplace.  There was sometimes a late flight that would stop

13   in Sacramento and come on to Oakland, but it seemed like a lot

14   of extra production to go up and come back down, put people on

15   and off the plane just to try and get what's about an hour and

16   a half, hour and 45-minute flight.

17         MS. DEVLEMING:  We just lost someone.  I don't think it

18   was anyone important.  Was it Attorney Pomerantz?  I don't

19   think we're missing anyone, right?  Looks good to me.  Okay.

20   Q     BY MS. DEVLEMING:  All right.  Carrie, sorry to interrupt.

21   You testified a minute ago about the general ending time for

22   the first day.  We talked about the Union's membership meeting.

23   So roughly, what time would the parties conclude bargaining?

24   A     4, 4-ish, between 4 and 5.

25   Q     That's the first day?



1    A    The first day.

2    Q    Okay.  And then let's get back to where we were before.

3    In addition to yourself, who else joined as members of the

4    Union's bargaining team?

5    A    So we would have one individual with us from the

6    bargaining unit at all times.  For the bulk of this, it has

7    been Ellen Hanson, who's a news photographer, a longtime

8    employee, and currently serves as an executive Board member of

9    our local.  So she has experience as a Union official, a shop

10   steward, and representative.

11       And she stepped up to fill in that position after -- when

12   bargaining started, I had two different people who stepped

13   forward and weren't a great fit with the process, and this

14   often happens with my members.  They're used to being out and

15   about, grab the camera, get in the vehicle, go, drive

16   someplace, do things.  And now, I'd like you to sit in a room

17   and watch paint dry.

18       And it's just that they don't have a lot of experience of

19   sitting and doing nothing, waiting during a caucus or taking

20   notes during a bargaining session.

21   Q    Okay.

22   A    So --

23   Q    You broke up in the middle there just a bit, but I'm not

24   sure we missed anything really substantive.  Right before you

25   said, they don't have experience sitting in a room watching --



1    A    So --

2    Q    -- paint dry and other comments.

3    A    So they are very active people.  They're used to going

4    outside with the news photographers, grabbing a camera, going

5    to it.  An interesting day and new story, they don't

6    necessarily each day even know what they're going to go cover.

7        And it's very different to have the skills of taking

8    notes, keeping track of explicit words, and the turn of a comma

9    can make a difference in an interpretation of language.  It is

10   very different for those who have never done it before.

11   Q    Who were those individuals who weren't a great fit early

12   on?

13   A    So we had Adam Thompson and then we had a second news --

14   we had a second photographer and editor who came from the

15   sports department.  I am, at the moment, not recalling his

16   name, but he was with us briefly.  And then, he had a personal

17   problem going on and he felt he could not devote time to the

18   negotiations.  He had a family matter that was going to take a

19   good deal of his attention.  And so he asked to step back.

20   Q    I think, ultimately, the record will clear up the names,

21   so we won't worry about that for now.  But to be clear though,

22   who had served as the Union's chief spokesperson?

23   A    I have been the chief spokesperson from the beginning to

24   the present.

25   Q    And has anyone else attended bargaining, other than the



1    members of the Union time and Respondent's team?

2    A    No, as I mentioned earlier, Local President Kevin Wilson

3    attended early on in the process.  He joined us at bargaining.

4    In part, because this was a new employer.  This was KOIN and we

5    knew some of the faces on the management team, but it was also

6    new in that it was now owned by Nexstar.  So Local President

7    Wilson joined me for two days.  And then, Ann Yen, as our legal

8    counsel, was in town on an NLRB matter and it was scheduled

9    such that she could participate in the bargaining so that she

10   too could come to the table for a session or two.

11   Q    And we do have the stipulation as to the list of all the

12   names and titles of the individuals who participated on

13   Respondent's bargaining team, but to your recollection, who

14   were you primarily at least dealing with on Respondent's side?

15   A    So when it first began, Tim Busch, who was the president

16   of the corporation, was their spokesperson.  They sometimes had

17   Mr. Pautsch with him, but he was not always there.  And at that

18   time, he was outside counsel.  He was hired on as their staff

19   labor counsel later on in the process.  At the beginning, he

20   was with an outside firm.

21        Then we had Patrick Nevin, who is the vice president and

22   general manager.  We had Rick Brown, who is a technical

23   manager.  He's not a member of the bargaining unit in recent

24   years, who would come with the company.  And Mr. Casey Wenger,

25   W-E-N-G-E-R.  Casey was the business administrator.  He was the



1    person with whom we would coordinate bargaining dates, payments

2    of things, if I needed to send the proposal, it was usually he

3    who was taking the proposals and keeping the records on the

4    company side.  Ms. VelDeming (sic) just disappeared.

5         JUDGE TRACY:  I see her trying to join back in.  Okay.

6    Let's go off the record.

7    (Off the record at 10:50 a.m.)

8         JUDGE TRACY:  All right.  So we're back on the record.  Go

9    ahead, once Claudine says she's ready.

10        THE REPORTER:  On the record.

11        JUDGE TRACY:  Okay, go ahead.

12        MS. DEVLEMING:  Thank you, Your Honor.

13   Q    BY MS. DEVLEMING:  So Carrie, when we had technological

14   issues, I believe you were in the middle of listing who you

15   have dealt with on Respondent's bargaining team

16   A    Yes, I believe I was at Casey Wenger, who is the business

17   administrator for the Employer for a large number of years.  He

18   was the individual with whom we would generally have point of

19   contact about scheduling, needing a document, emailing

20   documents back and forth during bargaining, or needing records

21   of the company as to earnings or employment status.

22        And then Rich Kurtz, K-U-R-T-Z, who was the news director,

23   also came.  And then over time, a few times, the Employer

24   brought other people.  Whether Mr. Wenger wasn't available, so

25   they brought in additional folks to help with their notes and



1    record-keeping.

2    Q    And I -- it probably was just me, but I think I personally

3    cut out right when you were talking about Pat Nevin's

4    involvement.  Can you repeat that part?

5    A    So Pat Nevin was the vice president/general manager of the

6    station.  So he was very often, not always, at the bargaining

7    table.  There were times when he had other pressing business

8    and did not join us.

9    Q    Okay.  So at the outset of bargaining back in June, 2017,

10   did the parties set any of the overall ground rules?

11   A    Pretty basic ones, not in writing.  These were parties who

12   had just finished bargaining a contract less than two years

13   before because it had culminated in July of 2015 for two-year

14   negotiations.  And we agreed that we would exchange our

15   proposals in writing, and that we would try at the end of each

16   day to email the other party the proposals rather than do it as

17   each one was generated.  To be sure we didn't miss one, we

18   would do a wrap-up one at the end of the day.  And sometimes

19   somebody was dashing off for another place and that email might

20   not come for a couple of days, or hey, I didn't get those

21   proposals.  I would have received them maybe physically, but

22   not electronically for a few days later.

23   Q    And you said the parties had just bargained a contract two

24   years before that.  Had you bargained with these individuals

25   before?



1    A    I had not bargained with most of these people, other than

2    Mr. Brown and Mr. Wenger, who had been representatives of the

3    company previously.  But Mr. Nevin was new, obviously Mr. Busch

4    as the president of Nexstar was new, and Mr. Pautsch was new to

5    the relationship.

6    Q    And who was -- who served as Respondent's chief

7    spokesperson?

8    A    If Mr. Pautsch was there, he did.  Early on, he was not

9    always there or we might not see him during the first couple of

10   joint sessions of the day, but then see him at the end of the

11   day, so he had been in their caucus room, but he wasn't

12   necessarily meeting with us.  And in those cases, the

13   spokesperson might be Mr. Busch or sometimes Mr. Nevin.

14   Q    And at some point, did that changed at all?

15   A    Well, it did.  Mr. Busch stopped coming to the

16   negotiations, and we didn't see him anymore.  And then, Mr.

17   Pautsch, once he was added to staff at Nexstar, was definitely

18   there every time.

19   Q    Okay.

20        MS. DEVLEMING:  And at this point, I would like to show

21   Carrie what has been entered into SharePoint and admitted as

22   joint -- as Joint Exhibit 3 and 4.  I guess starting with 3.

23   Q    BY MS. DEVLEMING:  Okay.  Carrie, do you recognize this

24   document?

25   A    Oh, wait, can you go down a little bit, over the Post-It?



1    Yes, that looks like contract proposals for the successor

2    agreement.

3    Q    And it looks like you -- who's Post-It is that there?

4    A    Not mine.

5    Q    Okay.  So this is in evidence as the initial KOIN, June

6    21st, 2017 bargaining proposal.  Does that sound right?

7    A    Very plausible, yes.

8    Q    Okay.  Could you tell, when you reviewed this proposal,

9    kind of what the overall priorities might be for Respondent in

10   this round of bargaining?

11   A    It was pretty stunning.  We had just bargained the

12   contract in great detail.  Two years before, we had

13   restructured.  We'd restructured part of the bargaining unit

14   work.  It had been major negotiations with two different

15   employers during 2015, '16, and then finally our settlement in

16   the summer of '17.  We settled with Media General.  So we had

17   started out bargaining with LIN Media as the owners of KOIN TV,

18   and transitioned to Media General once they had purchased the

19   station.  And then, they had a change of legal representation.

20   So it was three lawyers on the company side as the spokesperson

21   during that '15-'17 negotiations.  And it was very much my

22   feeling that there was not a lot of work that needed to be done

23   to this contract.  We did not come in with extensive proposals,

24   but the company came with about 45.

25   Q    Okay.



1          MS. DEVLEMING:  And can we pull up Joint Exhibit 4.  Oh,

2     I'm sorry, I had it hidden.

3     Q    BY MS. DEVLEMING:  All right.  So Carrie, do you recognize

4     this document?

5     A    Yes, I do.  That was the initial proposal that we made at

6     KOIN TV in June of 2017.

7          MS. DEVLEMING:  Well, maybe, Mr. Schiff, can we scroll a

8     bit to the substance.

9     Q    BY MS. DEVLEMING:  So generally, what were -- you were

10    alluding to this, but maybe an event where he tell -- what were

11    the Union's main priorities in this round of bargaining?

12    A    There were some economic issues, some clean-up of changes

13    in the law.  For instance, we had coverage for domestic

14    partners for healthcare.  We had the decision in Obergefell.

15    I'm going to mangle the poor man's name.  But the U.S. Supreme

16    Court decision was changing the definition of marriage for

17    benefits purposes.  The question was, did the Employer want to

18    change domestic partnership language, require the people being

19    married in order to get benefits, or leave what was there

20    alone?

21          And I also felt very strongly, at that point, that

22    healthcare was probably going to become a national issue again.

23    The Affordable Care ACT was coming and going en vogue.  And it

24    was taking adventures through the court, so we had a proposal

25    that would be how we would handle it if there was a major



1    change in national healthcare law.  Would we reopen the

2    contract?  How would we deal with that issue if that came up?

3    But these were more, I don't want to say, technical issues or

4    minor issues.  They were important in the impacts they have,

5    but we didn't come in to reinvent this wheel.

6         We had just been through it again and we felt that it was

7    working pretty well.  There hadn't been very many grievances at

8    the station.  People were getting along.  Obviously, people

9    wanted raises and there were economic issues because, after a

10   protracted negotiation, folks had gotten a two percent raise --

11   or excuse me, a four percent raise upon settlement.  And then

12   the following year, they had gotten a one percent raise.  So

13   they were already a year past that one percent.  They didn't

14   feel like it was a lot of money.  So there were requests to

15   restructure the wages.

16   Q    And are -- the second consolidated complaint before us

17   today is really predominantly focuses on 2019 bargaining, so I

18   don't want to go too far into the weeds, but maybe if you can

19   give us your personal impression of the tenor and progress of

20   bargaining between June 2017 and the end of 2018.

21   A    So in June of 2017, when we opened negotiations, as I've

22   said, some of these people were new to us.  We've never met Mr.

23   Busch before.  He had bargained with other people in NABET, but

24   I didn't personally know him or had I bargained with him.  And

25   the impression from the company was that they had opened every



1    section of the contract and they felt that these were essential

2    things and they needed to be.  And I felt that Nexstar had

3    stepped up in size quite a bit with the merger of Media

4    General.  They had gone from a company that had maybe 60

5    stations to having 160 stations.  And the Portland market for,

6    as we call it, DMA, the area where you can see their signal,

7    was in the 20s.  And generally, Nexstar had been a smaller

8    market, small cities, smaller places.

9    Q    And how did that relate back to the progress of bargaining

10   in 2017/2018?

11   A    Well, there were things that the company was surprised to

12   see in the contract.  They were unhappy within the contract

13   that are pretty standard provisions for NABET contracts at a TV

14   station.  Not necessarily have they come from an ABC or an NBC

15   contract, but other stations of the same broadcasts lives that

16   we would have.  As I said, I've bargained contracts with

17   Univision, which is a much smaller company, Scripps, KQED,

18   which is a public broadcaster here in San Francisco where we

19   have 11 bargaining units.  So things that we found to be pretty

20   normal for an NABET contract seemed to be a bone of contention

21   as the negotiations opened.

22   Q    What kind of contract provisions are you referring to?

23   A    Well, the contract, because KOIN had been sold so many

24   times, had specific provisions about how much vacation time or

25   holiday time people would have with it specifically listed in



 1    the contract.  And Nexstar was proposing that we take the

 2    company policy so that it would not be locked in for the

 3    duration of the agreement.  We knew that healthcare was going

 4    to be a big issue because it had been a major focus of our

 5    previous negotiations.  And we had eventually settled

 6    healthcare at KOIN so that there was a set Employer

 7    contribution for the healthcare monthly.  It had -- was a

 8    dollar amount that was listed in the contract and had

 9    structured so that members wouldn't see major increases and

10    what their healthcare was going to cost.

11    Q    And --

12    A    And it appeared that they were not going to -- they were

13    not interested in continuing with that paradigm.

14    Q    Okay.  Any other provisions that had you all conflicted in

15    terms of the size of the market that they were surprised by?

16    A    We spent huge amount of time between that June '17 and

17    December of '18 on employee reimbursement and travel time to

18    assignments, and would there be payment for a meal if you were

19    outside the broadcast area, outside the DMA.  We worked with

20    maps, we compared where assignments would go.  Would it be a

21    flat 50-mile distance?  Would it be outside of the DMA in

22    general?  And the DMA is not obviously anything that you see on

23    the ground when you're driving around.  So if you're going to

24    give up payment for a missed lunch period, if you go beyond,

25    say, the state capitol, you need to know, how many people is



1     that going to impact?

2          JUDGE TRACY:  Ms. Biggs-Adams, can I ask -- just interject

3     here.  You're referring to "DMA".  Is that an acronym of

4     something?  If you could just help to clarify it for the

5     record --

6          THE WITNESS:  Yes, this -- they kept the same acronym and

7     got renamed at one point to make it -- it was originally a

8     dominant market area, so a place where the signal of that city

9     was drawn.  So if you were going to buy advertising, you wanted

10    to know whether you were paying for that town 100 miles away,

11    would you get viewers there or not?  Were you just getting them

12    in the center?  And broadcast signals don't go so much in

13    straight lines as they go in contours based on what the

14    mountain locations may be, valleys, where the transmitter is

15    located and far the signal is carried.

16         JUDGE TRACY:  So when you say "DMA 20", what does the 20

17    symbolize?

18         THE WITNESS:  So the Nielsen Company, which also does

19    ratings of television shows to tell you that this was the

20    first -- the number one rated show last week with people ages

21    18 to 25.  Also, rates each television market based on how big

22    (audio interference).  And they go from number 1, which is, I

23    believe, still New York City, into about the 212 or '15

24    markets, which are very, very small places with very, very

25    small crews, and very, very small viewership.



1        JUDGE TRACY:  Thank you.  Sorry to interrupt, but --

2        THE WITNESS:  That's okay.  So a station would care very

3    much if they got a higher ranking number because it would mean

4    they could probably charge more for their advertising and have

5    more viewers in their geographical area.

6        JUDGE TRACY:  Okay, thank you.  Ms. DeVleming, go ahead

7    please.

8        MS. DEVLEMING:  Thank you, Your Honor.

9    Q    BY MS. DEVLEMING:  So you have been here throughout the

10   hearing so far as part of your representative, right, Carrie?

11   Can you answer verbally?

12   A    Yes.

13   Q    So you probably then heard Respondent's opening statement

14   talking about the progress made during 2017 and 2018, reaching

15   TA's on non-economic items.  Do you agree that it was at least

16   relatively good progress in 2017/2018?

17   A    It was, could I call it, herky-jerky.  It was not a linear

18   progression.  Some negotiations, once you start and you get

19   some -- some settlements between you, you get to know the style

20   of the opposing spokesperson, you can then start to build on

21   those relationships.  This didn't have that kind of smoothing

22   experience.  It was more like the experience when I sat in the

23   car and I taught my then 16-year-old daughter to drive a stick

24   shift.  There were moments where it would -- she'd get it in

25   fourth, we were going fast enough that it'd be okay, but then



1    we have to down shift for a stoplight and progress would halt.

2    Sometimes it was what subject we were bargaining on because

3    they were more emotional impact.  And sometimes they were

4    just -- they were just difficult negotiations.

5    Q    How would you characterize -- how did 2019 bargaining

6    compare?

7    A    2019 bargaining got much harder.

8    Q    In what ways?

9    A    Well, for one thing, we had removed some of the issues, so

10   if it we resolved an issue, we no longer had that one to work

11   with to try and make forward progress.  It became more

12   difficult, when we had the issue of short turnaround, which is

13   a payment for working less than 12 hours off between shifts.

14   And we thought we had finally come to an understanding about

15   short turnaround.  We had reached a tentative agreement on the

16   existing contract language.  And then suddenly, it was getting

17   worded differently in the workplace.  And this, of course, is

18   where no language had changed.  And now I had a series of very

19   upset members who knew how this penalty had been paid over the

20   years, and suddenly it wasn't being paid.

21   Q    Can you explain for a lay observer or listener or reader

22   of the transcript what short turnaround refers to?

23   A    So in theory, if you have an office job, it gets to be 5

24   or 6:00 in the evening and you go home.  And if you're lucky,

25   you don't get bothered again by your work until the next



 1    morning when you're due back in the office at 9 in the morning.

 2        In television, we're working 24/7 because we're collecting

 3    news at different times of the day.  Some people need to be in

 4    the station to broadcast in the middle of the night should

 5    something happen, or start very early because they're preparing

 6    for a 4 or 5 a.m. morning news show, so they need to edit and

 7    assemble material that will be used.  You wake up in the

 8    morning and roll over and turn on the TV.  We have been there

 9    all night making sure that there's video and audio to be

10    presented to you.

11        So we have people who are asked to stay.  And tradition in

12    television is that people never are allowed to refuse overtime.

13    It is not necessarily written into the contract, but it is the

14    practice that you really have to be having something major

15    before you can say it's 5:00 and I have a date tonight, I need

16    to go home.  If the employer tells you to stay, our members

17    stay and do the work.  I can tell you that if it was a breaking

18    news story situation, for instance, the weather turns bad, that

19    happens a lot in Portland, it gets snowy or icy, and then

20    there's a lot of news to be made, vehicles sliding down the

21    street sideways.  Hopefully, nobody gets hurt in those

22    adventures, but we have to have people who work all the time to

23    get those news stories, and they have to be in position.  So if

24    there's going to be an ice storm, people will sometimes be

25    brought into the station early so that they're not at home



1    trying to come to work or trying to go out to cover a news

2    story, and it's too icy, the vehicle won't go.

3        So to protect people having time off, we have come up with

4    a theory of short turnaround, and that is how many hours you

5    have to have between shifts, or if you get less than the

6    regular turnaround period, you are paid a dollar amount for

7    each hour that you have an incursion into the protected window.

8    So some contracts spell that out as a dollar amount.  If you

9    work less than 12 hours off, you will get $10 per hour that you

10   incur into that 12-hour period.  That, of course, then means

11   that each time you bargain, that's the dollar amount that you

12   have to negotiate up.  It doesn't progress with the pay rate.

13       So in many of our contracts, we express it in an hourly

14   wage amount.  You will get an hour of straight time for each

15   hour incursion between the 12 hours off.  Now, if there was

16   overtime that was worked in there, and there might be or not

17   might be, depending on how you had been scheduled, you would

18   get overtime for the hours worked in excessive eight, which was

19   provided in the contract, and then you would get the premium or

20   penalty of short turnaround for each hour less than 12 that you

21   had off.

22   Q    Thank you.  Any -- maybe just briefly for now, because

23   unfortunately, we're going to go more into the back and forth

24   on these things, but other hot button 2019 unresolved issues?

25   A    So overtime after eight hours in a day was a very

1    contentious issue because members were afraid that if they

2    didn't get overtime after eight and they then worked 12 hours

3    on Monday, but on Friday they were told that they could go home

4    early and worked four hours, they would achieve only an extra

5    number of hours of straight time hours, not time and a half

6    hours.  So there was concern about that.  The sixth and seventh

7    day concepts are not just on the sixth day of the week but

8    might be the sixth consecutive day of work.  Because we're not

9    the kind of traditional industry where we have Monday through

10   Friday work, and Friday night, we all wave goodbye and close

11   the place up and come back again on Monday.  So days off tend

12   to change.  They are flexible.  They can be moved according to

13   the contract.  So you might have Saturday and Sunday as your

14   days off, and then the next week, you might work -- you might

15   (audio interference).

16       And you would have worked six consecutive days or seven

17   consecutive days, and those are additional premiums that are

18   charged for that.  Because you're not getting to be home with

19   your family on what would have been those traditional days off,

20   even if they were just yours and the family was used to seeing

21   you on Thursday and Friday.  If your days off had to change,

22   they did, you worked, and we try to keep money as an incentive

23   to the -- the member to do the more onerous work or assignment,

24   and also as an incentive to the employer to not change things

25   around as much.  You know, it doesn't matter what the premium

1    is if you never pay it.

2    Q    So you talked a lot about short turnaround, overtime,

3    sixth and seventh day, any other issues that weren't kind of --

4    I see those as being in an overtime bucket.  Any other

5    outstanding 2019 issues that were the main sticking points?

6    A    Well, the -- as I think I mentioned, from the beginning,

7    we had the vacation issue, the holiday issue, because there was

8    a proposal to fix up the company handbook and whatever they

9    were offering on those issues at the time.  And then, the

10   healthcare really ran through the entire negotiations in an

11   effort to find a way that we could give people a stability, as

12   best you can, within healthcare bargaining so that people would

13   know what their costs would be for their share of the premium.

14   Because if you're going to pay an extra $200 a month, your

15   personal finances won't work through that extra $200 a month

16   unless you get a raise of $200 a month or more.

17        So it was an economic and very emotional issue, and more

18   so because, as I say, the employer had changed at the station

19   quite often.  We would sometimes joke that, it's been 18

20   months, it's time for whoever the current owner is to sell this

21   place.  And it did, for quite a while, turn over every 18

22   months to every two years.

23   Q    Had other economic issues been resolved at this point?

24   A    Not many.  We -- I mean, we had finally come to some sort

25   of an understanding about the expenses in the field.  If you



1    were going outside the DMA, or how far you were going, so that

2    people would know what they were entitled to, but not major

3    economic issues that are on the top of my mind.

4    Q    What about wages?

5    A    Oh, we were definitely a long ways from wages.  The

6    contract, the predecessor contract, was structured so that it

7    had a minimum in-hire rate and then a raise six months later.

8    And then, if you worked for years at KOIN-TV -- and many people

9    did -- there are a cadre of long-term employees at the

10   station -- they would only get the percentage of the contract

11   settlement.  So there was not a second or third tier, or excuse

12   me, third or fourth tier at a year, two years, four years, five

13   years.

14        I have different contracts with different escalator

15   provisions in them so that people are making a progression as

16   they work in the craft and have been at the station longer.

17   That's a real advantage to an employer because they don't have

18   to retrain.  They -- if -- if you bring a news photographer

19   from one town to another, they won't know how to get to the

20   courthouse, that there's a back door to the side of it.  City

21   hall, that's the best way in when you're going to a press

22   conference.  There's a lot of that knowledge that comes with

23   working in the market and understanding the company's culture

24   and equipment so that they know how things work.  And -- and if

25   you turn over a lot, you spend a lot of time training people

1    and why we do it that way here.

2    Q   Okay, and we'll more into the specific proposals as we go

3    along, so let's move on.

4        MS. DEVLEMING:  Mr. Schiff, can we pull up Joint Exhibit

5    17?

6        JUDGE TRACY:  And while you're pulling that up, I just

7    want to be clear from the prior testimony here, Ms. Biggs-

8    Adams.  You were talking about what -- the questions were

9    referring to what was accomplished or not accomplished or

10   outstanding by the end of 2018; is that correct?

11       THE WITNESS:  Yes, in a broader stroke rather than a

12   point-by-point.

13       JUDGE TRACY:  Okay.

14       MS. DEVLEMING:  The most recent round was about 2019,

15   centering in on what was remaining in 2019 and comparing that

16   to 2017, 2018.

17       JUDGE TRACY:  Okay.  That would be helpful, if you could

18   answer that.

19       MS. DEVLEMING:  Oh, I think she already did, so all -- the

20   last five or six questions from me --

21       JUDGE TRACY:  Okay.

22       MS. DEVLEMING:  -- were about 2019.

23       JUDGE TRACY:  Okay, okay.  Thank you.

24   Q   BY MS. DEVLEMING:  Okay, so Carrie, if you can see Joint

25   Exhibit 17, and it's quite a lengthy document, but if we can



1    slowly scroll through it --

2        MS. DEVLEMING:  Mr. Schiff?  And just maybe more quickly

3    scroll all the way to the end to show what it includes.

4    Q    BY MS. DEVLEMING:  So Carrie, do you recognize these

5    documents?

6    A    I do.  These are bargaining bulletins, generally, as

7    pulled from software that we use called Constant Contact.  So

8    when we would finish a round of bargaining or have something

9    happen, we would generate a bargaining bulletin.  That would,

10   as much as possible, be my task on the second day of

11   bargaining, to generate the bargaining bulletin, get it into my

12   office in San Francisco for distribution before I left the

13   bargaining table and headed for the airport.

14   Q    So is it your testimony that you drafted these?

15   A    It is.

16   Q    And what was the audience or purpose?

17   A    It was to bring our members up to date on what had gone on

18   at the bargaining table.  While we would invite them to come

19   and sit in and watch in person, it just was not all that

20   practical for them to do that.  There were times when

21   individuals came for the whole day on a day off, but if they

22   were working or they worked a different day part, it wasn't

23   easy for people to come in a observe the negotiations.  So the

24   goal of the bulletin was to give them the flavor and the facts

25   of what had gone on.



1    Q    Okay, and looking at -- just as an example, let's look at

2    bargaining bulletin number 26, which I believe starts on Bates

3    33.  So it starts "our first bargaining session".  So to the

4    extent of this one and perhaps others, summarized bargaining,

5    is it your -- well, do they -- from your perspective, are they

6    accurate summaries of what happened at the bargaining table on

7    those dates?

8    A    Yes, it was very important to me to write an updated

9    document to explain what had happened, what new proposals had

10   been received, what new issues might be open, and what had been

11   resolved, so that the members what had gone on.

12        Okay.  Thank you, Mr. Schiff.  Can we next show her Joint

13   Exhibit 13, which is just as lengthy of a document, I think,

14   maybe a little shorter.  Okay, so same thing; can we scroll

15   through slowly?

16   Q    BY MS. DEVLEMING:  And Carrie, can you see this?  And kind

17   of take a minute to review; do you recognize these documents,

18   Carrie?

19   A    I -- I do.  So they're --

20   Q    What are they?

21   A    -- two versions of the same material.  One is the

22   handwritten notes that I would take during bargaining while

23   being the spokesperson.  And the other are transcribed; those

24   are the typed versions of those notes, which were done most

25   recently for the purpose of this hearing, trial.


www.escribers.net | 800-257-0885

1    Q    And why did you do that, transcribe?

2    A    At your request because I was concerned that my

3    handwriting, especially when I'm writing for myself, is not

4    particularly legible.

5    Q    And are the transcribed versions, to the best of your

6    knowledge, ability, exact transcriptions of your handwriting?

7    A    That's what I tried to do.  I didn't fill out the words

8    that I wouldn't have written down; I just typed a typed version

9    of what was handwritten.

10   Q    And from your perspective, the transcribed and the

11   handwritten versions, are these accurate descriptions of

12   discussions and proposals had at the bargaining table?

13   A    Absolutely.  But I was the spokesperson, so I was not

14   taking the kind of notes that I would if I were a member of a

15   bargaining committee and someone else were the spokesperson.  I

16   would probably have ten times the length of proposal -- of --

17   of notes if I were simply taking notes in a session.  But I was

18   doing the talking, so these were small notations, something the

19   company said, something I might want to add to a bulletin,

20   something I'd need to go back and check with our legal counsel.

21        MS. DEVLEMING:  All right.  Mr. Schiff, can we pull up

22   Joint Exhibit 14?

23        JUDGE TRACY:  And again, Ms. Biggs-Adams, the Joint

24   Exhibit 13, those were all your own handwritten notes, and then

25   you're the one who typed them up afterwards?



1          (No audible response)

2          JUDGE TRACY:  Okay.  Thank you.

3          MS. DEVLEMING:  And same thing with Joint Exhibit 14, Mr.

4    Schiff.  If we can slowly scroll through it and give Carrie a

5    minute to look at that longer document?  Okay.

6    Q    BY MS. DEVLEMING:  Carrie, do you recognize these

7    documents?

8    A    I do.  These are the bargaining notes that were taken by

9    Ellen Hansen, who would type hers during the bargaining

10   session.

11   Q    And why did she take notes?

12   A    One of the things that I need to assist me in bargaining

13   is somebody else listening and taking notes.  I could actually

14   slow down and take better, more in-depth notes, but it's an

15   advantage to me to have a member of the bargaining unit

16   listening carefully.  So if they're carefully listening to take

17   notes, they will hear other things than if they were just

18   casual observers.  And so Ms. Hansen would take these on an

19   iPad, sometimes with a keyboard, and then maybe clean them up,

20   maybe not clean them up, and then send them to me for our

21   records.

22   Q    And question as to both these and the handwritten notes in

23   Joint Exhibit 13, your handwritten notes:  just to be clear, is

24   it your testimony that they were taken during or immediately

25   after each respective bargaining session?



1    A    That is correct.

2    Q    Did you review Ellen Hansen's notes in Joint Exhibit 14,

3    after she sent them to you, for general accuracy?

4    A    I generally did.  She was ill at one time and had an eye

5    problem that kept her out of work and requiring surgery.  I

6    (audio interference) she was well enough to be able to see and

7    take notes before we would schedule bargaining again.

8    Q    Okay, and as to the ones you reviewed, or having now

9    reviewed -- have you now reviewed all of Ellen Hansen's notes?

10   Are they --

11   A    I --

12   Q    Are they mostly accurate as to your recollection from

13   bargaining?

14   A    They are.

15   Q    Okay, and here, Carrie, I'll ask you:  if I were

16   hypothetically to ask you what happened at 3:30 p.m. on April

17   23rd, 2019 at the bargaining table, is that a question you

18   would be able to answer from memory?

19   A    No.

20   Q    Would anything help you to remember what might have

21   happened at 3:30 on April 23rd?

22   A    My handwritten notes or Ellen's notes.  The transcribed

23   notes are just the same as the handwritten notes, so they would

24   be interchangeable.

25        MS. DEVLEMING:  So rather than doing this over and over



1    again, Your Honor, of course I'm going to probe the witness'

2    testimony from recollection.  But I hope that -- obviously, I

3    expect that Mr. Roberts may do the same with his witnesses, but

4    I hope we can understand that the notes can be a helpful tool

5    to refresh Ms. Biggs-Adams' recollection about the specifics in

6    terms of details of proposals, details of discussions, at each

7    respective session.

8        MR. ROBERTS:  Just let me comment.  I mean, obviously, her

9    memory has to be exhausted first.  And I don't know if we've

10    fully established that at the moment other than asking whether

11    she can recall what was said at a specific time.  We might --

12    this is just my suggestion.  It might be more helpful if you

13    asked what she could recall about that meeting, and then let's

14    exhaust that.  And then, my understanding of how it works is

15    that, then, you show her the notes and let her review it, and

16    then take them away and let her testify from memory, if that's

17    what you're trying to do, is refresh her recollection.  I don't

18    think the foundation, really, has been fully laid at this

19    point.

20        MS. DEVLEMING:  Sure.  Again, I intend to do that with

21    each session.  I just think it's going to kind of be quite a

22    game to do it over and over again.  I'm just flagging that, you

23    know -- I agree with you.  I think we'll get there with each

24    session.

25        MR. ROBERTS:  I don't want to make this more complex.  I'm



1    certainly not trying to lengthen it.  I just don't know that

2    having her read the notes and then testify from them, you know,

3    is the right way to go about it.  But I'm not really objecting.

4    I don't know -- I'm not saying this very well.  I'm not really

5    objecting, but it just seems to me that we might be jumping a

6    little bit ahead, Your Honor.

7        JUDGE TRACY:  Right, so it sounds like -- and let me -- I

8    hope that I'm understanding you guys correctly.  Obviously,

9    you're going to be -- it sounds like you're going to be, Ms.

10   DeVleming, going through each of the sessions with her.  And so

11   certainly, I would expect for you to -- to the best of her

12   memory, is to ask her to recall what she recalls from session

13   1, let's say, what happened during that time.

14       And then, if there are specific details that she can't

15   recall because, you know, that's to be expected, then at that

16   point is when you refer to the notes.  But also, the notes,

17   then, also speak for themselves, so we don't want to, kind of,

18   belabor some of this stuff that's already in the notes, but

19   certainly, so you know, I would expect for you to first ask,

20   you know, what do you recall from these sessions.  I'm

21   expecting that some sessions had something particularly

22   significant that occurred during them and others didn't.

23       So I think that that -- I think that's what it sounds like

24   everybody is agreeing to do, and I'm sure that Mr. Roberts, as

25   you said, will do that with his own witness.  So I think, if we

1    proceed that way, that would be perfectly fine with me.

2        And I don't think that we'll need to take another break,

3    unless somebody needs to, before we take -- we'll take a

4    lunchbreak at 12, 12 to 1.

5        Okay, so if we could go ahead, Ms. DeVleming?

6        MS. DEVLEMING:  Thank you, Your Honor.

7    Q    BY MS. DEVLEMING:  All right, so Carrie, turning -- again,

8    as parties stipulated to all the dates of bargaining, I'm going

9    to dive in with 2019, so turning to the first 2019 bargaining

10   session, January 24th, 2019.  I don't know if we still have

11   Joint Exhibit 14 and 13 up, but I will just note for the record

12   that there are no -- I'm sorry.  In Joint Exhibit 13, your

13   notes, there are no 24 or 25 bargaining notes; why is that?

14   A    Those poor notes who had to travel back and forth to

15   Portland every time, because they were in binders, so I would

16   carry a large quantity of paper.  But they had not been typed

17   or transcribed, so they just -- the handwritten notes were all

18   that existed.  Somewhere amongst the adventures between all the

19   traveling since January of 2019, taking apart all my bargaining

20   books in order to prepare evidence to file these charges, and

21   then COVID because no longer do I work out of an office, I work

22   out of home, stuff gets moved around quite a bit.  And they

23   (audio interference) --

24       MS. DEVLEMING:  Can we pull up Joint Exhibit 11, please,

25   Mr. Schiff?



1    Q    BY MS. DEVLEMING:  Now, Carrie, take a second to look at

2    this, and maybe we can scroll.  I think it's multiple pages.

3    Do you recognize this document?

4    A    I do.  It's a company package proposal.

5    Q    And the date?

6    A    I believe it was January 24th of 2019.

7    Q    So is this the package proposal you received on that date

8    from KOIN?

9    A    Yes, it is, and when you first went by it, it showed the

10   time up in the upper righthand corner; looks like I got it at

11   12:18 p.m.

12   Q    Okay, and do you remember what you did after receiving it?

13   A    Well, it was a combination of economic offers, some of

14   which were new, and I went through it point by point.  So I

15   would say my normal pattern would be:  to get an offer like

16   that, have a lunchbreak at the middle of the day, use that time

17   to research the proposal, see what its implications were, its

18   impact on other language, and of course, break for lunch.

19   Q    And when you say it was a package, a combination of some

20   economic proposals, was there a wage proposal in this package?

21   A    There was not.

22   Q    All right.  Do you recall anything else important from the

23   January 24th bargaining session?

24   A    I see that my old friend C-47 is there, and I believe that

25   was the first indemnification proposal, in C-47.



1    MS. DEVLEMING:  Okay.  Can we scroll to the bottom to C-

2    47, Mr. Schiff?  I think it's toward the very end, maybe the

3    last page.

4    Q    BY MS. DEVLEMING:  Okay, so just generally, what was your

5    understanding of the proposal here, Carrie?

6    A    So this was a new language about the union indemnifying

7    the company for certain actions or claims against them, new

8    concept to the bargaining, not one that I generally have in

9    contracts.  And I was very concerned about our exposure in

10   paying for their defense because the union was not going to be

11   the one calling -- picking the lawyer, but I was going to be

12   responsible for the bill on our side.  And that didn't seem to

13   me like a good idea.

14   Q    And just for the record, we were talking about Joint

15   Exhibit 11, Bates number -- well, mine doesn't have a Bates.

16       MS. DEVLEMING:  Does yours have a Bates?  Oh, it didn't

17   get Bates yet.

18   Q    BY MS. DEVLEMING:  It's the last page of Joint Exhibit 11?

19   A    So January 24th, I believe, is the handwritten notation

20   from me at the top of that page.

21       MS. DEVLEMING:  All right.  Okay, and then, if we could

22   scroll up to -- and I'm sorry this didn't get Bates stamped.  I

23   could have sworn I had Bates'd on all the longer documents.

24   But to page -- page 6, I believe it is.  It's KOIN proposal C-

25   5, article 2, "union security".  Okay, so -- wait a minute.



1    It's kind of jumping around.  Okay.  It's going down.  I

2    have -- I'm trying to flip my screen right.  All right.

3    Q    BY MS. DEVLEMING:  Carrie, do you see that?

4    A    Yes, I do.

5    Q    And is there anything noteworthy in that proposal?

6    A    Well, it's the article "to union security" language, and

7    it, I believe, adds some new concepts.  It's now at a size that

8    I can't actually read it anymore, so I can't tell you what

9    the -- so the company agrees "as a condition of employment" has

10   been removed and "that people should remain in good standing"

11   has been removed, "during their tenure as members of the

12   bargaining unit" and "as members of the bargaining

13   representative union".

14   Q    Okay, and then, maybe the next page, article 3, what was

15   important from this proposal?  What did you take away from it?

16   A    So the issue of Social Security numbers had been

17   contentious from the very beginning of the bargaining.  And

18   this is because our union local is part of not only NABET on a

19   national level, but we are part of CWA, the Communications

20   Workers of America.  And our dues processing, we are a bottom-

21   up local.  We collect the dues.  We process the dues, and we

22   send data and money to CWA, and CWA has been tied,

23   traditionally, for their dues systems using a Social Security

24   number to identify unique individuals.

25        There are generally 700,000 members working in CWA,



1    sometimes worldwide, at any one time, and that means there

2    could be a large number of people with the same name.  The way

3    they are identified is by their Social Security number, being

4    their unique identifier.  And the company felt strongly that

5    the Social Security numbers should not be provided on -- in

6    recordkeeping purposes.

7         And from the beginning of the negotiations, that had been

8    difficult for me because Mr. Wilson has been part of a new

9    member tracking software that our local has been developing.

10   And we also knew that CWA was rolling out a new system, that

11   they did in fact roll out in 2019, called Aptify.  And we

12   needed to be compliant within Aptify so that, when we sent our

13   records to Washington electronically, they would know which

14   John Jones those dues were to be credited for.

15        And in broadcasting, lots of people work for multiple

16   employers, so it's not as though they were just able to have a

17   unique identifier for KOIN-TV if they also did work, say, for

18   ESPN or ABC.  As they came through the area or they traveled to

19   some other part of the country for a broadcast, we needed to be

20   able to track their earnings and their dues and make sure they

21   were properly credited.

22        MS. DEVLEMING:  And then, if we scroll to the next page,

23   Mr. Schiff?

24   Q    BY MS. DEVLEMING:  There's a few more things crossed out

25   here.  What was the key takeaway from these proposals?



1    A    Can we get that just a hair bigger?  Thank you.  So

2    removed from the second paragraph on this page is the

3    irrevocable period of the dues checkoff form.  So our members

4    have worked under, and we follow, a system which we believe to

5    be totally legal and compliant, that you are under a dues

6    checkoff agreement to have your dues and/or initiation fee

7    deducted from your pay as you are paid and then remitted to the

8    union.  And if you want to end that, the lined-out paragraph at

9    the very bottom of the screen right now is the language about

10   the window and when you have to give notice and when you have

11   to get out.  And the Employer was proposing to change the

12   document, because this is the language of the dues checkoff

13   form, that it would note they were removing both "irrevocable"

14   and "irrevocable for a period" -- for a period of one year".

15        MS. DEVLEMING:  And then, the next two pages, Mr. Schiff.

16   Q    BY MS. DEVLEMING:  It looks like C-17 had a proposal on

17   article 8.4, and C-18, a proposal on article 8.5?

18   A    Yes.

19   Q    Briefly, I know we've talked about this issue.  Briefly,

20   what were the salient points here?

21   A    So C-17 is hours worked in excess of eight hours in a day,

22   which is being crossed out there, and 40 hours in a week shall

23   be at time and a half, so that's a very explicit change, for

24   daily overtime to be removed.  The company was adding a concern

25   that people were working without the prior approval of their



1    supervisor.

2        We had to have lengthy conversation about that because,

3    when you were on a news story, you may be on a news story where

4    your signal is not very good, you can't reach your boss, you're

5    supposed to be covering -- you've gone to cover the brush fire

6    and spending your time trying to get a hold of the assignment

7    desk to say, hey, can I work overtime.

8        The company knew they sent you far away from where the

9    station is and that your shift was ending.  And as I said

10    earlier in my testimony, our members do not arrive at the end

11    of the day and just say, okay, it's 6:00, I'm clocking out, I'm

12    going home.  They would be expected to stay at that news story

13    and keep working, but adding a requirement that they handshake

14    with a supervisor or department manager could be onerous or

15    difficult.

16        JUDGE TRACY:  And I'm sorry I keep interrupting, but I

17    just want to be clear for the record.  When I'm looking Joint

18    Exhibit 11, which it looks like is the Respondent's proposals

19    that were presented on January 24th, the language that's there

20    -- like, for example, the page that we're all looking at, which

21    is C-17, that page -- that's the language that's coming from

22    the prior agreement?  And then, the Respondent's proposal is

23    blanking out or crossing out certain portions, and then they're

24    adding in the certain portions there that are underlined and in

25    bold?  I just want to be clear for the record.  Is that right?



 1        THE WITNESS:  That is the way we had agreed to do it, that

 2   you would cross out and highlight so that you could see what

 3   was being removed, and that you would underline and embolden

 4   anything that was new.  Now, generally, that was from the

 5   previous contract.  But after you get deep in the weeds on some

 6   of this stuff, exchanging proposals back and forth, sometimes

 7   you wouldn't propose the change back to the original contract

 8   language; it would be to your previous contract proposal on

 9   this issue.

10        JUDGE TRACY:  Right, okay.  Thank you.

11        THE WITNESS:  Um-hum.

12   Q    BY MS. DEVLEMING:  And that takes us back to what we

13   already talked about, D-4, D-7, so let's turn to January 25th's

14   bargaining, 2019.  Again, no notes from you because they got

15   lost.  Do you remember what happened that day?

16   A    Independently, no.

17   Q    You had just received this January 24th package; did you

18   discuss it?

19   A    Yes, and we were still discussing the many items that were

20   in here because, as you saw, that was a pretty extensive

21   proposal --

22   Q    (Audio interference) --

23   A    -- with, I guess, eight things in there.

24   Q    Sorry about that.  Do you remember any specific proposals

25   that you discussed on January 25th?



1    A    Not at this point.  Maybe some coffee will help

2         MS. DEVLEMING:  Okay, or maybe we can pull up Joint

3    Exhibit -- and I guess this will be hard to kind of have both

4    at once, or I don't know if we need both at once.  For now,

5    though, Joint Exhibit 14, which was notetaker Ellen Hansen's

6    notes.  Okay.

7    Q    BY MS. DEVLEMING:  So if you were to look at -- I think

8    it's Bates 2 of the January 25th notes; does this refresh you,

9    briefly, on maybe the first specific proposal the parties

10   discussed that day?

11   A    So yeah, it talks about the indemnification proposal.

12   Because it was a new proposal, I had questions for Mr. Pautsch.

13   This had, we felt, deep origins in a situation that had come up

14   during negotiations, during the period of negotiations, where

15   the Employer had instituted a new driving background check

16   methodology, which people started to find, when they logged in

17   to turn their timesheet in, suddenly, they could not proceed

18   until they filled out an indemnification form and gave

19   background check permission to the employer with the Department

20   of Motor Vehicles in Oregon.

21   Q    And confirm for the record -- I think you've alluded to

22   this a few times.  But your recollection is that the first time

23   the Union was presented with C-47, an indemnification proposal,

24   was in the package proposal of January 24th?

25   A    That's correct.



1      MS. DEVLEMING:  Okay, so can we just very briefly, then,

2    pull up -- I believe is JX-10-A.

3    Q    BY MS. DEVLEMING:  Okay, so this is in our joint exhibits,

4    Carrie.  It looks like it's dated November 27th, 2018, and it's

5    a C-47 proposal.  Is it your testimony that you don't recall

6    receiving this from the company on that date?

7    A    I, in fact, know that I did not get it on that date.  It

8    was listed with that date, but it had never been given to us.

9    It was -- the first time we saw it was when it came in the

10   package proposal of January 24th.

11     MS. DEVLEMING:  Okay.  Can we just open JX-10-B briefly?

12   Q    BY MS. DEVLEMING:  Okay, and whose handwriting is it at

13   the top right there?

14   A    That is the beautiful script of Carrie Biggs-Adams.

15   Q    And what does it say --

16   A    I had crossed out the November 27, 2018 day because that

17   was not correct.  It had not been given to us on that previous

18   date.  The company notes above that they're giving us a version

19   of January 24th, 2019, but I put an additional notation that

20   this is the first time I'm seeing a C-47 proposal, on the 24th

21   of January of '19.

22   Q    And Carrie, do you remember any other specific proposals

23   from KOIN's package number 8 dated January 24th that you

24   discussed at bargaining on January 25th?

25   A    So I know that there were the CE -- for the first time, we



 1   were starting to see these economic proposals.  And while they

 2   weren't wages, CE-1 and CE-2 were included in this package.

 3   And I think I could gently say that packages in this particular

 4   negotiations had been problematic.  There had been times when

 5   things were packaged together with proposals that we found

 6   unacceptable, so we would not go in deeply to the other parts

 7   of the package until the company agreed that it was not a take

 8   it or leave it, this is a package, you must accept all these

 9   parts to get anything that's in here.

10        MS. DEVLEMING:  And Mr. Schiff, can we go back to Joint

11   Exhibit 11?

12   Q    BY MS. DEVLEMING:  So on page 2, is this the CE-1 you're

13   referring to?

14   A    Correct.

15   Q    And then, page 3 is CE-1, page 2 of 3, and page 4 is

16   the -- 2.  Page 1 of 2?

17   A    Correct.

18   Q    That's the CE-2 you're referring to?

19   A    That's correct.

20   Q    Okay, and what specifically were -- I think you alluded to

21   it being a package, but what were your concerns about CE-1 and

22   CE-2?

23   A    Well, I believe it's CE-1 that has the vacation language

24   in it.  This was a concern because, culturally, with this

25   history of owners changing, people had appreciated locking into



1    the contract language how many weeks of vacation you would get

2    each year, what number of years of service would give you the

3    right to an additional week of service -- vacation per year.

4        And to say, okay, we won't have that in the contract

5    anymore, we'll just take the company policy, first off, it

6    might be immediately different.  And secondly, it could be

7    changed as the company changed that policy for the entire

8    country.  So the security of knowing how that would be handled

9    in your workplace was going to be gone.

10       So that was the question that CE-1 raised for me about

11   vacation, in particular, and holidays.  And then, here in CE-2,

12   we see the insurance and benefit plans, and as I said earlier,

13   we had negotiated at great length in 2013, '14, and '15 to

14   reach a healthcare agreement that was locked into the contract.

15   And people could tell how much their healthcare contribution

16   was going to be in the contract, so they knew, if it was $168 a

17   month for the coverage you were selecting, that's what you had

18   an obligation to be paying for that.  It would not be, as it

19   sometimes is, that you arrive at the open enrollment late in

20   one calendar year and find out what the new healthcare premiums

21   were going to be effective January 1st.

22   Q    Do you recall any other discussion about insurance rates?

23   A    Yes, because rather than a fixed dollar amount, Nexstar

24   wanted to change the premium amount with each paycheck.  So if

25   you made a lot of overtime because there was a big forest fire,



1    the amount of your dollar contribution for your healthcare

2    would go up because they were going to recalculate your

3    healthcare each pay period.  You would be obligated to pay 10.4

4    percent of your earnings towards healthcare with each check.

5    Q    Does it reference that change in rates per paycheck here

6    in CE-number-2?

7    A    I would say not in the part that I'm looking at so far,

8    but I'm only looking at the top paragraph of it.  So you see

9    all the dollar amounts that are crossed out there at the top of

10   the page at the moment by the bottom of 18.2?  So you see that

11   there are locked-in dollar amounts that people had been paying.

12   It had gone up in -- on January 1 of '16, and then they had

13   reached this January 1 of '17 dollar amount.  And the members

14   had continued to pay that amount each check.  By this time,

15   we're in January of '19, so they'd been paying $135.80 per

16   month for family coverage in the core plan.

17        MS. DEVLEMING:  Okay.  I'm back.  I had a momentarily

18   pause.  Do we need to repeat from that, Claudine?

19        THE COURT REPORTER:  Not on my end.  The witness was

20   talking the whole time.

21        JUDGE TRACY:  Yeah.  Your screen was a bit frozen.  So I

22   wasn't sure if you could hear it if your screen was frozen, but

23   I believe that the record reflects her answer of just

24   reiterating what was in the prior contract article.

25        MS. DEVLEMING:  Perfect.



1    Q    BY MS. DEVLEMING:  And Carrie, now that you just discussed

2    that their proposal was a rate change for paychecks, and I

3    think we confirmed that it's not on this page, did the parties

4    have discussions of that at the bargaining table?

5    A    We did, but we didn't have dollar amounts so that I would

6    know it was now going to be $200 per month, or that rate that

7    we see there as $135.80, or any of those other rates.  We

8    weren't talking about, here are the rates people will be

9    expected to pay.

10   Q    But how did you know the company's proposal as of this

11   date was a change in rate?

12   A    I believe it comes in the pay what -- pay -- how our

13   healthcare works.  You're not going to bargain over it and put

14   it in the contract; you're going to take the Nexstar model or

15   paradigm of healthcare as other workers similarly situated.

16   Q    And your understanding of what that was came from where?

17   When did you learn what their other workers thought?

18   A    It was in discussions across the bargaining table about

19   how it would work.

20   Q    Okay.

21        JUDGE TRACY:  Now, is this a good place to stop, or do you

22   want to -- do you have more to discuss about the January 24th,

23   25th session, or?

24        MS. DEVLEMING:  I do, but it's a good place to stop

25   because there's actually a bit more to cover.



1    JUDGE TRACY:  Okay.  All right, so it's 12:00, basically,

2    12:01 p.m., Pacific Time, so let's take a lunchbreak now, and

3    until 1 p.m.  Hopefully, that's a decent time.  Somebody let me

4    know if it's not, but hopefully, that's enough time.

5        But I will say, Ms. Biggs-Adams --

6        Mr. Schiff, could you check on her SharePoint?

7        Maybe, if you have time during the lunchbreak, Ms. Biggs-

8    Adams, check again to see if you have access to it?

9        THE WITNESS:  I will definitely try it again, and I will

10    look and see if I've gotten a message.

11        JUDGE TRACY:  Okay, so do that.  I have a note to myself

12    to remind myself about doing that, and that's when we'll

13    resume.

14        And Ms. DeVleming, do you think that you'll have any other

15    witnesses today, or is she going to be -- she's going to be it?

16        MS. DEVLEMING:  Unlikely.  Yes, I think Carrie will be on

17    all day.

18        JUDGE TRACY:  Okay, and do you think that we'll be able --

19    will she be on tomorrow morning, as well?  I mean, obviously,

20    Mr. Roberts' cross will take as long as he needs.  But for your

21    direct, is your direct going to take the remainder of the day?

22    Hopefully, she can come back on.

23        MR. ROBERTS:  I think we lost her.

24        MS. DEVLEMING:  (Audio interference) five to ten times the

25    lengthiest witness.



1          JUDGE TRACY:  What's that?

2          MS. DEVLEMING:  Sorry.  I know I'm breaking up.  She's by

3    far our lengthiest witness, so rest assured this won't be the

4    case with anyone else.  But she will definitely all day on

5    direct, maybe into tomorrow.

6          JUDGE TRACY:  Okay, okay.  All right.  Good to know.

7    Thank you so much.

8          So you know, let's just take a lunchbreak until 1:05 p.m.

9    Again, I'm going to -- don't sign off.  Just, if you guys could

10   just turn off the video and mute yourselves, and then that

11   way -- then, you know, I'll come back on a little bit earlier.

12   And if you need to reach Mr. Schiff or anything, just send an

13   email.

14         But hopefully, your SharePoint problem is fixed.

15         And Ms. DeVleming, hopefully, your audio can kind of get

16   fixed.  It's been fine.  You know, at least nobody has gotten

17   totally disconnected.

18         So anyway, I'll see you guys at 1:05, and we can go off

19   the record.

20   (Off the record at 12:04 p.m.)

21         JUDGE TRACY:  Let's go ahead and go back on the record.

22         THE COURT REPORTER:  Okay.  We're on the record.

23                     **RESUMED DIRECT EXAMINATION**

24   Q    BY MS. DEVLEMING:  Okay.  Hi, again, Carrie.  I think

25   where we left off before lunch, we were talking about the



1    January 25th, 2019 bargaining session where it sounds like the

2    parties discussed at least some of the items in Respondent's

3    package proposal number 8, which is Joint Exhibit 11.  Do you

4    remember other -- you were talking about the health coverage

5    and rates, and that kind of thing.  Were there other topics

6    covered pertaining to Respondent's proposal on health coverage?

7    A    So we were touching on the 401(k) issue because that was

8    an economic issue that had been pending since late 2017 or

9    early 2018.  In the first quarter of '18, CWA asked all union

10   officers to reach out to employers to ask that we get some of

11   the windfall from the tax law that went into effect, that

12   rolled back taxes on corporations.  So CWA at ABC, at AT&T, and

13   I at Nexstar, because I was in open bargaining, said that we

14   thought that we should get some of the windfall that the

15   Employer was going to get.

16       They had given a $500 bonus to the non-represented people

17   or people whose contracts were in effect, but they had not

18   given it to our members because our contract was open.  So we

19   were continuing to try to get that $500 and to increase the

20   contribution to the 401(k).  So that was part of the discussion

21   that came with all of the economic issues, not the first time

22   but on and ongoing basis.

23   Q    Okay, but circling back to health coverage, did you have

24   any -- did you discuss any concerns about the substantive

25   coverage that was being offered, in terms of procedure?



1    A    Yes.  We had had a situation in Portland where a member's

2    -- a member of the bargaining unit's child had a diagnosis of

3    gender dysphoria and needed medical treatment.  This was a

4    teenager.  And the Nexstar coverage had declined to pay for it.

5    In fact, he had had to go and get a charity grant from the

6    hospital.  I don't know whether they were, you know, local

7    funds or government funds, but he had to get a charity grant to

8    cover the gender dysphoria treatment because the Nexstar

9    coverage wouldn't pay for it.

10        So I began asking what their gender dysphoria coverage was

11   and asking also about abortion coverage because I had heard --

12   I had not yet received a summary plan description during these

13   negotiations.  But I had heard that the Nexstar healthcare

14   coverage only covered abortion in the case of rape or incest.

15   And this is the women's healthcare for our members, for the

16   children of our members, up to age 26 staying on the parents'

17   healthcare coverage, and for the partners and wives of our

18   members who might be dependents covered by this coverage.  So

19   this was very important to me that they have full access to

20   abortion coverage so that, if their doctor and they agree that

21   they needed an abortion, they didn't have to be facing only

22   coverage that would have been provided if they had said that

23   this was a case of rape or incest.

24   Q    And how did Respondent's team respond to you when you

25   raised those concerns about coverage at the January 25th



1    discussion?

2    A    Mr. Pautsch was -- said that he was not aware as to

3    whether they provided the coverage or not.  And he began, this

4    being early in the year, telling me that he would find out what

5    the coverage was and get back to me.

6         MS. DEVLEMING:  Okay.  Mr. Schiff, can we pull up Joint

7    Exhibit 18?

8    Q    BY MS. DEVLEMING:  And Carrie, it looks like -- oh, yeah.

9    18 to 28, there's an email attached.  That is, sent on my end,

10   so I don't know if you've received it, but it's been sent on my

11   end.  Carrie, do you recognize this document?

12   A    I'm sorry.  I went back to look for emails.

13   Q    No worries.

14   A    I got 5 and 6, 7 to 10, 11 to 17, but nothing else yet.

15   Q    Okay, so for now, let's use the screenshare, so if you can

16   look at what Mr. Schiff has pulled up, Joint Exhibit 18?

17   A    Okay.

18        MS. DEVLEMING:  Can we scroll down a bit, Mr. Schiff?  At

19   least, on my screen, it's just a portion.  Oh, there we go.

20   Perfect.

21   Q    BY MS. DEVLEMING:  Do you recognize this, Carrie?

22   A    Yes, I do.  It looks like a copy of an email from me to

23   Mr. Pautsch, Rick Brown, copying Ellen Hansen, and also

24   addressed to Casey Wenger.

25   Q    Okay.  This was dated --



1    A    January 24th at 4:19 p.m. Pacific Standard Time.

2    Q    And why did you send this email?

3    A    Well, because, as I'd been addressing earlier, without the

4    dollar amounts, I had no way to compare the economics for my

5    members.  I had that previous healthcare provision in the

6    contract, under which people were still working, which set

7    fixed dollar amounts that people would contribute.  And since

8    they had not given me the numbers, I asked for the COBRA rates

9    and what the employer contributions were.  So I thought I could

10   take -- the COBRA number would be the whole number plus two

11   percent, so that would get me close.  But I could back up two

12   percent of the whole number of the COBRA rate.  And then, if I

13   knew what the employer was contributing to the healthcare for

14   each person, then I would be able to tell what the exposure of

15   each member was for the premium.

16   Q    Okay, and do you remember, how did Respondent's

17   side answer this if they did?

18   A    I don't know about a specific email response.  I know that

19   those COBRA numbers were not a number that I got for most of

20   the year, and I never got the employer contribution towards the

21   healthcare.

22   Q    When you say the COBRA numbers, can you maybe clarify what

23   you just said about not getting them?

24   A    Well, we'll use a fantasy $100 on a premium cost.  So if

25   your healthcare costs $100 a month, and you separate it from



1    the employer, and you were going to get healthcare from them

2    until you got another job or you qualified for an exchange

3    plan, you would pay an additional two percent that is allowed

4    by law for the employer for the processing of keeping you on

5    the healthcare.  So you pay the full price plus two percent as

6    a separated employee, but at least you have an idea, then, of

7    what the plan costs for your level of coverage, dependents that

8    you're covering under that plan, so.

9    Q    What was --

10   A    My thought was this would get me close.

11   Q    What was your response in terms of whether these were

12   provided, what you just described?

13   A    I never got the COBRA numbers, and I didn't get a company

14   contribution.  I would have expected to hear, using that $100

15   example, well, we pay in $50 and the worker picks up the other

16   $50 of the cost.  Instead, what I heard was --

17        MS. DEVLEMING:  Can we pull up Joint --

18   Q    BY MS. DEVLEMING:  Oh, I'm sorry?

19   A    What the worker would pay was the 10.4 percent of their

20   earnings on that paycheck.

21        MS. DEVLEMING:  I will pause severely.  Sorry about that.

22        Can we pull up Joint Exhibit 19?

23   Q    BY MS. DEVLEMING:  And take a minute again.  I'm not sure

24   you received the email with these, so using screenshare, do you

25   recognize this, Carrie?



 1    A    It looks like another email from me.

 2    Q    Okay, and what's the date?

 3    A    The date is January 24th.

 4    Q    And what were you requesting here and why?

 5    A    The subject line is "information request, wages".  And it

 6    talks about "dear Chuck, in order to make an economic offer as

 7    you request, we need the following information, 1" -- I'm

 8    sorry.  The -- I work off a small laptop, so this is super

 9    small at the moment.  Thank you.  "Please provide a list of all

10    current NABET/CWA representative employees of KOIN, including

11    any new hires or rehires since the last time that you provided

12    wage information, please include any wage increases which have

13    been granted to any member of the bargaining unit and the date

14    and amount of the increase, also, please provide current job

15    titles for all members of the unit, sincerely, Carrie".

16    Q    So why were you requesting this?

17    A    Well, if I was going to have an offer that was going to be

18    10.4 percent of their gross earnings, I needed to know

19    approximately what their gross earnings were to calculate that.

20    And additionally, the company had been insisting that I make a

21    wage offer, an economic offer including wages, and I needed the

22    current rates of pay of all employees.  There had been many

23    stories about that new hires were coming in at significantly

24    higher pay rates than the current employees.  So as you know,

25    the (audio interference) stories.  People thought that, you



1    know, I heard Igor got hired and Igor is making more money than

2    I am.  And so I needed to know what the current wages were for

3    these individuals, especially any new hires.

4    Q    And you referenced a ten percent of total wages number.

5    I'm not sure that's clear in the record.  What was that in

6    reference to?

7    A    That is the amount that the employee would be expected to

8    contribute of their gross earnings on that paycheck.  They're

9    paid every two weeks, and they would be expected to kick in

10   10.4 percent of what they made towards their healthcare

11   contribution.  So the paradigm couldn't be much different from

12   having a contract that had specific dollar amounts that you

13   would pay each month for the coverage to, we're going to

14   recalculate your contribute every check.  But I could begin to

15   hypothesize how much people might be charged if I knew what

16   kind of coverage they had and how much they were making,

17   whether they were making overtime, which would adjust the

18   benefit contribution up.

19   Q    And so looking back at Joint Exhibit 19, do you recall if

20   you received a response to this?

21   A    Not at that time.

22        MR. ROBERTS:  Your Honor, I'm going to at least raise a

23   question, more than an objection.  These are not -- these two

24   emails are -- there's no allegation in the complaint about a

25   refusal to furnish information for these.  And I guess I'm



1    asking:  is the General Counsel intending to, you know,

2    litigate these as refusals to furnish information,?  Or is this

3    simply related to the surface bargaining allegation?  So I just

4    need to know what the contention is with regard to these two.

5         JUDGE TRACY:  So Ms. DeVleming, if you could go ahead and

6    respond to that?

7         MR. ROBERTS:  I think her screen froze.

8         JUDGE TRACY:  I think so, too.  We can still try to

9    reconnect there.

10         MS. DEVLEMING:  Can you hear me now?

11         JUDGE TRACY:  Yes, we can hear you now.  Yes.

12         MS. DEVLEMING:  Okay.  I was waiting patiently.  I just

13    knew it was fixable.  I'm sorry.  I was trying to answer.  No,

14    it does go to the totality of the circumstances surrounding the

15    surface bargaining allegation.  There are no charges or

16    specific allegations in the complaint about these two

17    information requests.

18         MR. ROBERTS:  All right.  Thank you for that

19    clarification.  I appreciate it.

20         JUDGE TRACY:  Thank you.

21         Before we go on, Ms. Biggs-Adams, I think that Ms.

22    DeVleming asked you this, but I guess, to be a little bit more

23    clear, if I'm being obtuse, is that that 10.4 percent, I think

24    you said, was that connected to, already, the Respondent's

25    proposal in terms of what they're proposing the healthcare



1    costs would be for -- in their proposal that was -- I forget,

2    whatever joint exhibit for that January 24th date?

3        THE WITNESS:  They had explained that that's how their

4    healthcare system worked, that they adjusted the contribution

5    each check.  And I knew where the number came from because it's

6    the maximum allowed by the Affordable Care Act to charge an

7    employee of their wages for healthcare.

8        JUDGE TRACY:  Okay.  Thank you.

9    Q    BY MS. DEVLEMING:  But Carrie, they had used that number,

10   or you were guessing?

11   A    No, they had used that number in discussions with us.

12   Q    Okay.  Looking at my points here.  Okay.  Do you recall

13   anything else important from January 25th, 24th or 25th

14   bargaining, I guess I should say?

15   A    Not at this point.  Sorry.

16   Q    No, quite all right.  Okay.  Do you remember what time

17   bargaining ended on the 25th?

18   A    No, I -- it would be in my notes or in Ellen's notes.

19   Q    Okay, so I think (audio interference) --

20       JUDGE TRACY:  I'm sorry, Ms. DeVleming.  It's cut out.

21   What did you just say?

22       MS. DEVLEMING:  Oh, no.  I think we established that

23   Carrie's January 24th and 25th are not in the record; they've

24   gone missing.

25       But if we can open Joint Exhibit 14, Mr. Schiff?  And



1    then, scroll to Bates 3, page 3.  Okay.

2    Q    BY MS. DEVLEMING:  On reviewing that, Carrie, does that

3    refresh your recollection about what time bargaining ended on

4    the 25th?

5    A    Yes, it does; it shows that Mr. Pautsch left at 1:41 p.m.

6    Q    Would that have ended bargaining?

7    A    Yes.

8    Q    Was that a typical ending time?

9    A    It happened pretty often on that second day, depended upon

10   where he was flying to next.

11   Q    Were there occasions when the Union's side was the first

12   to leave?

13   A    No, there weren't.  There were occasional times where I

14   had to take a conference call or be involved in something

15   outside the union, but not that I was hopping on a plane to go

16   someplace.  It was not uncommon for bargaining to break up in

17   early afternoon and me to sit in the Portland airport until an

18   8 or 9:00 plane in the evening before I started my air travel

19   home.

20   Q    And do you recall, before the end of the January 25th

21   session, did the parties schedule a future bargaining date?

22   A    Tried to, yes.

23   Q    And what do you mean by that?

24   A    Well, I would always try because, as was mentioned

25   earlier, we had the complexity of the company's folks'



1    schedules, my schedule, the mediator's schedule.  And then, if

2    you could line all the people, you had to find a place to hold

3    the bargaining, which, this being winter, would have been one

4    of those difficult moments.

5    Q    And the parties did stipulate that the next bargaining

6    session was held on April 23rd.  So first question:  why wasn't

7    there bargaining held in February?

8    A    Some inside baseball before you about television.  You've

9    heard of sweeps weeks.  You hear that sometimes in the

10   vernacular, but it's really sweeps month.  There's a four-week

11   period called the sweeps month.  Starts on a -- it starts on a

12   Thursday, ends on a Wednesday four weeks later.  And sweeps is

13   a time when it's very difficult to get employers to agree to

14   bargaining or to release members of my bargaining unit for

15   bargaining because ratings have a higher value at that time.

16   So the employers want people to go out and make special shows,

17   special news segments, so that they can get better ratings and

18   charge more for their advertising for the following couple of

19   months.  Sweeps take place in February, May, July, and

20   November.

21   Q    Carrie, you've spoken generally about television

22   employers, but did Respondent, KOIN, take that position as to

23   February bargaining?

24   A    Yes.

25   Q    And then, why weren't -- why didn't the parties bargain in



1    March?

2    A    I couldn't tell you at this point.  It had to do with

3    availability.  As I recall, the mediator had a change in her

4    schedule.  I think we had set some March dates, and the

5    mediator emailed us subsequently and said she'd discovered she

6    had to go a meeting or a training and the bargaining days had

7    to be blown out.

8         MS. DEVLEMING:  Mr. Schiff, can we pull up Joint Exhibit

9    17?  And then, we're going to need to scroll to the middle of

10   it.

11        JUDGE TRACY:  Can I just ask a quick question here?  The

12   mediator, how often was the mediator there, or when did the

13   mediator participate in bargaining?  When did that begin?

14        THE WITNESS:  That began in March of 2018, so about nine

15   months into bargaining.

16        JUDGE TRACY:  Okay, and then, did the mediator attend

17   after that, from March 2018 until whenever bargaining ended?

18   Did the mediator attend --

19        THE WITNESS:  Yes, she did.  So the Employer felt strongly

20   that they wanted to bring a mediator in, so I was concerned

21   there was still a lot on the table to bring in a mediator.  But

22   we agreed to do it, so from then on, we had to coordinate with

23   her schedule in addition to those of the Employer's group.  And

24   the Union's side was mostly my schedule and Ellen Hansen's

25   availability.



1      JUDGE TRACY:  And so I just want to clear, Ms. DeVleming.

2   When you're asking these questions about the bargaining

3   sessions and when they were agreed upon, you know, the mediator

4   is a third party here who is participating.  So to be clear

5   about whether it was her or his -- it sounds like it's a her,

6   if she's the same one who attended every time -- if it was her

7   schedule that also impacted the scheduling.  Okay?

8      MS. DEVLEMING:  Okay.  Was that not already clear as to

9   February and March?  I can circle back and hammer it home.

10      JUDGE TRACY:  I would just be clear about February and

11   March and then be clear going forward.

12   Q    BY MS. DEVLEMING:  Okay, so Carrie, with February, you

13   testified that the Employer, that KOIN, took the position that,

14   because it was sweeps, they couldn't bargain; is that right?

15   A    Correct.

16   Q    Do you know whether the mediator was available in

17   February?

18   A    He did have some availability in the spring, including

19   February.

20   Q    Okay, and then, as to March, I think you just testified

21   that the parties could have met, but the mediator had a

22   conflict?

23   A    Correct.  We had agreed upon bargaining dates.  We'd

24   confirmed, we were in the confirming process of, a hotel.  And

25   then, the mediator wrote and said she could not meet, and



1    apologized, and we had to reschedule, and that's how we got to

2    April.

3        MS. DEVLEMING:  Okay.  All right, so can we scroll up to

4    Bates 33 of Joint Exhibit 17?

5    Q    BY MS. DEVLEMING:  All right, so we already talked this

6    document at large, Carrie, but do you recognize this specific

7    bargaining bulletin?

8    A    I do.  This is a bargaining bulletin that was issued on

9    January 25th after the meetings of the 24th and 25th.

10   Q    Got it.  So you mentioned -- you had previously testified

11   about CE-1 and 2 being economic proposals, but had they made a

12   wage proposal at this point?

13   A    No, they had not.

14   Q    And then, below -- let me see if I can find my place --

15   there is a reference to taking mobilization public.  I think

16   it's on page 2 or later.  Yeah, the bottom of page Bates 34,

17   the second page of that exhibit, that bargaining bulletin.

18   What was that about?

19   A    So NABET/CWA for decades has waged economic campaigns

20   against employers when we can't get a contract.  Now, that

21   could be a television network like NBC or ABC, so that would

22   happen at many locations.  Or it might be at one individual

23   station, as this would be with KOIN.  In the negotiations that

24   eventually led to the 2015 contract, we had had groups of

25   people out on Saturdays in front of advertisers on the



1    television station asking people not to shop at that business

2    because they were doing business with KOIN 6 TV.

3        So we had reached out to grocery stores, and car dealers,

4    office business machine companies, a wide array of local

5    television advertisers at KOIN during the '13 through '15

6    mobilization, which many of the members at KOIN would have

7    remembered when I said that -- discussed it when I said this in

8    the bulletin, and that we were starting to look at reaching out

9    for advertisers this go-around.  It was going to be spring

10   soon.  I tend not to like sending people out in snowy, icy,

11   rainy conditions to try and turn away customers.

12       One of the -- one of the businesses that we had mobilized

13   around extensively in Portland had been appliance stores

14   because they were big advertisers on KOIN-TV.  And they

15   sponsored some segments, some cooking segments, that were in

16   the local news and local broadcast.  So we were getting ready,

17   once it became more spring-like, to go back out and put on

18   pressure at advertisers.

19       MS. DEVLEMING:  Okay.  Can we pull up Joint Exhibit 20?

20   Okay, and maybe if you can scroll through it a bit?  I know

21   it's an eight-page document.

22   Q    BY MS. DEVLEMING:  Do you recognize this, Carrie?

23   A    It looks like the email interchange between Casey Wenger

24   and I, and I'd have to figure out who Michelle Gregory was.  It

25   would be my guess that she was with one of the hotels that we



1    were trying to book.

2         MS. DEVLEMING:  Can we get on page 5, please, of Joint

3    Exhibit 20?  I don't know if everyone else can see it, but I'm

4    seeing the -- oh, there we go.  Okay.

5    Q    BY MS. DEVLEMING:  Carrie, you recognize that one?

6    A    Yes.  It's an email from Julie Kettler to Casey Wenger.

7    Q    And who is Julie Kettler?

8    A    She's the federal mediator who assisted these parties.

9    Q    Okay, and you had previously testified that the mediator

10   couldn't meet at all in March; does this refresh your

11   recollection on that point?

12   A    Yes, because there had been dates, and then she had a --

13   she had a conference that conflicted with the dates that the

14   parties had agreed to.

15        MS. DEVLEMING:  Okay, and then, can we scroll up to page

16   4?  Okay.

17   Q    BY MS. DEVLEMING:  Do you recognize this?

18   A    So this is from Casey back to Julie saying that he had

19   gotten a response from Chuck -- that would be Chuck Pautsch --

20   the March dates don't work for him.  There's a word cut off, so

21   I'm not going to try to guess.  He did probably say the next

22   dates are open.  I have not heard from Pat yet, so this was

23   part of the set of mechanics that would go on.  If we had lined

24   up our schedules for a bargaining date, and it fell out for

25   some reason, then you'd have to line everybody up again to make



1    sure that the new alternatives were available on their

2    schedules.

3        MS. DEVLEMING:  Okay.  Next, let's pull Joint Exhibit 21.

4    Lots of exhibits here.  And scroll through it so Carrie can

5    review it.  All right.

6    Q    BY MS. DEVLEMING:  Carrie, do you recognize this?

7    A    Yes, it looks like a memo from vice president, general

8    manager, of KOIN, Pat Nevin, to all members of our bargaining

9    unit with a recap of the January bargaining.

10   Q    Okay, and the third paragraph -- actually, second and

11   third paragraph seem to mention union -- I don't want to mis-

12   summarize your -- initiation fees and monthly dues.  The third

13   line of the second paragraph, what was that about?

14   A    So we're now in March of 2019.  And since the first of the

15   year, the company, which had had objections to some of the

16   mechanics of the dues and union security issues, had added

17   another one, which was about the rate of the initiation fee for

18   our local.  So it was something where they were starting to

19   reach out to members to try to convince them that the Union was

20   too expensive, overcharged them.  They in fact said to people

21   during this process that they were renegotiating the Union's

22   initiation fee.

23       MR. ROBERTS:  Objection.  This sounds like hearsay.  She

24   said they were saying -- that's not in the -- I don't believe

25   that's in the document.



 1          JUDGE TRACY:  So if you could just clarify --

 2     Q    BY MS. DEVLEMING:  Carrie, what --

 3          JUDGE TRACY:  -- (audio interference) again, Ms. DeVleming

 4     for her?  Because I think it seems as though she's testifying

 5     from this Joint Exhibit 21. So --

 6          (Audio interference, simultaneous speech)

 7     Q    BY MS. DEVLEMING:  Right.  Well, Carrie, on what you were

 8     just --

 9          JUDGE TRACY:  Hold on.

10          MS. DEVLEMING:  Sorry.  Let me rephrase.

11          JUDGE TRACY:  Just hold on.  This is where -- remember,

12     this is our first objection, really, of the day, so let's just

13     be careful.  So I've responded to the objection, not really

14     ruling upon it, but basically asking for clarification of the

15     question that's being asked.  I thought that the questions were

16     about Joint Exhibit 21, and so let's kind of clean that up a

17     little bit.  So wait for that.

18          So now, Ms. DeVleming, go ahead and please restate your

19     question.

20     Q    BY MS. DEVLEMING:  Okay.  Well, my initial que -- (audio

21     interference) what this issue was about, so maybe we could just

22     circle back there.  I think we'll get back to what you were

23     talking about, Carrie, in proper order.  So maybe finish the --

24     well, don't finish the thought you were just giving, but just

25     in terms of:  what was the issue that was being raised here?



1    A    So as I mentioned earlier about Nexstar, their purchase of

2    KOIN, that was the largest market that they now owned a

3    television station in.  They previously were in Syracuse, or

4    Rochester, New York, or Wheeling, West Virginia, or Hartford,

5    or New Haven, Connecticut, smaller markets, smaller TV

6    stations, and much smaller union locals.

7        Our local, 51, is one of the NABET network locals.  We

8    started out representing the people at ABC, and in NABET, ABC

9    and NBC were founding networks for our union.  We, in fact,

10   were founded in 1934 when NBC and ABC were one company, so our

11   contracts have continued to grow with those television

12   networks.  The networks own stations and operations nationwide.

13   We represented, at different times -- because there have been

14   sales and closures of operations.

15       There was a time when they could only own five or seven

16   television stations, and we would represent five or six of

17   those when they were -- the ownership regulations only allowed

18   coverage of 35 percent of the country, a limited number of

19   television stations.  But those television stations on the

20   network side would be in major television markets:  New York,

21   Washington, D.C., Chicago, San Francisco, Los Angeles.

22       So we represent, at the network level -- I don't want to

23   sound overly elitist.  But that's the cream of the crop for a

24   television job, at one time, was to get yourself to the

25   network.  You might start in the local TV station in Cleveland



1    and work your way up until you got hired at a job at the

2    network.  The network was doing higher-caliber production, not

3    just a local news show, but production of -- using back when I

4    worked at NBC, you know, we had the Tonight Show with Johnny

5    Carson five nights a week.  We had soap operas that were huge

6    productions.  We had game shows, theatrical productions.

7        And then, we had sports coverage.  So we would go to the

8    Rose Bowl, and on New Years' Day, we would present to the

9    public the Rose Parade game in the morning.  And by midday, a

10   different crew of 100 people were at the Rose Bowl covering one

11   of the biggest championship college football games of the year.

12   So this was elite work.  The networks made money.  The people

13   who worked at the networks did very well, and our structure

14   grew up along with network television.

15       And the theory behind our initiation fee is that it's

16   based on your first day wage.  So if you make a high wage on

17   the first day you're hired, you pay three weeks at that rate.

18   If you come in at a smaller station or at a lower rate of pay,

19   your initiation fee is significantly lower, not in percentage

20   because it's still three weeks' pay, but the dollar amount is

21   lower.  Is that clear enough?

22   Q    Carrie, thank you.  Just one time, in your -- from your

23   perspective -- well, not from your perspective.  In your

24   experience comparing to comparable markets, comparable network

25   stations, is it your opinion that the Union's initiation fee is

1    exorbitantly high?

2    A    It is not.  Our initiation fee in Local 51 is consistent.

3    If you go to work in Bakersfield, where I have a bargaining

4    unit of six people, you will pay three weeks' pay at the rate

5    of pay of your first day of work.  Bakersfield, I haven't

6    looked lately, but I think it's in the 125 DMA as opposed to

7    Portland's in the vicinity of 21.

8    Q    The lower the number, the larger DMA?

9    A    The lower the number, the larger the DMA.  The goal in

10   life is to be number 1.

11   Q    And what about Local 51's dues?

12   A    So --

13   Q    Are they exorbitantly high?

14   A    I don't believe so.  NABET charges dues on gross earnings.

15   So you pay -- if you get lots of overtime or you're paid lots

16   of financial penalties or nightshift differential, you pay a

17   percentage on all of those earnings, not just your base pay.

18   Our dues are 2.25 percent of gross for the month.  They are

19   normally handled by dues checkoff, so as people are paid, it

20   comes out of each check.  And we also have a lower rate; if

21   people are making less than $20 an hour, they pay their dues on

22   a rate of 1.87 percent of gross earnings.

23       MR. ROBERTS:  Your Honor, at this point, I'm going to

24   renew my subpoena request for items 8 and 9, which are

25   documents reflecting any kind of surveys or communications with



1    the Union regarding their initiation fee and dues.

2    I believe that Ms. Biggs-Adams has now injected this issue into

3    this hearing.  She can't have it both ways, in our opinion.

4    You know, like, and she's now made this a viable issue, and I

5    would renew my subpoena for paragraphs 8 and 9.  As she's

6    testified that they're not exorbitant, I think I'm entitled to

7    these kind of documents, in light of that position.

8         MS. DEVLEMING:  I'll defer to Ms. Yen to respond for the

9    Union.

10        MS. YEN:  Well I -- I continue to believe that the

11   internal documents of the union, which has communications

12   between union agents and internally, documents such as

13   resolutions and communications regarding their own dues and

14   their own initiation fees, are the union's business and do not

15   affect the employer -- the employer's ability to bargain with

16   the Union about union security and dues check-off.  So I -- I

17   still don't see the relevance of the documents themselves.

18   What Ms. Biggs-Adams was just testifying to is simply that

19   the -- unlike the company's message to the bargaining unit

20   members, the dues and the fees are not exorbitant in her

21   experience in the industry, and that doesn't involve -- that

22   doesn't affect any documents that are internal to the union,

23   and doesn't make -- doesn't make those documents relevant to

24   the employer's duty to bargain about union security and dues

25   check-off.



1          MR. ROBERTS:  It makes it relevant to the credibility of

2     her statement that they're not excessive.  She's taken that

3     position and she's -- now she's -- the Union's declining to

4     provide documentation that might either support or refute that

5     position.  I don't think we're bound by her position that it's

6     not exorbitant.  I don't think having own -- her own -- only,

7     you know, having elicited this testimony, I think it's now fair

8     game.  You can't open the door and then pretend that it's --

9     that it's been closed.

10          MS. DEVLEMING:  Well, if I may, Your Honor, the testimony

11     is relevant because one of the major issues here is

12     Respondent's continued position that these are, in fact,

13     exorbitant, and that these are, in fact, exorbitant -- I would

14     piggyback -- piggyback on what Ms. Yen said in terms of the

15     underlying internal union documents, about how they get to

16     those figures, a comparison with the rest of the market, any of

17     that I don't think the door has been opened to just by asking

18     Carrie, what's your response to Respondent's position that your

19     dues and fees are exorbitant.

20          JUDGE TRACY:  Well, I guess, Ms. Biggs-Adams, what's the

21     basis of your testimony that the -- that in your opinion, in

22     your experiences, the -- that the dues are, you know, not

23     exorbitant, that they are -- they are the -- what the market

24     would call for?

25          THE WITNESS:  So initially, my response is, Local 51,



1    which represents people at ABC and ESPN in the western 18 US

2    states, and two owned stations, KGO and KABC, that is

3    consistently the set of initiation fee and dues for those

4    members of our local.  As the same with two Univision stations,

5    a Scripps station, a public broadcaster; the rates are

6    consistent for every member of the local, every bargaining unit

7    of the local.  Then past that experience, I was previously the

8    president of NABET Local 53 in Los Angeles way back in the

9    1980s, and I know what our initiation fee was then, and what

10   their dues were then.  I remained a member of that local until

11   I retired, having paid the same dues rate as all other members

12   while I was working on the national union staff in 19 -- excuse

13   me, in 2016.  So that's my personal experience with it.

14       And then I know, because I talk with the presidents of

15   other network locals; we have regular meetings about questions

16   like that.  And I meet with the ABC and NBC network local

17   presidents normally twice a year, COVID having been a little

18   difficult on our meeting schedule this year.

19       JUDGE TRACY:  Well, you know, at this point, I would still

20   grant the -- the Union's petition to revoke for categories 8

21   and 9.  However, it has -- I -- I don't know what these

22   internal -- because I'm taking a look at, you know, what your

23   request was, and I'm look -- taking a look at, you know,

24   thinking about what her testimony is, and what you're seeking

25   to prove.  Well, frankly, a lot of that is going to be through



1    her testimony and not really whatever they communicate to their

2    members about whatever this may be, and internal union

3    documents, I just don't see are relevant at this point.

4        So I would say that, you know, let's -- still going to

5    grant that petition revoke.  If you want to submit it at some

6    point into the record, if you disagree with my position on it,

7    then you can do that.  That way, on exception to -- you know,

8    argue about that.  But I still don't see the relevance of their

9    internal communications with their members versus their

10    bargaining proposal in response to the Respondent's bargaining

11    proposal.  You know, that is going to be based upon, you know,

12    whatever the party's positions are, and whatever they -- the

13    union is communicating to its members, or bargaining unit

14    employees, I don't see the relevance of that or its proposal.

15        MR. ROBERTS:  Well, let me just make -- let me just

16    comment, just so the record is clear.  The -- one of the

17    defenses is that the initiation fee is a -- violates the

18    Section AB 5, is excessive.  That's not a -- a question of --

19    of -- has nothing to do with the bargaining here, it has to do

20    with whether it's excessive and discriminatory under AB 5.  And

21    that's a -- that's a -- almost an objective kind of standard

22    that's independent of these negotiation.  I certainly --

23    obviously respect your ruling, but I am -- I -- I will be

24    requesting to but the subpoena in.  I see no reason to do it

25    this very minute, and -- and, you know, disrupt the nego --



1    the -- the testimony, but probably in the morning, you know, we

2    will be wanting to introduce that.  I do think that it's

3    relevant, and -- and particularly now that she's given this

4    testimony, I think I'm entitled to test her -- the credibility

5    of her statements, that these are all consistent with what --

6    what they charge.  So anyway, I won't burden the record any

7    further at this point, but would like to put that into the

8    record in the morning.

9        JUDGE TRACY:  Yeah, so what you can do with that is that

10   you can introduce it in the record as a Respondent's Exhibit 1

11   or what have you, this subpoena, and the petition to revoke.

12   I'm assuming that you have not prepared any written response to

13   it, have you?

14       MR. ROBERTS:  Well, only the initial communi -- the kind

15   of -- the ca -- Ms. Yen and I exchanged some emails in which we

16   attempted to conciliate, if you will, the -- the differences.

17   And so I did set forth my position in -- in there, but I think

18   I've also stated it here.

19       JUDGE TRACY:  That's fine.

20       MR. ROBERTS:  And okay, and -- and so, I think -- I don't

21   have -- I don't plan to file a written response above and

22   beyond what was already in the -- what was already going to be

23   in the record, and what's -- what we've stated here today, but

24   I think that adequately preserves my position, so --

25       JUDGE TRACY:  Yeah, that's fine, that's fine.  So what



1   we'll do if -- and -- and we don't have to do it in the

2   morning.  What we can do is wait and hold off until next week,

3   so you can see if any of these other issues come up.  But, you

4   know, just so we can put that in the record and preserve your

5   rights or exceptions, to file that.

6       The -- the other thing, though, is that in -- in response

7   to -- to that, I -- I would like to just hear very briefly from

8   Ms. Yen and Ms. DeVleming, if you've got anything to add.  But

9   again, I go back to this issue that I'm thinking about, is

10  that, you know, I hear her testimony, this is her opinion based

11  upon her experience.  Certainly the Respondent, you're going to

12  have your negotiator testify and talk about his experience, and

13  what he's based it upon.  And so, I guess to me, the

14  communications internally that go on between the union and its

15  members and employees, I don't know how that would be relevant

16  when I wouldn't imagine you would find a document where the

17  union says, hey, we're -- you guys are paying more than

18  everybody else.  Do you agree?  I mean, I just don't know what

19  you would find in that, and so I am very reluctant to -- to

20  order that those documents be released.  So again, I don't see

21  the connection.  I see -- I see what you're saying in terms of

22  your argument, and I certainly think that you can have put in

23  enough evidence to -- to enforce your argument through the --

24  the testimony.

25      So -- but I have your -- your argument is there, and we



1    can put these in tomorrow or the next week, like I said,

2    because the other of these that you guys didn't agree to will

3    come about, and that way we can be clear for the record about

4    what's still an issue.

5        MR. ROBERTS:  Just so -- for clarification, the paragraphs

6    do not request communications with union members, it requests

7    internal -- among agents of the union.  So it's requesting any

8    kind of documents or surveys or anything that the union itself

9    may have internally.  Not -- not communications with their

10   members, I just want to make that clarification.

11       JUDGE TRACY:  Okay, so that -- that's even more -- I don't

12   see how it's related.  But anyway, let me just, for the record,

13   have Ms. Yen speak about it, so then -- and Ms. DeVleming, if

14   she wants, and then we'll -- we can move on and -- and put this

15   in the record, okay?  Either -- at some point, I'll put it on

16   the side to remind myself.

17       Ms. Yen, go ahead, if you want to response.

18       MS. YEN:  Thank you.  Yes, I -- I think that -- that your

19   comment is correct with respect to the internal communications

20   within the union not being particularly relevant.  What is

21   relevant here is what the communications were across the table

22   between the employer's representatives and what the union --

23   and -- and the union's representatives.  And I -- and I also

24   want to refer back to Exhibit C attached to the position to

25   revoke, which demonstrates that the -- the region already



1    decided, and the General Counsel already upheld the region's

2    determination that -- that the -- that the Respondent's

3    allegation that the -- the union's fees violate the act are

4    without merit.

5        And so -- so that is -- and I think that the subpoena is

6    simply an improper attempt by Respondent to try and revive that

7    issue and inject it into this case where it doesn't belong.

8        JUDGE TRACY:  Okay, thank you.  And Ms. DeVleming,

9    anything you would add to that?

10        MS. DEVLEMING:  I think we've got it well covered.  The

11    only additional thing I would add would be that I don't -- I'm

12    waiting here with Carrie because this is going to come up over

13    and over again.  This subject is pervasive throughout

14    bargaining.  At the same time, I think it's not relevant to

15    further bargaining.  Whether the union's initiation fee is too

16    high or too low is not a defense to whether Respondent engaged

17    in service of bargaining.  So just to the extent that they're

18    seeking further documents to prove that the initiation fee is

19    too high, as Ms. Yen pointed out, that ship has sailed, and

20    further, it's not really relevant here other than to General

21    Counsel's case that it was such a repeat issue that, you know,

22    was brought up again and again and again.

23        JUDGE TRACY:  All right, well, thank you.  So the record,

24    I think, reflects all the different arguments.  So go ahead and

25    continue on with your questioning.



1          MS. DEVLEMING:  Okay, thank you, Your Honor.  So I think

2     we're still looking here, Carrie, at General -- sorry, Joint

3     Exhibit 21.  And we were talking about paragraph 2 and 3, so on

4     page -- the first page of that Exhibit.  So just to wrap that,

5     the very last line of the third paragraph.  Basically -- and I

6     don't want to mischaracterize it, so I'll just read it.  It

7     says, "Your union representative has told us this is not

8     something," referring to Article 2, union security, "she is

9     willing to negotiate."

10    Q    BY MS. DEVLEMING:  Is that accurate?

11    A    Yes.  The internal workings of the union and how we set

12    our initiation fee or our dues structure are not appropriate

13    for bargaining.

14    Q    Were you willing to bargain over union security at all?

15    A    Of course.  My concern was that I was trying to find out

16    why they wanted to charge $50 per month for the processing of

17    union dues when their explanation for the expense made no sense

18    to me.

19    Q    I think we'll get to there in a moment.  So had you

20    offered their last piece --

21         MS. DEVLEMING:  Actually, I think that's all I need with

22    that one.  So next one, can we go back to Joint Exhibit 17, Mr.

23    Schiff?  Actually, scratch that, don't need it.  Let's skip to

24    April 23rd, 2019 bargaining, Carrie.

25    Q    BY MS. DEVLEMING:  So looking at Joint Exhibit 13 and 14,



1    we do have your notes from the -- this session.  But to the

2    best of your recollection, do you remember how bargaining

3    began?

4    A    Well, we hadn't bargained obviously since January, so it

5    had been three months.  And the company was very adamant that

6    they wanted to have a -- a wage proposal, so that -- that was a

7    big deal, and we were back to the initiation fee and the union

8    issues about why the initiation fee and the dues were the

9    union's business in terms of the amount of them as opposed to

10   the company's.

11   Q    Do you remember specifically what you discussed with

12   Respondent's side about the initiation fees and dues?

13   A    Well, they -- they were talking to us about other

14   locations.  And the union structure in the smaller towns, where

15   they have a bargaining relationship with NABET CWA are very

16   different.  So our local has about 1,000 dues paying members

17   per month.  We have a number of contracts in addition to the

18   large ABC ESPN presence, and Erie, Pennsylvania, I believe, has

19   two TV stations.  Avon has one TV station, a CW station that

20   they bought three contracts.  It's a small bargaining unit.

21   They certainly don't have an office, people to answer the phone

22   and help members with issues and problems, they don't have

23   full-time staff.  We keep one and a half people on who are

24   professional staff to handle contract interpretation and

25   representation issues.  At this time, that's me plus Kevin



1   Wilson, and I also have another former local president, Richard

2   Diskowski (phonetic), who are available with background in the

3   ABC contract to assist members with problems.  And those are

4   not things that go on in those smaller towns.

5   Q    Did you discuss the union security clause during that

6   session, do you know?

7   A    We did, because the company felt that it was inhibiting

8   their ability to hire people.  But when I asked who explained

9   the union initiation fee structure to the prospective members,

10  I believe that's when Mr. Nevin explained that he explained it

11  to people.  And I didn't feel it was appropriate for the

12  general manager of the station to be explaining that, because I

13  wasn't sure if he knew what it actually was, or how it worked.

14  Q    Beyond the initiation fee and dues issue that we've

15  already just now spoken about a lot and will continue to, did

16  Respondent really have any other concerns about union security

17  as an issue?

18  A    Well, they were concerned that they didn't want to have to

19  fire people because they hadn't paid their dues.  So to me it's

20  somewhat integrated.  But we do have union security that says

21  people must become members in good standing within thirty days

22  of their hiring and remain in good standing, and if they don't,

23  that the employer will terminate their employment.  And

24  obviously we're never looking for someone to get fired at that

25  moment, we're looking for assistance to get members to



1    understand that it's a serious obligation and that they should

2    take it seriously.

3         MS. DEVLEMING:  Mr. Schiff, can we pull up Joint Exhibit

4    22?

5         JUDGE TRACY:  And Ms. DeVleming, we'll probably take a

6    break soon, so when you find a good spot to take a break, we'll

7    take just, like, a ten minute break, and then that will be

8    probably our only break unless anybody needs one until we --

9    we -- we'll go to about 4:30 today.

10        Mr. Schiff, are you around until 4:30, does that work?

11   Yeah?  Okay.

12        MR. SCHIFF:  Yes, Your Honor.

13        JUDGE TRACY:  All right, thank you.  So we'll take a 10,

14   15-minute break.  Maybe a ten-minute break.  But just find a

15   good spot so that people can take a restroom break or what have

16   you.  Go ahead.

17        MS. DEVLEMING:  Okay.  I've got -- let's do two exhibits,

18   and then maybe we'll break.

19   Q    BY MS. DEVLEMING:  Okay, so looking at Joint Exhibit 22,

20   Carrie, can you see that shared screen?

21   A    I see the top of it, yes.

22        MS. DEVLEMING:  Can we scroll down a little bit, Mr.

23   Schiff?

24   A    So that's an email from me to Mr. Pautsch, copying Mr.

25   Wenger, asking about the holidays and vacation allotments under



1    the company policy, because the company's CE number 1 was

2    proposing both of those things, moving from specific language

3    in the contract to accepting whatever the company policy was.

4    So the first question for me was to see how much people would

5    lose.  And then, of course, I had to be concerned that if it

6    was just the company policy, it could change.  Theoretically,

7    be increased, but more likely be decreased during the term of

8    the contract.

9    Q    I muted myself.  Do you remember, Carrie, did you receive

10   a response to this?

11   A    I did eventually, yes.

12        MS. DEVLEMING:  And can we pull up Joint Exhibit 8D?

13   Q    BY MS. DEVLEMING:  All right.  Carrie, do you recognize

14   this?

15   A    I do.  It looks like a contract proposal from April 23rd,

16   a counterproposal to CE 2, proposing that we would be covered

17   by the Nexstar benefit plan, but that they would not increase

18   above what was allowed under the contract.  So the idea would

19   be, we'll take your -- your benefit model, but the language

20   that already exists in the contract that locks the premium

21   amounts would remain.  So you can give us a different

22   healthcare model, but not increase the dollar amount that

23   people will be expected to contribute towards that coverage.

24   And then we're looking for the tax windfall -- in number two,

25   the tax windfall money and money not paid into the 401k,



1  because they had reduced the 401k contribution as I understood

2  it at that time.

3       And then in three, we're once again proposing that they

4  would provide gender dysphoria treatment and full women's

5  healthcare services, including abortion coverage.  And then

6  there's a no cutback provision.

7       MS. DEVLEMING:  Okay.  Maybe I'll do two more exhibits,

8  you did that one pretty fast.  Okay, can we look at Joint

9  Exhibit 5H?  Start with that, I guess.  Okay, and I think this

10  is a couple pages long, if I remember correctly.  So let me

11  scroll through it a bit just to see on the same page.  Am I

12  wrong, is it one page?

13  Q    BY MS. DEVLEMING:  Okay, so it is just a one page.  What

14  is this, Carrie?

15  A    This is a counterproposal from KOIN.  It -- in the first

16  paragraph, that's the existing language.  So they were crossing

17  it out in its entirety.  If you notice how the highlighting is

18  working in that first graph, they previously had only proposed

19  to remove, "as a condition of employment," from the first line,

20  and, "in good standing," from the second to the last whole

21  line.  Now they were proposing to entirely eliminate that

22  language of the existing contract.  And proposed a new 2.1 and

23  2.2.

24  Q    Did the union have any concerns about these 2.1 and 2.2

25  proposals?



1    A    Well, I particularly did about the 2.2 language, which was

2    obvious to me had been listed from some other contract with

3    NABET -- and certainly nothing wrong with copying good language

4    from one contract to another, but it has to work within the

5    structure that it's being pasted into.  In this case, I want to

6    say it's the last whole sentence of 2.2.  "Within 14 days of

7    receipt of notice from the union, the employer will suspend the

8    employment of the employee until such time as the employer

9    receives written notice from the union sector office that the

10   employee has retained his membership in good standing."

11        So my concern was that is not how the due structure of my

12   local or any other network local works.  We are a bottom-up

13   union, we collect the dues from the employer, we process them,

14   and after adding the paperwork from the employer who tells us

15   what amounts each person earned, we keep a portion of the dues,

16   and re -- we remit the remainder to the national office.  The

17   sector is what we call the NABET-CWA headquarters.  The dues

18   are not even handled by the sector office.  Dues are handled by

19   the Communications Workers of America, our parent union, and

20   neither of those entities would know when a member was in good

21   or bad standing of our actively being resolved members.

22        So if you're not paying all of your dues, Washington won't

23   know it until we report it.  So we would know that you were

24   behind in your dues, or hadn't paid your dues, or hadn't made a

25   payment on an initiation fee, and we would handle that with the



1    employer.  It makes no sense for us to go to the union sector

2    office and say, you should tell KOIN TV in Portland that so-

3    and-so is in bad standing or good standing.  Because they're

4    not part of that process, that's not a service they provide to

5    us.  That is what my office manager bookkeeper takes care of.

6         And then, as local president, either she or I informs the

7    employer that the individual is not in good standing and must

8    make themselves whole.  So it made no sense that somebody would

9    lift this language, which couldn't work in this circumstance,

10   in this contract.

11        MS. DEVLEMING:  I don't know, I -- I have one more

12   proposal to walk through, but we could break now.  It might

13   take five or ten minutes to walk through it, so what do you

14   guys think?

15        JUDGE TRACY:  No, let's go ahead, go ahead.

16        MS. DEVLEMING:  Go ahead?  Okay, can we pull up Joint

17   Exhibit 6H?

18   Q    BY MS. DEVLEMING:  All right, Carrie, do you recognize

19   this?

20   A    Yes, I do.  That's a KOIN counterproposal.  It is article

21   3, would, be the look of it, on union business.  So this was

22   the mechanics of dues checkoff.

23   Q    Also present on April 23rd?

24   A    Yes, it was.

25   Q    Okay.  Did the union have any concerns about this



1    proposal?

2    A    We did.  The social security number was still being

3    opposed and I was still trying to find a way to see if within

4    the new computer methods that were being designed, if we could

5    find a way to use some other individual identifiable number

6    that wasn't a social security number.  This was a -- a very

7    difficult problem if they were just hellbent that they weren't

8    going to give us the social security number, even though the

9    documents that involved this financial and personal information

10   were exchanged between the parties, specifically between Casey

11   Wenger and DeeDee Morua, back and forth in a password protected

12   model.

13       So I knew they were safe, I knew that we were not the leak

14   or the loss of anybody's social security number from KOIN TV,

15   and as you see in the crossed out last line of 3.1, the company

16   was looking to have the union reimburse the company $10 per

17   employee on a monthly basis for the services rendered by the

18   company for the dues checkoff practice.  And I felt very

19   strongly that the company was not expending anywhere near the

20   amount of time or money that they were proposing to calculate

21   the dues for our members.

22       JUDGE TRACY:  Mr. Schiff, can you scroll down a little bit

23   further so she can see the rest of the proposal?  Thank you.

24   A    BY MS. DEVLEMING:  So now instead of -- yeah.  So -- so

25   now instead of the $10 per employee which is at the top of the

1    screen in the lined out red, the company was proposing that we

2    would pay $50 per month for the processing of dues.  And I

3    continued to seek a justification for that $50.  You know, what

4    are you expending that you want to charge me $50 of?  And I

5    heard repeatedly that it was super complicated for Casey Wenger

6    to calculate the dues, and I just felt that this was

7    inappropriate.

8         Because they took taxes out of people's checks on a

9    percentage basis, and it didn't seem to be a huge problem to

10   deduct FICA and other payroll taxes.  They were going to ask us

11   to go to a model where they were going to recalculate the

12   healthcare contribution every two weeks with every pay period,

13   and yet they were saying that deducting 2.25 percent of a

14   bargaining unit which at it maximum number in recent years had

15   been about 45 people just seemed out of control.  I was pretty

16   sure you could develop a spreadsheet, pour in the earnings,

17   have it pop out a number, paste that, and send it to us as,

18   these are the earnings, these are the dues that we deducted

19   from these individuals' checks.

20   Q    So Carrie, section 3.1 there in the middle refers to an

21   Exhibit A.

22        MS. DEVLEMING:  And can we scroll, Mr. Schiff, to the next

23   page?  And maybe scroll down further to the substance.

24   A    BY MS. DEVLEMING:  Exhibit A in the contract -- and that's

25   how it is currently listed, it has been for many years -- is a



1    copy of the local's initiation and dues checkoff form.  That

2    form is not something that just gets typed up when we're in the

3    mood, the form is part of our local bylaws.

4    Q    Okay.  So what was your concern -- or did you have a

5    concern with including this in the contract?

6    A    Oh, I had a concern that they were trying to remove

7    structural parts of the process.  So you see in the highlighted

8    red that's crossed out, "I further authorize KOIN to deduct

9    from my wages in the amount -- the amount of an initiation fee

10   in the sum of," and then there's a blank, "which shall be paid

11   for each partial," for period and number of payments.  So that

12   would normally show how much money it was, and how many

13   payments it would take to resolve that, to reach the full

14   payment that was due.

15        And then, at the bottom of the page, in lieu of the annual

16   window to get yourself off dues checkoff, they were removing

17   that concept entirely.  So it's crossed out in its mechanics of

18   a ten-day window prior to the expiration, and when people had

19   to give what kind of notice.  That's crossed out in red.  And

20   then in the paragraph in-between, they've crossed out

21   irrevocable for a period of one year from this date.  Which

22   should have been highlighted so that it would have jumped out

23   at you, but it was another way that they were trying to change

24   the structure of the dues checkoff form.

25        MS. DEVLEMING:  Okay.  I think this is a good stopping



1    point, and I'm going to try to get another option for my

2    internet connection.

3         JUDGE TRACY:  All right, so let's take -- at 2:30,

4    let's -- Pacific Time.  Let's take a ten-minute break, and

5    then -- well, let's do a 15-minute break, because then we're

6    going to push forward until about 4:30.

7         Ms. DeVleming, you feel that you'll be here tomorrow

8    morning?

9         MS. DEVLEMING:  Yes.

10        JUDGE TRACY:  Okay.  One thing I just want to note, Ms.

11   Biggs-Adams, please just be careful to pause and wait for Ms.

12   DeVleming's questions to be finished asking.  I think you

13   can -- what happens is the longer this goes, you can probably

14   anticipate what she's going to ask, and you start answering

15   before she's finished, and that will mess up the transcript.

16   The same goes when Mr. Roberts's asked you some questions on

17   cross-examination when that comes about.

18        And the other thing is -- what I'm noticing is also be

19   careful, Ms. Biggs-Adams, to wait for a question.  So even

20   though Ms. DeVleming might start asking Mr. Schiff to open a

21   document and refer to something, just wait for the question

22   instead of just talking about what the document is, okay?  We

23   need to wait for that.  So I appreciate that.  So let's come

24   back at 2:45 Pacific Time, so 15 minutes from now.  And I'm

25   just going to mute myself and my -- close my screen, okay?  Or

1    turn off my video.  Okay, let's go off the record.

2        MS. DEVLEMING:  I'm going to change my internet, so I will

3    probably drop off again, sorry Daniel to make you re-admit me

4    every time.

5    (Off the record at 2:32 p.m.)

6        JUDGE TRACY:  All right, so let's go ahead and go back on

7    the record.

8        MR. SCHIFF:  We're on the record.

9        JUDGE TRACY:  All right.  So Ms. DeVleming, you're going

10   to have to unmute.  I think she forgot.

11       MS. DEVLEMING:  Thank you.

12   Q    BY MS. DEVLEMING:  All right, so diving back in, Carrie, I

13   think we were at the April 24th, 2019 bargaining session, would

14   be the next to cover.  Do you -- do you happen to remember what

15   happened on that bargaining day?

16   A    So during the bargaining on the 23rd, the company had

17   again made a very big deal about the union presenting a -- an

18   economic offer, wage offer.  So they gave me, on the 23rd, the

19   information I'd been requesting about wages and any new

20   employees, new members.  And so I sat with Ellen Hansen that

21   afternoon and into the evening and developed an entire proposal

22   structure for a wage offer, which I presented the next day.

23       MS. DEVLEMING:  Okay.  Mr. Schiff, can we first open Joint

24   Exhibit 23?

25       MR. SCHIFF:  Excuse me.  Your Honor, in -- is my cell



1    phone back in?

2         JUDGE TRACY:  No, actually I don't see it on there, no.

3         MR. SCHIFF:  My apologies, thank you.

4         JUDGE TRACY:  Is -- is -- is the -- what we've done thus

5    far okay?  Is it recorded?

6         MR. SCHIFF:  Yes, ma'am, I have that.

7         JUDGE TRACY:  Okay, all right, good.  Okay.

8         MS. DEVLEMING:  Okay.  All right, sorry.  Do we have 23?

9    Perfect.

10   Q    BY MS. DEVLEMING:  Carrie, are you looking at the

11   screenshare of Joint Exhibit 23?

12   A    Yes, I am.

13   Q    What is this?

14   A    This is an email from me to Mr. Pautsch on the 24th.  So

15   obviously I had my days mixed up.  The bargaining dates I guess

16   were the 24th and the 25th.  So on the 24th at 11:50 in the

17   morning, I emailed asking for current wage rate, hourly rate,

18   date of hire, Nexstar and KOIN, as those might be different,

19   current job title, and name of all members of the bargaining

20   unit.  "Please include their most recent wage increase." And

21   export electronically so that I could use it to draft proposal.

22        MS. DEVLEMING:  And can we pull up Joint Exhibit 24?

23   Q    BY MS. DEVLEMING:  And Carrie, what is this?

24   A    This is a printout of that excel spreadsheet that was sent

25   to me in response with the wages.



1   Q    Okay, on that same day?

2   A    Yes.

3       MS. DEVLEMING:  Okay.  So then -- all the exhibits.  Let's

4   pull out Joint Exhibit 9.  And let me scroll down a little.

5   Sorry, I'm kind of whispering.

6   Q    BY MS. DEVLEMING:  Okay.  So first let's look at the email

7   cover page, the first page of the document.  So Carrie, what is

8   this?

9   A    This is a cover sheet which, unfortunately, the first

10  paragraph is now covered up by the cursor covering its link,

11  but I -- I'm explaining there that the wage proposal includes

12  article 24, entry level minimum rates, and article 25 wage

13  increases, both parts of the -- of the wage package.  And the

14  proposal explains that each person's wages would be adjusted on

15  ratification to the new rate.  In article 24, if there were an

16  individual who had ten years or more service, they would get a

17  raise -- a minimum raise of at least $3 per hour, and then

18  annualized percentage increases on the anniversaries of that

19  first wage increase.  I noted that I did not do all the work to

20  calculate all the rates because it would be really a waste

21  of -- of time.  Let's figure out what a percentage would be,

22  and then we can agree what the -- the math metric is.  And our

23  proposal is based on a four-year term.

24  Q    And you sent this over, it looks like, April 24th at 4:15

25  p.m.  Pacific Time, so the same day that you received --



1    A    The day.

2    Q    The same day you received that information we just

3    identified as General Counsel --

4    A    Yes, I think I got that information about midday, and this

5    was four or five hours later.

6    Q    Okay, so now let's scroll to page two and three.  Two

7    first.  So what were the terms, generally?

8    A    So the current contract has a zero to six-month rate and a

9    six month and over rate.  I was putting in another step at two

10   years and over.  So if you note in the first column, it --

11   the -- the graph says old contract, and that's the rates that

12   you would find in the expired agreement.  But then, at the two

13   years and over, the notation is new, because that is a new wage

14   rate, it doesn't exist currently.  And I had built that into

15   each of the wage categories.  On the theory, as I had mentioned

16   earlier, of a recognition of somebody who had stayed with the

17   station over the years and not left, being financially

18   supported for having given that loyalty to KOIN.

19   Q    Okay.  And what were these rates designed to do, if

20   anything?

21   A    Well, they were to raise the minimum in-hire rates, and

22   they were also designed to capture the people who had been

23   hired in the preceding couple of years.  This is April of 2019.

24   We had been -- but the specific terms of the expired contract

25   had expired in July of '17, so what, about 20 months earlier?



1    And the idea was, you hired all these people at higher than the

2    contract minimums, because the company said, we have to keep

3    hiring them at higher rates because they won't come to work

4    here for the minimum.  So okay, if you're recognizing you have

5    to pay them more to work here, let's restructure those current

6    wages to recognize that.

7    Q    And when was the last time bargaining unit employees had

8    gotten a raise?

9    A    Their last raise had been on -- in July of 2016.

10   Q    Why is that?

11   A    Because the 2015 contract was a two-year contract with a

12   four percent increase on effective non-signature, and a one

13   percent raise a year later -- that year later would have been

14   July of -- of '16.  And then it expired a year after that.

15   Q    Were the new pay rates you were proposing for this

16   document extremely high in your experience compared to other

17   employers in the market?

18   A    No, I don't think they were extremely high.  They were

19   higher than what people were getting paid, but they had been

20   stuck, many of them, at these artificially low rates, and then

21   there were some people who -- one manager or one employer in

22   history had given them a serious bump, and those peoples wages

23   might be double what a coworker made for the exact same work.

24   Q    So you just testified about them being higher than before

25   at KOIN, but just to double back and make sure it's clear, how



1    did they compare to the industry standards in your experience?

2    A    They -- they -- well, at -- at $15 -- $17.50, which was

3    the in-hire rate, that was starting to be at risk of being

4    superseded by minimum wage.  The campaigns for minimum wage to

5    be $15 an hour or more could have overtaken that rate.  And

6    these are highly skilled jobs, they require technical

7    expertise, knowledge, information skills, and I believe that

8    they should be paid for -- in recognition of that, that they

9    should be paid more money.

10   Q    But how did your proposed rates, the 21, 25.30, how did

11   those compare to the market?

12   A    I don't have access to the contracts from the other

13   Portland stations, but I did know that these rates had not gone

14   up since 20 -- the minimum rates had not gone up since 2013.

15   Q    For the other contracts, or for KOIN?

16   A    No, for KOIN's contract.

17   Q    Okay.  Do you have any knowledge of what an industry

18   standard pay rate is for a new videographer?

19   A    No.  It's -- it's a pretty wide swing.

20        MS. YEN:  I just want to make one comment about Joint

21   Exhibit 24.  Joint Exhibit 24, I guess is what it is.  The -- I

22   have a concern about putting this into a public record.  The --

23   I understand the point of it, but generally speaking -- and

24   it's probably just I -- I usually err on the side of privacy

25   for individuals.  I would prefer if you would just redact all



1    the first names.  I don't think anybody's name is the same.

2    And really, for the purpose of the record, you don't even need

3    the name of the person.  The point of it is the title and the

4    date of hire and their salary, and the differences.  So I would

5    just prefer for this record, since it will be a public record

6    that anybody could look at, that you redact these individuals'

7    names for the transcripts.  Are there any objections to that?

8        MS. DEVLEMING:  No, Your Honor.

9        JUDGE TRACY:   Not from me.

10        MS. YEN:  Mr. Roberts, where'd you go?

11        MR. ROBERTS:  No, I'm sorry, I had trouble unmuting.  No

12    objections.

13        JUDGE TRACY:  Okay.  And -- well, we need you back on the

14    screen.

15        MR. ROBERTS:  All right.  I hit the wrong button.

16        JUDGE TRACY:  We want to look at you.  Also, so what -- if

17    you guys could do, at some point, you know, again, a note that

18    we have the subpoena and the petition to revoke to put in the

19    record.  That's one note that I have for myself.  But the other

20    note is for Joint Exhibit 24, please redact the first and last

21    names of these people, and then we can just substitute that in

22    before it goes into the transcript.  You know, Claudine, that's

23    not going to -- are you going to be uploading these today, or

24    when do they have time to do this?

25        MS. METOYER:  They have time.  I have not even received



 1    the link for them.

 2         JUDGE TRACY:  Okay.  Okay, so that's good, so you have

 3    time.  I just know with a multiple day hearing, especially when

 4    it goes into other weeks.  Sometimes I've had where things are

 5    uploaded that are not -- or put into the official transcript

 6    that are not ready yet.  So let's just take care of that.  And

 7    then also, keep in mind, really it's going to be the General

 8    Counsel's responsibility to get these documents to the court

 9    reporter, so however way that you could do that, okay?  So

10    let's just make sure she gets them at some point.

11         Anyway, I'm sorry to interrupt the -- the flow of the

12    testimony.  But let's -- go ahead, Ms. DeVleming.

13         MS. DEVLEMING:  Thank you, Your Honor.

14    Q    BY MS. DEVLEMING:  Let's turn back to Joint Exhibit 9.

15    Okay, if we can scroll down to the second page of this proposal

16    itself, so page 3 of the document.  Okay.  All right, so what

17    about this article 25 proposal.  What did you think of what was

18    in there?

19    A    So this would be for people who are overscale, or people

20    who weren't on that escalator structure that was above, and

21    what increase they would receive.  So in the fourth line, you

22    see, receive a 3.5 percent increase.  And then it's proposed

23    that that would be on the first anniversary of the contract,

24    the second anniversary of the contract, and the third

25    anniversary, that there would be a 3.4 percent increase each



1    year for those who were at top scale or above.

2    Q    Okay.  So after emailing Joint Exhibit 9 to Respondent at

3    4:15 on April 24th, did you guys meet again that day?

4    A    I don't believe we did.

5    Q    Okay.  Do you recall if you had an opportunity to discuss

6    scheduling future bargaining dates before the end of that

7    session?

8    A    I started the discussion, especially since we're in April,

9    after the March dates had fallen apart.

10   Q    Okay.  Do you remember what those discussion were, or if

11   the parties settled on future dates?

12   A    I know we did before we left, but I don't recall at the

13   moment whether we did on that first day.  It was always my goal

14   to try and get the dates out, because somebody might have to

15   check with family, friends, office, others, to confirm their

16   availability.

17   Q    So just for the record, and this is thankfully stipulated,

18   the set here is April 23rd and 24th, so this is day two.  I

19   think the confusion was when the wage proposal was sent over,

20   but that should be clear --

21   A    I've got you.

22   Q    -- just from the documents.  Okay.  Well, hearing that

23   you -- would there be something that would refresh your

24   recollection as to what was discussed about future bargaining

25   dates?



1    A    Either the bargaining bulletin or my handwritten notes

2    should show at the bottom of them what the next dates were.

3    Q    Yeah, let's start with Joint Exhibit 13, and it's date 6,

4    which would likely be first or second page.  Okay, it's a one-

5    page typewritten transcription of your handwritten notes.   If

6    we can go to 6.  Perfect, right there is great.  Does this

7    refresh your recollection -- recollection about any discussion

8    of bargaining dates?

9    A    Yes, it does.  We had agreed to June 25th and 26th.

10   Q    Do you remember why there wasn't agreement to a date in --

11   dates in May?

12   A    Because, once again, May would be a sweeps ratings month.

13   Q    Okay, which meant?

14   A    Unavailability of the news related people in the

15   bargaining.

16   Q    Who -- which party afforded that they couldn't meet in

17   May?

18   A    The employer.

19       MS. DEVLEMING:  Okay.  All right, let's open, if we can --

20   thank you again, Mr. Schiff, for all your help.  Joint Exhibit

21   17, and we will scroll again to the middle.  I think last we

22   were at date 33, so it's got to be around date 35 or so.  It's

23   number 27, bargaining bullet 27.  Maybe a little further than I

24   thought.  Perfect.

25   Q    BY MS. DEVLEMING:  All right, Carrie, do you recognize



1    this?

2    A    This is a bargaining bulletin, number 27 from April 24th.

3         MS. DEVLEMING:  Okay.  Actually, I guess I have no

4    important questions from that one.  Let's move on to Joint

5    Exhibit 25, please.  All right, is there a way we can see more

6    of it at a time?  If we can -- there we go, perfect.  Or maybe

7    it's not -- nope, I don't know, it's not on my screen.

8    Q    BY MS. DEVLEMING:  Okay, Carrie, can you see this Joint

9    Exhibit 25?

10   A    I can tell it's a memo from Pat Nevin, but I can't read

11   it.

12   Q    Is it too small?

13   A    It's --

14        MS. DEVLEMING:  Yeah, I think that's the problem.  Go

15   ahead and do whatever you were doing, Mr. Schiff.  I'm pulling

16   up a copy on my side.  Okay.

17   Q    BY MS. DEVLEMING:  So -- okay, so line three refers to

18   stall tactics on the side of their -- these employees' business

19   representatives.  Would that be you?

20   A    That's who he was referring to.

21   Q    Were -- first of all, were you their business

22   representative?

23   A    I was not.

24   Q    What were you?

25   A    I was their local president.



1    Q    Okay.  And stall tactics, were you -- do you agree that

2    you were engaging in stall tactics?

3    A    Totally not.  I think the example is, I finally got the

4    wage information and created a proposal within a few hours.

5    Q    Okay.  And then, below -- well, we talked about that.

6    Okay.  They call you out by name somewhere, probably on page 2.

7    So page 2, first paragraph.  They refer to you using a similar

8    tactic as what you used back in 2015 during bargaining with the

9    predecessor.  Is that what that refers to?

10    A    Correct.

11    Q    Okay.  Did you ultimately reach a collective bargaining

12    agreement with the predecessor?

13    A    I did.  We did.

14    Q    Were you in charge of that bargaining for the Union?

15    A    I was.

16    Q    Was Chuck Pautsch involved in bargaining for the

17    predecessor?

18    A    No, he was not.

19    Q    Was Pat Nevin?

20    A    No.  He didn't work there yet.

21    Q    Okay.  And then it mentions your wage proposal and says

22    you have finally provided one.  Let me find where this is.  I

23    think that's on page 1 at the bottom.  Had they provided a wage

24    proposal to this point?

25    A    No, they had not.



1    Q    And why was it that it took you until this point to

2    provide a wage proposal?

3    A    Because I needed the current earnings, and the last time

4    I'd had the earnings had been the previous summer.

5    Q    Okay.  Can we look at Joint Exhibit 26?  All right.  Can

6    you see this one, Carrie?

7    A    Yeah, it's getting smaller as it clicks, but yes.

8    Q    What is this?

9    A    It's another memo from Mr. Nevin to all KOIN employees.

10   So he was no longer referring just to the members of the

11   bargaining unit, but he was speaking to all employees at the

12   station, if that was truly how it was distributed.

13   Q    Okay.  On here again, paragraph 2, the assigned Union

14   representative?

15   A    That would be me.

16   Q    I believe it called you out by name again.  I'm scanning.

17   I should have marked this up better.  Oh, sorry.  Okay, well,

18   paragraph 2, it says, "The assigned Union representative",

19   which you confess to at least is you, "has been repeatedly

20   unprepared and unwilling to engage" -- "engage in progressive

21   negotiations."  Do you agree with that statement?

22   A    I do not.  Progressive negotiations were something the

23   company repeatedly accused us of not following, and so I had

24   asked for an explanation of what progressive negotiations were.

25   I had been bargaining contracts for over 40 years, but nobody



1    had ever invoked progressive negotiations with me before.  The

2    company then provided me with a paragraph that said it

3    explained what progressive negotiations were.  I did some

4    online research to try and find out what progressive

5    negotiations were, and I believe they relate to maritime law,

6    something that I don't get involved in.  Bargain contracts in

7    broadcasting of their labor law.

8    Q    And it says you "avoided discussing hourly wages and

9    exorbitant initiation fees".  What's your response to that?

10   A    Well, the hourly wages I was clearly trying to discuss.

11   That's why I made a proposal about an improved hourly wage for

12   in-hire rates, second, an additional tier being a third tier

13   total of wage increases after two years in service, and that I

14   had proposed a rate for people who were above those rates

15   because of the years that they had been with the station.

16   Q    Okay, let's turn to the June 26th, 2019, bargaining

17   session.  Do you remember what happened at the beginning of

18   that session?

19   A    I'm sure we had a disagreement about the lovely memos that

20   Mr. Nevin had been sending to people about me.

21   Q    Do you remember what you discussed in terms of the memos?

22   A    Not right at the moment.  Sorry.  I'm starting to fade.

23   Q    I bet.  It's been a long day.  Thank you for your

24   perseverance.  Can we?  Lets' start with -- let's pull up Joint

25   Exhibit 27, please.



1      JUDGE TRACY:  Ms. Adams, do you need to take a break?  I

2  know it's --

3      THE WITNESS:  Oh, I'm okay.  I'm just going to move away

4  from my camera for a minute and just reposition myself.  I'm

5  sort of slouchy.

6      MS. DEVLEMING:  Okay.  Sorry to put you back.

7      THE WITNESS:  We'll see if good posture helps.

8      JUDGE TRACY:  Yeah.  Like I said, you know, I was trying

9  to avoid taking another break, but if we need to take a

10  five-minute stretch break, restroom break, I'm okay with that.

11  You know, for many of us this is our first Zoom hearing, myself

12  included, and so it's just I'm hearing alone, and a bargaining

13  case in particular can be quite methodical.  And so in person,

14  we get mentally fatigued by the end of the day, and now that

15  we're on here, it's even more so because we don't get the

16  energy of everybody in the room.

17      So I told everybody on the calls before in preparation of

18  this, we'll take the breaks that we need to get through this.

19  If it takes more time, it takes more time.  I don't want to

20  charge anybody extra money for that in the sense of like

21  delaying things, but we're just going to do the best we can so

22  everybody gets a chance to put the case on, okay?  So if you

23  need a break, let us know.

24      THE WITNESS:  I appreciate that.  I've also used each of

25  the breaks that you all have taken to try and work with the IT

1    folks.

2         JUDGE TRACY:  Oh, yeah.

3         THE WITNESS:  To get access to the SharePoint.  So it'll

4    be less stressful when we have that resolved, as well.

5         MS. DEVLEMING:  Long day.

6    Q    BY MS. DEVLEMING:  All right.  Well, we've got Joint

7    Exhibit 27 pulled up.  I know the screen strain on the eyes is

8    getting to me, too, but can you -- can you make out what this

9    is?

10   A    Yes.

11   Q    What is it?

12   A    It's a request for information from Mr. Nevin and --

13   Q    Okay, dated June 26th?

14   A    Yes.  June 26th marked as Joint 27.

15   Q    Okay, and what was he requesting, just generally speaking?

16   A    He was requesting retroactive to January 1, 2017, before

17   Nexstar even owned the station, information communicated

18   between us and members of the bargaining unit, and then those

19   notices are then provided to the Employer.  So it seemed odd

20   that he was demanding them of me.

21   Q    And then, can we scroll down a bit to the conclusionary

22   paragraph there?  So it asks for a response by no later than

23   close of business the following day of bargaining, June 27th?

24   A    That is correct.  This was the beginning of giving me

25   information requests which had 24-hour deadlines on them.  I



1    get them sometime during bargaining on day one, and the

2    obligation would be to provide the information by the close of

3    the following day, all while I was at the bargaining table.  So

4    if it was something that I was going to need to pull physically

5    from the files in our offices, I would have to have someone

6    else do that because I wasn't going to be able to go back to my

7    office to pull those documents.

8    Q    In addition to the scope, you mentioned the time frame

9    back to 2017, but did you have any substantive issues with what

10   this was requesting?

11   A    Well, the Beck decision and Beck rights.  Since that's a

12   U.S. Supreme Court's decision in Beck v. Communications Workers

13   of America, it's something that is a very big deal at CWA.  I

14   had worked in the headquarters.  I knew how the department that

15   handled our calculations or chargeable and nonchargeable

16   expenses worked and the allocations of time and the processing,

17   and I did not feel it was appropriate that the company wanted

18   to see what we had been telling, under the Beck decision, to

19   the members of the bargaining unit.  We -- we are in

20   compliance.  CWA makes sure we're in compliance.  They have a

21   Beck compliance department that makes sure we stay in

22   compliance.

23   Q    What did this have to do with contract bargaining?

24   A    Well, it should have nothing, but it related to demands to

25   get into internal Union operations and internal Union decisions



1    that I don't feel are correctly the Employer's to make.  They

2    don't work on our compliance on Beck.  They don't do our

3    calculations on political lobbying which is not all that's

4    nonchargeable.  It's far more complicated than political

5    lobbying that is removed from the chargeable amounts under the

6    Beck decision.  That calculation is done by all of CWA with

7    input from all national staff who report four times a year.

8    When it's your reporting week, you have to report every minute

9    of every day, not just the ones you were working, what hours

10   you were off, when you worked, what you did, what kind of work

11   you did, and then we have allocations of all of the budgets and

12   resources.  And I think I'm justly proud that we -- we work

13   very hard to make sure that we stay in compliance, we do the

14   reporting, and this was not anything that an employer belongs

15   in.

16   Q    Okay, so again, Joint Exhibit 27 requested a response by

17   close of business, June 27th.  Can we pull up, please, Joint

18   Exhibit 28?  Okay, Carrie.  Can you see Joint Exhibit 28?

19   A    Yes, I can.  It's starting to get littler, but I can still

20   see it.

21   Q    What is it?

22   A    This is my response to Mr. Nevin about his information

23   request of June 26th.

24   Q    And it's dated June 26th.  Does that mean you sent it that

25   day?



1    A    I did.

2    Q    Did the parties discuss this issue, the back and forth

3    here, at bargaining, at the bargaining table on June 26th?

4    A    Yes, I believe we did.

5    Q    Do you recall any specifics that you haven't already

6    mentioned about back and forth between the parties or any

7    concerns the Union expressed at the table?

8    A    Well, it was a very strong feeling on my part that the

9    Employer was mucking about in something that was none of their

10   business.  This was not a question of some member having a

11   question about their Beck rights and coming to the Union for

12   questions or clarifications.  This was the company, after

13   having sent memos to our members, saying we're going to reduce

14   your initiation fee, which is not something that's any of their

15   business either.  And so now we were getting into pretty

16   invasive information requests, and while we had had a lot of

17   discussion from the beginning of the bargaining over the

18   mechanics of the Union security provision and the Union

19   business provision, it had really largely involved the -- first

20   the providing the Social Security numbers, which the company

21   did not want to do, and my effort to try and find a way out of

22   that problem to satisfy the need for appropriate data to credit

23   the individual's funds and to -- to then get deeper into all of

24   this with the charge of $10 per member per month, or later $50

25   per member per month, for the deducting of the dues from



1   people's checks because they said it was such a complicated

2   process and so expensive to the company to do.

3   Q    Did the parties discuss wages on June 26th?

4   A    I don't remember anymore.

5   Q    Okay.  Well, to this point, had you discussed your April

6   24th wage proposal in session?

7   A    We really hadn't because we'd given it to them as they

8   were -- as we were ending those two days.  So this would have

9   been the first really in depth discussion.

10  Q    So to your recollection, did you discuss the wage proposal

11  on June 26th?

12  A    I'm sorry.

13  Q    Would something refresh your recollection?

14  A    A copy of my notes would be helpful.

15  Q    Okay.  Can we put up Joint Exhibit 13?  And it's going to

16  be Bates 9.  Yeah, 8-9.  So kind of in the top of the middle of

17  the page, Carrie, can you see JX-13?

18  A    Yes.

19  Q    And this is your June 26th bargaining note?

20  A    Correct.

21  Q    So the written response to the letter, that would have

22  been the letter for the information request and my written

23  response, the one we were just looking at.  And then, C-5 and

24  C-6 are those continuing discussions of Article 2 and Article

25  3, Union Security and Union Business.  And then, wages, they



1    felt our proposal was out there.  It was a very dismissive kind

2    of -- not a counterproposal, not gee, 3.5 percent is a lot of

3    money to give our workers.  It was dismissive, like, you know,

4    you're just crazy.  You're demanding way too much money.  And

5    so then, that's Mr. Pautsch saying, you know what we settle on.

6    A percentage up.  Bargain that very hard.  They were well known

7    for bargaining a part of a percent.  Like not giving a whole

8    percent increase.  Giving 0.25 percent of a raise.  And I felt

9    that that was inappropriate in this circumstance.  They were

10   looking at a successful television station, and they had the

11   money to have bought this series of television stations, and

12   they were not quite but I was starting to think it was going to

13   be them getting ready to buy Tribune.  So they were

14   going -- they had enough.  I think that one was $4-plus billion

15   that they had to buy another chain of television stations, and

16   yet they felt that because it was their pattern, I should

17   accept a part of a percent for a wage increase, when both the

18   wages needed to be increased and the structure needed to be

19   improved.  Did you freeze?

20   Q    No, I'm sorry.  I was taking a moment.  Do you recall any

21   discussions about the indemnification proposal discussions?

22   A    It wouldn't surprise me because the indemnification

23   language was now in those C-5 and C-6 proposals.

24   Q    Okay, and that's the --

25   A    Not -- not so much that separate number 47 indemnification



1    but within -- they wanted to be indemnified by the Union if

2    somebody sued over the amount of their initiation fee or their

3    dues.

4    Q    Okay.  I believe that takes us to the next day, June 27th,

5    2019.  Do you remember how bargaining began on June 27th?

6    A    I'm sure it began much as it ended the day before.  Still

7    talking about how upset the company was with us.

8    Q    About what?

9    A    About the economic offers, about the -- the pushback.  As

10   you'd seen in his email, he was very upset that we were going

11   to go out to advertisers, and it was coming up on Blues Fest,

12   and I think they had become aware that we were going to take

13   mobilization action at the Blues Fest.

14   Q    What is the Blues Fest?

15   A    The Blues Fest is a Portland musical tradition.  It takes

16   place on the Waterfront Park, which is a few blocks from

17   KOIN-TV, but -- and it -- that Waterfront Park goes along the

18   river, the Columbia River, through the middle of the -- the

19   city, and it has multiple entrances, multiple stages.  It's a

20   big musical to-do in Portland and goes on around the Fourth of

21   July for four or five days.  And just as we had in 2015, we

22   intended to have people go out and talk to the public as they

23   went into the Blues Fest, in part not just because it was in

24   Portland but because KOIN broadcasts large segments of the

25   Blues Fest, and the fireworks that take place are also shown on



1    television as a live event.

2    Q    So what was the tone of the conversations at bargaining in

3    June, June 26th and 27th, when that subject came up?

4    A    Mr. Nevin in particular felt that we should not be doing

5    things like that towards the station, that it was inappropriate

6    that we reach out to the public about the situation that we had

7    trying to get a contract.  And mobilization of that type had

8    been part of my experience working in NABET since 1976 when I

9    went to work at NBC, and six weeks later I went on my first

10   strike in many, many picket lines.

11   Q    When you say he was concerned, or I'm sorry if I

12   mischaracterize the word you just used, describe what you mean.

13   What was the tone?  Were there -- what kinds of conversations

14   were had?

15   A    He was dismissive.  He was disparaging.  You saw the tone

16   of the memo that you looked at about 15 or 20 minutes ago,

17   memos from him to the employees at KOIN.  He was ramping up his

18   attack on us for our going to the public.

19   Q    And what about the conversations about your wage proposal?

20   What was the tone of those conversations?

21   A    He continued to say that it was excessive, that it was

22   inappropriate, that it was too much money, but not just like,

23   hey, you're asking for a lot.  It was as though it was like are

24   you crazy?  That's -- that's not going to happen.  That's way

25   too much money.



1    Q    You discussed the Article 2 and 3, Company 5 and 6

2    proposals on the table, at that point?

3    A    Yes, I believe we did.

4    Q    What kind of tone was had during those conversations?

5    A    We continued down the path that he was attacking that

6    our -- he felt that our financial arrangements between us and

7    our members which had been voted on by membership referendum to

8    set the dues of that rate were inappropriate, and there was a

9    lack of, to me, respect for the fact that a group of people in

10   a Union can decide what to pay for their initiation fees.

11   There are -- and their dues.  There are protections in the law.

12   There were protections in our bylaws.  The local bylaws, the

13   sector bylaws, the CWA Constitution all mandate how we handle

14   increasing a dues rate.  It's certainly not anything that's

15   done lightly and has to be in full compliance with changing the

16   local bylaws, which requires two readings at least 30 days

17   apart.  Then, it requires the approval of the National Union,

18   and because it's a levy or an increase that's financial, it has

19   to go to a secret ballot vote of the membership.  Then, after

20   you approved the changes, then you have to submit (audio

21   interference) to the sector to be sure that they sign off on it

22   and they approve it.  And then, of course when you file your LM

23   at the end of that year, you have to include any changes to

24   your bylaws in your filing to the federal government.  So to

25   act as though this was something that was done by the Union in



1    a grubby, money-sucking, just-taking-from-you,

2    not-giving-anything-to-you kind of way is offensive to me.

3    Q    All right.  Can we pull up Joint Exhibit 6-J, please?  All

4    right, Carrie, take a minute to look at this, and maybe we can

5    scroll.  What is this, Carrie?

6    A    So this looks like it's the NABET Counterproposal.  So if

7    you look at the top of the page, NABET Counterproposal of

8    6/27/19 to the Company Proposal of 4/23/19, C-6.  So that's

9    breadcrumbs left for when you later -- years later, if I here

10   need to go back and figure out what was this proposal, when was

11   it made.  So we had crossed out the company proposal of the

12   Section 3.1, 3.2, 3.3, because that was their restructuring of

13   it.  It previously had just been one paragraph because the

14   Union rejects this proposal as a nonmandatory subject to

15   bargaining.  The Union is not going to bargain over changes to

16   the internal dues in initiation fee structure of the Union

17   Local as to the $50 fee for the Union to enable -- the Union is

18   unable to bargain without an explanation for the expense and

19   time that the company would not explain.  This had been the

20   $50.  We've been told repeatedly that it took Mr. Wenger five

21   or six hours every two weeks to calculate the 2.25 percent of

22   dues.  And then, the single sentence we reiterate the language

23   of the current contract because we felt it was working.  And

24   then, Section 3.2 is in conflict with the already tentatively

25   agreed to Section 3.6.2.  And that was my way of pointing out



1    in writing that there was a mismatch by how they had already

2    TA'd what information they would give us and what they were

3    changing in their reiterated 3.2.

4    Q    Then, can we scroll down a little further, please, with

5    this language, into the following page?

6    A    3.1, the dues check-off language, and then down through

7    the check-off form is our proposal reiterated from the existing

8    contract as to how to go about doing dues and an initiation fee

9    deduction.

10   Q    Okay, so on June 27th, after you presented this, did the

11   parties discuss it?

12   A    We did.

13   Q    What do you recall discussing about this proposal?

14   A    I can assure you they didn't say, oh, now we understand.

15   I couldn't even get the parts straight about how the

16   tentatively agreed to language in the two sections of 3.2 and

17   3.6.2 were in conflict with each other, and I would have

18   thought that if I'd just pointed it out in writing and set it

19   across the table, somebody would look at the two provisions and

20   go, oh okay, I see what you mean.

21   Q    But they didn't?

22   A    They didn't, and it seemed to me like they just weren't

23   listening to anything I said because that, to me, was a pretty

24   simple fix.

25   Q    And what was the tone in this conversation at this point



1    in the June 27th session?

2    A    It continued through from the day before.  This is more of

3    the dismissive, not-going-to-do-it, disrespectful bargaining.

4    Q    When you say "disrespectful", what do you mean?

5    A    I've bargained with attorneys from big union-busting law

6    firms, King & Ballow for an example, who want to fight with you

7    and put you down and take away what you got, but it was

8    generally a more respectful environment than what was going on

9    in these negotiations.  The tone was nasty.  The lack of

10   respect for what I would say or what I would write or what I

11   would present was continuing and ongoing, and as you'll see in

12   the campaign of letters to the membership, trying to gin up

13   some sort of a controversy that had not existed.  That is, to

14   me, union-busting, and I wasn't enjoying it.

15   Q    So do you remember any name calling on either side?

16   A    I will openly admit that I can dish it out just as much as

17   it may be dished towards me, and I certainly don't shy away

18   from swearing, but I find it inappropriate when people are

19   trying to bust the Union and really don't have any respect for

20   the workers.  "We" is the one they're bargaining for, who I'm

21   trying to get a better wages, hours, working conditions

22   structure put in place, and I think, and it certainly felt that

23   the company thought if they just dragged it out and kept

24   railing on us that we would just back off, give in.  Either

25   agree to pay the $50 or agree to give up on deducting



1    initiation fee.  It was about getting me specifically, not just

2    the Local Union, to acquiesce to their positions.

3    Q    Why do you feel that way?

4    A    Because this was the strongest contract that Nexstar had,

5    at that point.  It had the strongest provisions.  It had things

6    that had not been -- how can I say?  They hadn't grown up to be

7    weak as they had in some of the places where Nexstar had been

8    the owner for many years.  So weak negotiations over a long

9    period of time had made for some weak provisions or

10   unenforceable or hard to enforce language in other contracts,

11   and in this circumstance I was in a major market.  I was on the

12   West Coast.  I was not in a Right to Work state in the South.

13   There's good union density in Portland.  There was support by

14   the labor movement and Jobs with Justice for our members, and

15   this was particularly true because we were reaching out to a

16   lot of unions at that time in preparation for the Blues Fest.

17   There are --

18   Q    So Carrie --

19   A    There are unions that sponsor stages and acts during the

20   Blues Fest.

21   Q    Carrie, let's get back to June 27th bargaining.  So I

22   think, if I'm summarizing, and please correct me if we're not,

23   you admitted a minute ago that you can yourself potentially get

24   a little crass.  Did you do so on June 27th?

25   A    I believe I did.



1    Q    And do you recall how Respondent's side responded to that?

2    A    My father who was a historical -- was a Cali -- a

3    historian and a Ph.D., could use some colorful language, and he

4    would talk about the reformed whore at the strawberry festival.

5    People who acted like they just never heard swearing.  They'd

6    never seen anything out of control.  They were just acting like

7    they were pure as the driven snow, and how in the world could

8    you talk like that?  That was kind of what it came off like.

9    Q    Did they ever use swear words themselves?

10   A    Oh, yes.

11   Q    Like what?

12   A    It will come out, out of context, obviously, because I'm

13   not quoting the whole conversation, and I don't have a

14   recording of it or verbatim notes, but calling me a bitch.  You

15   know, early on Mr. Busch, early in the negotiations, set the

16   tone of the negotiations with things that he said to me and to

17   Kevin Wilson when he came to the bargaining table during August

18   of 2017.  He at one point just stopped and said, "I know what

19   you are," pretty loudly -- I mean, like the emphasis that I

20   just gave you -- to Kevin Wilson.  And Kevin said, "What?"  And

21   he said, "You're a tiger."  And Kevin said, "Well, my wife says

22   that, but how did you know?"  And it was as though, you know,

23   he could just put out these disparaging comments and be

24   dismissive and disrespectful.  The fact that the man is the

25   president of a large broadcast corporation doesn't give him the



 1    right to be disrespectful to me or the economic lives of the

 2    people I represent.

 3    Q    You mentioned being called a bitch.  Who was it who called

 4    you a bitch?

 5    A    Mr. Nevin.

 6    Q    When was that?

 7    A    I believe it was during that June 20 -- what are we on,

 8    28?

 9    Q    We're on 27.  Was it during that session?

10    A    During that session.

11    Q    Okay.  Can we pull up Joint Exhibit 5-I?  Okay, Carrie,

12    take a minute to look at this, if you can, and maybe we'll

13    scroll down a little further.  Do you recognize this, Carrie?

14    A    Yeah, it -- it looks like a NABET response.  It -- if you

15    go to the top of each page, it normally says who made the

16    proposal.  So that's a June 27, '19 proposal in response to an

17    April 23rd C-5 proposal.

18    Q    Can we scroll down to page 2?  Oh, I guess page 1 is

19    the -- halfway through page 1.  Okay.  And that's your

20    proposal?

21    A    Correct.

22    Q    I don't see any highlights or deletions.  Is that their

23    existing contract language?

24    A    That would have been the existing language, yes.

25    Q    Did the parties discuss this proposal at the bargaining



1    table on June 27th?

2    A    Yes, because we again continued to present that this

3    language worked.  There wasn't a problem.  So why were we

4    seeing all of this union-busting to break up the existing

5    language?

6    Q    And more conversations to before about changing the -- for

7    the Beck and all that kind of thing?

8    A    Correct.

9    Q    Okay.  Do you remember if anything else happened at

10   bargaining that day?

11   A    Not at the moment.

12   Q    Do you know if the parties had a chance to schedule future

13   bargaining sessions before this June 27th session ended?

14   A    I'm sure we tried.

15   Q    Okay.  Ultimately, the parties had stipulated.  You didn't

16   meet again until August 15th and 16th.  Can you remember why no

17   bargaining in July?

18   A    Well, July is sweeps, and it was always hard to get them

19   to agree to bargaining during sweeps.

20   Q    I believe your earlier testimony was that there are four

21   months a year that are sweeps months and that so far, at least,

22   Respondent had been taking the position in, I think it was

23   February, whatever.  The record will reflect which month

24   Respondent took the position they couldn't meet because it was

25   sweeps.  Was it acceptable to the Union to just walk out four



1    months of the year for possible bargaining?

2    A    No.  You know, I don't think that they had that many

3    people on their side of the table who were directly involved in

4    producing news.  So the news director came to the bargaining

5    table from time to time, but he wasn't an integral part of

6    their team.  So I believe that they could have carried on

7    without him being at the table all day, and he wasn't always

8    there.

9    Q    All right.  Can we pull up Joint Exhibit 29, please?  All

10   right, and maybe we can scroll down a bit.  This is a June

11   27th, 2019 document.  Do you recognize this, Carrie?

12   A    Yes.  This is a written response from Mr. Nevin to the

13   response that we looked at from the day before.  So I'd gotten

14   the information request for all of the data about Beck, about

15   initiation fees, very invasive, with an order that it be

16   complied with within 24 hours.  I have responded in written

17   form, point by point, as to why we didn't believe that the

18   request was appropriate, and this was the pushback that I got

19   for -- for that.  And now I was to the point of being ordered

20   to respond by close of business today.  So I'd gone from 24

21   hours to respond to, you know, get it in here today.

22   Q    Okay, can we pull up Joint Exhibit 17, please, which is a

23   larger document?  Scroll down to Bates -- we're going to

24   Bargaining Bulletin Number 29, which is Bates 39.  All right.

25   Do you recognize this, Carrie?



1    A    Yes.  This is the --

2    Q    Sorry, I didn't mean --

3    A    -- collection of bargaining bulletins all in one PDF.

4    Q    Okay, just got there.  So what is this particular one on

5    Bates 39?

6    A    This is the bargaining bulletin from June 27th after those

7    two days of bargaining.

8    Q    And you mention, toward the top in bold there, Wages.

9    Have you received any wage proposals from Respondent yet?

10   A    No, I hadn't.

11   Q    And then, if we scroll down a bit, please, to Benefits in

12   bold.  It says, "Nexstar's proposal can be summed up as the

13   trust me model."  What do you mean by that?

14   A    And in fact, Mr. Pautsch said that.  You know, just trust

15   us.  We'll do right by you.  We won't increase the price of the

16   benefits too much.  The benefit levels will be fine, and that's

17   a pretty big leap of faith after we had had predictable costs

18   over the term of the previous contract, and now they were

19   saying you'll just pay what everybody else pays, and we'll

20   change it as we want.  Trust us.  It'll be fine.

21   Q    Okay, and then scrolling to toward the end on, I think,

22   the next page.  Actually, at the very last sentence there for a

23   bit.  Next bargaining dates are August 15th and 16th, and it

24   says, their lawyer had no dates to offer in July.  Is that your

25   recollection?



1    A    Yes, it is.

2    Q    Do you remember, is that Chuck Pautsch?

3    A    Yes.

4    Q    Did he explain why their date -- why he wasn't available

5    in July?

6    A    No.  They never contended it's sweeps and we can't do it.

7    It's just if you tried to get bargaining dates for the next

8    month or two months forward, depending on when it was for

9    sweeps, they just wouldn't agree to it.

10    Q    Oh, so your testimony that you assumed it was sweeps was

11    the reason when they said they couldn't meet for an entire

12    month; that was a sweeps month?

13    A    Yep.

14    Q    But they didn't even say that?

15    A    Nope.

16    Q    All right.  Can we pull up Joint Exhibit 30, please?

17         THE WITNESS:  Could I have just a moment to grab my water?

18         JUDGE TRACY:  Oh, sure.

19         THE WITNESS:  Amazingly for San Francisco in November,

20    we're getting warm in here.

21         MS. DEVLEMING:  It happens.

22    Q    BY MS. DEVLEMING:  All right.  So what is this document,

23    Joint Exhibit 30?  Sorry.

24    A    So this is another message from Mr. Nevin to members of

25    the bargaining unit, and I noticed, as I said earlier,



www.escribers.net | 800-257-0885

1    sometimes they were addressed to all employees at the station,

2    but this one was one of the ones that went specifically to

3    members of our bargaining unit.

4    Q    Okay, so let's look at paragraph 2.  So first it talks

5    about them bringing in a federal mediator.  What was your

6    position on the participation of the mediator in general?

7    A    When the company said they wanted to bring in a federal

8    mediator, which would have been in the fall -- I'll call it

9    November/December of 2018 -- 2017 -- I thought it was too early

10   to bring in a mediator.  There were a lot of open items.  The

11   parties just needed to work at it.  It becomes more complicated

12   when you add another person in terms of scheduling the

13   bargaining dates, but also in terms of the dynamic of how

14   things get done.  It can change the mix of how the process

15   works.  And I did feel that it was too early to bring the

16   federal mediator in.  Doesn't mean I didn't agree to do it.

17   Cooperated with her.  Enjoyed her company.  Wasn't really sure

18   that she had a handle on how to make this negotiations get done

19   any better than I did.  I tried a lot of different ideas.  I

20   tried a lot of ideas on her, and the disrespectful tone of the

21   company just continued.

22   Q    And here in the middle of this second paragraph, they call

23   you "narcissistic".  Do you think -- are you a narcissist?

24   A    I do not think I am a narcissist.

25   Q    And that you have a lack of focus, is that true?



1    A    I totally don't believe that that's true.

2    Q    Have you demonstrated the lack of focus, though, at

3    bargaining?

4    A    No, because I was trying to find a way to get the company

5    to move their positions to what I thought was an acceptable

6    existing contract or to do the least amount of harm so that I

7    could get to a contract offer that people could vote on, and at

8    this point, I've been trying to get an offer that the members

9    could vote on.  I would have asked them to turn it down, but my

10   hope was that they would make (audio interference) rather than

11   just holding their breath and having a temper tantrum over the

12   wages that we had proposed and that they just didn't seem to be

13   interested in trying to do that.  There was no way that the

14   offer, as it stood at that time, with no wage increases and

15   only takeaways that were financial would have been something I

16   could even take to the membership for a vote.

17   Q    And then, if we just can briefly kind of scroll through,

18   quite a bit of this appears to be about the initiation fees and

19   dues, and it says, "Ms. Biggs-Adams apparently believes that

20   she answers to no one."  Do you know what that part refers to?

21   A    No, other than I didn't -- I clearly didn't and don't

22   answer to Mr. Nevin.  I do answer to the members that I work

23   for and who elect me.

24   Q    And there's a link here at the top.  What's this link

25   about?  I'm sorry.  Top of page 2.



 1    A    I'm sorry.  I really don't recall.  That could have been

 2    an individual who in the same NLRB region was suing us with the

 3    assistance of the National Right to Work for less foundation

 4    over his Beck rights and his failure to follow the instructions

 5    that he'd been given by the Union on how to complain about Beck

 6    if he wanted to become an objector.

 7    Q    And then scrolling to page 3, there are some links in the

 8    middle there.  Do you know what those are?

 9    A    Let's see.  So the first one is KQED television.  That was

10    a campaign by the Local over the campaign that we accused them

11    of some union-busting, and we also talked about the fact that

12    they had $95 million that they had gotten for selling some

13    broadcast spectrum, and rather than putting it away for a rainy

14    day as you -- maybe you should do, at least some of the money

15    if you're a public broadcaster, they had decided to remodel

16    their headquarters and turn it into what we call the Crystal

17    Castle.  They cut off an end of the building and made it all

18    glass, and they made an outdoor park area on the roof in a part

19    of San Francisco that's -- can be foggy, is across from a major

20    bus terminal.  So the idea that they were going to make this

21    outdoor wonderland on the roof when it was going to be dirty

22    and dusty all the time just seemed a not great response.  We

23    had been pushing KQED that they hold a broadcast license and

24    they don't create much local television content, and we didn't

25    feel that it was appropriate for them to have those broadcast

1    airwaves and not serve the community by making more local

2    television.  They make one half-hour a week of a news show, and

3    they make a restaurant review show, and they make about 15 of

4    them a year.

5    Q    Okay, and then, on this same page here, second to last

6    paragraph asks -- basically, I'm looking at third to fourth

7    line.  It says, "How long do we put up with you using the

8    profits for your own odd satisfaction?  And ask the employees

9    whether they should continue down that path."  Were you abusing

10   the profits for your own odd satisfaction?

11   A    Not at all.  My goal was to get a successful contract for

12   these folks at KOIN-TV that I could bring back to them for

13   ratification.

14   Q    Okay.  Can we pull up Joint Exhibit 31, please?  All

15   right, Carrie.  What is this document?

16   A    This is a letter that we received, a memo that I received

17   via email and FedEx from Mr. Nevin advising that he had ceased

18   dues check-off effective the pay period that was just then

19   ending.

20   Q    Can we scroll to, I believe, it's the bottom?  On my own

21   copy here.  The very last sentence there.  It starts, "Had you

22   provided us with the information, we could have had a more

23   cooperative discussion."  This was the information about what?

24   A    About the Beck rights, about the dues, initiation fee, all

25   of the internal workings of the Union.



1    Q    Okay.  Can we pull up Joint Exhibit 32, please?  Okay,

2    Carrie, and what is this document?

3    A    This is Mr. Nevin's announcement to the members of the

4    bargaining unit, the all native Local 51 members, that the

5    company was no longer going to be collecting their dues from

6    their checks or deducting them from their checks effective the

7    next day.

8    Q    And Mr. Schiff, can we scroll to the bottom of that one,

9    too?  Okay.  All right.  So here it says, "Employees will see

10   an increase in their tax due to the absence of the Union

11   payment deduction."  What are your thoughts on this

12   communication?

13   A    Well, our members find dues checkoff to be a convenience

14   because they don't have to calculate separately how much our

15   dues are since they're based on gross earnings.  You don't have

16   to wait until they get the check stub from their wages to

17   calculate what their dues would be and write us a check and

18   mail it to us.  The fact that it comes out of their checks with

19   their taxes and other obligations, if they're paying a credit

20   union or have something on time coming out of their checks, or

21   even charitable contributions to the United Way can come out of

22   your paycheck.  And now, he wanted to say your check is going

23   to be bigger because we took care of it for you.  We're not

24   going to deduct your dues, but of course, the obligation to pay

25   those dues wasn't going away, just the convenience of dues



1    checkoff was going away for these members.

2    Q    Okay.  Let's talk about August 15th, 2019 bargaining.

3         JUDGE TRACY:  And then, let me -- sorry to interject here.

4    So you're going to go through August 15th and 16th now.  That

5    may be a good time to end for today.

6         MS. DEVLEMING:  Before or after?

7         JUDGE TRACY:  Oh, after.  After.  Let's get through August

8    15th, 16th, and then I'm trying to see what were -- how many

9    more bargaining sessions are there that you go through?

10        MS. DEVLEMING:  October.  Two in October, two in December.

11        JUDGE TRACY:  Yeah.  So let's end with the August ones

12   today, and then we'll resume tomorrow with the October ones.

13   And really hopefully, we need to get this SharePoint thing

14   fixed because I can imagine -- these are joint exhibits, and I

15   can also imagine that looking at these things on a small screen

16   is rather difficult.  And so we'll work on that, because I also

17   don't want any witness for any party to have to waste their

18   breaks with trying to work on technology.  They need their

19   breaks to be able to testify, and that's what we need them here

20   for.  That goes for everybody.

21        So let's just go ahead and finish up these two days, and

22   then we'll end for today.

23        THE WITNESS:  Thank you.  I've told the IT guy I will be

24   happy to jump on a Zoom with him at 6:00 tomorrow morning if

25   that'll work.  So we'll see if that -- if he could figure out



1    what's going on.

2        JUDGE TRACY:  Yeah.  And Mr. Roberts, just make sure that

3    your witnesses have what they need to, okay, since we've got a

4    heads up that at least one witness has a SharePoint problem.

5    So if your witnesses -- I imagine, if you've got some major

6    witnesses who are participants in these negotiations and need

7    to see these documents, let's just make sure that they have

8    them however way they need them, okay?  So let us know, or let

9    us make sure they access the documents early to make sure that

10   they can get them.

11       MR. ROBERTS:  Certainly.

12       JUDGE TRACY:  Okay.  Thank you.

13       Go ahead.  Sorry.

14       MS. DEVLEMING:  Oh, thank you, Your Honor.

15   Q    BY MS. DEVLEMING:  Okay, so returning to August 15th

16   bargaining, can we pull up Joint Exhibit 12, please?  I'm

17   sorry.  Okay, Carrie.  Do you recognize this?

18   A    Yes, I do.  That's the cover sheet from a comprehensive

19   proposal that I gave back to the company.  So it had a fresh or

20   restated proposal on every open item.

21   Q    And I believe this exhibit actually is 13 pages.  Can we

22   scroll maybe at least to page 2 for now?  Okay, so this would

23   be -- what is this?

24   A    This is the Union (audio interference) or C-5 in the

25   company's numbering system proposal from the Union.



1    Q    Okay, and can we continue scrolling a bit?  And maybe just

2    keep kind of scrolling.  So these are all your August 15th

3    proposals on these particular items?

4    A    Correct.  I believe you just jumped by the first time I

5    proposed that we would accept the clock number instead of the

6    Social Security number.  I had worked with the headquarters

7    software folks to say if we can find a number that is a unique

8    identifier, can we use it?  So if the company has a unique

9    identifier for each of the members, can we use that to be in

10   lieu of the Social Security number as the identifier for the

11   member in the dues system?

12   Q    And then, Mr. Schiff, can we actually put it on Bates 2?

13   Sorry that I had you scroll through.  And the bottom half of

14   Bates 2.  Is that what you were referring to?

15   A    Yes, right there.  And then I had responded to the

16   indemnification language that the company had been insisting

17   on.  So here I was saying, all right.  I'll indemnify you if

18   you should be sued because of claims or suits arising out of

19   dues checkoff or compliance with the dues checkoff language but

20   that the Union would pick the counsel.  So if we were going to

21   pay for it, we felt we should retain the counsel.

22   Q    And that was different from their proposal?

23   A    Yes.  They wanted to pick the counsel and us just pay for

24   it.

25   Q    Can we scroll to the next -- actually to Bates 4, please,



1    the next proposal?  And what happened here?

2    A    So there had been exclusions in the contract for vacation

3    time and a holiday off -- excuse me -- I'm sorry -- for sick

4    hours.  So if somebody called in sick and that broke the number

5    of days worked, even though the individual was payed for 40

6    hours, they would not get time and a half for the work on the

7    extra day or after eight hours in a day because there had been

8    sick hours or holiday compensation day, a day you get off in

9    lieu of the holiday itself or vacation time take.  So we were

10   saying, okay, you can deduct those hours from the calculator of

11   8 hours and 40 hours and not have to pay time and a half

12   crediting that paid but not worked time.

13   Q    And to be clear, was that a change from your prior

14   proposal?

15   A    Yes, it was.

16   Q    Okay.  Can we scroll to the next page?  Okay.  This

17   remains the same?

18   A    Correct.

19   Q    Okay, next page.  The same thing, 15 and 16?

20   A    Correct.

21   Q    How about next page on Bates 8, no change?

22   A    No, that's the same language we had proposed in April.

23   Q    Okay.  Do you remember any other conversations you had

24   with Respondent?  Oh, so sorry.  You presented this.  Did you

25   all walk through these proposals at bargaining on August 15th?



1    A     Yes, we did.

2    Q     Okay.  Do you remember any standout issues?  Were there

3    bigger concerns on Respondent's side about any of your new

4    proposals?

5    A     Well, they were certainly not -- not compliant.  This was

6    the set of bargaining dates when Ms. Yen was present at the

7    bargaining table.  So I, in fact, tried some sidebars between

8    Ms. Yen and Mr. Pautsch to see if she could in a -- outside my

9    presence, so try it so that it's not that the being in the main

10   bargaining room is the problem.  See if there was a way to get

11   the company to understand that we were trying to get to an

12   offer that could be voted on, but they had to come back with

13   some of these things.

14   Q     When you say they weren't compliant and you had to resort

15   to sidebars between Yen and whomever, what do you mean

16   by -- how weren't they compliant?

17   A     Well, you know, we had a bargaining -- a wage proposal on

18   the table now, for what? Almost four months.  That they made

19   in April.  They had been whining before that for six months.

20   So they wanted us to make a wage offer.  We made a wage offer.

21   They hadn't given us a counter, other than dismissively saying

22   that our proposal was too much money, and they were adamant

23   that I should bargain against myself and reduce the proposal

24   without ever getting a counter from them.

25   Q     Before we go too far afield, can we -- well, actually, a



1    little further into JX-12, to the twelfth.

2    JUDGE TRACY:  May I interject?  I just have a question to

3    ask that probably will become evident once I take a look at

4    everything, but there's a lot of reference to CE1, CE2.  What

5    does "CE" stand for?  Because it's not --

6    THE WITNESS:  It's not totally logical.

7    JUDGE TRACY:  No.

8    THE WITNESS:  The company created its own numbering system

9    from day one of their proposals.  So C1 became Company 1, C2

10    Company 2, somewhat in order through the contract, but then

11    when they got to a wage offer, they created CE, Company

12    Economic 1, Company Economic 2, which sometimes combined

13    proposals that had already had these other numbers.  So C5

14    might get mixed in with CE1.  I find it --

15    JUDGE TRACY:  Okay.  Well, that's all I needed to know.

16    THE WITNESS:  Correct.

17    JUDGE TRACY:  I understand.

18    THE WITNESS:  I use -- we would sometimes use their

19    numbering just so you could be sure that you knew that it was

20    about that, but the contract is entirely numbered.  So it

21    seemed like you could just respond to Article 12 and just move

22    on.

23    JUDGE TRACY:  Okay, okay, and I'm sure that once I kind of

24    take a look at all of these documents as they match up together

25    by the dates, it will become more clear, but I keep seeing



1    this, and you know, it comes in different colors, and so I just

2    wonder if that -- I just wanted to know what that meant because

3    I didn't know if I needed to read more into it.  But you know,

4    as long as I can track the articles and the proposals, in the

5    end, that's all that really matters.  So thank you.  Go ahead.

6         THE WITNESS:  You're welcome.

7    Q    BY MS. DEVLEMING:  Okay, so we're on Bates 12, the page

8    showing here of Bates 12.  So what was this?

9    A    So this is a term of the contract.  I had proposed when I

10   made the economic offer that we take a four-year contract so

11   that I had enough space to reach some of the bargaining goals

12   that I had that were economics.  We had also improved some

13   pretty good time here.  So you know, we were two years past

14   expiration, two years, I guess, and a month, at that point.  It

15   was August of '19, and I thought that folks would be better off

16   when we got a contract for it to go to four years so that they

17   would have some stability and we wouldn't have to do this again

18   so soon.

19   Q    And can we scroll to this next page, please, which is

20   Bates 13?  What's this?

21   A    Here is a letter of understanding in the contract called

22   the Healthcare Letter of Understanding.  I alluded to it

23   earlier in the day that it comes out of the Affordable Care

24   Act.  When the ACA went into effect, it had a ramp-up of a

25   couple of years, but there were negotiations that became



1   necessary because healthcare provisions weren't compliant with

2   the ACA.  And so you had to change what were paid for as

3   wellness care that is not subject to a deductible, things like

4   that that needed to be incorporated into plans.  So this

5   language, which comes from another contract, which had been

6   perfectly acceptable with the Employer and ratified was that if

7   the healthcare picture changes, new laws go into effect that

8   would fundamentally change the manner of healthcare and how it

9   was to be provided.  Let's say we reach the moment of nirvana

10  called single payer, then we would need to sit down, meet and

11  discuss, and change the contract to be compliant with the new

12  law.  This called for 30 days' notice to agree to sit down and

13  bargain.  I found it to be incredibly not controversial, and

14  the company was highly offended at its existence.

15  Q    What do you mean by that?

16  A    Well, they told me I didn't know how healthcare had been

17  bargained when the ACA went into effect, which seemed quite odd

18  to me because I had bargained major contracts through the 2008

19  and 2009 Great Recession where I had to reopen contracts for

20  crisis bargaining.  Then, when the ACA came in, there was a

21  major concern, especially when we didn't know when it would be

22  in effect that the Cadillac tax would hit, and if the Cadillac

23  tax hit, members were going to have their benefits capped where

24  they were going to be charged for benefits that were in excess

25  of, I guess, the Ford or Subaru version.  If you had the really



1    good healthcare, you were going to have to pay an additional

2    tax on your healthcare benefits, and that was something that

3    could affect people's benefits.  We were worried that employers

4    were going to cut their benefits so that they didn't have to

5    pay the tax.

6    Q    What was your impression, Carrie, of how Anne Yen's

7    participation in the August 15th and 16th bargaining session

8    affected the tone of discussion, if at all -- if it affected

9    them, at all?

10   A    I think the dismissiveness was dialed down, but the

11   cooperation didn't go up.  It improved the tone of the

12   bargaining, but it didn't get us to any tentative agreements.

13   Q    Okay.  Can we pull up Joint Exhibit 6-L?  Okay, Carrie,

14   what is this?  Do you recognize this?

15   A    So this is a company proposal faxed to us on August 15th

16   at 11:30 a.m.  It now shows a couple of different times where

17   they've made the proposal or maybe it's changed.  It was just

18   sometimes they change their convention in numbering, but it was

19   still C-6, it was still Article 3, Union business.  It still

20   involved checkoff.  It still involved indemnification.  You can

21   see there in 3.3, the last line that's visible, of the

22   proposal.

23   Q    Can we scroll down just a bit there?  Is there additional

24   language there?

25   A    So this was their counter to ours saying, you know, that



1    we would pay, and now they were proposing that the company and

2    the Union will jointly select counsel to undertake the defense,

3    but the Union shall be responsible for the cost of defense.  So

4    we were still to pay the full price of the defense, but we

5    could have some input to assist in the selection of legal

6    counsel.

7    Q    Did you have any concerns with this proposal?

8    A    I did because it wasn't at all clear what might trigger

9    it.  It could be the right to work for less folks.  It could be

10   just somebody with a bit of a wild hair making a complaint

11   about the provision, and here we would have legal exposure to

12   pay for the defense of the company.

13   Q    And can we pull up Joint Exhibit 33?  Okay, Carrie, do you

14   recognize this?

15   A    I do.  It's yet another information request from Mr. Nevin

16   dated August 15th, 2019.

17   Q    Can we scroll down a little?  What is it asking for,

18   generally speaking?

19   A    So the Employer had gotten ahold of a welcome letter to a

20   new member of the bargaining unit back in February.  So they

21   may have started in January.  It could have been December.

22   They had redacted the name of the person, but they took the

23   Local standard welcome letter and demanded each of the benefit

24   plans that are mentioned in the letter as being things that are

25   available to people after they join the Union.  The Union



1    Privilege program, or sometimes called the Union Plus program,

2    is a series of benefits.  You can see right there, number 8,

3    The travel club.  That is a group buying option on travel so

4    that it reduces your costs on a prepackaged vacation or other

5    travel benefits, but there are some healthcare plans for people

6    who don't have healthcare available to them that are offered.

7    Q    Were any of these benefits or healthcare plans you had

8    proposed at bargaining?

9    A    None.

10   Q    What was your concern?  Did you have any concern with

11   their requests for this information?

12   A    Well, I did because these benefits are made by

13   people -- are made available to people who voluntarily choose

14   to join the Union.  You can choose to be a Beck objector and

15   not join the Union, and you will not get the benefit of any

16   discounts that we have for Union members because you've chosen

17   not to be a Union member.  So the personal loan plan, or the

18   legal services plan, or the travel club, or the pet insurance

19   are all benefits that we make on a group buying basis available

20   to members who choose to join, on AFL-CIO Union in this case,

21   specifically NABET CWA, and I wouldn't have proposed these

22   benefits to be the healthcare plan because they require Union

23   membership, and I know better than to require people under the

24   contract to become members of the Union in order to get

25   healthcare.  They have the choice not to join the Union, and



1    they can pay uniform fees.  They can pay fees with a reduction

2    of the Beck objector amount, but that it would be wrong to say,

3    well, you can't have healthcare because you didn't join the

4    Union.  The contract only gives it to those who are Union

5    members.  So I felt that this was really misdirection at its

6    best --

7    Q    Could you --

8    A    -- and bargaining over a legal services plan or a pet

9    insurance plan, I don't know that Nexstar offers a pet

10   insurance plan.

11   Q    Did the Local intend to propose a similar pet insurance

12   plan or any of these other items similar to these programs?

13   A    As benefits under the contract, absolutely not.  These are

14   benefits that are available to our members.  They join the

15   Union.  After they have joined and been voted into membership,

16   they then receive a packet with phone numbers and contact

17   information on the Union Plus benefits.

18   Q    Okay, and then, at the bottom it asks for a response by no

19   later than close of business, August 15th.  How does that

20   compare, if we can scroll to the top to the date of the

21   request, if you remember?

22   A    It's probably the same day.  Yes, it is.

23   Q    Okay.  Can we pull up Joint Exhibit 34, please?  Excuse

24   me.  Okay, do you recognize this document, Carrie?

25   A    I do.  It's my response because I was in Portland and had



1    no access to a scanner.  I wrote the letter, sent it to my

2    secretary in San Francisco who put it on letterhead, and if you

3    notice, the signature is initialed by her.  That's not my

4    normal signature.

5    Q    At the bottom?

6    A    At the bottom of the letter.  And then, she sent that back

7    to me as a PDF, and I passed it on.

8    Q    Okay.  How did you pass it on?

9    A    By email.

10   Q    Okay.  On August 15th?

11   A    Um-hum.

12        JUDGE TRACY:  Please say yes or no for the record, please.

13   A    Yes.  I'm sorry.

14        JUDGE TRACY:  That's okay.

15   Q    BY MS. DEVLEMING:  That would be yes?

16   A    Yes.

17   Q    Okay, so generally, and the document obviously speaks for

18   itself, but what was your general response -- similar to what

19   you just described?

20   A    Yes, and it was not -- I didn't think it was an effort

21   that was really intended to find a better set of healthcare

22   options and financial charges for our members for healthcare

23   and other medical benefits.

24   Q    And Carrie, you earlier alluded to trying to have some

25   sidebars between Anne Yen and -- I forget if you mentioned who



1    on Respondent's team, but was there a sidebar that you recall

2    happening on this day?

3    A    There was a sidebar between Ms. Yen and Mr. Pautsch.

4    It --

5    Q    And remind me again why?

6    A    I'm sorry.  (Audio interference, simultaneous speaking) --

7    Q    You go ahead.

8    A    So I was not in the sidebar.

9    Q    Okay.  Did Anne tell you what happened in the sidebar?

10    A    Yes.  She reported when she came back that she tried to --

11    MR. ROBERTS:  Object.  Object.  Objection.  It's hearsay.

12    MS. DEVLEMING:  Fair enough.

13    JUDGE TRACY:  Sustained.  Thank you.

14    MS. DEVLEMING:  I'll withdraw the question.

15    Q    BY MS. DEVLEMING:  Okay.  Getting close to the end here.

16    Okay, Carrie.  In terms of the impacts on holidays and

17    vacations, you had previously requested information about the

18    impact on employees from Respondent's new proposals on those

19    topics.  Do you remember that testimony and document?  Had

20    you --

21    A    Yes.

22    Q    Sorry.  Had you received it by this point?

23    A    What I received was what the company handbook would offer.

24    I had asked for the individual calculations so that Igor could

25    tell that Igor was going to lose two weeks' vacation for four



1    years until they reached another threshold, but instead, what I

2    got was sort of the makings to go fix it yourself.

3    Q    Did you go fix it yourself, figure it out yourself?

4    A    I generally did.  I tried to figure out what people's date

5    of hire was or their seniority date because sometimes those are

6    different.  They could have previous company credit from time

7    and a different employer, but having been credited with an

8    earlier company seniority date than their Union -- unit

9    seniority date.  And then, I sent out a bulletin explaining to

10   people how much vacation and how many holidays I thought they

11   would lose.

12   Q    Did you do some of that number crunching during this

13   session?

14   A    I did.

15   Q    How do you know that?

16   A    I found it in my notes.

17   Q    Okay, and we can pull up the notes, but the notes are in.

18   All right.  So let's move, then, just to August 16th

19   bargaining.  Do you remember?  Well, first of all, I'll note

20   for the record that you don't have any August 16th bargaining

21   notes, and I don't think Ellen Hansen did either.  So why is

22   that?

23   A    I don't believe we had a joint session that day.

24   Q    Okay.  Can we pull up Joint Exhibit 35, please?  So first,

25   Carrie, you said you didn't have a joint session, but did the



1    parties appear at the hotel for bargaining?

2    A    We certainly did, and I believe they did, as well.

3    Q    Just in separate rooms?

4    A    Correct.

5    Q    Okay.  All right.  So this is Joint Exhibit 35 that we

6    have on the shared screen.  Do you recognize this?

7    A    Yes.  This is a memo or letter from me to Mr. Nevin.

8    Q    Okay.  All right.  And what were you asking for here?

9    A    Here I was looking for that impact of the proposals so

10   that if you were thinking about voting yes on a contract offer,

11   you might say, well, I don't care about a raise, but you know,

12   when I start to look at the fact that I lose a week's vacation

13   and it could take me six years until I earn it back, that's a

14   bridge too far for me.

15   Q    Okay, and then, the last sentence there.  It says, "Please

16   respond by Friday, September 6th"?

17   A    Correct.  So I gave it a couple of weeks.

18   Q    Why did you give it that length of time?

19   A    Because I figured this was pretty complicated.  You were

20   going to have to go through the actual records of each

21   individual and figure out what their company service date was

22   and calculate what they would have or not have in the way of

23   benefits -- vacation and holidays.

24   Q    Okay, can we pull up Joint Exhibit 36, please?  Okay.  Do

25   you recognize this document, Carrie?



1    A    I do.  It's another memo from Mr. Nevin.

2    Q    But to whom?

3    A    To me.

4    Q    Okay.  So it says, "Response to request for information",

5    and was that the August 15th -- their August 15th information

6    request we talked about earlier?

7    A    Correct.

8    Q    Okay.  And if we scroll -- well, we'll leave that one.

9    Okay, last one.  Joint Exhibit 37, please.  What is this?

10    A    This is a request for information, a response from me to

11    Mr. Never -- Nevin in a letter sent by email on August 16th.

12    Q    Is this different or the same as your previous response on

13    August 15th?

14        MS. DEVLEMING:  I'll strike that question.  Hopefully,

15    that is -- the record will reflect that.

16    Q    BY MS. DEVLEMING:  Why did you submit this response?

17    A    Because I was making perfectly clear that I had responded

18    to his request, and I was responding again.

19        MS. DEVLEMING:  Okay, Your Honor, I think that's a great

20    stopping point there.

21        JUDGE TRACY:  All right.  So again what we'll do, and

22    we're kind of on time.  So what we'll do, and so again the

23    things that are outstanding.  We've got Joint Exhibit 24 that

24    should be redacted.  Again that doesn't have to be done

25    tonight, you know, or tomorrow.  Even over the weekend would be



1    great.  And then, there's the issues of the subpoenas.

2    I would just have them, Mr. Roberts, ready to be put into

3    the record at some point.  You might want to do it in your case

4    in chief even.  That way you know which ones you want to push

5    forward and what the rulings are for it.  So just have that

6    ready.

7    And then, like I said, I think it's really important.  The

8    technology today has gone pretty well.  I'm happy about it, but

9    the documents are a problem, and so just make sure for any of

10   the Respondent's witnesses your people have what they need

11   because this is such a document intensive case.  It's really

12   hard.  That's why I opened up my screen also on SharePoint,

13   just so I could see it bigger than -- Mr. Schiff is sort of

14   limited in what he can show so it's big enough, but then we can

15   see the whole document.  But regardless of whether your witness

16   has their own documents, we'll still do the share screen to

17   make sure that everybody is on the same page.  And so

18   hopefully, the SharePoint can get fixed, or maybe Ms.

19   DeVleming, after this, can try to get it to you in a different

20   way through the email.  So hopefully, we can do that, okay?

21   Is there anything else before we end?  We're going to make

22   sure that everybody needs to leave the meeting.  I have this

23   note.  Like, leave the meeting.  You're not -- don't do

24   anything else.  So that way you can use the same link for

25   tomorrow.



1      MR. ROBERTS:  There is one issue I need to raise, just

2   again for scheduling purposes, the -- we have, as I understand,

3   at least a few photographers who were subpoenaed for

4   tomorrow -- and I can be corrected, but it appears to me that

5   we're going to go, at least on direct, for another few hours,

6   you know, in the morning.  And then, I imagine that there's a

7   very lengthy affidavit from Ms. Biggs-Adams and that

8   my -- based on just an estimate, I would estimate

9   cross-examination at probably around three hours.  So I just

10   didn't know whether we could rule out whether you're going to

11   need these photographers tomorrow or not, or maybe your

12   estimates are different than mine, but I did want to raise

13   that.

14      MS. DEVLEMING:  Okay, well again, like I said before, very

15   comfortably saying that no one but Ellen Hansen will be needed

16   tomorrow, but I wouldn't want to not have Ellen Hansen

17   prepared, just in case the cross doesn't go as long as

18   predicted or whatever.

19      MR. ROBERTS:  Certainly, but --

20      MS. DEVLEMING:  Toward the end of the day, likely.

21      MR. ROBERTS:  But beyond that, you don't anticipate

22   needing anyone else; is that a fair statement?

23      MS. DEVLEMING:  Correct.

24      MR. ROBERTS:  All right.  Thank you.

25      JUDGE TRACY:  And then, that way at the end of tomorrow,



1   then you'll know who -- she can let you know who she thinks she

2   needs ready for Monday.  And Ms. Yen also has an opportunity to

3   ask questions.  We can't forget her.  So she does have that

4   opportunity, as well.  So we've got that added time.

5        So is there anything else before we re-meet again at 9

6   a.m. tomorrow?  We made it through the first day.  It's tough.

7   The bargain -- it's tough in person, and it's they're more

8   tough.

9        And Mr. Schiff, thank you from the East Coast hanging out

10   with us.  We really appreciate your help today of putting

11   things on there and doing that for us.  So anything else?  Ms.

12   Yen or Ms. DeVleming, Ms. Burke, anything?

13        MS. DEVLEMING:  I just want to ask an off the record

14   question before we all leave, if I might.  It's about

15   technology.

16        JUDGE TRACY:  Okay, sure.

17        And so Ms. Biggs-Adams, you will be testifying again

18   tomorrow.  Please -- as we've done before, please don't discuss

19   your testimony with anyone else until after the close of the

20   hearing.  So I just want to remind you of that, okay?  And

21   other than that, we'll meet again tomorrow at 9 a.m.  And we

22   can go off the record.

23   **(Whereupon, the hearing in the above-entitled matter was**

24   **recessed at 4:36 p.m. until Friday, November 13, 2020 at 9**

25   **a.m.)**



1                              **CERTIFICATION**

2    This is to certify that the attached proceedings before the

3    National Labor Relations Board (NLRB), Region 19, Subregion 36,

4    Case Numbers 19-CA-248735, 19-CA-255180, 19-CA-259398, 19-CA-

5    262203, National Association Of Broadcast Employees &

6    Technicians, the Broadcasting and Cable Television Workers

7    Sector of the Communications Workers of America, and Nexstar

8    Broadcasting, Inc., at the National Labor Relations Board,

9    Region 19, Subregion 36, 915 2nd Ave., Ste. 2948, Seattle,

10   Washington 98174, on Thursday, November 12, 2020, at 9:12 a.m.,

11   was held according to the record, and that this is the

12   original, complete, and true and accurate transcript that has

13   been compared to the reporting or recording, accomplished at

14   the hearing, that the exhibit files have been checked for

15   completeness and no exhibits received in evidence or in the

16   rejected exhibit files are missing.

17

18

19                                CLAUDINE METOYER

20
                                  Official Reporter
21

22

23

24

25



EXHIBIT 5(b)

OFFICIAL REPORT OF PROCEEDINGS

BEFORE THE

NATIONAL LABOR RELATIONS BOARD

REGION 19,SUBREGION 36

In the Matter of:

| | |
|---|---|
| National Association Of | Case Nos.  19-CA-248735 |
| Broadcast Employees & | 19-CA-255180 |
| Technicians, the Broadcasting | 19-CA-259398 |
| and Cable Television Workers | 19-CA-262203 |
| Sector of the Communications | |
| Workers of America, Local 51, | |
| AFL-CIO, | |

　　　　　Charging Party/Union,

and

Nexstar Broadcasting, Inc.
d/b/a KOIN-TV,

　　　　　Respondent.

_____

_____

Place: Seattle, Washington (Via Zoom Videoconference)

Dates: November 13, 2020

Pages: 199 Through 344

Volume: 2

OFFICIAL REPORTERS
eScribers, LLC
E-Reporting and E-Transcription
7227 North 16th Street, Suite 207
Phoenix, AZ 85020
(602) 263-0885



**UNITED STATES OF AMERICA**

**BEFORE THE NATIONAL LABOR RELATIONS BOARD**

**REGION 19 SUBREGION 36**

| | |
|---|---|
| In the Matter of:<br><br>NATIONAL ASSOCIATION OF<br>BROADCAST EMPLOYEES &<br>TECHNICIANS, THE BROADCASTING<br>AND CABLE TELEVISION WORKERS<br>SECTOR OF THE COMMUNICATIONS<br>WORKERS OF AMERICA, LOCAL 51,<br>AFL-CIO,<br><br>       Charging Party/Union,<br><br>and<br><br>NEXSTAR BROADCASTING, INC.<br>D/B/A KOIN-TV,<br><br>              Respondent | Case Nos.  19-CA-248735<br>19-CA-255180<br>19-CA-259398<br>19-CA-262203 |

The above-entitled matter came on for hearing, via Zoom Videoconference, pursuant to notice, before **AMITA B. TRACY**, Administrative Law Judge, at the National Labor Relations Board, Region 19, Subregion 36, 915 2nd Ave., Ste. 2948, Seattle, Washington 98174, on **Friday, November 13, 2020, 9:07 a.m.**



1                  A P P E A R A N C E S

2    **On behalf of the Respondent:**

3        **CHARLES P. ROBERTS, III, ESQ.**
         CONSTANGY, BROOKS, SMITH & PROPHETE, LLP
4        100 N. Cherry Street, Suite 300
         Winston Salem, NC 27101
5        Tel. (336)721-6852

6        **TIMOTHY A. DAVIS, ESQ.**
         CONSTANGY BROOKS SMITH & PROPHETE LLP
7        2600 Grand Boulevard, Suite 750
         Kansas City, MO 64108
8
         **CHARLES W. PAUTSCH, ESQ.**
9        Vice President of Labor and Employment
         Nexstar Media Group, Inc.
10       545 E. John Carpenter Freeway, Suite 700
         Irving, TX 75062
11       Email: cpautsch@nexstar.ty

12   **On behalf of the General Counsel:**

13       **ELIZABETH H. DEVLEMING, ESQ.**
         **SARAH BURKE, ESQ.**
14       NATIONAL LABOR RELATIONS BOARD
         915 2nd Ave., Ste. 2948
15       Seattle, WA 98174
         Tel. (206)220-6291 (Burke)
16       Email: elizabeth.devleming@nlrb.gov (DeVleming)

17   **On behalf of the Charging Party/Union:**

18       **ANNE I. YES, ESQ.**
         WEINBERG, ROGER & ROSENFELD
19       1001 Marina Village Pkwy., Ste. 200
         Alameda, CA 94501
20       Tel. (510)224-7687

21       **CARRIE J. BIGGS-ADAMS, PRESIDENT**
         NABET-CWA, Local 51, AFL-CIO
22       240 2nd St., Ste. 220
         San Francisco, CA 94105
23       Email: carrie@nabet51.org

24

25



1                              I N D E X

2

3      WITNESS              DIRECT   CROSS   REDIRECT   RECROSS   VOIR DIRE

4      Carrie Biggs-Adams    210    308,310

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                                  **E X H I B I T S**

2

3     **EXHIBIT**                              **IDENTIFIED**    **IN EVIDENCE**

4     **General Counsel:**

5        GC-2                                     280              297

6        GC-3                                     287              287

7        GC-4                                     288              289

8        GC-5                                     290              291

9        GC-6                                     291              292

10       GC-7                                     292              293

11       GC-8                                     293              294

12       GC-9                                     294              295

13       GC-10                                    298              298

14       GC-13                                    302              303

15       GC-14                                    304              306

16

17    **Joint:**

18       J-60(a)                                   10              243

19       J-60(b)                                  242              243

20       J-60(c)                                  242              243

21       J-61(a)                                  245              245

22       J-61(b)                                  245              245

23       J-62(a)                                  245              248

24       J-62(b)                                  246              248

25



1          <u>P R O C E E D I N G S</u>--

2          JUDGE TRACY:  All right.  Well, thank you.  So before we

3     go to resume Ms. Biggs-Adam's direct testimony today, there's a

4     couple of items that I would like to discuss, one of which is

5     that yesterday at the start of the hearing, the General Counsel

6     sought to amend the complaint on two separate issues.

7          One was those of intention to amend the complaint, which

8     was issued on November 4th.  And that one involved paragraph 4.

9     Yesterday, I accepted that amendment and there was an

10    additional name of Matthew Rosenfeld that was added to that.

11    So I accepted that amendment to paragraph 4.

12         There was also a notice of intention to amend complaint --

13    to amend the complaint such that paragraphs 9 and 11 of the

14    second consolidated complaint, which was executed on September

15    18th, 2020, that those, per the direction of General Counsel

16    were to be withdrawn.  Yesterday I accepted the withdrawal.

17    However, after listening to one day of testimony and thinking

18    about the overall allegations of paragraph 12 is still included

19    in the second consolidated complaint, I have decided that I

20    will reserve my ruling on whether those -- I would accept that

21    withdrawal of complaint paragraphs 9 and 11 for the decision.

22         So I would I'm going to put my decision on whether I

23    accept the withdrawal in the -- my decision that I'll issue

24    after the end of this hearing.  And so I just want the parties

25    to be on notice to fully litigate these matters.  I do believe



1    that based upon discussions yesterday, that the parties also

2    understood that the underlying issues, or the facts -- alleged

3    facts surrounding those would still be put on the record.  And

4    so -- but I want to be clear that this will be a live

5    allegation to be proven or disproven.

6        So I'm putting the parties on notice of that.  And so the

7    final thing that I want to talk about, and then I'm going to

8    let you state your positions for the record, if you so choose,

9    is that, again, a lot of things came up yesterday with regard

10   to the subpoenas, which the response to subpoena to the

11   Charging Party, and so we're going to put those in the record

12   along with the -- the petition to revoke, so those are

13   preserved for a Respondent to file exceptions to.

14       But there are issues of affirmative defenses.  And some of

15   the responses I received with regard to why a petition to

16   revoke should be revoked should be granted is that these were

17   either settled issues or they were dismissed issues.  And so I

18   would like at some point for the parties to put in -- you don't

19   have to put in the settlement, but some sort of -- I mean, you

20   could put in the settlement.  That would make it easier.  I

21   understand that the settlement of several of the CV cases,

22   civil cases in Union, were settled unilaterally, so over

23   Respondent's objections.  And so I don't know where that is at,

24   if that is still -- the appeal period is still running or the

25   appeal period has run.

1        And so I'd like to know the status of that and I'd also

2   like to know the status of the cases that were dismissed, such

3   that they're relevant to this proceeding where they've already

4   been alleged and the General Counsel -- the Regional Director

5   didn't authorize complaint on them.  They've been appealed and

6   the General Counsel said no, this dismissal is still -- is the

7   final decision on that.

8        So I would like evidence of that because, it makes it --

9   it's not going to foreclose any affirmative defenses that the

10  Respondent puts on, but certainly, I don't want to get too far

11  afield.  But I would like to know, because I assume that there

12  will be some evidence presented by General Counsel and the

13  Charging Party to say these are already resolved and that these

14  defenses fall because they've already been resolved.  So I

15  would like that.  And so, think about it, how you want to get

16  into the record.  They can be joint exhibits, if they're

17  documents that are self-explanatory.

18        So saying all that, I'm going to go ahead and, Ms.

19  DeVleming, if you have any response to that on behalf of

20  General Counsel?

21        MS. DEVLEMING:  I suppose I would just reiterate the

22  General Counsel's specific direction that those paragraphs be

23  withdrawn.

24        JUDGE TRACY:  Okay.  And then for the remainder of it,

25  about the documents, if you guys would just work together and



1    figure that out or if it's evidence that's testimony, you can

2    do that, too.  But it seems as though there's got to be

3    documents that relate to this that could be put into the

4    record.

5        Ms. Yen, any comments before we go on?

6        MS. YEN:  No, I have no comments.  I appreciate the ALJ

7    providing notification to the parties to make sure that all the

8    parties have a chance to fully litigate those issues.  And I

9    will -- with respect to the cases that -- in which I'm -- as

10   Charging Party, am referring to the dismissals or settlements,

11   I will get those and provide those to you on the third day of

12   hearing.

13       JUDGE TRACY:  Okay, thank you.

14       And then, Mr. Roberts, on behalf of Respondent?

15       MR. ROBERTS:  Yes, I mean, obviously, our position is that

16   we understand the ruling, or at least the reservation of the

17   ruling, and that just so it's clear, that we're not consenting

18   to litigate this.  It's just not a voluntary litigation.  It's

19   litigation because of your order, which we accept and

20   understand.  But I don't want there to be an inference that we

21   acquiesced it in some fashion and voluntarily litigated those

22   issues, because I believe, ultimately, our position is going to

23   be that they should be accepted and whatever issues of who has

24   authority, I don't really know at the moment.  We'll reserve

25   that position.



 1          But just with that understanding that I don't have

 2     anything else to add, other than we will -- there is a

 3     unilateral settlement, to answer one of your questions, an

 4     appeal was filed, I believe it was the day before yesterday.

 5     And so it's not been ruled on.  The other dismissals, appeals

 6     were filed and denied.  But we would be -- believe they should

 7     go into the record.  I think that's consistent with what you're

 8     saying and the unilateral settlement, I think should go into

 9     the record.

10          We were probably intending to offer that anyways, so I

11     would just say that -- I would hope the parties could just

12     mutually agree, rather than wasting time trying to dig these up

13     and offer them, maybe we could on Monday next week, maybe we

14     could all jointly submit these.  I mean, I'd be willing to try

15     to communicate with the other parties and see if we can reach

16     some kind of package, if you will, to put into the record.

17          JUDGE TRACY:  Yeah, that works out great.  And it sounds

18     like, you know, even by the last day of the hearing, before the

19     record is closed, and if we need to keep the record open a

20     little bit just to wait for that appeal that you said that was

21     just filed a couple days ago, and then maybe somehow --

22     somebody can communicate with the General Counsel that this

23     hearing is ongoing and so the sooner you can make a decision

24     the better, so we can make sure that all of these things are in

25     the record.



 1      And so I would just say you don't have to rush it for

 2   Monday, but before the record closes, to put all of this in and

 3   if you guys could all agree on it, that would be even better

 4   because, I mean, they stand for what they are.  So even if you

 5   just wanted to put them in yourself, then then you can do that.

 6   But I just wanted everybody to be on notice.  And like I said,

 7   I do understand.  I, too, have my own sort of reservations

 8   about the withdrawal.  But I also am very concerned because, my

 9   job is to ensure that there is due process for everyone.  And

10   considering the allegations in this case, I just am reluctant

11   to close the door on those two paragraphs because they do seem

12   important based upon the first day.  So I just want everybody

13   to know.  I don't want to catch anybody on surprise in the

14   decision, okay?  So that's why I'm doing it this way.

15      Okay, well, let's go ahead.  And it'll be today, again

16   Ms. -- I'm sorry.  What I'm saying is that, in terms of breaks,

17   Ms. DeVleming, you kind of know how much more you have to go.

18   And so please do kind of, as appropriate, find good stopping

19   points where you feel like maybe you could take a break.  And

20   so we can see how much longer she'll need, because then Ms. Yen

21   has a turn, and then of course, Mr. Roberts.

22      And so you kind of let us know and I'll kind of keep an

23   eye on the time, as well of when to take a break.  Again, we'll

24   do lunch at about noon, because Ms. Yen has a call, and that

25   seems to work for everybody to do a few hours, three hours in



1    the morning, three hours in the afternoon.  So anyway, let's go

2    ahead, if you're ready, with this Ms. Biggs-Adams.

3        Ms. Biggs-Adams, I just want to remind you of the oath

4    that I administered to you yesterday, that you're still

5    testifying under that oath.  And you recognize that?

6        THE WITNESS:  Yes, ma'am.

7    Whereupon,

8                        **CARRIE BIGGS-ADAMS**

9    having been previously sworn, was called as a witness herein

10   and was examined and testified, telephonically as follows:

11       JUDGE TRACY:  Okay.  And then if you could, just please,

12   because once again, is there anybody in the room with you

13   there?

14       THE WITNESS:  There is not.

15       JUDGE TRACY:  Okay.  And do you have anything in front of

16   you, a cell phone or anything like that in front of you?

17       THE WITNESS:  The notes I'm taking as we've been talking

18   so far.

19       JUDGE TRACY:  Okay.  And so just -- I just want to remind

20   you of that, to make sure that you're just testifying from your

21   own memory, not with assistance from anyone else.  And that if

22   anybody does come into the room or anything like that, that you

23   please let us know and not to be communicating with your cell

24   phone or anything -- anyone else, okay?  Thank you.

25       THE WITNESS:  No problem.



1    JUDGE TRACY:  All right, Ms. DeVleming, go ahead, please.

2    MS. DEVLEMING:  Thank you, Your Honor.

3                    **RESUMED DIRECT EXAMINATION**

4    Q    BY MS. DEVLEMING:  So hi, Carrie.  Good morning again.

5    A    Good morning.

6    Q    Thank you for your marathon testimony yesterday.  And

7    hopefully we'll get it wrapped up today.  Just to recenter us

8    on where we finished off, we finished off yesterday talking

9    about the August 15th and 16th, 2019 bargaining sessions.  And

10   specifically the proposals of the Union's comprehensive

11   proposal, JX-12 and Respondent's counter on Article 3, which

12   was JX-6L And then there was also a back-and-forth about

13   Respondent's request for the Union benefit information, in JX-

14   33 and 34.

15        So first off, the parties had stipulated that they did not

16   meet again for bargaining until October 7th and 9th.  You

17   recall why there were no sessions in September?

18   A    It was an availability question.  There were possibilities

19   from the parties.

20   Q    On both sides?

21   A    No, my schedule was generally open.  I guess I might as

22   well say this, because it's going to play into my schedule for

23   part of this year.  My husband had become ill and needed

24   surgery at the end of August.  But that was the only time that

25   I specifically had to step away from the process, to be there



1    while he had surgery.

2    Q    And can we pull up Mr. Schiff's Joint Exhibit 38, please?

3    And Carrie, I hope you have a set now or access in SharePoint

4    to have your own copy.

5    A    I have access in SharePoint.

6    Q    Fabulous.

7    A    But it's your preference that I look at them from the

8    shared screen, from Mr. Schiff?

9    Q    I don't think it matters.  They're in the record.  But

10   I'll point you salient points in that.

11        JUDGE TRACY:  I think the point of you making sure you

12   have SharePoint, just as much as any other witnesses who going

13   to be testifying from the joint exhibits is that it may be also

14   easier for you on your eyes to be able to see the size of it,

15   because, you know, we're limited in Mr. Schiff's screen

16   sharing, that he can't go too far deep, depending upon if

17   you're using a laptop or a desktop screen and we want to make

18   sure to share the screen so everybody's on the same page, in

19   terms of what document you are looking at with regard to the

20   questions.

21        THE WITNESS:  Thank you.  I -- so far as I can, I'll

22   continue to just look at them on my laptop as he shares them.

23        JUDGE TRACY:  Okay.

24   Q    BY MS. DEVLEMING:  All right.  Carrie, do you recognize

25   Joint Exhibit 38?



1    A    Yes, I believe this is a memo from Mr. Nevin to the

2    members of our bargaining unit.

3    Q    All right.  And circling down to there -- looks like

4    there's blue text under these questions and answers.  If you

5    scroll down a little bit to, let's see -- okay.  So in the last

6    paragraph on page 1, it mentions you by name there and it

7    implies that you misrepresented or fraudulently represented

8    something.  Did you misrepresent whether employees could be

9    fired if they decided not to pay their dues?

10   A    No, ma'am, I did not.

11   Q    Did you have conversations with employees about that

12   subject?

13   A    I actually didn't have specific conversations with people

14   that went into any depth.  It was a situation where the company

15   had unilaterally ceased dues deduction at the beginning of

16   August, with the July payroll.  And so I reached out to members

17   to see if we could find ways for them to continue to pay their

18   dues, since they could no longer pay them through payroll

19   deduction.

20   Q    And then scrolling down to page 2, toward the bottom, the

21   question about whether the company has the right to cease

22   deducting dues checkoff.

23       Again, your name is mentioned.  And again, it stated that

24   you misrepresented the law with employees once again; is that

25   correct?



1    A    That is what Mr. Nevin's states in the letter.  I don't

2    believe --

3    Q    Did you --

4    A    I'm sorry?

5    Q    Sorry, go ahead and repeat that.

6    A    I don't believe that I did misrepresent the law.

7    Q    And then at the top of page 3, the second question, it

8    talks about your secret ballot election that you -- the Union

9    says they held more than five years ago.  Was there an election

10   to set dues?

11   A    There certainly was.  I was not a member or an officer of

12   the local at the time, but I was able to confirm the process

13   that was used by Local 51 in setting their dues rate.  I have

14   since --

15   Q    And then they express -- sorry.

16   A    I'm sorry.  I have since confirmed that the vote actually

17   took care -- took place in 2010.

18   Q    And then Nevin expresses some concerns about that process

19   and your internal vote system.  Have they expressed those

20   concerns at bargaining?

21   A    Never.

22   Q    And then at the very end, it talks about how the company

23   is still working hard to get you to the negotiation table.

24   What's your response to that?

25   A    I appeared every time we had bargaining scheduled.  I



1    offered more dates than we're ever agreed to by the Employer.

2    And it was my goal and my purpose to negotiate a contract to

3    conclusion so that we could get an offer that was good enough

4    to be given to the members for ratification.

5    Q    Mr. Schiff, can we pull up Joint Exhibit 39?

6    And Carrie, if you want to open your own copy, as well.

7    Carrie, do you have paper copies or are you opening these on

8    your computer?

9    A    I don't have paper copies.  I only got these about 45

10    minutes ago, did they open access for me.

11    Q    Oh.

12    A    So I'm just going to stick with the screen share for now.

13    Once the day ends today, I'll print them all out and I'll have

14    copies available physically.

15    Q    Just in time for you to be off the witness stand.

16    Perfect.  All right.  Do you recognize Joint Exhibit 39?

17    A    I do.  That is an email from Casey Wenger to me saying,

18    you're welcome.  I presume there's more below that.

19    Q    Yeah.  Can we scroll, slowly, I guess, through the three-

20    page document, Mr. Schiff?  Maybe all the way to the bottom of

21    page 3, or top of page 3/bottom on page 2.  What's that email?

22    A    In order to direct-bill members for their dues, I first

23    needed members' earnings.  I requested those earnings from the

24    company.  Mr. Wanger sent me those earnings, which he points

25    out.  It says it shows to be for the month of July, as you see



1    in my question right now at the bottom of the screen.

2        I, then, tried to understand what period July was.  And

3    the reason for this is I didn't know whether these were

4    earnings from July 1 to the last day or were these pay periods?

5    So I needed to know chronologically what they -- what time

6    period they covered.  So this is an interchange with Mr.

7    Wanger, trying to ascertain what the period of time was.

8    Q    And why did you request this information and that

9    clarification?

10   A    I needed to be able to make the next request.  Was my next

11   request to be from August 1 to the last day of August?  Or were

12   these -- was the month a shorthand?  Meaning, is it really for

13   four weeks, because it's two two-week pay periods.  And in this

14   case, this exchange, Mr. Wanger and I are exploring that.  And

15   he explains to me what the period is.  It's by pay period, not

16   really by the calendar month.

17   Q    But why did you need the underlying information?

18   A    So that I would know in order to credit billing for that

19   period, what period of time that would be for for the members,

20   that was two --

21   Q    Billing for what?

22   A    Billing for dues.

23   Q    Why did you have to do that?

24   A    We would have to create bills for each member by taking

25   the earnings reported for the company, calculating by 2.25



1   percent dues rate.  And in order to be an appropriate bill, it

2   needed to say what the period of time that dollar amount would

3   cover.

4   Q    Let's move to Joint Exhibit 40.  Can you pull that one up?

5   Do you recognize the document, Carrie?

6   A    Yes, it's a -- it's a letter from me, dated September

7   27th.  Obviously, it's been redacted as to who was sent to.

8   Q    And what were you communicating through this letter?  Take

9   a minute to review it if you need to.  Maybe we can scroll to

10  page 2.

11  A    So it -- it clarifies a number of issues.  First, that I'm

12  reiterating to folks that we'd rather have the contract done.

13  It's not our desire to prolong this process.  Then, it talks

14  about that people are working without a contract and that for

15  the month of October, as you see on the second (audio

16  interference) line there, no later than October 31, members

17  were being -- members of the bargaining unit were being given

18  the opportunity to join the Union with a waiver of initiation

19  fee.

20       So this letter explains the action taken by the Local 51

21  executive board, which had voted to waive initiation fee for

22  the month of October for all members of KOIN bargaining unit,

23  to be able to join the Union at a significantly reduced amount.

24  Obviously, a zero initiation fee, as opposed to three weeks'

25  pay.



1    Q     Why did the Local executive board make that decision?

2    A     It was two-fold.  We had been hearing Mr. Nevin's drumbeat

3    of letters and messages in the workplace, that the Union was

4    only interested in making money out of the members of this

5    bargaining unit.  That must be why we were charging an

6    initiation fee that he kept contending was excessive.  And

7    in -- our tradition is that in a bargaining unit where we do

8    not yet have a contract, we waive initiation fee because in a

9    new bargaining unit we don't have -- other than the NLRB, we

10   don't have a contract in place.  We can't file a grievance.  We

11   can't arbitrate over an individual's problems.  So we don't

12   charge an initiation fee until there's a contract in place.

13        We were, at this point, two years past having a contract

14   in effect with KOIN.  We couldn't process grievances.  We could

15   certainly file them, but we couldn't take them to arbitration.

16   So using that as a consistent standard, I had asked our Local

17   executive board to offer, you might call it an initiation fee

18   holiday, a period of time during which people would have the

19   opportunity to join without an initiation fee.

20   Q     All right, can we turn to Joint Exhibit 17, Bates 42,

21   please?  Should be more than halfway through.

22        Thank you so much.  All right, Carrie.  Do you recognize

23   this document?

24   A     Yes, it's bargaining bulletin number 30, dated October

25   4th, 2019, to members of the bargaining unit.



1    Q    And Mr. Schiff, can we scroll just a bit to the middle of

2    the page, where it starts Nexstar?  In the middle of that

3    paragraph, where it starts, Nexstar has been focusing --

4    A    Yes.

5    Q    -- it talks about -- you say we are entitled to two days

6    per month.  What did you mean about that?

7    A    The general rule, as I understand it, is that the Employer

8    can't just refuse to give us bargaining dates, or the Union

9    refuse to give bargaining dates.  The -- the parties, as a

10   standard, should agree to come to the bargaining table at least

11   two days per month, in order to be bargaining in good faith and

12   in the effort to get a contract.

13   Q    That's your understanding of whose general rule?

14   A    The NLRB's general rule.

15   Q    Okay.  Let's talk now about October 7, 2019 bargaining,

16   the next session held between the parties.  So again, reminding

17   us about the end of yesterday, we were talking about the

18   proposals exchanged August 16th and 17th, including the Union's

19   comprehensive proposal and Respondent's counter on Article 3.

20   Do you recall if you had any discussions further about either

21   of those proposals?

22   A    Yes.  Obviously, we were taking back up on those proposals

23   when we started bargaining.

24   Q    Do you remember any specifics of what you discussed?

25   A    Not independently, I'm sorry.



1    Q    Let's pull up Joint Exhibit 6(l), one more time.

2    Actually, scroll, kind of the substance at the bottom.

3         Okay.  Do you remember discussing this any further?

4    A    Yes, because we were still at issue over our paying for

5    the company's defense and the indemnification there, listed in

6    Section 3.3.

7    Q    Okay.  And what did the Union -- what were the Union's

8    concerns about the indemnification language?

9    A    Well, just the same as I would be concerned about paying

10   for anyone else's legal services, I don't want them to pick

11   somebody who is extremely expensive and stick us with the bill.

12   So while we had reached the moment where we were to -- in the

13   proposal, to jointly select an individual to undertake the

14   defense, we were still going to pay for the defense they were

15   directing.

16   Q    And then section 3.1 still has that $50 language.  Did you

17   discuss that again?

18   A    Yes.  In the ongoing effort to try and understand what

19   the -- what the costs were that that $50 was supposed to

20   represent.  The position of the Employer had been that Mr.

21   Wanger was spending between five and six hours per pay period,

22   so every two weeks, to create the billing necessary for the

23   2.25 percent.  And that we should pay $50, because that

24   represented the 10 to 12 hours per month that Mr. Wanger was

25   dedicating to the processing of the calculation.



1    Q    And then I think this is more than one page.  Can we

2    scroll to the next page of this exhibit, please?  And did you

3    talk about this proposed letter language?

4    A    Yes.  Because again, this makes major changes to an

5    internal Union document, while we print them in the contract as

6    an appendix, this is not bargained between the parties at any

7    of our employers.  The dues checkoff form for the Local is the

8    same at ABC, as at KOIN, as it KQED.  And here, the company now

9    wanted us to add the chargeable -- the nonchargeable amount to

10   the checkoff form.

11   Q    And what about the one-year language?  What was that

12   about?

13   A    I'm sorry?

14   Q    Sorry, the one-year language here.  What was that about?

15   A    So the checkoff form, as it currently exists in the

16   contract, goes for a year, separate from expiry of a contract.

17   It's good for 12 months.  And then there's a window during

18   which the individual can give notice that they want to cease

19   dues checkoff deduction.  And this is changing that, so that it

20   would not have an annual window, but that at any time after one

21   year had passed, the individual could withdraw this by sending

22   an email to the Union with read receipt.

23        I had a concern about that because with read receipt, they

24   may get a message that it had been sent to us, but it could be

25   sitting in a spam folder, a junk folder.  It doesn't



 1    necessarily guarantee that we've seen the document or that we

 2    got it.

 3    Q    And I just noted -- can we pull up Joint Exhibit 13, Bates

 4    22, which are Carrie's notes, but only because there's some

 5    kind of unintelligible things there that I want to clarify.  No

 6    offense, Carrie.

 7        Okay.  So actually -- Bates 22.  I'm on the wrong page.

 8    Okay.  So actually, sorry, Bates 21, if you could, the first

 9    page of her October 7th notes.  So scroll down just a bit,

10    toward the bottom, please.  Only P-L.  What does that refer to?

11    A    I would think that that is personal leave.  It's referring

12    to over time after 40.  And what I paid time would be not

13    credited for the purposes of achieving 40 hours and overtime.

14    But that's my guess, based on -- I know that P-L is what my

15    handwriting says.  If I typed it there, that's what it says,

16    but that's the best I can recollect from 13 months ago.

17    Q    Good enough.  Okay.  Do you remember what happened -- so

18    you guys talked about overtime.  Do you remember any other --

19    we can put the notes away.  Do you remember more about that

20    conversation?

21    A    Well.  The entire conversation, if I may, because I

22    started to touch on it on the previous exhibit, there was -- in

23    the -- in the checkoff form, the company wanted us to type in

24    the nonchargeable percentage and have -- having that in written

25    form is somewhat difficult, because the number is recalculated



1    annually.  So if I put in the form that this is what you will

2    be rebated if you are an objector, somebody might look at the

3    form and say, well, I signed here and it said I get a 25

4    percent rebate and you said now the rebate's only 21 percent.

5         I did not want people to be confused by that.  That dollar

6    amount that people are rebated and the percentage is calculated

7    annually.  And it's not calculated by our Local.  CWA

8    calculates that dollar amount and issues it to all locals and

9    all parts of the Union on an annual basis.  So it's not

10   something I have a control over when the number comes out, when

11   or how it's calculated.

12   Q    Can we pull up Joint Exhibit 6(m)?

13        Okay, Carrie, do you recognize this document?

14   A    So that's Union's counter of October 7th, approximately 2

15   p.m. on the company's category C-6, Article 3, Union business.

16   Q    Okay.  Anything important to note here in terms of --

17   A    Well, you've got the clock number, again, replacing Social

18   Security.  This had been the thing that the company had been

19   mightily resisting the Social Security number, really from day

20   one of bargaining.  And we had offered them the clock number as

21   an alternative, unique identifier.  And yet they were not

22   interested in that.

23   Q    Okay.  And then scrolling a little further down.  Not that

24   far, just on page 1, the other two pieces.

25        Okay, so this unnecessary language?



1    A    Correct.  So I believe I testified I'd raised this a

2    couple of times, both in June and in August, that the company

3    had made a mismatch between the tentative agreement that had

4    been reached on 3.6.2 and their proposal of 3.2.

5         The two were in conflict as to when the notice would be

6    given to the Union of a new hire, so I believe that a date -- a

7    time certain had been agreed to in 3.6.2 and the company was

8    continuing to propose that they would give us the notice of the

9    new hire by the time of the first paycheck.  And I didn't want

10   there to be complexity in the contract about when you have to

11   give the notice.  If all employment notices must be given

12   within 14 days of when they happen, then we should get those

13   notices in a consistent way.

14   Q    And can we scroll briefly back to the top?  It says that

15   encounter of 10/7/19, 2p.m.  Is that roughly when you recall

16   presenting this?

17   A    Roughly.

18   Q    Can we pull up Joint Exhibit 6(n), please?  All right.  Do

19   you recognize this?

20   A    So this is the company's counter to the proposal we just

21   looked at, which was 6(m), as in Mary.  And this is their

22   response.

23   Q    Okay.  And can we scroll down just a little, towards the

24   bottom of page 1?  Did they respond to your concern about the

25   conflicting language?



 1    A    They had not in writing.

 2    Q    And then just briefly scrolling through it, anything else

 3    new here?

 4    A    Yes.  Employee ID number, it was just briefly there at the

 5    top of the screen.  I had been using the phrase clock number,

 6    because that was what I believed was the Nexstar title and/or

 7    Aptify, our new software's title for an alternative number.

 8    And so this was the first time the company was responding to

 9    that with an employee ID as a -- as an alternative identifier.

10    Q    All right.  And you just testified that they hadn't yet,

11    in writing, resolved the conflict we just mentioned.  But did

12    you have a discussion about that at the bargaining table?

13    A    Yes, we did.  And well, I really did think I'd been clear

14    about the mismatch between the two provisions.  I believe that

15    was the day they finally understood what I was saying.

16    Q    Okay, can we pull up Joint Exhibit 6(o)?

17    A    I'm sorry, can I see the top of it?  I presume it's a

18    Union proposal, but --

19    Q    Keep going.  That's page 2, I think.  There we go.  All

20    right, do you recognize this, Carrie?

21    A    Yes.  So that's an Employer counter to the Union, at 4:15

22    p.m.

23    Q    Okay.  And scrolling down just a little, to Section 3.2.

24    So what did this do?

25    A    This finally accomplished what I'd been requesting.  The



1    company took out the proposal for a new 3.2, so that the

2    language of 3.6.2 would be the only obligation for giving

3    and -- information on employee changes, whether it was a new

4    hire, a separation, a wage increase.  And this way there was no

5    longer a mismatch about when the obligation kicked in, because

6    there would only be one piece of language, 3.6.2.

7    Q    Do you recall if the parties discussed future bargaining

8    at this session?

9    A    Absolutely, because we were, once again, getting into --

10   it's October, but we were once again getting into the

11   difficulty of booking rooms during the holidays and we could

12   see the end of the year coming.  So we tried to settle on

13   bargaining dates.  We had December dates that were already

14   agreed to, and I wanted to get January dates on the books.  And

15   I believe we did agree to January dates at that time with all

16   parties.

17   Q    Why not November dates?

18   A    Again, it was the sweeps period and the Employer did not

19   offer any dates during that period of time.

20   Q    Did the Union offer November dates?

21   A    We had availability during November.  Even with

22   Thanksgiving, there were some pretty good holes in November.

23   Q    Do you recall, though, if you specifically offered your

24   available November dates?

25   A    I'm sure I did.



1    Q    Okay.  Can we actually pull up Joint Exhibit 13, Bates

2    20 -- okay, that would be Bates 22.  Oh, yes, sorry.  I have

3    this stapled funny.  So Bates 22, toward the top.  It's a POS,

4    November 13 to 15.  What does that refer to?

5    A    POS is my shorthand for possible.  So those were possible

6    dates that we were offering, November 13 through 15.  It was

7    the norm to have two days, as happens sometimes when there was

8    another hearing or something else going on, sometimes not back-

9    to-back, but with a hearing in the middle or on either side.

10   Q    All right, can we pull up Joint Exhibit 41, please?  And

11   scroll a little to the Casey Wenger email.

12        Carrie, do you recognize this document?

13   A    Yes.

14   Q    What is this?

15   A    It's the request from me to Mr. Wenger for the earnings

16   for the 1st of October through September -- through September,

17   meaning it would be for a two-month period of time, the month

18   of August and the month of September.

19   Q    And then we scroll back up a little, Mr. Schiff, to the

20   response.  And what's the --

21   A    Attached, you'll find the September earnings for employees

22   who worked under the NABET CWA expired collective bargaining

23   agreement.  This spreadsheet remains password-protected.

24   Q    So we didn't attach the attachment, but did they provide

25   the September earnings?



1    A    Yes, they did.

2    Q    Can we pull up Joint Exhibit 17, Bates 43?

3         Okay, do you recognize this, Carrie?

4    A    Yes, I do.  It's a bargaining bullet addressed to members

5    of the bargaining unit, not addressed to Union members.  It's

6    addressed to all members of the bargaining unit.

7    Q    Is that how the other bargaining bulletins were addressed?

8    A    Not always.  Initially, they had been Dear Member, and

9    that would be member of the bargaining unit -- excuse me,

10   member of the Union.  But we were reaching out to the folks who

11   were not Union members about joining the Union, so we were

12   making an effort to send our information to everyone in the

13   bargaining unit, whether they were a member or not.

14   Q    And if we scroll toward the bottom of Bates 43, top of

15   Bates 44, actually, yes, stay right there.  That's perfect.  So

16   this says -- states your next bargaining dates.  So do you

17   recall, had those been set at the October 9th -- 7th or 9th

18   session?

19   A    I think December 9 and 10 had been set in August.  And

20   now, during this session, we had set January 14th and 15th.

21   Q    All right, let's talk about October 9th bargaining.  So

22   first, why didn't you meet on October 8th?  Usually you met on

23   consecutive dates.

24   A    I believe we had an NLRB trial, or at least, one

25   scheduled.



1    Q    Can we pull up Joint Exhibit 42, please, which is quite a

2    lengthy document, but I really need is the first page.  Scroll

3    down a bit to the -- what is this at the top, where it says my

4    name, Carrie?  Do you know what that is?

5    A    That is my sending this email to --

6    Q    Jennifer.

7    A    You printed it out.  I sent it to Jennifer Schulze on

8    Friday, November 1st, 2019.

9    Q    And some of the documents look this way.  Who is Jennifer

10   Schulze?

11   A    She -- Ms. Schulze was the Board agent who was

12   investigating our unfair labor practice charges.

13   Q    Okay, let's talk about the October 9th email, in the

14   middle there.  What is that?

15   A    So that's October 9th, 2019, from me to Pat Nevin and

16   Casey Wenger and Charles Pautsch.  So this is -- I'm sorry.

17   I've got that backwards.  This is Pat Nevin to me, copying

18   Casey Wenger and Charles Pautsch.  The title is meeting

19   schedule, but it's -- what it talks about is attached is the

20   relevant information for coverage in the areas of your request.

21   You will find the requested information within the attached

22   SPD, which I know to be summary planned description, by

23   performing a word search using the terms abortion and sexual.

24        We also renew our request for information from our last

25   bargaining session regarding fringe benefit programs available



1    through NABET.  We would like to review what is available

2    within these plans as a potential alternative supplement to

3    available Nexstar plans.  Thank you, Pat.

4    Q    So in terms of the first two sentences, what was this a

5    response to?

6    A    This was the ongoing request, probably over a year old at

7    that point, to clarify whether coverage was available for

8    women's health and abortion, and for Gender Dysphoria under the

9    Nexstar plan.

10   Q    Had you received a response to that before this email?

11   A    I had not.  I had received word from Mr. Pautsch

12   repeatedly that they were checking on it or they hoped to have

13   it soon, but I had not gotten the definitive answer -- not that

14   this is the definitive answer, but this was the pathway to the

15   answer that they were now telling me there was an attached

16   document.  If I opened it and a word searched it, I could find

17   the answer.

18   Q    Do you remember if you discussed what you found in that

19   document at October 9th bargaining?

20   A    Yes, I then had to open the document.  It's, as I recall,

21   hundreds of pages long.  And so I had to download it onto my

22   laptop, open the document, do the word search to find Gender

23   Dysphoria listed under -- or located by the word sexual.  And

24   the term abortion led me to their coverage only of rape and

25   incest being the only justifications under which they would pay



1    for abortion.

2    Q    And I'm sorry if you just said this, but so the record's

3    clear, what was the answer about coverage for Gender Dysphoria

4    treatment?

5    A    It was not covered.

6    Q    Did you -- the second piece, the last few sentences here

7    about renewing their request for information about the Unions

8    fringe benefit programs, did you discuss that at the bargaining

9    table on this date?

10   A    Yes, we did.  And I considered -- continued to be

11   concerned that the plans that they were talking about -- well,

12   available to people because of their membership in an AFL-CIO

13   Union, would be health care or travel benefits or discounts on

14   flowers that were available only to people who could be

15   verified as members of an AFL-CIO Union, and that that would

16   not be appropriate health care for me to bargain in a contract,

17   because people would not have it available to them at all if

18   they chose to be an objector, which is their legal right.

19        And it would also create a time lag, because it would not

20   be coverage that starts on your first day of employment.

21   Membership is something that takes a little longer.  People are

22   not required to join until they have worked at least 30 days.

23   They then have another grace period and after that, when they

24   submit their application, they don't become a member until

25   they're voted into membership at our next executive board



1    meeting, a meeting that's held monthly.

2        So it could be three months, depending on the timing of

3    all the paperwork, before they would be a member of the Union.

4    Then that information has to handshake with the Union Plus

5    process, to know that they -- the individual is within our

6    records.  And then they would have the opportunity to look at

7    those programs and see if they wanted them for health care.

8    That just didn't seem to me a good method.

9    Q    How did Respondent respond to those concerns expressed on

10    October 9th?

11    A    That I should give them the documents, that I should give

12    them information (audio interference) and that they would

13    consider putting most members in the Union Plus programs and

14    then they would keep the nonunion or nonmember individuals in

15    the Nexstar plan.

16    Q    Did they put that in writing?

17    A    No, I believe they set it across the table, but they

18    didn't propose it in writing.

19    Q    How did you respond to that proposal?

20    A    I rejected the concept as unworkable.  And I did ask

21    whether they were willing to consider the plan called the Flex

22    Plan, which is a Taft-Hartley trust, that Union members under

23    contracts had access to.  So for instance, at ABC, we have

24    agreed with ABC that the flex plan will be the access to

25    healthcare for daily hire or casual workers.  And upon hiring,



1    a new daily hire can go to the flex plan and enroll in

2    healthcare coverage there.  And a regular contribution is made

3    by the Employer with every pay towards that plan.  And the flex

4    plan covers, I think, about 30,000 people in the entertainment

5    industry at large.

6         So it's not just NABET, it's other unions in Hollywood who

7    helped develop this cafeteria-style plan.  It has a 401k.  It

8    has other kinds of healthcare options.  But I can't just offer

9    that to members.  I can only make it available where the

10   Employer has agreed to be a Taft-Hartley Trust participating

11   Employer.  And it was my understanding that Nexstar was not

12   willing to do that.

13   Q    How was that your understanding?

14   A    It had come up previously in the bargaining that they did

15   not want to take on a Taft-Hartley Trust, which can have

16   financial implications and obligations for an Employer.

17   Q    At this point, by October 9th, did you have a good sense

18   of the contributions and costs of Respondent's healthcare

19   proposal?

20   A    I did not.

21   Q    Why not?

22   A    I didn't know how much they were currently paying for each

23   member.  I knew that for the members under the contract, I knew

24   how much the member had to pay towards the healthcare, because

25   it was locked in the contract, but I didn't know what the total



1    cost of each plan was.

2         So I knew, for instance, under one coverage that the

3    employee would be charged $168 a month.  But I didn't know if

4    the company's contribution was $1 or a $1,000.  So if I was

5    going to take the money available, the Employer contribution

6    and the employee contribution and look at different coverage, I

7    needed to know how much money there was in the pot to be able

8    to buy it.

9         I couldn't go out and buy a plan that cost $2,000 a month

10   if I only had $1,000 a month.  And if you recall yesterday, I

11   had asked for COBRA rates at one time, because I had figured if

12   I knew what the COBRA rate was and then I knew what the

13   employee had been contributing, I should then know what the

14   total dollar amount was that Nexstar was paying for healthcare.

15   And I could see whether I had enough money to buy one of the

16   alternative style plans inside the flex plan.

17   Q    Had you received that information yet?

18   A    I had not.

19   Q    Did you discuss your need for the information at the

20   October 9th session?

21   A    I did.  I once again asked for those numbers.  So I wanted

22   both their willingness to accept a Taft-Hartley Trust, and what

23   dollars there were in the pot to buy coverage.

24   Q    Do you remember around what time the October 9th session

25   ended?



1    A    Not independently.  Probably the second day of bargaining,

2    so early afternoon.

3    Q    Why early afternoon?

4    A    Because Mr. Pautsch tended to take an earlier flight to

5    head out to somewhere else.  It was the last day of bargaining,

6    so it was the -- you would call it (audio interference) not

7    just a travel day, but a day where you were going to work and

8    then you were going to -- in my case, go to the airport, return

9    the rental car, get to the airport, check in and fly home.

10   Q    Could you have stayed longer?

11   A    I could.  I often stayed over if we got to another -- I

12   could have another meeting.  I could stay over in Portland

13   pretty much routinely.  I don't like to change a plane ticket

14   the day of, because those charges are excessive and I try not

15   to spend the Union's money that way, but I could have booked it

16   in a different way.

17   Q    Okay.  Can we pull up Joint Exhibit 43?  All right.  And

18   can we -- well, first, Carrie, do you recognize this?

19   A    Yes.  This is a memo from Mr. Nevin to the members of the

20   NABET Local 51 bargaining unit.

21   Q    Okay.  And if we review this, at various points it's

22   called something you had just done, an October trick, fool's

23   gold, a trap, a dirty trick.  What was this referring to?

24   A    This was referring to the offer by the local Union to

25   waive the initiation fee.



1    Q    Could that have been a trick?

2    A    It's definitely not a trick.  It was a concerted decision

3    on the part of the Local to counter Mr. Nevin's comments about

4    the initiation fee by offering a waiver of initiation to

5    anybody who was working in the bargaining unit, but had not yet

6    joined the Union.

7    Q    And then if we scroll down to page 2 of Joint Exhibit 43

8    in the middle, so it encourages -- yeah, "Those forced in the

9    past to pay this exorbitant fee should ask for their money

10   back."  Did you get any requests for money back?

11   A    I did not.

12   Q    What did you think when you read that part?

13   A    I thought it was distinctly meddling in the internal

14   affairs of the Union.

15   Q    And scrolling to page 3.  Actually, toward the bottom of

16   page 3, there's some salary information.  Your salary it

17   purports to be.  What's your response there?

18   A    So this is taken from the LM2 of the Local.  Our fiscal

19   year ends on September 30th.  So he was looking at our last LM

20   from a year that had ended September of 2018.  When I was a

21   part-time employee of NABED for the Local, and I also worked as

22   the temporary administrator of a statewide court interpreters

23   bargaining unit, the Local had -- interpreters had gotten into

24   extreme trouble with the CWA or National Parent Union.  And

25   they had lost the right to run their own Local.  And I was



1    asked to step in on a part-time basis to run that Local.  So

2    while I had committed to work for NABED CWA at part time,

3    theoretically 20 hours a week, I was working a second part-time

4    job, but they were both for parts of the Union.  And for

5    clarity and for not totally messing up my payroll, I was paid

6    by NABED Local 51 for both jobs.  So NABED 51 would (audio

7    interference) the interpreters Union for my time.  And the

8    interpreters Union would pay NABED Local 51 for my

9    contributions and for my wages.

10   Q    And then scrolling at the bottom of page 4, the

11   conclusionary paragraph, again, it uses your name and it says,

12   "Don't fall prey to her trickery.  Fool's gold.  In our

13   opinion, you would do better to hold on to your hard earned

14   money."  How did you interpret that statement?

15   A    Once again, meddling in Union business that was really

16   none of the company's purview.

17   Q    How could employees hold onto their hard earned money with

18   respect to the Union?

19   A    What Mr. Nevin was proposing was that they not pay dues,

20   and that they not contribute financially to the Local.

21   Q    What was your overall take on this memo?

22   A    I thought that was pretty outrageous.  It was not a total

23   surprise.  It was in the vein of a number of nasty memos that

24   Mr. Nevin had sent to me or distributed about me to the Union

25   membership and the bargaining unit, but he was pretty much



 1    ramping up the tone of it.

 2    Q    Okay.  Can we pull up Joint Exhibit 44, please?  And maybe

 3    scroll to the bottom so we can go in order of the email chain.

 4    So bottom of page 2 of that exhibit.  So Carrie, what is this?

 5    A    This is my request on November 4th for the earnings for

 6    the month of October, and it's from me to Casey Wenger, copying

 7    DeeDee Morua, our office manager.

 8    Q    And then scrolling up to top of page 2.  What's that?

 9    A    That's from Casey Wenger back to me, copying Lisa Newell.

10    And so it says, "Attached you'll find the October NABED

11    employee earning.  As you have heard, November 15th will be my

12    last day.  Lisa Newell would be your point of contact from

13    forward.  Please feel free to contact her if any questions."

14    Q    And again, we didn't include the attachment, but did he in

15    fact send the October earnings?

16    A    Yes, he did.

17    Q    Okay.  And then scrolling up on page 1.  What are these

18    emails?

19    A    This is the continuation of that chain.  So me thanking

20    Casey for the earnings reports.  Wishing him congratulations on

21    his retirement.  Welcoming Ms. Newell, asking where she was

22    based.  Because I wasn't sure whether she would physically be

23    located in Portland or just handing the records of the

24    Employer.  So I was asking for phone numbers to reach her, in

25    addition to her email address and offering our contact



1    information, both the office for our NABED Local office in San

2    Francisco, our general telephone number.  The email of -- my

3    email, and Ms. Morua's email.  And then I believe at the very

4    bottom of that email, I also offered my cell phone number.

5    Q    All right.  Can we pull up Joint Exhibit 17 again?  Bates

6    45.  Okay.

7         Carrie, do you recognize this?

8    A    It's a Bargaining Bulletin, number 32, dated December 6,

9    2019.

10   Q    Okay.  And it notes that you're holding a membership

11   meeting.  Was that one of your usual post-bargaining meetings?

12   A    Yes, it was.  You'll see there in the second paragraph

13   that it's from 6 to 7:30 p.m.

14   Q    And then at the -- the last sentence on that page if you

15   can scroll to the bottom, the issue of healthcare coverage and

16   benefits will be your focus for those bargaining sessions.  Why

17   was that?

18   A    Because we were -- we now had the summary plan

19   description, which we've gotten in the October session.  We

20   knew for sure that the abortion and gender dysphoria coverage

21   was not offered, and we still didn't have a healthcare metric.

22   I didn't have a dollar amount that I could tell people that

23   they would be paying for healthcare, nor exactly what coverage

24   they would have.  I knew that for sure, that the Nexstar

25   coverage now was inadequate in terms of the women's



1    reproductive health coverage.

2    Q    Okay.  And can we pull up Joint Exhibit 46, please?  And

3    scrolling to the bottom, Carrie, maybe just for efficiency

4    sake, is this yet another request for earnings for December and

5    November?

6    A    Yes, it is.

7    Q    And at the top, is Lisa Newell your new point of contact

8    sending those?

9    A    Yes, she is.

10        MS. DEVLEMING:  So, Your Honor, here I would dive into

11   December 9th.  Maybe this a good point to break.

12        JUDGE TRACY:  Yeah, that sounds good.  Let's take -- so do

13   you think before we take the break, you -- well, you still got

14   I think December I think as I recall yesterday.  You're going

15   to go through that bargaining and then how much longer after

16   that will she be on?

17        MS. DEVLEMING:  Not very long.  I think I'll be done by

18   lunch.  Famous last words.

19        JUDGE TRACY:  Okay.  And so that would be -- and Ms. Yen,

20   do you think -- well, do you have any questions that you intend

21   to ask your case-in-chief Ms. Biggs-Adams?

22        MS. YEN:  No, I don't.  I -- I don't believe that my

23   questions will take very long.

24        JUDGE TRACY:  Okay.  So let's see if we can have time.  If

25   you can aim to finish.  So let's maybe take a ten-minute break



1    right now.  Aim to finish by noon.  Fingers crossed, because

2    I'm -- well, then Mr. Roberts will do his cross, and he might

3    need time to review some things.  So that might be a longer

4    lunch break, actually, to do that.  So let's take a ten-minute

5    break.  So it's 10:20.  So 10:30 we'll come back, okay?  Thank

6    you.

7         MS. DEVLEMING:  Thank you.

8         (Off the record at 10:19 a.m.)

9         JUDGE TRACY:  All right.  Let's see.  Claudine, go ahead

10   and go back on the record, please.

11        THE COURT REPORTER:  We're on the record.

12        JUDGE TRACY:  Okay, go ahead.

13        MS. DEVLEMING:  All right.  Your Honor, as we were talking

14   with Carrie there, I got an email from Respondent with some new

15   documents I hadn't seen before just now.

16        So with your permission, I'd like to show them to Carrie

17   and see if there is something we would want to stipulate to as

18   joint exhibits.  So Mr. -- thank you.

19        Mr. Schiff, can you pull up what's been pre-marked but not

20   yet admitted as Joint Exhibit 60(a).

21                    **RESUMED DIRECT EXAMINATION**

22   Q    BY MS. DEVLEMING:  So, Carrie, do you recognize this

23   document?

24   A    It looks like an email from Casey.  It says, "With dental

25   vision premiums."  I don't independently recollect anything



1    about it at the moment.

2    Q    Okay.  Let's also show her -- let's start with JX-60(b).

3    And this you can see the title here matches if we go back to

4    60(a) one of the purported attachments to 60(a).  Medial

5    (phonetic), which I assume is a type of a medical plan.  So

6    looking back at 60(b), Carrie, do you recognize that?

7    A    Yes, I believe I've seen these before.

8    Q    What's your understanding of what they are?

9    A    They code -- they state what's in the contract.  So these

10   dollar amounts, if you turn them into monthly amounts and

11   compare them to the healthcare provision of the contract, are

12   the same dollar amounts.

13   Q    Of the expired CBA?

14   A    Correct.  So these are exactly what people were paying in

15   January of 2019 when this was sent to me.  It's not anything I

16   don't already know because it's what I bargained in 2015.

17   Q    Okay.  And can we look at Joint Exhibit 60(c) -- what's

18   pre-marked as Joint Exhibit 60(c).  It says dental and vision

19   rates including contributions?  Do you recognize this?

20   A    Yes.  And I believe this is the same situation.  This

21   is -- see where it says 2017 rates?  That would be consistent

22   with the contract that locked those numbers in as of 1/1/17.

23   Q    Was this the type of information you were seeking?

24   A    No, because what I wanted to know was what the whole cost

25   of the coverage is, so that I could calculate what the company



1    was dedicating to healthcare contributions, so I could see what

2    I could buy with that money in some other plan that I could

3    propose.

4    Q    So you note that 60(c) and 60(b) reference, 20 -- I'm

5    sorry, 60(b) says 2019 rates, if we can open that one again.

6    What would that mean?

7    A    It would have meant that that's what people were paying at

8    the time in January of 2019.  But what they were paying in 2019

9    was the same amount they had paid since January 1 of 2017, when

10   the contract increase went in.  There had been two healthcare

11   rates in that provision of the contract; the 2016 numbers and

12   then the 2017 numbers.  And under the expired CBA that people

13   had continued to pay that same contribution.  But it says

14   nothing as to what the company was dedicating to healthcare.

15        MS. DEVLEMING:  Okay.  Your Honor, with those

16   explanations, I have no objection to offering these as Joint

17   Exhibits 60(a) through (c).

18        JUDGE TRACY:  Any objections?

19        Ms. Yen?

20        MS. YEN:  No.  No objection.

21        JUDGE TRACY:  All right.

22        Mr. Roberts.

23        MR. ROBERTS:  No objection.

24        JUDGE TRACY:  All right.  So Joint Exhibits 60(a), (b),

25   and (c) are admitted into evidence.



1    **(Joint Exhibit Numbers 60(a) through 60(c) Received into**

2    **Evidence)**

3    JUDGE TRACY:  And then at some point, if we could just

4    upload those two that SharePoint site under joint exhibits.

5    MS. DEVLEMING:  All right.

6    Mr. Schiff, can we open what's been pre-marked as Joint

7    Exhibit 61(a).  It's very small.  Okay.  And maybe can we

8    scroll to the middle of this?  Let me scroll along with you.

9    Okay, so specifically to the email we haven't seen before.

10   Q    BY MS. DEVLEMING:  So if you go all the way to the bottom,

11   this appears to be the email we just discussed, right?

12   A    That's what it appears to be.

13   Q    Um-hum.  Okay.  So the next one up, which is time stamped

14   3:45 p.m.  Go down one, please.  Down to the substance of that

15   one.  There you go.  "Attached you will find the benefit rate."

16   Do you recognize this email?

17   A    Yes.  I believe that was part of that whole dialog.

18   Q    Okay.

19   MS. DEVLEMING:  And then can we show Carrie what's been

20   pre-marked as Joint Exhibit 61(b)?  Okay.  This looks eerily

21   familiar.

22   Q    BY MS. DEVLEMING:  Do you recognize it?

23   A    It looks like the same information.

24   Q    Okay.  So jumping back to Joint Exhibit 61(a) please,

25   scrolling up to the next email.  They are time stamped 3:52.



1    What is that?

2    A    That's my response to Mr. Wenger, Mr. Brown, and Mr.

3    Pautsch, that the dental and vision on the nonrepresented

4    employees says 2017 and is the same and the prices you sent us

5    for nonrepresent -- for represented employees.

6    Q    So were you acknowledging that what's been pre-marked as

7    61(b) is the same as an earlier --

8    A    Correct.  It's the earlier -- they were saying that these

9    were for the nonrepresented people, but they were saying they

10    were charging them the same as the Union represented people

11    under the contract.

12    Q    Okay.  And then scrolling to the top of 61(a), please.  Do

13    you recognize this?

14    A    Yes.  So this is the last in that discussion coming at

15    just before 6:00 p.m., that there had been no change in the

16    rate for dental, vision for those three years.  The rates are

17    the same for represented employees and nonrepresented

18    employees.  And again, this only says the rates that the people

19    are paying, not what the product costs the company.

20    Q    Was that the information you were speaking about, dental

21    and vision?

22    A    Yes, it was.

23    Q    Only the rates that people were paying?

24    A    And only the rate?  No.  What I was looking for was what

25    the company was dedicating to the cost of healthcare.



1        MS. DEVLEMING:  Okay.  With those explanations, I again,

2   have no objection to jointly stipulating to Joint Exhibit 61(a)

3   and (b).  We offer them into evidence.

4        JUDGE TRACY:  Any objection?

5        MR. ROBERTS:  No objection.

6        MS. YEN:  No objection.

7        JUDGE TRACY:  All right.  So Joint Exhibits 61(a) and (b)

8   are admitted into evidence.

9   **(Joint Exhibit Numbers 61(a) and 61(b) Received into Evidence)**

10        JUDGE TRACY:  And just upload them to the SharePoint link.

11   Q    BY MS. DEVLEMING:  Okay.  Can we open Joint Exhibit 62(a)?

12   And this one says at the top 6:31.  Well, first, you recognize

13   this?

14   A    Yes.  It's an email from Mr. Wenger to me and some others.

15   Q    And scrolling to the bottom there may be first.  Do you

16   recognize this?

17   A    Yes.  This is an email and questions from me.  I guess

18   since there are responses embedded in there, I asked the

19   question, "May we have the COBRA rates and the Employer

20   contributions are on the plans?"  And I get the answer first.

21   "Two, the premium gets adjusted on each paycheck.  Yes, that's

22   correct."  "If the" person -- the "family coverage is paid

23   $2,000 gross one week, the amount would be $208, but the next

24   pay period they make $2,400, they would pay $249.60."  The

25   answer is "Yes."  And if they made $2,404 or more on one check,



1    they would only pay $250 because the company was saying that

2    the maximum contribution per paycheck for that family coverage

3    would be $250.00.

4    Q    Okay.  And then scrolling up to the top again.  It says

5    something's attached.  Can we open what's been pre-marked as

6    Joint Exhibit 62(b)?  Do you recognize this, Carrie?

7    A    I believe it was part of the communications in all of that

8    series of dialogs, three emails and three email exchanges.

9    Q    Okay.  And what is this?

10   A    It's saying that this is what an individual would be

11   charged if they were to separate from Nexstar and ask for COBRA

12   coverage.  There are two kinds of healthcare coverage.  So

13   that's why there's the top line is the PPO policy.  The second

14   is the high deductible policy.  And then the dental coverage

15   only offers two kinds of coverage; individual or individual

16   plus people.  So while above, it came in four flavors.  You

17   only get two flavors in the COBRA and the dental and the

18   vision.

19   Q    Did this information answer your questions as to what you

20   were seeking?

21   A    Well, it gets -- it's gets closer to telling me -- I think

22   what it told me was that in, for instance, the dental care, the

23   employee was paying all of the dental premium.  The company was

24   providing nothing towards that premium.  And then I'd have to

25   go back and look at all the math.  But it doesn't show that the



1    company's paying a lot towards those coverages.

2    Q    Just for the lay person and maybe very briefly, how do you

3    know that this shows the employee paid all of the dental?

4    A    I would have to compare the couple of documents that

5    you've just shown me before this, as to how much each employee

6    is having deducted per paycheck.  But if we compare those and

7    they're per check and these dollar amounts are per month, if

8    let's say -- let's use $10 to make this simpler as an example.

9    So if vision care costs $10 per month for an employee, and the

10    employee was kicking in $5 per paycheck, the employee is

11    kicking in more than $10 per month that is the cost of the

12    coverage.  And then if these are COBRA rates, you have to

13    deduct two percent off of them because by law, employers are

14    allowed to add a two-percent handling fee for COBRA coverage.

15    And once you deduct the two percent off of all of these numbers

16    and then back out the employee contributions, the employee is

17    kicking in most of the money.

18        MS. DEVLEMING:  Okay.  All right, Your Honor.  Same thing

19    with those explanations, I have no objection to offering and

20    having Joint Exhibits 62(a) and (b) admitted into evidence.

21        JUDGE TRACY:  Any objections?

22        MS. YEN:  No.

23        MR. ROBERTS:  None.

24        JUDGE TRACY:  Okay.  All right.  Thank you.  So Joint

25    Exhibits 62(a) and (b) are admitted into evidence.



1    **(Joint Exhibit Number 62(a) and 62(b) Received into Evidence)**

2         JUDGE TRACY:  And just upload them into SharePoint.  Thank

3    you.

4    Q    BY MS. DEVLEMING:  All right, Carrie, let's dive back in

5    now to where we were, which was the December 9th, 2019

6    bargaining session.

7         MS. DEVLEMING:  Okay.  Can we pull up Joint Exhibit 47,

8    please?

9    Q    BY MS. DEVLEMING:  All right, Carrie.  Do you recognize

10   this document?

11   A    Yes.  It's an email to me from Pat Nevin in response to

12   requests for information.

13   Q    Okay.  Give me just one second.

14        MS. DEVLEMING:  Okay.  So if we -- actually can we -- so

15   kind of look at these numbers in your head and then, Mr.

16   Schiff, can we show Joint Exhibit 60(b).

17   Q    BY MS. DEVLEMING:  So do you see -- are these the same or

18   different numbers?

19   A    I think they look like the same numbers.  I would compare

20   them side by side if -- if I was doing this independently, but

21   from screen to screen, they look like the same numbers.

22        MS. DEVLEMING:  Okay.  And then same thing with -- okay,

23   scratch that question.

24   Q    BY MS. DEVLEMING:  First question, is this the information

25   you were still seeking as of December 9th?



1    A    Well, I was still seeking it.  It still didn't answer the

2    question.

3    Q    But the information provided here, is this what you were

4    seeking?

5    A    It was what I was seeking.

6    Q    What was the question that was unanswered?

7    A    What was unanswered was what the Employer dedicated to

8    healthcare per employee.  Even where I have bargained

9    healthcare with self-insured employers, it is my experience

10   that what they will dedicate is we will pay $250 per worker

11   towards healthcare or each month or each pay period.  They will

12   set a dollar amount, even if it's based on experience rating.

13   They will set the dollar amount that is budgeted in that

14   department or division for healthcare based on employee.

15        And then some employers pay more towards family coverage

16   because they want to encourage family coverage.  Others pay

17   only the same dollar amount.  If they put in $100 for an

18   individual, they'll put in that same 100 towards the individual

19   with family coverage.  And any additional money, because you

20   choose to have your dependents covered by the employer's

21   healthcare, will be the responsibility of the worker.  But you

22   can tell how much you have to make up because the employer has

23   budgeted X number of dollars for healthcare per worker.

24   Q    So did this December 9th response answer those questions?

25   A    It did not.



1    Q    Okay.  Scrolling to page 2 of Joint Exhibit 47.  This

2    second to last paragraph reiterates and asks you to reconsider

3    your refusal to respond to the information request about the

4    possibility of employee participation in the entertainment

5    industry flex plan.  Just remind us very briefly what that was

6    about.

7    A    That is the Taft-Hartley Trust.  That is called the

8    Entertainment Industry Flex Plan, which I had said that I was

9    willing to offer as a coverage possibility.  But I needed to

10   know how much the company was willing to dedicate -- allocate

11   towards healthcare so that I could tell what each member would

12   be responsible for.  It would not make me a good bargain or

13   popular with my members if I came back and said, hey, I fixed

14   your healthcare, but you're going to have to pay $1,000 a month

15   to get the coverage.  In order to weigh that economically, I

16   need to know that they make enough money to pay for it.  So I

17   need the wages to go up to cover any increase, but I can't even

18   do that calculation until I know what it costs.

19   Q    Okay.  Circling back, though, to the reference here to the

20   August 15th Respondent information request.  Do you recall did

21   the parties discuss that information request at the bargaining

22   table on December 9th?

23   A    We may have, but it would be my recollection without

24   looking at that information request right now of August 15th.

25   I believe that August 15th information request was not about



1    the entertainment industry flex plan.  It was their request for

2    the coverage of the Union privilege program.  And the Union

3    privilege programs are the ones that require you to be a Union

4    member to be covered.

5    Q    Did you discuss those Union privilege programs at the

6    December 9th bargaining?

7    A    Well, I continued to feel very strongly that those would

8    not be the right ones for us to offer because you have to be a

9    member of an AFL-CIO Union to participate in those programs.

10   Q    Did Respondent share its perspective on that information

11   request or the viability of those programs?

12   A    They felt very strongly that I should provide those

13   programs, even though, as I kept saying, they were not a viable

14   alternative for members of a bargaining unit that aren't

15   members of the Union.

16   Q    Can we pull up Joint Exhibit 48, please?  All right.

17   Carrie, this looks very similar, but it has a different number.

18   Do you recognize this document?

19   A    This is a -- I think the first part of it, the two bullet

20   points are just refreshing what I had requested.  It just

21   restates what I had asked for in November.  And then it

22   (simultaneous speech) --

23       MS. DEVLEMING:  So I know my Joint Exhibit 48 stamp in the

24   top right makes it hard to see, but, Mr. Schiff, can we kind of

25   zoom in as well as we can on the top right corner there.



1    Q    BY MS. DEVLEMING:  Can you make out --

2    A    Sure.  That's my lovely handwriting.  11/9/19.  I'm going

3    to guess 1:35 p.m.

4    Q    Okay.

5         MS. DEVLEMING:  And then do we have 47 still handy, or can

6    we just scroll up, I guess, in your -- back to Joint Exhibit

7    47.

8    Q    BY MS. DEVLEMING:  Same thing.  Top right corner.

9    A    So that's the same date, 11/9/19 at 11:07 a.m.

10   Q    Okay.  Just comparing to the typewritten date in the

11   document, is it 11 or 12?  It's the December 9th bargaining, I

12   think.

13   A    I'm sorry.  Yes, December 9th.

14   Q    Okay.  So looking back at Joint Exhibit 48, please.  Do

15   you recall what the difference between these was, or if there

16   was one?

17   A    So I had asked again for the COBRA rates so that I can --

18   because my goal in all of this continued to be to search for

19   what the company dedicated to healthcare.

20   Q    So this one, if we compare -- --

21        MS. DEVLEMING:  And I'm sorry to make you keep going back

22   and forth, Mr. Schiff -- but 47, if you scroll down to COBRA

23   rates midway through page 1, there's two columns.  And then

24   looking at 48, same place, there's three columns.

25        Sorry, after page 1, three columns.



1    Q    BY MS. DEVLEMING:  Is that the information you were

2    seeking in the third column there?

3    A    It might be what I was looking for.  Because I was trying

4    to find out what the company was contributing.  So on the face

5    of it, it might be the right numbers.  But upon receiving the

6    email, I'd have no way of knowing whether it was the right

7    number.  You would hope -- I've been asking for what the

8    Employer contribution is, and this answers the question.  This

9    is what the Employer contribution is on a biweekly basis.

10    Q    Okay.

11    MS. DEVLEMING:  Can we open Joint Exhibit 49, which is (a)

12    through (f)?  And that was initially only because one of them

13    was an uneditable document.  Now, they're all at editable.  I

14    think we lost your screen, Daniel, but you probably know about

15    it.

16    MR. SCHIFF:  Sorry.  Bear with me just one second.  I'm

17    going to combine this.  Okay.  They're up now.

18    MS. DEVLEMING:  Okay.  They look pretty small for me, so

19    maybe we can zoom in a bit before I go through the desk.  And

20    then just to the middle of the document where it's Carrie's

21    emails.

22    Q    BY MS. DEVLEMING:  Carrie, do you recognize this document?

23    A    Yes.

24    Q    This is Joint Exhibit 49(a).  What is this?

25    A    So this is an email from me to Lisa Newell, Chuck Pautsch,



1    copying Anne Yen, saying, "Attached from the flex plan website

2    are the summary plan description and the Anthem 60 and Anthem

3    80 plan summaries, as well as the Delta Dental and VSP Vision

4    Plan summaries.  The prices of the coverage are on the bottom

5    right."

6    Q    Okay.  And then just very quickly, can you scan through

7    Joint Exhibits 49(b) through -- what is it -- (b) through (f).

8    I think they're pretty lengthy, but just to make sure we're on

9    the same page.  What are these?

10   A    So these are the documents from the entertainment industry

11   flex plan that include the structure of the plan, the summary

12   plan description, where you would verify coverage.  And then

13   where we are now is the documents that have the prices of the

14   coverage, and what they cover in general.  So right there you

15   had a vision plan was the last one that went by my face and it

16   shows what your copayment is when a vision exam is allowed.

17   And I believe down that -- and this is for the year 2020.  And

18   then the coverages for different glasses and lenses.  And what

19   would -- how often you could have new glasses, new frames.  And

20   then further down the page should be what the cost is for that

21   coverage.  So these are monthly rates for the year 2020.  And

22   there's a 50 -- 50-cent administrative fee that a single

23   individual their premium would be $9.67 for the month for the

24   vision coverage offered in this -- this particular, I think

25   it's a one or two-page document.



1    Q    And are these the attachments to Joint Exhibit 49(a)?

2    A    That is correct.

3    Q    Why did you send 49(a) through (f) to Respondent?

4    A    The company had been asking for the entertainment industry

5    flex plan documents.  The email that we had just looked at

6    from, I believe earlier that day, said they were looking for

7    the entertainment industry flex plan rates, and these are those

8    documents available to people in the State of Oregon.

9    Q    Was the Union proposing these benefits to be included in

10    the collective bargaining agreement?

11    A    I was prepared to propose them if there was enough money

12    available to pay for them.  I didn't want to disrupt people's

13    coverage and charge them a massively larger amount of money, if

14    it wasn't going to work.

15    Q    Did Respondent's side give you an answer or respond to

16    their receipt of these documents at December 9th bargaining?

17    A    I know that they responded because they put out messages

18    to the membership saying that the Union is proposing much worse

19    coverage.  It won't be as good.  It'll cost you more money.

20    They certainly didn't accept the proposal of moving into the

21    flex plan.

22    Q    Do you remember if they rejected it?

23    A    I don't know that they rejected it per se.

24    Q    Okay.  Would something refresh your recollection as to

25    whether this (simultaneous speech) --



1    A    My notes -- my notes might do that.

2         JUDGE TRACY:  Make sure just to wait for her to finish

3    asking the question to you.

4    Q    BY MS. DEVLEMING:  Okay.  Can we actually open Joint

5    Exhibit 14?  And it's Bates 20.  Okay.  Right at the very end

6    of Bates 20.  And take a second to look at that and let me know

7    if you recall a response one way or another.

8    A    So yes, I've refreshed my recollection.

9    Q    And did they give you a response that day?

10   A    It was a verbal response delivered through the federal

11   mediator saying that the company wanted to stay with their own

12   medical plan.  And my response was that back -- again, back

13   through the mediator, that without consulting the members and

14   what the costs were that are tied to a wage proposal, I can't

15   answer any further than that.

16   Q    And I just want to clarify one other thing from the notes

17   that I don't understand.  And so this would be Joint Exhibit

18   13.  Bates 30 -- no, 32.  Oh, actually, I'm sorry, it's 31.

19   Okay, at the bottom of 30 -- well, I guess maybe it is 32.  I'm

20   so sorry.  So you're referring to your handwritten notes.

21   A    Um-hum.

22        JUDGE TRACY:  Say yes or no.

23        THE WITNESS:  Yes.

24   Q    BY MS. DEVLEMING:  So explained you made some

25   calculations.  What kind of calculations?



1    A    So I tried to take the calculations from what the flex

2    plan would cost, what the company had said in that email

3    earlier in the day that they were dedicating towards

4    healthcare, to see what it would cost members to move to the

5    flex plan coverage.  Could I take what Nexstar was contributing

6    and calculate what members would have to pay for healthcare?

7    Would it be more?  Would it be less?  And then I could balance

8    that against a wage offer.

9    Q    And did you reach any conclusions?

10   A    I believe the conclusion that I reached was that the

11   members would need to look at the plans because I would need to

12   know what coverage each individual carried.  If you were

13   covering family, how much more would your personal copayment

14   premium be?  Because the impacts were significantly different

15   between individual coverage and family coverage.

16        Then I would need to ask members if they were willing to

17   move in to the two flex plan products.  As always, with

18   healthcare, it might have individual impacts that would cause

19   people not to be willing to move to the new coverage.  If I

20   could be more specific, you might have a longtime relationship

21   with your oncologist who got you through cancer five years ago,

22   and you've only want healthcare that gets you access to that

23   oncologist.  So if that oncologist is not available through the

24   coverage that the Union's moving you to, that -- it's not going

25   to be acceptable to that individual member.  And it wouldn't be



1    a good thing to do.

2        MS. DEVLEMING:  Mr. Schiff, can we briefly pull up Joint

3    Exhibit 48 one more time?  And just scroll to the charts there,

4    the contribution.

5    Q    BY MS. DEVLEMING:  So this says biweekly.  What was the

6    significance of any of the biweekly figures?

7    A    Well, in order to do the calculations of what the monthly

8    impacts were, I had to calculate that against the monthly

9    premiums from the flex plan.  So take the biweekly, multiply it

10   by 24, divide by 12.  See what the contribution would be on a

11   monthly basis and see what the impact of the coverage change

12   would be.  Before I got into the content of the medical care,

13   this would just be a way to evaluate the financial impact on

14   each member.

15   Q    Were there costs like this set forth in the expired

16   contract?

17   A    The expired contract shows the employees' cost per month

18   for these coverages.

19   Q    Okay.  So after your calculations, how did these compare

20   to the contractual rate?

21   A    They were exactly the rates in the contract.

22   Q    Okay, let's talk about December 10th bargaining.  You

23   remember how that session began?

24   A    I'm sure it began once again on healthcare, as you noted,

25   with those emails and those numbers that have been late into



1    the evening that we had been working on that the night before.

2    Q    Do you remember anything else that happened first before

3    the parties dove into healthcare?

4    A    Yes.  I was delayed because the secretary treasurer

5    emeritus of the Local had died suddenly.  And I received a call

6    from the former Local president and portend business

7    representative, Kevin Wilson, that James Sudsweeks, as we

8    called him, more commonly, Suds had passed away overnight and

9    that it was going to be necessary for the Local to organize a

10   memorial service for him.

11   Q    Do you remember what time you arrived to bargaining?

12   A    I think I got there about 9:45.  Normally I would arrive

13   about nine, but I had been delayed trying to figure out with my

14   office manager, as well as with Mr. Wilson, what we were going

15   to do and the mechanics of what we would need to do.

16        Meaning if we were going to hold a service, I would need

17   an executive board motion to allocate funds for a service.

18   We'd need to figure out where to hold it.  It would be much

19   like the sudden death of a family member, but in this case, he

20   was a longtime fixture of our Local who had suddenly died, and

21   because of his family situation, services were going to be up

22   to the Local to organize.

23   Q    Were any of the Union's bargaining team members present

24   before you got there?

25   A    Ellen Hanson had gotten there on time before me.



1    Q    And did you arrive before or after any joint session

2    between the parties began?

3    A    I arrived before the joint session.  The joint session

4    waited for me.

5    Q    Do you remember what happened at the beginning of the

6    joint session that day?

7    A    Not independently.

8    Q    Would something refresh your recollection?

9    A    My notes would be helpful.

10    Q    Okay.

11    MS. DEVLEMING:  Can we pull up Joint Exhibit 13, Bates 33?

12    Q    BY MS. DEVLEMING:  Okay, so at the top there of Bates 33,

13    joint session begins, and then it says "mediator" and some

14    words.  Do you remember; does that refresh your recollection on

15    something that might have happened?

16    A    Yes.  The mediator, Ms. Kettler, organized a joint session

17    in that she got us all in one room and then explained that

18    there had been 42 sessions, 16 of them with the mediator.  She

19    felt that enough progress was not being made; we should get to

20    a deal somehow.  She wasn't sure she should continue to

21    participate in the process.  She was -- she was pretty intense

22    about this.  This was not the first time that she had explained

23    that she wanted this -- this assignment to end would be more, I

24    think, what her frustration was.  And then we launched back

25    into healthcare.



1    Q    Did the Union side respond to her concerns, the mediator's

2    concerns?

3    A    Well, I'm sure we did, because I did over and over again.

4    Obviously, when I was responding, I didn't write down my

5    response, which is why you don't see it there in the -- in my

6    typed version of my notes.  But I felt strongly that we still

7    needed to resolve healthcare as one of the major economic

8    issues.  I had no wage offer from the company, and even if I'd

9    gotten a wage offer at that moment, it wouldn't have told me

10   enough to resolve the economic issues in the contract because

11   members were going to be paying more, perhaps significantly

12   more, in their healthcare contributions.  And if I didn't bring

13   back enough wages to cover that, economically, that would have

14   been a step back for each of our members.

15   Q    And did Respondent weigh in?

16   A    From these notes, I can't tell you exactly what their

17   comments were, but it was instructive that it says high

18   deductible, no pre-funding of payments.  This was one of the

19   arguments that we'd had throughout this healthcare discussion.

20   I felt certain, because I had never dealt with an employer who

21   didn't set a number for what healthcare costs.  You budget how

22   much you're going to pay for healthcare for workers.

23   There's -- we're going to -- it's going to cost us a $1,000 a

24   month to have one worker, and if we have two workers, it'll

25   cost $2,000 a month.



1       But in running a business, you have to know how much that

2       obligation is going to be; otherwise, you go out of business

3       running out of money.  And even if Nexstar was a huge

4       company -- because by this time, I think they had finished the

5       Tribune merger, so they'd added more TV stations -- but they

6       had to have a dollar amount that each business unit would

7       credit for the cost of healthcare.  If you're going to have 100

8       workers, you -- and they cost a $1,000 a month -- you have to

9       have $100,000 a month on your books to pay for healthcare.

10      Q    And --

11      A    But if you're self-funded --  I'm sorry.

12      Q    Go ahead.

13      A    Even if you're self-funded, you have to allocate funds.

14      So it may not be that you get a bill from the insurance company

15      that says you owe $100,000 for December's healthcare, you have

16      to know how much you've transferred to the mothership, if the

17      mothership is doing healthcare, for coverage of healthcare.

18      Q    Did the party -- did the Union express any other concerns

19      about the Employer -- the Respondent's healthcare?

20      A    Well, I -- I still didn't have the 2020 contributions.  So

21      you see there at the next line, it says -- just below where the

22      cursor's flat -- flashing, "The 2020 contribution numbers,

23      We'll get you the numbers.  They are available."  So it's

24      December 10th, and they admit that they know what the 2020

25      numbers are going to be, but they haven't given them to me as



1    yet, they are going to get them for me.

2    Q    And the parties -- you mentioned wages a minute ago -- did

3    the parties discuss wages?

4    A    We stayed on -- on healthcare for quite a while.  You see

5    the notation that "our plan is better than the Tribune plan".

6    There had been a merger of Tribune with Nexstar.  The Nexstar

7    employee -- the Tribune employees, which I did not represent in

8    these circumstances, were now getting Nexstar healthcare.  And

9    they're saying that our plan is better than the Tribune plan,

10    that -- that the employees recently merged into the new

11    Employer were happy with the healthcare that was being offered

12    to them.

13    Q    Okay.  But do you recall any discussions about wages?

14    A    Not directly.

15    Q    Had Respondent's side provided a wage offer?

16    A    No.

17    Q    Did they give you a response to yours on this day?

18    A    No, not -- not in terms of, you know, we'll pay $42 an

19    hour for this job classification.

20    Q    Would something refresh your recollection on the

21    discussion about wages?

22    A    Yes, the rest of my notes, or any proposals made that day.

23        MS. DEVLEMING:  Can we open Joint Exhibit 14, the last

24    page,

25        Bates 22?



1    Q    BY MS. DEVLEMING:  Okay.  So Carrie, take a minute.  Look

2    at this, especially kind of in the middle of the group of

3    texts.  Does that refresh your recollection about the specifics

4    of the back and forth about wages at the December 10th session?

5    I mean, specifically, if you look at the "Chuck, make a better

6    wage offer" and your response, what was that discussion about

7    if you recall?

8    A    So -- so I said, "We need to know about the dollar amounts

9    that you were charged for the coverage in -- in 2020."  And

10    then Chuck says, "Well, make a better wage offer."  I replied,

11    "I'm not bargaining against myself."  I had made a wage offer

12    that was still on the table unresponded to.  And then Chuck

13    said, "Well, the people in (audio interference) made a good

14    (audio interference), more realistic."  So he's comparing our

15    wage offer to the one made by the NABET Bargaining Unit in

16    Buffalo, New York.

17        Then Chuck said, "Buffalo came in with three, two and

18    two"; those would be percentages per year.  "We are not going

19    to agree to that, but that's what they came in at.  I've

20    settled with other unions at one and one and a half"; so one

21    percent and one and a half percent.

22        My comment was, "You're not paying as low as the contract

23    rates are."  This refers to the minimum rates in the contract,

24    which are in-hire rates and minimums.  And I knew by the

25    information request that I had gotten from the company about

1    what the current pay rates were, that they were paying more

2    than the minimums in the contract.  Certainly, allowed to do

3    that, but that was part of my reasoning in proposing to raise

4    the minimums because they were having to pay more than the

5    minimum rates because they were too low.  They hadn't gone up

6    since 2015.

7         This is now five-and-a-half years later.  The Employer

8    recognized that de facto by hiring people at more than the

9    minimum rates in the contract.  So to me, the answer is you

10   raise the minimum so that you can hire people at the minimum in

11   the contract; you can still offer more than that.  But we

12   needed to raise the floor as well as a percentage for each

13   employee who had been there a number of years.

14        So that's what the comment about I made a third step.

15   That was that step in the wage proposal for employees who'd

16   been there more than two years, so that they would get the

17   in- hire rate and increase after six months and another

18   increase after two years.

19   Q    Okay.  Do you remember discuss -- any other subjects

20   discussed at bargaining on December 10th?

21   A    Well, then Chuck starts back into the initiation fee,

22   because that's the elephant in the room.  "We're not going to

23   collect it."  And then I replied, "Pat Nevin was mad when we

24   waived the fee.  He put out a nasty email about me."  Chuck

25   replied, " It was a strong memo, I don't know if it was mean."



1          And then we called for a caucus and provided our request,

2    as they had said earlier in the bargaining that they had the

3    2020 healthcare rates.  So I make -- made another written

4    information request for what the costs were going to be for the

5    coverage in the upcoming new year.

6    Q    All right.  I know we're running up on lunch, and just a

7    couple more questions, I hope.

8          MS. DEVLEMING:  One more exhibit, Joint Exhibit 15?

9    Q    BY MS. DEVLEMING:  Okay.  And then just scrolling down to

10   the December 10th email there.

11         Carrie, do you recognize this document?

12   A    So that would be the email from me to Lisa Newell.  And

13   responding that while the COBRA rates are helpful, knowing what

14   the charges would be for the whole year ahead, we need more

15   specific answers on what Nexstar amounts would be contributed

16   by the Employer, and what would be expected of the employees

17   for coverage in the upcoming year.

18   Q    Did you receive a response from Respondent with those

19   rates?

20   A    I don't -- I don't believe I did.

21   Q    Do you remember what time December 10th bargaining ended?

22   A    I think it was early afternoon.

23   Q    Do you remember why?

24   A    I believe Mr. Pautsch had to leave town.

25   Q    Was that a normal stopping time?



1    A    No, normally we would go later, heading towards that last

2    flight at, hopefully, the 8:00 flight.

3    Q    Okay.  And do you remember, did the parties schedule or

4    confirm any future bargaining sessions before the December 10th

5    session ended?

6    A    So in October, we had set January dates.  And so it being

7    December, I would now be looking for, hopefully, February

8    dates.  If not February, because of sweeps, then March dates,

9    but dates further out.  And then there was -- sorry, the only

10    word that came into my head was in Spanish.  There -- there was

11    a situation that came up where suddenly, the January dates

12    previously agreed to, and to which the Union had already signed

13    a contract for the hotels because it was around the holidays,

14    and it was super hard to get a place to agree to it.  And so we

15    had locked in the date and signed the contracts.  And then

16    suddenly, we were being told that the parties could not meet in

17    January.

18        And given that it was about a month away, I believe I was

19    already even holding a plane ticket for the January trip.

20    Q    Okay.  And I think we'll save diving into that in a bit

21    more detail until after lunch.  But just a final question or

22    question in terms of February dates.  Do you recall the

23    discussions you had at December 10th bargaining about February

24    dates?

25    A    Yes, I was trying to get February bargaining dates so



1    that -- because I thought we made more progress when we met

2    every month.

3    Q    And do you remember if the parties settled on February

4    dates?

5    A    We did at one time.

6        MS. DEVLEMING:  Okay.  Your Honor, I think I can stop

7    there.  Look at that timing.  My clock says noon on the dot.

8        JUDGE TRACY:  So how much longer do you have with her?

9        MS. DEVLEMING:  I hope less than -- certainly less than 30

10    minutes, 20 to 30.

11        JUDGE TRACY:  And then Ms. Yen, how much time do you need?

12        MS. YEN:  I think Liz has covered everything almost, so

13    you know, just a couple minutes.

14        JUDGE TRACY:  So let me ask you.  Now, I know that,

15    originally, we had said Ms. Yen had requested that we end now.

16    But I do feel as though if we go ahead and push through and

17    finish your direct examination, that that way, we can take --

18    it will be a longer lunch break, because I'm assuming that Mr.

19    Roberts needs to prepare for the cross-examination, and it

20    seems better to do that.

21        Ms. Yen, I mean, I had sort of promised you -- well, not

22    really promised, but I said I'll try to keep in mind if it's

23    best if we can do that.  But I do feel if it's only just about

24    30 minutes left, that we should just go ahead and proceed,

25    because Mr. Roberts is going to take some time and, you know,



1    he hasn't asked for it yet, but he mentioned it yesterday about

2    the affidavit.  It's come up before, so I'm assuming he's going

3    to want the affidavit.  It's going to take him time.  I'm not

4    sure what arrangements you all have made about that.  So,

5    anyway, my point being is that I would like to proceed.

6        Is that all right, Ms. Yen?  Can somebody else cover in

7    your meeting?

8        MS. YEN:  Well, I do need -- well, I do -- I do feel that

9    I need to attend that meeting, but I mean, if I -- if I miss

10   just the tail end of Carrie's testimony, I mean, I guess

11   it's --  that's not the end of the world.  I'll -- I'll have

12   the transcript later.

13       JUDGE TRACY:  We could do that, or the alternative option

14   that I could offer right now is that even though the direct

15   examination isn't finished, if you want to go ahead and -- Mr.

16   Roberts, are you going to be requesting the affidavit?

17       MR. ROBERTS:  Yes, I would be pretty malfeasant if I

18   didn't, but yes.

19       JUDGE TRACY:  Well, it's happened, so that's why -- I

20   mean, I don't want to offer it, because it's not my position to

21   offer it, it's your responsibility to ask for it.  But you've

22   mentioned it several times, and it's come up during the call.

23   So it's not like I'm alerting you and reminding you of

24   something that you need to do, but I have had cases where

25   they've not asked and I've been surprised.



1         So the other option is if -- if the General Counsel is

2    agreeable to it, is to take a longer lunch break right now.  Go

3    ahead and -- and give them the affidavit.  That way, you can

4    finish your portion, the rest of it.

5         Ms. Yen, if she has any questions, she can fully

6    participate and do that, and then we can go ahead and go into

7    Mr. Roberts, who, you know, at this time of day, I'm not even

8    sure if he'll finish today.  But, you know, at least we can get

9    started on it rather than taking a lunch break, doing your 30

10   minutes, then he'll need, you know, time and do it that way.

11   But I can't force anybody to do these things.  So what do

12   you -- what do you guys want to do?

13        MS. DEVLEMING:  I don't see any issue with that if Mr.

14   Roberts is agreeable.  I can send the affidavits now.

15        MR. ROBERTS:  That's perfectly fine with me.  I am

16   requesting them, whether now or at an appropriate time, so.

17        MS. DEVLEMING:  And there are quite a few Jencks

18   statements.  I believe there's three affidavits -- four

19   affidavits.

20        MR. ROBERTS:  Totaling -- totaling how many pages; can you

21   tell me that?

22        MS. DEVLEMING:  Roughly --

23        MS. YEN:  Okay.  Well, I'm going to go ahead and --

24        JUDGE TRACY:  Okay.

25        MS. YEN:  -- go -- go dark on my screen and attend that



1    other meeting.  I'll check back in -- in an hour.

2        JUDGE TRACY:  Yeah, we won't be resuming in an hour

3    because he's going to need time.  So we're just going to take a

4    longer break.  So what you can do is, maybe, Ms. DeVleming, we

5    can just all send an email saying we're going to back.  So you

6    can check your email about what time we'll resume.  Okay?

7        MS. YEN:  All right.  Okay, thanks.

8        MS. DEVLEMING:  And maybe while we're still on the record,

9    I'll say for the first time, I did not prepare a protective

10   order.  But I do want to make it crystal clear on the record

11   several times these will be emailed over because we're having a

12   Zoom hearing, but no copies will be made, whether paper or

13   electronic.  And the email will be permanently deleted once

14   we're done with cross-examination.

15       MR. ROBERTS:  I will -- my intention would be to print out

16   a copy to be able to read rather than to try to read it on the

17   screen, but you have my assurances that it will be shredded or

18   destroyed.  I'm not going to maintain it, so.

19       MS. DEVLEMING:  Perfect.

20       MR. ROBERTS:  I've been around a long, so I know how to

21   handle that.

22       MS. DEVLEMING:  Fair enough.

23       MR. ROBERTS:  But I do want to print it out to be able to

24   read it.

25       MS. DEVLEMING:  Fair enough.  Fair enough.



 1        JUDGE TRACY:  Okay.  So why don't we do this?  How many

 2   pages did you say that there are?

 3        MS. DEVLEMING:  It's about 60.  There are four affidavits;

 4   one is 27 pages itself, and then there is a declaration and a

 5   substantive email (indiscernible).

 6        JUDGE TRACY:  Okay.  And did you email them over yet?

 7        MS. DEVLEMING:  No.

 8        JUDGE TRACY:  Okay.  So here's what we'll do.  So you're

 9   still -- just for the record is clear -- you still have direct

10   examination questions to ask, but -- and -- but I appreciate

11   your, you know, courtesy and willingness to work.  Mr. Roberts

12   has, you know, officially requested the Jencks statements, I

13   believe.  And so what you can do is go ahead and email them

14   over.

15        And Mr. Roberts, it sounds like you will print them out

16   and you will, you know, affirm that, you know, after the cross-

17   examination of Ms. Biggs-Adams is completed, you will destroy

18   the affidavit; is that correct?

19        MR. ROBERTS:  That is accurate.

20        JUDGE TRACY:  Okay.  So what I'm going to do, and please

21   remind me if I forget, is that once the -- her testimony is

22   complete, so cross, recross -- once that's complete, I would

23   just like for you to state on the record that you are, you

24   know, shredding those right at that -- at that time.  Okay?

25   Obviously, if it comes up again later, then we'll have to

1    resend it to you, but it -- it shouldn't.  It's usually

2    obviously just at this portion of time.

3         Because there are 60 pages, I'm going to say let's --

4    let's say 1:45 -- 1:45 Pacific Time.  I will be on here

5    probably earlier than that, but if there is a need for

6    additional time, Mr. Roberts, please let us know, and how much

7    more time.  I feel that, hopefully, that will give you enough

8    time to have a break and also get ready.  And then that way,

9    we'll go back into her direct, we'll do any questions from the

10   Charging Party, and then we'll go into the cross.  And we'll

11   take a break, of course, at some point after that.  Okay?

12        MS. DEVLEMING:  Sorry, I was distracted, about to send the

13   documents.  Is 1:45 what you said?

14        JUDGE TRACY:  1:45, yes.

15        So you know, Mr. Schiff, do you have everybody's email?

16   Do you mind if you just send an email to all just saying we'll

17   resume at 1:45 p.m. Pacific Time?

18        MR. SCHIFF:  Yes, Judge.

19        JUDGE TRACY:  Yeah, so just --

20        MR. SCHIFF:  I'll send that out.

21        JUDGE TRACY:  -- and again, Mr. Roberts will jump back on.

22   And if you say I need another ten minutes, if you don't mind,

23   then, you know, we can work that out, okay?

24        MR. ROBERTS:  Certainly.  That's fine.

25        JUDGE TRACY:  He's -- he's the biggest witness, I think,



1    for the General Counsel.  And then I'm assuming your -- your

2    person might take as long, too.  Maybe, maybe.

3          MR. ROBERTS:  Yeah.

4          JUDGE TRACY:  Anyway, I don't want to presume anything.

5    But let's -- let's do it that way.  So we'll check back in at

6    1:45, okay?

7          MR. ROBERTS:  All right, thank you.

8          JUDGE TRACY:  All right, thank you so much.

9          MS. DEVLEMING:  And Mr. Schiff -- oh, sorry, off the

10   record -- I'm sorry.

11         JUDGE TRACY:  Oh, yes, off the record.  I'm sorry.  Sorry,

12   let's go off the record.

13         THE COURT REPORTER:  Off the record.

14         (Off the record at 12:09 a.m.)

15         JUDGE TRACY:  All right, so let's go ahead and go back on

16   the record.

17         THE COURT REPORTER:  Okay, we're on the record.

18         JUDGE TRACY:  All right, Ms. DeVleming, go ahead, please.

19         MS. DEVLEMING:  So Your Honor, I mean, should we quickly

20   note just for the record, that the redacted version of Joint

21   Exhibit 24 is now appropriately substituted in SharePoint?

22         JUDGE TRACY:  Yes, so thank you.  So as we discussed

23   before we went off the record that -- or when we went off the

24   record before the break, the General Counsel has switched out

25   and uploaded a redacted version of Joint Exhibit 24 into the



1    record.  Thank you.

2        MS. DEVLEMING:  Perfect.  All right, Carrie, almost done,

3    at least on my end.  So let's start first with Joint Exhibit 51

4    if we can, Mr. Schiff?

5        MR. SCHIFF:  Sorry, I dropped off there for a second

6    there.

7        THE COURT:  Yeah, I'm going to make you the host again.

8    And I wasn't paying attention, Mr. Schiff,  I don't know if you

9    had dropped off when I said can we pull up Joint Exhibit 51?

10   Just to make sure, I think we're still waiting on  -- are you

11   still working on Joint Exhibit 51, Mr. Schiff?

12       MR. SCHIFF:  No, I have it; I'm sharing it.

13       MS. DEVLEMING:  Okay.  Oh, you are?  Oh, I'm sorry.  Maybe

14   I have mine minimized.  I do.  I'm sorry for the delay,

15   everyone.  It was hiding behind other windows.

16   RESUMED DIRECT EXAMINATION
     Q    BY MS. DEVLEMING:  All right, Carrie.  Can you see this?
17
     A    Yes, I can.
18
     Q    Okay, I guess I was the last.  What is it?
19
     A    It is an email from me to Charles Pautsch, Julie Kettler,
20
     Pat Nevin, and Lisa Newell.
21
     Q    Okay, let's scroll actually, first to the bottom since
22
     these chains kind of go in reverse order.
23
         All right, do you recognize this piece of the chain?
24
     A    Yes.
25
     Q    What is that?



1    A    This is a response from Julie Kettler apologizing for the

2    somewhat disjointed wrap-up of mediation this afternoon.  "I

3    wanted to follow up and confirm the request to hold January

4    14th and 15th at the Marriott for the next mediation session.

5    If those dates aren't workable, I'm available for January 23

6    and 24", and a question about scheduling.  And she believes

7    that we are scheduled for February 11th and 12th.

8    Q    Okay.  And then scrolling up a bit to the next email,

9    actually, I guess, it shows right there at the top --

10    A    Yes --

11    Q    -- of the screen.

12    A    -- it's still on the screen.  "The meeting rooms at the

13    Marriott are booked for the 14th and 15th, so we're fine with

14    those dates.  February 11th and 12th also work for us.  Once

15    they are set, we will start looking" for ho -- "for bargaining

16    rooms.  For now, we will hold the Marriott reservation."

17    Q    And then one more item up, so on the bottom of page 1.

18    A    So --

19    Q    what is this?

20    A    -- from Mr. Pautsch, addressed to me and the mediator,

21    Julie Kettler.  "There has been a misunderstanding.  I'm not

22    available on January 14 and 15 as I need to be in New York that

23    week.  We are available January 23 and 24 in lieu of those

24    dates.  That is what I thought we had conveyed and thought we

25    would check with the Marriott.  We can check on those dates if



1    you like."

2    Q    Do you recall them indicating they weren't available

3    January 14 and 15?

4    A    No.  In fact, as far as I knew, those dates were

5    confirmed.  They were locked in, and they were sufficiently

6    locked that we had signed the contract on the hotel for the

7    meeting rooms.

8    Q    And what about to the extent that it's at least implied

9    they had conveyed they were available January 23rd and 24th in

10   lieu of the 14th and 15th; do you recall that?

11   A    Yeah.  When this who's not available, who's available

12   trouble started, then the 23rd an 24th had been offered.

13   Q    But do you recall before this email a discussion like

14   that?

15   A    It may have happened at the end of the day with Ms.

16   Kettler, but the company had left before this issue had come

17   up.

18   Q    So do you recall any conversation with the company prior

19   to this email about rescheduling the January date?

20   A    No.  I thought it was Ms. Kettler who was having a

21   problem, and I was willing to even go forward without her, if

22   that's what it was going to take, because we were having so

23   much difficulty calendaring and booking hotel rooms.

24   Q    Okay.  And then at the top, just finishing off; what is

25   that?



1    A    So that's from me back to the group of Pautsch and

2    Kettler, copying Nevin and Newell, saying, "Chuck, we had

3    agreed to the January dates back in November, which is why we

4    had tried to book both sets of dates at the Porter, the hotel

5    that was closer to KOIN.  And when that didn't work, we booked

6    the Marriott.  Here's what I propose.  DeeDee will try to move

7    January 14 to January 23 and 24.  Please confirm February dates

8    of 11 and 12, Tuesday and Wednesday, which we have told the

9    mediator earlier this morning, were possible for us.  Once we

10   hear that those are confirmed, we'll try to get the Porter

11   followed by the Marriott's for its meeting room.  Sincerely,

12   Carrie."

13   Q    Did Respondent's side ever confirmed February 11th and

14   12th?

15   A    Yes, they did, as did the mediator.

16   Q    And just back down to the bottom of page 1 here, Chuck

17   Pautsch's email, it references New York.  Did you have any

18   knowledge about what he was doing in New York?

19   A    Yes, I knew he was going to be in Buffalo, New York,

20   because I spoke with the Union rep who he was bargaining with.

21   As -- as you may recall from my testimony earlier, he was

22   talking about the wages that had been offered in Buffalo.  So I

23   reached out to the local president and the staff representative

24   to try and find out what was going on with the wages at the

25   Buffalo bargaining.



1    Q    And earlier, you mentioned the Union making hotel

2    arrangements for the -- or attempting to rearrange the hotel

3    arrangements for these dates?

4    A    It became more complicated.  The January 14th and 15th, we

5    had already signed the contract.  We tried to move those.  The

6    23rd and the 24th were not available at the Porter.

7        Then we booked them at the Marriott and tried to swap the

8    reservations because we'd already paid for the meeting rooms

9    for January.

10   Q    Okay.

11       MS. DEVLEMING:  And here is where I'm going to start to

12   dive into General Counsel exhibits, and I realized I probably

13   should have uploaded at least some of these to SharePoint on

14   our break and neglected to.

15       But what's our best practice here, Your Honor?  Should I

16   email everyone the General Counsel exhibits I plan to talk

17   through with Carrie here?

18       JUDGE TRACY:  Right.  Before you screenshare them and

19   share them with the witness, go ahead and email them to Ms.

20   Yen, Ms. Roberts -- Mr. Roberts, I'm sorry, and myself.  And

21   let them get a chance to take a look before you start asking

22   questions.

23       MS. DEVLEMING:  Okay, I just hit send on General Counsel

24   2.  I hope it come through fairly quickly.  And maybe just let

25   me know, Chuck and Anne, when you've had a chance to open and



1   look at it.  And then maybe we'll have Mr. Schiff screen share.

2        MR. ROBERTS:  How many are you sending?

3        MS. DEVLEMING:  Just that one for now, and then there will

4   still be three more.

5        MR. ROBERTS:  Oh, just one?

6        MS. DEVLEMING:  Just one in that email.

7        MS. YEN:  Okay, I've seen it.

8        MR. ROBERTS:  Okay, I have it.

9        MS. DEVLEMING:  Okay, and I guess you're right, maybe I'll

10  just toss -- rather than wasting our time here -- toss several

11  into the next -- okay.  Can we then screen share what's been

12  marked for identification as General Counsel Full Exhibit 2?

13  Q    BY MS. DEVLEMING:  Okay.  And then maybe scroll again to

14  the bottom of the proper order -- I guess up a little to the

15  header for the email, I guess.  All right, so Carrie, do you

16  recognize this document?

17  A    Yes, this -- this is an email between Deedee Morua -- the

18  part we're looking at at the moment is the Portland Hotel

19  communication about meetings and a contract.  And Deedee Morua,

20  again, is my office manager.  So I believe as we go up, we'll

21  find where she emails this to me.

22        MS. DEVLEMING:  Give me one second.  Sorry, I think this

23  one's a little jumbled.  Okay, let's come back to this in a

24  minute.  I'm going to flag it.  Okay, first, let's -- can we

25  pull up -- and I will note that that's not in yet -- can we



1    first pull up Joint Exhibit 17?  And this would be Bates

2    stamped 47 through 50.

3         So first, starting on 47.  Okay, and maybe just a little

4    bit to see the header.

5    Q    BY MS. DEVLEMING:  Okay, Carrie, do you recognize this

6    document?

7    A    Yes, it's a bargaining bulletin where the notation says,

8    "Deedee, that's a reference copy"  because she has the test

9    email, so it -- it's one that's addressed to her.

10   Q    Who all received this?

11   A    This would have gone to all people in the bargaining unit

12   that we had email addresses for.

13   Q    Okay, and what is this shown on Bates 47?

14   A    So it is talking about the fact that we're trying to

15   figure out healthcare still, and we need more information from

16   you as individuals so that we can tell whether this will work.

17   Please fill out this survey and let us know your thoughts.

18   Q    Okay.  And then scrolling to Bates 49; do you recognize

19   this?

20   A    Yes, so it ended up with the same number.  Occasionally,

21   since these weren't being done in a system other than Word,

22   they would get two with the same number.  But in this case,

23   this is the bargaining bulletin at the end of the day.  This

24   one is addressed to me, so it was one that came into my inbox.

25        MS. DEVLEMING:  Okay.  And then can we pull up Joint



1     Exhibit 52?  Okay.  And then scroll to the bottom, would you?

2     I want to focus only on, for now, on January 6th email at the

3     bottom.  Okay.  So maybe if we can kind of split it.  Okay.

4     Q     BY MS. DEVLEMING:  So do you recognize the January 6th

5     email there?

6     A     Yes, it's a January 6th, 5:16 in the evening in the

7     evening email from me to Ellen Hansen, Charles Pautsch, Pat

8     Nevin, Lisa Newell, Julie Kettler at the FMCS, with a copy to

9     Deedee Morua in my office; subject bargaining dates in January

10    and February.

11    Q     And then onto page 2, it reflects that you had reserved

12    rooms at these various hotels for January 23rd, 24th, and

13    February 11th, 12th.  So at this point, had those been

14    confirmed by the parties?

15    A     Yes.

16    Q     Okay.  And just so we don't forget it, although a little

17    out of order, at the top of this email is a January 21st

18    response; what is that?

19    Q     So that is an email from me back to all the same parties;

20    Hansen, Pautsch, Nevin, Newell, Kettler, Kucking (phonetic) and

21    Yen, our counsel.  "Below is the email which I sent to you

22    confirming the plans for meeting rooms on the scheduled dates,

23    January 23rd and 24th, February 11 and 12th.  The email went

24    out to you on January 6, my first working day of the year.

25          "To date, none of you has responded on the plans and



1    expenses.  I understand that Ms. Newell advised Ms. Ellen

2    Hansen that the company was not going to meet on the January

3    dates, and that the Union was responsible for the cost of the

4    meeting rooms, the shared room, and the one being held for the

5    company's separate caucus space.

6         "I've also heard Mr. Pautsch was going to write me to

7    advise the intentions of the company, but I have not heard from

8    him.  Please be advised that we believe KOIN Nexstar continues

9    to have an obligation to bargain with our Union over wages,

10   hours, and working conditions of our two bargaining units at

11   your station.  Mr. Nevin's letter of January 8 attached.

12        "While apparently quoting from board cases or the case law

13   is not sufficient to cancel bargaining dates currently

14   calendared and guaranteed by the Union for the convenience of

15   the parties, refusing to respond to the Union -- and you do

16   know my email and phone numbers -- and responding to members,

17   executive board member of the local, is not only poor

18   etiquette, but further evidence of your unfair labor practices

19   and failure to bargain in good faith.  Sincerely, Carrie Biggs-

20   Adams, Local President."

21   Q    Okay.  And we'll stop there because we're going to get

22   into, of course, what had happened.

23        MS. DEVLEMING:  Let's pull up Joint Exhibit 53, please.

24   Q    BY MS. DEVLEMING:  Okay.  Carrie, do you recognize this

25   document?



1    A    Yes.  This is an email from me to Ms. Newell on January

2    6th, at 5:30 in the evening -- 5:33 p.m., with leave of absence

3    forms for Ms. Hansen for January and February bargaining dates.

4    Q    And if you can scroll just a bit, I think it's a

5    three- page exhibit.  What are these documents attached?

6    A    So we had had some confusion early in bargaining about

7    whether or not we had requested Ms. Hansen's leaves of absence,

8    so we had generated this form.  Sometimes I would fill them out

9    by hand if I was in person at the bargaining table, or in this

10   case, I typed the dates into the document because I was working

11   from my office that day.  And so I signed the request, sent it

12   on to Ms. Newell.  The norm would be the Employer would

13   acknowledge the request by signing it and adding the date and

14   then sending it back to me.

15        MS. DEVLEMING:  Okay.  And can we just pull up Joint

16   Exhibit 54?

17   Q    BY MS. DEVLEMING:  Do you recognize this, Carrie?

18   A    Yes, it's an email from me to Ms. Newell, copying Mr.

19   Pautsch and copying Anne Yen.

20   Q    And actually, let me interrupt you.  Can we scroll to the

21   bottom and first talk about the January 6th email there; do you

22   recognize it?

23   A    Yes, this is, if you will, my regular monthly request for

24   earnings.  So December had ended, it the first working day of

25   the year for me.  So I was writing Ms. Newell for the December



1    earnings.

2    Q    Did you ever receive the December earnings?

3    A    I did not.

4    Q    Okay.  Now, let's scroll up and tell me if -- I don't know

5    if you had finished summarizing what that was?

6    A    So at the top of this page, it's an email from me, January

7    16th to Ms. Newell, Mr. Pautsch, copying Anne Yen, attaching

8    the email of January 6th to it, "That it's been ten days since

9    my request, and we are now six days past the deadline for

10   providing the information.

11       "To date, I have not heard back from you or received"

12   requested infor -- "requested the information."  A little

13   bad -- bad grammar there.

14       "While I have heard the Employer made statements to the

15   Union members during meetings on January 8th, that the

16   information was no longer going to be sent, I would expect

17   KOIN-TV and Nexstar to respond" within -- "with the information

18   or your legal position, whatever it may be, in writing.  I will

19   appreciate prompt written response.  Sincerely, Carrie Biggs-

20   Adams, Local President.

21   Q    Okay.

22       MS. DEVLEMING:  And now can we pull up -- I -- well, let

23   me confirm first.  I sent a second email with Joint Exhibits 3

24   through 14 -- or sorry, General Counsel exhibits would have

25   been marked as GCX 3 through 14.  Anne and Chuck, did you



1    receive those?

2        MR. ROBERTS:  Not yet.

3        MS. DEVLEMING:  Oh.

4        MR. ROBERTS:  Wait, yeah, here it is.

5        MS. YEN:  Yes, I have it.

6        MS. DEVLEMING:  Okay.  I'll give Mr. Roberts a minute to

7    glance at those since he just got them.

8        And Mr. Schiff, did you get them?

9        MR. SCHIFF:  Yeah.

10        MS. DEVLEMING:  Okay.

11        MR. ROBERTS:  Okay.  I mean, there's a number of them, but

12    I'm okay if you go ahead and --

13        MS. DEVLEMING:  Okay.

14        MR. ROBERTS:  -- put them up on the screen.

15        MS. DEVLEMING:  Just -- just stop me if we're going too

16    fast and --

17        MR. ROBERTS:  All right.

18        MS. DEVLEMING:  -- wherever you need it.  Okay.

19        So Mr. Schiff, can we pull up what's been marked as

20    Joint -- or General Counsel Exhibit 3?

21    Q    BY MS. DEVLEMING:  All right.  And let's just focus on the

22    January 7th email with this picture; do you recognize that,

23    Carrie?

24    A    Yes, I do.  That's an email from Ellen Hansen to me,

25    copying Matt Rashleigh and Robert Dingwall.



1    Q    And remind us, just so the record is clear here, who Matt

2    Rashleigh and Robert Dingwall were?

3    A    They are both news photographers at the station.  And they

4    are both shop stewards, the Union shop stewards at the station.

5    Q    Okay.  And what was -- what did you interpret to be shown

6    in this picture?

7    A    So this picture is of the vacation schedule, and it shows

8    the number of people who were going to be allowed to be off

9    during that period of time, which is during July, the first

10   week in July.

11   Q    Okay.  And was anything noteworthy in this?

12   A    Where normally two people had been allowed off at a time,

13   and in other weeks, two people were being allowed off, the

14   number of slots for vacation those days had been reduced from

15   two to one.

16   Q    Okay.

17        MS. DEVLEMING:  I would offer General Counsel Exhibit 3.

18        MR. ROBERTS:  No objection.

19        JUDGE TRACY:  Ms. Yen?

20        MS. YEN:  No objection.

21        JUDGE TRACY:  All right, so General Counsel's Exhibit 3 is

22   admitted into evidence.

23   **(General Counsel Exhibit Number 3 Received into Evidence)**

24        JUDGE TRACY:  And you haven't moved for 2 yet, right?

25        MS. DEVLEMING:  No, I haven't.  I put it -- I wrote it in



1   where it's going to come up shortly.

2        JUDGE TRACY:  Okay.

3        MS. DEVLEMING:  I don't know how I misordered those, but

4   it happens.  All right.  Next, can we pull up Joint Exhibit 55?

5   Q    BY MS. DEVLEMING:  Carrie, it's a little small, but you

6   recognize this document?

7   A    Yes, I do.  It's the January 8th, 2020 letter from Pat

8   Nevin to me, date-stamped after it was physically received in

9   my office.

10  Q    And what did you take from this letter?

11  A    So Mr. Nevin was writing to advise me that the company was

12  withdrawing recognition due to a, quote, good faith,

13  reasonable, unquote, belief that our Union no longer enjoys the

14  support of the majority of employees in either unit.  And based

15  on the National Labor Relations Act as amended, the company, we

16  are under an obligation and do hereby withdraw recognition of

17  your Union as we -- what I can see on the page is collective,

18  but I believe it was collective bargaining representative.

19       MS. DEVLEMING:  Can we pull up what's been marked for

20  identification as General Counsel's Exhibit 4?

21  Q    BY MS. DEVLEMING:  Carrie, do you recognize this document?

22  A    Yes, it's a January 8th at 11:11 a.m. email from Ellen

23  Hansen to me describing a meeting that had taken place at 10:15

24  a.m. where Pat Nevin called Union members together and advised

25  them that they were withdrawing recognition.



1    Q    Okay.

2         MS. DEVLEMING:  I would offer General Counsel Exhibit 4.

3         MR. ROBERTS:  I would object.  At least at this point, it

4    appears to be hearsay based on what Ms. Hansen saw.  Nothing --

5    Ms. Biggs-Adams was not a party to that -- or at least, subject

6    to Ms. Hansen testifying and corroborating it.  But at this

7    point in time, I would object.

8         MS. DEVLEMING:  So the response would simply be that as a

9    member of the executive board and a member of the bargaining

10   team, as we've seen so far, Ms. Hansen regularly, in the course

11   of Union business, sent business record-type emails summarizing

12   things like this to Local President Carrie Biggs-Adams.  So we

13   would say it would be a business record exception.

14        JUDGE TRACY:  All right.

15        MR. ROBERTS:  But you seem to be offering it for the truth

16   of what's stated in there, and that's why I was objecting.

17        JUDGE TRACY:  Certainly so.  So I'm going to overrule the

18   objection and admit General Counsel's Exhibit 4 into evidence.

19   **(General Counsel Exhibit Number 4 Received into Evidence)**

20        JUDGE TRACY:  However, I will note that, yes, it follows

21   the business record exception, but I do believe that also, Ms.

22   Hansen will be testifying.  So certainly, you know, she can be

23   tested on her recollection of these events and -- and -- and et

24   cetera for Mr. Roberts, the Respondent.  Okay?

25        MS. DEVLEMING:  Okay.  Thank you, Your Honor.



1          Can we pull up the General Counsel Exhibit 5?

2    Q    BY MS. DEVLEMING:  All right, Carrie, do you recognize

3    this document?  Actually, sorry.  Can we scroll toward the

4    bottom to a January 8th email at the bottom?  Oops, I lied.

5          Never mind.  Never mind.  Just -- do you recognize this

6    single email, Carrie?

7    A    Yes.  It's an email from shop steward, Robert Dingwall to

8    Ellen Hansen, me, and other shop steward, Matt Rashleigh, and

9    our legal counsel, Ms. Yen.

10         Mr. Dingwall is explaining that he knows of no petition

11   being circulated.  And then he starts to recount part of what

12   he experienced at one of the meetings that had been held on

13   January 8th.

14   Q    And what was the reference to a petition being circulated?

15   A    Well, the Employer in their letter said that they had

16   beliefs that the Union didn't have majority standing.  And one

17   of the ways I believe that that could have been true is if

18   people had signed a petition to that effect or a document to

19   that effect.  And so I was checking with my people in the

20   bargaining unit to see if they knew of any such petition.  And

21   his first answer is, I know no petition being circulated.

22         MS. DEVLEMING:  Your Honor, similarly, General Counsel

23   would offer General Counsel's Exhibit 5.

24         MR. ROBERTS:  I would have the same objection.  And I

25   don't know if Mr. Dingwall is going to be a witness or not.  If



1    he's not, I certainly, object.  If he is, then my -- I assume

2    that I can test it at that point, but it's clearly hearsay

3    about what -- he what he observed.

4        MS. DEVLEMING:  I'm going to --

5        JUDGE TRACY:  Well --

6        MS. DEVLEMING:  Yeah, two-fold response; business record

7    exception, and also, Mr. Dingwall will be on the stand.

8        JUDGE TRACY:  So again, I'm going to overrule the

9    objection and -- and admit General Counsel's Exhibit 5.

10       Again, I'm more inclined to say that I want to see that

11   it's corroborated or that the weight that it'll be given is --

12   is minimal potentially.

13       Again, you know, the -- the rules of evidence, especially

14   regarding hearsay, we don't exactly follow, but we try as best

15   as we can generally speaking, though, we're looking to make

16   sure that evidence is corroborated.  So whether it be him

17   testifying or et cetera.  So -- but I'm glad to hear that he

18   will be.  So that sort of resolves some of these things.

19       So General Counsel's Exhibit 5 is admitted into evidence.

20   **(General Counsel Exhibit Number 5 Received into Evidence)**

21       MS. DEVLEMING:  All right.  Can we pull up what's been

22   marked as General Counsel's Exhibit 6?  I muted myself.

23   Q    BY MS. DEVLEMING:  Starting at the bottom, I suppose, do

24   you recognize that email?

25   A    Yes, it's an email from Mr. Dingwall to Ms. Hansen, to me,



1    Mr. Rashleigh, and Ms. Yen.

2    Q    And the below email?

3    A  Is a January 9th, 2020, 2:30 in the afternoon, email from Ms.

4    Hansen.

5    Q    Did you receive the lower email?

6    A    Yes, I did.

7    Q    All right.

8        MS. DEVLEMING:  Same thing, General Counsel would offer

9    General Counsel Exhibit 6.

10        MR. ROBERTS:  No objection.

11        JUDGE TRACY:  All right.  So General Counsel's Exhibit 6

12    is admitted into evidence.

13    **(General Counsel Exhibit Number 6 Received into Evidence)**

14        MS. DEVLEMING:  And then can we pull up what's been pre-

15    marked as GC-7?

16    Q    BY MS. DEVLEMING:  Okay.  Carrie, do you recognize this

17    document?

18    A    Yes, it's a copy of an email from Steward Matt Rashleigh

19    January 9th, at 1:30 a.m. entitled, "Notes and Questions," to

20    me at two different email addresses, Mr. Dingwall and Ms.

21    Hansen.

22    Q    Okay.

23        MR. ROBERTS:  Can we scroll down so we can see the whole

24    thing?

25        MS. DEVLEMING:  All right.  Jump -- sorry, go ahead.



1    MR. ROBERTS:  I'm sorry.  I haven't seen the whole thing.

2    I saw through that paragraph, where it says "recycled," is the

3    last word I see.  All right.  Stop, please.  Go back up a

4    little bit.  All right.  Stop.  Okay.  Thank you.

5    MS. DEVLEMING:  General Counsel would offer, General

6    Counsel's Exhibit 7.

7    MR. ROBERTS:  No objection.

8    JUDGE TRACY:  All right.  So General Counsel's Exhibit 7

9    is admitted into evidence.  Again you know, I'm hopeful that

10   there will be employees that testify about -- you know, Mr.

11   Schiff if -- if you can scroll up -- this meeting, January 8th,

12   so hopefully there will be some testimony of those who attended

13   this meeting.  Okay?  But General Counsel's Exhibit 7 is

14   admitted into evidence.

15   **(General Counsel Exhibit Number 7 Received into Evidence)**

16   MS. DEVLEMING:  All right.  Can we call up General Counsel

17   8, please?  Keep muting myself to cough and forgetting.  I

18   believe this is a multiple-page document, can we briefly scroll

19   through it?

20   Q   BY MS. DEVLEMING:  Carrie, do you recognize this document

21   and what appear to be some pictures attached?

22   A   Yes, it's an email from Matt Rashleigh to me, Ellen

23   Hansen, Robert Dingwall.  And then it has a series of pictures

24   that were what we were getting a herky-jerky hue through.  He

25   had discovered that the Union bulletin boards, which had been



1    on the walls at KOIN on two different floors in different

2    working areas, were gone.  And there was now just a blank wall

3    where the bulletin boards had been, or the screws were just

4    left.

5    Q    All right.

6         MS. DEVLEMING:  General Counsel offers GC-8.

7         MR. ROBERTS:  I have no objection, but I do note, we've

8    stipulated that the bulletin boards were removed, so this

9    really isn't in dispute.

10        JUDGE TRACY:  All right.  So General Counsel Exhibit 8 is

11   admitted into evidence.

12   **(General Counsel Exhibit Number 8 Received into Evidence)**

13        MS. DEVLEMING:  Okay.  Can we pull up the General --

14   what's been pre-marked as General Counsel Exhibit 9?  And

15   scrolling down a bit to the email from DeeDee and maybe

16   scrolling very slowly through, so Carrie can see what this is.

17   And maybe down to the bottom.  Yeah.  Okay.  Okay.  Can we stop

18   right there?  Let's go to the first email to the last -- bottom

19   of -- whatever page that was, page 3.

20   Q    BY MS. DEVLEMING:  All right, Carrie, do you recognize

21   that email?

22   A    Yes, it is an email that's part of that whole chain sent

23   to me by DeeDee Morua regarding the meeting dates on January

24   23rd and 24th at the Marriott.

25        JUDGE TRACY:  And scrolling up a little, please.  And



1    whoops, sorry, just to the next one.  We actually -- my -- on

2    the --

3    Q    BY MS. DEVLEMING:  Do you recognize that piece?

4    A    Yes, so this is the contact at the Marriott to Deedee

5    asking if the Union wanted to confirm that we were canceling

6    the February dates because we were the signatories to the

7    contract.

8         MS. DEVLEMING:  Okay.  And then scrolling up to DeeDee's

9    response.  Oh, sorry that just the (indiscernible).  We're on

10   GC-9.  Sorry, everyone.  Am I on the right thing?

11        Okay.  Well, General Counsel moves for the admission of

12   GC-9.

13        MR. ROBERTS:  No objection.

14        JUDGE TRACY:  All right.  General Counsel's Exhibit 9 is

15   admitted into evidence.

16   **(General Counsel Exhibit Number 9 Received into Evidence)**

17        JUDGE TRACY:  I'm sorry, Ms. Yen.  I'm not even giving you

18   a chance to respond, but I'm assuming that you don't oppose --

19   you don't have any objections.

20        MS. YEN:  Yes, no objection.

21        MS. DEVLEMING:  Okay.  Now's a good time to jump back to

22   what was marked out of order as General Counsel Exhibit 2.

23   Okay.

24   Q    BY MS. DEVLEMING:  So I think we started explaining this,

25   but I kind of interrupted you because it was not in the right



1    chronology, so do you recognize this?

2    A    Yes.  This is an email from Ms. Morua and to me on January

3    15th that there's a cancelation fee of a $1,000 if we don't

4    rebook the Kilton -- the Hilton Portland downtown meeting

5    rooms.  And so if we could rebook and use them before the end

6    of March, we would have a credit.  Otherwise, they were going

7    to charge us a $1,000.

8    Q    Were you able to avoid the cancelation fee?

9    A    No, we were not.

10    Q    And can we just scroll down a bit further to the lower

11    email on page -- well, I guess, to the bottom, and then slowly

12    up to the second to last?  So this bottom email is -- what is

13    that?

14    A    That is a January 3rd confirmation from the hotel to Ms.

15    Morua is the countersigned contract for the meetings for

16    January 23rd and 24th.

17    Q    And then just briefly, you -- the email that spans from

18    page 1 to 2.  What is this?

19    A    So --

20    Q    Sorry, not -- not that one.  We are you talked about that,

21    but a little bit further down on page 1, I guess, top of page 2

22    is where the substance is.

23    A    So I can read the bottom part first, that -- that's Ms.

24    Morua's signature and she's advising the hotel, "I'm sorry, but

25    the party we were" (audio interference) "will not need the



1    meeting rooms."

2    Q    Okay.

3         MS. DEVLEMING:  General Counsel offers General Counsel 2.

4         MR. ROBERTS:  No objection.

5         JUDGE TRACY:  All right.  So General Counsel's Exhibit 2

6    is -- is admitted into evidence.

7    **(General Counsel Exhibit Number 2 Received into Evidence)**

8         MS. DEVLEMING:  All right.  Can we open Joint Exhibit 57?

9    Q    BY MS. DEVLEMING:  All right.  Carrie, do you recognize

10   this document?

11   A    Yes, it's an -- a memo from Mr. Nevin to all NABET Local

12   51 bargaining unit members dated January 20 -- January 16th

13   regarding questions asked and answers provided.

14        MS. DEVLEMING:  And if we scroll down just a little, Mr.

15   Schiff, there's a question posed and an answer.  And then, it

16   says, "If the Union is telling you otherwise."

17        So can we scroll up just a bit to the question above

18   there?  Scroll up to the first question?

19   Q    BY MS. DEVLEMING:  So the question is, if someone started

20   after the contract expired, would they not have voting rights

21   if there were an election?  And it said that the Union is

22   telling you otherwise, please be aware that this is a trick.

23        Had you told employees that they were not eligible to vote

24   in a NLRB election?

25   A    Certainly not.  I very clearly know that being eligible to



1    vote in a Union-representation election, certification, or

2    decertification election is based upon working in the

3    bargaining unit in question, not whether or not someone has

4    opted to join the Union and become a member of NABET CWA.

5    Q    Okay.

6         MS. DEVLEMING:  Can we pull up what's been marked as

7    General Counsel's Exhibit 10?

8    Q    BY MS. DEVLEMING:  Carrie, do you recognize this document?

9    A    Yes.  This is an email from Ellen Hansen to me on Friday,

10   January 17th at 10:15 a.m.  That morning, shortly before she

11   had written this to me, Ms. Hansen had gone to Lisa Newell's

12   office to inquire about the leave of absences for the

13   negotiations.  This would have been on January 23rd and 24th.

14   And she says, "First, she just looked at me and she said she --

15   she looked, they had been very clear that they weren't

16   negotiating.  Then she said she believed Chuck was sending a

17   response.  And then, asked about the hotel bill.  Were we stuck

18   with that?  And she nodded.  I said thank you and left," Ellen

19   Hansen.

20        MS. DEVLEMING:  All right.  General Counsel moves for the

21   admission of General Counsel 10.

22        MR. ROBERTS:  No objection.

23        JUDGE TRACY:  All right.  So General Counsel's Exhibit 10

24   is admitted into evidence.

25   **(General Counsel Exhibit Number 10 Received into Evidence)**



 1          MS. DEVLEMING:  And next, can we go to Joint Exhibit 17,

 2     Bates 51 to 54.

 3     Q    BY MS. DEVLEMING:  Okay.  Carrie, do you recognize this

 4     document?

 5     A    Excuse me.  Yes, that is Bulletin number 34, dated Friday,

 6     January 17th to members of the bargaining unit.

 7          MS. DEVLEMING:  And can we scroll to the top of Bates 52,

 8     the second page?  Oh, sorry, bottom of page 2/top of page 3.

 9     And so can we kind of span the 2 pages?  Okay.

10          So actually, this is perfect right here.

11     Q    BY MS. DEVLEMING:  It says -- there's a reference to 45

12     days, nothing would change for 45 days; why were you making

13     that reference?

14          MS. DEVLEMING:  Can we scroll --

15     A    In --

16          MS. DEVLEMING:  -- down just a bit?

17     A    In Mr. Nevin's meetings on January 8th, which I believe

18     were three meetings with the members of the bargaining unit, he

19     told the members who were present that nothing would change for

20     45 days, but that after 45 days, raises would be possible.

21          And this is my explanation of that that I found the 45

22     days strange because that was not a standard or something that

23     we could see a logic for.  So I had worked with our attorneys

24     and while I -- the explanation is that our lawyers think they

25     are applying a decision in Johnson Controls from July 3rd of



1    2019, which talks about advance withdrawal of recognition when

2    a contract is about to expire.  That's clearly not what's

3    happening here.  We are bargaining.  There are ULPs pending in

4    assorted stages of the process.  And now, they are refusing to

5    bargain any further.

6    Q    BY MS. DEVLEMING:  Okay.

7         MS. DEVLEMING:  Can we please pull up spot -- Joint

8    Exhibit 58?  If you heard me typing, I was sending a message to

9    Sarah, or my cocounsel.  Okay.  Can we scroll down a bit here?

10   Q    BY MS. DEVLEMING:  Do you recognize this document, Carrie?

11   A    Yes, it's an email to me from Ellen Hansen, including an

12   email to her inside of her KOIN addresses from Lisa Newell and

13   copying Rick Brown, who is her supervisor.  It formally denies

14   the four days of leaves of absence January 23rd, 24th, February

15   11th, and 12th to participate in negotiation sessions.  "As Pat

16   mentioned in the meetings with employees that you attended in

17   the Station will not be participating in negotiation meeting --

18   thank -- meetings.  Thanks, Lisa Newell."

19   Q    Okay.  So the withdrawal of recognition letter, that's in

20   evidence as Joint Exhibit 55.  You had summarized for us,

21   indicated that due to Respondent's good-faith and reasonable

22   belief, the Union no longer joined -- or they were withdrawing

23   recognition.  What did you do when you learned that they had

24   that good faith, reasonable belief?

25   A    When I received the letter, I reached out to the members



1    of the bargaining unit, who at about the same time as I

2    received the letter by FedEx had been called to meetings where

3    Pat Nevin was telling them that the Union was no longer going

4    to be recognized and that they had this belief that we

5    didn't -- or would enjoy majority standing.  So first, I tried

6    to find out if there had been a petition circulated.  I believe

7    we saw that in one of Mr. Dingwall's replies, so I reached out

8    to my three Union officers saying, has anybody seen a petition?

9    Has anybody heard anybody say that they have a petition, or

10   that they've signed the petition?  And nobody was able to say

11   that they had seen a petition, or anybody had been asked to

12   sign a petition.

13   Q    Do you -- so hearing that there was no such petition, what

14   did you do next if anything?

15   A    I worked with counsel on a strategy to get our members to

16   sign new cards, showing that we did have majority standing.  We

17   didn't physically use cards, but we generated a petition for

18   people in the two separate bargaining units to affirm their

19   desire to continue to have the Union recog -- be their

20   representative.

21   Q    And once you developed those petitions, what did you do

22   with them?

23   A    So the petitions were circulated by different members of

24   the -- the team.  Our -- our different officers worked on

25   reaching out to people.  In a television station, not always



1    easy because people aren't all working in one place at the same

2    time.  It took a little while to catch up with everybody.  But

3    once we had sufficient signatures, verified that we had a

4    majority standing, we reached out on a way to present these to

5    the company.  And we found a -- a third-party neutral to

6    confirm the signatures, confirm the standing that we had.

7         We worked with the group, Jobs with Justice, there in

8    Portland to find somebody to be the neutral.  And Mr. -- the

9    retired reverend, Jack Mosbrucker, who was a retired Catholic

10   priest, is a retired Catholic priest said that he would be

11   happy to assist us.  So he was given the petitions, the

12   signatures, the lists of members of the bargaining units, the

13   two-separate units, and he ascertained that we did, in fact,

14   have majority status based on the petitions.  And he signed a

15   certification confirming what he had ascertained by his looking

16   at the petitions.

17   Q    Did he engage in that process and sign the certification

18   at the Union's direction?

19   A    Yes, he -- at our request, yes.

20        MS. DEVLEMING:  Can we pull up what's been marked for

21   identification as General Counsel's Exhibit 13?

22   Q    BY MS. DEVLEMING:  Carrie, do you recognize this document?

23   A    Yes, it's dated February 18th.  It is a certification of

24   majority support.  It is certifying that Reverend Mosbrucker

25   had done a signature count showing 19 of 28 members of the



1    technical unit and 7 of the 13 in the production unit had

2    confirmed proof of continuing majority support for NABET CWA to

3    represent them as the exclusive employee represented -- excuse

4    me, exclusive employee organization for purposes of collective

5    bargaining.  And I believe that's Reverend Mosbrucker's

6    signature right there at the bottom of this share.

7        MS. DEVLEMING:  Can we scroll just a bit further just

8    scroll in it?

9    Q    BY MS. DEVLEMING:  Carrie, did you receive a copy of the

10   certification?

11   A    Yes, I did.

12   Q    And did Respondent?

13   A    Yes.  Reverend Mosbrucker with Fiona Marten (sic), a local

14   labor activist who was helping us with this effort and A.J.

15   Mendoza, who is a president of a CWA Local in Portland, a

16   telecom local.  He also has a role at Jobs With Justice.  So

17   the three of them went to KOIN and delivered the letter to

18   Mr. -- Mr. Nevin.

19       MS. DEVLEMING:  Okay.  Your Honor, at this point, General

20   Counsel would offer General Counsel's Exhibit 13.

21       MR. ROBERTS:  No objection.

22       JUDGE TRACY:  All right.  So General Counsel's 13 is

23   admitted in evidence.

24   **(General Counsel Exhibit Number 13 Received into Evidence)**

25       MS. DEVLEMING:  And can we pull up General Counsel Exhibit



1    14?

2    Q    BY MS. DEVLEMING:  Carrie, do you recognize this document?

3    A    Yes, it's an email -- a letter on letterhead, I will

4    assume it's signed by me on a second or subsequent page

5    addressed to Mr. Nevin to be delivered by email responding to

6    the unilateral withdrawal of recognition and talking about when

7    they walked away from bargaining, left us with the hotel bill

8    for meeting rooms, and refused to provide necessary earnings

9    data for December 2019.  "We know it was further proof of your

10   failure to bargain in good faith with our Union.  In recent

11   weeks, we have collected more than sufficient signatures to

12   prove our majority standing as the representatives of both the

13   bargaining units at Nexstar KOIN TV.  This week, Father Jack

14   Mosbrucker as well" -- "a well-known Catholic priest in the

15   Portland area labor community examined the signatures and lists

16   of employees and certified our signatures.  This morning, he

17   joined by A.J. Mendoza, Fiona Martens, and" Matt -- "Matt

18   Rashleigh delivered the certification to you at KOIN TV.

19   Attached with this letter is a copy of the certification as

20   well.

21        "We continue to request the December earnings of all

22   members of our bargaining unit and will forward a new round of

23   requests for January earnings as well.  We continue to demand

24   that you resume bargaining with our Union to conclude

25   bargaining on a ratifiable contract between the parties.  We



1    are aware that you've told members of the bargaining units that

2    after 45 days, you would make changes in the workplace.

3         "We do not believe that the employer has the right to

4    refuse to continue to bargain with us or to remove the Union

5    bulletin boards, a major method of internal communications

6    between the members and their Union representatives from the

7    workplace.  We know that you have no right or authority to

8    change the wages, hours, or working conditions, bargained

9    between the parties for our units at KOIN T.V."

10        I believe the letter goes on because it goes to a second

11   page, but that's all of it that I can see.

12   Q    Okay.  It's okay.  As it stands for itself.  We don't need

13   to read the rest.  But did you ever receive a response to this

14   letter, Carrie?

15   A    I did not.

16   Q    And then just to clarify, in the middle -- you read it out

17   loud, but in the middle of page 1, it said, "Attached is a copy

18   of the certification."  Is that the -- a copy of what we just

19   talked about General Counsel Exhibit 13?

20   A    Yes, it is.

21        MS. DEVLEMING:  All right.  Your Honor, General Counsel

22   would move for the admission of GC-14.

23        MR. ROBERTS:  No objection.

24        JUDGE TRACY:  All right.  So General Counsel's Exhibit 14

25   is admitted into evidence.



1    **(General Counsel Exhibit Number 14 Received into Evidence)**

2    Q    BY MS. DEVLEMING:  Carrie, just out of curiosity, it

3    doesn't seem like you or other Father Mosbrucker shared the

4    names of employees who signed the petition with Respondent; why

5    was that?

6    A    There was extreme fear on the part of the members of the

7    bargaining unit, which was expressed repeatedly that people

8    wanted to continue to have the Union, but they were afraid of

9    disciplinary or harassing actions that they might take.

10        Specifically, people pointed out the trouble that Ellen

11   Hansen had had from the company over the bargaining and over

12   the years, and that they didn't want to be in that kind of

13   trouble.  But they didn't want the Union to go away, but they

14   didn't want to stick their heads out and get themselves in the

15   kind of grief that he -- she had suffered over the years.

16   Q    Carrie, did the Union hold any meetings with the workers

17   in the bargaining unit following Respondent's January 8th

18   withdrawal of recognition?

19   A    Yes, we did.  I came to Portland on the already scheduled

20   January dates and held a -- a unit meeting.

21   Q    How was attendance at that meeting?

22   A    People were very interested.  So it had been a couple of

23   weeks since the January 8th withdrawal of recognition, so

24   people were interested to see what was going on and came out

25   and participated.  Some signed the petition there on the spot.



1    Others signed subsequent to that meeting.

2    Q    Did you hold any other meetings with employees after that

3    first one?

4    A    It's been a hell of a great year for travel, so -- the --

5    the -- the world kind of closed up kind of hard in March and I

6    haven't been back to Portland since.

7    Q    How would you gauge your impression of employee engagement

8    in the Union since the withdrawal of recognition?

9    A    It's been difficult.  I hear from some people.  I continue

10   to have regular contact with Ellen Hansen as she's an executive

11   board member of the locals.  So she engages in the regular

12   business of the local, our monthly meetings, decisions at the

13   local house to take to conduct our business.  I have contact

14   with Matt Rashleigh and with Robert Dingwall, but I don't hear

15   from too many more people in that bargaining unit anymore.

16   Q    How did that compare to before the withdrawal of

17   recognition?  What was your impression of employee-engagement

18   with the Union?

19   A    Even though the negotiations had gone on a super-long time

20   and people were frustrated, I had people come to those regular

21   meetings on the first evening of bargaining throughout 2019.

22   And then, sometimes I would hold a separate meeting when we

23   were explaining to people about the waiver of initiation fee.

24   I came and held those meetings in person in the local Chinese

25   restaurant about a block-and-a-half from the station.  So that



1    was a very well-attended meeting and that was the middle of

2    October.

3    Q    Okay.  Thank you, very much, Carrie, for your quite

4    marathon direct testimony.  I know you're not anywhere near

5    done yet, but I appreciate your time.

6         MS. DEVLEMING:  Your Honor, no further questions for this

7    witness.  I will just note that I am aware that we have not yet

8    offered General Counsel's 11 and 12.  We have flagged that, and

9    they will be offered through another witness.

10        JUDGE TRACY:  All right.

11        Ms. Yen, any questions for Ms. Biggs-Adams?

12        MS. YEN:  Yes.

13                        **CROSS-EXAMINATION**

14   Q    BY MS. YEN:  Ms. Riggs-Adams, I think that Ms. DeVleming

15   may have already covered it, but just to -- just to be clear,

16   in (audio interference) notes --

17   A    I'm sorry, Anne.  You froze up and I didn't hear.

18   Q    Okay.  So just -- just to be clear in your bargaining

19   notes, Joint Exhibit 13, where you noted the time that Mr.

20   Pautsch left or the company left early for bargaining; was that

21   true and correct?

22   A    Yes, to the best of my knowledge, that was what happened.

23   That's why I put it down my notes as it happened.

24   Q    Okay.

25        MS. YEN:  All right.  Other than that, I think that Ms.



 1    DeVleming has has covered everything.  So I have no further

 2    questions.

 3        JUDGE TRACY:  Okay.  All right.  Mr. Roberts, it will be

 4    you.  Now, I -- it's -- it's 2:52 Pacific time, and I'm kind of

 5    wondering if you can gauge how many hours it'll be.  If you --

 6    if you kind of have a good sense -- if you'd have a estimate?

 7        MR. ROBERTS:  Yes, I mean, I think at an outside and this

 8    would be the outside, I'd say three hours.  But I think it will

 9    be less than that.  If I had to put an estimate, I guess, I

10    would say around two hours, depending on how -- I mean,

11    obviously, there's a lot of documents.  Although, I may try to

12    avoid too many of them, but depending on how cumbersome that

13    becomes in terms of going back and forth between documents, I

14    mean, two, possibly three.  I don't think it'll go that long

15    but.

16        JUDGE TRACY:  So how about this?  Let's just take a -- a

17    break, like, until 3:00 Pacific Time, just a quick break.  And

18    then let's see -- we'll go for about an hour, hour-and-a-half

19    if we need a break, that's fine.  And then, let's just see kind

20    of where you're at.  I think, I mentioned on the calls that I'm

21    very reluctant -- I hate breaking up examination, cross-

22    examinations and then for the whole weekend.  But certainly,

23    let's see how much we can accomplish today.

24        Obviously, there's going to be a redirect, recross, so

25    we're not likely to finish today.  But let's see if you can



1   kind of come to a good stopping point today where you can pick

2   back up on Monday.  So let's -- let's do that.  Instead of

3   ending now, because I feel as though if we don't use another

4   hour, hour-and-a-half now, then Monday, potentially, she could

5   be on for most of the day and I'd think we'd like to try to

6   start moving on to some of the other witnesses that are

7   waiting.  Okay.  So let's just stop until like 3:05, let's say,

8   it's 2:54, I have.  So let's stop till 3 -- or resume at -- at

9   3:05, okay?  So we'll go off the record.  Thank you.

10       THE COURT REPORTER:  Your Honor?

11       JUDGE TRACY:  Yes.

12       (Off the record at 2:54 p.m.)

13       JUDGE TRACY:  (Audio begins mid-sentence) is admitted into

14   evidence.  All right.

15       So Mr. Roberts, please go ahead.

16       MR. ROBERTS:  All right.  Thank you.

17                        **CROSS-EXAMINATION**

18   Q   BY MR. ROBERTS:  Good afternoon, Ms. Biggs-Adams.  How are

19   you?

20   A   I'm wonderful, sir.

21   Q   All right.  As you know, I'm Chuck Roberts, the counsel

22   for Nexstar KOIN.  And I'm going to try not to extend this

23   thing too long.  And I'm also going to try to limit the number

24   of documents that we have to look at.  There will be some, but

25   if you ever need to refer to a document when I'm asking you a



1    question, just say so.  I try -- I'd like to try to limit that,

2    but if you need it, just let me know.  All right?

3    A    No problem.  Thank you.

4    Q    All right.  Thank you.  Let me start with just with some

5    of the things that you were asked at the very end of your

6    testimony, just a few kind of isolated issues that are kind of

7    disconnected from bargaining.  But the petition, I believe it

8    was General Counsel's Exhibits 13 and 14.

9         MR. ROBERTS:  If we could just show her quickly those just

10   so we all know what we're talking about.

11   Q    BY MR. ROBERTS:  But the cert -- I'm talking about the

12   certification that you received from the Catholic priest.

13   A    Yes.

14   Q    Now, that -- you had been informed on January 8th that the

15   company was withdrawing recognition, correct?

16   A    Yes, sir.

17   Q    All right.  And so this petition, when did it start to

18   circulate?  And I see that he signed his certification on

19   February 18th of 2020; when did the petition first start

20   circulating?

21   A    About the 1st of February.  I -- about three weeks after

22   the withdrawal of recognition.

23   Q    Okay.  And so he had -- he signed on the 18th, so that

24   would mean that in the -- in the course of roughly two, two-

25   and-a-half weeks that you obtained the signatures that you



1    submitted to him; is that correct?

2    A    I believe that's about the window in which it was done,

3    yes --

4    Q    All right.  And you --

5    A    -- maybe a little earlier.

6    Q    All right.  You did not.  You understood that you could

7    have taken those -- that petition and filed a representation

8    petition with the Board, correct?

9    A    I -- I understood that that was one of our options.

10   Q    You did not do that, correct?

11   A    But we did not.

12   Q    Okay.  Now, just quickly, you said that the timing of that

13   obviously was right as the COVID-19 pandemic was really

14   hitting.  And is it true that you had -- since that, meetings

15   that you had in February, travel -- you've not traveled to

16   Portland for any kind of reason related to your work, correct?

17   A    No, that's correct.

18   Q    And in fact, if the parties had even continued bargaining,

19   it would have been difficult to meet in person; is that -- is

20   that a true -- fair statement?

21   A    Oh, I think it would have been certainly by mid-March,

22   impossible to meet in person.  We would have had to have met

23   like Zoom, like we are here now.

24   Q    All right.  Thank you.  Now, let me move back to the

25   negotiations themselves, and a little bit about your



1  background.  You testified at some length yesterday about

2  your -- I believe, I don't remember how many years it may have

3  been 40 years, 30 years, whatever, but how many -- how many

4  contracts -- I know your experienced, but how many contracts

5  roughly over that time, have you negotiated?

6  A    I estimated, I think in my testimony yesterday, about 50.

7  Q    Okay.  And you testified about -- well, let me ask you

8  this.  Would it be fair to say that -- that you testified about

9  some of the difficulties in this negotiations.  It's not

10  unusual for negotiations to be difficult and contentious; is

11  it?

12  A    No.

13  Q    Labor negotiations are kind of a world unto themselves,

14  correct?

15  A    Correct.

16  Q    And it's not unusual for there to be emotion and sometimes

17  even anger or outbursts during the negotiations?

18  A    Correct.

19  Q    Okay.  You yourself said that you -- I think your phrase

20  was you could dish it out as good as you could take it; is

21  that -- is that correct?

22  A    I believe that's how I -- how I said it, yes.

23  Q    Okay.  And -- and negotiations, is it fair to say that --

24  that there's really several different types of negotiations,

25  one would be a first-contract negotiations?  You're obviously



1    familiar with that, correct?

2    A    Correct.

3    Q    And those are fairly difficult and extended typically

4    because you're starting from the -- scratch, if you will, from

5    whatever you have at that moment and you're trying to build an

6    actual contract, right?

7    A    Correct.

8    Q    And then you have, what I would call, renewal negotiations

9    where there's been no change in the employer and you have --

10   perhaps even a longstanding relationship, those tend to be a

11   good bit easier; is that -- is that a fair statement?

12   A    I hope they're easier, not always.

13   Q    Okay.  And then we have what appears to me to be the

14   situation here, where you have -- you -- it's not a first

15   contract, but it's also, you've had a change in the employer's

16   identity during that time period.  And you, yourself, said that

17   the -- the employer at this particular -- at KOIN had changed

18   multiple times since the Union's became recognized or

19   certified, I believe, in around 2005; is that -- is that

20   correct?

21   A    That's correct.  And I would almost say that every time we

22   bargained with KOIN; it's been with a different owner.

23   Q    And that, of course, creates difficulties because in some

24   ways, even though you have a contract, you're starting anew

25   with that employer, correct?



1    A    We're starting a new relationship with that employer.

2    Q    And you mentioned that the -- in the KOIN -- the

3    immediately preceding negotiations, the ones that were with, I

4    guess, where WIN had transitioned into Media General; am I

5    correct that tho -- I got a little confused on the time frame.

6    Did you say that those negotiations took roughly two years to

7    complete?

8    A    I think it was about two years.  Yes, sir.

9    Q    And so that contract was from 2015 to 2000 -- so it was

10   like -- was it like July of '15 to July of 2017?

11   A    That was the term of the most recent contract, yes.

12   Q    So you would have started those negotiations roughly in

13   the middle, somewhere in the mid -- the summer or fall or

14   spring of 2013?

15   A    Yes, sir.  I think we started actually in May of '13.

16   Q    Okay.  Were those negotiations also contentious in terms

17   of -- of emotion -- I'm going to use the phrase emotion and

18   sometimes anger, was that prevalent in those negotiations?

19   A    Yes, that was a difficult negotiations.  It got less so as

20   time progressed, but it was a difficult negotiations,

21   particularly at the start.

22   Q    Okay.  And the -- the issues that occurred in that

23   negotiation, were they similar in certain respects to the

24   negotiations that occurred with -- with Nexstar?

25   A    Well, similar in that healthcare was a huge bone of



 1    contention during that negotiations, culminating eventually in

 2    the language which we have in the contract now.

 3    Q    And with -- with Media General, the healthcare language,

 4    you -- you were under their company polic -- healthcare policy;

 5    is that correct?

 6    A    That -- the -- the -- that contract in '13 --

 7    Q    Yes.

 8    A    -- had -- had moved under a LIN Media.  And then LIN and

 9    Media General were merged, and people moved into the Media

10    General benefits.

11    Q    Okay.  But the contract was not -- this was not some plan

12    that had been shopped outside, it was a company sponsored plan;

13    is that correct?

14    A    In what ended up in the contract in 2015, in the end, we

15    took the company benefits with language locking the premium

16    contributions and language about changes.

17    Q    And when -- when Nexstar acquired KOIN, which was, I

18    believe, in January of 2017, you had about six months to run on

19    your contract; is that -- is that right?

20    A    That's correct.  It was going to expire in July of '17.

21    Q    And Nexstar adopted that contract for the six-month period

22    or so that remained on its term; is that right?

23    A    That's correct.

24    Q    Um-hum.  And -- but -- but obviously Nexstar could not

25    continue Media General's benefit plan, correct?



1    A    That's correct.  They didn't have those plans.

2    Q    So at -- is it accurate to say that when you move -- when

3    Nexstar became the employer, the employees moved on to

4    Nexstar's healthcare -- health benefit plan?

5    A    Yes.  They moved into the plans, I believe, provided under

6    United -- or UMR.

7    Q    Okay.  And those were -- still though, you had the

8    language that was locking in the premiums that would be --

9    would be charged to employees during the term of the contract?

10   A    That's correct.  Both the dollar amounts and then in the

11   next provision of the contract, we have language about changes

12   and being tied to the nonexecutive, nonrepresented equal of

13   the -- of the employer.

14   Q    Now, moving to the negotiation or the sche -- let's talk

15   about this because you -- you testified at some length about

16   the scheduling issues.  And you -- you mentioned, I think,

17   early in your testimony about what you called sweeps months.

18   And I think I wrote down February, May, July, and November;

19   is -- is that accurate?

20   A    Those -- those are the four sweeps months during the year,

21   yes.

22   Q    And it's true, though, that -- that -- well, let me ask

23   you this, if we look at Joint Exhibit 1, which is the

24   stipulation.

25       MR. ROBERTS:  If that could be pulled up?  And Joint 1 --



1    and if we scroll down to page 2, right, and -- and -- and page

2    3.

3    Q    BY MR. ROBERTS:  If you look at 2, it looks to me as if we

4    had that the parties did in fact meet in November of 2017, at

5    least the end of it.  They met -- can we move to the next page?

6    And they met in February of 2018; is that correct?

7    A    I believe that's correct.

8    Q    And they met in -- in May of 2018, correct?

9    A    Yes.

10   Q    And they met in November of 2018, which were all that --

11   correct?

12   A    Those -- those are the dates that we met, yes.

13   Q    And those were all in what you have referred to as sweeps

14   months?

15   A    No.

16   Q    And why is that incorrect?

17   A    Sweeps is called a month, but it's actually a four-week

18   period of time that often begins in the preceding month.  And

19   it -- it does not line up with the calendar.  We'll use

20   November as an example.  Sweeps ends always on the Wednesday

21   before Thanksgiving.

22       So it may start in, depending on when Thanksgiving falls,

23   all of sweeps might be in November or some of sweeps might be

24   in October.  So those dates, November 26 and 27, I think, are

25   probably Monday and Tuesday or the Tuesday and Wednesday after



1    Thanksgiving, so they were outside of sweeps.

2    Q    Okay.  But you -- you testified -- well, let me ask you

3    this.  They -- you used -- I think you had an understanding

4    that -- that generally, there was an expectation that company

5    and Union would meet at least two days in each month; is

6    that -- that was (audio interference) some understanding that

7    you had; is that correct?

8    A    Well, we would definitely meet for two days each time we

9    bargained.  And my goal was --

10   Q    No, but you --

11   A    -- to have us meet each month for two days.

12   Q    But what I'm asking is, is that was something that was

13   discussed among the parties early in the process that they

14   would attempt to meet two days each month; is that -- is that

15   correct?

16   A    No.  I think when we started bargaining, we had fantasies

17   or expectations of this not taking years -- this not going on.

18   We didn't calendar out the rest of the year when we started

19   bargaining in June of '17.

20   Q    No, but how did it come to be -- I mean, with some

21   exceptions, which you pointed out, the parties appear to have

22   met two-consecutive days in each month.  Was that -- I'm just

23   trying to ask, was that by agreement or --

24   A    Right, by agreement that we would meet two days in a row,

25   but it was complicated to travel to Portland.  Company



1    representative and I -- and company representatives changed in

2    there, but company representatives who travel in, and that I

3    would travel in, and that we would travel with the purpose of

4    bargaining two days at a time.

5    Q    And you, of course, are based in San Francisco; is that

6    correct?

7    A    I am.

8    Q    And San Francisco to Portland, I believe you testified

9    that there may not be a huge number of flights, I'm sure

10   there's some.  But you said something on Fridays or something

11   that -- or -- or maybe one night at 6 p.m., I understood you to

12   say, was like the last flight out of Portland back to San

13   Francisco?

14   A    When it becomes winter, that's the -- the last direct

15   flight, nonstop-direct flight.  You may have to stop someplace

16   else to get -- get the distance.

17   Q    And with Nexstar, you understood that -- well, they had

18   some local representatives, but they also had corporate

19   representatives who were coming from Dallas; is that correct?

20   A    Well, I knew Mr. Busch was coming from somewhere.  I don't

21   know whether he was based in Dallas or -- or further back east,

22   but yes, he was definitely traveling in.

23   Q    Okay.  And -- and Mr. Pautsch, when he appeared early, and

24   then when he took over, he was traveling in, too, correct?

25   A    Correct.  He would -- he was not corporate counsel.  He



1    was outside counsel when he first started participating in the

2    bargaining, and then was named their legal counsel later on in

3    the process.

4    Q    Okay.  Now, when we get to -- let's -- let's now move to

5    2019 in terms of scheduling, and I know you met, it appears on

6    January 24th and 25th of 2019.

7         MR. ROBERTS:  And then if we move to -- if -- if they can

8    pull up Joint Exhibit, I believe it's 14, if you will, which

9    are the notes of Ms. Hansen.  If we could scroll down to page

10   2 -- of that Bate's page 2 at the bottom.  All right.  Set --

11   right there.  There's -- in those notes, it says March 11,

12   question mark, 14, question mark, 15, question mark.

13   Q    BY MR. ROBERTS:   do you know what that's --

14   A    Those --

15   Q    -- or what they --

16   A    -- are the dates that I was offering to see if they would

17   work on people's schedule.

18   Q    And -- and -- and not -- this -- with regard to this

19   month, but in general, did it work that way?  Someone, either

20   you, or perhaps the other party, or the mediator would offer a

21   date, or two dates, and then the other parties would check

22   their calendars and see if they could conform to that proposed

23   date?

24   A    Generally, that was the way it was done.  The situation

25   there in January, you see we're jumping ahead a month.  So



1    we're in January.  We're not talking about February; we're

2    talking about a month out.  So after a series of problems,

3    either getting rooms or getting availability, I started to try

4    to calendar that two sessions ahead.  So if I was in January

5    and I had March dates booked, I would have been asking about

6    April because at times, we had extreme difficulty finding

7    accommodations for the bargaining in the hotels in Portland.

8    We might get all the parties together and agree on our calendar

9    that we wanted to meet, but then there was no place to be able

10   to meet.

11   Q    Yeah, as I understand that, but with respect to where it's

12   in March 11, question mark, 14 and 15, those -- are you saying

13   that those were dates that you threw out as your availability;

14   is that -- is that correct?

15   A    I don't know whether that was me or not.  Those are Ms.

16   Hansen's notes.  So I don't know whether that was me talking.

17   Q    Okay, well, just --

18   A    I (audio interference) --

19   Q    I'm sorry, someone -- I think you would agree that someone

20   proposed those as possible dates because of the question mark

21   that's beside them?

22   A    Correct.

23   Q    And I take it from the question mark that's beside them

24   that, for whatever reason, the parties did not lot -- commit to

25   those dates on January 25th?



1    A     Before lunch.

2    Q     Okay.

3    A     So they could have later in the day.  That was just the

4    initial effort to try and get dates together for the next round

5    of bargaining.

6    Q     Okay.  And -- and you did not have any -- well, you had

7    notes, but because of some glitch of some type or they got

8    lost, not questioning that.  But you don't have any notes for

9    that particular day; is that --

10    A     No.

11    Q     -- correct?

12    A     Unfortunately, and a lot of traveling around it, then a

13    lot of COVID moving around, those notes and I have become

14    separated.

15    Q     Well, if we scroll on down to page 3, the rest of the

16    meeting, I don't see anything on there that indicates that

17    dates were committed to.  And you would have no -- you'd have

18    no reason to -- to contend otherwise that there was any

19    commitment to dates on that particular day?

20    A     Not -- not from that, no.

21    Q     All right.  And then if we can pull up Joint Exhibit 20,

22    which is a series of emails back and forth between -- primarily

23    between Casey Wenger, the mediator, and you, but there are some

24    other people receiving it.

25          MR. ROBERTS:  If we could move back to the bottom of that



1    or if we could go all the way to the last page on there?  There

2    should be multiple pages.

3        Is that the last page?

4        My pages, for some reason, I'm not quite sure are a little

5    bit out of order, but I have a email that is from Casey Wenger

6    of February 12th, 2019 -- excuse me.  I'm sorry.

7        MS. DEVLEMING:  I think it just popped up now on the

8    screen, look again.

9    Q    BY MR. ROBERTS:  All right.  I'm just trying to find the

10   first email in that -- in that series.  They -- mine are out of

11   order and that may be my fault, but --

12       In any event, let's -- this started with -- oh, okay.  I

13   think, I see it now.  Sorry, it's on February 6th.

14       MR. ROBERTS:  Can we scroll down to where there's a

15   February -- at the bottom -- right there.

16   Q    BY MR. ROBERTS:  It says -- it has a 1 at the bottom as

17   the page number, but it's a February 6th email from Casey

18   Wenger.  And it basically just says CBA negotiations Thursday,

19   March the 14th.  Do you know --

20   A    I --

21   Q    -- do you know how that date came to be?

22   A    The parties had agreed on that date.  I believe that that

23   is a meeting invitation from Mr. Wenger.  What it subsequently

24   looks like when it's down the ways a piece --

25   Q    Okay.



1    A    -- as it's forwarded and responded to.

2    Q    So he was sending out an invitation to all the relevant

3    parties, indicating that negotiations would be on March the

4    14th; is that correct?

5    A    Correct.

6    Q    And then we notice above that that -- but your

7    understanding was that the parties had agreed to that date in

8    some fashion prior to this email, correct?

9    A    Correct.

10   Q    You -- do you know whether that was at the previous

11   meeting at the end of January or whether it was sometime after

12   that?

13   A    I believe it was at that meeting, but I can't tell you

14   more than that.

15   Q    Did Casey Wenger, when there were issues about scheduling,

16   was he often involved in working with you to schedule those?

17   A    I -- he most definitely was.  He was usually my point of

18   contact and our point of contact between me and our office

19   manager.  He was the point of contact for KOIN, for meetings.

20   Q    And I know you raised some issues with some of the

21   representatives of -- of KOIN, but you had no issues with

22   regard to Mr. Wenger, correct?

23   A    No.

24   Q    And he was always cooperative in terms of any issues that

25   you might have in assisting with scheduling?



1    A    Certainly.

2    Q    Okay.  All right.  And then, there's the email above this

3    from later that day from the mediator indicating that -- that

4    she needed to attend the mandatory meeting on those days.  And

5    then, she threw out the 21st, the 22nd, the 28th, and the 29th.

6    And then, I'm just reading that and then it says there a

7    response from you later that day at the top, which you

8    indicated that you would be in Union trials from March 19th,

9    April 3, correct?  So you had previously scheduled commitments

10   for those dates?

11   A    Yes, I had a block of time where I was required to

12   testify.

13   Q    And that was unrelated to KOIN, correct?

14   A    Totally unrelated to KOIN.

15   Q    Did you have any other contracts that were open for

16   negotiations at that time, in early 2019?

17   A    I believe we were starting to bargain -- we were starting

18   to bargain KDTV, Spanish language TV, but I don't know whether

19   we had started yet.

20   Q    Okay.  And where was that located?  Is that in some --

21   A    It's located here in the Bay Area.  And we were in

22   discussions about when we would bargain it.

23   Q    And I'd asked you about early 2019, but continuing on into

24   2019, did you have other contracts that were coming up for

25   negotiation?



1    A    No, it was -- it was my good year.

2    Q    Okay.  You have some years then I take it, where you have

3    multiple contracts open for negotiations; is that fair?

4    A    I can have very complicated, big negotiations that then

5    have to take the priority.  They're the largest contract group

6    or when I'm involved with ABC issues that involves four other

7    locations, so those are more complicated to calendar and to

8    schedule.

9    Q    And in fact, when you indicated those dates were

10    unavailable, the -- the employer, Mr. Pautsch or Mr. Wenger,

11    there's an email dated -- that has a page 4 at the bottom.  I

12    don't know if it's chronological or not; mine were mixed up.

13    That right -- there we go.  And it appears on February 8th

14    that -- that -- that the company had sent -- had said that the

15    dates -- the alternative dates that the mediator threw out were

16    not good for him.  As it turned out, they were not good for you

17    either, correct?

18    A    That's correct.  They were coming right up against my

19    trial.  To be more explicit, really trials, plural.  It's a

20    series of them that I was required to testify in.

21    Q    Right.  Then if we go to what's -- I'm -- I'm taking

22    things out of order because they -- this is -- is we go up --

23    go up to page 3 or down, I don't know which way -- there it is.

24    On 2/12, Mr. Wenger, that's where he had thrown out the  dates

25    of April 1 to April 12th.  And that's when --



1   (Dog barking)

2       UNIDENTIFIED SPEAKER:  Sh.

3   Q   BY MR. ROBERTS:  -- you also said you were not only for

4   the first week of April and trials, but you had some conference

5   in Las Vegas --

6   (Dog barking)

7       UNIDENTIFIED SPEAKER:  Rusty --

8   Q   BY MR. ROBERTS:  -- the following week.

9   A   That week in April is the -- what's called the NAB, the

10  National Association of Broadcasters --

11  (Dog barking)

12      UNIDENTIFIED SPEAKER:  Shut up.

13  A   -- and it's --

14  (Dog barking)

15      UNIDENTIFIED SPEAKER:  (Indiscernible)

16  A   -- we're 100,000 broadcast technicians go to Las Vegas and

17  look --

18  (Dog barking)

19      UNIDENTIFIED SPEAKER:  Sit.

20  A   -- at all the new equipment.  And in conjunction with NAB,

21  as we call it, our Union holds meetings of leaders at the same

22  time.  So we're all going to Vegas to look at equipment and

23  then we stay to have a meeting.

24  Q   Okay.  Well, eventually, it appears that you did -- an

25  agreement was reached and made on April 23 and 24, 2019, would



1    be your next negotiations?

2    A    Correct.

3    Q    And that was by mutual agreement, correct, that was when

4    you could all match your schedules and book a room?

5    A    Match our schedules, match the mediator, match, and book a

6    room.

7    Q    We all -- I mean, you testified about the -- or mentioned

8    the term, the busy negotiators of this.  We all understand

9    that -- that you still have to make things work even if you're

10   busy.  But it does create problems, of course, when there's

11   three different -- if you will, not only the two parties, but

12   of -- the mediators schedule that has to be accommodated?

13   A    Correct.

14   Q    And is it fair to say that -- that not just in this month,

15   but in almost every month, it was somewhat trying to come up

16   with dates that would fit everybody's schedule?

17   A    It could be a challenge.  The bigger the company committee

18   got, the more schedules there were to accommodate.  Then, when

19   we added the mediator, her schedule had to be accommodated.

20   And then, as I think has become clear, periodically, we get

21   everybody aligned for the dates, and then there was literally

22   not a hotel available or sufficient meeting rooms.  And we were

23   really only looking for two rooms, but that would be difficult

24   to accomplish.

25   Q    All right.



1      MR. ROBERTS:  If we could now pull up Joint Exhibit 13 and

2    it's Bates page number 6.  That doesn't -- all right.  Now --

3    now, you have to go up to the typed notes.  It should be --

4    there it is.  Okay.  Look -- did you see that?  Oh, no, go back

5    up where we had the dates at the bottom.

6      MR. SCHIFF:  To 3?

7      MR. ROBERTS:  You need to scroll back up -- right there.

8    Q    BY MR. ROBERTS:  You see that?

9    A    Yes.  We agreed via the mediator to bargaining June 25 and

10   26.

11   Q    BY MR. ROBERTS:  So that was by mutual agreement that you

12   agreed to those dates, correct?

13   A    Correct.

14   Q    And no -- no one said, hey, we should be meeting earlier

15   than that, that's not satisfactory, or anything like that?

16   A    Well, that doesn't reflect the whole conversation, but no,

17   in the end, especially with the mediator as the intermediary

18   with the calendar, it was agreed to by the mediator, the

19   employer, and the Union that we would meet on June 25 and 26th.

20   Q    But it actually looks like if I move to -- in the same

21   document to pages 12, it looks like you actually met on the

22   26th and 27th instead of the 25th and the 26th?

23   A    Yes, it looks like it got adjusted.

24   Q    Do you know how that came to be?

25   A    I -- I don't currently recollect.  It can often be when we



1    try to get rooms that it wiggles.

2    Q    Okay.  So even even if at a negotiating session, the

3    parties successfully agree on dates, it's always subject to

4    there being a room available; is that fair?

5    A    Correct.

6    Q    Okay.  And for whatever reason, this -- this -- these

7    meetings got pushed to the 26th and 27th.  And I don't see

8    anything in your notes, moving over to pages 12 and 13 -- well,

9    I that back 13, if we can move to Bates page 13.  All right.

10   Right there.  So there's -- at the very top, you've made a

11   note, "Dates in July is booked."  I take it from your testimony

12   that that was a statement by Mr. Pautsch, or is it someone else

13   who said that?

14   A    It could be someone else who said that.  I can't tell that

15   from those notes.

16   Q    Okay.  So because -- let me -- let me phrase it this way,

17   and this is a hypothetical.  But hypothetically, you might be

18   available July 5th through the 12th, and Mr. Pautsch might not

19   be -- might be available the 15th through the 22nd, and the

20   mediator might be available the -- the 20 -- 25th through the

21   30th or whatever.  So is that sometimes how it worked?

22   A    Sometimes, and that's why the further out we could book

23   these, the easier it was.

24   Q    Okay.  Did the mediator ever raise to the parties her

25   belief that -- that it -- that it was not productive to



1    schedule meetings two months out?  That, you know, that that

2    signaled that you didn't expect to get much progress at the

3    next set of meetings?

4    A    No, I think she understood the challenge that we had had,

5    and I felt it more intensely since the Union had the

6    responsibility for finding the accommodations, that we needed

7    to be further out to be able to get a room or rooms, plural.

8    Q    All right.

9         MR. ROBERTS:  And now, we'll keep moving on, the same

10   Exhibit Number 13, but the pages -- page 21 and 22.  All right.

11   And yes, go back up -- go to 22, if you will, that's the second

12   page of that -- of the October the 7th.

13   Q    BY MR. ROBERTS:  You've got a date that says on there,

14   possibly November the 13th through the 15th --

15   A    Correct.

16   Q    -- you might have been asked about it.  Do you know how --

17   who through that date out?

18   A    I couldn't tell you.

19   Q    So it could have been -- it could have been the company,

20   it could have been the Union, or possibly it could have been

21   the mediator?

22   A    It could've been anyone.  You can't tell from those notes.

23   Q    Now, when we get to -- if you'd move on to pages 26 and

24   27, which are your notes for October the 9th, you've got

25   January 14 and 15 -- this is on page 27.  You said --



1          MR. ROBERTS:  The last page of that, one page down.  Keep

2    going to the bottom of that right there.

3    Q    BY MR. ROBERTS:  At the very bottom, you see the notation

4    January 14 and 15?

5    A    Correct.

6    Q    How did those dates -- what -- I mean, how did they come

7    and were they -- what -- were they proposed dates?  What -- I

8    don't know what that really means, January booking at this

9    point --

10   A    I believe those had been agreed to.

11   Q    These --

12   A    It -- it would depend on the whole conversation but some

13   (audio interference) were agreed to because it was so far out

14   that people were able to clear their schedules or see their

15   schedules that far out.

16   Q    Okay.  That -- that's your -- but you don't really have a

17   specific recollection as to whether those dates were actually

18   committed to or whether they were just dates that were

19   possibilities?

20   A    Not from these notes; I can't tell.  But I know that I

21   generated those forms that requested the leave of absence.  And

22   then, I generated the effort to book meeting rooms.

23   Q    Okay.  Now, if we move on to the same exhibit number, to

24   Bates page 34, which is the last page of your notes on December

25   the 10th.



1    MR. ROBERTS:  And move up -- all right, there.

2    Q    BY MR. ROBERTS:  Now, there's some reference to -- down at

3    the bottom, the first reference to dates I see is January

4    23/25, and then February 11 and 12, but then at the bottom

5    below that, it says the company had left by 12:00 noon, and we

6    were unable to get February dates.  So are you saying that it

7    was January 23 and 25 that had been agreed to at that time?

8    A    No, we had January -- earlier dates, those 13 and 14 dates

9    who had -- which had been agreed to quite some time before and

10   com --

11   Q    When?

12   A    -- before this meeting on December 10th.

13   Q    I see.  So when -- when were those dates agreed to.  Is

14   that back in October or was that --

15   A    It started out in October and they had been confirmed by

16   email correspondence, so that the hotel rooms had already been

17   booked for those.

18   Q    And I have -- it may be in here.  I don't recall email

19   correspondence confirming that.  You saying that there's --

20   there's some email correspondence concerning January the 13th

21   and the 14th?

22   A    I believe there is.

23   Q    Well, it will either -- it'll either be there, or it

24   won't.  I don't -- and I -- it may be there; I just don't

25   specifically recall.



1          In any event, moving back to -- to the bottom part of

2     this -- this document.  It's a little confusing because that --

3     it says the company had left by 12 noon.  We were unable to get

4     February dates.  And then it says, "First, mediator objected to

5     January 13 and 14." Is that a -- is that an accurate statement?

6     A    Yes.  She said she couldn't meet those dates.

7     Q    And she wanted to move it to the 23rd and 24th?

8     A    Correct.

9     Q    And you said that you'd already signed a contract with

10    Marriott?

11    A    Correct.

12    Q    And then, she somehow said that -- that she could do

13    January 13th and 14th; is that --

14    A    That is correct.

15    Q    -- what this (indiscernible)?  Okay.  But at that time,

16    the company had left that meeting.  It was no -- it was not

17    there when this conversation was going on; was it?

18    A    Correct.

19    Q    And in fact, when you go to December, the -- one of the --

20    I don't -- one of the emails if you have (audio interference)

21    where the mediator said something to the effect of, sorry for

22    how the last meeting wrapped up or the confusing manner; you

23    recall that email?

24    A    Yes.  And that's what that's referring to, that issue

25    about those dates.



1    Q    And then, thereafter you got -- was when Mr. Pautsch sent

2    an email saying that -- that there was some confusion, that

3    he -- he thought that you'd agree to some different dates in

4    January; you recall that?

5    A    Yes.

6    Q    Just give me a second, so I can pull -- I think, pull that

7    up, make sure we're -- --

8         MR. ROBERTS:  Yes, if we could go to a Joint Exhibit 51,

9    and it'd be -- we'll start with page 2, which is the last page.

10   All right.  That's where the mediator on December the 10th,

11   made the statement, I talked about the disjointed wrath of the

12   last meeting.

13   Q    BY MR. ROBERTS:  And she indi -- so it appears to me that

14   she's uncertain whether January 14th and 15th were locked in,

15   too?

16   A    I think that by the time she wrote this at 4:26 p.m., she

17   knew the company was no longer available for those dates,

18   irrespective to the communications earlier going back a month

19   or two, locking in those dates.

20   Q    Do you -- she didn't say that to you though, correct?

21   A    No.

22   Q    That's supposition on your part.

23   A    No, I think that the -- the clearest recollection and the

24   most contemporaneous explanation of all of this was in the

25   bargaining bulletin of December 10th, which was written shortly



1    after all of this happened.  And it talks about what the dates

2    were, and what had been agreed to, and what was now being

3    changed because the members liked to try and come to

4    bargaining, and wanted to know when bargaining was, so that

5    they could come and sit in before work, after work, on lunch.

6    And so I tried to keep a running explanation of when the next

7    bargaining was in the bargaining bulletins, as I wrote them.

8    Q    All right.  I'm -- yeah, but the statements you made was

9    that the mediator was, in essence, if I interpreted you

10   correctly, that there was something -- that she was somehow

11   covering for the company; is that your -- is that your

12   testimony?

13   A    It is.

14   Q    Yeah.  And did she say anything to make you believe that?

15   A    Yes.  She initially said that she was not available.  And

16   she didn't say I had a obligation come up or a training come

17   up.  As you saw in one of the earlier exhibits, she had a

18   training that had happened in the spring of 2019 and she had to

19   ask us to move bargaining after we were pretty close to the

20   date.  In this instance, first, she said, well, I have a

21   conflict.  And then, she later said, well, really, it's Mr.

22   Pautsch who has a conflict.

23   Q    That's not in your notes though that that's what --

24   A    It wouldn't have been in the notes there during the -- the

25   bargaining.  And this is an email on that same day.  It took a



1    little while for all the parts to come out of what was going

2    on.

3    Q    Okay.  So your -- your testimony now is that she said

4    that -- that it really wasn't her, that she had been telling

5    them -- had been untruthful in saying that she couldn't do it

6    on those days, that it was Mr. Pautsch who had the problem?

7    A    She didn't say she was untruthful.  She said that she was

8    just trying to have there be less conflict.  So she said that

9    she wasn't available on those dates, but later she said it

10   wasn't her, it was that Mr. Pautsch had a conflict.  He had to

11   be in New York on those dates.

12   Q    Okay.  Let's move from the scheduling to --

13        MR. ROBERTS:  Well, let me ask, Judge, I -- I mean, I'm

14   not asking to stop.  I'm just pointing out that I am at a

15   transition point.  I don't know what your preferences are,

16   whatever you prefer to do.  I mean, I've still got --

17   definitely got, you know, probably over, maybe an hour, hour-

18   and-a-half still to go so and may be longer, but probably no

19   longer than an hour-and-a-half.  So I just wanted to alert you

20   to that.  You -- and ask where -- you want me to rather move

21   into the next -- next subject or wait?  I mean, I just noticed

22   that it's -- it's about -- well, it's about 6:00 here, it's

23   4:00 almost there.

24        JUDGE TRACY:  All right.  I don't know.

25        Do the parties want to go ahead -- I mean, I'm sort of --



 1    you know, kind of ambivalent actually, to whether we should go

 2    for another 30 minutes or we should just let you finish up on

 3    Monday with her and do any redirect or cross or recross at that

 4    time.  What's -- what's everybody's position?

 5         MR. ROBERTS:  Let me say that I go whatever.  I -- I can

 6    move forward.  I may be more focused if I'm able to organize

 7    these documents with a little bit more time.  I mean, it was a

 8    60-page affidavit.  And then, with all the documents we have

 9    flipping back and forth.  But again, I'm -- I'm -- I'm able to

10    move forward if that's the way you want to proceed.

11         JUDGE TRACY:  This is a marathon.

12         So Ms. Yen, Ms. DeVleming, do you guys have any thoughts

13    about it?

14         MS. YEN:  Well, I'm on Pacific Time, so I'm flexible,

15    whatever you folks want to do.

16         MS. DEVLEMING:  And I don't have a strong opinion other

17    than I just want, you know, us to make sure that obviously

18    Respondent's case is probably going to be lengthy, just like

19    ours, this is our first witness.  So I just don't want us to

20    make decisions that will make it that we don't even finish next

21    week is my only concern.

22         MR. ROBERTS:  I can -- could we go off the record for a

23    minute to discuss scheduling?  I mean, just -- well, how long

24    we think things are going to take or do you want to do that on

25    the record?



 1      JUDGE TRACY:  We can stay on the record; that's fine.

 2      MR. ROBERTS:  Okay.  I was going to respond to her

 3  question about -- once we finish -- once we finish, Ms. Biggs,

 4  what's -- you've got -- I know you got Ms. Hansen and then

 5  you've got at least a handful of -- of -- but they're going to

 6  be pretty short; am I correct in that regard?  I -- I don't --

 7  I'm not sure I have any if -- cross-examination on a lot of

 8  those, particularly the employees.  If it is, it will be very,

 9  very short.  Do you think if I take no more than an hour to an

10  hour-and-a-half to finish up, will you be able to finish your

11  case, assuming whatever redirect you may have, will you be able

12  to finish your case on Monday or is it going to roll into

13  Tuesday?

14      MS. DEVLEMING:  There's -- you know, several witnesses,

15  with Ellen slightly longer, so it's hard to exactly say, but I

16  would guess that's right about where we would end.  Whether it

17  goes into Tuesday a little is a possibility, but not far.

18      MR. ROBERTS:  Okay.  My first witness will be Mr. Pautsch.

19  I expect that it will be not nearly as lengthy as -- as Ms.

20  Biggs-Adams, but it probably direct, I think, four hours at

21  most.  I think I can get through him in -- in -- in that span.

22  But whatever cross would be in that, you know, on that.  And

23  then we have -- well, you have -- well, I take that back.  You

24  have Mr. Nevin, who you subpoenaed and we can make him

25  available -- I can't remember what -- whatever -- you said you



 1    were flexible on when he was, but so if it's on -- on Tuesday,

 2    would that be -- if we did him first thing Tuesday morning,

 3    would that be acceptable?

 4        MS. DEVLEMING:  Yeah, how about we talk off the record

 5    about him once Carrie's all said and done, I will have a good

 6    sense of when or if I really need him.

 7        MR. ROBERTS:  Okay.  All right.

 8        JUDGE TRACY:  And then, you're -- and then after -- after

 9    Mr. Pautsch --

10        MR. ROBERTS:  We have -- we have probably three or four

11    other witnesses, but they're going to be relatively short.  I

12    mean, Mr. Pautsch is the only one who -- anyone else, I can't

13    imagine would take more than an hour, an hour-and-a-half at the

14    most and that's probably stretching.  I don't think we'll have

15    any trouble finishing by the end of the week, if not, you know,

16    probably by Thursday.

17        JUDGE TRACY:  Yeah, I -- I agree, listening to this.

18    Although, you know, I -- I get reluctant when we're still on

19    the first witness.  But she plays a significant role here.  I

20    also probably think that maybe for the witness perhaps we just

21    resume on Monday since we have to call her anyway.

22    (Indiscernible) probably don't care, but maybe if you want to

23    question (indiscernible).

24        THE WITNESS:  I think Monday would make it all one

25    experience.



1       JUDGE TRACY:  All right.  So let's -- let's -- let's --

2   let's go ahead and -- and go off the record.  Then, we will

3   resume on Monday.  Mr. Schiff probably appreciates that, too,

4   at 9 a.m.

5       And I'm trying -- was there anything else that we needed

6   to take care of.  You -- you've substituted documents.  We

7   still have reports to subpoena stuff that -- that can be put in

8   and then all these other documents, that hopefully, you guys --

9   maybe you can take the time right now to work that out if you

10  want to come up with joint -- if you can agree that they can be

11  joint exhibits or what have you, you can maybe work on that

12  right now.

13      MR. ROBERTS:  Your --

14      JUDGE TRACY:  So you can do that.  And I can keep the --

15  keep the call open.  And the rest of us can -- can sign off or

16  something like that if you guys need it.

17      MR. ROBERTS:  I think that would be helpful to talk about

18  these documents.  And then, we hope we could agree on what

19  would go in and whether it's a joint exhibit or whether it

20  comes in as -- or Respondent's Exhibit.

21      JUDGE TRACY:  So what would you do -- so I don't think --

22  we don't need the court reporter, Claudine.  So you're --

23  you're welcome to leave the meeting.  And Mr. Schiff, it can --

24  like, go back to me, and you can leave the meeting.  Ms. Biggs-

25  Adams, please just don't discuss your testimony with anyone

1    until, again, after the close of the hearing.  You can sign

2    off.  And what I will do since I need to be the last one to

3    leave.  I will just mute my screen -- or mute myself and turn

4    off my video, so that way you guys can talk.  And I will, kind

5    of, leave my office here; is that -- is that okay?

6          MR. ROBERTS:  Certainly.

7          JUDGE TRACY:  Okay.  So I'll see you guys at 9:00 a.m.

8    Pacific Time on Monday.  Have a good weekend.

9          MS. DEVLEMING:  You, too.

10         JUDGE TRACY:  Be safe.

11         MR. ROBERTS:  All right.  Thank you, Judge.

12         JUDGE TRACY:  You, too.  Thanks.

13    **(Whereupon, the hearing in the above-entitled matter was**

14    **recessed at 3:59 p.m. until Monday, November 16, 2020 at 9:00**

15    **a.m.)**

16

17

18

19

20

21

22

23

24

25



1                    **C E R T I F I C A T I O N**

2    This is to certify that the attached proceedings, via Zoom

3    Videoconference, before the National Labor Relations Board

4    (NLRB), Region 19, Subregion 36, Case Numbers 19-CA-248735,

5    19-CA-255180, 19-CA-259398, 19-CA-2622, National Association Of

6    Broadcast Employees & Technicians, the Broadcasting and Cable

7    Television Workers Sector of the Communications Workers of

8    America, Local 51, AFL-CIO and Nexstar Broadcasting, Inc.,

9    d/b/a KOIN-TV, at the National Labor Relations Board, Region

10   19, Subregion 36, 915 2nd Ave., Ste. 2948, Seattle, Washington,

11   on November 13, 2020, at 9:07 a.m. was held according to the

12   record, and that this is the original, complete, and true and

13   accurate transcript that has been compared to the reporting or

14   recording, accomplished at the hearing, that the exhibit files

15   have been checked for completeness and no exhibits received in

16   evidence or in the rejected exhibit files are missing.

17

18

19

20                                   _____

21                                   CLAUDINE METOYER
                                     Official Reporter

22

23

24

25



EXHIBIT 5(c)

OFFICIAL REPORT OF PROCEEDINGS

BEFORE THE

NATIONAL LABOR RELATIONS BOARD

REGION 19, SUBREGION 36

In the Matter of:

National Association Of          Case Nos.   19-CA-248735
Broadcast Employees &                        19-CA-255180
Technicians, the Broadcasting                19-CA-259398
and Cable Television Workers                 19-CA-262203
Sector of the Communications
Workers of America, Local 51,
AFL-CIO,

        Charging Party/Union,

and

Nexstar Broadcasting, Inc.
d/b/a KOIN-TV,

        Respondent.

_____

_____

Place: Seattle, Washington (Via Zoom Videoconference)

Dates: November 16, 2020

Pages: 345 Through 523

Volume: 3

OFFICIAL REPORTERS
eScribers, LLC
E-Reporting and E-Transcription
7227 North 16th Street, Suite 207
Phoenix, AZ 85020
(602) 263-0885



**UNITED STATES OF AMERICA**

**BEFORE THE NATIONAL LABOR RELATIONS BOARD**

**REGION 19, SUBREGION 36**

In the Matter of:

NATIONAL ASSOCIATION OF        Case Nos.   19-CA-248735
BROADCAST EMPLOYEES &                       19-CA-255180
TECHNICIANS, THE BROADCASTING               19-CA-259398
AND CABLE TELEVISION WORKERS                19-CA-262203
SECTOR OF THE COMMUNICATIONS
WORKERS OF AMERICA, LOCAL 51,
AFL-CIO,

      Charging Party/Union,

and

NEXSTAR BROADCASTING, INC.
D/B/A KOIN-TV,

      Respondent

The above-entitled matter came on for hearing, via Zoom
Videoconference, pursuant to notice, before **AMITA B. TRACY**,
Administrative Law Judge, at the National Labor Relations
Board, Region 19, Subregion 36, 915 2nd Ave., Ste. 2948,
Seattle, Washington 98174, on **Monday, November 16, 2020,
9:06 a.m.**



1                          A P P E A R A N C E S

2      **On behalf of the Respondent:**

3          **CHARLES P. ROBERTS, III, ESQ.**
           CONSTANGY, BROOKS, SMITH & PROPHETE, LLP
4          100 N. Cherry Street, Suite 300
           Winston Salem, NC 27101
5          Tel. (336)721-6852

6          **TIMOTHY A. DAVIS, ESQ.**
           CONSTANGY BROOKS SMITH & PROPHETE LLP
7          2600 Grand Boulevard, Suite 750
           Kansas City, MO 64108
8
           **CHARLES W. PAUTSCH, ESQ.**
9          Vice President of Labor and Employment
           Nexstar Media Group, Inc.
10         545 E. John Carpenter Freeway, Suite 700
           Irving, TX 75062
11         Email: cpautsch@nexstar.ty

12     **On behalf of the General Counsel:**

13         **ELIZABETH H. DEVLEMING, ESQ.**
           **SARAH BURKE, ESQ.**
14         NATIONAL LABOR RELATIONS BOARD
           915 2nd Ave., Ste. 2948
15         Seattle, WA 98174
           Tel. (206)220-6291 (Burke)
16         Email: elizabeth.devleming@nlrb.gov (DeVleming)

17     **On behalf of the Charging Party/Union:**

18         **ANNE I. YEN, ESQ.**
           WEINBERG, ROGER & ROSENFELD
19         1001 Marina Village Pkwy., Ste. 200
           Alameda, CA 94501
20         Tel. (510)224-7687

21         **CARRIE J. BIGGS-ADAMS, PRESIDENT**
           NABET-CWA, Local 51, AFL-CIO
22         240 2nd St., Ste. 220
           San Francisco, CA 94105
23         Email: carrie@nabet51.org

24

25



1                                    **I N D E X**

2

3   **WITNESS**           **DIRECT**   **CROSS**   **REDIRECT**   **RECROSS**   **VOIR DIRE**

4   Carrie Biggs-Adams              350      413

5   Ellen Hansen          438      483      486

6   Robert Dingwall       496      519

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



1                    <u>E X H I B I T S</u>

2

3    <u>EXHIBIT</u>                        <u>IDENTIFIED</u>      <u>IN EVIDENCE</u>

4    **General Counsel:**

5       GC-15                               470              471

6       GC-16                               475              475

7       GC-18                               508              508

8       GC-17                               510              510

9

10   **Respondent:**

11      R-1                                 488              490

12

13   **Charging Party:**

14      CP-1                                488              491

15      CP-2                                488              491

16

17

18

19

20

21

22

23

24

25



www.escribers.net | 800-257-0885

1                    P R O C E E D I N G S

2        JUDGE TRACY:  Okay, great.  So this is a resumption of the

3   hearing in Nexstar and I wanted to just remind Ms. Biggs-Adams

4   that you are still testifying under oath that I had

5   administered back on Thursday.  And if you could just let us

6   know, is there anybody in the room with you presently?

7        THE WITNESS:  No, ma'am.  I'm by myself.

8        JUDGE TRACY:  Okay.  And then do you have anything in

9   front of you?

10       THE WITNESS:  Just a blank pad of paper that I'm taking

11   notes on.

12       JUDGE TRACY:  Okay.  And so if you could just please

13   refrain from using your phone, texting or any sort of other

14   communication during your testimony, I would appreciate that.

15       THE WITNESS:  Yes, ma'am.

16       JUDGE TRACY:  And Mr. Roberts, you have your partners

17   there with you; is that correct?

18       MR. ROBERTS:  Yes.  Mr. Davis, Mr. Pautsch is in the room,

19   and the legal assistant, Ms. Gregory is here --

20       JUDGE TRACY:  Okay.

21       MR. ROBERTS:  The same as the last time.

22       JUDGE TRACY:  Okay, great.  And if we recall from what

23   Claudine, the court reporter had mentioned last week, if any of

24   them are going to be speaking, we just need to make sure she

25   gets an audio of them so that way she can decipher their



1    voices.  So let's --

2        MR. ROBERTS:  But before we get to that -- where they

3    will, I will -- we will do that.

4        JUDGE TRACY:  Okay.

5        MR. ROBERTS:  It may be later today or tomorrow.M2

6        JUDGE TRACY:  Okay.  All right.  Sounds good.  All right,

7    so Mr. Roberts, go ahead, please.

8    Whereupon,

9                        **CARRIE BIGGS-ADAMS**

10   having been previously sworn, was called as a witness herein

11   and was examined and testified, telephonically as follows:

12                    **RESUMED CROSS-EXAMINATION**

13   Q    BY MR. ROBERTS:  All right.  Good morning, Ms. Biggs-

14   Adams.  How are you?

15   A    I'm fine, thank you, sir.

16   Q    I want to hopefully be a little more organized now that

17   I've had the weekend to look at these documents.  Do you have

18   hard copies of these or paper copies of these?

19   A    I do not.

20   Q    Okay.  Well, the one I -- I'm going to try to give you a

21   heads up about which documents I'm going to be looking at so

22   that we -- you can have those in front of you.  I'm looking at

23   Joint Exhibit 17 is what I'm going to ask you some questions

24   about.  This has to do with your memos or bulletins, updates to

25   your members about the about the bargaining.  So anyway, that's



1    where I'm going to ask you some questions.

2        Now, you testified on Friday, or maybe it was Thursday,

3    about the company's updates by Mr. Nevin.  And you raised some

4    of the concerns in terms of the tenor or tone of those memos.

5    But I wanted to ask you about your own what I'll call economic

6    tactics.  You mentioned some things, like mobilization and some

7    terms like that.  And I wanted to see if we could talk about

8    what efforts you were making to put pressure, if you will, on

9    the Employer.  And let me ask you this, you've been around a

10   long time.  It's not unusual for the Union to engage in some

11   kind of economic tactics in order to put pressure on the

12   Employer within their dealings.  Is that true?

13   A    That's correct.  Mobilization is a part of our strategy.

14   Q    And that's the one you've used with other employers

15   throughout your many years?

16   A    Yes.

17   Q    And what is the purpose of those tactics?  What are you

18   trying to accomplish?

19   A    Well, mobilization comes in a pretty wide range of

20   actions.  But the purpose is to get us to a contract.  So if

21   talking at the bargaining table isn't getting us there, then

22   external pressure put on by members and members of the

23   community to urge the Employer to bargain with us, to an (audio

24   interference) added in.

25   Q    And what other tactics do you -- I mean, obviously, a



1    strike would be a tactic, but I assume that that's one that you

2    prefer not to use unless it's absolutely necessary.  Is that a

3    fair statement?

4    A    That's correct.

5    Q    And are there other tactics that are -- I'm not talking

6    just about Nexstar or KOIN, but are there other tactics that

7    the Union sometimes uses in bargaining?

8    A    Certainly.  We sometimes have letter writing campaigns,

9    where members of the community write to the leadership at the

10   station, usually a general manager or vice president.  We

11   sometimes take economic action, asking advertisers to withdraw

12   their advertising until we reach a contract.

13   Q    Okay.

14   A    I've been known to dress up in costumes and dance through

15   the streets of Washington, D.C.

16   Q    Okay.  And when you've done that with other employers over

17   the years, is it not typical that the employers will attempt to

18   respond in some fashion with their own economic tactics, if you

19   will?

20   A    I don't know that I'd call them economic tactics.  There

21   have been times when advertisers were given free advertising by

22   the Employer.  So if we've asked them to pull their advertising

23   and they don't, the TV station may say, okay, we'll give you

24   free commercial time.

25   Q    When you -- in this case, you communicated with your



1    members through your update bulletins, correct?

2    A    Correct.

3    Q    And is that something you typically do in order -- I mean,

4    in negotiations?

5    A    Yes, it is.

6    Q    And in your experience, when you do that, is it not

7    typical that the employer's response -- typically respond with

8    their own communications to employees?

9    A    It varies.  Some do, some don't.

10    MR. ROBERTS:  Let's look at Joint Exhibit 17.

11    Q    BY MR. ROBERTS:  And I want to direct your attention to

12    page 27, which is -- it starts on page 26, but it's bulletin

13    number 20, dated September 12th, 2018.  And --

14    JUDGE TRACY:  So one second, Mr. Roberts.  If Mr. Schiff

15    could go ahead and share screen and put that document up for

16    everybody, to be sure we're all on the same page.

17    MR. ROBERTS:  Sure.  And if we could --

18    MR. SCHIFF:  I'm sorry, what page?

19    MR. ROBERTS:  Page 27, at the bottom of the page on 27.

20    Yes, that's correct one.  I'll represent that the date is

21    September 12th, 2018.  That's on the previous page.

22    Q    BY MR. ROBERTS:  But Ms. Biggs-Adams, what I want -- if we

23    could move that to the next page, 27 and down to the -- all

24    right, that's good.

25    So in the paragraph that begins, meanwhile, we need to



1    push back on the company's proposals and then you say

2    mobilization is the key.  And we are planning increased

3    activity to get us to the contract we all deserve.  And then

4    you talk about teachers in Washington state.  We can all read

5    what this says, but what is what is all of this a reference to?

6    A    Well, in Washington state around that time, and I couldn't

7    give you the exact dates, but there had been a very large

8    teacher strike in the part of Washington state that borders

9    Portland, so it had been covered extensively on KOIN TV.

10   Q    And so you were letting your members know that that was an

11   example of the type of mobilization that might be considered

12   for KOIN?

13   A    Well, as you see there, I said they mobilized and educated

14   the community for months before they went on strike.  So it

15   wasn't as though these folks had just gone on strike.  What

16   they had done was they had talked to the community about what

17   the issues were, what the economic issues were that they were

18   facing, and why they thought they deserved a raise.

19   Q    The term mobilization is one that is not necessarily self-

20   explanatory.  Did you did you believe that your members

21   understood what you meant by mobilization?

22   A    Well, depending on how long they've been there, they've

23   seen mobilization in the contract negotiations that ran from

24   2013 through 2015, where there was extensive mobilization.

25   There had been rallies.  There had been interactions with the



1    group Jobs With Justice.  And there had been actions at

2    advertisers extensively during that period of time.

3    Q    If we could move now, the same document to page 29, which

4    is October the 16th, 2018, the very bottom of that page.  Up

5    just a little bit.  There you go.  As you referenced, on

6    Saturday, December the 15th, which would be 2018, we are

7    planning a training for activists interested in being stewards

8    or mobilizers.  What was that -- what -- what was that training

9    consisting of?

10   A    So that would have been a gathering.  I don't see right

11   off the top where it was -- yes, it's the Musicians Hall.  So

12   we rented a Union hall in the area and invited people to come

13   and discuss mobilization, see what possible tactics might work

14   in this circumstance.  It's not as though there's a one-size-

15   fit-all, we do this followed by we do that.  We generally start

16   with what the members think would be effective in their

17   community.

18   Q    Did you conduct this training yourself or did someone else

19   do it?

20   A    I conducted it.

21   Q    And what did it consist of?  In a broad view.  I'm not --

22   A    In a very broad view, I'm sure we would have used the CWA

23   publication Mobilizing to Build Power, which is a manual of the

24   structure of mobilization and ideas of tactics that other

25   groups have used -- other Union locals have used.  And then



1    routinely, we break for lunch and looks like from 5 to 8:30, so

2    I guess we were going to do that during the day and then have a

3    gathering in the evening.

4    Q    Okay.  Do you recall how many KOIN employees attended this

5    training?

6        MS. YEN:  You know, I'm going to start objecting to this

7    line of questioning.  I mean, I -- I think we're talking about

8    the internal strategies on -- on the Union side, as opposed to

9    negotiations over the table.  And so I believe that the -- that

10   this line of questioning is not relevant.

11       JUDGE TRACY:  Mr. Roberts?

12       MR. ROBERTS:  Yeah, well, there's allegations about the --

13   a heavy part of it -- I think it's obvious, a big part of this

14   case are the bulletins or the -- or the memos that came from

15   the company to employees.  Our position is they were responsive

16   to the actions of the Union.  So I'm, in my view, clearly

17   entitled to explore the -- the actions that the Union were

18   taking, you know, to put pressure on the company.  And these

19   are documents that the Union -- I mean, excuse me, the General

20   Counsel has already introduced into evidence and questioned Ms.

21   Biggs-Adams about.  So I think I'm entitled to explore that.

22       JUDGE TRACY:  All right.  So I'm going to overrule the

23   objection.  But Mr. Roberts, because one, it is cross-

24   examination, but two, just be careful about getting into the

25   weeds of what some of the training was, because the document



1    does speak for itself in terms of what the Union communicated,

2    just as much as what the Respondent communicated to the

3    employees.  So in terms of how many employees attended that --

4    or bargaining unit employees attended, I'm not sure of the

5    relevance of that.  So to the extent they need to ask questions

6    to probe into the extent of their response to -- to -- or

7    updates for bargaining, that's allowed.  But just be careful

8    about getting into too many details about these internal Union

9    communications.

10        MR. ROBERTS:  I don't have to have the answer to that

11   question.  We're surely not going to get into the identity of

12   anyone.  I was just trying to get a flavor for how many KOIN

13   employees may be involved, but I can defer on that for now.

14   I'll certainly try to do that.

15   Q    BY MR. ROBERTS:  Let's move, then, to the next one that I

16   have is page 31, which is bulletin 24, November 27th, 2018.  Or

17   was that the one I was -- I lost track.  I don't know if that

18   was the one I was just looking at.  I think -- I don't think it

19   was.  Do you have that?  There you go.  On Saturday -- in the

20   middle of the page there, and I won't ask any details, but did

21   you hold another training session on December the 15th?

22   A    That's the same session the previous memo was about.

23   Q    All right.  All right, let's move forward to 2019, page

24   34.  This is dated -- this is your update of January 25th,

25   2019.



1        MR. ROBERTS:  And down at the bottom, if we could scroll

2    up just a little bit, where it says mobilization.

3    Q    BY MR. ROBERTS:  So now it appears -- this references,

4    you're getting ready to take our mobilization public.  So did

5    you, in fact, begin your mobilization activities in early 2019?

6    A    I know we discussed doing it.  I'm not sure that we

7    actually did go out to any advertisers.  We continued to have

8    outreach between our folks and folks with Jobs With Justice.

9    Q    And what do you mean by that?

10   A    Just mostly explained to other activists in the area what

11   was going on in the contract fight.  So we would ask somebody

12   to go to the Jobs With Justice meeting to give an update on

13   what was happening in the KOIN contract negotiations.

14   Q    All right, and then if we move to page 37 of this

15   document, which is dated June 26, 2019, things.  You've

16   published the CEOs, or the president and chief executive

17   officer of KOIN, who published the salaries that they that they

18   made; is that correct?  Move down just a little bit.  I think

19   you've got to move down a little bit more.  It's at the top of

20   this page.  Is that page 37?  It looks like, right there, up at

21   the top, where it says wages, you then talk about the salaries

22   of the CEO and executives of KOIN; is that correct?

23   A    Mr. Sook is definitely, I believe, the CEO.  Could I just

24   ask for clarification what the date of this document is?

25   Q    It's June 26, 2019.



1    A    Okay, so that makes sense that I would be talking about

2    the CEO and the shareholders, because I had gone to Texas to

3    attend the shareholders meeting of Nexstar.

4    Q    Well, and --

5    A    I am -- excuse me, I am a shareholder, as well.

6    Q    And your purpose in relating this to the employees was

7    what?

8    A    Well, they'd been hearing that there was no money.  They

9    certainly had not had a raise since July of 2016, which had

10   been a one percent raise.  And there had been no offer of wages

11   from the company.

12   Q    Okay.

13   A    And yet we had a company that was doing very, very well.

14   Q    But you knew that by publishing those salaries, you

15   expected that you would get some kind of response from the

16   company to that, didn't you?

17   A    No, sir, I wasn't publishing that for the company.  I

18   presume the company knows what their wages are.  I was

19   publishing that to let the members know that they had a right

20   to an economic piece of that pie.

21   Q    All right, well turn to the next page, page 38.  And

22   that's a continuation of the same update.  But where it says

23   why did we start (audio interference) advertisers.  So I take

24   it by June 26th, you had started reaching out to advertisers at

25   KOIN; is that correct?



1    A    Yes, we had.

2    Q    And specifically, what do you recall doing in that regard?

3    A    I can visualize the location.  I'm sorry to say that I

4    don't recall what they sold, but there was an advertiser that

5    had a lot of ads.  They may have been an appliance or a

6    furniture company.

7    Q    Was it Standard Appliance?

8    A    That's plausible.  Obviously, I've never been in the

9    store, so I wouldn't totally recall.  I recall their sidewalk

10   better than I recall their location.

11   Q    But what -- what activities did you, yourself, engage in

12   with regard to this particular store?

13   A    So I had written and called the advertiser and asked them

14   to stop advertising.  They had declined.  So we went out on a

15   Saturday to hold a sign asking folks not to shop there.  There

16   (audio interference) had been a flier as well, handed out to

17   anybody who was going in to shop, explaining the issues.

18   Q    And for how long were you out there that day?

19   A    I would say a couple of hours.  I have a total knee

20   replacement.  I don't do well standing on a sidewalk for four

21   or five hours.  I can usually do a couple hours.

22       MR. ROBERTS:  All right, if we move on to page 41, which

23   is July 5th, 2019, if we could scroll down a little bit.  All

24   right, yeah, right there, where it says now, members have

25   started asking advertisers to stop advertising.



www.escribers.net  |  800-257-0885

1    Q    BY MR. ROBERTS:  You've mentioned that, but I wanted to

2    ask you about the line down at the bottom of that paragraph

3    that says additional, they have taken to social media.  And

4    then it says, please take action to sign their petition to Pat

5    Nevin, telling him to bargain with the Union and stop Union

6    busting.  What is this a reference to?

7    A    We had started an online campaign with a petition where

8    people could click through, signs their comment to Mr. Nevin,

9    that they thought he should bargain in good faith or that he

10   should stop Union busting.

11   Q    And did you actually present a petition to the company?

12   A    Not in a physical way.  These were online and they were

13   emailed to Mr. Nevin by the system that we had set up.

14   Q    And that would have been around the time of this -- which

15   is this memo was dated July the 5th is that of 2019.  Is that

16   the time that this was occurring in?

17   A    That is correct.

18   Q    Okay.  I'm now going to move to a different exhibit.  This

19   one is going to be Joint Exhibit 25, which is May 31st, 2019

20   update from Mr. Nevin to all NABET Local 51 members.  I want to

21   ask you a question or two about that.  And if we can go to the

22   second page right there, that, where -- the first paragraph

23   there, where it says -- talks about your going after

24   advertisings, that was Mr. Nevin responding to that particular

25   tactic; is that correct?



1    A    Well, it starts out by saying that I've taken an odd and

2    unprofessional approach to our ongoing negotiations.  I guess

3    he's entitled to his opinion.

4    Q    Well, you referenced the fact that it appears to be a

5    similar tactic -- or he references the fact that it appears to

6    be a similar tactic that you used back in 2015.  And I believe

7    you said -- well, you said you've done that before.  I don't

8    know if you said you did it in 2015.  Was that something that

9    was done when you were bargaining with KOIN in 2015?

10    A    It was done in the negotiations that ended up with the

11    contract in 2015.  I believe it may have gone on '14 and '15.

12    Q    All right, let's move to another topic right now.  I want

13    to ask you about some of the requests for information that the

14    company made of the of the Union.  And if we would go to Joint

15    Exhibit 27, it's a-- it's a request for information dated June

16    26, 2019.

17        I think you were asked a little bit about it on direct,

18    but I want to ask you a little bit more.  This is the

19    information request.  You recall receiving this particular

20    information request, correct?

21    A    Yes.

22    Q    Okay.  And this was in reference to the negotiations that

23    were occurring about the Union security files.  Is that right?

24    A    No, I believe it's more broad than that.

25    Q    But this was at a time period when you were, in fact,



1   discussing the Union security clause at the bargaining table,

2   correct?

3   A   We certainly discussed the Union's security provisions

4   from the beginning of the contract to the last time I met with

5   the parties, yes.

6   Q   All right, and you -- on Joint Exhibit 28, if we could

7   turn to that, this is your response to that information

8   request?  Is that correct?

9   A   I believe so, yes.

10   Q   All right.  And you had, I believe, testified that on

11   Joint Exhibit 27, you had raised the question about he had

12   asked that you respond no later than the close of business,

13   June 27th.  So you actually responded the very same day,

14   correct?

15   A   I did.

16   Q   With regard to information request, when someone -- do you

17   yourself, when you make information requests, typically put a

18   response date in there?

19   A   Usually a week or ten days.

20   Q   With respect to when you're -- when you were provided

21   days, there's nothing -- you could have asked for an extension

22   of time if you needed additional time to respond to this,

23   correct?

24   A   I'm sure I could have.

25   Q   But you obviously were able to respond without even



1    waiting until the next day, right?

2    A    No, what I did was stopped what I was doing and worked on

3    this.

4    Q    She took the position -- it's fair to say that you

5    basically said you were not going to provide the information,

6    correct?

7        MS. YEN:  Objection.  The document speaks for itself.

8        JUDGE TRACY:  Overruled.  Go ahead, Ms. Biggs-Adams.

9        THE WITNESS:  I felt that there was some of the

10    information the company was asking for that was not relevant to

11    the bargaining.  It was internal Union matters that were not

12    something I was going to bargain over.

13    Q    BY MR. ROBERTS:  We'll talk about that in a little bit.

14    But I want to get through the rest of these information

15    requests.  Then just so it's clear, if we could turn to Joint

16    Exhibit 29 and go up to the top, to the letter.  Down a little

17    bit.

18        Now, in this Joint Exhibit 29 is a response from Mr.

19    Nevin.  To what you -- to Joint Exhibit 28, which was the

20    previous day.  I just want to ask you about some of the stuff

21    that's in there.  In particular, the second paragraph.  He

22    asserts the belief that the current form violates certain

23    elements of the General Counsel memo -- of a General Counsel

24    memo.  Was this something that was discussed at the table?  Did

25    I tell you that that, that that was their belief?



 1   A    I don't recall them bringing up the General Counsel memo

 2   in advance of me seeing it in writing.  But we were in

 3   bargaining, so it's hard to break those apart.

 4   Q    So either before or after, did they make that statement at

 5   the bargaining table also?

 6   A    I believe they do, but I don't have a specific memory of

 7   it.

 8   Q    Okay.  All right, if we could go to Joint Exhibit 33,

 9   which is an August the 15th, 2019 request for information

10   related to certain benefits offered by NABET.  Do you recall

11   receiving that request?

12   A    Yes, I do.

13   Q    And again, he asked that you respond by the close of

14   business today, which is what you did in Joint Exhibit 34.  If

15   we could move to 34.  So this was your response, refusing to

16   provide that information?

17   A    It's my response.

18   Q    Well, did you refuse to provide the information?

19   A    I did not feel that what he was asking for was germane to

20   the negotiations.

21   Q    These are -- these two requests that we've gone over, the

22   request for the information about dues (audio interference) --

23   A    I'm sorry, you're breaking up.

24   Q    The two requests that we've been discussing, the one --

25   previous one where they requested information about dues



1    deduction and checkoff authorizations, and this one, those are

2    part of the ones that you just recently settled with the

3    National Labor Relations Board; is that correct?

4    A    They became part of a case or two at the NLRB, yes.

5    Q    And you entered into a settlement agreement with those

6    charges.  Is that true?

7    A    I believe we had, yes.

8         JUDGE TRACY:  Mr. Roberts, which General Counsel exhibits

9    are they?  Which requests for information, again, please?

10        MR. ROBERTS:  Okay.  Well, they were Joint Exhibits.

11        JUDGE TRACY:  Oh, Joint Exhibits.  I'm sorry.

12        MR. ROBERTS:  They were Joint Exhibits.  The initial

13   request was Joint Exhibit 27.  There's some follow up documents

14   and then the next one is the Joint Exhibit 33, those three.

15        JUDGE TRACY:  Okay.  Thank you.

16        MS. YEN:  Your Honor, just for the record, I'm going to

17   object and move to strike some of the response there.  The

18   settlement that will be in the record will speak for itself.

19   To the extent that there's an implication here that the

20   nonresponse or the details of the response to the request for

21   dues information was a merit binding from -- by the Region or

22   the General Counsel that was resolved, that particular

23   allegation is not part of the settlement.

24        JUDGE TRACY:  Well, I'm assuming the settlement will speak

25   for itself and be clear to me of what was settled.  So I just



www.escribers.net | 800-257-0885

1    want to know from what which exactly numbers he was talking

2    about, because he was providing dates and I just wanted to

3    match that up.  So I understand.  That's what I'm looking

4    forward to seeing, are these documents.  So thank you.

5         Mr. Roberts, go ahead, please.

6         MR. ROBERTS:  All right.  Thank you.

7    Q    BY MR. ROBERTS:  And just so we're clear on the responses,

8    General Counsel -- I mean, excuse me, Joint Exhibit 34 is your

9    response to Joint Exhibit 33.  33 was the information request

10   and is Joint Exhibit 34 your response?

11   A    Yes, it is.

12   Q    Okay.  And then Joint Exhibit 36, if we could turn to

13   that.  Yeah, if you could stop there.  This is a letter you

14   received from Mr. Nevin's dated August the 16, 2019; is that

15   correct?

16   A    It a memo, yes.

17   Q    And I just want to -- because I don't believe there's been

18   any testimony about it, but in the first full -- well, the

19   second full paragraph that references as to your first refusal

20   to furnish information, he -- he said that there was NLRB

21   Regional Director found merit, but dismissed the charge based

22   on your assurance that failure to supply the information was

23   inadvertent.  What I'm -- my question is this, do you know what

24   that request for information was for?

25   A    I'm sorry, I don't recall.  There have been a series of



1    these.

2    Q    Well, let me ask you this, was there a request for

3    information in which you were asked about communications having

4    to do with -- well, let me back up.  You had filed a charge at

5    one time, alleging that the company made a unilateral change

6    because it requested that employees acknowledge receipt of

7    certain corporate policies and one in particular, with respect

8    to conducting MVR or motor vehicle report cert -- or making

9    motor vehicle report inquiries.  Do you recall that?

10   A    Yes.

11   Q    Okay.  And did the -- after you filed that charge, did the

12   company make a request for information related to that?

13   A    I'm sorry.  I really do not recall.

14   Q    Okay.

15   A    There was certainly a case about the unilateral imposition

16   of motor vehicles' background checks.

17   Q    All right.  Let's move to substantive bargaining issues.

18        MR. ROBERTS:  If I could direct your -- or have them pull

19   up Joint Exhibit 12.

20   Q    BY MR. ROBERTS:  I want to ask you about this.  This is

21   your -- the Union's comprehensive response to outstanding

22   issues, August the 15th, 2019.  Do you recognize this document?

23   A    Yes, I do.

24   Q    And are those, in fact, the issues that were still

25   outstanding as of August the 15th, 2019?



1    A    I believe they are.  It was an effort to -- on my part, to

2    pull together a response to all outstanding bargaining issues.

3    Q    So I believe you testified that when the company presented

4    its initial proposal back in June of 2017, I wrote down that

5    you characterized it as a stunning proposal because it

6    contained like 40 something items.  Do you recall that?

7    A    Yes, sir.

8    Q    So even though there were many items, all of those other

9    items, save these specific ones, had been resolved by August of

10    2019; is that correct?

11    A    They had certainly been resolved, a few of them withdrawn

12    on.  But probably, they had been resolved much earlier in the

13    year.  I don't think that there were any tentative agreements

14    reached during 2019.

15    Q    Yeah, in fact, even though this is saying as of August the

16    15th, this was the same issues that were outstanding in January

17    of 2019; is that correct?

18    A    I believe so, because I don't think anything got resolved

19    during 2019.

20    Q    All right.  With respect to these specific issues, I just

21    want to understand, I think you've testified, but the company

22    used a numbering system where it's proposed -- it's noneconomic

23    proposals were like C-1, C-2, and so on; is that right?

24    A    That's correct.

25    Q    And if economic -- or what it viewed as economic proposals



1    were CE-1, CE-2, and so on.

2    A    Yes, sir.

3    Q    Okay.  So, but C-5 and C-6, Union security and Union

4    business, although those were two separate proposals, isn't it

5    true that they were always discussed together?  They were so

6    interrelated that you couldn't really solve one without

7    discussing the other one?

8    A    They were discussed together quite often.  I don't know

9    that they were -- you had to settle one without -- to get to

10   the other.  They were independend, they're independent articles

11   of the contract.

12   Q    Okay.  But with respect to C-17 and C-18 daily overtime,

13   6th and 7th day overtime, were those typically discussed

14   together?

15   A    Sometimes, but not always.

16   Q    Okay.  With respect to CE-1, which is holidays and

17   vacations, that was the company's proposal, to utilize whatever

18   the company policy was with regard to vacations and holidays?

19   Is that what that proposals were?

20   A    That's correct.

21   Q    And then benefits CE-2, that was regarding primarily

22   health insurance and 401(k)s; is that correct?

23   A    I believe so.

24   Q    And then, of course, we know what wages are.  The term of

25   agreement C-43 you would agree that typically that's the last



1    thing?  You don't -- you can't resolve the term of the

2    agreement until you know the economics?

3    A    They often go together and sometimes you give or take away

4    another year off a contract based on what the finances are.

5    Q    Now, with respect to Union security and checkoff, I know

6    that you've testified that there was much discussion about the

7    amount of your initiation fees.  And -- and the company did

8    take the position that, in their view, they were excessively

9    high, correct?

10   A    They did, not at the beginning of the negotiations, but

11   somewhere in 2018, I think they started that.

12   Q    Okay.  And they -- in the discussions about that, the

13   company indicated that it was their experience in other

14   contracts, that your initiation fees, which were roughly --

15   well, were three weeks of pay, were far more than what they

16   were used to seeing in other locations; is that correct?

17   A    They were comparing our (audio interference) something

18   very different, much smaller stations, much smaller Union

19   operations than ours.

20   Q    Okay.  So -- but let me ask you this, although there was

21   initial discussion that the company thought your initiation

22   fees were too high, at least by April 23rd of 2019, they had

23   simply taken the position that you could charge whatever you

24   wanted to.  They just weren't going to collect the initiation

25   fees; isn't that correct?



1    A    That was one of their positions during bargaining.

2    Q    Well, let's look at we can look at -- if we could look at

3    Joint Exhibit 6-H.  And go down -- go to the second page.  Down

4    further.  All right, right there.  You can see that where -- in

5    the middle there where it says, in addition, I further

6    authorize KOIN to deduct -- deduct, so on about initiation

7    fees, they've stricken that particular provision in this

8    proposal; is that correct?

9    A    That's correct.

10   Q    And at that point, the company's consistent position

11   throughout negotiations was you could charge whatever you

12   wanted to, but they weren't going to collect; is that correct?

13   A    You mean from that time forward?

14   Q    Yes.

15   A    No, I don't think that was their position because they

16   continued to write memos to the members and to tell people that

17   they were negotiating the rate of the initiation fee.

18   Q    But from a written proposal standpoint.  That remained --

19   that particular language continued to be -- appear or be

20   stricken in all of the company's succeeding proposals, correct?

21   A    That may be true.

22   Q    Do you recall the company saying that -- Mr. Pautsch

23   saying, on or about June 27th, that you could jack it up to

24   $10,000 and we will not collect it?

25   A    He may have said that.  I --



1    Q    Okay.  Do you recall him -- either he or --  well, him

2    saying that it is your business, but when you bring us into it,

3    it becomes our business?

4    A    I believe so, but it was more about what to do if somebody

5    had not paid their initiation fee than it was the dollar amount

6    of it that the company was being bought in -- brought into.

7    Q    I'm sorry, I missed -- I faded away on that.  Can you

8    repeat that, please?

9    A    So he was referring more to the fact that the company did

10   not want to be required, if somebody had not paid their

11   initiation fee, to enforce the Union security provisions.

12   Q    Okay, he --

13   A    So there were discussions throughout the negotiations of

14   the difficulty the company had in calculating deductions.  That

15   was one set of objections.  And then the other objection was

16   whether or not Union security could be enforced.

17   Q    Okay.  So there were several aspects to this, then.  Let's

18   take them one at a time.  You just said -- I mean, one was

19   whether they would collect them at all.  That was an issue,

20   correct?

21   A    Whether they would collect dues and or initiation fees.

22   Q    Right.  And a second issue was if they collected them,

23   whether they were going to charge you a certain dollar amount

24   to do so; is that -- is that correct?

25   A    There were assorted models of ways to charge the Union for



1    the payroll deduction processing, yes.

2    Q    And the third issue had to do with even whether they

3    collected them or not, whether they would apply Union security

4    if someone failed to pay those particular things; is that --

5    was that a third issue?

6    A    That was a third issue.

7    Q    And I assume, from looking at this proposal, there's a

8    fourth issue that had to do with what the -- what information

9    would be contained in the authorization, the checkoff

10   authorization form itself?

11   A    There was the ongoing issue about the Social Security

12   numbers.

13   Q    Well, that and also what kind of Beck language would be in

14   there; is that accurate?

15   A    What the -- what the period of time would be for the

16   duration of the checkoff agreement?

17   A    And -- and -- so with respect to all of these issues,

18   isn't it true that you took the position that that this was

19   none of the company's business and you weren't going to bargain

20   over this?

21       MS. YEN:  Vague and ambiguous, as to this.

22       JUDGE TRACY:  Okay, just clarify the question, please, Mr.

23   Roberts.

24   Q    BY MR. ROBERTS:  With respect to the four issues that

25   we've mentioned, isn't it true that the Union's position



1    throughout -- or your position throughout the negotiations was

2    that you viewed this as strictly internal Union business?  You

3    took that position, correct?

4        MS. YEN:  Compound.

5        MR. ROBERTS:  No, it --

6        MS. YEN:  Four different issues.

7        JUDGE TRACY:  Okay.  So I'm going to overrule the

8    objection.  Go ahead, Mr. Roberts.

9        Go ahead, Ms. Biggs-Adams.  Can you answer that, please?

10       THE WITNESS:  So for this Social Security number question,

11   which is then the question that started from the beginning of

12   the negotiations, I bargained over that back and forth, trying

13   to find a solution that would both satisfy the company's

14   concerns and satisfy the Union structure's concerns of an

15   identifiable number.  So I definitely bargained over that, back

16   and forth.  I definitely pointed out that it was a password

17   protected, secure form of transmission that we were using

18   between the parties.  They've been no problem with it.  And I

19   thought that it did not need to be changed.  So that -- and

20   that that is a -- not one single discussion, that's a

21   discussion from the beginning through the entire bargaining.

22   Q    Okay.  And that that issue, the parties ultimately agreed

23   on that, correct?  They agreed that you would use some

24   alternative employee number, instead of the Social Security

25   number?



1   A    I found the solution on the Union side in a technological

2   answer so that they could give me a different unique

3   identifier.

4   Q    Okay.  So certainly by the end of -- by the end -- I don't

5   know what date, but by the end of 2019, that issue was no

6   longer in --

7   A    The Social Security number was no longer in question.

8   Q    So let's talk about the other issues with respect to

9   whether the company would or would not deduct the initiation

10  fees,  Your consistent position was that that was none of the

11  company's business.  And you were not going to bargain over

12  that?

13  A    No, sir.

14  Q    You didn't --  you never took the position that that

15  was -- that that was internal Union business you would not

16  discuss?

17  A    The amount of the initiation fee was internal Union

18  business.

19  Q    But by April the 20 -- whatever the date of this proposal

20  was, April 20 -- sometime in April of 2019, the company was no

21  longer -- their proposal was strictly that they wouldn't

22  collect them at all.  It had nothing to do with the amount of

23  the initiation fees, correct?

24  A    This proposal says that they would not deduct the

25  initiation fee, but they were still very actively campaigning



1    about the amount of the initiation fee and telling members that

2    they were working to reduce their initiation fee.  So I would

3    say that we were still actively arguing about the issue of the

4    amount of the initiation fee.

5    Q    But that was -- those were communications that were not at

6    the bargaining table, correct?

7    A    They sort of work for the totality of my members

8    experience.  They assume that the company is in arguing over

9    the amount of the initiation fee if they get personal contact

10    and written messages about the initiation fee charged by the

11    Local.

12    Q    Did the company ever make a written proposal that -- that

13    limited the amount of the Union's initiation fees?

14    A    I don't recall.  I'm sorry.

15    Q    With respect to the language -- you've talked about, the

16    Social Security issue.  I understand that was a problem.  But

17    with respect to the revocability of it, when it would be

18    revokable, how long it would be for, and what Beck language

19    would be in there, what was the -- what was your position with

20    regard to that proposal?

21    A    Across the board, we use a consistent form that is part of

22    the Local's executive -- excuse me, is part of the Local's

23    bylaws.  It is consistently used with all of our employers.

24    And I did not want to change that because it would mean I would

25    have to change the Local bylaws if I was going to change the



1    methodology or the structure of the checkoff form.

2    Q    But in this particular case, in the prior contract -- the

3    contract that had expired or terminated, the form -- the

4    authorization form was, in fact, part of -- it was included

5    within the contract, correct?

6    A    It was included in the contract as an exhibit, if I recall

7    how it's listed.  And it's -- the one that's in the contract is

8    the same one that you would find in our Local bylaws.

9    Q    But you were -- you, as the Union, were asking that that

10   form be continued to be included in the contract as an exhibit?

11   A    Correct, in the same way.

12   Q    With respect to the amount that was being charged or

13   proposed to be charged, it started out -- the company initially

14   was proposing $10 per employee; is that correct?

15   A    For the charge for the dues deduction?

16   Q    Yes.

17   A    Yes, $10 per employee per month.

18   Q    And there were roughly, I believe, what, 43, give or take,

19   employees?

20   A    The membership's about that at any given time, yes.

21   Q    So under that proposal, it would have been $430 a month,

22   roughly; is that correct?

23   A    Roughly.

24   Q    And then subsequently, though, they changed it to a flat

25   fee of $50, rather than a per-employee charge?



1    A    They -- they  did change from a per -- per individual

2    charge to a flat dollar amount.

3    Q    And that was on a monthly basis, $50 per month?

4    A    I believe so, yes.

5    Q    Your objection to that -- it's -- it's true, isn't it,

6    that your objection to that was that you'd never done anything

7    like that and you going to start it now?  Is that -- is that

8    your position?

9    A    I had a number of objections, one of which was that we had

10   not paid for that elsewhere.  We had not paid for that with

11   Nexstar or at KOIN.  My other objection was that I wanted to

12   know what the expense was that that was supposedly covering.

13   Q    Okay, and didn't, in your bargaining sessions, didn't

14   Casey Wenger, who is the one who reportedly had to make these

15   calculations, didn't he explain at some length why it took so

16   long, how it took five to six hours per pay period to calculate

17   this?

18   A    The five to six hour amount was raised repeatedly by the

19   company spokespeople and Mr. Wenger did try to explain how it

20   could take that long.

21   Q    And his position was that you had -- well, your dues are

22   calculated on a certain percentage basis.  In other words,

23   they're not a flat dollar amount; isn't that correct?

24   A    Correct.  They're calculated on gross earnings.

25   Q    And -- but in calc -- these employees that you represent



1    also because they're, like, photographers and news people,

2    they're traveling -- they're using -- they incur personal

3    expenses that have to be reimbursed by the company; is that

4    correct?

5    A    To some extent, they get a meal period, or they might be

6    paid for a sandwich if they were at a long assignment away from

7    the office.

8    Q    And did Mr. Wenger explain -- or the company explain --

9    that in order to make this calculation, they had to back out

10    any kind of personal reimbursements for tax reasons that they

11    could not charge the dues on that -- on the reimbursement

12    amount?

13    A    It was not so much the reimbursement of a sandwich or a

14    meal.  His difficulty seemed to be with the amount that was

15    attributed for the com -- personal use of company vehicles.

16    That's that was the thing that he explained was very

17    complicated for him.

18    Q    If you could look at Joint Exhibit 14, which are Ms. --

19    Ms. Hansen's bargaining notes, page 11.  And the reason I'm

20    looking at those, hers are more detailed than yours.  I believe

21    you testified to that.  But we're looking at page 11 of Joint

22    Exhibit -- I mean, Joint Exhibit 14.

23        And move on down a little bit further.  Up.  All right.  I

24    don't -- down a little bit, I'm sorry.  All right.  Move just a

25    little bit -- all right, there it is, where it says Casey.  And



1    if you would just -- I don't -- you don't need to read it out

2    loud.  I just want you to read it.  And what my question is

3    going to be is, is that an accurate reflection of what was said

4    at the bargaining table by Mr. Wenger?  So if you would take a

5    minute just to read it for yourself and let me know when you've

6    read it.

7    A    Okay, I don't know what the date is of this.  But, yes, I

8    understand the discussion.

9    Q    It's June 20 -- I'll represent to you that it's June 27th

10   of 2019.  Does that sound --

11   A    That sounds plausible, certainly.

12   Q    But the substance of what's in there, you don't -- you

13   don't dispute that that was the gist of the discussion?

14   A    At that time?  No.  I believe that would be the gist of

15   the conversation.

16   Q    Let's -- let's move to healthcare, which is the insurance

17   benefit proposal.  And if you can look at Joint Exhibit 8, 8(a)

18   and 8(b).  Let's start with 8(a).

19       MR. ROBERTS:  If you could scroll down just a little bit,

20   a little bit, right there.  Back up.  Back up.  There.  This is

21   dated January 24th.  This was part of package 8.

22   Q    BY MR. ROBERTS:  This was the company's written proposal

23   regarding health insurance; is that correct?

24   A    It looks like that document, yes, sir.

25   Q    And you were already -- well, even before Nexstar acquired



1    KOIN, you had Media General's health insurance policy; is that

2    correct?

3    A    That's correct.  The Media General health insurance had

4    been negotiated into the contract.

5    Q    Okay.  And my point really is only this, is that there

6    was -- there's never been, like, a separate Union plan of some

7    type.  It's always been a company plan ever since you guys have

8    represented the employees?

9    A    That's correct.  We've bargained over how much people

10   would pay for it or what their coverage might be.

11   Q    Right.  In your pre -- in the contract that was now

12   terminated, you had the company plan, but you had a limit on

13   what the employee contributions to the coverage were; is that

14   correct?

15   A    That's correct.  During the 2013 through 2015

16   negotiations, we spent an extensive amount of time looking at a

17   separate plan or if we could find another external plan that we

18   could apply to these folks.  And in the end, what we did is

19   agreed that we would take the company healthcare coverage with

20   fixed contributions.  They were set for the first year of the

21   contract.  And then at the beginning of the last year of the

22   contract on January 1 of 2017, those contributions were allowed

23   to go up.

24   Q    Okay.  And in respect to the company's proposal here, it's

25   their propose -- the only difference was their proposal is to



 1     continue to provide the company's insurance plan, but instead

 2     of locking in your premiums, they're saying in their proposal

 3     that whatever changes are made to the nonbargaining Union

 4     employees, those changes would be equally applicable to the

 5     bargaining Union.  That was their proposal, correct?

 6     A    That is their proposal, I believe Mr. Pautsch called it

 7     the trust me proposal.

 8     Q    Did he also refer to it as a me too proposal?

 9     A    I don't think so.  It was it was more me too, as to any

10     changes.

11     Q    All right.  Now, if we could go to 8(b) -- Joint Exhibit

12     8(b), which is just a little further down, I believe.  Yeah,

13     just right there.  This is -- so that -- KOIN's proposal was

14     January 24th of 2019.  This is your init -- the Union's initial

15     proposal with regard to health insurance; is that correct?

16     A    It's certainly our response to the company, CE-2

17     company -- company economic package 2.  I don't know that we

18     didn't have any positions on healthcare before that, but this

19     was our response just to their economic package 2.

20     Q    And there's four -- you make four points in here.

21     Paragraph 1, in essence, says that you would -- you're

22     proposing to use the Nexstar plan, provided that the premiums

23     do not increase during the term of the successor agreement.  Is

24     that -- paragraph 1?

25     A    Correct.



1    Q    And --

2         JUDGE TRACY:  But hold on one second.  One second, here.

3    Ms. Biggs-Adams, make sure that you wait for him to finish

4    asking the question before you respond.  So if you could

5    just -- I just want the record to be clear on what your

6    response was to his question.  I think you said no, but let's

7    just be clear that the record reflects that.

8    A    So the first paragraph of this document is our response

9    that we would take the company coverage, as they had proposed,

10   but that we would lock the premium amounts to what was in the

11   current 18.2 of the -- of the contract.  It would lock the

12   dollar amount.

13   Q    BY MR. ROBERTS:  All right, thank you.  Now, with respect

14   to paragraph 2, I don't think we've had much evidence in the

15   record about that.  Can you explain what paragraph 2 is a

16   reference to?

17   A    So in late 2017, the -- the U.S. Congress and the

18   president signed a windfall tax package that reduced corporate

19   interests -- excuse me, corporate tax rates.  And across the

20   board, the Union demanded that we get a part of those windfall

21   amounts that the Employers were going to get.  So there had

22   been an action by Nexstar in the early spring of 2018.  I would

23   guess February, March, by announcing to all employees that they

24   were giving them a $500 bonus payment and they were increasing

25   the amount of the Employer contribution to the 401(k).



1        But the memo stated that if you were under contract and in

2    negotiations, you would not get this benefit.  Your Union would

3    have to negotiate for this.  If you were under a Union contract

4    and your contract was in place, not open, the nonunion people

5    got those two benefits.  Excuse me, the Union people got those

6    benefits, irrespective of location in Nexstar.  So this was me

7    reiterating that we wanted to be sure that we got that money

8    that we felt was on the table and had been promised would be

9    part of settling a contract.

10   Q    All right.  And then the third bullet point was an issue

11   of -- you were saying that while you would take the company

12   plan, you were proposing that the company would make sure that

13   their coverage included gender dysphoria treatment and abortion

14   coverage.  That was your point, correct?

15   A    That is correct.  So we were willing to accept the company

16   plan, but we wanted to be certain that there was coverage

17   available to our members and their dependents for both gender

18   dysphoria and a whole range of women's healthcare, including

19   abortion coverage.

20   Q    For those of us who are not fully versed in gender

21   dysphoria, can you just explain what that's the reference to?

22   A    So it's particularly important with -- I'll call them

23   youth.  They're not -- they're not children, I'm not talking

24   two and three year olds.  I'm talking young people who have a

25   gender identity that is different than the gender that was



1    necessarily assigned at birth.  And because of this mismatch

2    between their identity in their heads, in their cells, they

3    have a very serious medical situation.

4         And based on the medical treatment, as I understand it,

5    it's very important that treatment be given as early as

6    possible.

7         In this case, it may involve hormone blockers, so that a

8    person who may present a female does not develop breasts.  So

9    this is specific medical care, not just talk therapy, but also

10   a series of prescriptions -- prescription medicines and other

11   treatments that need to be offered to these folks at the time

12   when their mismatch becomes a problem.  So it's not something

13   they can wait years to resolve.  If they do -- if they have to,

14   it's a far more complicated situation.

15   Q    All right.  Thank you.  And bullet point 4, I think self-

16   explanatory.  You were proposing that even though you would

17   take the company plan, you would be -- there would be no

18   cutbacks or negative changes in the benefits being provided; is

19   that correct?

20   A    That's correct.

21   Q    Now.  At the -- this proposal -- your proposal came on

22   April 23rd, but the company's proposal had been made on January

23   24th.  And when the -- excuse me, Joint Exhibit 8(a), so when

24   that proposal was made, isn't it true that there was extensive

25   discussion of the insurance issue on January 25th of 2019?



1    A    There had been discussion in January, yes.

2    Q    And at that time, the company informed you that the

3    premiums -- because one of your questions was, well, how much

4    is it going to cost the employees; is that -- is that accurate?

5    A    That's correct.

6    Q    And they told you that under their -- under their plan,

7    they charged up to 10.4 percent of gross earnings; is that

8    correct?

9    A    That's correct.  They charged a floating dollar amount

10    based on a percentage.

11    Q    So hypothetically, if someone made $1,000 a week, they

12    would be paying $104 towards the -- the company's insurance?

13    A    That week, yes, sir.

14    Q    Okay.  All right.  And now you, at the time of -- in

15    January, you had already obtained a copy of the 2017 SPD for

16    the Nexstar health plan; is that -- is that correct?

17    A    I believe I had one.  I don't know whether I got it

18    from --- from KOIN.

19    Q    But either --

20    JUDGE TRACY:  I'm sorry, for the record, what is SPD? s

21    MR. ROBERTS:  Summary plan description.

22    JUDGE TRACY:  Okay.  Thank you.

23    Q    BY MR. ROBERTS:  So the summary plan -- the summary plan

24    description is a document that reflects the -- the gist of the

25    plan.  It doesn't have all the details, but it provides a



1    comprehensive overview of the plan; is that -- is that

2    accurate, Ms. Biggs-Adams?

3    A    That's correct.

4    Q    So it's not the plan itself, but it's a comprehen -- a

5    comprehensible description of the plan that's more easily

6    understood by employees and by lawyers; is that accurate?

7    A    I don't know that they're always comprehensible, but they

8    are a more detailed document that provides more coverage levels

9    than, say, a simple two- or three-page document that employees

10   might get during open enrollment that says something simple,

11   like, we'll pay 20 percent of your doctor visit.  But then

12   there are lots of details that go into that.  And so the SPD

13   usually is the place where you look for greater detail.

14   Q    And in all your experience, that's a document you

15   regularly -- when you're bargaining over health insurance with

16   whoever it may be, that's a document that you typically would

17   request to see; is that right?

18   A    I typically request and typically receive.

19   Q    And in this case, whether it came from the company or

20   whether you obtained it through some other means, you did, in

21   fact, have a copy of at least the 2017 summary plan

22   description?

23   A    I did have an older version, yes.

24   Q    And as of January 2019, you knew that at least under the

25   older version, abortion and gender dysphoria was not covered;



1    is that correct?

2    A    That is correct.

3    Q    And -- but you were obviously, even -- you hadn't actually

4    made up this proposal of April 23rd, 2019.  But even at that

5    point in January, that was a topic that came up in January that

6    you were interested -- it was a topic you were interested in

7    from the very beginning; is that correct?

8    A    The abortion coverage definitely from the beginning.  And

9    when we had a member at the KOIN unit who had the situation

10   with gender dysphoria not being covered, that became far more

11   important to us because he had had to go and get a charity

12   grant to cover the care -- the care.

13       If I could just complete my thought, it was because we had

14   asked many, many times if the company would go ahead and cover

15   gender dysphoria irrespective of what might be in the SPD.  I

16   know that employers can choose to cover something beyond the

17   written text of that document.

18   Q    But in that individual's case, the company had not covered

19   that procedure; is that accurate?

20   A    He had gotten an -- an initial rejection and could not

21   wait to fight it out.  So I had asked Mr. Pautsch, rather

22   consistently throughout the negotiations, what was their

23   position on gender dysphoria?

24   Q    Okay.  And Mr. Pautsch told you he would look into it.  At

25   least, initially he told you that?



1    A    He told me at different times that he would look into it

2    or that Ms. Teri Bush (phonetic), who had responsibility for

3    human resources and this subject at the corporate level, was

4    looking into it.

5    Q    And at least by October 9th, when you all met on October

6    9th -- if you need to look at a document to confirm this, we'll

7    look at it.  But do you recall that Mr. Pautsch confirmed

8    around about October 9th that they did not cover it and would

9    not cover it?

10    A    I believe that October 9th of 2019 was when I got the

11    definitive answer.  That's when I was emailed the electronic

12    SPD and told to do the keyword search of it.  And then at that

13    time, I was told that it would not be covered and they would

14    not override the document.

15    Q    All right, now, with respect to Joint Exhibits 8(a) and

16    8(b), 8(a) was the company's initial proposal, 8(b) was at

17    least a written proposal.  You said you weren't sure whether

18    you made some kind of proposal prior to that.  But it is true,

19    correct, that thereafter, neither -- neither party --  neither

20    the company, nor the Union ever made a different written

21    proposal regarding health insurance; is that -- is that

22    accurate?

23    A    That seems plausible.

24    Q    But even though there were no further written proposals,

25    there -- it is true there was extensive discussion of health



1    insurance at the bargaining table.  Would you agree with that?

2    A    Certainly.  We were trying to ascertain the price of the

3    coverage and how much it was going to cost our members to get

4    the care from Nexstar.

5    Q    And --

6         JUDGE TRACY:  Mr. Roberts, let me just ask you, and once

7    you find a good breaking point, then we can take a break for

8    about ten minutes.  I'm not sure how much more time you have or

9    need.

10        MR. ROBERTS:  Actually, now is fine.  And I would say

11   after we come back no more than an hour.

12        JUDGE TRACY:  Okay.

13        MR. ROBERTS:  But now's fine with me.

14        JUDGE TRACY:  Now, is good?  Okay, great.  So let's

15   take -- it's about 10:20 or so.  Let's resume at 10:30.  So

16   about ten minutes, if that works for everybody.

17        MR. ROBERTS:  All right.  Thank you.

18        MS. YEN:  Thank you.

19        JUDGE TRACY:  Okay.  Let's go off the record.

20   (Off the record at 10:21 a.m.)

21        JUDGE TRACY:  Okay, go ahead.

22        Go ahead, then, please.

23                    **RESUMED CROSS-EXAMINATION**

24   Q    BY MR. ROBERTS:  All right.  Ms. Biggs-Adams, I believe,

25   where we left off was, we were talking about the health



1    insurance and we -- think we had covered some of the issues

2    about it.  But I want to ask you about some of the discussions.

3        Is she here?  I'm not seeing her on my -- --

4        JUDGE TRACY:  Ms. Biggs-Adams?  She's here.

5        THE WITNESS:  Yes, I'm here.

6    Q    BY MR. ROBERTS:  Okay, I don't know why she's not

7    appearing on my screen for some reason.  Hold on.  Okay.  There

8    we go.  I'm sorry.  When we left off, I think we were talking

9    about the health insurance.  But I want to -- you said that in

10   October, Mr. Pautsch confirmed that the Nexstar plan did not

11   provide the coverage that you were seeking with regard to

12   abortion and gender dysphoria; is that correct?

13   A    Correct.

14   Q    And the company took the position at that meeting, and

15   maybe at other times, too, but that while it was it was

16   impossible for the company to change its plan because it was a

17   national plan, he was willing to look at other alternatives.

18   Is that accurate?

19   A    From time to time, yes.

20   Q    And there was discussion -- you recall discussion in

21   October, at the October 2019 meetings that one possibility was

22   a stipend of some type, a stipend that would allow employees to

23   get a different kind of plan?

24   A    More specifically, the company was referencing the

25   solution they use in Buffalo, New York between NABET and the



1    now Nexstar station, where they, for many, many years, going

2    back under LIN Media, had taken a dollar amount and then bought

3    a healthcare product that worked best in Western New York.

4    Q    Okay, so there was discussion of what -- Mr. Pautsch

5    discussed what he had done in Buffalo, or what the company had

6    done in Buffalo?

7    A    Yeah, he was -- he was currently in negotiations with the

8    NABET bargaining unit, in Buffalo.  And he mentioned that the

9    folks in Buffalo were very happy with the model that they had.

10   I have bargained in that area and I know that part of the

11   situation is that very often national plans don't offer very

12   good coverage in Western New York.  But there are smaller

13   regional choices that you can get that give you much more

14   access to medical care treatment hospitals in the Western New

15   York area.

16   Q    So there was discussion of that at the table and Mr.

17   Pautsch offered to explore some option like that, with respect

18   to the KOIN location; is that correct?

19   A    He had discussed that he might be willing to do that.  I

20   also knew that they had problems in Western New York, where

21   they -- sometimes the employees have to make up any additional

22   dollar amount that -- if the premiums go up.

23   Q    Now, one of the other plants he mentioned -- we asked you

24   earlier, you had gotten a request for information regarding the

25   coverage of the Union's plan that it offers to certain members,



1    which you declined to provide.  But isn't it true that he -- he

2    indicated that they would consider some kind of hybrid plan,

3    where members might be covered by the Union plan and nonmembers

4    covered by some other plan?

5    A    He did suggest that was a possibility, because what he

6    wanted me to explore was the Union privilege programs or Union

7    plus programs.  And those are only available to people who are

8    members of an AFL-CIO Union.  So I didn't think that was a good

9    idea because I would be requiring people to become Union

10   members in order to get healthcare.  And I was pretty certain

11   that that was not going to be legal.

12   Q    But he suggested that one option might be to allow Union

13   members to participate in that plan and nonmembers to

14   participate in the Nexstar plan.  Is that true?

15   A    He did suggest that.  It was not anything that I could do

16   any further with, because I didn't know how much the company

17   was willing to put towards healthcare per person.

18   Q    And there was also discussion at some point, and I'm not

19   quite sure how it came up, perhaps you can tell us, is the

20   entertainment industry Flex Plan -- I know you testified some

21   about that, but can you -- how did that -- or how did that plan

22   come up during the bargaining?

23   A    I had offered that a couple of times.  It is a Taft-

24   Hartley trust and it requires the Employer to be a member of

25   the trust before we can offer it to workers at that station.



1    So, for instance, for our daily hire members, who are casual

2    workers at ABC and ESPN nationwide, they don't go into the

3    company-covered plans.  They go into the Flex Plan.  And the

4    Employer provides a contribution per day worked to the Flex

5    Plan, and they get their coverage there.  But for that to be an

6    option at Nexstar, at KOIN, Nexstar would have to agree to

7    become a signatory to the Taft-Hartley trust.

8    Q    Mr. Pautsch indicated that they -- that at certain

9    locations Nexstar did participate in the Taft-Hartley trust; is

10   that correct?

11   A    He did.  This was later on in the negotiations that he

12   said that, yes.

13   Q    Okay, but -- but he said that this was something that

14   Nexstar had done on certain occasions, in certain locations?

15   A    And it was after he said that that they were willing to

16   consider the Taft-Hartley trust that I worked with the Flex

17   Plan to provide coverage levels and premium costs.

18   Q    And you don't need to look at it, but just for the record,

19   there's an email from you on November 22nd -- this is Joint

20   Exhibit 45 -- November 22nd, 2019, where you, I think, provided

21   information about that particular plan.  Do you recall that?

22   A    That's correct.  And those were -- I had coordinated with

23   the Flex Plan to make sure that those were benefit coverages

24   that they could offer in Oregon.

25   Q    Now, in -- after the October sessions, the next sessions



1    were the December 9th and 10th, 2019 sessions; is that correct?

2    A    Correct.

3    Q    And isn't it true that -- that healthcare was essentially

4    the only topic that was discussed on those two days?

5    A    I think it was the primary issue that we discussed during

6    those sessions, yes.

7    Q    So essentially those two bargaining sessions were devoted

8    almost, if not exclusively, almost exclusively to healthcare.

9    Is that -- is that a fair statement?

10    A    It was a pretty major subject that needed to be resolved

11    before we could come to an offer that my members could

12    understand economically.

13    Q    In some ways, it was more of an impediment to reaching

14    an -- or more important to reaching an agreement than wages,

15    because -- let me finish the thought here, because what you

16    would require a wage increase would depend, in part, upon what

17    impact there was on healthcare coverage.  Is that a fair

18    statement?

19    A    That's correct.  The financial impact on each member was

20    going to be how much their healthcare would cost, presumably

21    more than they'd been paying since 2017.  And how much they had

22    in wages to help cover that cost.

23    Q    I want you to -- if we could put up Joint Exhibit 48, this

24    is a December 9th, 2019 response from Pat Nevin to you

25    regarding a certain request for information about health



1    insurance.  And I just want to make sure -- you testified at

2    some length about it, but it's a little complicated.  I want to

3    make sure we understand it.

4        MR. ROBERTS:  That's Joint Exhibit 48, if could scroll

5    down.  And just move up -- go up just a little bit to the

6    employee, right there.

7    Q    BY MR. ROBERTS:  So what -- this is information that was

8    provided -- well, excuse me, that's for bargaining unit

9    members.  Let's go to the next page.  The COBRA rates for

10    (audio interference) and -- yeah, all right, there.  So I think

11    you testified that you were trying to figure out how much -- I

12    think, and you correct me if I'm wrong, but I understood you to

13    say that you were trying to figure out how much the company

14    allocated or paid for health insurance.  Is that is that

15    accurate?

16    A    That's correct.  I wanted to know how much the company was

17    allocating so I could take that dollar amount and see how much

18    it would buy of the Flex Plan.

19        So if the company allocated $100 and the Flex Plan costs

20    $200, then I would need to get an extra $100 from somewhere.

21    Either the employee was going to have to pay it or I was going

22    to have to increase the amount the company was paying.

23    Q    And I think you testified that one way of possibly

24    ascertaining that was to look at the COBRA rates, because those

25    rates reflected a two percent surcharge on top of the full cost



1  of the coverage.  Is that -- is that is that accurate?

2  A    That's how COBRA normally works.  So I thought if I had

3  that COBRA rate, I could back it out and see what the company

4  was allocating for healthcare.

5  Q    So when -- if we look at this page that we have up right

6  now, the COBRA rates, and we're just using the employee only,

7  so it -- when you get COBRA, you pay the full rate plus two

8  percent.  Is that -- is that accurate?

9  A    The Employer is allowed to charge an extra two percent,

10  yes.

11  Q    So when I look at what's up there and it says employee

12  only $745.47, that is the entire cost of the coverage plus two

13  percent.  Is that -- is that the way we would look at it?

14  A    That's what I would assume it would be.

15  Q    So I'm not a math genius, but in order to calculate the

16  total cost, if I took that figure, $745.47, and divided it by

17  1.02, that would give me the total cost of it; is that

18  accurate?

19  A    Without the two percent increase, yes, should be.

20  Q    So something less than 745 per month -- let's say -- this

21  is just purely hypothetical.  Let's say that dividing 745 by

22  1.02 was $730, you would then multiply it by 12 and that would

23  give you the total annual cost for the coverage; is that

24  correct?

25  A    It should.



 1    Q    Okay.  And then -- so that would, in fact -- and then, if

 2    you if you knew that -- that the only -- the only missing piece

 3    would be what percent the employee or how much the employee

 4    would be paying; is that -- is that correct?

 5    A    Well, if that was the price that they were allocating,

 6    then, yes, that should tell you what it cost and then it would

 7    tell me how much the employee had to make up to get to that

 8    number.

 9        MR. ROBERTS:  Can we scroll up to the page above that?  Or

10    the page before that?  Scroll down, I guess.  Going up.  All

11    right, there.

12    Q    BY MR. ROBERTS:  But you testified, because employees

13    contribute biweekly, rather than monthly, that you would have

14    to do some conversion in order to make those match up.

15    A    Correct.

16    Q    And -- but if they paid biweekly, that would mean there's

17    26 pay periods in a year; is that -- is that correct?

18    A    Correct.

19    Q    So if I multiply 26 times whatever the employee

20    contribution or the employee cost was -- in this case, you know

21    what the Employer contribution is, so if I multiply that by 26,

22    I would find out the entire Employer contribution that's being

23    made for whatever coverage I'm looking at.  Is that right?

24    A    Should be, yes.

25    Q    All right.  So when you left the December 10th meeting,



1    and you -- I believe your testimony was that you previously

2    scheduled meetings in January.  I don't recall the dates.

3    Doesn't really matter.  But so when you left, health insurance

4    was still something that was on the table but had not been

5    agreed to; is that accurate?

6    A    That's correct.

7    Q    Okay.  All right.  So let's talk about wages and, you

8    know, the Union had made a proposal -- well, let me back up.

9    In the company package 8, which was offered in January of 2019,

10   they did not include a wage proposal.  Is that --

11   A    That is correct.

12   Q    Okay.  And thereafter --

13        JUDGE TRACY:  Wait.  I'm sorry, wait -- just wait for the

14   question to be finishing up.  And also, Mr. Roberts, I think

15   because you're looking at papers, it might be making a little

16   bit of noise into the audio.  So it was -- I didn't quite hear

17   the beginning of the question.  So maybe you could just start

18   over.

19        And Ms. Biggs-Adams, again, wait for him to finish asking

20   the question.

21        MR. ROBERTS:  Certainly.  I probably did make some noise

22   there.

23   Q    BY MR. ROBERTS:  Let me go back.  In January of 2019, the

24   company made what it called a package proposal, number 8.  It

25   included economics, except for a wage proposal, which it did



1   not include; is that accurate?

2   A    That's correct.

3   Q    All right.  And then thereafter, in the meetings that

4   followed, there was discussion in the com -- about the fact

5   that there was -- or the Union brought up the fact that the

6   company had not made a wage proposal; is that true?

7   A    That is correct.

8   Q    And they asked -- the company being, they requested that

9   the Union make an initial demand of some type.  Is that true?

10  A    Can you be more specific as to time frame?

11  Q    Well, hold on.  Let's -- sure, give me one second.

12       All right, direct -- April 24th --

13       MR. ROBERTS:  let's put up Joint Exhibit 14, page 6.  If

14  we could go down a little bit further, there you go, yeah.  All

15  right, looking where it says -- kind of in toward the bottom,

16  where it says Chuck, Chuck, Chuck, Carrie, Chuck.

17  Q    BY MR. ROBERTS:  You see that part?

18       In there is Chuck, refer -- and that's referring to Mr.

19  Pautsch; is that correct?

20  A    Correct.

21  Q    It says we need to talk wages.  And it shows a response by

22  you, of make an offer.  And then another response by Mr.

23  Pautsch, saying make a demand.  Do you recall that

24  conversation?

25  A    Yes, sir.



1    Q    And -- and I know these aren't your notes, but is that an

2    accurate reflection of what was at least part of the

3    discussion?

4    A    It's the flavor of the discussion, yes, sir.

5    Q    And okay, so that was on April the 24th.  And is that --

6    when did you make your proposal?  Was it later that day or was

7    it sometime thereafter?

8    A    It was either later that day or the next day.  It was

9    right around in there.

10   Q    And in fact, you -- you all broke or caucused or whatever,

11   so that you and I believe Ms. Hansen, could work on an actual

12   wage proposal?

13   A    That's correct.

14   Q    And then if I look at Joint Exhibit 9, if we could pull

15   that up, it's an April 24, 2019 email from you to the company

16   and the media.  And attaching -- that's 9 -- 9(b) is the actual

17   proposal.  Does that refresh your memory as to when that was

18   made?

19   A    Yes, so it was later that day.

20        MR. ROBERTS:  All right, if we could scroll back down to

21   9(b), which is the actual proposal.

22        MS. YEN:  I think it's all labeled 9, including the

23   attachment.

24   Q    BY MR. ROBERTS:  Okay, well, if we could just move

25   further, then.  There.  If we just stop there.  So these



1    were -- were your initial proposals.  And so let me make sure I

2    understand what's -- take what's happening here.  The contract,

3    the pre-existing contract, the previous contract had expired.

4    If I'm understanding correctly, they included entry level

5    minimum rates, and then they included rates for zero to six

6    months and six months to two years.  But they did not include a

7    rate for two years and over.  Is that -- is that correct?

8    A    That's correct.  I was proposing that in this document, a

9    two year and over rate.  That's why it says new.

10   Q    Right.  And so just so we all understand this document,

11   just using the first one, the videographer, a new -- the new

12   videographer, the minimum rate for him or her would be $17.15

13   under the old contract?

14   A    Correct.

15   Q    And you were proposing, upon ratification, that that

16   minimum rate would be $21.  Is that -- is that how we read

17   this?

18   A    That is correct.

19   Q    And then -- and for six months to two years, the old rate

20   was $18.  You're proposing that upon ratification, it would be

21   $25.

22   A    Correct.

23   Q    So if my math -- again, this is just -- if I go from $18

24   to $25, that's a $7-an-hour increase.  That's probably in the

25   neighborhood of a 40 percent increase.  And that's a rough



1   estimate, but you were looking for increases in the

2   neighborhood of 30 to 40 percent; is that accurate?

3   A    No, sir.

4   Q    Okay.  How is that not accurate?  How much were you

5   looking -- again --

6   A    Because the company had continued to hire people at over

7   the scale of the contract, there were people already at about

8   that $25 rate.  They were hiring them in at above minimums that

9   were in the previous contract, because it was the company's

10  position that those rates were too low and they were having to

11  hire them at more than the minimums in order to get people to

12  come to work there.

13  Q    All right.

14  A    That was fine with me, but I wanted to raise that floor so

15  that they could get good people, that people would have rates

16  that matched how they'd been hiring, and that they would have

17  the opportunity to advance to that two year and over rate that

18  did not previously exist.

19  Q    All right.  And then there was a second part of your

20  proposal, though, which goes down to article 25.

21       MR. ROBERTS:  If we scroll down further or up further.  Go

22  down to there.

23  Q    BY MR. ROBERTS:  So that -- what we just talked about were

24  your proposal for increasing the minimum rates and the step

25  procedure; is that right?



1    A    Correct.

2    Q    And in article 25, though, we're talking about a general

3    or an anniversary increase -- by anniversary, I mean

4    anniversary dates of the agreement.  Is that right?

5    A    That's correct.

6    Q    And so you were proposing that in addition to those

7    increases, there would be a 3.5 percent annual increase each

8    year of the contract, which I think you were proposing a four-

9    year agreement at this point in time.

10    A    Yes, it was the first time I had proposed a term.  I

11    needed to put something in there to answer the question of how

12    much I was proposing the wages to be.  And there are a

13    significant number of employees at KOIN who've been there many,

14    many years, certainly far more than two.  And they have wage

15    rates that have been set -- they have been set by a model of

16    serendipity.  Sometimes a manager likes somebody and increased

17    their base pay.  Sometimes they were not a favored individual

18    and they'd gotten very small increases.  So there were wide

19    disparities for that same classification of work.  I wasn't

20    proposing to fix all of that, but I was proposing that they get

21    a 3.5 percent increase upon ratification and then each year

22    thereafter.

23    Q    All right, so you made this proposal on, I believe it was

24    April 24th or 25th -- April 24th, I believe.  And the -- at the

25    next bargaining sessions in June of 2019, do you recall Mr.



1    Pautsch saying -- saying -- and I'm going to put this in

2    quotes, "I'd like to talk turkey on wages, but this is out

3    there.  This is counterproductive."  Do you recall him making

4    that statement?

5    A    Something to that effect.

6    Q    And you responded -- do you recall responding you're your

7    folks, meaning your members, were way behind because the costs

8    have gone up, meaning the cost of living; is that accurate?

9    A    Correct.

10    Q    Did Mr. Pautsch also say that we, being the company,

11    bargained these percentages hard and the industry is declining.

12    Do you recall him saying that?

13    A    I recall him saying that they bargained percentage

14    increases hard.  I'm not sure if he said that the industry was

15    declining or that was normally Mr. Nevin's take on the

16    industry.

17    Q    But would you agree that one of them referenced the fact

18    that the industry was declining?

19    A    Their -- their -- that was their position.

20    Q    And Mr. Nevin stated that he used to be $165 million

21    advertising market, but now it was only $100 million.  Do you

22    recall that being said?

23    A    I do recall Mr. Nevin saying that.

24    Q    And do you recall responding that Nexstar made plenty of

25    money, something to that effect?



1    A    Certainly.  Nexstar (audio interference) was doing very

2    well financially.  You're talking that's June of 2019.  I'd

3    been to the shareholders meeting.  I had read their financials.

4    They had -- they were getting ready to buy another large

5    entity.

6    Q    Okay.  Did you -- did Mr. Pautsch, in June of 2019 also

7    say something to the effect, you know what we settle on,

8    meaning you know what the company settles on.  Do you recall

9    that statement?

10    A    He did say something to that effect.

11    Q    And did you, in fact, know what the company had been

12    settling on at other locations?

13    A    I knew that their reputation was for settling on a part of

14    a percent, that they had in other places been known to offer

15    .25 percent increase, not a one percent increase, but a quarter

16    of a percent increase.

17    Q    And moving further in the year, we were talking about June

18    of 2019.  If we move to December of 2019 and note the primary

19    topic was -- was health insurance, but do you recall this being

20    said at the December 10th meeting, where Mr. Pautsch stated

21    that Buffalo, referring to the Nexstar location in Buffalo,

22    made a realistic proposal of three, two, and two, meaning three

23    percent, two percent, two percent.  And we settled at one, one

24    and a half percent.  Do you recall that being said?

25    A    I do believe he said that.  Just to clarify, Mr. Roberts,



1    I'm not sure that contract had been settled at those amounts,

2    but that was what he said.

3    Q    Well, he said that maybe not with respect to Buffalo.  He

4    said that's what we're set -- we, being the company, we're

5    typically settling contracts at one or one and a half percent.

6    Is that a more accurate statement of what he said?

7    A    I believe that's correct.  I -- I don't know what Buffalo

8    finally settled at, or if they did.

9    Q    Okay.  I want to move to another topic, just briefly.  And

10    one of the proposals that there was some discussion of was an

11    indemnification proposal.  And it was a separate article.  I

12    know there's some indemnification language in the dues checkoff

13    clause, but in terms of, do you know what -- you understand

14    what I'm talking about, their indemnification proposal?

15    A    That's correct.  I believe it was maybe their C-47.

16    Q    Okay.  All right.  And let me find it so we make sure

17    we're all on the same page here.  Yes.  Okay.  If we look at

18    Joint Exhibit -- if we could put up Joint Exhibit 10(a).  And

19    actually, go to 10(b), if you would.

20    MR. ROBERTS:  And scroll up so we see it a little bit

21    better.  All right, there.

22    Q    BY MR. ROBERTS:  So there's an earlier version -- well,

23    it's the same version, but you received this proposal on

24    January 24th of 2019?

25    A    That's correct.  It was included, I believe, in that



1    package 8.

2    Q    Okay, well we haven't had much discussion of what this is

3    in reference to, but is it true that this is in reference to

4    the Unions filing a charge about the company requesting

5    employees to acknowledge receipt of certain company business

6    policies, in particular, one allowing the company to check

7    motor vehicle records?  Is that correct?

8    A    Well, it surrounded company requests for background checks

9    of people's driving records.  So it wasn't just receipt of the

10   policy.  It was that the company wanted to be able to go into

11   their motor vehicle record with the state of Oregon on a

12   regular basis.  I don't recall at this time whether it was

13   annually.  I know it was tied to the employee's birthday.

14       So employees had logged in to do their time sheet, found a

15   new policy that ordered them to sign a document authorizing the

16   company to open their record with the motor vehicle agency in

17   Oregon.  I guess it would be Oregon and Washington, since some

18   live in Washington.  And that the company had never had such a

19   policy before.  They had instituted it unilaterally.  They had

20   not bargained with us over it.  We had filed a charge.  The

21   case had been investigated, a complaint had issued.  This had

22   gone quite some ways down the road by the time we were

23   discussing this indemnification proposal in January of '19.  I

24   don't recall exactly when the trial took place.  And I

25   couldn't, at this point in time, tell you where that case is



1       probably wandering around in appeals.  Or it might be the one

2       that's in the courts.

3       Q    All right.

4       A    So there was a litigation track on that question, and this

5       was a new proposal on the part of the company indirectly,

6       related to the unilateral driver's license background checks.

7       Q    All right.  Thank you.  My -- the point being, though,

8       that this proposal, at least related indirectly to that

9       particular issue is that -- being the company's unilateral

10      implementation of this new policy, as you've described it.

11      A    It related to the fact that they were not currently able

12      to do these background checks, so now they wanted the Union to

13      indemnify the company, in case anything happened by an employee

14      who they didn't have their most recent driving record from the

15      state.

16      Q    Okay.  So we can read the -- I'll read the proposal, but I

17      want -- in terms of the discussion that occurred at the

18      bargaining table, was there discussion that that essentially,

19      since you won't let us -- since you won't -- you being the

20      Union -- since the Union won't agree to allow us to check these

21      records if an employee who is driving a company vehicle has an

22      accident, we, the company, want the Union to indemnify us for

23      any liability we have.  Is that the essence of it?

24      A    Within the fact that the company had not proposed the

25      background checks to be done.  That -- that step hadn't taken



 1    place.  It had unilaterally been instituted.  We had filed the

 2    charge with the board.  The board had blocked that in a series

 3    of actions.  And so now the company had not proposed to let us

 4    do background checks.  They had, instead, now said that the

 5    Union should financially back the company, in a pretty broad

 6    piece of language, and that we would pay for their legal

 7    defense.

 8    Q    All right.  Thank you.  Was this proposal -- it was -- or

 9    it passed across the table on January 24th of '19, was it ever

10    discussed thereafter?

11    A    I believe it was.

12    Q    When do you recall it being discussed again?

13    A    Not a chance I could tell you.  I know the subject of

14    indemnification because it was in a couple of places in the

15    contract.  It had been put into the dues checkoff language and

16    it was also in this broader point of view.

17    Q    Okay.  But let -- let's talk about the dues checkoff part

18    of it.  I mean, even in the old contract you had -- and there

19    was an indemnification clause with regard to the dues checkoff

20    provision.  In other words, the Union indemnified the company

21    if they -- if they happened to -- to deduct dues from somebody

22    and there was a problem with that checkoff; is that correct?

23    A    That's correct.

24    Q    I mean, and that's -- in all your experience, that kind of

25    indemnification, with respect to the dues checkoff, that's a



1  very standard clause in almost every contract, isn't it?

2  A    That's correct.  The difference was that the Employer was

3  going to hire the lawyers and they wanted us to pay for their

4  lawyers and their legal defense.  That -- that's not normal.

5  And those dues indemnifications or other indemnification, which

6  I have seen in contracts.

7  Q    Okay, but -- and I understand that.  But there was this --

8  and I won't ask you again, but you've testified about the

9  various discussions and the back and forth on that.  But as far

10  as the actual just the stuff -- the actual indemnification

11  itself sale was not unusual, with respect to dues checkoff,

12  correct?

13  A    No, sir.

14  Q    Okay.

15      JUDGE TRACY:  Can you repeat your answer, Ms. Biggs-Adams?

16      THE WITNESS:  No, sir.

17      JUDGE TRACY:  Thank you.

18      MR. ROBERTS:  Your Honor, might I take five (audio

19  interference) I'd like to consult with my cocounsel, if I

20  might.  Give me a few minutes off the record?

21      JUDGE TRACY:  Oh, sure.  Yeah, sure.  Let's go off the

22  record.  And you guys are all there, so if you just want to

23  mute yourselves.

24  (Off the record at 11:16 a.m.)

25      JUDGE TRACY:  All right, Mr. Roberts.  Go ahead, please.



 1          MR. ROBERTS:  Ms. Biggs Adams, thank you.  I do not have

 2   any further questions.  I appreciate your stamina in

 3   testifying.  I'll turn you back over to the General Counsel.

 4          JUDGE TRACY:  Okay.

 5          MR. ROBERTS:  Or -- yeah, to the General Counsel.

 6          JUDGE TRACY:  Yeah.  Ms. DeVleming, any redirect?

 7          MS. DEVLEMING:  Yes, Your Honor.  And you can give me five

 8   seconds to hit print on this?

 9          JUDGE TRACY:  Okay.

10          MS. DEVLEMING:  Okay, thank you, Your Honor.

11                      **REDIRECT EXAMINATION**

12   Q     BY MS. DEVLEMING:  Hi again, Carrie.

13   A     Hello.

14   Q     Getting close to done.  Thanks for hanging in there.  All

15   right, so just a couple major points, I hope, famous last

16   words.

17          MS. DEVLEMING:  The first being, if we can pull up Joint

18   Exhibit 20, which you were asked about fairly early on in your

19   cross-examination last Friday.

20          MS. DEVLEMING:  Here we go.  Okay.  Can we scroll to the

21   very last page of this exhibit?  Is this the right -- JX-20, I

22   thought we fixed it with a multiple-page exhibit.  It's eight

23   pages long.  Could this be an erroneous copy?  I think it's an

24   eight-page.  Oh, are you on page 8 of it?  okay, maybe that's

25   my -- we jumped too quickly.  Maybe I'm just confused.  Okay,



1    so right, can we scroll up just a bit so we can see the

2    substance of that first email or second email from Julie

3    Kettler?

4    Q    BY MS. DEVLEMING:  All right.  Carrie, last Friday, you

5    were pointed to -- sorry, all the way to page 8, please.  Okay.

6    Last Friday,  Carrie, you were pointed directly to this

7    February 6th email from Julie Kettler.  And remind us who that

8    is.

9    A    Ms. Kettler was the federal mediator assigned to this

10    negotiation.

11    Q    And this shows that she had to cancel.

12        MS. DEVLEMING:  So scrolling up a little.

13    Q    BY MS. DEVLEMING:  Actually, no, sorry, right at the top

14    of page 8 here is your response.  You say I will touch base for

15    them, updated plans.  Do you remember what you meant by that?

16    A    Sorry, a little autocorrect added into -- into my typing.

17    I was -- because I had served as the temporary administrator of

18    a local in California for the interpreters representing the

19    Communications Workers of America, their trials on their

20    failure to -- to comport themselves like good Union members in

21    assorted ways had finally come up.

22        So the trials were scheduled for March 19th through April

23    3rd.  So Ms. Kettler was offering dates into that period of

24    time that I was not available.  So I was willing to reach out

25    to all the parties in the trials and see if any of those were



 1   going to open up.  But I wasn't very hopeful about it.  We had

 2   blocked that time for people coming from all over the country

 3   for these trials.

 4   Q    Okay.

 5       MS. DEVLEMING:  And can we scroll to what's marked as page

 6   5, and it is page 5 of 8 of the Exhibit JX-20.  And scrolling

 7   up a little bit further, please, to the February 8th email from

 8   Julie Kettler.

 9   Q    BY MS. DEVLEMING:  So their testimony was that you did

10   your best to reach out.  Were you able to find possible

11   alternate dates in March?

12   A    Yes.  So I had found March 29th and 29th -- probably 28th

13   and 29th, at 1:00 in the afternoon, so it wasn't as though it

14   was -- I was writing in the middle of the night any or maybe

15   that's what Ms. Kettler was saying.

16       Anyway, I had found some dates in -- in late March to

17   offer up to replace them.  If that wouldn't work, then the next

18   availability I had was April 15th.

19   Q    And this reflects that the mediator would have been able

20   to rearrange her schedule, if that worked?

21   A    Correct.

22   Q    Okay.

23       MS. DEVLEMING:  And then scrolling up one further to a

24   February 8th response from Casey Wenger.

25   Q    BY MS. DEVLEMING:  What does that reflect?



1    A    Mr. Wenger said that Chuck could not do the March dates

2    and he did not say -- it -- it just is cut off.  He said A.

3    And he had not heard from Pat yet.

4    Q    Okay.  On the topic of involving the mediator and having

5    kind of three parties that you need to schedule around, Mr.

6    Roberts, asked you some questions about that last Friday as

7    well, was this a concern on the Union's part?

8    A    Absolutely.  Our concern, as I think you may have gotten

9    the flavor throughout all of this, was not only that we had the

10    three parties, the Union, the company, the mediator, but the

11    hotels were a gigantic problem.  So adding Ms. Kettler's

12    schedule in to the mix just made this always difficult problem

13    worse.

14    Q    And I believe you testified last week and the parties have

15    also stipulated that the mediator was first brought in March

16    2018.  What was the union's position on bringing the mediator

17    in at that point?

18    A    I was not unwilling to have a mediator, but I felt it was

19    too early to bring in a mediator.  There were so many open

20    issues, it was going to complicate the process of teaching her

21    all of the open items on the table and bringing her up to speed

22    over and over again on those issues.

23    Q    And was scheduling another concern about including the

24    mediator so early?

25    A    Absolutely, because I knew it would just add another



1    dynamic to the effort to get us to the bargaining table.

2    Q    So to be crystal clear, who -- which party requested the

3    mediator at that stage, in March 2018?

4    A    The -- the Employer asked that the mediator be brought

5    into the process.

6    Q    Okay.  And then at one point on Friday, you were shown

7    your notes from the October 7th bargaining session.  This was

8    Joint Exhibit 13, Bates 22, where there is a reference to POS

9    November 13 and 15 dates.  And when asked, you answered that

10   you couldn't tell from those notes alone which party had

11   suggested the November 13 or 15 bargaining dates.  Do you

12   remember that testimony?

13   A    I do recall that.

14   Q    Okay, can we pull up -- it was in that same -- oh, no,

15   actually it's Joint Exhibit 17, please, Bates 44.

16        Okay, so for the record, this is page -- once we get to

17   Bates 44 -- page 2 of your October 10th bargaining bulletin

18   number 31, following the October 7th session.

19   A    Correct.

20   Q    If you want to briefly review that and let me know if that

21   refreshes your recollection about who proposed November dates

22   during the October 7th session.

23   A    So we had offered the November dates, but the Employer and

24   the mediator were not available to the two weeks that I had

25   available on our schedules.



1    Q    So the reference in your October 7th notes to POS November

2    13 and 15, do you recall now who proposed those dates?

3    A    That would -- that sounds like it was me, the Union side.

4    Q    Okay.  And then similarly, you were asked about whether or

5    when the parties agreed to the January 14th and 15th, 2019 or,

6    sorry,  2020 bargaining sessions and there was some confusion

7    as to when those were agreed to or whether it's reflected in

8    the documents.

9        MS. DEVLEMING:  Can we pull up Joint Exhibit 17?  Sorry,

10    we're already on it.  Bates 50, please, which for the record,

11    is the second page of your bargaining bulletin number 33, dated

12    December 19th.

13    Q    BY MS. DEVLEMING:  Do you want to -- it got pretty small

14    there.  Maybe we can zoom in a little bit more so Carrie can

15    read that last paragraph.

16        Carrie, after reading through the paragraph, does that

17    refresh your recollection about where -- when the January 14th

18    and 15th special sessions were confirmed?

19    A    Yes, so that's consistent with the last exhibit that I was

20    looking at from the October bulletin.  We had agreed to

21    December and January dates in October.

22        JUDGE TRACY:  That last part really kind of got a little

23    bit garbled.  Ms. Biggs-Adams, can you just repeat what your

24    what your response was, please?

25        THE WITNESS:  Certainly.  The parties had agreed in



1    October, on December and January dates.  So that's consistent

2    between this bulletin, that's from December, and the previous

3    bulletin that was from October.  The October shows ahead that

4    we have December dates and January dates, nothing available in

5    November.  This brings us to November -- to -- to the meetings

6    in December.  And I'm reiterating that we had set the January

7    dates back in October.

8    Q    BY MS. DEVLEMING:  And do you recall if in addition to

9    setting this forth in your December 19th bargaining bulletin,

10   did you reflect that agreement in your October bargaining note?

11   A    Yes.

12   Q    Okay.  And just to clarify, I think we explained some of

13   this, but it says here that we were concerned to learn the

14   federal mediator was no longer available on those dates.  But

15   you testified yes -- on Friday on cross that the mediator

16   ultimately told you that she was covering for a conflict on

17   Respondent then.  Is that your testimony?

18   A    That is correct.

19   Q    What, exactly, did she tell you?

20   A    She said that the company was not available on the

21   previously agreed-to January 14th and 15th dates.  She had said

22   it was her lack of availability, but that really, the problem

23   was the -- Chuck Pautsch, the lead negotiator, was not

24   available on those dates.

25   Q    Did she explain why she had initially kind of taken the



1    blame?

2    A    She said that she didn't want calendaring to become yet

3    another issue between the parties.

4    Q    And did you learn that from her -- hear that clarification

5    from the mediator before or after this bargaining bulletin

6    number 31?

7    A    Before this bargaining bulletin.

8    Q    So then, why didn't you share that information on the face

9    of the bargaining bulletin?

10   A    Well, it -- it would have been right around in that time

11   frame, though it may have been after.  The bulletin generally

12   goes out at the end of the bargaining day of the second day of

13   the meetings.  And she, as I recall, sent an email at -- the --

14   the end of the session became a flash and dash and she had to

15   dash.  And she wrote an email later that apologized for the

16   speed with which she had departed and the mess which the next

17   sessions were now left in.

18   Q    And so how does that answer the question about why this is

19   reflected in the bargaining bulletin?

20   A    So it would have been after I sent the bulletin, because I

21   would have been working on the bulletin after she and the

22   company departed and I would have gotten that message from her

23   later, whether it was the same day or the next day, that it was

24   sent and I got it, I couldn't tell you independently right now.

25   Q    All right.  Moving to today, resuming cross-examination



1    this morning, you were asked about, in general, whether past

2    April 2019 Respondent had ceased trying to bargain or just --

3    ceased trying to bargain over the level of the Union's

4    initiation fees and dues.  Do you remember those questions?

5    A    I do recall those questions.

6    Q    And also about whether they had ceased trying to bargain

7    over the type of language that would be included in your

8    welcome letters, Beck notices, dues, checkoff letters.  Do you

9    remember that -- those questions?

10   A    I do.

11   Q    You were asked -- do you recall now whether those specific

12   subjects came up at the bargaining table past April 2019?

13   A    I know the issue is still very much alive because I was

14   getting memos sent from Pat Nevin to the membership about the

15   initiation fee, and we certainly had not reached agreement on

16   the issue of Union security or Union business articles 2 and 3.

17   So the proposals were still there.  The issue had not been

18   resolved.

19   Q    In addition to the post-April 2019 memos from Nevin that

20   mentioned that subject, do you remember it coming up at the

21   bargaining table?

22   A    I do recall it did.

23   Q    Do you currently recall any of the specific dates that

24   came up or details?

25   A    Not at the moment.  We've danced around in those



 1    negotiations between last week and today that it's not in very

 2    linear order in my head at the moment.

 3    Q    Would something refresh your recollection?

 4    A    My notes would be helpful.

 5    Q    All right.

 6         MS. DEVLEMING:  Can we pull up Joint Exhibit 13, starting

 7    with Bates 1?

 8    Q    BY MS. DEVLEMING:  Okay, so if you -- this is April 23rd.

 9    So again, we're primarily talking about after this.  But

10    looking at the top there, did initiation fees and the level of

11    initiation fees come up at this session?

12    A    Yes, they did.  I'm told again that the initiation fee is

13    too high, that -- that the Employer had agreed to suspend

14    bargaining unit members at that station who fall behind.  The

15    interferes with the ability to hire people was Mr. Nevin's

16    consistent position.  And the major impediment to getting a

17    contract, I would expect was Mr. Pautsch would be -- just my

18    guess, from those -- those notes, whose voices those sound

19    like.

20    Q    Do you remember any other dates where this came up?

21    A    So it -- it would have just continued to be a live

22    subject, as we continued to bargain.  So it may have come up in

23    the next day, where we were discussing the wages, and then it

24    continued on into June.

25    Q    Do you remember if it came up on June 27th?



1    A    I believe it did, but my notes would be helpful to tell

2    you the gist of the conversation.

3    Q    Okay.

4        MS. DEVLEMING:  Can we pull up Joint Exhibit 14, Bates 10?

5    And this is Ellen Hansen's June 27th bargaining notes.  Can we

6    go all the way to the bottom of Bates 10?

7    Q    BY MS. DEVLEMING:  And so just reviewing the very last

8    couple of sentences here, Carrie, does that refresh your

9    recollection about whether this subject was raised on June

10   27th?

11   A    Yes, it was clearly a quite extensive part of the

12   conversation about what the percentage is, in terms of the

13   dues.  We're back to a discussion in Erie, Pennsylvania.  They

14   were still trying to charge the $50 fee.  And I had yet to have

15   any explanation that explained why it would take that much time

16   to calculate a percentage of gross earnings of the same group

17   of people.  The -- the number of folks would remain the same,

18   payroll to payroll, unless somebody departed or there was a new

19   hire.  It wasn't a -- it seemed hard for me to believe that it

20   would take five or six hours of Mr. Wenger's time to calculate

21   this on a regular basis.

22   Q    Okay.  And reviewing through the end of Bates 10, and take

23   a minute if you need to, do you recall if there was a specific

24   discussion about the level of initiation fees?

25   A    Yes.  This is -- this was them still pushing back on the



1    amount that our initiation fee and our dues were and that they

2    had resolved other contract in other places.  Mr. Nevin

3    pointing out, I've concluded ten contracts since we started,

4    why not with you?  And my reaction was, you haven't tried to

5    bust up the contract in all of those places.

6    Q    Those were Ellen's notes.  You also took notes from this

7    bargaining session.

8        MS. DEVLEMING:  Can we toggle back to Joint Exhibit 13?

9        JUDGE TRACY:  Okay, so that was what my question was, was

10   does Ms. Biggs-Adams have her own notes from this session?  I

11   couldn't recall which one she didn't have notes, but it sounds

12   like you've answered that.  So let's look at these ones, too.

13   So starting at the top of Bates 12, please.

14       Actually, sorry, the middle of Bates 12.  I see a

15   reference to ridiculous issue, and maybe if we can zoom in a

16   bit.  I think it's too small for Carrie, like it is for me.

17   Q    BY MS. DEVLEMING:  Does this refresh your recollection --

18   A    Yes.

19   Q    -- about whether you discussed that issue on June 27?

20   A    Yes, we did.  So you see the same sort of reference where

21   ten contracts finalized.  That was Mr. Pautsch.  A comment

22   about the different people with whom those contracts had been

23   negotiated.  Eric is Eric Seggi.  He was a staff representative

24   for CWA.  Lou Fallot, another staff representative for CWA or

25   NABET-CWA.  Those had been my coworkers when I had been a staff



1    representative and that they had bargained with IBEW.  And then

2    they were saying that the dues in eight markets were, I guess,

3    not a problem elsewhere, and then as a ridiculous issue of the

4    initiation fee.  The difference between the different unions

5    listed there, NABET and different locations or different

6    locals, IBEW again, different locals, different parts of the

7    country, and SAG-AFTRA, which does not represent any workers in

8    KOIN.  But they do represent people who work at Nexstar in

9    other locations.

10    Q    Carrie, who was it who used the term "ridiculous issue"?

11    A    I'm sure it was me.

12    Q    What do you mean by that?

13    A    Well, the -- the company had just made an issue of

14    something that I thought was not a problem.  They had been

15    creating a ridiculous, or straw man issue, suddenly saying that

16    the Union's initiation fee was too high at KOIN in Portland,

17    where our structure had been consistent for many, many years.

18    And the company had not started out objecting to our initiation

19    fee.  They had raised this as the contract talks had dragged

20    on.

21    Q    And who was it you talked through comparing NABET to IBEW

22    and SAG-AFTRA?  Who was it who brought up those other examples?

23    A    Mr. Pautsch.

24    Q    And same with Portland and Buffalo?

25    A    Yes, Mr. Pautsch bargained Buffalo contract.



1    Q    And he was comparing initiation fees in those contracts?

2    A    Yes.

3    Q    The Union's initiation fees in those locations?

4    A    Correct.

5    Q    Okay.  And just going very briefly to Bates 13.  This is

6    the second page of your June 27th.

7         MS. DEVLEMING:  And can we scroll so we can see less than

8    half a page of notes?

9    Q    BY MS. DEVLEMING:  Do you see where there are further

10   discussions of Union -- sorry, initiation fees at this session?

11   A    Yes, and I believed -- I believe I saw it also just above

12   the page break.  So the adding new people to the spreadsheet

13   was a comment by Mr. Wenger that the amount of time that it

14   took, as new people were hired or people terminated from

15   employment, and then a discussion about Beck and member in good

16   standing, and then there was an issue of the new General

17   Counsel of the NLRB and what memos he may or may not have put

18   out.

19   Q    What was the discussion here about Beck?

20   A    So they wanted to know how Beck would impact on someone

21   being a member in good standing.  The Union is very, very

22   careful about Beck.  These are decisions, well, from the

23   Supreme Court -- U.S. Supreme Court and other agencies and

24   entities over the years.  It's not just one case.  But they all

25   relate originally to CWA.  So it's something that has been



1    drilled into my life experience to be extremely cautious with

2    Beck, to be sure that we do it right.

3        And there's a structure within CWA.  We make sure that

4    people get their refunds.  Advance refunds are issued.  It's

5    a -- it's -- it's something that we handle very carefully and

6    we make sure we're in compliance with.

7    Q    Carrie, do you recall if the subject of the Union's

8    allegedly excessive initiation fees or dues came up again past

9    this June 27th session?

10   A    I'm sure it did.

11   Q    Do you remember the specific date or dates?

12   A    I do not.  I would be helpful if I could see my notes.

13   Q    Sure.

14       MS. DEVLEMING:  Can we please, Mr. Schiff, scroll to same

15   exhibit, Carrie's notes Joint Exhibit 13 to Bates 34, please?

16   So, Carrie, for the record, this is the second page -- and if

17   we need to, we can scroll to Bates 33 -- it's the second page

18   of your December 10th bargaining notes.

19   Q    BY MS. DEVLEMING:  Do you recall now if you discussed this

20   subject on December 10th?

21   A    Yes, we did.

22   Q    Do you recall what you discussed?

23   A    So we talked about the initiation fees.  We are not going

24   to -- I'm sure that's the company saying we're not going to

25   deduct those initiation fees.  And then a discussion about



1    the -- about the inappropriate memo.  I -- I would guess that

2    this would have been Halloween themed memo for Mr. Nevin to the

3    membership, which was extensively about initiation fees and

4    dues.

5    Q    Do you recall if you specifically discussed Respondent's

6    concern about the level of the Union's initiation fees and dues

7    at this session?

8    A    Certainly, because I continued to point out that it was

9    none of the company's business how much we charged for

10   initiation fees, and that I felt the Halloween themed memo was

11   inappropriately meddling in the Union's business.

12   Q    Carrie, throughout the bargaining process, have you ever

13   taken the position that you would not bargain over Union

14   security?

15   A    No.

16   Q    Have you ever taken the position that you would not

17   bargain over dues checkoff?

18   A    No.

19   Q    What did you refuse to bargain over, if anything?

20   A    I felt that the amount of our dues and the amount of our

21   initiation fee are internal Union matters.  And those are not

22   things that the company should be involved in.

23   Q    Okay, transitioning to two last subjects here, the first

24   being healthcare.  You are asked this morning about how the

25   parties primarily focused on healthcare in the December 9th and



1    10th, 2019 sessions.  Do you remember that line of questioning?

2    A    Yes.

3    Q    And you were asked to compare the importance or urgency of

4    resolving healthcare at those sessions versus resolving wages.

5    Do you remember that question?

6    A    Yes, ma'am.

7    Q    Is it your testimony, Carrie, that one of those subjects

8    was more important or urgent to resolve than the other?

9    A    No, they both needed to be resolved.  They -- we could

10   have resolved one or the other first.  It really wouldn't have

11   been important if we had resolved the healthcare premiums so

12   that I knew how much people would be having to pay for

13   healthcare going forward.  Then I would need to resolve the

14   economic issue of how much they'd be paid so that they could

15   cover those costs.

16   Q    Okay.  And you were asked, final subject here, about

17   whether the subject of indemnification came up again, following

18   the Respondent's written proposal on C-47 indemnification that

19   came through its January 24th package, proposal number 8.  Do

20   you remember that?

21   A    Yes, I do.

22   Q    And you answered that you believed that subject had come

23   up again, but you couldn't recall exactly when.  Do you

24   remember that testimony?

25   A    I do recall that.



1    Q    Can you presently recall when it came up again?

2    A    I think I recall the question.  I know I had to coordinate

3    with Ms. Yen over how we would respond to this or how we could

4    handle this.  And so I have recollection of a couple of

5    different times working with her on what a proposal might look

6    like or how we could safely enter into this issue.

7    Q    Would something refresh your recollection about when, if

8    ever, that subject came up again at bargaining?

9    A    My notes would be the most effective.

10        MS. DEVLEMING:  All right, can we look at Joint Exhibit

11    13, Bates 2?

12    Q    BY MS. DEVLEMING:  So at the top there, your notes from

13    the April 23rd, 2019 session.  And I see a reference to C-47.

14    What was that?

15    A    That is the indemnification proposal that the company had

16    made in January.

17    Q    So by its inclusion in your notes, would that have come

18    up -- would that have come up at this session?

19    A    Yes, it would have.

20    Q    And then finally, can we pull up JX-14 -- oh, sorry.  .

21    First, do you recall if this ever came up again, past April

22    23rd?

23    A    I believe it did.  I believe it came up during August,

24    but --

25    Q    Can we pull up --



1    A    My notes would be helpful.

2        MS. DEVLEMING:  Can we pull up Joint Exhibit 14, please?

3    Bates 9.

4    Q    BY MS. DEVLEMING:  Okay, Carrie, this is Ellen Hansen,

5    Union's notetaker's notes, from the June 26th bargaining

6    session.  And there's some -- the very final line here

7    reflects -- what does this reflect?

8    A    That at 3:30, the company left the room with the mediator

9    came back and gave us a proposal from the company on C-47

10   indemnification by the Union.

11   Q    And this part is a little confusing, Carrie, because we

12   have only to two C-47 proposals from the company in the joint

13   record, the last -- the January 24th proposal we've just

14   discussed, which is Joint Exhibit 10-B, and an earlier one from

15   November 2018.  Do you recall what this was that you saw on

16   June 26th?

17   A    I'm sorry, I don't.  It -- it looks to me like it would be

18   a new proposal from the company on indemnification.  It

19   wouldn't have been our proposal, and that it would have been

20   presented to me physically by the -- by the mediator.

21   Q    Okay.  Have you searched for a copy of this proposal?

22   A    I have.

23   Q    Did you find it?

24   A    Not thus far.  The methodology would have been that after

25   a bargaining session, the parties would exchange the written



1     documents so that we'd have electronic copies in our files.

2     But as this happens, the company may not have sent it to me at

3     that time, and that's why I wouldn't have it as I go

4     chronologically through my electronic files on the -- on the

5     negotiations.

6     Q    To the extent, Carrie, that the notes reflect that a C-47

7     proposal came in, do you believe that to be accurate, even if

8     you can't find it?

9     A    I do.

10          MS. DEVLEMING:  Okay.  Thank you, Your Honor.  No further

11    questions for Carrie.

12          JUDGE TRACY:  Ms. Yen?

13          MS. YEN:  No, no further questions.

14          JUDGE TRACY:  Okay.  Mr. Roberts?

15          MR. ROBERTS:  No, I don't have anything else.

16          JUDGE TRACY:  All right.  Well, thank you very much, Ms.

17    Biggs-Adams, for your testimony for the past three days.

18    Please don't discuss your testimony with anyone else until

19    after the close of the hearing.  And now, at this point, I am

20    assuming that you'll be attending the hearing as a party

21    representative; is that correct?

22          THE WITNESS:  That is correct.

23          JUDGE TRACY:  Okay.  So what we can do is, it's about

24    noon.

25          And who is going to be your next witness, Ms. DeVleming?



1   MS. DEVLEMING:  Ellen Hansen will be our next witness,

2 handled by Ms. Burke.

3   JUDGE TRACY:  Okay.  And so --

4   MS. DEVLEMING:  I'll pass over the reins --

5   JUDGE TRACY:  I'm sorry.  Go ahead.

6   MS. DEVLEMING:  Sorry, so I'll pass over the reins after

7 lunch.

8   JUDGE TRACY:  Okay.  And is Ms. Hansen expected to take

9 all afternoon?

10   MS. DEVLEMING:  I will defer to Ms. Burke on that.  I

11 don't believe so.

12   MS. BURKE:  No, Your Honor, I anticipate between direct

13 and cross, no more than two hours is my -- my thoughts.

14   JUDGE TRACY:  Okay.  And then will you have your next

15 witness, then, ready?  Have you guys worked it out with Mr.

16 Roberts?

17   MS. BURKE:  Yes, they should be ready and available.

18   JUDGE TRACY:  -- go off the record until about -- it's --

19 well, let's go ahead and go off the record.

20 (Off the record at 11:59 a.m.)

21   THE COURT REPORTER:  We're on the record.

22   JUDGE TRACY:  All right.  So before the General Counsel

23 calls their next witness, thankfully, I've been reminded by Mr.

24 Roberts that he received the various Jencks statements from Ms.

25 Biggs -- from -- from the General Counsel of Ms. Biggs-Adams.



1    And so Mr. Roberts, if you could just put on the record

2    what you have done with those statements, and if there were

3    attachments to them, how you have destroyed them, just for the

4    record?

5    MR. ROBERTS:  Certainly.  I received them by email, and as

6    I indicated, I printed them out so that I could use them rather

7    than having to look at them on the screen.  The printed copies

8    have been shredded.  The email has been deleted.  And so I have

9    not yet gone into my trash, but I will go into the trash and

10    delete that, too.  So it's -- we've destroyed all copies.

11    JUDGE TRACY:  And Ms. DeVleming, any issues with that or

12    any other assurances that you need?

13    MS. DEVLEMING:  That sounds good to me.  I trust Mr.

14    Roberts.  Thanks.

15    JUDGE TRACY:  All right, thank you so much.  All right.

16    So, Ms. DeVleming, go ahead and call your next witness.

17    And I just want to note for the record also, that Ms.

18    Biggs-Adams still present, but now she is a party -- well,

19    she's always been a party representative -- but she'll be

20    attending the remainder of the hearing as a party

21    representative.  So I'll just put that on the record there.

22    And there is nobody else that I see there.

23    So, Mr. DeVleming, go ahead and call your next witness.

24    And Mr. Schiff, I'm assuming she's in the -- the waiting room.

25    MS. DEVLEMING:  Thank you, Your Honor.  I'll actually turn



1  it over to my cocounsel, Sarah Burke, for the remainder of much

2  of the afternoon.

3       MS. BURKE:  Thank you, Your Honor.  Counsel for the

4  General Counsel would call Ellen Hansen.

5       JUDGE TRACY:  All right.  Ms. Hansen, can you just go

6  ahead so we can hear you audibly there?

7       MS. HANSEN:  Yes, hi.

8       JUDGE TRACY:  Hi.

9       MS. HANSEN:  How are you?

10      JUDGE TRACY:  Good.  And Ms. Hansen, could you just go

11  ahead and state your name for the record?

12      MS. HANSEN:  Yes, my name is Ellen Joyce Hansen,

13  H-A-N-S-E-N.

14      JUDGE TRACY:  Okay.  And if you could go ahead and raise

15  your right hand, please?

16      THE WITNESS:  Yes, I do.

17  Whereupon,

18                      **ELLEN HANSEN**

19  having been duly sworn, was called as a witness herein and was

20  examined and testified, telephonically as follows:

21      JUDGE TRACY:  All right, thank you.  So you've already

22  stated your name for the record.  I'm just going to give you a

23  few instructions, but I'm also going to ask you a few questions

24  here before I turn it over to Ms. Burke.  First of all, is

25  there anybody in the room present with you?



1          THE WITNESS:  No.

2          JUDGE TRACY:  Okay.  And do you have anything in front of

3     you?

4          THE WITNESS:  I only have copies of the exhibits that were

5     sent to me.  I can put them away, if that's not okay.  I

6     thought that was okay to have just the exhibits.

7          JUDGE TRACY:  So what I would like for you to do,

8     actually, is take those exhibits and turn them over, because I

9     don't want you to get distracted by all of the papers in front

10    of you.  Hopefully, you have them in some sort of order to be

11    able to easily kind of refer to them.  And Ms. Burke will then

12    have you, when she's ready for you to look at those exhibits,

13    she will have you pull them out.

14         The other thing that we will be doing to aid everybody,

15    including yourself, is we're going to screen share the

16    documents that you're asked to testify from.  So that way,

17    you're certain that if you are looking at a paper copy that the

18    paper copy is the same as the one that's on our screen that --

19    so we all know what you're testifying from.  Anything else in

20    front of you?

21         THE WITNESS:  No.  A glass of water and that's it.

22         JUDGE TRACY:  Okay.  And I just want to ask that if you

23    have a cell phone, to please put it away.  Please don't

24    communicate with anyone during this hearing or even after this

25    hearing, there has been a sequestration order issued.  And so

1    what that means is that, you know, during your testimony,

2    throughout your testimony, and even at the end of your

3    testimony, you are not to discuss your testimony with anyone

4    else until the close of the hearing.  And also during the

5    hearing, of course, there should be no communication with

6    anyone else texting, email, or anyone else in the room.  If

7    circumstances change or someone comes in, please just let us

8    all know.

9        And also, just when you're testifying, please, we need

10   verbal responses.  But also, you're just going to have to maybe

11   pause a little bit, until you get into the flow of how this

12   works, that you wait for the question to be finished being

13   asked before you begin answering.  Sometimes it can get cut up

14   a little bit, and we're creating a transcript after this

15   hearing.  And what can happen in that situation is that the

16   question gets cut off, the answer is cut off.  And so no one is

17   really sure, when we read back on this record, what you were

18   answering and what your answer was.  So it's just very (audio

19   interference) you have to be very mindful.  I might remind you

20   if you forget, because it's easy to forget when you feel like

21   you're just answering the question, and you may know what the

22   question is that's being asked of you.

23       And so -- yeah.  And if at any point you need a break,

24   just please let us know and we're more than happy to give you a

25   break when -- when it's appropriate -- not in the middle of

1    questioning, but perhaps at a certain proper stopping point.

2    All right?  Any questions that you have?

3            THE WITNESS:  No, I hope not.

4            JUDGE TRACY:  All right.

5            Ms. Burke, go ahead, please.

6            MS. BURKE:  Thank you, Your Honor.

7                        **DIRECT EXAMINATION**

8    Q    BY MS. BURKE:  Good afternoon, Ellen.  How are you doing?

9    A    Good.

10   Q    So Ellen, are you currently employed?

11   A    Yes.

12   Q    And who is your Employer?

13   A    KOIN-TV.

14   Q    And what does KOIN do?

15   A    It's a television station.

16   Q    And where is KOIN located?

17   A    Portland, Oregon.

18   Q    If you know, how many facilities does KOIN have?

19   A    One.

20   Q    And if you could, briefly describe that facility layout

21   for me?

22   A    We are in the bottom -- basement of the KOIN Tower, on

23   three floors below, beginning at the top floor, and then the

24   second floor, and the third floor down.

25   Q    And where in the facility do you work?


www.escribers.net | 800-257-0885

1    A    I worked on the bottom floor.

2    Q    When did you start working for KOIN?

3    A    1993.

4    Q    And what do you do for KOIN?

5    A    I'm a photographer, editor, live truck operator, and a

6    live shot operator with TVUs.

7    Q    What does a typical day look like for you at KOIN?

8    A    Normally, pre-COVID, we would come into the building and

9    get our assignments there.  Now, I wait at home for my

10   assignment, but I would go out and shoot what they've asked me

11   to shoot or do interviews as they request, edit as they need.

12   Q    And so where are you working from right now?

13   A    From home.

14   Q    What is your current work schedule?

15   A    Monday through Friday, 10 to 6:30.

16   Q    And who is your current supervisor?

17   A    Rick Brown.

18   Q    What is Mr. Brown's job title?

19   A    Operations manager.

20   Q    How long has Mr. Brown been your supervisor?

21   A    At least 15 years, maybe 20.

22   Q    Are employees at KOIN represented by a union?

23   A    Yes.

24   Q    And which union?

25   A    NABET, excuse me, NABET 51, the National Association of



1    (sic) Television Employees and Technicians

2    Q    And are you a member of NABET?

3    A    Yes.

4    Q    How long have you been a member of NABET?

5    A    Since we organized around 20 -- or 2005.

6    Q    Do you hold any positions with the Union?

7    A    Yes.

8    Q    And what position?

9    A    I'm on the negotiating committee, and I'm on the executive

10   board for the union.

11   Q    Do you have a specific title on the executive board?

12   A    Just e-board member representing KOIN.

13   Q    And what does your executive board position entail?

14   A    Once a month, we have meetings.  We look at the company or

15   the Union finances, approve -- approve them, discuss problems

16   at other stations, and the general business of the -- of the

17   Union.

18   Q    Now, you also mentioned you serve on the negotiations

19   committee; how long have you been on the negotiation committee?

20   A    I've been on there about two years now, a little bit more.

21   Q    And what is your role on the negotiation committee?

22   A    Mostly, I take notes and answer questions if asked, and

23   sometimes help Carrie if she has questions about what's going

24   on at KOIN.

25   Q    And who is Carrie?



1    A    Carrie Biggs-Adams is the president of our Union.

2    Q    And is -- was she on the negotiation committee?

3    A    Yes.

4    Q    What was her role?

5    A    She is the main negotiator for us at this time.

6    Q    Other than yourself and Ms. Biggs -- Ms. Biggs-Adams, is

7    there anyone else on the negotiation committee?

8    A    Not at this time, no.

9    Q    If you recall, who served on the committee for KOIN-TV?

10    A    Chuck Pautsch, the lawyer; Tim Busch was -- is the vice

11    president of Nexstar, he would come sometimes; Pat Nevin, the

12    general manager; Rick Brown, operations manager; Casey Wenger,

13    HR; and sometimes Rich Kurtz, the news director.

14    Q    What type of negotiation where these?

15    A    Pardon?

16    Q    What type of negotiations were these?

17    A    Well, they were for the -- the contract.

18    Q    And was this a successor contract?

19    A    Oh, yes.  Yes, it was.

20    Q    If you know, when did the previous contract expire?

21    A    I believe it was 2017.

22    Q    And are the Union and KOIN TV currently negotiating?

23    A    No.

24    Q    And why not?

25    A    The company quit negotiating.



1    Q     Why did the company quit negotiating?

2    A     I don't know.  They just believed that there was no reason

3    for them to negotiate anymore.

4    Q     When did the company stop negotiating?

5    A     It was early January, I think January 8th.  They called us

6    to a meeting, all the union members, and told us that they were

7    no longer going to be negotiating.

8    Q     Now, I want to touch on that in just a moment.  But going

9    back to negotiation, prior to negotiations ceasing, about how

10   many bargaining sessions would you estimate you attended?

11   A     Oh, at least 20.  I'm sorry, I didn't count.

12   Q     That's okay.  And when were these sessions held?

13   A     They were held about once every month and a half for two

14   days.

15   Q     And if you recall, what time did negotiations typically

16   begin?

17   A     9 or 10 in the morning.  And then the first day anyway,

18   until about 5:00.  Often, the second day was short because the

19   company would leave early.

20   Q     And do you recall what days the negotiations typically

21   happened; what specific days of the week?

22   A     Some -- they could be any two days of the week --

23   sometimes Wednesday/ Thursdays or Monday/Tuesdays, two

24   consecutive days.

25   Q     What did you do when sessions were scheduled during your



1    workday?

2    A    Pardon?

3    Q    What did you do when sessions were scheduled during your

4    workday?

5    A    Oh, well, I would go to the negotiations.  We would ask --

6    we would get permission to -- for that.

7    Q    And when you say we, who do you mean?

8    A    Oh, Carrie.  Carrie would ask for a leave of absence for

9    me ahead of time.

10    Q    And you would ask for leaves of absences?

11    A    Um-hum.

12         JUDGE TRACY:  Say yes or no for the record, please.

13         THE WITNESS:  Oh, yes.

14    Q    BY MS. BURKE:  How would you know if these leaves of

15    absences were approved?

16    A    Usually, we would do that at the very end of the last day,

17    and Carrie would make sure to hand it to the company.  And most

18    of the time, they would sign it, then Casey Wenger would sign

19    it and give it back to us.  There were a couple times when they

20    would email it to us.

21    Q    And when you say end of the last day, do you mean the end

22    of the last day of bargaining?

23    A    Yeah, the last -- last day of the two-day bargaining

24    session.

25    Q    During the time you served on the negotiations committee,



1   were any of these leave requests ever denied?

2   A     No, not until the last one.

3   Q     So there was a leave request denied the last bargaining

4   session?

5   A     Yes.

6   Q     Okay.  How did you find out that that leave request had

7   been denied?

8   A     Well, after they had decided not to negotiate, I did go up

9   to Lisa Newell who was the administrative assistant taking over

10  for -- who took over for Casey Wenger, and I asked her if they

11  were going on honor the leave of absence.

12  Q     And what, if anything, did Ms. Newell say?

13  A     She said, no, we're not going to negoti -- we're not

14  negotiating any more.

15  Q     And did you say anything in response?

16  A     I asked her about the cost of the hotel that we had hired.

17  Actually, it was their turn, but we had -- I believe that

18  Carrie had booked it for them.  And I asked her if we were

19  supposed to pay for that, and she said yes.

20  Q     What, if anything, else was said during that meeting?

21  A     I think she said that Chuck was supposed to send an email

22  regarding my leaves.

23  Q     And did you, in fact, get an email regarding that leave?

24  A     I did.

25        MS. BURKE:  Okay.  May the witness please be shown what



1    has previously been marked as General -- or not General

2    Counsel -- Joint Exhibit 58?

3        JUDGE TRACY:  And so Ms. Burke, do you want her to also

4    take a look at Joint Exhibit 58 if she has it?

5        MS. BURKE:  Yes, Ellen, if you have Joint Exhibit 58, go

6    ahead and -- and refer to it, if it is easier than seeing the

7    screen.

8        JUDGE TRACY:  I say that because I saw her reaching for

9    the documents, and unlike Ms. Biggs-Adams, she -- she actually

10   has paper documents in front of her, so.

11       THE WITNESS:  Yes, that is the same one I have.

12   Q    BY MS. BURKE:  Okay.  And Ellen, do you recognize this

13   document?

14   A    Yes.

15   Q    And what is it?

16   A    It's a email from Lisa Newell saying this is to formally

17   deny the leave of absence request, saying that the station will

18   not be participating in the negotiations.

19   Q    And is this the email you were just testifying to?

20   A    Yes.

21   Q    Okay, great.

22       MS. BURKE:  So go ahead and put that document back over,

23   Ellen.

24       And then Mr. Schiff, thank you, that can be taken away.

25   Q    BY MS. BURKE:  Ellen, did you document the conversation



1    you had with Ms. Newell?

2    A    I did.

3    Q    And how did you document it?

4    A    I sent an email to Carrie Biggs-Adams.

5    Q    Okay.

6         MS. BURKE:  And Mr. Schiff, may the witness be shown GC

7    Exhibit 10?  And Ellen, you can also pull that up, your paper

8    copy, if it is easier to see.

9         THE WITNESS:  Yes.

10   Q    BY MS. BURKE:  Okay.  And then, Ellen, just to confirm, is

11   the document that you are looking at the same as the one on the

12   screen?

13   A    Yes, it is.

14   Q    Okay.  And do you recognize this document?

15   A    Yes.

16   Q    And how do you recognize this document?

17   A    It is the email that I sent to Carrie.

18   Q    And is this the email you were just testifying to?

19   A    Yes.

20   Q    Take a moment and review the document, and once you're

21   finished, is this a fair and accurate representation of the

22   conversation that you had with Ms. Newell?

23   A    Yes.

24   Q    Okay.

25        MS. BURKE:  I don't remember if GC 10 already came in, but



1    if not, I would offer GC 10 into evidence.

2         MR. ROBERTS:  No objection.

3         JUDGE TRACY:  Sorry, I have a loud -- a street cleaner

4    outside, so I had muted myself.  I don't think it's come, so GC

5    Exhibit 10 is admitted into evidence.

6         MS. BURKE:  Thank you.  All right.  And then, Ellen, you

7    may go ahead and turn that back over, and it can be taken down

8    Mr. Schiff.  Thank you.

9    Q    BY MS. BURKE:  Ellen, again, staying with negotiation, how

10   would you characterize the tenor of bargaining sessions that

11   you attended?

12   A    They were contentious.

13   Q    And how so?

14   A    They -- I don't think they were very nice.  They would

15   change their minds.  They would -- well, it just -- we just --

16   they weren't -- it -- it -- it -- they weren't -- I would say

17   they were just weren't very nice.  They were pretty bossy.

18   Q    And for the record, to be clear, when you say "they", who

19   are you referring to?

20   A    Chuck Pautsch, Tim Busch, Pat Nevin, in particular.

21   Q    Do you recall specifically what happened during each

22   bargaining session you attended?

23   A    I don't recall specifically each one, no.

24   Q    Okay.  Is there something that would help you remember

25   what happened during each session?



1    A    Well, I do have some exhibits here that are from 2019.

2    Q    What -- and what would -- what would help you remember?

3    A    Well, if I took a look at them, maybe if -- if there was a

4    specific question.

5    Q    And are those exhibits your bargaining notes?

6    A    Oh, yes, they are.  Yeah, I'm sorry.

7    Q    Okay, so -- okay.

8         MS. BURKE:  So why don't we, Mr. Schiff, please pull up

9    Joint Exhibit 14, which is Mrs. Han -- Ms. Hansen's bargaining

10   note.  And then, Ms. Hansen, you can go ahead and grab Joint

11   Exhibit 14.

12        JUDGE TRACY:  Hold on one second.  Before you do that,

13   though, you really haven't exhausted her memory with regard to

14   whatever questions that you have, like specific, you know, on

15   this session, do you remember what you talked about?  You know,

16   I understand what you've done just wholesale, but it really

17   needs to be more specific before she starts looking at her

18   notes, because that goes to her credibility in terms of her

19   recollection as compared to her notes.  So if you have more

20   specific questions, and then, if she -- once she's exhausted

21   her memory that you go to those notes, that would be the way

22   that it should be done.

23        MS. BURKE:  Of course, I'm sorry, Your Honor.

24   Q    BY MS. BURKE:  Ellen, do you recall specifically a time

25   when Mr. Nevin would have been not very nice, as you previously



 1   testified?

 2   A    Oh, I -- yeah, I do recall.

 3   Q    And what -- when would that have been?

 4   A    Oh, boy, I don't remember any specific dates, but I know

 5   that he would -- he would cut off Carrie off.  They -- at one

 6   point, I know that Chuck accused Carrie of -- I know that

 7   she -- of being incompetent, that she had been fired from her

 8   last job, which wasn't true, that why can't we get somebody in

 9   here that knows what they're doing?  You don't know what you're

10   doing.  They would make up words and definitions and Carrie

11   would try to find out what they were talking about.  And then a

12   lot of times, they would get very angry, and finally, Carrie

13   would call for a caucus.

14   Q    Do you recall, specifically, negotiations on June 27th,

15   2019?

16   A    No.

17   Q    Okay.  And would something help you recall that specific

18   date?

19   A    Just looking at my notes.

20   Q    Okay.

21       MS. BURKE:  So then, can we just pull up June 27th on

22   Joint Exhibit 14, which is the Bates stamp 10 through 12, I

23   believe?

24       THE WITNESS:  Can I get that out of my stack?

25       MS. BURKE:  Yes, go ahead.  Just the June 27th notes,



 1    please, Ellen.

 2         THE WITNESS:  Okay, I have June 27th.

 3    Q    BY MS. BURKE:  Okay.  And can you confirm, though, what

 4    you have is the same thing that's being displayed on the

 5    screen?

 6    A    Yes, I believe so.

 7    Q    Okay.  Now, Ellen, do you recognize this document?

 8    A    Yes.

 9    Q    And how do you recognize it?

10    A    These -- these look like the notes that I took.

11    Q    Okay.  Now, going to the second page on Joint Exhibit 14,

12    which is Bates stamp 11, you wrote "Chuck insults Carrie,

13    calling her obscene names."  What, if anything, do you recall

14    Chuck saying?

15    A    Well, I did put down here that she -- he called -- said

16    that she was obnoxious and foulmouthed.  It - it seemed like

17    there was a whole lot of stuff, and I had a hard time keeping

18    up.  I'm not a professional typist, so I did the best I could,

19    but I don't remember in this particular instance.

20    Q    If you recall, was this the first time that Mr. Pautsch

21    used this type of language?

22    A    Oh, no, no.  It -- it was worse before the mediator came

23    on board.

24    Q    And when did the media -- mediator come on board, if you

25    recall?



1    A    I think that was in 2019.

2    Q    And do you recall if you wrote down specific times that

3    Mr. Pautsch had used other obscene language prior to these

4    notes?

5    A    That would have been in my older notes from 2017 and 2018,

6    but I did not write down the foul language.

7    Q    In your previous notes?

8    A    Yeah.

9    Q    And why not?

10   A    I don't know.  It's embarrassing.  It was -- it was

11   shocking.

12   Q    And what do you mean by shocking?

13   A    Just to hear it go that way.  I've been in negotiations

14   with Carrie and with a previous union president, and I'd never

15   really heard any negotiations go like this before.

16       MS. BURKE:  Now, thank you, Mr. Schiff, we can pull that

17   down.  And Carr -- or Ellen, please go ahead and turn down your

18   notes again.

19   Q    BY MS. BURKE:  Ellen, I want to go back.  You mentioned a

20   January 8th meeting, and that was where there was an

21   announcement regarding negotiations.  How did you first learn

22   about this meeting?

23   A    Oh, we got an email in the morning about three meetings

24   and invited to participate in any one that we were able to be

25   in.



1    Q    And do you recall when this meeting would have been held?

2    A    There was one at 10:15, one at 2:30, and maybe one at 7,

3    approximately.

4    Q    And do you -- do you recall what date it would have been?

5    A    January 8th.

6    Q    And you referenced three meetings; how many meetings did

7    you attend?

8    A    Two of them.

9    Q    And which two?

10    A    The 10:15 and then the 2:30.

11    MS. BURKE:  And then Mr. Schiff, may the witness be shown Joint

12    Exhibit 56?  And then Ellen, if you have that, go ahead and

13    refer to Joint Exhibit 56.

14    Q    BY MS. BURKE:  And Ellen, is this the document that you --

15    on the screen -- that you're also referring to in a paper copy?

16    A    Hang -- hang on one minute.

17    Q    Mm-hmm.

18    A    Let's see.

19    MS. BURKE:  And then, Mr. Schiff, if we can actually

20    scroll down to, I think, a little farther.

21    THE WITNESS:  Well, I got my notes kind of all mixed up.

22    That is the -- that is the email that I got, yes.

23    Q    BY MS. BURKE:  So with Joint Exhibit 56, do you recognize

24    the document?

25    A    Yes, I do.



1    Q    And how do you recognize it?

2    A    It is the email that -- that I got, and it went out to all

3    the KOIN Union members.  And I'm on that list under KOIN Union.

4    Q    Okay.  And is this the email you were just testifying to

5    regarding the January 8th meeting?

6    A    Yes.

7    Q    Okay.

8        MS. BURKE:  So thank you, Mr. Schiff.  That can be pulled

9    down.

10   Q    BY MS. BURKE:  So Ellen, I want to focus on the 10:15 a.m.

11   meeting first.  Do you recall who was present at this meeting?

12   A    Yes.  Pat Nevin, Rick Brown, and Lisa Newell for

13   management, and then there was maybe about a dozen union

14   members there also.

15   Q    Do you recall which employees specifically?

16   A    No, I didn't write down any names.  I know that

17   Adele Steiger was there because she asked a question, but.

18   Q    And you said union members, were there any nonbargaining

19   unit members present at the meeting?

20   A    Only the three with management.

21   Q    Okay.  And where was this meeting held, if you recall?

22   A    In the upstairs executive conference room.

23   Q    How did the meeting begin?

24   A    Pat saying that he had good news, that they were no longer

25   representing -- or they were no longer going to recognize the



1    Union.

2    Q    And what, if anything, was the response to that?

3    A    People did ask are we going to get raises.  And he said,

4    no, we can't do anything for 45 days.  No raises, no changes to

5    anything in terms of union benefits for 45 days.  It would

6    looks like --

7    Q    As per --

8    A    -- we were incentivi -- I'm sorry.

9    Q    Sorry, it -- it cut off on my end.  Go ahead and repeat

10   the end of your answer for me.

11   A    Oh, just that he said we can't give a raise because it

12   would look like they were incentivizing anti-Union feelings.

13   Q    And then for clarity of the record, he being who?

14   A    Pat Nevin.

15   Q    Okay.  And what, if anything, happened after (audio

16   interference) this?

17   A    That -- the one thing that they did say was changing was

18   that they were going to take down the Union bulletin boards,

19   and that they had not yet contacted the Union, but they were

20   going to do so shortly.

21   Q    And you mentioned there were questions, do you recall what

22   specifically?

23   A    I just remember that Adele asked if senior people were

24   going to be laid off.  And he said no, that we're growing.

25   Q    Okay.



 1    A    I guess I had asked a couple questions.

 2    Q    And what did you ask?

 3    A    I asked if this was because we had charged them with

 4    surface bargaining, and he said no.  I asked at the end of 45

 5    days, are -- are you going to take away all of our union

 6    benefits, our -- our overtime, et cetera, things that are

 7    different for us.  And he said he -- he couldn't say anything

 8    or didn't know what was going to happen after 45 days.

 9    Q    Did he say he didn't know or did he not respond?

10    A    It was kind -- it was kind of both.  He -- he -- he would

11    not say when we would lose our union benefits, that was the

12    gist of it.

13    Q    And again, for clarification, for the record, this is all

14    Mr. Nevin?

15    A    Yes.

16    Q    Okay.  You mentioned there was a surface bargaining

17    charge; what was that?

18    A    I -- well, you know, and I may have had it wrong.  I know

19    that we had had some -- had some issues with them in the

20    bargaining.  I don't know if there was a surface bargaining or

21    if it was lack of an information request or whatever, but I

22    knew that there was stuff going on.  And so I was wondering

23    if -- if that had to do with their decision.

24    Q    Did you document this 10:15 a.m. meeting?

25    A    Yes.



1    Q    And how did you document it?

2    A    I sent an email to Carrie Biggs-Adams.

3    Q    Okay.

4    MS. BURKE:  Then Mr. Schiff, will you please pull up GC Exhibit

5    4?  And then, Ellen, you can turn to GC Exhibit 4 as well in

6    your paper copy.

7         THE WITNESS:  Yes, I have it.  Yes.

8    Q    BY MS. BURKE:  And then Ellen, go ahead and confirm for

9    me, is the document on the screen the same as the document you

10   have printed out?

11   A    Yes, it is.

12   Q    Okay.  And do you recognize this document?

13   A    Yes, it's the email I sent to Carrie.

14   Q    And is this the email you were just testifying to?

15   A    Yes.

16        MS. BURKE:  Okay.  And I believe GC Exhibit 4 is already

17   in, but if not, I would offer it into evidence.

18        JUDGE TRACY:  Yeah, I believe it's in, but just to be

19   certain -- and Mr. Roberts, any objections?

20        MR. ROBERTS:  Sorry, I had it on mute.  No, I don't have

21   any objection.  I think it's already in, but no, I don't

22   object.

23        JUDGE TRACY:  I believe so, too.  I think we -- Ms.

24   DeVleming, recall for me, was at Number 10 and 11 we held off

25   on?



1    MS. DEVLEMING:  11 and 12.  I think 10 was already in as

2    well.

3        JUDGE TRACY:  Okay, 11 --

4        MS. DEVLEMING:  11 and 12 are missing.

5        JUDGE TRACY:  All right, Claudine, you have GC Exhibit 4

6    in the record, right?

7        THE WITNESS:  I'm -- I'm sorry?

8        JUDGE TRACY:  Oh, I was talking to the court reporter.

9        THE COURT REPORTER:  Okay, ma'am, I'm sorry.  What did you

10   say?

11       JUDGE TRACY:  I said, GC-4 is in the record, right?

12       THE COURT REPORTER:  Yes, ma'am.

13       JUDGE TRACY:  Okay.  Yeah, so I've got a note here, 11 and

14   12 is what I'll look out for.  Okay.  Go ahead, please.

15       MS. BURKE:  Perfect.  I will note that as well.

16   Q    BY MS. BURKE:  And Ellen, is this still a fair and

17   accurate depiction of your recollection of the January 8th

18   meeting?

19   A    Yes.

20   Q    Okay.  All right, so --

21   A    And --

22   Q    -- thank you.

23   A    -- there's one thing I didn't add, and that was that Pat

24   told everybody that we didn't have to pay dues anymore, and

25   that they were never go -- they weren't going to send any



1    payroll information to the Union.

2    Q    Okay.

3         MS. BURKE:  Thank you, Mr. Schiff, that --

4         THE WITNESS:  (Audio interference) --

5         MS. BURKE:  -- that can be pulled down.

6         JUDGE TRACY:  One second, please.

7         Ms. Hansen, just wait for there to be a question that's

8    being asked of you.  Okay?  So just -- it isn't going to be

9    everything, or you might want to add more, but you need to wait

10   until there's a question posed before you.  Okay?

11        THE WITNESS:  Okay.

12        JUDGE TRACY:  All right, thank you.

13        THE WITNESS:  Sorry.

14        JUDGE TRACY:  Go ahead, Ms. Burke.

15        MS. BURKE:  Okay.  All right.  And then, Ellen, go ahead

16   and flip that exhibit back over.

17   Q    BY MS. BURKE:  Now, you mentioned bulletin boards; what

18   were these bulletin boards?

19   A    They were the two Union bulletin boards that we've had

20   since we had a Union.

21   Q    And where were these bulletin boards located?

22   A    One was up on the middle floor at -- in the employee break

23   area, and one was on the bottom floor, near the news

24   department.

25   A    About how big were these bulletin boards?



1    A    Three by four, three feet by four feet.

2    Q    And what would typically be posted on them?

3    A    Negotiating bulletins, other bulletins, and information,

4    possibly things that were available to union members,

5    scholarships, et cetera.

6    Q    And would the information on negotiations be from the

7    Union?

8    A    Yes.

9    Q    Okay.  And if you know, was the use of bulletin boards

10    outlined in the party's collective bargaining agreement?

11    A    Yes.

12    Q    Okay.  Now, you mentioned that during the meeting, Mr.

13    Nevin stated the bulletin boards would be removed.  If you

14    know, were the bulletin boards actually removed?

15    A    They had been removed by the time of the 2:30 meeting.

16    Q    And how do you know?

17    A    I looked for them and they were gone.

18    Q    And if you know, where --  what's the status of the

19    bulletin boards now?

20    A    I don't know where the boards are, no.

21    Q    Are they hanging where they used to be?

22    A    No, they're gone.  There's other stuff on them.

23    Q    Now, I want to focus on the second meeting.  Who was

24    present at that meeting?

25    A    The same three managers, and a different group of -- of



1    union members, and Matt Rashleigh.

2    Q    And who is Mr. Rashleigh?

3    A    He's a steward with our union.

4    Q    Where was this meeting held?

5    A    In the same place.

6    Q    And how did this meeting begin?

7    A    Basically the same way, with the same information.

8    Q    Do you recall anything said during this meeting that

9    wasn't said during the first meeting?

10   A    Well, I asked where the bulletin board material was, and

11   they said it had been thrown out.  Pat had looked at Rick, and

12   Rick said, yes, thrown out, recycled.

13   Q    Was there anything else said during that meeting that

14   wasn't previously said during the 10:15 meeting?

15   A    Yes.  Matt asked how did they know that there was no

16   support for the Union?  Did they take a poll, et cetera?  And

17   Pat said no, they just had had a few conversations with people

18   and decided that there wasn't enough support.

19   Q    Do you recall anything else about this meeting?

20   A    I don't think so, not right now.

21   Q    How long with this meeting?

22   A    They were both short, 15, 20 minutes.

23        JUDGE TRACY:  Let me as you something, and I'm sorry to

24   interject here, but you said that -- you just testified about

25   the support.  Who said -- who -- who on behalf of management



1    spoke about, you know, that they had just talked to people?  I

2    don't want to misstate your testimony, but could you just

3    please clarify that for the record?

4        THE WITNESS:  Yes.  Pat Nevin, at both meetings, was the

5    one who said we have decided that there isn't enough support

6    for the Union among the members, and therefore, we are not

7    recognizing the Union anymore.

8        JUDGE TRACY:  Um-hum, but at the second meeting at 2:30,

9    Mr. Rashleigh, you've just testified, asked a question, and who

10   responded to him?

11   A    Oh, Pat Nevin.

12       JUDGE TRACY:  Okay, thank you.

13   Q    BY MS. BURKE:  Prior to this meeting, Ellen, had you been

14   asked by anyone at KOIN-TV, whether you still supported the

15   Union?

16   A    No.

17   Q    And were these two meetings on January 8th, the first time

18   you heard that KOIN no longer believed the Union had support?

19   A    Yes.

20   Q    What did you think when you heard that?

21       MR. ROBERTS:  Objection.

22   A    Well, I was surprised.

23       JUDGE TRACY:  Okay, so -- oh, I'm sorry, Ms. Hansen.  I

24   also forgot to tell you that when there is an objection, please

25   don't answer the question unless I tell you to -- to answer it



1    or not, because I need to make a ruling on that.

2        So Mr. Roberts has objected to the question, and the --

3    the objection is sustained.

4        Go ahead, Ms. Burke, with your next question.

5        Please don't answer that, Ms. Hansen.

6    Q    BY MS. BURKE:  After the meeting, what if anything, did

7    you do to determine if there was still support for the Union?

8    A    Personally, I did go around and -- and ask people how they

9    felt.  And -- and eventually, we did get a petition going of --

10    of support.

11        MS. BURKE:  There's quite a bit of background noise coming

12    through from someone.  I'm not -- not sure if it's Your

13    Honor -- the jackhammer you referenced earlier or?

14        JUDGE TRACY:  No, no.  That was a street cleaner, and

15    there -- there is no more noise here anywhere.

16        MS. BURKE:  Okay, no jackhammer, somebody's jackhammer.

17        THE WITNESS:  It's my -- my -- my neighbor is doing

18    something, and I don't know what.

19        MS. BURKE:  Unavoidable then, as long as it's somebody who

20    couldn't be muted, so I just wanted to say.

21        THE WITNESS:  Yeah, I'm sorry.  I didn't know they were --

22    I don't know what he's doing, taking the leaves off his roof or

23    something.

24    Q    BY MS. BURKE:  So Ellen, you stated that you went around

25    and had conversations with individuals; how many conversations



1    did you have?

2    A    I don't know.

3    Q    Was it more than ten?

4    A    Oh, yes.  Yeah.

5    Q    Do you recall any of these conversations specifically?

6    A    Yes.

7    Q    And what were they?

8    A    One of them was with Travis Box at the coffee machine,

9    and -- I'll move closer.  One of them was with Travis Box at

10    the coffee machine.  I asked him what he was thinking, how he

11    felt.  He's a new employee.  And he just said, well, he was

12    waiting for the dust to settle.

13    Q    And when did this conversation occur, if you recall?

14    A    January 8th?  I'm not sure.

15    Q    Okay.  What were you doing prior to speaking to Mr. Box?

16    A    I was on a break.  I was getting coffee.

17    Q    And what, if anything, did you say in response to Mr. Box

18    saying he wanted the dust to settle?

19    A    Well, we were interrupted at that point by Rick Brown.

20    Q    And what happened after that?

21    A    Rick Brown suddenly came up from behind me and said, I

22    wouldn't talk about that if I were you.  Something to that

23    effect, yeah.

24          JUDGE TRACY:  Ms. Hansen, are you able to possibly close

25    the -- close the window if you have a window there?  Are you



1  able to do that?  I'm sorry, maybe I don't --

2       THE WITNESS:  Yes.

3       MS. DEVLEMING:  -- (audio interference), that might help.

4       THE WITNESS:  Boy, I could maybe go into another room.

5  Hang on.  Is this any better?  Is that better?

6       JUDGE TRACY:  I think so, I don't think that we hear that

7  noise outside, or did you stay in the room or you went

8  somewhere else?

9       THE WITNESS:  I just -- I'm in the restroom.  Oh, all

10  right.  Well, if that works for you, and you know, just one of

11  the unavoidable things that happens with Zoom that is under no

12  one's control versus if we were in person, we wouldn't likely

13  have the sound of street cleaners or things that we can't --

14  that we can prevent when we're together.  I just note that for

15  the record.  Go ahead, Ms. Burke, I'm sorry.

16       MS. BURKE:  That's okay.  Thank you, Your Honor.

17  Q    BY MS. BURKE:  So, Ellen, who -- remind us who Rick Brown

18  is?

19  A    Rick Brown is my manager.  He's the operations manager.

20  Q    And did you respond after he told you that he didn't think

21  you should be talking about that?

22  A    I was surprised and I said, Rick, we're getting coffee.

23  Q    Okay.  Why are you surprised?

24  A    Well, he surprised me by walking up behind me, and it's

25  kind of my understanding that if you're getting coffee, you can



1    talk about things, the weekend, whatever.

2    Q    Had you noticed Mr. Brown prior to him approaching you?

3    A    No.

4    Q    And what, if anything, happened after you told him you

5    were just getting coffee?

6    A    Travis quickly walked away back to his desk, and -- and

7    Rick went somewhere else for coffee, I guess.  And I finished

8    getting my coffee.

9    Q    And did you document this conversation with Mr. Brown?

10   A    Yes, I did.

11   Q    How?

12   A    I had sent an email to Carrie Biggs-Adams.

13   Q    Okay.

14        MS. BURKE:  And then, so Mr. Schiff, will you please pull

15   up GC Exhibit 11?  And Ellen, you can refer to GC Exhibit 11,

16   if you have it printed out.

17        THE WITNESS:  Okay, yes.

18   Q    BY MS. BURKE:  And then, Ellen, go ahead and confirm that

19   the document on the screen is the same as the document you're

20   referring to.

21   A    Let's see.  Let's see.  Yes, that -- that's -- that's the

22   email.  Um-hum.  I couldn't find it in the pile, but that is

23   the email.

24   Q    You can see it on the screen?  Okay.  And you recognize

25   this document?



 1   A   Yes.

 2   Q   And how do you recognize it?

 3   A   It's the email that I sent to Carrie.

 4   Q   And is this the email you were just testifying to?

 5   A   Yes.

 6   Q   And is it a fair and accurate representation of the

 7   events --

 8   A   Yes.

 9   Q   -- of that day?

10   A   Yes.

11       MS. BURKE:   Then I would offer GC Exhibit 11 into

12   evidence.

13       MR. ROBERTS:  No objection.

14       JUDGE TRACY:  All right.  So General Counsel's Exhibit 11

15   is admitted into evidence.

16       MS. BURKE:  Okay.  And then thank you, Mr. Schiff, that

17   can be taken down.

18   Q   BY MS. BURKE:  And then Ellen, I believe you said that you

19   recalled speaking to other employees; who else did you speak

20   to?

21   A   Oh, I spoke to Neil Sparks once.

22   Q   And who is Mr. Sparks?

23   A   He's up in commercial production.  And basically, it was

24   actually, Colin Cashin had asked me a question.  He's in

25   production, and so I went upstairs with a bulletin to give to



1  Colin.  And he wasn't in his office, so I handed it to Neil

2  Sparks to relay it to Colin.

3  Q    And do you recall when this conversation would have

4  happened?

5  A    I think it was in early afternoon.  I don't recall.  I

6  don't.

7  Q    Okay.  And what were you doing prior to speaking to Mr.

8  Sparks?

9  A    I believe I was on a break, you know, wait -- waiting for

10  an assignment.

11  Q    And what was he doing when you approached him?

12  A    He was in his office, and I don't know what he was doing.

13  Q    How long did the conversation with Mr. Sparks last?

14  A    Oh, very brief.  I just said, would you give this to Colin

15  when -- when he comes in?

16  Q    And what was the document you were handing to him?

17  A    It was a bulletin, a negotiating bulletin, or a bulletin

18  about what was going on.

19  Q    And what, if anything, happened after you handed the

20  bulletin to Mr. Sparks?

21  A    I went down -- back downstairs.  And on my way back

22  downstairs, I did pass Rick Brown in the hallway.  He saw me

23  and then I went -- continued on downstairs.  And he came up a

24  couple minutes later and said, Ellen, do you have a couple

25  minutes?  And I said, okay.  And we walked into it's the --



 1    it's an open area downstairs in the news area -- and he said,

 2    you are not to be handing out bulletins.  We are not

 3    recognizing the Union, and you cannot do that.

 4    Q    And what did you say in response?

 5    A    I think maybe I said it's just a bulletin or, you know,

 6    not -- not much.  I didn't say much.  He mostly talked at me.

 7    Q    Do you recall anything else about that conversation?

 8    A    Just that he was very angry, and I -- his voice was

 9    raised.

10    Q    Was anyone else present for that conversation?

11    A    I don't know, there could have been people.  It was in an

12    open area.

13    Q    And how long did that conversation last?

14    A    It was very brief.

15    Q    Prior to this incident, had you ever been restricted from

16    handing out Union information?

17    A    No, not officially.  No, I've never been told that.

18    Q    Did you document this incident with Mr. Brown?

19    A    Yes, I did.

20    Q    And how?

21    A    I sent a email to Carrie Biggs-Adams.

22    Q    Okay.

23         MS. BURKE:  Mr. Schiff, if we can please pull up GC

24    Exhibit 12?  And Ellen, if you have it, you may refer to it

25    or -- or use the screen, whatever is easiest.



1    Q    BY MS. BURKE:  Ellen, is the document --

2    A    Yes, that is the --

3    Q    -- you have printed out the same as the document on the

4    screen?

5    A    Yeah, I -- I'm just looking at the screen, and it is the

6    email that I sent.

7    Q    Okay.  And so you recognize the document?

8    A    Yes.

9    Q    And how do you recognize it?

10   A    It's the email that I sent to Carrie.

11   Q    And is this the email you were just testifying to?

12   A    Yes.

13   Q    Okay.

14        MS. BURKE:  I would offer GC Exhibit 12 into evidence.

15        MR. ROBERTS:  No objection.

16        JUDGE TRACY:  General Counsel's Exhibit 12 is admitted

17   into evidence.

18        MS. BURKE:  Okay.  And then, thank you, Mr. Schiff.  That

19   that can be pulled down.

20   Q    BY MS. BURKE:  Now, Ellen, I want to turn back to what Mr.

21   Nevin said during that January 8th meeting regarding nothing

22   changing for 45 days other than the bulletin board.  Prior to

23   that January 8th meeting, had you noticed any changes at the

24   Employer?

25   A    Yes, I did.



1    Q    And what did you notice specifically?

2    A    On January 6th, I noticed that they had changed the

3    vacation policy.

4    Q    And when you say they, who do you mean?

5    A    I don't know exactly who -- who did, but management did,

6    and they -- it was written (audio interference) vacation policy

7    to change.

8    Q    What was the previous vacation policy?

9    A    We had for the -- the different groups have their own

10   policies, but for the photographers specifically -- actually,

11   for everybody, we're allowed to select our vacation except for

12   three periods of time called sweeps, which are November,

13   February, and May.  So if we -- and we do it by seniority.

14   They put up a bulletin board and we take turns, and we select

15   our vacation.

16   Q    And how do you know this is the vacation policy?

17   A    We kind of had an agreement for several -- well, probably

18   four or five years -- specific to that.

19   MS. BURKE:  And then, Mr. Schiff, if we can have General

20   Counsel Exhibit 15 pulled up, please?  And then if we can maybe

21   just scroll, so Ellen can see the whole document.

22   Q    BY MS. BURKE:  Ellen, do you recognize this document?

23   A    Yes.

24   Q    And what is this document?

25   A    It is the policy that we negotiated with KOIN at one point



1    on -- on how to fairly take vacations and select them according

2    to seniority.

3    Q    And is this the policy you were just outlining?

4    A    Yes.

5    Q    Okay.

6         MS. BURKE:  I would offer GC Exhibit 15 into evidence.

7         MR. ROBERTS:  No objection.

8         JUDGE TRACY:  All right, so General Counsel Exhibit 15 is

9    it -- is admitted into evidence.

10   **(General Counsel Exhibit Number 15 Received into Evidence)--**

11        MS. BURKE:  Okay.  And then Mr. Schiff, that can be pulled

12   down, thank you.

13   Q    BY MS. BURKE:  Now, Ellen, what specifically was the

14   change that you noticed regarding vacation?

15   A    They add -- they added a time period where normally people

16   have vacation, and they made it so that only -- whereas in our

17   department, two people could take this week off, they crossed

18   that out and said only one could take this particular week.

19   Q    And just describe to me, how is that different than the

20   policy we just referenced?

21   A    It was not included in the ti -- times that are not

22   allowed to -- that we're not allowed to take vacations.  It was

23   in the period of time that we're allowed to take vacations.

24   Q    You testified you noticed this on January -- on or about

25   January 6th; what did you do after you noticed the vacation



1    policy change?

2    A    I sent a email to Carrie.

3        MS. BURKE:  Okay.  If we can pull up GC Exhibit 3, please?

4    And then, if we can just scroll a little bit?  All right.

5    Q    BY MS. BURKE:  Ellen, do you recognize this document?

6    A    Yes.

7    Q    And how do you recognize it?

8    Q    Well, right now I'm looking at the photograph.  It's a

9    photograph that I took of the vacation schedule.

10   Q    Okay.

11       MS. BURKE:  And then, Mr. Schiff, if we can scroll up the

12   first page?

13   Q    BY MS. BURKE:  And so Ellen, now seeing the entire

14   document, what is the document?

15   A    Is the email that I sent Carrie.

16   Q    Okay.  And is this the email you were just testifying to?

17   A    Yes.

18   Q    I know you referenced the attached photo; who took that

19   photo?

20   A    I did.

21       MS. BURKE:  And Mr. Schiff, if we can scroll down a little

22   bit again, please?

23   Q    BY MS. BURKE:  What -- what does that photo show?

24   A    It shows that only one photographer is allowed off from

25   July 1st through July 4th because of the Blues Fest -- "only



1    one photog off" -- normally, there would be two.

2    Q    And remind me again, when are sweeps during the year?

3    A    November -- November, February, and May.  I may have had

4    (simultaneous speech) --

5    Q    But not July?

6    A    No.  There is sweeps during July, but we've never

7    recognized it because it's summer, and they don't pay any

8    attention to it.  It's never been off -- off -- they've never

9    taken that off the vacation.

10    Q    And prior to this, has there ever been a restriction on

11    that July weekend?

12    A    No.

13    Q    Okay, great.

14        MS. BURKE:  Thank you, Mr. Schiff.  That can be taken

15    down.

16        JUDGE TRACY:  Yes, Ms. Hansen?

17        THE WITNESS:  I think the noise has stopped.  May I go

18    back into the other room?

19        JUDGE TRACY:  Oh, sure, sure.

20        THE WITNESS:  Okay.

21        JUDGE TRACY:  Okay, Ms. Burke, go ahead.

22        MS. BURKE:  Thank you.

23    Q    BY MS. BURKE:  When do you typically sign up for vacation?

24    A    We start in November.

25    Q    Have you signed up for vacation this year?



1    A    I have done -- yeah, one sign up so far.

2    Q    And if you know, what, if anything, are the restrictions

3    for that July week for 2021?

4    A    This -- this year or next year, there's no one off on that

5    time period.

6    Q    And how do you know that?

7    A    I saw it.  And actual -- actually, I saw it hanging up.

8    And I have -- Bill sent out a photograph and an email

9    explaining the policy.

10    Q    And who is Bill?

11    A    Bill Cortez, he is the chief photographer.  And he has

12    taken over the vacation duties.  He's a member of our Union,

13    but he's been assigned to do that.

14    Q    Okay.

15        MS. BURKE:  So then, Mr. Schiff, if you can please pull up

16    GC Exhibit 16?

17        MR. SCHIFF:  15 or 16?

18        MS. BURKE:  16, please.

19        MR. SCHIFF:  16.

20        MS. BURKE:  And if we can just scroll through a little bit

21    of the document so Ms. Hansen can see it?

22    THE WITNESS:  Yes.

23    Q    BY MS. BURKE:  Ellen, do you recognize this document?

24    A    Yes.

25    Q    And what is it?



1    A    It's an email that I got from Bill Cortez regarding the

2    vacations.

3    Q    Is this the email you were just testifying to?

4    A    Yes.

5    Q    Okay.

6        MS. BURKE:  We would offer GC Exhibit 16 into evidence.

7        MR. ROBERTS:  No objection.

8        JUDGE TRACY:  All right, so General Counsel's Exhibit 16

9    is admitted into evidence.

10   **(General Counsel Exhibit Number 16 Received into Evidence)**

11       MS. BURKE:  Okay, great.  Thank you, Mr. Schiff, that can

12   be taken back.

13   Q    BY MS. BURKE:  All right.  Ellen, we've focused on the

14   days before the January 8th meeting, but now I want to touch on

15   after the January 8th meeting.  What, if anything, changed

16   after those 45 days passed?

17   A    They did call us into another meeting to talk about

18   compensation.

19   Q    And again, when you say they, who do you mean?

20   A    Oh, Pat Nevin, Rick Brown, and Lisa Newell.

21   Q    And how did you learn about that meeting?

22   A    Through an email.

23   Q    Do you recall when that meeting was held?

24   A    I should, I just looked.  I was studying, but I can't

25   remember now.  Was that May?



www.escribers.net | 800-257-0885

1        MS. BURKE:  So can we please pull up Joint Exhibit 59, and

2   then scroll down a bit, please?

3   Q    BY MS. BURKE:  Ellen, do you recognize this document?

4   A    Yes.  It is a --

5   Q    And what is it?

6   A    -- an email from Pat saying that they were -- to schedule

7   a meeting to discuss compensation.

8   Q    And is this the email you received about the meeting?

9   A    Yes.

10  Q    Okay.  And the -- this email indicates it was sent on

11  March 17th?

12  A    Oh, okay.  I'm sorry.

13  Q    When would you have attended the -- when would you have

14  attended the meeting?

15  A    I don't have the exact date.  I probably sent an email to

16  Carrie right after it that would have a date.  I don't recall.

17  MS. BURKE:  Thank you, Mr. Schiff.

18  Q    BY MS. BURKE:  So Ellen, if you recall, where was this

19  meeting held?

20  A    It was upstairs, outside the executive board room in an

21  open area.  We were social distancing because of COVID, so we

22  were placed in chairs six feet apart.  And is that noise --

23  Q    And --

24  A    -- bad again?  Okay.  I'll move there.  Okay, sorry about

25  that.



1    Q    Okay.  And who was present at this meeting?

2    A    There were about six people, and I -- it was Pat Nevin,

3    Lisa Newell, and Rick Brown again, I believe.

4    Q    And were there employees present?

5    A    Yes, probably about six.

6    Q    And do you recall anyone specifically?

7    A    No.

8    Q    Okay.  And how did that meeting begin, if you recall?

9    A    Pat announced that they were going to be giving us a 1.5

10   percent raise that would be retroactive to January.

11   Q    And was there a response to that?

12   A    People were quiet.

13   Q    And what, if anything, happened after that?

14   A    Mostly, the COVID had really started, and people were very

15   concerned about that.  So most of the questions were about

16   COVID, and I don't think anybody really wanted to talk about

17   the Union.

18   Q    Do you recall who this raise would apply to?

19   A    Everyone in - in the Union.  It was just for Union

20   members.

21   Q    And you stated that Mr. Nevin said it would be retroactive

22   to January.  Was it, in fact, retroactive to January?

23   A    Yes.

24   Q    And did you, in fact, receive a 1.5 percent wage increase?

25   A    Yes.



1    Q    Okay.  And when did you receive that, if you know?

2    A    It -- probably on the next paycheck.

3    Q    Okay.  Now, you mentioned a petition; what was that

4    petition?

5    A    We started passing around a petition to show that there

6    was support for the Union.

7    Q    And when you say we, who do you mean?

8    A    Mostly me, Matt, and Robert.

9    Q    And when did you start passing this out?

10   A    I don't remember the exact date now, but it was after they

11   had said that there was no support for the Union.  So maybe a

12   month later, within the month.

13   Q    Okay.  And what was the response to the petition?

14   A    Well, most of the people I talked to were hoping that the

15   Union survived this; however, they were nervous about signing

16   anything because they were afraid of retribution.

17   Q    And what, if anything, happened with the petition?

18   A    We got a Catholic priest to certify the names on it, and

19   that we had a majority of the Union members.  So that we told

20   people that we would have an outside party certify it so their

21   names would not be entered into the record.  And we did that,

22   and then it was presented to Pat Nevin, I believe by Matt

23   Rashleigh.

24   Q    And do you recall when that would have been presented?

25   A    No.



1    Q    Okay.  And what, if anything, did Mr. Nevin do when he

2    received that petition?

3    A    I don't know, because I wasn't there.

4    Q    Okay.  Since the Respondent withdrew recognition, have

5    employees reached out to you about the Union?

6    A    Yes.

7    Q    How many times?

8    A    Oh, well, we had conversations.  We -- we got enough

9    signatures, so I talked to them during that process.  So I'd

10   say nearly half of them, probably.  I don't run into contact

11   with all of -- all of the members, but I had a lot of people

12   asking questions.

13   Q    And in the previous few months, how often have people

14   reached out to you?

15   A    Well, when we were in the building and I would be around

16   the building, I'd have conversations a couple of times a week

17   with people.

18   Q    Now, you said when you were in the building, has it

19   changed since you've been out of the building?

20   A    Yes, I don't -- I don't see anybody anymore.  Rarely, once

21   in a while, I'll see a couple people.

22   Q    And so how many employees have reached out about the Union

23   now, post-CO -- or during COVID?

24   A    None that I recall.

25   Q    Okay.



1    MS. BURKE:  Wait just one moment, Your Honor.  All right,

2    Your Honor, I have no further questions for Ms. Hansen at this

3    time.

4    JUDGE TRACY:  Ms. Yen?

5    MS. YEN:  No, I don't have any questions.  Thank you.

6    JUDGE TRACY:  All right.  Mr. Roberts?

7    MR. ROBERTS:  Yes, I would request any Jencks statements,

8    please.

9    MS. BURKE:  Okay.

10    JUDGE TRACY:  Are there any?

11    MS. BURKE:  There -- there are, yes.  I believe, and I'll

12    just tell you to give you an estimate.  Let me -- one, two,

13    three, four -- I believe there are four total, and page-wise,

14    maybe 30 pages, but that's a real rough estimate.

15    MR. ROBERTS:  Your Honor, could we request 45 minutes?

16    I'll try to keep it to that.  I mean, if it's 30 pages, it will

17    take a little bit of time to get through.  I don't expect my

18    question -- my cross-examination to be very long, but I want to

19    make sure I get through all of that.

20    JUDGE TRACY:  Sure.  So, yeah, 45 minutes is fine.  And

21    then, you know, if you want to jump back on at 45 minutes if --

22    or your colleague says that, you know, I need another 10

23    minutes, that -- that's fine, too.

24    So Ms. Burke, are you going to go ahead and email it over

25    to him?



1        MS. BURKE:  I am.

2        JUDGE TRACY:  Okay, just go ahead and let us know when

3    you've done that.  And then he'll need to print it out and all

4    that, so you may need a little bit longer than 45 minutes.

5    It's possible, but let's aim for 45 minutes.  It's 2:43 right

6    now, so let's check in at 3:30.

7        MS. YEN:  Thank you.

8        JUDGE TRACY:  And I won't go off the record yet until I --

9    he gets it sent over to him.

10       MS. BURKE:  So I will say, Your Honor, some of these only

11   tangentially relate to bargaining, but for totality of

12   circumstances, we're erring on the side of providing.  So

13   perhaps it won't take as long, but it might.

14       JUDGE TRACY:  Yeah.  You know, and Mr. Roberts, if you're

15   done earlier, just come on.  I will kind of be coming in and

16   out and, you know, just kind of checking in to see, you know,

17   how's it going?  I'll come back probably -- well, I really

18   won't go anywhere, but I'll just on my case over there in -- in

19   like 30 minutes.  But have you went ahead and sent that over?

20       MS. BURKE:  They're getting attached right now, sorry.

21       JUDGE TRACY:  So Mr. Roberts, again, just like -- just

22   like we did with the other Jencks statements, I just want to

23   ensure on the record that what your intentions are, is that you

24   will be taking these affidavits that they're providing, the

25   General Counsel is providing, of Ms. Hansen, printing them out,



1    using them for cross-examination purposes.  And then remind me,

2    if I forgot to ask you, that after you're complete with her

3    testimony there, that you will go ahead and delete them from

4    your email inbox, the trash box, and shred her -- her

5    statements that you've printed out.

6        MR. ROBERTS:  Yes, that's correct.  Thank you.

7        JUDGE TRACY:  Okay.  All right.  Well, Ms. Hansen, I'm

8    going to go ahead and say that you -- what you can do is you

9    can -- maybe, Mr. Schiff, let's go ahead and put her in a

10   breakout room.  That way she can just sort of wait.  You can

11   then mute and -- yourself, Ms. Hansen, and what -- what we'll

12   be aiming for is about 3:30 Pacific Time to get back on with

13   you for the cross-examination.  So just sort of hang around

14   there so you're -- you're present.  If we get called a little

15   bit earlier, hopefully, you'll just sort of be listening to see

16   if Mr. Schiff tries to call you back earlier.  Okay?

17       THE WITNESS:  Okay.

18       JUDGE TRACY:  All right.  And so let's aim for 3:30.  It

19   may take a little bit longer if he needs to print and all that

20   jazz, so we'll go ahead and go off the record until 3:30

21   Pacific Time.

22   (Off the record at 2:45 p.m.)

23       JUDGE TRACY:  All right, let's go ahead and go back on the

24   record.

25       THE COURT REPORTER:  Okay, we're on the record.



1      JUDGE TRACY:  All right.  Mr. Roberts, go ahead, please.

2                        **CROSS-EXAMINATION**

3  Q    BY MR. ROBERTS:  Good afternoon, Ms. Hansen.  My name is

4  Charles Roberts.  I'm the attorney for KOIN, and I just have a

5  couple of questions for you.  Okay?

6  A    Yeah.

7  Q    Number one, you testified that during negotiations, that

8  Mr. Pautsch at some point stated that Carr -- Ms.-- Ms.

9  Biggs -Adams was foulmouthed; do you requi -- you recall that

10  testimony?

11  A    Today?

12  Q    Yes.

13  A    Yeah.

14  Q    Okay.  In fact, during the negotiations, Ms. -- Ms.

15  Biggs- Adams regularly used profanity whenever she got upset at

16  company proposals; isn't that true?

17  A    There were times.

18  Q    And what kind of profanity was -- do you recall specific

19  examples?

20  A    I don't.

21  Q    Okay.  But she -- she did use profanity when she didn't

22  like particular company proposals?

23  A    Sometimes.

24  Q    Okay.  Now, the other question, do you recall back in

25  October or so, do you recall the Union offering employees a



1    waiver of their initiation fees if they joined within a certain

2    time period?

3    A    Yes.

4    Q    My question is this.  In -- in January or February of

5    2020, when you and a few other employees were circulating a

6    petition to try to show Union support, did you offer the

7    employees a waiver at that time of initiation fees?

8    A    I don't -- I don't remember.  No, I don't think so.  I

9    don't remember when that was.

10    Q    Well, you said it was in January or February of 2020 that

11    you were circulating a petition, correct?

12        MS. YEN:  Misstates testimony.

13    A    Oh, yes (audio interference) .

14        JUDGE TRACY:  Okay, hold on one second.  Hold on one

15    second, please.  Again, I just have to remind all -- even the

16    attorneys here at this, you know, and -- and it's hard to jump

17    in when we have Zoom going on, but we have to slow down.

18    Unfortunately, it's not like when we're in person, and it can

19    be a little bit more rapid fire.

20        So it appears that Ms. Yen had an objection.  So go ahead

21    and state your objection for the record.  Ms. Hansen, do not

22    respond until I tell you to do so or not.

23        MS. YEN:  Well, I thought that -- I thought that the

24    question misstated the testimony, but I could be wrong.  I will

25    (audio interference).



1          JUDGE TRACY:  Well, so how about this, Mr. Roberts, if you

2     could just restate the question?  Or you know, I'm sure you're

3     not going to remember it verbatim, so whatever your question

4     was?

5          MR. ROBERTS:  Yes.  Well, let me just re-ask it.

6     Q    BY MR. ROBERTS:  Ms. Hansen, you did testify that after

7     the company withdrew recognition, that sometime thereafter, you

8     and some other employees circulated a petition among other

9     employees, trying to get support for the Union; is that

10    correct?

11    A    Yes.

12    Q    And I took that to be that that -- that occurred in

13    sometime in January and/or February of 2020; is that accurate?

14    A    I believe so.

15    Q    Okay.  And so that's the time period I'm talking about.

16    When you were doing that, you were circulating that petition,

17    did you and the other -- to your knowledge -- the others who

18    were doing the circulating, offer to waive the initiation fees

19    if employees signed up at that time?

20    A    I don't recall what time period it was that the waiver was

21    in -- in -- that we did the waiver.  I have not reviewed that,

22    and I don't believe that it was at the same time we were

23    circulating the petition.

24    Q    All right, thank you.  I don't have any other questions.

25    A    Okay.



1      MR. ROBERTS:  That's it.

2      JUDGE TRACY:  All right, thank you.  Ms. -- Mr.

3   DeVleming -- or I'm sorry, Mr. Burke.

4      MS. BURKE:  Thank you, Your Honor.

5                   **REDIRECT EXAMINATION**

6   Q    BY MS. BURKE:  I just have one -- one question, Ms.

7   Hansen.  When you were asking employees to sign the petition,

8   did you offer to waive their -- did you ever explicitly offer

9   to waive their initiation fees?

10  A    No, no.  We -- I don't believe that being part of that at

11  all.

12  Q    Okay.

13     MS. BURKE:  I have no further questions, Your Honor.

14     JUDGE TRACY:  Ms. Yen?

15     MS. YEN:  No questions, thank you.

16     JUDGE TRACY:  Okay.  And then Mr. Roberts?

17     MR. ROBERTS:  No, nothing else.

18     JUDGE TRACY:  All right.  So Mr. Roberts, if you could

19  just explain to us what you're going to do with her affidavits?

20     MR. ROBERTS:  As soon as have a moment, if we have a

21  little bit of a break here or whenever, I'm going to print out

22  copies of the affidavits.  There's about four of them.  And

23  then I'm going to delete them from my email and from my trash

24  box.  I can either do that now or if we're -- if there's going

25  to be a few minutes before the next witness, or I can do it at



1    the end of the day.

2        JUDGE TRACY:  Well, whenever you get a moment.  Ms. Burke,

3    does -- does that -- Mr. Roberts' statements here, are -- are

4    they sufficient in terms of, you know, him handing over the

5    Jencks statements back to you?

6        MS. BURKE:  Yes, Your Honor.

7        JUDGE TRACY:  Okay, thank you.  So one thing, though, is

8    well, Ms. Burke and Ms. DeVleming, are you guys ready for your

9    next witness?

10        MS. BURKE:  Yes, Your Honor.

11        MS. DEVLEMING:  I'll defer to Ms. Burke, yes.

12        JUDGE TRACY:  Ms. Burke will be leading the direct

13    examination?

14        MS. BURKE:  I will.

15        JUDGE TRACY:  I'm sorry?

16        MS. BURKE:  Yes, I will.

17        JUDGE TRACY:  Okay.

18        MS. BURKE:  Yes, I will.  And I believe that the next

19    witness is in the waiting room.  It'll be Robert Dingwall, Your

20    Honor.

21        JUDGE TRACY:  Okay.  So what we'll do is, we'll just take

22    a really quick five-minute break.  Is that good for everybody?

23    Let's take a five-minute break.

24        Ms. Hansen, I want to thank you for your testimony today.

25    Please don't discuss your testimony with anyone else until



1    after the close of the hearing.  You'll find out about the

2    close of the hearing from the General Counsel or from the

3    Union, and then you can talk about it after it's done.  And you

4    know, at this point, your -- we will have you sort of exit the

5    hearing, but I do appreciate your participation today.

6         THE WITNESS:  You're welcome, thank you.

7         JUDGE TRACY:  All right, thank you.  So Mr. Schiff, she

8    can, I guess, sign out or she can leave the meeting?

9         Okay, sounds good.  Before we take a break, though, do you

10   guys -- I noticed that the Charging Party reuploaded the -- the

11   exhibits for the subpoena, the petition to revoke.  Do we want

12   to go ahead and take care of that?

13        MS. YEN:  Sure, why don't we do that?  What I uploaded was

14   the petition to revoke and the exhibits that we'll attach to

15   the petition to revoke as Charging Party Exhibit 1 and Charging

16   Party Exhibit 2 in response to the issue that Respondent is

17   raising about the subpoena.

18        JUDGE TRACY:  Yeah.  And so, Mr. Roberts, you have already

19   uploaded the subpoena to -- as Respondent's Exhibit 1, so why

20   don't you guys, the three parties, take a look to make sure

21   that these documents are appropriate, Respondent's Exhibit 1

22   and Charging Party's Exhibits 1 and 2.  And then once you've

23   done that, you can offer them into evidence.  And then I just

24   want to make sure from Mr. Roberts, at this point, what -- what

25   is at issue.  Okay?  Let me know when you're ready.



1          MR. SCHIFF:  Just -- just FYI, I don't see the next

2     witness in the waiting room anymore.

3          JUDGE TRACY:  Oh.

4          MR. SCHIFF:  I don't know if he needs to be called back

5     or?

6          JUDGE TRACY:  Did you put him in a different room,

7     remember?  I thought maybe in a breakout room, or --

8          MR. SCHIFF:  I put the previous witness in the breakout

9     room.

10         JUDGE TRACY:  Okay.

11         MR. SCHIFF:  And he was just in there, so he might have

12    gotten tired in the waiting room, Judge, or I don't know --

13         THE COURT REPORTER:  I'll check.

14         MR. SCHIFF:  -- but he's not showing up.

15         JUDGE TRACY:  Okay, thank you.

16         MR. ROBERTS:  Well, I'm ready whenever, if Ms. Yen is.

17         JUDGE TRACY:  Okay.  Ms. Yen and Ms. DeVleming, do you see

18    the documents there?

19         MS. DEVLEMING:  Sorry, you were breaking up.  I assume you

20    weren't talking to me, but just in case.

21         JUDGE TRACY:  No, you -- I was.  I was.

22         MS. DEVLEMING:  Okay, perfect.

23         JUDGE TRACY:  I was asking if you took -- took a look at,

24    you know, just Respondent's Exhibit 1 and Charging Party's

25    Exhibits 1 and 2.


www.escribers.net | 800-257-0885

1     MS. DEVLEMING:  Yes.

2     JUDGE TRACY:  Okay.

3     MS. DEVLEMING:  They look good to me --

4     JUDGE TRACY:  All right.

5     MS. DEVLEMING:  -- on behalf of the General Counsel.

6     JUDGE TRACY:  All right.  So for the Respondent, why don't

7  you go ahead and you know, introduce those into the record?

8     MR. ROBERTS:  Your Honor, Respondent would offer

9  Respondents Exhibit 1, which is the subpoena duces tecum that

10  was issued by Respondent to the Charging Party.  It's a package

11  with a cover letter, the copy of the check, and the subpoena

12  itself.  I understand that in conjunction with this, Ms. Yen is

13  going to offer as Charging Party exhibits the petition to

14  revoke, which also attaches some email correspondence between

15  her and myself regarding the subpoena.  So I would offer

16  Respondent's Exhibit 1, and I assume she's going to ar -- offer

17  her exhibit right now.

18     JUDGE TRACY:  Yeah.  So Respondent's Exhibit 1, are there

19  any objections?

20     MS. YEN:  No.

21     MS. DEVLEMING:  No objection.

22     JUDGE TRACY:  All right, so Respondent's Exhibit 1 is

23  admitted into evidence.

24  **(Respondent Exhibit Number 1 Received into Evidence)**

25     JUDGE TRACY:  And then for the Charging Party, Ms. Yen?



1        MS. YEN:  Yes, I'd like to offer Charging Party Exhibit 1,

2    which is the petition to revoke; and Charging Party Exhibit 2,

3    the exhibits that were attached to the petition to revoke in

4    response to Respondent's issue regarding the subpoena duces

5    tecum.

6        JUDGE TRACY:  All right, so any objection?

7        MR. ROBERTS:  No object -- no objection.

8        MS. BURKE:  No, no.  No objection.

9        JUDGE TRACY:  All right, so Charging Party's Exhibits 1

10   and 2 are admitted into evidence.

11   **(Charging Party Exhibit Numbers 1 and 2 Received into Evidence)**

12       JUDGE TRACY:  And just to be clear for the record, at this

13   point, Mr. Roberts, the reason for these to be admitted into

14   evidence is because there appears to be still an issue with --

15   with portions of your subpoena, and because normally, these

16   don't come into the record.  But I just want to be clear, at

17   this point in the hearing, there were some, you know,

18   agreements that the, you know, the Charging Party and the

19   Respondent had reached on some of the documents.  There --but

20   there are particular ones, a couple of them at this point, that

21   are still at issue, which I had verbally on the record, granted

22   Charging Party's petitions to revote on those specific

23   portions.

24       And -- and also, before we went on the record, I basically

25   had indicated that if these become an issue, I would grant the



 1    entire petition to revoke to -- that -- that was filed by the
 2    Charging Party.  But I certainly understood if, as testimony
 3    went along, if there were moments where the Respondent felt
 4    like, again, wanting to renew the request for the documents,
 5    that I would entertain that.  We heard those arguments, and I
 6    still declined to order Charging Party to turn over the
 7    documents, but just to be clear, what numbers were there --
 8    were they at issue still at -- at this point?
 9        MR. ROBERTS:  They're -- the ones that are at issue that's
10    still an issue are paragraphs 8 and 9 which relate to -- well,
11    I won't repeat them, they're in the record -- but 8, 9, 10, 11,
12    15, and 16.  I think, you know, I did make a renewal of at
13    least 8 and 9 at one time, which we had -- you know, my
14    positions on the record, and it's still revoked.  But I don't
15    need to add anything, really, to that.
16        I just think that -- that in light of the testimony that's
17    come out and all of these paragraphs relate to issues that have
18    been questions about by the General Counsel in their case.  And
19    I think that they relate to issues that are in play here,
20    particularly given all the charges, the competing charges, if
21    you will, between the company and the Union and our defenses
22    that you've raised about bad faith on the part of the Union.
23    So I think they all are relevant to that extent.  I don't have
24    anything else to add at this point, other than what's already
25    on the record.



1          JUDGE TRACY:  Yes.  And I again, as I said before, I

2     granted the Charging Party's petitions to revoke for 8, 9, 10,

3     11, 15, and 16.  And I don't want to repeat that -- repeat my

4     reasoning behind it, because I don't want to contradict myself

5     from -- from Thursday.  So we'll see what -- what I said in the

6     transcripts.  All right, so that's on the record.

7          Let's just take a really quick five-minute break, or if

8     you guys don't need a break, we can jump right into -- or --

9     well, first, is -- is he back?  He's back.  Okay, it's up to

10    you guys.  So the sooner than we finish for the day?

11         MR. ROBERTS:  I'm -- I'm good with continuing on.

12         JUDGE TRACY:  Okay.

13         MR. ROBERTS:  I don't know about the others.

14         JUDGE TRACY:  Yeah, it seems like everybody else is fine

15    to continue.  Ms. Burke?

16         MS. BURKE:  Yeah, that would be fine.  Thank you.

17         JUDGE TRACY:  All right.  Let's go ahead and bring him on

18    in.

19         All right.  So we have Robert Dingwall, who's come into

20    the hearing.  If you could just state your name for the record,

21    please?

22         MR. DINGWALL:  It's Robert Colin Dingwall.

23         JUDGE TRACY:  Okay.  And if you could just please raise

24    your right hand?

25         Mr. DINGWALL:  I do.



 1    Whereupon,

 2                           **ROBERT DINGWALL**

 3    having been duly sworn, was called as a witness herein and was

 4    examined and testified, telephonically as follows:

 5        JUDGE TRACY:  All right, thank you.  So I'm Judge Tracy,

 6    and I just want to thank you for participating in the hearing.

 7    Let me give you just some instructions and also ask you a

 8    couple of questions.  Mr. Dingwall, is there anyone else

 9    present in the room with you right now as you're testifying?

10        THE WITNESS:  No.

11        JUDGE TRACY:  Okay.  And do you have anything in front of

12    you?

13        THE WITNESS:  Just a glass of water, a glass of Diet Coke,

14    some ChapStick, and my copies of the exhibits.

15        JUDGE TRACY:  All right.  So what I'd like for you to do

16    with those exhibits is turn them over until the counsel for the

17    General Counsel asks for you to specifically look at them.  Or

18    if the Respondent's attorney asks to -- or the Charging Party

19    asks for you to look at them, just keep them turned over until

20    you're asked to testify about them.

21        THE WITNESS:  Okay.

22        JUDGE TRACY:  And then please make sure that you don't

23    have a phone or any sort of communication device because you

24    are not to communicate with anyone else during the course of

25    this hearing.  I'm sure that that's obvious, but I just have to



1    state that for the record.  The other thing is you -- please

2    give verbal responses in terms of responding, no shaking of the

3    head or nodding.

4        The other thing is, is that when you're asked questions,

5    please wait for the question to finish being asked before you

6    respond to make sure that the transcript is clear that's going

7    to be made of this -- this hearing.  And so we get fully you --

8    you get to hear the question and we get your full response.

9        If there is an objection that's raised, and sometimes

10   it'll happen really quick, and there's a little bit of audio

11   delay, and so, of course, you might start responding.  But to

12   the best of your abilities, once you hear an objection, please

13   don't answer until I rule upon whether you should respond to

14   the -- the question or not.

15       THE WITNESS:  Okay.

16       JUDGE TRACY:  And so I think that with all of those

17   things -- and I'm sure I've forgotten something, but I will

18   jump in if I've forgotten -- I'm going to go ahead and turn it

19   over to, I believe, Ms. Burke is going to be doing the

20   questioning.

21       MR. SCHIFF:  Judge, can I ask you a quick question?

22       JUDGE TRACY:  Oh, yes.

23       MR. SCHIFF:  I just wanted to see, is anyone expecting

24   Rosalynn [Rash-lay] to be -- Ra -- Rashleigh to be observing?

25       MS. BURKE:  I believe that that would be our next witness,



1    Matthew Rashleigh.

2        MR. SCHIFF:  Oh, that's the next witness?  Oh, sorry.

3    Okay.

4        JUDGE TRACY:  And so he will be put into a waiting room.

5        MR. SCHIFF:  He's in the waiting room.

6        MS. BURKE:  Correct.

7        MR. SCHIFF:  Yes.

8        JUDGE TRACY:  Okay.  Do you think that you'll be able to

9    call him today?

10        MS. BURKE:  That was the hope, Your Honor, but I'm not

11    certain.

12        JUDGE TRACY:  Okay.  Well, we'll just keep him in the

13    waiting room, and let's see how -- how this goes.  Not to rush

14    anybody, but, you know, just -- and if you knew for certain you

15    wanted him to go, you can.  But if not, we'll just keep him in

16    the waiting room.  That's fine.  Go ahead, please.

17        MS. BURKE:  Thank you.

18                      **DIRECT EXAMINATION**

19    Q    BY MS. BURKE:  Good afternoon, Robert.  As you know, I'm

20    Sarah Burke.  I'm counsel to the General Counsel.  Are you

21    currently employed?

22    A    Yes.

23    Q    And what do you do?

24    A    I'm a news videographer at KOIN-TV.

25    Q    And what does KOIN do?



1    A    It's a TV station.

2    Q    And where is KOIN located?

3    A    In Portland, Oregon.

4    Q    When did you start working for KOIN?

5    A    Ten years ago.

6    Q    And briefly describe to me your responsibilities as a news

7    videographer.

8    A    I shoot and edit daily news stories, working with

9    reporters, sometimes by myself, or most of the time by myself,

10    actually.

11    Q    And who is your supervisor at KOIN?

12    A    Rick Brown.

13    Q    And what does Mr. Brown down?

14    A    He's the operations manager.

15    Q    And how long has Mr. Brown been your supervisor?

16    A    Ten years.

17    Q    Are news videographers at KOIN represented by a Union?

18    A    Yes.

19    Q    And which union?

20    A    NABET Local 51.

21    Q    And are you a member of NABET?

22    A    Yes.

23    Q    How long have you been a member of NABET?

24    A    Ten years.

25    Q    Do you hold any positions with the Union?



1  A    Yes, I'm a shop steward.

2  Q    And how long have you been a shop steward?

3  A    A little over a year.

4  Q    Briefly describe for me your duties as a shop steward.

5  A    I represent Union members in disciplinary meetings with

6  management, and I act as a sort of a go-between between Union

7  members and the Union leadership.

8  Q    Are you the only shop steward?

9  A    No.

10  Q    Who else is a shop steward?

11  A    Ellen Hansen and Matt Rashleigh.

12  Q    If you know, is there a current collective bargaining

13  agreement in effect?

14  A    There is not.

15  Q    And if you know, why not?

16  Q    The company stopped negotiating in -- earlier this year,

17  when they withdrew recognition of the Union.

18  Q    I want to focus on the withdrawal of recognition.  How did

19  you first learn that the company no longer recognized the

20  Union?

21  A    In a meeting called by the general manager at the time,

22  Pat Nevin.

23  Q    Do you recall when this meeting was held?

24  A    I don't remember the date exactly off the top of my head.

25  Q    Okay.  To your knowledge, was there only one meeting?



1    A    No, there were several.  There was one in the morning, one

2    in the afternoon, and one in the evening.

3    Q    And how did you learn about the meeting?

4    A    General Manager Pat Nevin sent out an email.

5    Q    And you said there was one in the morning, afternoon, and

6    one in the evening; which of the three did you attend?

7    A    The afternoon one at 3 p.m.

8    Q    Okay.  Where was this meeting held?

9    A    In the first-floor conference room.

10   Q    And do you recall who was present for KOIN?

11   A    The general manager, Pat Nevin; Rick Brown, the operations

12   manager; Lisa Newell, the human resources manager; and I

13   believe, Rich Kurtz, the news director, was there also.

14   Q    Were there other employees at the meeting you attended?

15   Yes.

16   Q    Do you remember how many?

17   A    Not exactly.  I remember there were a few other people

18   there, though.

19   Q    How did that meeting begin?

20   A    We came in and sat down, and Pat told us that he had

21   exciting news that they had objective evidence that the Union

22   no longer had majority support and that they were legally

23   obligated to not recognize the Union anymore.

24   Q    And what, if anything, happened after Mr. Nevin said this?

25   A    He said that nothing would change for 45 days.  And in



www.escribers.net | 800-257-0885

1    that time, the Union could fight it or do nothing.  And then he

2    opened up to questions.

3    Q    And were there any questions?

4    A    Yes.

5    Q    Do you recall any specifically?

6    A    Yes.  One of the web producers, Cambrie, asked if she

7    needed to sign anything.  Matt Rashleigh asked if -- or what

8    happened to the bulletin boards, the Union bulletin boards that

9    had been up in -- in the break room and in the hallway.  And

10   then I asked if -- how he -- they came to this objective

11   evidence, if they had done any polling or anything like that.

12   Q    And when you say he, who do you mean?

13   A    Pat Nevin.

14   Q    And what, if anything, was Mr. Nevin's response to your

15   question?

16   A    To my question, he -- he said no, we didn't do any

17   polling, just people came into his office and told him that

18   they didn't want to be in the Union any longer.

19   Q    Do you recall anything else about that meeting?

20   A    I remember just -- just Matt asking about the bulletin

21   boards, and that was about it.

22   Q    You stated that Mr. Nevin said he had objective evidence?

23   A    Yes.

24   Q    Was that ever defined --

25   A    No, he just said --



1    Q    -- during the meeting?

2    A    No, he just said that people had come into his office and

3    talked to him.

4    Q    And what, if anything, did you do after this meeting?

5    A    Went out -- went on outside, and Matt and I just talked

6    briefly about what had just happened, and we were shocked.

7    Q    And why were you shocked?

8    A    Because we did not believe that the -- we believed that

9    the Union did have majority support, and we were shocked that

10   they came to this decision.

11   Q    Prior to this meeting, had you been asked if you still

12   supported the Union?

13   A    No.

14   Q    Did you document this meeting?

15   A    Yes, I took notes.

16   Q    And what, if anything, did you do with these notes?

17   A    I typed them up in an email and sent them out to Carrie

18   Biggs-Adams and Matt Rashleigh and Ellen Hansen.

19        MS. BURKE:  So Mr. Schiff, if we can please pull up Joint

20   Exhibit 56?  And Mr. Dingwall, if you have that printed out,

21   you can turn to Joint Exhibit 56.

22        THE WITNESS:  My pages are sticking.  Okay, I have it.

23        MS. BURKE:  And if, Mr. Schiff, we can scroll down a bit?

24   Q    BY MS. BURKE:  And Robert, if you can clarify, is the

25   email -- is the document on the screen the same as the document



1    you're looking at?

2    A    Yes.

3    Q    Okay.  And do you recognize this document?

4    A    Yes.

5    Q    What is it?

6    A    It is the email that we got from Pat Nevin announcing the

7    meeting.

8    Q    And is this the first email you were testifying to

9    regarding that meeting?

10   A    Yes.

11   Q    Okay.  And then the email indicates it was sent on January

12   8th; did you receive it that day?

13   A    Yes.

14   Q    And was that the same day you attended the meeting?

15   A    Yes.

16        MS. BURKE:  And then Mr. Schiff, if we can please pull up

17   GC Exhibit 5? .  And Robert, you can turn to GC Exhibit 5, if

18   you have that.

19        THE WITNESS:  Okay.

20   Q    BY MS. BURKE:  And Robert, just confirm for me, is the

21   document on the screen the same document you're looking at?

22   A    Yes.

23   Q    Okay.  And do you recognize this document?

24   A    I do.

25   Q    How do you recognize it?



1    A    This is the notes that I typed up and sent out in the

2    email.

3    Q    And is this the second email you were testifying to

4    regarding sending it to Carrie Biggs-Adams?

5    A    Yes.

6    Q    Okay.  Take a moment to review the document.  And after

7    you've reviewed it, let me know, is it still a fair and

8    accurate depiction of your recollection of the January 8th

9    meeting?

10    A    Yes, this is accurate.

11    Q    Okay.

12        MS. BURKE:  And Mr. Schiff, if we can pull up GC Exhibit

13    6, please?  And Robert, you can turn to that as well, if you

14    have it.

15        THE WITNESS:  Um-hum.

16    Q    BY MS. BURKE:  Is the document on the screen the same as

17    the document you have, Mr. Dingwall?

18    A    Yes.

19    Q    Okay.  And do you recognize this document?

20    A    I do.

21    Q    And what is this document?

22    A    This is an email that I responded to that Ellen had sent

23    out, and I responded to.

24    Q    Okay.  And take a moment to review your portion of the

25    email, and let me know if it is a fair and accurate depiction



1    of your recollection regarding --

2    A    Yes.

3    Q    -- the January 8th meeting?

4    A    It is.

5    Q    Okay.

6         MS. BURKE:  Okay, thank you, Mr. Schiff, that can be taken

7    away.  And Robert, you can turn down the document.

8    Q    BY MS. BURKE:  After the January 8th meeting, what, if

9    anything, did you do in response to hearing the Employer no

10   longer recognized the Union?

11   A    We started circulating a petition amongst the Union

12   members to demonstrate that we had -- had majority support.

13   Q    Do you recall when, specifically, you would have spoken to

14   the Union members?

15   A    I don't remember exact dates, no.

16   Q    But sometime after the January 8th meeting?

17   A    Yes.

18   Q    And you said we started, who specifically started

19   circulating a petition?

20   A    It was myself, Matt Rashleigh, and Ellen Hansen with -- we

21   had some help from a few other people also.

22   Q    How many of the two unit employees -- two units of

23   employees did you speak to?

24   A    Me, personally?  I don't remember.

25   Q    Okay.  And what were the responses you received regarding



1    the petition?

2    A    Out of everybody that I talked to, I only had one person

3    say that they didn't want to sign it.  Everyone else either

4    signed it, or there were several people that were afraid that

5    there would be retaliation from Pat Nevin or from Rick Brown if

6    their na -- if they signed it.  So they would only sign it if

7    there was -- if they could remain anonymous.

8    Q    And can you estimate to the best of your ability how many

9    people you specifically spoke to?

10   A    Who said they were afraid or just in general?

11   Q    In general, in total?

12   A    I'm taking a minute to think.  Maybe 15, 20 people.

13   Q    And how many employees ended up signing the petition?

14   A    I don't remember the exact number, but it was more than

15   the 50 percent plus one that we needed.

16   Q    For both bargaining units?

17   A    Yes.

18   Q    Okay.  What, if anything, did you ultimately do with the

19   petition?

20   A    We had a part of the -- with the employees that were

21   afraid of their name being seen because of retaliation, we

22   agreed to take it to a third party, a neutral third party, who

23   would verify that we had the -- the number of signatures

24   needed.  That's what we did.

25   Q    And do you recall who this third party was?



1    A    He was a Catholic -- a local Catholic priest.

2    Q    And do you recall when you would have taken the petition

3    to him?

4    A    I don't remember the date, no.

5    Q    Okay.  And what happened after you took the petition to

6    the priest?

7    A    He verified that we had the amount of signatures that we

8    needed, and he delivered it by hand to Pat Nevin.

9    Q    And were you present when that position was delivered?

10    A    I was not.

11    Q    Okay.  To your knowledge, did the Respondent reverse its

12    decision to resume -- and resume recognizing the Union after it

13    received this petition?

14    A    They did not.

15    Q    Okay.  I want to focus on the time after the January 8th

16    meeting.  What, if anything, did you notice that had changed

17    following the January 8th meeting?

18    A    The first thing that I noticed was on our calendar that we

19    have for scheduling vacation time throughout the year.  There

20    was the week of the -- the Waterfront Blues Festival, where

21    ordinarily we, according to the past contract, we would be

22    able -- allowed to have two people off at the same time.  And

23    it had been crossed out and said that no one el -- that one

24    person had already taken the week off, but they were saying no

25    one else could take the -- the week off.



1    Q     And how was this different than the previous policy?

2    A     The previous policy is, is that no more than two people

3    can be off at the same time.  And the only time that no one can

4    be off is during February, May, and November ratings periods.

5    Q     Now, you said that was the first thing you noticed; what

6    else did you notice?

7    A     I noticed that Travis Teich, the sports executive

8    producer, was doing more bargaining unit work.

9    Q     And how did you notice that?

10   A     He would send out weekly emails to the entire newsroom

11   saying what their schedule of events was for the entire week

12   and how they were going to be covering those events.  And it

13   had -- usually it had -- several times it had his name listed

14   with a anchor or a reporter as going out to these events and

15   needing live equipment.

16   Q     Okay.

17         MS. BURKE:  So Mr. Schiff, if we can pull up GC Exhibit

18   18, please?  And then, Robert, you can turn to GC Exhibit 18,

19   if you have it.

20         THE WITNESS:  Okay.

21         MS. BURKE:  And if we can scroll down a bit, please?

22   Q     BY MS. BURKE:  And then, Robert, just confirm, is the

23   document you are looking at the same as the document on the

24   screen?

25   A     Yes.



1    Q    Okay.  And do you recognize this document?

2    A    Yes.

3    Q    How do you recognize it?

4    A    This is the -- one of the weekly emails that Travis sent

5    out with the schedule for sports.

6        MS. BURKE:  And if we can scroll up again a bit, Mr.

7    Schiff, please?

8    Q    BY MS. BURKE:  And so Robert, I don't see your name at the

9    section where it says "To" at the bottom of this first page.

10   How do you know you received this email?

11   A    Because I'm part of the KOIN news at Nexstar.TV list serve

12   which goes to the entire newsroom.

13   MS. BURKE:  And then if we can scroll back down again, Mr.

14   Schiff, please?

15       I would offer GC Exhibit 18 into evidence.

16       MR. ROBERTS:  No objection.

17       JUDGE TRACY:  All right, so General Counsel's Exhibit --

18   what number is this?

19       MS. BURKE:  Thank you, and I skipped 17.  It -- it will

20   come.

21       JUDGE TRACY:  Okay.  So, General Counsel's Exhibit 18 is

22   admitted into evidence.

23   **(General Counsel Exhibit Number 18 Received into Evidence)**

24       JUDGE TRACY:  I'm sorry.  I was trying to follow along,

25   but I was getting confused by the dates on this email.  So



1    that -- so if you could just clarify that, I -- that's where it

2    kind of cuts off, right where it jumps to the next page.  So I

3    was getting confused because it appears that this email is from

4    November of 2019?

5        THE WITNESS:  Yes.

6        JUDGE TRACY:  And -- and I had thought we were talking

7    about the changes after January 2020, but I could be jumping

8    ahead, so I apologize.

9        MS. BURKE:  No, Your Honor, I think you are right.  And we

10    actually should have GC Exhibit 17 up, so my apologies.

11        MR. ROBERTS:  So are you withdrawing that offer of this

12    exhibit?

13        MS. BURKE:  For now, yes.  I apologize.

14        JUDGE TRACY:  Well -- well, how about we, you know, let's

15    put it aside for now, even though it's already in the -- in the

16    record.  And obviously, if it ge -- once we get to the point

17    where you move to admit 18, if there are any objections, then

18    we can deal with them then.  But right now, let's look at --

19    let's focus on 17, even though 18 is in the record, and

20    let's -- let's do that.  Okay, thank you.  I'm sorry, I was

21    just getting lost about what was happening.

22        MS. BURKE:  No, that -- that's fine.  They should have

23    been.  My apologies.

24    Q    BY MS. BURKE:  So Robert, confirm, please, that the GC

25    Exhibit 17 that you're looking at is the same as the document



1    on the screen?

2    A    Yes.

3    Q    And do you recognize this document?

4    A    Yes.

5    Q    And how do you recognize it?

6    A    This is also one of the email from Sports about their

7    needs for the week.

8    Q    And again, how would you know that you received this

9    document?

10   A    Because I am in the KOIN News list serve.

11   Q    Okay.

12        MS. BURKE:  So at this point, I would offer GC Exhibit 17

13   into evidence.

14        MR. ROBERTS:  No objection.

15        MS. BURKE:  Thank you.

16        JUDGE TRACY:  Okay.  So General Counsel's Exhibit 17 is

17   admitted into evidence.

18   **(General Counsel Exhibit Number 17 Received into Evidence)**

19        JUDGE TRACY:  And again, I don't mean to step on your

20   toes, but I'm assuming that you're going to explain the

21   difference of what the change is, because I cannot tell from

22   17?

23        MS. BURKE:  Yes.

24   Q    BY MS. BURKE:  So Mr. Dingwall, prior to that January 8th

25   meeting, had you ever noticed bargaining unit being performed



1    by nonbargaining unit members?

2    A    Yes, Travis had done some bargaining unit work prior to

3    that meeting.

4    Q    Okay.  And do you recall when that would have been?

5    A    Apparently in December.

6    Q    Okay.

7        MS. BURKE:  And so then I would have us pull up GC Exhibit

8    18 again.  And now I would offer GC Exhibit 18 into evidence.

9        MR. ROBERTS:  No objection.

10       JUDGE TRACY:  All right, so General Counsel's Exhibit 18

11   is admitted into evidence.

12       Mr. Dingwall, what is defined as bargaining unit work

13   versus nonbargaining unit work?  How would I be able to tell

14   between these two different emails that you have in front of

15   you, GC Exhibits 17 and 18, what is bargaining unit work and

16   what isn't?

17       THE WITNESS:  The biggest thing is that the TV -- the use

18   of the TVU, which is the equipment we use to go live with,

19   only -- only news videographers are supposed to be using that

20   equipment.  And there are occasions where Travis was requesting

21   that equipment to be -- for himself to use.

22       MS. BURKE:  So --

23       JUDGE TRACY:  Go ahead, Ms. Burke.

24       MS. BURKE:  -- Mr. Schiff, if you will -- if you'll scroll

25   down a bit to the second page, I believe, of GC-18, a little



1    bit more, please?  All right.

2    Q    BY MS. BURKE:  So, Mr. Dingwall, you were just testifying

3    regarding a TVU?

4    A    Um-hum.

5    Q    Where on this document would it reflect what you were just

6    testifying to?

7    A    On Wednesday, it states AJ/Travis report from motor --

8    Moda Center, Sports will need TVU.  That is saying that AJ, the

9    sports anchor, and Travis, the -- the executive producer, will

10   be acting as her photographer/videographer at the Moda Center,

11   and he needs the TVU to shoot a live shot from there.

12   Q    And remind me, would Travis as the executive producer be

13   in the bargaining unit?

14   A    No, he's not.

15   Q    And who else besides videographer's would use the TVU?

16   A    No one.

17   Q    Okay.

18        MS. BURKE:  And then if we can pull up again GC Exhibit

19   17?  Okay, and scrolling down a bit again.

20   Q    BY MS. BURKE:  So, Robert, again, same question.  Can you

21   explain to us on this email where it would show that someone is

22   doing bargaining unit work that is not a bargaining unit

23   employee?

24   A    On Saturday, AJ/Travis, men's basketball Civil War,

25   AJ/Travis, live for 5 p.m. sports, TVU needed.  That's stating



 1    that AJ will be reporting from the basketball game, and Travis

 2    will be acting as her videographer and shooting the live shot.

 3    Q    And prior to November 2019, had you ever noticed Travis

 4    performing work with the TVU?

 5    A    No, not that I can remember.

 6    Q    Okay.

 7         MS. BURKE:  So then, Mr. Schiff, we can pull down GC

 8    Exhibit 17 and 18, please.

 9    Q    BY MS. BURKE:  Robert, do you receive performance reviews

10    by the Employer?

11    A    I do.

12    Q    How often?

13    A    We're supposed to get them once a year.

14    Q    And when was your last performance review?

15    A    It was -- I'm trying to remember -- March or April, or

16    maybe even May this year.  I can't remember exactly.

17    Q    Okay.  And who performed your performance review?

18    A    Rick Brown.

19    Q    And was anyone else present?

20    A    No.

21    Q    Where did it take place?

22    A    Over Zoom.

23    Q    How did the performance review begin?

24    A    It started with Rick telling me how it was going to go.

25    That there were several criteria that he rated -- that he could



1    rate me between 1 and 5; 1 being the lowest, 5 being the

2    highest.  And from there, he started with the first one, and

3    explained what criteria was for it and how I did in that

4    section, and how he rated me.

5    Q    And what, if anything, happened after he provided you

6    those ratings?

7    A    At the end of the review, he told me that we were going to

8    be -- we were entitled to additional raises compare -- on top

9    of what we had, the 1.5 percent that we had already gotten, and

10   that I would be getting one percent raise.

11   Q    And what, if anything, did you say in response to that?

12   A    I asked him why I was only getting one percent when I knew

13   that several other people had gotten two percent.

14   Q    And what happened after you said this?

15   A    He became visibly angry and told me that we're not

16   supposed to be talking about our raises, and that he knew who I

17   had talked to, and that he was going to talk to that person.

18   And that if he wanted to, he could revoke our raises.

19   Q    And what, if anything, was your -- your response to that?

20   A    I was shocked, so I just said, okay.

21   Q    Do you recall anything else about this meeting?

22   A    No.

23   Q    And how -- about how long did it last?

24   A    Less than half an hour.

25   Q    And why were you shocked?



1    A    I just had never heard that we were not able to talk about

2    raises.

3    Q    Now, you mentioned a 1.5 percent wage increase; when did

4    you first learn about that earlier?

5    A    Earlier, Pat had -- Nevin had called a meeting to tell us

6    that we were all going to be getting 1.5 percent raises

7    retroactive to the start of the year.

8    Q    And how did you learn about that meeting?

9    A    He sent out an email inviting us all to a meeting.

10   Q    And where was that meeting held?

11   A    In the lobby area outside his office.

12   Q    Do you recall who was present at that meeting?

13   A    Pat Nevin, Lisa Newell, myself, editor Mike Moore, lead

14   director Kris Danielson was there, and I can't remember who

15   else.

16   Q    And about how many employees would have been there?

17   A    I believe they limited it to six at a time because of

18   COVID.

19   Q    And how did that meeting begin?

20   A    He told us that we would all be receiving a 1.5 percent

21   raise retroactive to the start of the year.

22   Q    Prior to this meeting, when had you last received a wage

23   increase?

24   A    Not since during when our last collective bargaining

25   agreement was in effect.



1    Q    And when would that have been, if you know?

2    A    Maybe 2016.

3    Q    And did you, in fact, receive a 1.5 percent wage increase?

4    A    Yes.

5    Q    And was it, in fact, retroactive to January?

6    A    Yes.

7    Q    Okay.

8         MS. BURKE:  And then, Mr. Schiff, if we can please pull up

9    Joint Exhibit 59?  And Mr. Dingwall, if you have it, you can

10   refer to Joint Exhibit 59.

11        THE WITNESS:  Okay.

12        MS. BURKE:  And then if we can just scroll down a bit,

13   please?

14   Q    BY MS. BURKE:  And then, Robert, go ahead and confirm for

15   me, is the document you have printed out the same as the

16   document that is being shown on the screen?

17   A    Yes.

18   Q    And do you recognize this document?

19   A    I do.

20   Q    And what is it?

21   A    It's the email that Pat sent out announcing that we were

22   going to be having a meeting about a raise.

23   Q    And is this the email you were just testifying to?

24   A    Yes.

25   Q    And the email was sent on March 17th; would that have been



1    the date you attended the meeting?

2    A    Yes.

3    Q    Okay.

4         MS. BURKE:  Thank you, Mr. Schiff.  And Your Honor, I have

5    no further questions for Mr. Dingwall at this time.

6         JUDGE TRACY:  Ms. Yen?

7         MS. YEN:  No, thank you.  No questions.

8         JUDGE TRACY:  All right, Mr. Roberts?

9         MR. ROBERTS:  Yes, I would request any Jencks statements,

10   please?  Can you hear me?

11        JUDGE TRACY:  Yes, yes, yes.

12        MS. BURKE:  Yes.

13        MR. ROBERTS:  Earlier, I wouldn't sure I could be heard,

14   that was why I was asking.

15        MS. BURKE:  There are three relevant to the proceedings,

16   Your Honor.  And I can send them over right now.

17        MR. ROBERTS:  30?

18        JUDGE TRACY:  Three.

19        MS. BURKE:  Three, three.

20        JUDGE TRACY:  How many pages are there?

21        MS. BURKE:  What -- oh, pages?  Let me look, one moment.

22   It appears to be about 15.

23        JUDGE TRACY:  15, okay.  All right, Mr. Roberts, how much

24   time do you think you'll need?

25        MR. ROBERTS:  No more than ten minutes after I get them



1    printed off, but I don't know how long it will take for them to

2    come through.  So, I mean, I'd say 15 minutes to 20, 15 to 20

3    minutes.

4        JUDGE TRACY:  Okay.  All right.  So, Ms. Burke, if you

5    could just state for the record what you're doing in terms of

6    providing the Jencks statements to Mr. Roberts?

7        MS. BURKE:  Yes, Your Honor.  I will be emailing over the

8    three affidavits to Mr. Roberts for his use for cross-

9    examination.

10       JUDGE TRACY:  All right.  And as we've done with the other

11   witnesses, Mr. Roberts, you can confirm that after you've

12   received these -- this email from counsel for the General

13   Counsel, that you will be printing them out, using them for

14   cross-examination purposes, and then shredding the printout,

15   and deleting and removing from your trash bin any of the emails

16   regarding the Jencks statements that you've received; is that

17   correct?

18       MR. ROBERTS:  That is correct.

19       JUDGE TRACY:  Okay.  And what I'll do, if I don't

20   remember, you remind me that after you're done with the cross-

21   examination and he's done as a witness, that, you know, just

22   for the record, you'll just confirm that that's what you plan

23   to do.

24       All right, so let's take -- it's 4:22, so maybe 4:40?  And

25   I think that this will be our last witness of the day,



1  definitely.  I had promised Mr. Schiff I wouldn't keep him

2  around past 4:30, but, you know, hey, we're not going to end

3  now, Mr. Schiff.  Sorry.  And so let's -- let's put Mr.

4  Dingwall in a waiting room.

5      Mr. Dingwall, they're going to be preparing for your

6  cross-examination, then we'll call you in.  Please -- please

7  don't discuss your testimony with anyone at all until after the

8  close of the hearing, and that the Union and the General

9  Counsel will let you know when that is done.  But right now,

10 you're sort of on hold while they're preparing for your cross-

11 examination.  Okay?

12      THE WITNESS:  Okay.

13      JUDGE TRACY:  All right.  So we can go ahead and go off

14 the record.

15 (Off the record at 4:23 p.m.)

16      JUDGE TRACY:  Okay.  All right, let's go ahead and go back

17 on the record.

18      THE COURT REPORTER:  Okay, we're on the record.

19      JUDGE TRACY:  Okay.  Mr. Roberts, go ahead, please.

20                    **CROSS-EXAMINATION**

21 Q   BY MR. ROBERTS:  Mr. Dingwall, I'm Charles Roberts.  I'm

22 KOIN's attorney in this matter.  I just have -- really, I have

23 just one question.  You testified about circ -- in January or

24 maybe February of 2020, after the company withdrew the

25 recognition -- you testified about circulating a petition among



1    employees indicating their support for the Union; do you recall

2    that?

3    A    Yes.

4    Q    My question is this.  When you were doing that, did you

5    offer to the employees to waive their initiation fee if they

6    signed up at that time?

7    A    No.

8         MR. ROBERTS:  I don't have any other questions, that's it.

9         JUDGE TRACY:  Okay, thank you.  And Ms. Burke?

10        MS. BURKE:  No further questions, Your Honor.

11        JUDGE TRACY:  Okay, Ms. Yen?

12        MS. YEN:  Thank you, no questions.

13        JUDGE TRACY:  All right.  Well, thank you.

14        So Mr. Roberts, if you could please just state for the

15   record what you plan to do with the Jencks statements?

16        MR. ROBERTS:  Yes, I've already deleted from the email,

17   and I will be shredding -- or we will be shredding these as

18   soon as we leave this meeting.  So we will not be retaining

19   any -- any copies or any record of his -- of his statements.

20        JUDGE TRACY:  All right, thank you, Mr. Roberts.  And just

21   be sure to empty that trash bin, too.  Thank you.

22        All right, Mr. Dingwall, thank you very much for your

23   testimony today and your participation in this hearing.  Please

24   don't discuss your testimony with anyone until after the close

25   to the hearing.  As I said before, the General Counsel and the



1    Union can let you know when the hearing has closed.  But thank

2    you very much, and we're going to have you leave the meeting.

3         THE WITNESS:  Okay, thank you.

4         JUDGE TRACY:  All right.  So we can start again at 9:00

5    a.m. Pacific Time tomorrow, and start with the witness that you

6    had waiting in the waiting room, do your other witness, and

7    then Mr. Roberts will be ready -- should be ready to go

8    probably before lunch, for sure, I would think.  So just make

9    sure that your witness is ready and technology and all of that

10   is ready.

11        Is there anything that you guys need to talk about before

12   we sign off for today?

13        MR. ROBERTS:  Not that I'm aware of.

14        JUDGE TRACY:  All right, and then remind -- or as a

15   reminder -- that the package with the information on the

16   settlement, the charges, all of that, make sure that we get

17   that in somehow, you know, and -- and -- and then, obviously,

18   in the briefs, you'll -- you'll talk about the impact or you

19   know, or nonimpact on this case, but at least they can be put

20   into the record.  Okay?

21        All right, if there's nothing else, then I will see you

22   guys tomorrow at 9.  Again, I'll be the last one to leave the

23   meeting, so we don't -- we can use the same link for tomorrow.

24        MR. ROBERTS:  Thank you.

25        JUDGE TRACY:  Thank you, sounds good.



1        MS. YEN:  Your Honor, thank you.

2        MS. BURKE:  Thank you.

3        JUDGE TRACY:  Bye.

4        MS. BURKE:  Bye.

5    **(Whereupon, the hearing in the above-entitled matter was**

6    **recessed at 4:42 p.m. until Thursday, November 17, 2020 at 9:00**

7    **a.m.)**

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



1                          **C E R T I F I C A T I O N**

2      This is to certify that the attached proceedings, via Zoom

3      Videoconference, before the National Labor Relations Board

4      (NLRB), Region 19, Subregion 36, Case Numbers 19-CA-248735,

5      19-CA-255180, 19-CA-259398, 19-CA-2622, National Association Of

6      Broadcast Employees & Technicians, the Broadcasting and Cable

7      Television Workers Sector of the Communications Workers of

8      America, Local 51, AFL-CIO and Nexstar Broadcasting, Inc.,

9      d/b/a KOIN-TV, at the National Labor Relations Board, Region

10     19, Subregion 36, 915 2nd Ave., Ste. 2948, Seattle, Washington,

11     on November 16, 2020, at 9:06 a.m. was held according to the

12     record, and that this is the original, complete, and true and

13     accurate transcript that has been compared to the reporting or

14     recording, accomplished at the hearing, that the exhibit files

15     have been checked for completeness and no exhibits received in

16     evidence or in the rejected exhibit files are missing.

17

18

19

20                        _Claudine Metoyer_

21

22                        _____

23                        CLAUDINE METOYER
                          Official Reporter

24

25


www.escribers.net | 800-257-0885

EXHIBIT 5(d)

OFFICIAL REPORT OF PROCEEDINGS

BEFORE THE

NATIONAL LABOR RELATIONS BOARD

REGION 19, SUBREGION 36

In the Matter of:

| | |
|---|---|
| National Association Of Broadcast Employees & Technicians, the Broadcasting and Cable Television Workers Sector of the Communications Workers of America, Local 51, AFL-CIO, | Case Nos.   19-CA-248735<br>19-CA-255180<br>19-CA-259398<br>19-CA-262203 |

       Charging Party/Union,

and

Nexstar Broadcasting, Inc.
d/b/a KOIN-TV,

       Respondent.

_____

_____

Place: Seattle, Washington (via Zoom videoconference)

Dates: November 17, 2020

Pages: 524 Through 673

Volume: 4

OFFICIAL REPORTERS
eScribers, LLC
E-Reporting and E-Transcription
7227 North 16th Street, Suite 207
Phoenix, AZ 85020
(602) 263-0885



**UNITED STATES OF AMERICA**

**BEFORE THE NATIONAL LABOR RELATIONS BOARD**

**REGION 19, SUBREGION 36**

| | |
|---|---|
| In the Matter of:<br><br>NATIONAL ASSOCIATION OF<br>BROADCAST EMPLOYEES &<br>TECHNICIANS, THE BROADCASTING<br>AND CABLE TELEVISION WORKERS<br>SECTOR OF THE COMMUNICATIONS<br>WORKERS OF AMERICA, LOCAL 51,<br>AFL-CIO,<br><br>        Charging Party/Union,<br><br>and<br><br>NEXSTAR BROADCASTING, INC.<br>D/B/A KOIN-TV,<br><br>        Respondent. | Case Nos.  19-CA-248735<br>           19-CA-255180<br>           19-CA-259398<br>           19-CA-262203 |

The above-entitled matter came on for hearing via Zoom videoconference pursuant to notice, before **AMITA B. TRACY**, Administrative Law Judge, at the National Labor Relations Board, Region 19, Subregion 36, 915 2nd Avenue, Suite 2948, Seattle, Washington 98174-1006, on **Tuesday, November 17, 2020, 9:09 a.m.**



1                          A P P E A R A N C E S

2     **On behalf of the Respondent:**

3          **CHARLES P. ROBERTS, III, ESQ.**
           CONSTANGY, BROOKS, SMITH & PROPHETE, LLP
4          100 N. Cherry Street, Suite 300
           Winston Salem, NC 27101
5          Tel. (336)721-6852

6          **TIMOTHY A. DAVIS, ESQ.**
           CONSTANGY BROOKS SMITH & PROPHETE LLP
7          2600 Grand Boulevard, Suite 750
           Kansas City, MO 64108
8
           **CHARLES W. PAUTSCH, ESQ.**
9          Vice President of Labor and Employment
           Nexstar Media Group, Inc.
10         545 E. John Carpenter Freeway, Suite 700
           Irving, TX 75062
11         Email: cpautsch@nexstar.ty

12    **On behalf of the General Counsel:**

13         **ELIZABETH H. DEVLEMING, ESQ.**
           **SARAH BURKE, ESQ.**
14         NATIONAL LABOR RELATIONS BOARD
           915 2nd Ave., Ste. 2948
15         Seattle, WA 98174
           Tel. (206)220-6291 (Burke)
16         Email: elizabeth.devleming@nlrb.gov (DeVleming)

17    **On behalf of the Charging Party/Union:**

18         **ANNE I. YEN, ESQ.**
           WEINBERG, ROGER & ROSENFELD
19         1001 Marina Village Pkwy., Ste. 200
           Alameda, CA 94501
20         Tel. (510)224-7687

21         **CARRIE J. BIGGS-ADAMS, PRESIDENT**
           NABET-CWA, Local 51, AFL-CIO
22         240 2nd St., Ste. 220
           San Francisco, CA 94105
23         Email: carrie@nabet51.org

24

25



1                                    **I N D E X**

2

3    **WITNESS**              **DIRECT**  **CROSS**  **REDIRECT**  **RECROSS**  **VOIR DIRE**

4    Matthew Rashleigh        530      541

5    Jack Mosbrucker          546      556

6    Charles Pautsch          569      654

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25


www.escribers.net | 800-257-0885

1                                **E X H I B I T S**

2

3    **EXHIBIT**                                          **IDENTIFIED**        **IN EVIDENCE**

4    **Joint:**

5        J-63                                                653                  653

6        J-64                                                653                  653

7        J-65                                                653                  653

8        J-66                                                653                  653

9

10   **Respondent:**

11       R-2                                                 587                  590

12       R-3                                                 620                  631

13

14

15

16

17

18

19

20

21

22

23

24

25



1                           P R O C E E D I N G S

2        JUDGE TRACY:  So let's go ahead and go on the record.

3        THE COURT REPORTER:  Okay.  We're on the record.

4        JUDGE TRACY:  All right.  So Counsel for the General

5   Counsel if you want to call your next witness, please.

6        MS. BURKE:  All right.  Yes, Your Honor.  Counsel for the

7   General Counsel would call Matthew Rashleigh.

8        JUDGE TRACY:  All right.  All right.  And so Mr.

9   Rashleigh, if you could state your name for the record.

10       MR. RASHLEIGH:  My name is Matthew Rashleigh.

11       JUDGE TRACY:  Okay.  All right.  So I am Judge Tracy and I

12  want to just give you some instructions before you're asked

13  questions here.

14       First of all, let me go ahead and swear you in.  If you

15  could raise your right hand, please.

16  Whereupon,

17                       **MATTHEW RASHLEIGH**

18  having been duly sworn, was called as a witness herein and was

19  examined and testified, telephonically as follows:

20       JUDGE TRACY:  Okay.  Thank you.

21       All right.  So Mr. Rashleigh, you're going to be asked

22  some questions today by the various parties here.  Let me ask

23  you, do you -- is there anybody else present in the room with

24  you from where you're testifying?

25       THE WITNESS:  No, there's no one else in this room.



1    JUDGE TRACY:  Okay.  And do you have any papers or

2    anything like that in front of you?

3    THE WITNESS:  No, no papers in front of me.

4    JUDGE TRACY:  Okay.  And so I just want to caution you

5    that please don't use a cell phone or any way to communicate

6    with anyone else during the course of this hearing and during

7    the course of your testimony and so that we ensure that your

8    testimony is, you know, coming directly from you.

9    We will need verbal responses and so no shaking of the

10   head so go ahead and say yes or no for the record.

11   And also please wait for the question being -- finished to

12   be asked before you respond.  There's sometimes a slight delay

13   with the audio and so it's -- it's even more important that you

14   just sort of pause before you respond to make sure that you're

15   answering the question that's being asked because we are

16   creating a transcript of this hearing and so that way, we make

17   sure that we fully have the question and the -- and your

18   response there.

19   And if at any time you need a break -- your testimony may

20   be on the shorter side compared to some other witnesses so that

21   might not be necessary but if for any reason or you're

22   hearing -- having trouble hearing any of us or anything like

23   that, please just let us know.  Okay?

24   THE WITNESS:  Okay.

25   JUDGE TRACY:  All right.  Thank you.



1          Ms. Burke, go ahead please.

2          MS. BURKE:  Thank you, Your Honor.

3                        **DIRECT EXAMINATION**

4     Q    BY MS. BURKE:  Good morning, Matt.  How are you?

5     A    Good.

6     Q    Good.  Are you currently employed?

7     A    Yes.

8     Q    And what do you do?

9     A    I am a TV news photographer for KOIN-TV in Portland,

10    Oregon.

11    Q    When did you start working for KOIN-TV?

12    A    April of 2004.

13    Q    And briefly describe for me your responsibilities and

14    duties as a TV news photographer.

15    A    It is my responsibility to go wherever I'm sent, wherever

16    news is happening, to gather video and sound as well as

17    interviews.  I will then bring that video back to our producer

18    or work with the reporter.  And then we'll edit stories for

19    evening newscasts and shoot live shots of reporters presenting

20    those stories.

21    Q    And who is your supervisor at KOIN-TV?

22    A    Rick Brown.

23    Q    What does Mr. Brown do?

24    A    He's the Director of Technical Operations at KOIN-TV.

25    Q    And how long has Mr. Brown been your supervisor?



1    A    The entire time I've been at KOIN.

2    Q    Are news photographers represented by a Union at KOIN?

3    A    Yes.

4    Q    And which Union?

5    A    NABET Local 51.

6    Q    Are you a member of NABET?

7    A    Yes.

8    Q    And how long have you been a member?

9    A    Since the Union formed in 2005.

10    Q    Do you hold any positions with the Union?

11    A    I am a shop steward.

12    Q    How long have you been a shop steward?

13    A    Almost two years.

14    Q    Are you the only shop steward?

15    A    No, I am not.

16    Q    Who else serves as a shop steward?

17    A    Robert Dingwall.

18    Q    And briefly again describe your duties as a shop steward.

19    A    To help my fellow Union members be represented by the

20    Union, to help them with information regarding their job and

21    the Union as well as to be there for them when they need

22    assistance.

23    Q    If you know, is there a current collective bargaining

24    agreement in effect?

25    A    We've been negotiating for a contract for three years.



1    Currently the company does not recognize our Union.

2    Q    I'm going to turn to the recognition part in a moment but

3    let's stay on negotiations for now.  Did you attend negotiation

4    sessions?

5    A    I attended two negotiation sessions -- one in the spring

6    of 2019 and the other in the summer of 2019.

7    Q    And do you recall specific dates?

8    A    No.

9    Q    Briefly, how would you characterize the sessions you

10    attended?

11    A    Somewhat tense, not productive.

12    Q    And why would you describe them as tense?

13    A    There was a sense of hostility from Pat Nevin towards

14    Carrie Biggs-Adams, the Union president.

15    Q    And were there specific things that made you think it was

16    hostile?

17    A    Every time a point was made by Carrie Biggs-Adams or a

18    suggestion, Mr. Nevin would often interrupt and say that that

19    was unacceptable.

20    Q    Now turning back to the recognition.  How did you learn

21    that the -- that KOIN no longer recognizes the Union?

22    A    I received an email from Pat Nevin, the General Manager of

23    KOIN-TV at the time, suggest- -- or saying that he was going to

24    have meetings with employees that were represented by the

25    former bargaining units.



1    Q    And did you attend one of these meetings?

2    A    I attended the second meeting on that day at 3 in the

3    afternoon.

4    Q    Do you recall how many meetings there were that day?

5    A    I believe he was going to have three.  I was -- I knew I

6    was in the second meeting.

7    Q    And do you recall when this -- when you received this

8    email?

9    A    Prior to the meeting.  I don't know a specific time.

10    Q    Okay.  Where was this meeting held?

11    A    Main conference room, KOIN-TV.

12    Q    And who was present for the 3 p.m. meeting you attended?

13    A    Pat Nevin, Rick Brown, Rich Kurz and Lisa Newell for the

14    management of the TV station.  As far as Union members there

15    was myself, Ellen Hansen, Robert Dingwall, Bill Cortez, Chris

16    Thibodaux, Pat -- there was Patrick; there was Andrew.  I

17    believe that was it.

18    Q    And who is Mr. Kurz?

19    A    Rich Kurz is the News Director at KOIN-TV.

20    Q    And who is Ms. Newell?

21    A    She is Human Resources.

22    Q    Now, you named a number of bargaining unit employees who

23    were called.  Were those the only bargaining unit members

24    present?

25    A    No.  Kris Danielson, a Newscast Director, was there;



1    Cambrie Juarez, as well.

2    Q    How did that meeting begin?

3    A    Mr. Nevin started the meeting by saying that the company

4    would no longer recognize the Union and that they had the

5    belief that there was no longer majority support for the Union

6    at KOIN-TV.

7    Q    And what, if anything, happened after Mr. Nevin stated

8    that?

9    A    He said that nothing would change for 45 days.  He also

10   said that in that time the Union could respond or not.  I

11   remember him saying that we could vote or not but that this was

12   a positive step forward.

13   Q    And what, if anything, happened after Mr. Nevin said this

14   was a positive step forward?

15   A    I -- when he switched over to allow us to ask a few

16   questions, I asked if he could share any evidence to indicate

17   that there was a lack of majority support for the Union and Mr.

18   Nevin adamantly said no that they could not share any such

19   evidence but that -- that they had objective information that

20   there was nonsupport for the Union.

21   Q    Do you recall anything else about that meeting?

22   A    I remember him saying that they had taken down the Union

23   billboards at the TV station.

24   Q    Okay.

25         MS. BURKE:  And then, Mr. Schiff, if we can pull up Joint



1    Exhibit 56 please.  And then if we can scroll down a bit,

2    please.

3    Q    BY MS. BURKE:  Mr. Rashleigh, do you recognize this

4    document?

5    A    Yes.

6    Q    And what is this document?

7    A    This appears to be the email that Mr. Nevin had sent out

8    to the Union members stating that he was having meetings.

9    Q    And this email was sent on January 8th.  Would that have

10   been the date you would've attended the meeting you were just

11   testifying to?

12   A    Yes.

13   Q    Okay.

14        MS. BURKE:  Then, Mr. Schiff, if we can pull up GC Exhibit

15   7, please -- or no, not yet.  I'm sorry.  We can take this away

16   and we'll hold off on GC Exhibit 7.  Thank you.

17   Q    BY MS. BURKE:  Mr. Rashleigh, did you document that 3 p.m.

18   meeting on January 8th?

19   A    Yes.

20   Q    And how did you document it?

21   A    I wrote down notes as the meeting went forward so that I

22   could inform my Union president of what occurred.

23   Q    And did you, in fact, inform the Union president of what

24   occurred?

25   A    Yes.



1    Q    And how?

2    A    After I worked my shift, I got home about 1 a.m. --

3    must've been January 9th -- and I used my notes to construct an

4    email that I sent to Carrie.

5    Q    All right.

6         MS. BURKE:  So now, Mr. Schiff, may we please pull up GC

7    Exhibit 7.

8    Q    BY MS. BURKE:  Mr. Rashleigh, do you recognize this

9    document?

10   A    Yes.

11   Q    And what is this document?

12   A    It is a copy of the email I sent Ms. Biggs-Adams.

13   Q    Then go ahead and take a moment to review the document.

14   And after review, is this still a fair, accurate depiction of

15   your recollection of the January 8th meeting?

16   A    Yes.

17   Q    Now, I notice at the bottom, there's a section labeled

18   questions.  Were these questions that were asked during the

19   meeting?

20   A    No.

21   Q    What are these questions?

22   A    They are questions from my perspective towards Carrie

23   seeking advice.

24   Q    And why did you ask these questions?

25   A    Because I hoped that her experience and knowledge would



1   help me reassure my fellow Union members of what was going on.

2   Q     Okay.

3         MS. BURKE:   Thank you, Mr. Schiff.   That can be taken

4   down.

5   Q     BY MS. BURKE:   Mr. Rashleigh, you testified that Mr. Nevin

6   mentioned something about bulletin boards; is that correct?

7   A     Yes.

8   Q     And what do you -- what are these bulletin boards?

9   A     There were two bulletin boards in KOIN-TV for the Union to

10  use to share information with fellow Union members.   One was in

11  the breakroom, one was on the lower level near the green room

12  near the news department.

13  Q     And if you know, what happened to these bulletin boards?

14  A     They were removed.

15  Q     And how do you know they were removed?

16  A     At the meeting with Pat Nevin, he informed us that the

17  company had decided to take down the Union billboards -- excuse

18  me, bulletin boards.

19  Q     And did you document the removal of the bulletin boards?

20  A     After the meeting, I went to look to see if the bulletin

21  boards had been removed.   I had seen that they were and took

22  photographs of the walls where the bulletin boards had

23  previously been.

24  Q     And what, if anything, did you do with those photographs?

25  A     I sent them to Carrie Biggs-Adams.



1    Q    Okay.

2         MS. BURKE:  Mr. Schiff, if we could pull up GC Exhibit 8,

3    please.

4    Q    BY MS. BURKE:  Mr. Rashleigh, do you recognize this

5    document?

6    A    Yes.

7    Q    And what is this document?

8    A    This is a copy of the email I sent.

9    Q    And it looks like there are attachments.  If we scroll

10   down a bit, what are these attachments?

11   A    These are the photographs that I took of the walls where

12   the Union bulletin boards had been.

13        MS. BURKE:  Thank you, Mr. Schiff.  We can take GC Exhibit

14   8 down, please.

15   Q    BY MS. BURKE:  Mr. Rashleigh, following that January 8th

16   meeting what, if anything, did you do to determine if the Union

17   still had majority support?

18   A    I spoke to my fellow Union members and everyone I spoke to

19   conveyed to me that they still were in support of the Union.

20   We decided to have a petition to gather signatures of members

21   to show that there was still majority support for NABET to

22   represent us at KOIN-TV.

23   Q    Do you recall how many employees you spoke to?

24   A    Not specifically.

25   Q    Was it more than ten?



1   A    I would say definitely more than ten.

2   Q    And what, if anything, did you do with the petition?

3   A    After -- after being able to gather a majority of

4   signatures, we took those signatures to a third party to

5   confirm that those that signed were members of the bargaining

6   units.  And that third party was Father Jack Mosbrucker who

7   presented a letter to Pat Nevin indicating that he was a

8   neutral third party and that he, by looking at the signatures,

9   could confirm that we had majority support.

10  Q    And if you know, what if anything, did KOIN do in response

11  to receiving a petition?

12  A    I am unaware of them doing anything after receiving the

13  petition or the letter indicating the petition.

14  Q    And to your knowledge, did KOIN ever reverse its decision

15  and resume recognizing the Union?

16  A    No, not that I'm aware of.

17       MS. BURKE:  Your Honor, I have no further questions at

18  this time for Mr. Rashleigh.

19       JUDGE TRACY:  Ms. Yen?

20       MS. YEN:  No, no questions.  Thank you very much.

21       JUDGE TRACY:  Mr. Roberts.

22       MR. ROBERTS:  Yes.  If there are any Jencks statements, I

23  would request those.

24       MS. BURKE:  Yes, there is one and it is six pages.

25       MR. ROBERTS:  Okay.  And just as stated we have before, my



1    intent would be just to print it out, review it.  After he's

2    finished with whatever cross-examination there may be, I will

3    shred it and then delete it from my email and my trash.

4        And Your Honor, I don't -- it's only six pages.  Ten

5    minutes would be more than -- more than sufficient.

6        JUDGE TRACY:  Okay.  All right.  So are you, Ms. Burke,

7    emailing it to him right now?

8        MS. BURKE:  Yes, Your Honor.  I'm emailing it to Mr.

9    Roberts.

10        JUDGE TRACY:  Okay.  So it is 9:35.  Let's see.  Let's

11    resume at 9:45, 9:50 just because he'll have to print it out

12    and -- and then we'll just resume at that point.  Okay.  So

13    9:45 to 9:50.

14        All right.  So let's go ahead and -- well, Mr. Rashleigh,

15    let me just say.  You -- they're preparing for your cross-

16    examination and so Mr. Schiff will put you back into the (audio

17    interference) until we bring you back in.

18        And again, please just don't discuss your testimony with

19    anyone until after the close of the hearing but this is just a

20    brief ten-minute break.  Okay?

21        THE WITNESS:  I understand.

22        JUDGE TRACY:  All right.  Thank you so much.

23        And we'll go off the record.

24    (Off the record at 9:34 a.m.)

25        JUDGE TRACY:  Let's go ahead and bring him back from the



 1    waiting room.  All right.  So let's go ahead and go back on the

 2    record.

 3         THE COURT REPORTER:  We're on the record.

 4         JUDGE TRACY:  Mr. Roberts.

 5         MR. ROBERTS:  All right.

 6                        **CROSS-EXAMINATION**

 7    Q    BY MR. ROBERTS:  Good morning, Mr. Rashleigh.  My name is

 8    Charles Roberts.  I'm the attorney for KOIN and I have just a

 9    couple of questions for you.  Okay?

10    A    Okay.

11    Q    All right.  Thanks.

12         When you -- you testified that after Mr. Nevin held his

13    meeting and announced that the company was no longer going to

14    recognize the Union, you and some other workers went out and

15    circulated a petition among your coworkers; is that correct?

16    A    Yes.

17    Q    And what did you, personally, what did you say to your

18    coworkers about what the purpose of it was or what it meant to

19    sign the petition?

20    A    I told them it was a way to show their support for the

21    Union, that they don't want it.  I asked them that if they sign

22    it, it was a way to indicate that they wanted -- that they

23    wanted the Union to continue to represent them in negotiating

24    for contracts.

25    Q    Did you say anything about the possibility of a vote being



1    conducted or an election being presented?

2    A    No.

3    Q    Did you say anything about initiation fees or that they --

4    they would be waived for those who had not already joined the

5    Union?

6    A    No.

7    Q    And your best recollection of how many employees you spoke

8    to or I think you said you thought it was more than ten but you

9    couldn't recall specifically how many?

10   A    I would say definitely more than ten.  Maybe 12 or 15.

11   Q    All right.

12        MR. ROBERTS:  I don't have any other questions, Your

13   Honor.  That's all I have.

14        JUDGE TRACY:  Okay.  Thank you.

15        Ms. Burke.

16        MS. BURKE:  I have no further questions, Your Honor.

17        JUDGE TRACY:  Ms. Yen?

18        MS. YEN:  No questions.  Thank you.

19        JUDGE TRACY:  All right.  Thank you.

20        All right.  Mr. Rashleigh, thank you very much for your

21   participation in this hearing.  Please just don't discuss your

22   testimony until after the close of the hearing.  And

23   essentially, General Counsel and the Union will let you know

24   when the hearing has been completed before you can talk about

25   your testimony.  Okay?



1           THE WITNESS:  Okay.

2           JUDGE TRACY:  All right.  Well, thank you very much.

3      We're going to have you leave the meeting as we proceed

4      with the hearing.  Okay?  Thank you.

5           THE WITNESS:  Thank you.

6           JUDGE TRACY:  And then, Mr. Roberts, just for the record,

7      if you can put on the record what you're doing with the Jencks

8      statement.

9           MR. ROBERTS:  Yes.  I've already deleted it from my

10     computer.  I will delete it from my trash and place it in a

11     pile to be shredded when we have a moment.  We will not be

12     retaining any copies.

13          JUDGE TRACY:  Okay.  Thank you so much.

14          All right.  For the General Counsel, if you want to call

15     your next witness.

16          MS. DEVLEMING:  Yes.  I believe he should be in the

17     waiting room; is that true?  Not yet?  If not, I may need three

18     minutes to call him again and ask him to log in.

19          JUDGE TRACY:  Okay.  And who is this person?

20          MS. DEVLEMING:  This is Father Jack Mosbrucker.

21          JUDGE TRACY:  Oh, okay.  All right.

22          MS. DEVLEMING:  Okay.  So --

23          JUDGE TRACY:  Mr. Schiff, is he in the waiting room?

24          MR. SCHIFF:  No.  No, he's not.

25          JUDGE TRACY:  Okay.  So let's go off the record and you



1    just let us know when you have -- you have him.  He's -- Mr.

2    Schiff will let us know when he appears here and then we'll --

3    we'll go back on the record.  Okay?

4        MS. DEVLEMING:  Great.

5        JUDGE TRACY:  All right.  Thank you.

6    (Off the record at 9:51 a.m.)

7        JUDGE TRACY:  All right.  We'll just wait for the others.

8    Mr. Roberts was here.  Oh, there he is.  Yeah.  So who are we

9    missing?  Ms. Yen and Ms. Biggs-Adams.  She is going to be

10   showing her video.

11       UNIDENTIFIED SPEAKER:  I'm here.

12       JUDGE TRACY:  Okay.  All right.  So you guys ready?  And

13   who's doing it?

14       Ms. DeVleming?

15       MS. DEVLEMING:  I am.

16       JUDGE TRACY:  Okay.  So let's go ahead and go back on the

17   record.

18       THE COURT REPORTER:  Okay.  We're on the record.

19       JUDGE TRACY:  Okay.  All right.  For the General Counsel,

20   if you'd go ahead and call your next witness, please.

21       MS. DEVLEMING:  Yes, Your Honor.  General Counsel calls

22   Father Jack Mosbrucker.

23       JUDGE TRACY:  How do you spell his last name?

24       MS. DEVLEMING:  It's, I believe, M-O-S-B-R-U-C-K-E-R.  But

25   Father can correct me if I got that wrong.



1    JUDGE TRACY:  Oh, what's great about -- one problem,

2    everybody writes their names --

3    MS. DEVLEMING:  There you go.

4    JUDGE TRACY:  All right.  Let's see.  So Father

5    Mosbrucker, if you could just state your name for the record.

6    FATHER MOSBRUCKER:  My name is Father Jack Mosbrucker.

7    I'm a Catholic priest, retired from the Archdiocese of Portland

8    in Oregon.

9    JUDGE TRACY:  Thank you.  And I am Judge Tracy.  And so I

10   thank you for participating in this hearing today.

11       Let me just give you some instructions and ask you a few

12   questions.  Is there anybody present in the room with you there

13   where you're testifying from?

14   FATHER MOSBRUCKER:  No.

15   JUDGE TRACY:  Okay.  And do you have anything in front of

16   you?

17   FATHER MOSBRUCKER:  I do.  I have some documents -- the

18   letter that I sent to -- to the -- to the NABET.  So I have

19   that, that document.

20   JUDGE TRACY:  Okay.  All right.  If you could just go

21   ahead and turn those papers over.  And Ms. DeVleming or any of

22   the other attorneys might ask you to look at them but right now

23   let's just turn them over.

24   FATHER MOSBRUCKER:  Okay.

25   JUDGE TRACY:  So you're just focused on the questions that



1    are being asked of you.

2        And it's important that you don't communicate with anyone

3    during the course of the hearing -- cell phone or any other

4    means -- that your testimony is coming directly from you.

5        Also during the testimony, please be sure to provide

6    verbal responses.  And also be sure to wait for the question

7    being asked of you before you respond that way we are making a

8    transcript of this hearing at its conclusion and we can be

9    certain of the question that's being asked and of your answer.

10       Also if there happens to be any objections to your

11   testimony, just wait for me to respond and tell you whether you

12   should answer or not.  Okay?

13       FATHER MOSBRUCKER:  Okay.  Thank you.

14       JUDGE TRACY:  All right.  Thank you so much.

15       Ms. DeVleming, you can go ahead please.

16       MS. DEVLEMING:  Thank you, Your Honor.

17                    **DIRECT EXAMINATION**

18   Q    BY MS. DEVLEMING:  Good morning, Father Mosbrucker.

19       And first I'll ask -- if I forget my early Catholic

20   education -- as a retired priest, should we still be calling

21   you Father or am I being overly formal?

22   A    You can call me Father or Jack, either one.

23   Q    Okay, perfect.  Well, I will skip the formal and call you

24   Father Jack.  How about that?

25   A    Okay.



1   Q    All right.  So I believe you mentioned but what do you do

2   for a living, if anything, Jack?

3   A    What I do for a living?  I'm retired now.

4   Q    What did you do prior to your retirement?

5   A    What?  Pardon.  I -- I'm sorry, I didn't -- I have a

6   difficulty understanding you.

7   Q    Oh, I'm sorry.  I'll speak louder.  What did you do prior

8   to your retirement?

9   A    I'm -- what do I -- sorry.  I'm just having a little

10  difficulty --

11  Q    Oh, I'm so sorry.

12       MS. DEVLEMING:  Is everyone else having difficulty, too?

13  Am I breaking up?  No, just maybe --

14       THE WITNESS:  No?  I'm sorry --

15       MS. DEVLEMING:  No, I'll be louder.

16       THE WITNESS:  Let me adjust the quality of my speakers

17  here.

18       MS. DEVLEMING:  Oh, okay.  I'll speak really loud.

19  Q    BY MS. DEVLEMING:  Father, what did you do prior to your

20  retirement?

21  A    Well, prior to my retirement, I was a -- I was active as a

22  priest in the archdiocese and pastor to several churches and

23  working in consulting services for -- for the archdiocese.

24  Q    And how long did you work with the church in general, I

25  suppose, in total?



1    A    45 years.

2    Q    Father, are you personally aware of the KOIN's bargaining

3    status or recognition status between the Union in this matter,

4    NABET Local 51, and the Respondent, KOIN-TV?

5    A    I have no recent information concerning the bargaining

6    that is going on.  My information is from when I did the card

7    check and shortly after that but then I -- I have not kept in

8    contact with them.  No.

9    Q    Around what -- when was it that you did this card check?

10    A    It would've been around March, February, or March that I

11    did the card check.

12    Q    And when you say a card check, can you walk us through, in

13    detail, what exactly you did?

14    A    Okay.  A card check is typical for Unions and especially

15    when they're organizing and attempting to start a Union.  The

16    members -- the workers, the employees have to sign a card

17    saying that they want to join the Union and they sign it.  And

18    then this -- the -- a list of the employees is provided jointly

19    by the -- usually the Union organizer and an employee

20    representative and the employer.  And then I take this list

21    that they give me and I take the cards that the Union

22    representative gives me and I check to see that the signatures

23    on the cards match the signatures on the agreed-to list

24    between -- the list that's agreed to by the employer and the

25    employees and the Union representative.  So I just make sure



1    that they match, that the signatures match and then count how

2    many employees have signed the card accurately and then report

3    back to the Union representative and the employer.  So

4    that's --

5    Q    And have you --

6    A    That's the process.

7    Q    Have you done this -- sorry.  Have you done this card

8    check process on other occasions?

9    A    I've done it a number of times, yes.

10    Q    How did you -- why do you have this experience or how did

11    you come into contact with --

12    A    Well --

13    Q    -- the Union and then employers to do the card checks?

14    A    Well, I belong to a group, it's called Jobs with Justice

15    and the Faith Labor -- what we call the Faith Labor Committee.

16    And when I -- when I was active as a priest, I was active in

17    supporting Union organizing.  I find that is a very important

18    process in our country and for the workers and -- for a variety

19    of reasons.  And so I made contact with a number of Unions

20    through this group called the Faith Labor Committee which we

21    have some Union organizers on the committee, itself.  And they

22    have requested me to do the card checks.  So that's -- that's

23    the route I took to get into this process.

24    Q    And Father, please do stop me.  You're a little garbled on

25    my end.  I think we just lost Mr. Roberts.  But if you can't



 1    hear me at some point, please do stop me.

 2    A    Okay.

 3    Q    That we pause to make sure Mr. Roberts rejoins us.

 4         JUDGE TRACY:  Yes, let's wait for him to come back.  I'm

 5    not sure what happened.

 6         MS. DEVLEMING:  Technology.

 7         JUDGE TRACY:  Okay.  There he is again.  You're back, Mr.

 8    Roberts.

 9         MR. ROBERTS:  Can you hear me?

10         JUDGE TRACY:  Yes, we can hear you.

11         MR. ROBERTS:  I lost -- I don't know about everyone else

12    but I lost the last three minutes --

13         JUDGE TRACY:  Oh, okay.

14         MR. ROBERTS:  I had no connection.  After -- after the

15    Father related -- relayed that he had done these card checks in

16    the past and the question of Ms. DeVleming was how he became

17    involved in it.  And he was getting ready to say that that's

18    where I lost everything.  Everything froze up and then I lost

19    the connection.  So I didn't hear anything after that point.

20         JUDGE TRACY:  Okay.  How about -- so that was the only

21    response that he provided and then we noticed that you had

22    dropped off.  There were no other questions.

23         Father, to the extent that you can, could you just repeat

24    your testimony and your response to Ms. DeVleming's question

25    about, you know, where did you gain this experience of card



1    checks?

2    THE WITNESS:  I got involved with Union organizing while I

3    was still active as (audio interference) before retirement.

4    Then afterwards, I joined the group called a Faith Labor

5    Committee.  It's a subgroup of Jobs With Justice, the local

6    Jobs With Justice organization in Portland.  And then as part

7    of this -- part of our work with this Faith Labor Committee

8    which has people of faith, usually pastors and people like that

9    on it, and some Union organizers and some Union workers.  And

10    through this group I made contact with a number of labor Unions

11    and they requested me to do card checks.  So that's primarily

12    how I got into it.

13    Q    BY MS. DEVLEMING:  Father, when you referred to the card

14    check you did with KOIN-TV and NABET Local 51 earlier this

15    year, do you remember the context under which you were asked to

16    perform that card check?

17    A    Yes.  It was a little bit different because they felt they

18    had a Union and that the Union was going to be disbanded by the

19    company.  And they were -- they wanted to keep the Union.  They

20    wanted to maintain that.  And so they -- they wrote -- they

21    signed cards to that effect and asked me to do the card check

22    with them for that -- for that purpose so that they could send

23    a letter to the company indicating that they wished to maintain

24    this Union and not have it decertified.

25    Q    And did your process of checking those cards differ in any



1    way under that context versus what you described prior?

2    A    No.  No.  Well, it differed this way -- that the employer

3    was not there for this process but the Union organizer and

4    worker was there but not the employer.

5    Q    And Father Mosbrucker, when you checked the cards against

6    the employee list, what was your determination?

7    A    Well, I don't remember the exact number.  I knew, actually

8    the other day, but I don't remember it.  But there was a

9    majority that were in favor of maintaining the Union, keeping

10   the Union.

11   Q    And I believe you alluded to it but to be clear for the

12   record.  When you reached that determination, what did you do

13   with that information?

14   A    With that information, I wrote a letter indicating that I

15   had done the card check and that the -- of the number of

16   workers who were in favor of keeping the Union, then sent that

17   letter to the employer.  And we -- actually we didn't send it.

18   We delivered it, hand-delivered it to the employer.

19   Q    Who was with you when you hand-delivered it to the

20   employer?

21   A    There was a Union organizer and several of the employees

22   who were with me.

23   Q    And do you remember any names of the employer

24   representative you delivered it to?

25   A    Well, I -- I -- I don't remember who it was.  I -- I -- I



1    don't remember.  It was tough to get somebody -- anybody to

2    visit with us to acknowledge us and that we were going to

3    deliver this letter, but I don't remember the man's name.

4         MS. DEVLEMING:  Mr. Schiff, can we pull up Joint -- so

5    sorry -- General Counsel's Exhibit 13.

6    Q    BY MS. DEVLEMING:  And Father, we're going to show it on

7    the screen but it's very small and it should be the document I

8    believe you have there in your file, the February 18th letter.

9    A    Uh-huh.  Yes, right.

10   Q    Okay.  Do you recognize this document?

11   A    Yes.

12   Q    What is it?

13   A    It's the letter which I sent to the -- to the -- to the

14   employer.

15        MS. DEVLEMING:  And Mr. Schiff, can we scroll down a bit

16   to the signature line.

17   Q    BY MS. DEVLEMING:  And Father, is that your signature?

18   A    That's -- it is.  It is.

19   Q    And this is dated February 18th.  Would this have been the

20   date that you delivered it or would that have been before or

21   after this date?

22   A    It would've been probably a day or two before, before we

23   delivered it.

24   Q    In briefly reviewing this letter, Father, is it an

25   accurate description of the process you underwent to card check



1    and the results you determined?

2    A    Yes.

3    Q    And how -- do you recall how the individual you presented

4    this to for -- representing KOIN-TV responded?

5    A    Well, I -- I don't recall the discussion much but they

6    just -- they -- they accepted the letter and said that they

7    would deal with it, they would respond to it.  So that's kind

8    of where it ended.

9    Q    Thank you very much, Father Jack.

10    MS. DEVLEMING:  And thank you, Your Honor.  No further

11    questions for this witness.

12    JUDGE TRACY:  All right.

13    So Father, I just have a couple of questions just --

14    you -- you described at the beginning of your testimony about

15    how -- when initially employees are organizing you would

16    compare the signatures and the employers involved, et cetera.

17    In this case, it was a different situation as you had testified

18    to, correct?

19    THE WITNESS:  Correct.

20    JUDGE TRACY:  So how did you compare the signatures from

21    the petition that you received, what did you compare them to?

22    THE WITNESS:  Well, the signatures were on the petition

23    that I rec- -- on the list that I received which was as it says

24    in a letter that was a list of people gleaned from the

25    employer -- the employer's list of employees.  And so that



1    was -- I presume that was an accurate list from -- that it

2    was -- because it was the employer's list of employees.

3         JUDGE TRACY:  And the list, though, did that list include

4    their signatures?

5         THE WITNESS:  Yes.  Yes, that was -- that's -- that's

6    correct.

7         JUDGE TRACY:  Okay.  So you did match signatures there; is

8    that correct?

9         THE WITNESS:  Correct.

10        JUDGE TRACY:  Okay.

11        THE WITNESS:  Right.

12        JUDGE TRACY:  And what did the list that came from the

13   employer look like?

14        THE WITNESS:  It was simply a list of employees and their

15   names.  And I can't remember where their data -- there wasn't

16   much data involved, simply a list of employees and their

17   signatures and their names and signatures.

18        JUDGE TRACY:  Okay.

19        THE WITNESS:  Yeah.

20        JUDGE TRACY:  Okay.  Thank you.

21        Ms. Yen?

22        MS. YEN:  Yeah, I have no questions.  Thank you.

23        JUDGE TRACY:  All right.  Mr. Roberts.

24        MR. ROBERTS:  I'm going to assume that there's no

25   statement from the Father; is that -- is that accurate?



1    MS. DEVLEMING:  That's accurate.  There are no Jencks

2    statements for Father Jack.

3    MR. ROBERTS:  Okay.  Can I have one minute off the -- or

4    like a few minutes off the record (indiscernible)?

5    JUDGE TRACY:  Yes.  Yes.  Let's go off the record.

6    (Off the record at 10:10 a.m.)

7    JUDGE TRACY:  Bring him back from the waiting room.

8    Okay.  Let's go ahead and go back on the record.

9    THE COURT REPORTER:  On the record.

10   JUDGE TRACY:  Okay.  And Mr. Roberts.

11                      **CROSS-EXAMINATION**

12   Q    BY MR. ROBERTS:  Father, my name is Charles Roberts and

13   I'm the counsel for KOIN in this matter.  I just have a couple

14   questions that I can think of.  (Indiscernible).  Okay?

15   A    Okay.

16   Q    You can hear -- I just want to make sure you can hear me?

17   A    I can hear you, yes.

18   Q    I think there may be some confusion in the judge's

19   questions because when you compared -- the list that you got

20   that you characterized as the employer's payroll records, that

21   list did not contain the signatures of employees, did it?

22   A    The best of my recollection it did.  I won't -- that's the

23   best of my recollection.

24   Q    You didn't get -- you did not get the list directly from

25   the employer; is that correct?



 1    A    That's correct.

 2    Q    So this was a list provided to you by someone --

 3         THE COURT REPORTER:  I'm sorry.

 4         JUDGE TRACY:  So hold on one second.  So there's a lot of

 5    feedback and I don't know where that is coming from.

 6         MS. YEN:  Not to throw her under the bus, but I think I

 7    heard the court reporter apologize.  So hopefully, we're in

 8    better shape.

 9         JUDGE TRACY:  Oh, okay.  Was that Claudine?  I don't know

10    who it was.  I didn't know if we're moving too much or --

11         THE COURT REPORTER:  No, I was saying that the audio was

12    bad.  When I said I'm sorry, I -- it's so much background

13    noise, it's very hard to understand what Mr. Roberts is saying.

14         JUDGE TRACY:  Okay.  Did you get -- did you get that

15    though what he's asked thus far or do we need to sort of

16    restart?

17         THE COURT REPORTER:  It was the very end, the last

18    question that he was doing before Father answered.  The very

19    last -- I think Father tried to start to answer him and I had

20    to stop.  Mr. Roberts was in the middle of questioning and it

21    was a lot of -- just a lot of noise.  I'm not even sure where

22    it was coming from.  Noise or muffled sound that was happening.

23         MR. ROBERTS:  May I suggest that I -- I could backtrack a

24    little bit and see if I can kind of re-create (audio

25    interference).



1      JUDGE TRACY:  Yeah.  I mean, I'm just wondering, Mr.

2    Roberts.  There's some sort of audio issue going on with you.

3    Do you think perhaps -- Mr. Schiff, what do you think?  Maybe

4    he should leave the meeting and re-enter.  Maybe that could

5    help?

6      MR. SCHIFF:  Yeah, Judge.  That may help.

7      JUDGE TRACY:  Yes.  Well, let's go off the record.  Let's

8    have you leave the meeting, come back and then we'll just

9    restart again.

10      MR. ROBERTS:  Okay.  All right.  Thank you.

11    (Off the record at 10:14 a.m.)

12      THE COURT REPORTER:  And then, again, the only other thing

13    I could suggest, Your Honor, is I don't know why today the

14    audio, it just seems like everybody is having a little problem

15    with the audio.  But if he has a phone in the room, that's the

16    only other thing I can suggest is that maybe he call in instead

17    of using the computer audio --

18      JUDGE TRACY:  Yeah --

19      THE COURT REPORTER:  -- (simultaneous speech) help.

20      JUDGE TRACY:  -- I think what I've seen is you'll have a

21    phone number also with that person, their name and then another

22    thing would be phone number.  And the only phone number is

23    yours, so I don't know.  I don't know.  I agree.  I was

24    thinking oh, this is going so well -- don't say that out loud.

25    What I'll probably do is I'll probably mute myself and if you



1    guys, Ms. Yen, want to mute yourself, too, just in the off

2    chance that it's our audio.  I mean I'm not moving but just in

3    case.  I'll do that once he comes back on.

4        THE COURT REPORTER:  And right when you said that I

5    thought of something else, Your Honor.  If -- I know he had

6    other people that were in the room with him.  If they all had

7    their cell phones near him or near the computer, that could be

8    causing the audio feedback that we're getting as well.  If they

9    could turn it off or take it out of the room it might help.  I

10   don't know.

11       MR. ROBERTS:  All right.  Can you hear me better now?

12   Hello?

13       UNIDENTIFIED SPEAKER:  Yes, I can hear you.

14       THE WITNESS:  I can hear you.

15       MR. ROBERTS:  Is that (simultaneous speech) --

16       UNIDENTIFIED SPEAKER:  (Indiscernible) and Judge Tracy is

17   frozen --

18       MR. SCHIFF:  I would just say if -- if we're still having

19   problems I mean --

20   (Off the record at 10:16 a.m.)

21       UNIDENTIFIED SPEAKER:  (Indiscernible) still there?

22       MR. ROBERTS:  Well, then I'll have to reboot and restart

23   the whole computer then which is --

24       UNIDENTIFIED SPEAKER:  Do you have headphones?  I wonder

25   if you could try?  No?



1          MR. ROBERTS:  We don't have any of that.

2          Okay.  All right.  I'm not sure what --

3          JUDGE TRACY:  And Father -- and Father, can you hear Mr.

4    Roberts?

5          THE WITNESS:  I can hear him, yes.

6          JUDGE TRACY:  Okay.  And Ms. Claudine?

7          THE COURT REPORTER:  Yes, ma'am, much better right now.

8          JUDGE TRACY:  Okay.  All right.  Well, I'm going to just

9    use my -- I'll use my phone as a hotspot here.  Thankfully we

10   have those.

11         Okay.  And we're all here.  Okay.  So what I think would

12   be best is if we just start the cross-examination sort of all

13   over again.  So let's go ahead and go back on the record.

14         THE COURT REPORTER:  Okay.  We're on the record.

15         JUDGE TRACY:  Okay.  All right.  So --

16         MR. ROBERTS:  I'm not --

17         JUDGE TRACY:  Mr. Roberts --

18         THE COURT REPORTER:  Your Honor, that was horrible.

19         MR. ROBERTS:  She's gone.

20         JUDGE TRACY:  She's gone again.

21         MS. DEVLEMING:  Oh, no.

22         JUDGE TRACY:  Can you (audio interference) --

23         MS. DEVLEMING:  Little pieces here and there.

24         JUDGE TRACY:  Can you hear me?

25         MS. DEVLEMING:  Barely.



1          MR. SCHIFF:  The screen is frozen for me, Judge.

2          JUDGE TRACY:  Can you guys hear me now?

3          UNIDENTIFIED SPEAKER:  (Audio interference) --

4          JUDGE TRACY:  Oh, okay.

5          MS. DEVLEMING:  There you go.  Now you're back.

6          JUDGE TRACY:  I'm afraid -- Mr. Roberts, can you hear me?

7          MR. ROBERTS:  Yes, I can.

8          JUDGE TRACY:  Okay.  I don't want to move so.

9          MR. ROBERTS:  Well, you'd asked me to start over again

10   where we lost you.

11          JUDGE TRACY:  Yes.  Go ahead and start over and I will

12   cross my fingers that we be (audio interference) --

13          MR. SCHIFF:  Judge, for what it's worth, it's giving me a

14   signal that says Judge --

15          JUDGE TRACY:  No.

16          MR. SCHIFF:  -- Judge's network bandwidth is low.  I don't

17   know if it does that anytime anyone uses a hotspot but it's

18   like putting that announcement on Zoom, that caption.

19          JUDGE TRACY:  Okay.  So here's what we need to do.  Can we

20   take just a ten minute break so I can figure out -- I can -- it

21   seems as though I (indiscernible) open the internet is working

22   perhaps in my home again.  I'm also going to go ask my other

23   young members who have suddenly joined me in my home to get off

24   of Zoom if they can so we can -- I can do this hearing.  So

25   just give me ten minutes.  It's 10:26 so 10:35.  I am going



1    to -- Daniel, you're still the host.  So I'm going to kind of

2    get back onto my Wi-Fi if it's working but let me go find out

3    what's going on.  Okay?  Ten minutes.

4        MR. SCHIFF:  Okay.

5        JUDGE TRACY:  And I'll send an email if (audio

6    interference)

7    (Off the record at 10:26 a.m.)

8        JUDGE TRACY:  Okay.  So as I understand -- I had internet

9    troubles, was down, but I have shifted locations.  And I

10   received an email when we were off the record from all the

11   parties indicating that there was at least one stipulation that

12   was going to be reached about Father Mosbrucker -- brucker's

13   testimony which would then preclude the need for any cross-

14   examination or redirect.

15       And so Ms. DeVleming, why don't you go ahead and present

16   that?

17       MS. DEVLEMING:  Sure, Your Honor.  So during the break,

18   Mr. Roberts, Ms. Yen, Ms. Burke, and I discussed, and the

19   initial factual stipulation that I -- my understanding is will

20   allow us to excuse Father Jack, is simply that he did not in

21   fact compare signatures to signatures; he compared November

22   payroll records with employee names, not signatures to

23   signatures on the petition itself.  And so we are also working

24   on some additional document stipulations as to which records

25   and -- and how he did that, but we're not quite ready to offer



1  that.  But I believe that just with the factual stip I

2  reflected --

3    JUDGE TRACY:  Okay.  All right.  And so -- so to go back

4  to the statement that you just made regarding the -- the

5  signature comparison, Mr. Roberts, do you -- do you so

6  stipulate to Ms. DeVleming's statement there?

7    MR. ROBERTS:  I -- I think so.  Let me just restate it, if

8  I might, to make sure we're all on the same page.

9    JUDGE TRACY:  Yes.

10    MR. ROBERTS:  As I -- I understand it, Father Jack was

11  presented a petition bearing the signatures of -- purporting

12  bearing -- purporting to be bearing signatures of employees.

13  He had that in his possession.  He had another document of some

14  type.  We don't know exactly what right now, but it had the

15  names -- not signatures, but names of employees from November,

16  and then there was some questions about -- is -- is that me, or

17  is it --

18    JUDGE TRACY:  Huh-uh.  No.  Maybe Father -- Father, do you

19  mind if you just maybe mute your camera right now?  Anybody

20  who's not speaking, just mute.  Like Mr. Pautsch, if you just

21  mind muting your camera.  There you go.  Okay.  Ms. Yen too, go

22  ahead and mute.  So that way, we don't have any other

23  interference.

24    MR. ROBERTS:  So to repeat, we had a list -- we had the

25  petition with the -- bearing signatures, actual signatures.  He



1    had a list of names provided by the Union from a payroll

2    records back in November with some noted additions and

3    deletions.  He compared the name -- the -- the names -- the

4    signatures to the names.  So he -- he wasn't matching

5    signatures; he was simply indicating that the names that were

6    on the list matched up to the people for whom he had

7    signatures.

8         Is that -- I'm not sure if I -- if I confused that more

9    or -- or less, but --

10        JUDGE TRACY:  Well, it's -- it's a -- it's a -- it --

11   typically, I receive stipulations of, like, sentences that are

12   written into the record, but that's fine.  This was sort of

13   done just, you know, impromptu.  So I -- I do believe that

14   you've captured what Ms. DeVleming has already stated.

15        And so Ms. Yen -- so I'll start with Ms. DeVleming.  Do

16   you stipulate to what Mr. Roberts just stated on the record?

17        MS. DEVLEMING:  Yes, Your Honor.

18        JUDGE TRACY:  Okay.  And Ms. Yen?

19        MS. YEN:  Yes.

20        JUDGE TRACY:  Okay.  All right.  And so at this point,

21   then, it's not necessary for the father to remain as a witness.

22   Is that correct?

23        MS. DEVLEMING:  That is my understanding.

24        JUDGE TRACY:  Okay.  And Mr. Roberts, no cross-examination

25   needed of -- of Father Mosbrucker?



1       MR. ROBERTS:  That's correct.

2       JUDGE TRACY:  Okay.  And so Father -- and -- and the --

3   and Ms. -- Ms. DeVleming, you're going to have another

4   stipulation that you guys are working on?

5       MS. DEVLEMING:  Right, a few -- at least one, possibly two

6   or three, documents.

7       JUDGE TRACY:  And is it then -- does it -- it -- it seems

8   as though no one needs to call him or needs him any further, so

9   I'm going to release him, if the parties are in agreement.

10      MS. DEVLEMING:  Yes, Your Honor.

11      MR. ROBERTS:  That's fine with us, Your Honor.

12      MS. YEN:  Yes.

13      JUDGE TRACY:  Okay.  So Father, you can take me off of

14  mute now.  Or you're on mute.  Sorry.  You can unmute yourself.

15  Okay, great.

16      So thank you, Father Mosbrucker, for your testimony so

17  far.  The -- the parties have reached an agreement in -- in

18  regards to your testimony, and so there is no need for any

19  cross-examination or any redirect.  So I want to thank you for

20  your participation in the hearing.

21      And I would just like to remind you that -- that you're

22  not to discuss your testimony with anyone else until after the

23  hearing is completed.  And you can find out when the hearing is

24  completed by, you know, contacting the General Counsel or -- or

25  the Union.  Okay?  Thank you so much.



1        THE WITNESS:  You're welcome.  Bye, now.

2        JUDGE TRACY:  Bye-bye.  So we can -- yep.  Perfect.  Okay.

3        And so Ms. DeVleming, any other -- further witnesses for

4   the General Counsel?

5        MS. DEVLEMING:  No further witnesses, Your Honor.

6        JUDGE TRACY:  Okay.  And does the General Counsel rest

7   your case-in-chief?

8        MS. DEVLEMING:  Yes.  With the understanding that the

9   additional documents will be joint exhibits, we rest.

10        JUDGE TRACY:  Okay.  And then also, in addition to that,

11   the -- there is the -- the documents of the history of this

12   matter that you all are working on to also submit as a joint

13   exhibit?

14        MS. DEVLEMING:  I believe so.  Right, Ms. Burke?

15        MS. BURKE:  Yes.

16        MS. DEVLEMING:  Correct.

17        JUDGE TRACY:  Okay.  All right.  All right.  So as we

18   discussed off the record, we're going to go ahead and proceed

19   with some of the testimony now and then take a break, probably

20   in about an hour or so, after -- and just take a longer break

21   for -- for lunch or an eating break, since everybody's on

22   different time zones.

23        So Mr. Roberts, could you please call your first witness?

24        MR. ROBERTS:  Yes.  Respondent calls Charles Pautsch.

25        JUDGE TRACY:  Okay.



www.escribers.net | 800-257-0885

1    MR. ROBERTS:  And I believe he's alone, and he is in a

2    separate room from me, just so you're aware of that.  I cannot

3    see him, and he cannot see me.

4    JUDGE TRACY:  Okay.  Yeah, and that really -- my -- my

5    only concern of ask -- asking him to go to a different room is

6    just so that way, we could see you all -- you both on separate

7    cameras.

8    MR. ROBERTS:  Right.

9    JUDGE TRACY:  Mr. Pautsch, if you could just go ahead and

10   unmute yourself?

11   MR. PAUTSCH:  Okay.

12   JUDGE TRACY:  And -- hello.  And so can you go ahead and

13   state your name for the record?

14   MR. PAUTSCH:  Charles W. Pautsch.

15   JUDGE TRACY:  Okay.

16   MR. PAUTSCH:  P-A-U-T-S-C-H.

17   JUDGE TRACY:  All right, thank you.

18   Whereupon,

19                       **CHARLES W. PAUTSCH**

20   having been duly sworn, was called as a witness herein and was

21   examined and testified, telephonically as follows:

22   JUDGE TRACY:  Okay.  Now, you have been present throughout

23   this hearing; is that correct?

24   THE WITNESS:  That's correct, Your Honor.

25   JUDGE TRACY:  And you have been the -- the party



1    representative for Nexstar; is that correct?

2        THE WITNESS:  That's correct, Your Honor.

3        JUDGE TRACY:  Okay.  And so you've heard my, you know,

4    sort of opening to all the witnesses, but I'll just reit --

5    reiterate them for you for the record.

6        Please wait for the question to finish being asked before

7    you answer.  Please also, if there are any objections, wait for

8    me to rule on them before you respond.  We need verbal

9    responses.  It's really important to not, you know, interrupt

10    in the middle of a question with your answer, and -- and the

11    attorneys know the same.

12        Do you have -- do you -- so you're in a room that -- and

13    you're all by yourself; is that correct?

14        THE WITNESS:  That's correct, Your Honor.

15        JUDGE TRACY:  Okay.  And do you have any documents or

16    papers in front of you?

17        THE WITNESS:  I have a -- a notepad that's blank, and the

18    exhibit book is over there, but I'll get it if needed to look

19    at something.

20        JUDGE TRACY:  Okay, that's fine.  And -- and we'll be

21    using the --

22        THE WITNESS:  It's closed.

23        JUDGE TRACY:  -- share screen function, and then -- but

24    if -- if it's easier for you to look at documents also, that's

25    fine.  Just make sure that we're all on the same page,



1    literally.  And also, please be sure to not communicate with

2    anyone during the course of your testimony via cell phone or

3    any other method of communication; okay?

4        THE WITNESS:  Yes.  I understand that.

5        JUDGE TRACY:  All right.  Thank you so much.

6        Mr. Roberts, please go ahead.

7                        **DIRECT EXAMINATION**

8    Q    BY MR. ROBERTS:  Good afternoon, Mr. Pautsch.  You are an

9    attorney, correct?

10   A    Yes, I am.

11   Q    And are you in private practice, or are you employed by

12   someone?

13   A    At this point in time, I am employed by Nexstar as an in-

14   house counsel.  My title is associate counsel, vice president

15   of labor relations.

16   Q    And how long have you held that position?

17   A    Since January 1, 2019.

18   Q    And prior to that, were you in private practice?

19   A    Throughout my career -- I've been a practicing lawyer for

20   43 years, primarily in labor relations and employment

21   relations.  I have been in -- in-house counsel I think a total

22   of 11 years and in a private law firm the remaining 30 -- 32

23   years.  I -- I was in several law firms.  I had my own law firm

24   for a while.  Primarily management side.  Early in my career, I

25   did represent some Unions.



1    Q    Okay.  In the course of your career, you have engaged

2    in -- you've been -- you've -- you've handled a number of

3    contract negotiations; is that correct?

4    A    Yes.  Probably, if I had to estimate, several hundred

5    over -- over time.

6    Q    And when you became -- were -- were you -- before you

7    became in-house counsel for Nexstar, did you have any client

8    relationship with Nexstar?

9    A    Yes.  I've been negotiating for Nexstar as outside counsel

10   since about 2010, I think was when -- the first time I was

11   engaged by them.

12   Q    Can you tell us a little bit about Nexstar, you know, its

13   business, the scope of its business -- well, first of all,

14   where are you located?

15   A    I'm based in Ir -- Irving, Texas, where their corporate

16   headquarters is.

17   Q    Okay.  And -- and can you give us a little testimony about

18   the scope of Nexstar, what -- you know, how large it is, what

19   it does, and that respect.

20   A    Nexstar is an -- an owner of -- and operator of local

21   television -- excuse me -- local television stations in various

22   markets, 197 in total right now, in about -- I think about 130,

23   maybe 125 markets.  Markets are DMAs or cities.  And you know,

24   we're in small cities, large cities.  We range from market 2 at

25   this point, which is Chicago -- no, Los Angeles, and all the



1    way down to -- oh, I'd say Brownsville, Texas, which would be

2    177 or something like that.  But we're in many, many markets at

3    this point in time.  Operating -- and we operate these local

4    television stations that are affiliated either with ABC, CBS,

5    NBC, or Fox Entertainment, not Fox News.  But -- there.

6    Q    And we've heard some testimony about acquisitions.  Have

7    there been acquisitions by Nexstar in recent years?

8    A    Yes.  The -- there -- there have been many over the years.

9    But in the last few years, there were two large acquisitions.

10    There was the acquisition of a -- a company called Media

11    General, which had just before that acquired LIN TV.  Media

12    General, and then there was a -- an acquisition of the Tribune

13    Broadcasting Company, which pri -- previously had been

14    affiliated with the Chicago Tribune.

15    So two large acquisitions.  One, the Media General

16    acquisition was in 2016, and the Tribune acquisition was

17    culminated in -- I've got to keep these years straight.  It was

18    culminated in -- in the -- September 17th, 2019.

19    Q    And prior to those -- to that acquisition of Media General

20    and -- and Tribune, did Nexstar have Union contracts at other

21    locations?

22    A    Yes, it -- yes, it did.  It had about -- at that point in

23    time, it had about 11, 12, give or take, in about seven or

24    eight markets.

25    Q    Okay.  And then with the Media General acquisition, did



1    you -- well, are these -- were these stock transfers, stock

2    acquisitions, or were they asset purchases?

3    A    Yes, they were stock transact -- transactions rather than

4    asset -- asset purchases.

5    Q    So when you acquired, let's say, Media General, did you

6    acquire a number of collective bargaining agreements with that?

7    A    Yes.  Yes, sir.  We -- we picked up in that transaction

8    many markets -- all total, about 40, 50 markets.  And we -- in

9    terms of collective bargaining agreements, about 20 in about,

10    say, ten markets.

11    Q    Okay.  When you say 20 in ten markets -- and so that would

12    mean you had multiple bargaining units in certain locations?

13    A    Yes.  Sever -- in -- for example, we -- we acquired the

14    market in Hartford-New Haven, and at that -- at that station,

15    we had four collective bargaining units, three with NABET, one

16    with SAG-AFTRA.

17    Q    And with respect to the Tribune acquisition, how many

18    Union contracts did you acquire with that -- that transaction?

19    A    There -- in that transaction, we acquired 21 Union

20    contracts in, I'd say, eight markets.

21    Q    And since that time -- well, let's talk about what -- what

22    Unions -- you mentioned SAG-AFTRA and NABET.  What other Unions

23    do you have contracts with?

24    A    Right now, it -- my best estimation -- it's pretty close

25    because I -- I can to track this.  We have about 21 contracts



1    with the IDW.  We have ten contracts with NABET-CWA.  We have

2    two contracts with IATSE, and -- let's see.  I'm leaving one

3    out.  SAG-AFTRA, we have nine.  I think that adds up to 40

4    for -- I think I have those accurate.  It's close.  It's very

5    close, but.

6    Q    And what -- when did you first become involved in the KOIN

7    negotiations?

8    A    I think in mid-2017.  I think I went out there along with

9    the rest of the team.

10   Q    And at that time, you were outside counsel; is -- is that

11   correct?

12   A    Yes.  I had my own firm.  It was titled Pautsch, Spognardi

13   & Baiocchi.  I can give you spellings for my colleagues' names.

14   Q    Okay.  And what was your role initially there?  Were you

15   chief negotiator?  Were you simply a part of the bargaining

16   team?  What was your role?

17   A    I -- I was there really as maybe, you know, assistant

18   negotiator, assistant lead negotiator, but really as counsel.

19   I was there to add some input on -- on the -- on those issues.

20   And I was increasingly attending negotiations in person at --

21   at numbers of locations about that time.

22   Q    And with respect to KOIN, did you take on a different role

23   at some point in time during negotiations?

24   A    Really late in 2018, before -- actually, in 2019,

25   beginning when I assumed the role of vice president.  It -- by



1    then -- and -- and attorney -- associate counsel for Nexstar.

2    I took -- took over the negotiating role at that point in time

3    because Mr. Busch -- Tim Busch, who had been attending

4    negotiations oftentimes as lead -- his responsibilities became

5    so much more with the acquisition of the Tribune pending.  The

6    Media General still being, you know, really in -- you know,

7    becoming a part of the company more and more, his role -- it

8    was just too much for him to continue to actually go to

9    negotiations, you know, as I had a position.

10   Q    And -- and so did he step out -- Mr. Busch, did he step

11   out of the negotiations in 2019?

12   A    Yes.  Definitely.

13        JUDGE TRACY:  So let me just pause right here real quick.

14        Claudine, are you having any trouble at all hearing them?

15        THE COURT REPORTER:  Yes, ma'am.  A little.

16        JUDGE TRACY:  Okay.  So I'm wondering -- because I'm

17   having a little bit of feedback, too.  I'm wondering if -- are

18   you guys, like, in rooms right next to each other?  I just

19   wonder if there's some sort of reverberations that are going

20   on.

21        MR. ROBERTS:  Well, we -- no, we're not right next to each

22   other.  We're probably -- the rooms are probably about 25 feet

23   apart.  But I can have my assistant go in there and -- and

24   check to see if there's some way to -- and I don't know.  I

25   mean, we can try moving to another room that's further away.



 1          THE WITNESS:  They're thick -- thick doors, too.  I -- I

 2     don't think --

 3          JUDGE TRACY:  Yeah.  No -- yeah, I think it's just --

 4     it's -- sometimes it's a little bit of feedback.

 5          Is it okay for now, Claudine?

 6          THE COURT REPORTER:  Yes.  I will interrupt if it gets

 7     worse.

 8          JUDGE TRACY:  I guess what I'm suggesting is maybe over

 9     the lunch break, you guys kind of spread further apart,

10     especially if the wall that's behind you, Mr. Roberts, is --

11     you guys share a wall.  I don't know.  I'm trying to -- this

12     goes beyond my expertise.  So --

13          MS. DEVLEMING:  Your Honor, not that I am a tech expert,

14     but I think what's happening is the sound is coming out of one

15     computer and then it's bouncing through the other sounds -- you

16     know, because they're not using headphones --

17          JUDGE TRACY:  Okay.

18          MS. DEVLEMING:  -- and the sound is coming out, it's --

19          JUDGE TRACY:  Yeah.

20          MS. DEVLEMING:  -- bouncing back and forth.  So if one of

21     them had a headset or headphones, I think it would solve the

22     problem.

23          MR. ROBERTS:  We can look into that.  I'll admit that at

24     my age, I'm not that comfortable with headphones and stuff.

25     I'm -- I'm an old-school kind of person.  So I may -- I may



1    give that to Mr. Pautsch.  But --

2         JUDGE TRACY:  Well --

3         MR. ROBERTS:  -- we can see what we can do.

4         JUDGE TRACY:  Yeah.  I think -- I think -- again, I think

5    that the issue may be that if you spread further apart -- it's

6    almost like when we keep our phone right next to the computer

7    and there's the audio, it's, like, all this interference that

8    occurs with these radio signals and what have you.  So it may

9    be that during a break, if you can move just further away, down

10   the hall or something, that might prevent this.  Because what

11   happens, it's a little bit -- a little bit garbled, but it's

12   not like it's an internet connection problem; it's an audio

13   problem.

14        But Claudine, yes.  Again, like -- as I've reminded you

15   before, please just speak in the -- whenever if you cannot hear

16   what they're saying, because obviously, in the end, a

17   transcript is what we need here.

18        So I apologize for interrupting again, Mr. Roberts.

19        MR. ROBERTS:  No problem.  Maybe I should -- should try

20   to -- there's a few other items I think I can go through now,

21   and maybe we can take our lunch break a little sooner than what

22   I initially suggested, just so we can -- I do want to make sure

23   that he's heard clearly.  So --

24        JUDGE TRACY:  Oh, yeah.

25        MR. ROBERTS:  So let me get through a few other things.



1    If we're still having problems, then perhaps we can take a

2    break then.

3        JUDGE TRACY:  Okay.  Okay.  Well, let's see.  Let's go

4    ahead.

5    Q    BY MR. ROBERTS:  All right.  Mr. Pautsch, what -- did you

6    have any other contracts you were negot -- I'm talking -- right

7    now, I'm talking about primarily in 2018 and 2019.  Did you

8    have any other Nexstar contracts that you were negotiating at

9    that time?

10   A    Oh, yes.  Definitely.  Throughout 2017, 2018, there were

11   quite a few open contracts.  We're at a situation where

12   typically, there's 10 to 12 at a time that are open.  We had

13   the -- in 2018, I know Buffalo was open.  I wasn't too involved

14   in that, and I became more involved in that.  That's what made

15   that -- New Haven, Connecticut.  We had eventually three --

16   three contracts, then four, open in New Haven, Connecticut.  We

17   had one, a little nicer, but further assignment in Honolulu,

18   Hawaii, where we had a contract open there.  And then we had

19   several contracts in San Francisco that opened with the IDW and

20   the SAG-AFTRA.  Contract in Fresno, California, opened up.

21       I think that those were -- that was 2018 and then into

22   2019.  Those were the contracts that were open at that time,

23   and those -- that was before the Tribune acquisition started to

24   blend in.  So -- yeah.  There were, like, eight or nine that --

25   and I was involved, really, in all of them throughout 20 -- the



1    later part of 2018 and in -- into 9 -- '19.

2    Q    Okay.  Now, we're going -- now we're going to --

3         JUDGE TRACY:  Maybe -- maybe, Mr. Roberts -- one thing

4    that could help is maybe if you move a little bit close -- or

5    pull your laptop or whatever you're using a little bit closer

6    to you.  It seemed as though when you sort of sat up a little

7    bit more, that that might have helped.  Let's see if -- let's

8    try again with your question.

9    Q    BY MR. ROBERTS:  Yes.  Focusing on the -- the KOIN

10   negotiations, let's talk about that for right now.  You said

11   you became involved sometime in '17, and then you took on a

12   greater role.  What -- what did you -- when you got involved,

13   what did you observe as the tenor of the -- of the discussions?

14   And I'm talking about kind of the back and forth, the attitudes

15   and the demeanors, really, of the various parties.

16   A    Well, I think they were -- I -- I think you could say they

17   were guarded, and they were -- at -- at the first, when -- when

18   I would be there, there would be -- they were at first, very --

19   very unstructured and guarded.  The -- the -- there was a

20   difference of negotiating styles, the way I looked at it.

21        Mr. Busch, who led the negotiations then, is very

22   structured.  He is a -- he's out there negotiating on other

23   aspects of things, including mergers and what's known as

24   retransmission agreements, where he uses a very structured,

25   written proposal approach, even more than, in my career, I had



1   previously used.  He -- he's very into structured numbering of

2   proposals and presenting a complete draft of what would be the

3   proposed language versus what it had been.

4        And Ms. Biggs-Adams didn't follow that approach at all.

5   She -- she was -- she presented as her first set of proposals,

6   you know, sort of thought points, 1 through -- I counted 29 of

7   them just yesterday, looking at them.  We came in with --

8   Nexstar came in with 44.  But you know, they were written up

9   in, you know, the -- the prior language edited to reflect the

10  new language.  It -- it -- we've contrasted that with Ms.

11  Biggs-Adams' approach.  It was much less structured.  You know,

12  and it's something I'd seen from other Unions at different

13  times and different places in my life.  You know, it's not

14  something I'd not seen before.  But it was very, very different

15  than -- than what the Nexstar approach was and Mr. Busch's,

16  par -- in particular.  So there was a clash over that.  You

17  know, let's -- let's kind of get on the same page.

18       And over time and working with Mr. Busch and his

19  negotiating approach, there is a benefit to it.  You know,

20  it's -- it's -- it was one I adopted as time went on.  There's

21  a benefit.  It's more structured, and you do -- you do keep

22  everything in a better fashion that can be looked at later.

23       And so -- but there were some tense moments because of

24  that.  And then when you coupled that with the -- Ms. Biggs-

25  Adams' reaction to most of the proposals was simple reject,

1    that really kind of led to difficulty at first.  We'd make a

2    proposal on something relatively simple, and in response, there

3    would be a rejection.  And Mr. Busch would say, you know, hey,

4    let's at least get some kind of counter, some idea.  Where --

5    where are we wrong here?  You know, come up with some sort of

6    counter.  So there was a clash on that.

7         You know, so that -- that was my first impression.  As you

8    can go through each of the proposals, it was, like, you know,

9    using two different approaches.

10   Q    Okay.  And what about -- you said that there was -- there

11   was some tension and stuff.  What about the use of profanity by

12   either party?  Can you comment on that, please?

13   A    Yeah, that -- that -- you know, there's -- there started

14   to be -- when certain proposals were introduced, you know,

15   there started to be some, you know, real abrupt reactions,

16   whether it was, you know -- at one point -- this is a little

17   further down the road.  Early '18, I -- I would say, I was out

18   there on a -- on a negotiation, where, you know, Ms. -- Ms.

19   Biggs-Adams became very flushed and red and you know -- you

20   know, usually call -- she targeted Pat Nevin, for the most

21   part, and called him a dick, you know, which I don't like those

22   words.

23        You know, let me just say, I -- I listened to the

24   testimony of a couple of the witnesses yesterday.  I do not

25   ever swear.  Period.  It just -- it doesn't happen.  I don't --



1   I don't do it in my daily life.  I don't do it at the

2   bargaining table.  I don't do it.  I -- it's just who I am.

3   It's part of my, you know -- so I heard that testimony, and you

4   know, throwing me in with that really, you know, in a lot of

5   ways bothered me because I -- I -- I don't -- at the table, I

6   don't ever lose my temper.  I don't.  I don't.  I'm not a

7   table-pounder.  I pre -- I present myself in court like I -- I

8   present myself in bargaining like I present myself in court.

9   And --

10       JUDGE TRACY:  So -- so Mr. Pautsch, let me just sort of

11  interject here.  Please just try to answer the questions that

12  Mr. Roberts asks of you; okay?

13       THE WITNESS:  Okay.  All right.  I just -- that point of

14  it really, you know -- trying to go back and recall who said

15  what, I just went off on that point.

16       JUDGE TRACY:  Okay.

17  Q   BY MR. ROBERTS:  Mr. Pautsch, let me ask you -- yeah.

18  Just wait on me to ask you more specific questions, if you

19  will.

20  A   Okay.

21  Q   Did you yourself ever call Ms. Biggs-Adams a bitch?

22  A   Absolutely not.  Would never call anybody that in any

23  context or any place.

24  Q   And what about Mr. Nevin?  Did he ever call Ms. Biggs-

25  Adams a bitch while you were there?



 1    A    At -- not that I heard.

 2    Q    And in terms of profanity by -- you mentioned the one time

 3    that Ms. Biggs-Adams referred to Mr. Nevin as a dick.  Were

 4    there any other examples you have of her having profane

 5    outbursts?

 6    A    Not when I was there.  You know, maybe -- you know, I

 7    heard tell.  I heard tell about other incidents.

 8    Q    Okay, but not -- not while you were there?

 9    A    Not while I was there.

10    Q    What about -- well, let me ask you this.  At some point,

11    the record reflects that a mediator was requested to come in.

12    And do you know how that came about?

13    A    Yes.  It -- it -- I think there was a consensus decision

14    in early '18 -- 2018, amongst the bargaining team that things

15    weren't going well.  Things were not getting accomplished.

16    This clash of styles -- you know, I'm trying to be a little

17    kind on that because I think it was a little bit of a clash of

18    personalities as well -- was not leading to conclusions.  It

19    wasn't leading to TAs.

20         And that -- in other negotiations, as I've been through

21    this process with other acquisit -- acquired units in

22    particular, I've made it an objective to get as many TAs as I

23    can as soon as I can, really trying to get in there and cut

24    through the -- you know, cut through the -- the difficulties.

25         And that wasn't happening in -- in the first few sessions.



1    And you know, throughout 2017, early '18, there was a lot of

2    frustration.  There were -- there was a lot of discussion about

3    other things --

4    Q    Okay.  And --

5    A    -- rather than focusing on the open issues.

6    Q    Who requested that a mediator come in?

7    A    I believe the Company did.  And it did, you know, bring

8    some structure and some mediation to the situation where, you

9    know, somebody could walk between caucus rooms, bring the

10    parties together.

11        I really love mediation.  I mean, over the years,

12    mediation --

13    Q    All right.  I think you've ans -- I think you've answered

14    the question.

15    A    Okay.

16    Q    So let's, you know, stick to what I'm asking you.  The --

17    once the mediator came in, though, you -- what impact did that

18    ha -- you said it seemed to add structure.  But was there more

19    progress at that time?

20    A    Oh, def -- oh, definitely.  And I was at a few of those in

21    '18.  She was very good, and she was bringing about some

22    change, you know, in -- in the parties' behaviors and getting

23    some results.

24    Q    Okay.  And how did it work with the mediator?  I mean, I

25    know sometimes mediators use -- break people apart, sometimes



1    they bring them together.  What was the protocol with this

2    mediator?

3    A    Really tried everything in the book.  She went -- you

4    know, she -- she did everything she could.  She would, you

5    know, bring us together, she would talk to us separately, she'd

6    talk to us out -- have us talk out in the hall.  She suggested

7    sometimes that I talk with Carrie and -- and Anne Yen at -- on

8    one occasion when Anne was there.  She tried everything.  It

9    was -- it was a mixed bag of some very good ideas and

10   approaches.

11   Q    Let -- let me ask you about -- let me ask you about

12   scheduling.  How did that work?  How were meetings scheduled?

13   A    By agreement, opening our books.  Usually at the end of

14   each session, we'd -- we'd open our calendars and pick out

15   dates for the next session.

16   Q    And were there -- were there difficulties in matching

17   schedules?

18   A    Sometimes.  You know, there were issues that people ha --

19   excuse me, peop -- issues that people had.  I was getting

20   pressure here and there to set other negotiations from other

21   units -- let's get this done.  So sometimes I had to -- you

22   know, I've got this set up, I'm going to have to go out to

23   Honolulu, or I have to be in San Francisco, those places.  And

24   you know, so I -- sometimes I had to, you know, say, well,

25   I'm -- I'm going to -- I'm going to be there on those dates.



1        And then other times, it was Ms. -- you know, was Perry or

2    Ms. Biggs-Adams, and sometimes -- and a few times -- I think

3    really only once or twice, it was the mediator that had -- had

4    a conflict.  She was -- she was quite available, really.

5    Q    Did anyone, either party at the table, ever object to the

6    scheduling or complain that there was not -- that there were

7    not enough meetings being held?

8    A    No, there was really little of that.  I mean, I think I

9    remember one time Perry I think did say, hey, you know, I

10   thought we should have a -- one or two meetings -- one meeting

11   a month or something, or some meeting -- something like that.

12   But it wasn't like, hey, you know, this is not going the way we

13   want it.  You know, we need to have more meetings.  Because

14   I -- I don't -- you know, honestly, I don't think people felt

15   like it was the number of our meetings that was the issue.  It

16   was, you know, we had some differences.

17   Q    Okay.  Now, moving to 2019, I -- I want -- I want to have

18   the -- have the bailiff pull up Respondent's Exhibit 2.  This

19   is an exhibit that's been ident -- marked for identification.

20   It's not in the record yet.  It's a multipage document.

21       JUDGE TRACY:  And I just want to note, Mr. Roberts, I

22   think it's -- I don't think it's the distance that's the

23   problem.  I do think what Ms. DeVleming had said was -- was the

24   issue.  So when you kind of speak closer to your microphone,

25   whichever you're using, if it's a camera -- like, I have a



1    Logitech external camera I've been using that's -- that's my

2    speaker.  And so I've noticed that when you lean in closer to

3    put the question in, there isn't this feedback.  And it could

4    just be the room that you're in or what have you.  So it's -- I

5    think it's been working better as you lean in to give your

6    question.

7         MR. ROBERTS:  Okay.  I do -- I also have a camera on -- on

8    a monitor here, and I -- but I seem sometimes -- when I get too

9    close, it feels like there's feedback.  But anyway, I tell you

10   what.  Can we -- when we take a break --

11        JUDGE TRACY:  I guess my point is that you sound good.  So

12   I just want you --

13        MR. ROBERTS:  Well, okay.

14        JUDGE TRACY:  -- know that.

15        MR. ROBERTS:  All right.  Okay.  I thought maybe I was

16   still having problems.

17        JUDGE TRACY:  No, no, no.  I'm just saying that whatever

18   you're doing of leaning in, although it might not feel

19   comfortable, it's working.

20        Would you agree, Claudine?

21        THE COURT REPORTER:  Yes, ma'am, for both of them.

22        JUDGE TRACY:  Yeah.  So --

23        MR. ROBERTS:  Okay.

24        JUDGE TRACY:  -- go -- go ahead and -- so you don't have

25   to -- I guess my point is you don't have to break it up.  Do it



1    when you feel is a natural breaking point for yourself.

2         MR. ROBERTS:  All right.  Thank you.

3    Q    BY MR. ROBERTS:  Mr. Pautsch, if you could look at -- this

4    is the first page of Respondent's Exhibit 2, and -- and just

5    tell me what this is.  I mean, was this something that the

6    Company prepared, and what was it?

7    A    This would be the first page of each proposal.  The --

8    this one here in particular, the one we're looking at, is the

9    first page of C-1.  I've heard some discussion of the numbering

10   system.  We use C for noneconomic and then the number, and then

11   for economic, it's CE-1.  And that's -- this is CE-1, first

12   noneconomic proposal.

13   Q    You mean it's C-1, not CE?

14   A    Excuse me, C-1.

15   Q    Okay.  And --

16   A    Noneconomic proposal.

17   Q    And just using this one as an example, going down as to

18   what this tells us, it says, 6/21/17, presented to NABET by Tim

19   Busch.  Does that indicate that the Company presented whatever

20   its proposal was on the cover page at that time?

21   A    Yes.

22   Q    And then there's a -- that same date, Ms. Biggs-Adams

23   asked to edit the -- the NABET-named executive committee.  Is

24   that what that indicates?

25   A    That's right.  Yes.



1    Q    And then it said -- it looks like -- does this show every

2    time that -- that there was some kind of proposal related to

3    a -- a topic?

4    A    It should.  Yeah.

5    Q    And --

6    A    Yes, they should.

7    Q    So the -- the next time that we see any -- any entry with

8    respect to this particular page is September 12th, 2018, TA at

9    2:30 p.m.  Now, TA stands for what?

10    A    Tentative agreement.

11    Q    And so that would indicate that on September the 12th,

12    2018, the parties had tentatively agreed on that particular

13    proposal with respect to the cover page; is that what that

14    shows?

15    A    That -- that's right.

16    Q    All right.  If we could go down to the next page?  And

17    would this be the same format, C-2 being a proposal related to

18    I guess something titled the agreement?

19    A    It looks like some of the language of the agreement, I

20    suspect, the term of agreement, things like that.

21    Q    Okay.  And then moving to the next page, recog -- I won't

22    go through all of these.  But can we move to C-5, a more

23    substantive one?  So th -- this is one with respect to Union

24    security, article 2.  And let's just use this as an example.

25    Can you walk through for us what this is telling us?



www.escribers.net | 800-257-0885

1    A    Well, this is the chronological movement of the propo --

2    of the proposals by the parties on C-5, which was the Union's

3    security language in article 2.  So we -- I presented initially

4    the change.  The Union immediately rejected it.  It came up

5    again on a counter of the original proposal, movement by KOIN

6    on March 22, 2018.  And then the mediator threw out a supposal,

7    we called them, was one -- one of her thoughts, on --

8    Q    Well, let me interrupt you there.  What is a supposal?

9    A    Suppose if -- I -- I think the way she put it was suppose

10   it was submitted as such.  They're not necessarily willing to

11   submit it as such right now, but if they did, would you agree

12   to it?  You know, just kind of a -- a feeler, basically.  I

13   think that's how she -- she thought of those.

14   Q    Okay.  And that was on September the 12th, 2018?

15   A    That would have been -- on October 16th, they've --

16   they've made -- made a -- made a proposal on C-5 as part of a

17   comprehensive package proposal with some others.  On December

18   14th, they made another proposal on it.  On January 24th --

19   Q    Well, you skipped -- I'm sorry --

20   A    Excuse me.  On December 14th, we immediately countered it,

21   apparently, you know, half an hour later.  On January 24th,

22   Company 5 was part of a significant KOIN package proposal that

23   was made on -- on January 24th.  And it's -- and we'll talk

24   about that later, I believe.  And then on 4/23, April 23rd,

25   9 -- 2019, we made a counter involving it.  Then they made two



1   counters on it on June -- June 27th and then again on August

2   15th.  So you see the back and forth there that went on.

3   Q    And if we have -- for this document, this will -- this

4   will be the same format for all of the Company's 47 noneconomic

5   proposals?

6   A    Right, including the TA, you know, hopefully at most of

7   them -- and at the end of them, you know, there -- there's a TA

8   there.

9        MR. ROBERTS:  Okay.  I'm not going to go through all of

10  them at this point.  We may refer back to some of them.  But I

11  would offer Respondent's Exhibit 2.

12       JUDGE TRACY:  Any objections?

13       MS. DEVLEMING:  No objections.

14       MS. YEN:  No.

15       JUDGE TRACY:  All right.  So I'm going to admit

16  Respondent's Exhibit 2 into evidence.

17  **(Respondent Exhibit Number 2 Received into Evidence)**

18       JUDGE TRACY:  I do have a question, though, and hopefully

19  I didn't miss that.  This Respondent's Exhibit 2, who created

20  this document?

21       THE WITNESS:  I -- I would believe that Casey Wenger

22  created it.

23       JUDGE TRACY:  And when -- go ahead.  I'm sorry.

24       THE WITNESS:  It's a -- it's a running document.  It

25  was -- this would have been consistently updated.  That's part



1    of Mr. Busch's system that he likes to use, that you channel

2    each proposal -- sometimes it's part of the packages, but

3    always according to the number, so that you always have a -- a

4    running -- running system.

5        And it's -- in today's -- with today's word processing,

6    it's easier to keep it up, you know.  You know, he would

7    just -- Casey would probably have just updated this on each

8    session.  And you know, I think we were doing a lot of sharing,

9    so I think he sent this over to Perry quite a bit as well.  You

10   know, the -- a running assessment --

11       JUDGE TRACY:  Okay.

12       THE WITNESS:  -- of the proposals.

13       JUDGE TRACY:  So I'm gathering from your testimony that

14   this document was created at the beginning of bargaining and

15   was just added to after each of the sessions; is that correct?

16       THE WITNESS:  Even during the session.

17       JUDGE TRACY:  Okay.

18       THE WITNESS:  He would --

19       JUDGE TRACY:  Fair --

20       THE WITNESS:  He would edit it.  Sure.

21       JUDGE TRACY:  Okay, fair enough.  Thank you.  So as I

22   stated, Respondent's Exhibit 2 is admitted into evidence, and I

23   just ask those questions just to -- to be clear for the record

24   of -- of -- you know, when I -- when I review all of this

25   afterwards.  Thank you.



1        THE WITNESS:  You're welcome.

2    Q    BY MR. ROBERTS:  Yeah, and just to fol -- just to follow

3    up on the judge's questions, Mr. Pautsch, this was not created

4    in anticipation of litigation or anything.  It wasn't created

5    for the purpose of making an exhibit for this hearing; is that

6    correct?

7    A    No, this is identical to what we do, really, in every

8    negotiation.  I mean, every -- in every open contract I have at

9    this point in time, we have the exact same thing.

10   Q    Do you typically -- I'm sorry for interrupting.  Do you

11   typically keep -- listen to my question.  Do you typically keep

12   a notebook of some type in which you maintain your proposals?

13   A    Right.  It's called a workbook.  Typically we call it the

14   proposal workbook.  It's got that, and then the proposals are

15   updated as part of it as well.  And I think I've seen those as

16   exhibits as -- in numbers of instances here.  But that -- those

17   are the cover pages on each proposal, and then you have the

18   proposal going through what I would -- you know, its

19   edifications as it -- the iterations, as it goes through.

20        MR. ROBERTS:  All right.  Thank you.  If we could pull up

21   Joint Exhibit 11, which is package number 8?  Yeah, all right.

22   If we could leave -- I'm sorry.  If we could leave it there?

23   Q    BY MR. ROBERTS:  Can you tell us what this -- what this

24   document is?

25   A    This is a KOIN package proposal 8, which I -- I think I



1    mentioned earlier was -- is -- was an important package

2    proposal.  It represented an attempt to put onto the table

3    everything that was remaining open, just about.  And I -- I

4    looked at it, and I would call this a turning point, you know,

5    trying to get the final, you know.  And that's -- that's what

6    this proposal is.  And it lists its CEs, you know, CE-1 and 2.

7         Typically, you know -- and I -- I follow the same approach

8    on all these contracts.  We're -- we're at the turning point.

9    I'll -- I'll wait for your question.

10   Q    Yeah.

11   A    Rather than keep going with that.

12   Q    Okay.  Yes.  You said this is a format you -- you follow

13   in other negotiations; is that correct?

14   A    Right.  And -- and at some point in negotiations -- we go

15   in with the structure.  Let's get the noneconomics first, and

16   then we'll get to the economics.  You know, that -- that's an

17   approach we -- we typically use, unless there's just not much

18   in terms of noneconomics.  But at some point, I'm willing to

19   put some of the -- what are labeled noneconomic items out there

20   with the economic items, you know, let it break through the

21   threshold or whatever was -- was there, just see if we can get

22   it done.  Let's put it all out there.

23        And I -- I've done this -- I use a ver -- really, a very

24   similar package proposal in concluding the big agreement at New

25   Haven.  Just about -- it could -- almost could read about the



1    same.  CE-1, CE-2, a couple of CE -- C-5s that were still out

2    there.  And you know, we -- we -- we hit that turning point

3    there.  We hit the turning point in Buffalo recently.

4    Q    Okay.  Let -- let's stick to what we're talking about

5    here, is the KOIN negotiations.  The -- but these were the --

6    were these the items that were still open as of January 24th,

7    2019?

8    A    Yes.  And pretty much everything it -- that was still

9    open, and from our perspective, everything that would be open,

10   except for what would be labeled as CE-3, which would be wages.

11   Q    And you did not include -- you did not include a CE-3 wage

12   proposal at that time.  Why not?

13   A    Because that, I use -- I often -- and not just here.  In

14   other places, I leave that for last.  We'll add that in at a

15   certain point.  When you're moving in, you -- you've got -- you

16   see where your misunderstandings or disagreements are -- excuse

17   me -- disagreements are on CE-1 and 2, in particular.

18        And on -- and here, these are marked CE-17 and 18.  That's

19   inaccurate.  It should have been C -- it should be C, C-17, and

20   C-18, not -- those are noneconomic items.  But at some point,

21   we put out -- put out CE-3, once we see where the economic --

22   the differences exist on the others.

23   Q    Okay.  Let -- let me ask you this.  This -- at the top,

24   below the CE number, you said, this is presented as a package

25   proposal.  Any part that alters this proposed package, then the



1   entire package is null and void.  Was there any discussion on

2   the -- this was in January of 2018.  Was there any discussion

3   of what was meant by that at the table?

4   A    There -- there were -- there was -- I don't know

5   specifically on this one there was.  But whenever package

6   proposals were submitted by either side -- and they've

7   submitted a few as well.  Carrie submitted some.  The other

8   party would try to pick at the proposal and say, I'll take

9   that, and I'll take this, and -- you know.

10       And I -- I -- on this one, I think I probably said, you

11  know, if we can solve a couple of these, we're -- we're ahead

12  of the game.  And I certainly said that to the mediator.  I --

13  and I probably said it about this whole thing.  I mean, if we

14  can knock off 17 and 18 and resolve those, or if they're good

15  with CE-2, we can settle that as a separate mini package.

16       There was some -- you know, if you go back into some of

17  the other proposals, that was done.  It was done in -- at KOIN

18  for sure.  It's done everywhere.  That's, you know, kind of the

19  trade, a little bit of the trade of package proposals.

20  Q    Okay.  And after -- after the presenta -- presentation of

21  this proposal, in future meetings thereafter, did the parties

22  discuss a lot of these issues individually rather than as

23  packages?

24  A    Yes.  You know, a little of both.  Sometimes it was -- I

25  don't -- well, I shouldn't say -- I don't remember when our



1    package ever came up again that way, like, you know -- so it

2    was, you know, discussion of each item started to -- you know,

3    they broke apart again.  They weren't going to take the whole

4    package, so you know, you -- then you start talking about the

5    individual items again.

6         MR. ROBERTS:  All right.  Thank you.

7         Your Honor, I'm at a point where it makes sense -- I'm --

8    I'm getting a lot of feedback sometimes here, and it's -- my

9    neck's getting a little cramped too, leaning forward.  Can we

10   just go ahead and take a break now and let me see if I can

11   correct this issue before we continue on?

12        JUDGE TRACY:  Yeah, that's fine.  Shall we go ahead and

13   take our lunch break, then, for about an hour?

14        MR. ROBERTS:  Sure.

15        JUDGE TRACY:  Will that work for everybody?  So what I'm

16   going to do also -- it sounds like my internet might be working

17   again.  So I'm going to go back home.  So then -- because as

18   the sun comes over on this side of the house -- what I'm going

19   to do is I'm going to try to get -- as soon as I get back there

20   and get it hooked up -- Mr. Schiff, do you mind if you keep

21   your -- kind of keep watch of this?  Because maybe, Mr.

22   Roberts, you'd want to come back a little bit earlier just

23   to -- let's check your audio and see --

24        MR. ROBERTS:  Okay.

25        JUDGE TRACY:  -- how that's going.  I don't know if we can



1    duplicate the problems.  Well, I -- I'm saying that I don't

2    know if we need all of us to be here to be able to hear it.

3    But I'm thinking that, you know, if you would consider maybe

4    the idea of the headphones or -- I don't know what else you

5    guys can think of.  Because it is the -- it's the echoing, and

6    I'm not sure.  So maybe you've got some good brains there

7    that'll help figure that out.

8        MR. ROBERTS:  Well, we'll --

9        JUDGE TRACY:  And Mr. Schiff, if you have any thoughts

10   about it.

11       MR. SCHIFF:  Sure, sure.  None right now, but I -- I -- I

12   can contact tech, just -- if they have additional advice about

13   feedback.

14       MS. DEVLEMING:  I think maybe if one or both of them are

15   in smaller rooms, that can add to the echoing in the room,

16   which then reverbs through the computer.  Another option.

17       MR. ROBERTS:  I believe that Mr. Pautsch is in a fairly

18   small conference room.  I'm in a much larger conference room.

19   But we'll -- we'll -- we'll get some correction here, and I'll

20   be back 15 minutes early --

21       JUDGE TRACY:  Okay.

22       MR. ROBERTS:  -- just to make sure that we have it all

23   set.

24       JUDGE TRACY:  Okay.  Perfect.  Okay.  So it's 1:05 Pacific

25   time.  So let's resume at 2:05 Pacific time; okay?  Thank you



1    so much.  So I'm going to -- I'll end up leaving the meeting,

2    but I will rejoin back on, okay?  Thank you.  Let's go off the

3    record.  Sorry.

4    (Off the record at 1:05 p.m.)

5         THE COURT REPORTER:  We're on the record.

6         JUDGE TRACY:  Okay.  Mr. Roberts, continue please.

7         MR. ROBERTS:  Yes.

8                    **RESUMED DIRECT EXAMINATION**

9    Q    BY MR. ROBERTS:  Mr. Pautsch, I want to get a little bit

10   more into the substance of arguing now and let's talk about the

11   subject of health insurance.  Was that a major topic during the

12   discu -- during the negotiations?

13   A    Yes, especially during 2019.

14   Q    And if you could -- if we could pull up Joint Exhibit 8(a)

15   and (b).  And I'd like you just to look at -- look at that if

16   you would.  Those are the -- and I think they're in the record

17   as proposals of the -- of the company of the Union on health

18   insurance.

19        All right, yes, if you'd look at Joint Exhibit 8(a),

20   performance division KOIN proposal in January 24th, 2019, which

21   is part of package A.  Is that the company's proposal regarding

22   insurance?

23   A    Yes, it is.

24   Q    And we can read it, but essentially, what is it a proposal

25   for?



1  A    Well, it's -- it's a synced or me too proposal that says

2  that KOIN named representative employees would receive

3  essentially, the same coverage and various benefit plans and

4  contributions to those plans with regard to health, dental,

5  vision, short- and long-term disability, life insurance, 401K,

6  and other similar plans of benefits here.  There's a potpourri

7  out there of some other things as well.  They -- they receive

8  if those are changed, they would be changed according -- for

9  other nonrepresentative employees, they'd been changed

10  accordingly to the -- to the employee's that were represented

11  by NABET.

12  Q    Was this an unu -- excuse me.  Was this an unusual

13  proposal by Nexstar in -- in your experience?

14  A    No, not at all.  In fact, it's probably similar language

15  in about, I'd say 80 percent of the original Nex -- Nexstar

16  legacy agreements.  About 80 percent of the Media General and

17  probably 80 percent of the recently acquired Tribune agreements

18  has something like this, very much, very similar.

19  Q    Okay.  I -- if we could scroll down to -- to Joint 8(b),

20  the next page.  Well, it's several pages down.  Yes.  All

21  right, that's good.  Think this is in the record as the Union's

22  counter proposal of April 23rd, 2019.  And I want to focus on

23   -- it looks to me like paragraph 1 is saying they're willing

24  to accept Nexstar's coverage subject, of course, to 2, 3 -- to

25  points 2, 3, and 4.  Was that your understanding?



1    A    Yes.

2    Q    All right.  And -- and number 2, bullet point 2, we can

3    read it, but can you tell us what that was in reference to and

4    what discussion, if any, there was about that issue?

5    A    There was some discussion about it but what it represented

6    was NABET's concern that they be made whole for what was done

7    with respect to the 401K plans with -- across the country in

8    regards to the -- what they call, tax law windfall of 2017.

9    Nexstar in that situation, acted to make certain benefits

10   changes across the board.  It -- as a result of the tax law

11   savings that were encountered with the 2017 tax law.  And that

12   was their position they were -- they wanted to be made whole

13   and they -- they said that somehow, we increased the health --

14   the 401K match at oth -- at other locations and they wanted

15   some of that.

16   Q    Okay.  And bullet point number 3, we've heard some

17   testimony about that.  What was that in reference to?

18   A    They wanted to tack onto or amend the medical coverage to

19   include gender dysphoria treatments and all women's health

20   services including abortion coverage.  And there was some

21   discussion about what that meant, why it was a good idea from

22   their perspective.  You know, we -- we made some comments back

23   regarding that.

24   Q    All right.  And then the final -- the final bullet point

25   was essentially saying that -- that even though they would



1    agree to the Nexstar plan, they wanted to restrict any cutbacks

2    or reductions; is that -- in -- in coverage; is that what

3    that's saying?

4    A    Right.  They wanted -- wanted, you know, a protection or

5    some sort of cap on that, on whatever changes would be made.

6    Q    So -- so what were the -- what difficulties, if any, were

7    encountered by the parties in resolving the health insurance

8    issue over the course of the negotiations?  The Union's

9    proposals dated April 23rd so I'm talking about after those --

10   after that proposal; what discussions occurred about health

11   insurance?

12   A    Well, there was quite a bit of discussion about what the

13   concept in number 1 that there'd be a cap.  There was -- the

14   Union wanted to preserve the thought of a cap and we introduced

15   the concept of -- that under our -- our plan, it was a 10.4

16   percent of gross compensation that would be figured as the

17   employee share and that, you know -- that would -- that may

18   vary from, you know, pay period to pay period.  But we laid it

19   out, I believe at one point, we had discussion about it that

20   for most people, they'd be actually paying less than what was

21   the cap figure.  And we -- we don't as a rule, change that

22   figure, the 10.4, it stays there.  You know, because if we

23   change that we increase the premiums.  You know, it's everybody

24   across the whole country and we -- we worked hard not to

25   increase premiums.



1        So we -- we basically had discussions about that.  Carrie

2    would come in and, you know, argue for the thought that there

3    wouldn't, you know, sti -- still be some sort of cap and we'd

4    argue that the cap would be essentially that you're -- you're

5    treated the same as everybody else throughout the company.  And

6    the company had increased premiums for many years.  And other

7    Unions had agreed to this.

8    Q    And what was -- what was Ms. Biggs-Adams response to that?

9    A    She wanted to preserve the cap.  And there were going to

10   no doubt continue to be discu -- there were -- I think there

11   were discussions at every one of the sessions, just about, held

12   in 2019, that they wanted to have the caps in there.  You know,

13   would they have been in there and we continue to discuss this,

14   I don't know.  We have agreed at a couple locations to keep a

15   cap of some sort.

16   Q    Okay.  On item 3, the gender dysphoria and abortion

17   coverage, what efforts were made, if any, during negotiations

18   to resolve that dispute or that issue?

19   A    Well, I mean, it presented a real -- real dilemma.  I

20   looked at this as a very difficult high hanging curve ball for

21   me to somehow come to some sort of resolution on because, you

22   know, I'm not -- it's more or less out of my lane within the

23   corporation to amend the plan.  And it really -- those plan

24   changes within the plan, are thought out and conceived of by

25   the company working with its plan consultants.  And they do --



1    they do a curve, things are added.  And I explained that -- I

2    explained that to Carrie that (audio interference) we may do,

3    we may change up these coverages.  But right now, I don't see

4    us doing that.  And I indicated that -- I don't think I

5    indicated but I can say at this point that no other Union has

6    sought to change any plan aspect in the entire time I've

7    negotiated with Nexstar.  So it's something really, you know,

8    something really new, that say we want to throw into the

9    nationwide plan that covers 15,000 employees.

10   Q    What -- what if anything, did you say during negotiations

11   about the company's willingness to consider something other

12   than the Nexstar plan, in essence a plan that might include

13   that kind of coverage?

14   A    That's where I introduce the -- the thought, let's look

15   around.  Let's look at some other coverages that are available.

16   And I -- I raised the fact that in Buffalo, I know that the

17   predecessor had done that.  The predecessor there, Media

18   General that's in the same predecessor that existed here in

19   Portland with KOIN, same company.  And going -- going out quite

20   a few years ago, I, you know, looked at it, like, 2010.  They

21   went out and they found different coverage, the company and the

22   Union.  They were to fix -- and Carrie described it pretty

23   well, to fix the provider network problem.  There was a poor

24   provider network in Western New York.  And our plan is good,

25   you know, our -- Nexstar's plan was good and the Union there,



1    at this point, does think our plan is good.  But the provider

2    network was bad.  So it -- that you can fix a lot easier than

3    going in and changing your plan.  So we went out and looked

4    there.  I suggested we could do that here in Portland.  And --

5    and go -- go out together and look for insurance.

6    Q    And what, if anything, occurred with regard to that

7    suggestion?

8    A    Well, I -- I -- I personally recall, I was sitting in the

9    conference room there and I -- and I'm looking, you know,

10   coming -- trying to come up with an idea to, you know, find

11   different coverages.  And looked at the NABET website and saw

12   what -- on the NABET website, you know, a description of all

13   these NABET plans.  And I was looking at that for a lot of

14   different reasons with the Tribune acquisition coming because a

15   lot of them had their own plan.  SAG-AFTRA has a very well

16   developed, very good health and retirement plan.  So I'm -- I'm

17   thinking maybe NABET does.  So I looked at the website, saw it

18   and hence we made a proposal for information about that.  We

19   did that -- it was at the August meeting or June meeting, one

20   of those meetings we made a proposal and, you know, let's  --

21   let's start looking at these plans, kicking the tires and

22   seeing if they're, you know, they're worth considering.

23        MR. ROBERTS:  Let me stop you there and ask, Mr. Schiff to

24   pull up Joint Exhibit 33.

25        And if you could scroll down a little bit.  That's --



1    that's good.

2    Q    BY MR. ROBERTS:  It -- that's a request for information

3    dated August the 15th, 2019; is that the request you're

4    referencing?

5    A    Yes, it is.

6    Q    Okay.  And there in the record but what response did you

7    get to this request for information?

8    A    The -- that they wouldn't be -- they would not be

9    provided, pretty, pretty strong letter back saying no, it's not

10   going to be provided.

11       MR. ROBERTS:  So if we could put up Joint Exhibit 34,

12   which would be the next exhibit.

13   Q    BY MR. ROBERTS:  And is that the written -- immediate

14   response that you got --

15   A    Yes.

16   Q    -- to that request?

17   A    Yes, it was.  I was surprised.  I thought, you know, we

18   could have a discussion about it.  I also felt -- I mean, we

19   asked for it pretty quickly there.  I remember that but I

20   figured it was on the website and they could supplement what

21   was on the website, you know, and look --you know, very

22   quickly.  They could get somebody in their national office or

23   usually it's a carrier, insurance carrier that provides these

24   sorts of things.  They could get that over to us and we could

25   really have a good discussion about it.



1        You know, I -- I'm aware of what the point that Carrie is

2    raising.

3    Q    But let me stop you there.  All right.  One more question

4    if you would.  So what -- what reason or justification did Ms.

5    Biggs-Adams give for refusing to provide this information?

6    A    She's saying that and -- and I understand her concern,

7    she's saying that the plans they can't be provided.  You know,

8    she doesn't feel right in including them in the agreement if in

9    fact they're only available to Union members.  And I -- I'm

10   familiar with these plans.  I know they're, what's known as,

11   affiliation plans and you do it to be a participant in them,

12   you do need to be a member.  That's not -- I've read about

13   these for years.

14        But that was her -- her statement and my internal reaction

15   to it was no, I think I can get past that.  By having them be

16   offered essentially as an alternative, as something else you

17   could elect under the agreement and we could somehow figure out

18   a way to do that with a stipend.

19   Q    Was that --  I'm sorry.  Was there an actual discussion of

20   that at the table?

21   A    I don't think at that meeting.  I think it, you know,

22   this -- this, you know, caused some definite collision because

23   she just said no.  And I don't think we had that kind of

24   discussion at that point.  At some juncture I -- I know we did.

25   We did say, look, let's at least look at these and, you know,



1     consider them.  That's all -- the only reason I was asking for

2     them as an -- as an alternative, a side by side.  You'd have

3     option one, option two.  (Audio interference) would be the way

4     you could do this.  And then it would have solved our problem.

5         I mean, then if this might have been, you know, it's just

6     like, last point; I -- I won't keep going on.  Last point is

7     you can, you know, we -- under Nexstar's plan there was option

8     one and option two.  There was a high deductible plan and a low

9     deductible plan.  You know, you could set this up as a third

10    option and yeah, you'd have to be a Union member to pick that

11    option.

12        You know, the addit -- additional -- a reason why somebody

13    would not be a backup chapter, they'd join the Union and say

14    that, that's value.  And I -- I don't see a legal reason why

15    you couldn't do that.

16        MR. ROBERTS:  And if we could move to Joint Exhibit 36.

17    Q    BY MR. ROBERTS:  And is this a -- a further response from

18    the company to Ms. Biggs-Adams regarding her refusal to provide

19    that information?

20    A    Yes.  It was a -- you know, an analysis of the continued

21    failures to give information that had occurred.  This is the

22    fourth one and board had charged out on three -- the three

23    previous ones in one way or another.  They're -- you know, one

24    had gone, you know, it lays them out there pretty succinctly.

25    There were three charge outs by the board on this issue with us



1    and let's not have a fourth one basically.  Right?

2         MR. ROBERTS:  Okay.  And if we could go to Joint Exhibit

3    37.  If we could just scroll on down through.

4         Okay, it's right there.

5    Q    BY MR. ROBERTS:  And -- and is this a further response

6    from Ms. Biggs-Adams to this issue?

7    A    Yes, it is.

8    Q    Did the company end up filing a charge over this?

9    A    Yes, I mean, it was the fourth one that had happened and,

10   you know, again, you know, I was hoping here on this one,

11   eventually we'd get the information and move on.  And get

12   really to consider it.  And because I thought it was a good

13   option, yes.

14   Q    Okay.  Beyond -- beyond the Union plan; were there any

15   other alternative plans that the parties discussed possibly

16   considering?

17   A    Yes, Carrie came up with, I think it's the next meeting or

18   the meeting after that.  She came up with the entertainment

19   industry flex plan, which I was becoming familiar with.  We had

20   just acquired the KTLA station in Los Angeles.

21        And I had studied that plan and looked at it and we -- we

22   did and we looked at it and I thought it was good and creative

23   on her part to bring it forward.  And looked at it, studied it,

24   didn't seem that it was as good as the Nexstar plan, it seemed

25   costlier, it didn't seem as if it had as good of coverage.  But



1    it was worth exploring, you know, we -- we would have continued

2    to explore it as time went on to see if it worked.

3         It would -- it generally, something like that, in my

4    opinion, wouldn't be as good because it's set up mainly for

5    what are known as per diems.  And I can explain that if you

6    really want me to.  (Simultaneous speech) --

7    Q    Well, not at the time, but I'd like to pull Joint Exhibit

8    49.  Is that -- what's the December 9, 2019 email from Ms.

9    Biggs-Adams and what -- what is it?

10   A    That was an email that had information -- a set of

11   information about the flex plan, the entertainment industry

12   flex plan.  And you know, putting in summary plan descriptions

13   and things like that.  And the Delta dental plan and vision

14   plan that went with it.  So it was there for us to study.  We

15   did study it and we -- we looked at it and we, you know, had

16   some discussion at the table about it in December from what I

17   recall.

18   Q    Was that a -- was that a Taft-Hartley trust fund?

19   A    Yes, it is.

20   Q    Does the company -- does Nexstar -- is it party at other

21   locations to any Taft-Hartley trust funds?

22   A    Yes, definitely.  And we -- we've been participants in

23   some Taft-Hartley retirement pension funds.  We've had numbers

24   of those throughout the last eight, nine years that I went

25   across various pension funds.  We picked up more in the Media



www.escribers.net | 800-257-0885

1    General transaction and we picked up a lot more in the Tribune

2    transaction.  So we have -- we're participant in many Taft-

3    Hartley plans.

4    Q    Okay.  In December -- December of 2019, there -- the

5    record reflects there were two meetings -- or two bargaining

6    sessions; what discussion, if any, do you recall at those

7    December meetings regarding health insurance?

8    A    I do recall looking at discussing this plan and, you know,

9    talking about the, you know, advantages of it and perhaps some

10   skepticism about it in terms of cost and coverages.  We, you

11   know, I -- I indicated we probably had a preference, if we

12   could come to some sort of a deal on maintaining the employees

13   in the Nexstar plan.  The down -- the down side to Taft-Hartley

14   Health Plans is you really have very little control over them

15   in lots of respects.  You -- you're one of, you know, that one

16   I suspect there's literally hundreds of employers in them.

17   Either they  -- they set up a -- a board -- a board of trustees

18   to administer them -- administer the trust and everything about

19   them.  They -- they're all bureaucracy, basically, obviously.

20   And you know, you get lost in the -- the shuffle basically.  So

21   that, you know -- that -- yes, they can be good.  And we, like

22   I said, we have good SAG-AFTRA health and retirement plans.

23   And right now in Los Angeles, San Francisco, Chicago, Kansas

24   City, St. Louis, we're in -- we're in a -- they're good, they

25   seem like they're pretty well (audio interfere) trying to go.



1    Q    (Simultaneous speech).   Sorry, Mr. Pautsch, want to keep

2    you focused on the -- I know you got a lot of knowledge but

3    you're -- you're winding a little bit.  I'm focusing on what --

4    what was said at the table.  So if we could confine ourselves

5    to, you know, what discussion there was at the table about, not

6    only this plan, but the Nexstar plan and any other option that

7    may have been available.

8    A    That's pretty much what I said at the table.  I -- I -- I

9    said -- I talked about the disadvan -- the overall general

10   consensual disadvantage of a involvement in a group Taft-

11   Hartley health plan.  There's a whole set of different rules

12   for pension plans, but for the health you just lose, you know,

13   your ability to have some sort of a say in it.  And -- and it

14   can be poorly run.  I've seen some that are disasters, you

15   know.  But I --

16   Q    Describe --

17   A    That's what I talked about.  That's what I explained at

18   the table.

19   Q    Okay.  And -- and what -- what, if anything, you said you

20   had a preference for the Nexstar plan; what -- what did the

21   company say about it and what, you know, why they were touting

22   that plan versus some other plan?

23   A    You know, I -- I said I felt that, you know, our -- our --

24   my team felt strongly that the Nexstar health plan was well

25   regarded by the employees.  It in the recent transaction where



1    we acquired Tribune, the employees -- I had looked at the

2    materials -- and this is exactly what I said.  I looked at the

3    materials that were given to the Tribune employees at the time

4    of hire, Union, non-Union.  I said this is -- the Nexstar

5    plan's great.  That -- it's way better.  And you know, when can

6    we sign up?

7         So here I am in negotiations with basically somebody, I'm

8    saying to -- to her, you know, why do you want to get off this

9    good plan?  It's a good, you know, I -- I even sited that there

10   had been a number of employees who had astronomical healthcare

11   costs that had only ended up paying their, you know, their

12   maximum out of pocket and that was it.  I mean, that was one

13   percent -- 80,000 in medical costs, they paid 1,500, I think

14   was the out of pocket maximum.  So what did -- why are we

15   talking about changing this at this point?  It's a good plan.

16   And maybe in a year or two, it'll have gender dysphoria

17   coverage.  Maybe it'll have some different treatment of women's

18   reproductive rights.

19   Q    Okay.  What is (audio interference) --

20   A    That was exactly what I said.

21   Q    Was any agreement reached in -- was any agreement reached

22   in December of 2019 regarding healthcare?

23   A    No.  No, we -- we -- but we agreed to continue to talk

24   about it.  I don't think there's any -- it wasn't closed out

25   and I was hoping Carrie reconsider on that.



1    Q    Did you at any point in time during the negotiations

2    refuse to discuss healthcare or refuse to respond on

3    healthcare?

4    A    No, not at all.  I mean, it's some -- you know, last 30,

5    40 years of bartering that I've been involved in it.  You got

6    to solve this issue.  You've got to, you know, from a employee

7    relations standpoint, from a Union relations standpoint, you

8    have to; you got to solve this problem.

9    Q    Okay.  Let -- let's move to another topic.  Union security

10    and dues checkoff or Union business, I think, it's referred to

11    in the contract.  Was that a major issue?  A bone of

12    contention, if you will, during the negotiations?

13    A    You know, as 2019 developed it became such.  In earlier

14    times it was mentioned briefly.

15    Q    What were some of the -- I think the record reflects and

16    I'll just ask you about these, there was some question about

17    Social Security numbers and whether, you know, the offer --

18    that information should be provided to the Union.  What do you

19    recall the discussions about that?

20    A    That -- there were a lot of issues about that.  Now, that

21    I kind of looked at as sort of a separate issue, but it -- I

22    guess it was part of C-5.  There was just a lot of discussions

23    about the Social Security numbers and, you know, it's just

24    something we're sensitive to because, you know, it's, you know,

25    in every court filing we see, you know, it's an issue.  So



1    yeah, there were lots of discussions about the Social Security

2    number and getting access to it and when you get access to it.

3    Q    And how was that resolved, if it was resolved?

4    A    Well, finally I think came up with a concept using the

5    groups and group number, ID number that would be utilized at

6    least at the outset and then she could secure the Social

7    Security number from the, you know, from the employee.  When --

8    when, you know, we just didn't like the concept of releasing so

9    it worked out.  I think that was solved.

10    Q    The record reflects an issue about a company proposal,

11    initially, to charge the Union $10 per employee and then later

12    changing that to $50 -- a flat monthly fee of $50.  You --

13    for -- for making the calculations to the (indiscernible).  Do

14    you recall that discussion?

15    A    Yes.  Yes, I do.

16    Q    And what -- how did that come up and what was discussed

17    in -- and how was that resolved, if it was resolved?

18    A    Well, it -- it, you know, moved from the $10 per employee

19    to, you know, the $50 a month.  There were lots of discussions

20    about it in 2019 even.  And we introduced that, you know,

21    it's -- it's essentially a bargaining chip.  I kept kind of

22    indicating to Carrie, you know, it's something that, you know,

23    it's negotiable.  Sometimes your units agree to it, sometimes

24    they don't.  You know, in Eerie they agreed to it.  In Syracuse

25    they had agreed to it.  Youngstown, I proposed it, they didn't



1    agree to it and we withdrew it.  I mean, it -- it's been -- the

2    history of that has been -- it's a bargaining chip, something

3    we throw out there as a, you know, concept because it does cost

4    us money.  It costs us time and money to process that.  And

5    then Casey explained many, many times at the table how that

6    worked.  And it cost us more time -- well, I mean, let me

7    answer the question.  So I don't keep going on.

8    Q    Okay.  But you said Mr. -- Mr. Wenger explained it; do you

9    recall what his explanation was?

10   A    He went into the explanation he had to hand do it.  During

11   the time, I think, in 2019, we just aren't -- our payroll

12   system was overwhelmed and we knew -- we were picking up these

13   new companies.  And they couldn't establish with software some

14   of these similar items that vary from week to week.  And as a

15   result, as I understood it, the payroll system couldn't compute

16   the gross -- sort of a moving gross based upon the percentage

17   of the due -- it's a percentage of the dues.  And then based on

18   that, there's al -- there's also a deduction for certain

19   expense reimbursement.  And he just -- he had to hand do it

20   every week, every payroll period he had to spend several hours

21   at least, calculating each person's out.  The software wouldn't

22   do it.

23       You know, we, internally, we expressed frustration about

24   the software.  And I was like, can't they come up -- this 2020

25   or this is 2019, can't they come up with decent software?  But



1    no, he had to do it.  I --

2    Q    It also appears from the documents in record, that there

3    were issues about the language of the check off authorization

4    form, in part -- in particular, what you -- what we might refer

5    to as back language or language regarding what would be -- what

6    would not be charged nonmembers, as well as when it was

7    revokable or when it was not revokable.  Do you recall that?

8    A    Yes.

9    Q    And how did that -- how did that come (audio interference)

10   what was the discussion regarding that?

11   A    That came out of my research, you know.  I mean, I'm a

12   negotiator but I'm also a lawyer, you know.  And I'm sitting

13   there and I'm negotiating a contract and I'm looking at a

14   legal -- I was looking at the legal issue and the context of

15   the welcome to NABET letter.  And I studied that and I saw -- I

16   had some concerns about that letter.  That the letter was very

17   misleading in terms of when you could, you know, whether you

18   had to join the Union or not, what the back rights were.  And I

19   started doing some research and ran across General Counsel 19-4

20   and studied it and in the conclusion the authorization form was

21   faulty.  It was probably faulty before 19-04 but after 19-04,

22   it -- it was definitely faulty.  You know, so I -- I went to

23   work on it and the proposal and C-5.

24   Q    And what specific issues did you have or did you raise

25   with regard to the back language or the authorization language?



```
 1    A     The General Counsel was very clear in 19-04, that you have

 2    to put -- lay out in the initial let -- disclosures to the

 3    employee what the chargeable deduction would be, what the

 4    chargeable back deduction would be.  You can't wait until they

 5    ask, essentially.  It has to be right there in the documents

 6    so.  And there can't be -- in this other big point, and I'm

 7    summing it up, it's four or five pages, very well written legal

 8    ease.

 9          But some, you know, it later on it talks about the right

10    to resign and how that can't be hamstrung by you got to do this

11    or you got to do that.  Especially when the contract is

12    terminated.  When the contract terminates, you've got a pretty

13    much unlimited right to resign from the Union.  And that's got

14    to be in there.  So I went to work on it based upon my read of

15    that memorandum and he -- he in that case -- I can't remember

16    the case, he put it -- he said that the board wasn't following

17    and he wanted to check, you know, analyze that.  So we went to

18    work on it.  I -- I looked at the form and I -- I made changes

19    to it, submitted as part of C-5 -- C-6, it would be.

20    Q     And the authorization form was in the contract or the

21    preexisting contract for the -- the expired contract had

22    included the checkoff form as a -- as an actual exhibit in the

23    contract; is that right?

24    A     That's right man.  That made a huge difference.

25    Q     Why?
```



 1    A    Then I'm, you know, if it's in the contract, I'm

 2    essentially agreeing to the fact that -- that's it a -- that

 3    it's lawful.  I'm not going to agree to something that -- that

 4    isn't lawful and stick it in the contract and, you know, wait

 5    till somebody sues us, the Union and us for some sort of

 6    violation of their rights.  You know, then I'm on the hook and

 7    I've got to count on all the Union's indemnity -- dignify me or

 8    not.

 9         And there has been a history of back litigators at this

10    station that I was aware of.  During the last contract

11    negotiations, the Union was charged with a number of beck

12    complaints by various people in the hiatus of 20 -- when that

13    contract was up for negotiation.  There's a bunch of charge --

14    CB charges that were filed then.  So I -- so I'm not going to

15     -- we got to clean this up.  Going to have a new contract,

16    this has to be cleaned up.

17    Q    What was Ms. Biggs-Adams response to your efforts to

18    rewrite the language of the authorization form?

19    A    I think you heard it the other day and it was three words,

20    none of you -- well, four words, none of your business.

21    Q    And what -- what was your response to that?

22    A    Of course it's our business.  You're asking us to put it

23    in the contract and agree to it.  And most of the contracts we

24    have around the country with other Unions besides NABET --

25    NABET's about the only one of the Unions we have that wants it



 1     into the contract.  And maybe that's because, as Carrie

 2     explained, you know, CWA is really intent on this issue because

 3     they were sued in beck.  But when you like at an ID -- typical

 4     IDW contract, typical SAG-AFTRA contract, it's not in there.

 5     It -- they -- they do it on their own and I don't know.  I'm

 6     not agreeing to it then either.  But -- but NABET wants it in

 7     there.  Well, if it's in there, got to be compliant.

 8     Q    All right.  There's -- was there any about the Union

 9     security initiation fee; was there any -- was there any

10     discussion of the Union's initiation fee and the -- how whether

11     they were excessive or not?

12     A    No, it was during the year, pretty much, maybe start of

13     the year 2018, but definitely 2019.  That became a -- a major

14     issue; there was discussions about it.

15     Q    How -- how did it -- how did the issue arise?  And if you

16     recall, what -- what kind of triggered that issue?

17     A    It -- what triggered it internally, was me sitting there

18     in long caucuses and every time I was there for several of the

19     meetings, I would learn of people turning over and resigning.

20     There was always somebody coming and going or being -- leaving

21     for another station and what would come out would be, you know,

22     there's some concern over this big initiation fee or the new

23     hires.  And the questions would come, you know, do you have

24     to -- do you have to -- do they have to join the Union?  And

25     then we started looking -- I started looking at it legally.



1     MR. ROBERTS:  Okay.  Can we pull up Respondent's Exhibit

2  3?  That's a new exhibit that's just been marked for

3  identification.  And -- and if we could scroll down to the

4  attachments.  It was the welcome to NABET letter.  All right

5  and let's scroll on down to the next page, if you will.  All

6  right, right -- right there is good.

7  Q    BY MR. ROBERTS:  In the middle there, do you see a

8  reference to the local's initiation fee, which is equivalent to

9  three weeks of base pay?

10  A    Yes.

11  Q    And did you say during the negotiations, did you obtain a

12  copy of this welcome to NABET letter?

13  A    Yes.

14  Q    And what concerns, if any, did it -- did it trigger with

15  regard to the negotiations?

16  A    Well, first concern was on the -- was in the opening

17  paragraph.  And that's what kind of started the ball rolling.

18     MR. ROBERTS:  All right.  If we could scroll back up to

19  the first paragraph then, on the first page.

20  A    It says, "Welcome to NABET CWA.  According to our records,

21  KOIN, with whom we have a collective bargaining agreement has

22  recently employed you article two of the agreement; requires

23  that employees shall put in 30 calendar days after the date of

24  hire, make application to pay their financial obligation to the

25  Union."  Not true.  That's just a false statement.  The



1    contract had expired.  So if this was given out after September

2    of 2017, it's untrue.  That -- that was the first thing I saw.

3    And that, you know, eventually we filed a charge on that, which

4    the division of appeals sustained.  That, that was a violation

5    of the act.

6    Q    BY MR. ROBERTS:  Okay.

7    A    So then we went on -- I went down a little further.

8    Reading this is kind of what triggered me to think about these

9    health plans, a little further down the page I saw -- I saw

10   those, that's something we can look at.  And then I saw next,

11   on the next page, that it -- the high initiation fee.  You

12   know, had I heard about that before that?  Yeah, I think I had

13   but here it was in black and white, you know.  And there --

14   there it was and I'd never saw anything -- basically, 43 years

15   of practice, I never saw anything like it before.  And any

16   negotiating, literally like I said, hundreds of Union

17   contracts, coast to coast, many industries and never seen

18   anybody charge three weeks base pay.

19        So I'm thinking, whoa, this is -- this is kind of why

20   there's turn over.  You know, think about it.  You know, you're

21   ask -- you get a new job and you're asked to pay three weeks of

22   your gross pay in the first year.  It's not something you'd

23   want to do.  So you got to somehow -- this is a curveball.

24   This is a high and hard curveball.  (Simultaneous speech) --

25        JUDGE TRACY:  Hold on just a second.  Let me see -- Ms.



1    Yen dropped off.  I'm not sure what happened here.  Well, the

2    General Counsel is here.

3        Ms. DeVleming, do you want to send her an email or

4    something just letting her know that, you know, I -- she

5    obviously knows but, that we're proceeding and that hopefully

6    she can join us as soon as possible?

7        Okay.  Mr. -- Mr. Roberts, go ahead please.

8    Q    BY MR. ROBERTS:  All right.  Mr. Pautsch, you were saying

9    that three weeks you -- that was not something -- that was way

10   out of line with what you've seen in other contracts.  What

11   does three weeks of pay loo -- on average, equate to at KOIN?

12   A    About, anywhere between 2,800 to 3,000, rough figure.  I

13   think one figure at one time, 2,886.

14   Q    Okay.  And what did -- you said you had to file a charge.

15   Did you file a charge on this particular aspect of it?

16   A    You know, the first charge we filed was to deal with the

17   misleading or incorrect statement in the first paragraph.  But

18   at the table, I -- I didn't look at it as a charge issue.  I

19   mean, I wanted to sol -- solve these negotiations and get them

20   done.  And I looked at this as kind of like a, you know,  a

21   curveball.  I mean, it's like, you know, this is something I'd

22   never dealt with before and I looked at it and I'm sure

23   Carrie's going to want to keep it and defend.  And I know, you

24   know, I expect that she won't want us to interfere with it.

25       And so I start immediately thinking of, you know, what's a



1    kind of work around, some way to work out something that

2    would -- would deal with it.  Let the -- let the Union get what

3    it wants and we get what we want.  We win.  I, you know, sol --

4    settle a lot of contracts trying to work out some sort of win-

5    win.

6    Q    What did you (audio interference) -- what, if anything,

7    did you (audio interference)?

8    A    I think -- I don't know when exactly we came up with the

9    proposal that -- and I stayed with it all the way through.

10   It's --

11        MR. ROBERTS:  Ho -- hold on Mr. Pautsch.

12        JUDGE TRACY:  It really all just got garbled up there.  I

13   think Mr. Roberts is trying to ask a question.  Ms. Yen has

14   rejoined us.  We got an email that her power went out.

15        You didn't miss very much.  Mr. Pautsch just finished

16   answering the last question that you were cutoff hearing

17   probably and then they went on to the next question.  I decided

18   to go ahead because of General Counsel was on the call but

19   there wasn't much that you missed.

20        But before Mr. Roberts asks that question, Mr. Pautsch,

21   just as a reminder, if you could just focus on the questions

22   that are being asked of you.  You have a lot of knowledge

23   clearly, but, you know, we need to focus on the negotiations

24   that occurred here.

25        But the question that Mr. Roberts just asked you, which



1    is; did you file a charge over this?  I didn't get clearly the

2    answer.  Could you please answer that, yes or no?

3        THE WITNESS:  We filed a charge over the first paragraph

4    for sure, at some point.  I don't know what time sequence that

5    came in.  We filed -- ultimately,  we filed an A -- quite a

6    ways down the road, we filed an AB 5 charge on -- on this as

7    well that -- but that was down the road because I mean, I first

8    tried to work it out without a charge.

9        JUDGE TRACY:  Okay.  Mr. Roberts.

10   Q    BY MR. ROBERTS:  Yes, and an AB 5 charge is one that

11   alleges that the -- the initiation fee is excessive or

12   discriminatory.  Is that the essence of an AB 5 charge?

13   A    Yes.  And I'd never filed one of those before.  And I, you

14   know, filed it because we couldn't conclude this in any other

15   way.  You know, first I tried to work around it.  I'd like to

16   explain that when I get a chance.

17   Q    All right.  Well -- well, just wait for my questions.

18   What -- what -- you filed this charge and I know it was down

19   the road, but we might as well address it now, then we'll --

20   we'll back track.  What did you base your conclusion on that it

21   was excessive in -- in light of the industry in question?

22   A    I -- I did a call around throughout my -- throughout my

23   management to find out what other Unions that we had contracts

24   with were charging for both dues and ini -- initiation fees.  I

25   called numbers of other general managers and talked to them



1   about -- about it.  And found out that it was very -- it was

2   off the charts, it was an outlier, that's how I want to

3   describe.  It was like nobody else.

4   Q    What -- what was anoth -- what were the other initiation

5   fees that you found?

6   A    The -- the highest I saw anywhere else, in our system, was

7   525 -- 525 as opposed to, you know 3 -- close to 3,000.

8   Q    And -- and what -- what location was that at and what

9   Union?

10  A    That was NABET and that was in Buffalo, New York.

11  Q    Now, I think you heard testimony that -- that Portland --

12  that at least from the Union's perspective, some of these other

13  markets are smaller than Portland.  Were there any locations

14  that were larger than Portland if you look back?

15  A    Looked at San Francisco, where I was also in negotiations

16  most of 2019 -- well, most of 2018 and '19, and checked with --

17  what the IDW was charging there.  And found out it was dues

18  were 1.25 percent and a, you know, each pay -- payroll plus $19

19  a month on top of that.  And initiation fee, which we didn't

20  collect, was $300 total.

21  Q    So -- so are there some locations where you have contracts

22  where you do not collect either Union dues or initiation fees?

23  A    Yes, quite a few.  Ones that come to mind are IDW and the

24  initiation fees we don't but SAG-AFTRA in San Francisco we

25  don't collect their dues.  They collect them on their own.



1    Q    Okay.  All right.  So --

2    A    And a number of other markets around the country, they

3    collect their own dues.

4    Q    Let -- let's move back to where you were talking about the

5    negotiations over this initiation fee.  So obviously, there was

6    discussion of it being excessive; what was the Union's response

7    to your statements that it was excessive?

8    A    Again, that was a three -- three-word phrase, none of your

9    bus -- or four-word phrase, "none of your business".

10   Q    Okay.  And so what, if anything, did you do to resolve

11   that stalemate if you will?

12   A    That's where I came up with what I felt was a work around.

13   You know, trying to figure out a way to let both sides get what

14   they want and I proposed it and stuck with it all the way on

15   this issue.

16   Q    And what was that proposal?

17   A    Basically, you can charge what you want, but we're not

18   going to collect it.  We won't collect the -- the initiation

19   fees.  We'll continue to collect dues but we're not going to

20   collect the initiation fees.

21        MR. ROBERTS:  And I want to pull -- pull up Joint Exhibit

22   6, Joint Exhibit 6(h).  And if we could scroll down to the next

23   page of this where it has the authorization form.  No it's 6,

24   8 -- 6(h).  Yeah, keep going.  A little bit further.  All

25   right.  Right there.



 1   Q   BY MR. ROBERTS:  I see some in the middle there, I see

 2   some language that is stricken.  Specifically, in addition I

 3   further authorize KOIN to deduct my wages on account of Union

 4   initiation fees in the sum of blank dollars.  And then it goes

 5   on.  Who made that strike?

 6   A   We did.

 7   Q   And what were you attempting to accomplish with striking

 8   that language?

 9   A   This would accomplish the work around I'm talking about.

10   Basically, they can charge it, collect it on their own, but

11   take it out of the authorization form.

12   Q   Okay.  And what was -- what was Ms. Biggs-Adams response

13   to even that proposal?

14   A   None of your business.  In so many words.

15       MR. ROBERTS:  Now, I believe if we turn back to 6(g), we

16   scroll up to Joint Exhibit 6(g) and move on down to the

17   authorization form.  Keep going.  All right, stop there.

18   Q   BY MR. ROBERTS:  This is the proposal.  I'll represent

19   this dated earlier, March 22nd of '18.  That's -- at that

20   point, it still had the language in there about deducting

21   initiation fees; is that correct?

22   A   Right.

23   Q   And so it was the next proposal that you -- in April, that

24   you removed that language?

25   A   Yes.



1    Q    Did you ever attempt to put it back in or to -- to in --

2    insist that the Union reduce their initiation fees?

3    A    Never.  I just, you know, I -- I -- I met all my legal

4    training, reading the labor law for some 40 years.  It isn't my

5    business to guess on or change the amount; it's not my

6    business.  That I would agree on.

7    Q    What about whether you collected or not?  Did you view

8    that as your business?

9    A    Absolutely.  That's -- that's a neg -- a mandatory subject

10   of bargaining, we have to -- it -- it -- we have to bargain

11   over it, number 1, and number 2 what it -- it's impact on our

12   business, I do have to weigh and I have a right to weigh.

13        MR. ROBERTS:  I -- I haven't offered Joint -- Respondent's

14   Exhibit 3.  Before I forget that, let me do that.

15        JUDGE TRACY:  Any objection?

16        MS. DEVLEMING:  No objection, Your Honor.

17        JUDGE TRACY:  Ms. Yen?

18        MS. YEN:  To -- to which exhibit?

19        MR. ROBERTS:  Joint -- Respondent's Exhibit 3, it's a new

20   exhibit that was uploaded earlier today.  It's on the screen

21   now.

22        MS. YEN:  Yeah, since my powers not out -- I mean, my

23   powers -- although my power is back but my internet is not back

24   yet because it has to, you know, reboot.  I -- I can't see it.

25   Can I just reserve that --



1          JUDGE TRACY:  Can you show the front -- front -- first

2    page of that document Mr. Schiff?

3          MS. YEN:  And how many pages is that exhibit?

4          MR. ROBERTS:  It's several pa -- Your Honor, I'm fine with

5    reserving ruling on it if that will speed things up until Ms.

6    Yen has internet coverage.

7          JUDGE TRACY:  Well, it's not -- it's nine pages, it looks

8    like it was -- it begins with a request for information in the

9    copy of the NABET welcome letter.

10         And I think that, that if you could, Mr. Schiff, just

11   scroll through it slowly, that should be -- I -- I'd rather

12   hold off on it because I'd rather just put it in or not.

13         But I'd rather just kind of deal with it now.  So this is

14   the -- primarily the focus of the -- the testimony was the

15   welcome letter there.  And then let's see, what -- what else is

16   attached?  The attachments to that letter.

17         MS. BIGGS-ADAMS:  Your Honor?

18         JUDGE TRACY:  Yes?

19         MS. BIGGS-ADAMS:  This is Ms. Biggs-Adams.  May I speak

20   with Ms. Yen for just a moment.  I think we can sort this out.

21         JUDGE TRACY:  Well, hold on one second.

22         MS. BIGGS-ADAMS:  I know she can't --

23         JUDGE TRACY:  Mr. Schiff, why don't you go ahead and let's

24   go off the record and put them in a breakout room so they can

25   just talk real quick.



1    (Off the record at 3:04 p.m.)

2    JUDGE TRACY:  Okay, let's go ahead and go back on the

3    record.

4    THE COURT REPORTER:  We're on the record.

5    JUDGE TRACY:  Okay.  So before we went off the record, I

6    was seeking if there were any objections to Respondent's motion

7    to admit Respondent's Exhibit 3.  General Counsel had no

8    objections.

9    And for the Charging Party, any objections?

10    MS. YEN:  Just that we -- I believe that it's not

11    relevant.  The only dispute that it pertains to is one CB

12    charges, which was partially dismissed, and the remaining part

13    has been settled.  And so I don't dispute the authenticity of

14    these documents, but -- but I object on relevance.

15    JUDGE TRACY:  And Mr. Roberts, just for the record, what's

16    your response to the objection of the relevance?

17    MR. ROBERTS:  Well, two, I mean -- two points.  One,

18    we're -- it relates to our bargaining position.  I mean,

19    it's -- our bargaining position was based -- and there's an

20    allegation that we -- that we insisted upon reducing the -- or

21    bargaining over the amount of the -- the Union's initiation

22    fees.  They're -- to be sure, there has been discussion of the

23    company's position that it's excessive, but the company -- and

24    Mr. Pautsch has testified that the company's altered its

25    proposal, and simply proposed to not collect it.



1          So that's one thing.  But two, is, we've defended --

2     let's -- let's say hypothetically that -- that I'm wrong, that

3     we did something incorrect on bargaining and (indiscernible),

4     the initiation fees are excessive and violate AB 5, I would

5     take the position that it would not be a violation to refu --

6     to bargain over them.  You can't be forced to bargain or agree

7     on something that would be unlawful.  So I think it's relevant,

8     the fact that General Counsel dismissed it is beside the point.

9     We are entitled to litigate it irrespective of the General

10    Counsel's position.  So it's -- it's relevant to the bargaining

11    and it's relevant to that legal defense.

12         JUDGE TRACY:  All right, well in -- I'm going to overrule

13    Charging Party's objections and admit Respondent's Exhibit 3

14    into evidence.

15    **(Respondent Exhibit Number 3 Received into Evidence)**

16         JUDGE TRACY:  And certainly so, though, the parties are

17    all on notice of Mr. Roberts's position here in terms of their

18    affirmative defense.  So please be sure to address these issues

19    in the briefs.

20         Mr. Roberts, go ahead, please.

21         MR. ROBERTS:  All right, thank you.  We can take that down

22    now.  I'd like to pull up, though, instead, Joint Exhibit 27.

23         JUDGE TRACY:  And also, let me just say one other thing.

24    Let's not -- unless you -- if you need it, but let's not pull

25    it down, because I'm noticing that when Mr. Schiff has to stop



 1    screen-sharing, it's -- it takes longer for him to kind of get

 2    it back going again.  So if it's okay with everybody for your

 3    direct right now, just to leave it up.  And then he can

 4    switch -- it seems like it's quicker for him to switch it than

 5    to him closing it and then re-sharing and all of that.  So

 6    let's try it that way, okay?

 7         MR. ROBERTS:  Certainly.  So -- but it is -- is it okay to

 8    scroll -- ask him to scroll it down?

 9         JUDGE TRACY:  Yeah, definitely, yes, yes.

10         MR. SCHIFF:  All right, yeah, if you could scroll down

11    just a little bit.

12                    **RESUMED DIRECT EXAMINATION**

13    Q    BY MR. ROBERTS:  Is this -- what is this, Mr. -- Mr.

14    Pautsch?

15    A    This is a request for information that was sent

16    regarding -- generally speaking, these issues.

17    Q    And what -- what was your -- what was your reason for

18    asking for this information?

19    A    Really to look at the justification that I was being given

20    in terms of the process here.  You know, essentially, on all

21    items.  You know, like, if you look at number 2, the Beck --

22    you know, notices.  We had made a proposal to clean -- clean up

23    the form, so I -- I wanted to be -- make sure I had a full

24    range of documents to look at.  Each one of those really went

25    to some issue regarding C-5 or C-6.



1    Q    Okay.

2          MR. ROBERTS:  And if we -- if we could go to Joint Exhibit

3    28.

4    Q    BY MR. ROBERTS:  And this is -- appears to be a response

5    to your request.  Is that your understanding?

6    A    Yes.

7    Q    Okay.  And obviously this document speaks for itself, but

8    did you -- did the Union agree to provide this information?

9    A    Really, none of it.  It was all more consistent with the

10   none -- none of your business response that we were -- we were

11   getting on this issue.  They wouldn't even --

12   Q    All right.

13         MR. ROBERTS:  And then --

14         THE WITNESS:  Okay.

15         MR. ROBERTS:  -- then if we go to Joint Exhibit 29.

16   Q    BY MR. ROBERTS:  And is that -- it appears to be a letter

17   back from Mr. Nevin, Ms. Biggs-Adams, on the same subject?

18   A    Yes, it is.

19   Q    Okay.  Have you ever gotten that information?

20   A    No, not at all.  None of it.

21         MR. ROBERTS:  All right, if we could go to Joint Exhibit

22   43.  All right, now scroll down just a little bit.  That's

23   good.

24   Q    BY MR. ROBERTS:  Do you recognize this document?

25   A    Yes, I do.



1    Q    And what is it?

2    A    It's a document that was circulated at some point in the

3    fall of -- I would say September 27th, '19, by the Union at

4    KOIN.

5    Q    It appears to be a waiver of initiation fees for those who

6    joined within a 30-day period?

7    A    Yes, it is.

8    Q    Did you have any concerns about that letter?

9    A    I had a concern, and I also had another observation.  And

10   I'll start with the concern.  Any time somebody in the context

11   of initiation fees introduces a concept of waiving the intro --

12   the initiation fee, you're naturally putting in play the

13   important case of NLRB v. Savair.  And that decision, you know,

14   (indiscernible) decisions, long settled law that says that

15   whenever you do that, that naturally has some coercive effect

16   on the employees that receive it.  So that -- I had that

17   concern.  But then I look at it, and I'm thinking, well, maybe

18   it's hope for the future, in the sense that maybe Ms. Biggs-

19   Adams is moving off of, you know, coupling Union shop with

20   these high initiation fees, and maybe -- so maybe she'll change

21   her position, a position which was very rigid, I thought.

22   Q    Did it -- did she change her position on the issue?

23   A    No.  No, she didn't.  And -- and you know, stayed with the

24   concept, it's none of your business, you know, we're going

25   to -- we're going to sort of charge this down the road.  And



1   going back to the Savair aspect of it, the part about Savair is

2   when you say it's for a limited time or for a limited purpose,

3   Justice Douglas in that case, you know, said, that that's

4   like -- it's known as the fist inside the velvet glove.  The

5   power that giveth is the power that taketh away.  So it

6   naturally has a -- for people that don't take it, and for

7   people who it's not available to, it's basically saying, I've

8   got the right to charge you that amount later on.  And they're

9   not helped by it at all --

10  Q    Did you say -- did you file a charge over -- over that

11  issue, the waiver issue?

12  A    Ultimately, but not -- not -- not right away.  I -- I

13  forget exactly when we filed it, but we raised Savair

14  objections that led it, and filed a charge, yes.

15       JUDGE TRACY:  Sorry, Mr. Roberts, could you just repeat

16  the question that you just asked?  It kind of cut out a little

17  bit.

18  Q    BY MR. ROBERTS:  Did you file a charge over the waiver

19  issue.

20       JUDGE TRACY:  Thank you.

21       MR. ROBERTS:  And do you need him to answer that again?

22       JUDGE TRACY:  No, I heard the answer, thank you.

23       MR. ROBERTS:  Okay.  All right.  All right, okay, let's

24  move on to another exhibit.

25       JUDGE TRACY:  Everybody else, if you could just mute



1    your -- your audio, just to be sure.

2        MR. ROBERTS:  I'm still getting feedback, that's why I'm

3    stopping sometimes.  But with -- moving -- moving over to

4    another subject, I want to ask you about some memos that came

5    out over Pat's -- Nevin's signature to bargaining unit.  I'm

6    going to call them just generically bargaining updates, but

7    they're a series of letters and -- and memos in the -- in the

8    record that relate to communications with either bargaining

9    unit members or sometimes with the entire -- the entire

10   workforce at KOIN.  Are you familiar with those documents in

11   general?

12   A    Yes, I am.

13   Q    And what role, if any, did you follow in -- in those memos

14   and -- and letters?

15   A    I -- I wrote them.  I wrote them, essentially.

16   Q    Okay, so tell us what -- what -- I'm speaking broadly now,

17   not about any specific memo, but what -- is that something

18   you -- you do in negotiations typically, or is it something you

19   do -- well, how frequently do you do that in negotiations?

20   A    Well, if I -- if I had to go through my entire career, I'd

21   say five to ten percent of negotiations.  You do it when the

22   Union does it, when the Union goes on what has often been

23   labeled as a corporate campaign strategy, or a mobilization

24   strategy.  They're out there communicating, you need to

25   communicate back, or you're going to get -- you're not going to



1    do very well.  So --

2    Q    Okay.

3    A    -- that's the five or ten percent.  Different industries

4    at different times.  Years ago I wrote a lot of letters for the

5    CEO of American Airlines and his battle with -- longstanding

6    battle with the flight attendants Union.  They're very -- you

7    know, they're out there every day writing a letter or two.  And

8    he -- he wanted to respond to them, so we responded.

9    Q    All right, with respect to calling the -- and thes -- what

10   motivated you to engage in this communication?  I'll call it a

11   communication campaign.

12   A    To keep the record straight, so that they were

13   communicating, we were communicating.  At first it was rather

14   (audio interference), I thought, by them.  And then it -- as

15   time went on, it became more aggressive.  And we -- we felt we

16   had to address some of the things that they were raising, with

17   the intent to, at some point, you know, use the various

18   communication point to come to the deal.

19   Q    All right, (audio interference).  Let me ask you to get

20   some specificity about -- you said, I believe the Union

21   referred to it as mobilization efforts.  What -- what specific

22   actions did -- apart from writing these updates, their updates,

23   what -- was there any other specific actions that they engaged

24   in that caused you to respond?

25   A    Well, there was there.  There's a lot of these bulletins.



1    I don't know -- I've not gone back to count the number of them,

2    but there's these.  Then there was publicity that they entered

3    into with CWA and sent around and got some press releases on

4    regarding the tax bonus increase and why - why we were -- even

5    though we -- we gave -- you know, the company gave away quite a

6    bit of money, we're still being cheap.  And corp -- you know,

7    corporate -- the corporate greed theme was used.  There was

8    that, and then there was the peoplesworld.org article, where

9    the corporate greed thing came out again.  And also, say and

10   pay refusals were thrown out in the -- in the literature there.

11   And then what really felt -- really got us to the point where

12   we felt like we had to, you know, communicate even more, was in

13   that article, it -- in the statement that we had made a wage

14   offer that was point 1 -- point 1 -- I think at point 1 over

15   three years, and we were trying to divide the workers of

16   Portland from the workers of Buffalo, and that was what was

17   written by the -- that was actually the headline.  "Workers

18   trying to be divided."

19        And we say, okay, if we let people keep writing that, our

20   own employees read it -- in fact, that's how it turned up,

21   their new -- our news director at KOIN saw it, on a -- like, a

22   media alert on social media, he read it, and, you know, they're

23   going to control -- control the narrative with falsity.  So

24   we -- we had to write more.  Let me just kind of -- kind of add

25   one more thing.  We -- in no other Nexstar negotiation had we



1    communicated this.  Neither has the Union in no other

2    negotiation.  These are relatively small bargaining units.

3    You're talking, typically, this is 40, you know -- most of them

4    are 40 or 50.  So to see the -- you know, see the letter after

5    letter after letter, and then false -- you know, some of these

6    false statements, and -- you know, we had to -- we had to come

7    back and write to it.

8    Q    Let me -- let me ask you about the peoplesworld.org

9    document.  Did -- did the company make an information request

10   based on that article?

11   A    Yes, we did.

12   Q    And did the Union refuse to provide it?

13   A    Yes, we did.

14   Q    And did you later file --

15   A    Yes, they did.  Yes, they did.

16   Q    And did you later file an unfair labor practice charge

17   that was actually litigated before the Board?

18   A    Before the Board.  It went before an ALJ, the ALJ resolved

19   it against the Union in most -- most part, and the decision

20   speaks for itself.  And it was -- they didn't file exceptions,

21   and the Board affirmed it and (simultaneous speech) --

22   Q    Okay, so -- so that peoplesworld.org article is the

23   subject of an actual publish decision -- at least it -- the

24   details of it are set forth in a published decision by the

25   Board; is that correct?



1    A    Yes.

2    Q    Okay, all right.  You mentioned -- well, let me ask you

3    this.  Were there any efforts by NABET CWA to -- to engage in

4    tactics or activities with regard to your advertisers?

5    A    That was part of the mobilization discussed yesterday or

6    the day -- you know, when Carrie Biggs-Adams testified.  Yes,

7    mobilization occurred, some letters went out, some cosponsored

8    by the Oregon Labor Counsel, some by NABET directly.  Went out

9    to various advertisers.  We picked up some of them.  Probably

10   didn't pick up all of them, but they were all saying, you know,

11   we're Union busters, we're cheap, and we should, you know, stop

12   what we're doing.

13   Q    Okay.  Did they actually engage in any kind of activities

14   outside your advertiser's place of business?

15   A    Yeah.  They set up a -- what we would label a, you know, a

16   picket line.  They claimed it wasn't, it was bannering, and

17   that's the dispute that is, you know, all over Board law right

18   now.  There's a -- the Board is taking briefs on whether

19   bannering is picketing or not.  And they had a big banner, you

20   know -- I forget exactly what it said, you know, basically,

21   don't shop here, or something to that effect.  You know, KOIN

22   is -- KOIN is evil and they -- they work with KOIN.  I don't

23   recall exactly the signage.  They appeared there three or four

24   weeks -- weekends in a row through the summer of 2019.

25        The -- the numbers there were few in number, but they --



1    the customer obviously would -- didn't care, wasn't happy that

2    it was happening.  So again causing us the need to communicate

3    on this issue, that set out our side of the dispute.

4    Q    One of the -- one of the memos or letters put out by --

5    over Mr. Nevin's signature referenced Ms. Biggs-Adams' salary,

6    which had been a obtained from reports that have to be filed

7    with the department, right?  Why did you -- why did you issue a

8    letter, a memo setting forth that information?

9    A    The central theme of NABET in this situation, in -- and

10   actually in both this and in the CWA effort that they did with

11   respect to the tax bonus is a zero-in on our executive's

12   compensation.  You know, they -- they -- that's -- that's,

13   like, the central theme, actually, of those communications.  So

14   as this issue came up regarding her administration of her --

15   her business, we -- you know, we went with that, put those

16   items out there.  Is that the way a business should be

17   administered, basically?  You know, they don't think we should

18   administer our business that way, but they pay people a certain

19   rate as well.  And that's for others to judge.  Is that too

20   much, or is that enough?  Not enough?

21   Q    Let me ask you this.  And this goes back to when you first

22   became involved in the negotiations.  Did you have in your

23   mind, or envision that there might be some kind of

24   decertification or opportunity to eliminate the Union in

25   Portland?



 1    A    No way, no how.  It's Portland.  You know, not -- not at

 2    all.  I had no concept that that was a possibility.  It's --

 3    you know, it -- we -- you know, just no.

 4    Q    Did you -- well, let me ask you this.  Do you -- one of

 5    the things that you had testified about with regard to the

 6    initiation fees was that you believed that it was impacting

 7    your ability to hire, is that -- what evidence did you have to

 8    support that?

 9    A    Looking at lists as time came in, and hearing, you know,

10    the -- the people that were leaving, looking -- because we

11    would pull up lists for Ms. -- Ms. Biggs-Adams's request of

12    wages, and there'd always be a bunch of new hires that were --

13    were out there.  And I'd see people coming in -- you know, I'd

14    see the managers all worried about somebody leaving, or this

15    position, they're leaving.  You know, and -- and then -- and

16    then the word came out when that welcome to NABET let -- letter

17    came out.

18         This was a driving force.  You know, imagine, you know,

19    you're starting a new job, any job, you're making 40-, 50-,

20    60,000 a year, and in the first year of your employment, you

21    have to pay three grand.  I mean, a lot of people would take a

22    job if they were offered three grand.  You know?  I mean

23    that's -- that's a pretty good signing bonus.  Especially, you

24    know, the -- the younger people coming out of school, you know,

25    into these positions.



1        So it was a business problem, a huge business problem, you

2    know?  It's just -- and it's -- I can't say it enough, it's an

3    outlier.  It has never happened before.  I've never seen this.

4    It's a problem that presented itself.  We didn't -- you know,

5    we didn't want to deal with it.

6        MR. ROBERTS:  All right, thank you, I think you made it

7    through the question.  All right, let's move onto another

8    topic, wages.  And I'd like to pull up Joint Exhibit Number 9,

9    which is the Union's wage proposal of April 24th, 2019.  And if

10   we could scroll down to the next page where the -- the

11   number -- excuse me, the numbers are.  That's good, right

12   there.

13   Q    BY MR. ROBERTS:  When -- when you received this -- well,

14   first of all, how did the -- what happened, if you know, to

15   cause the Union to make this wage proposal?  In other words,

16   what discussions had occurred about wages before this proposal

17   was -- was sent to the company?

18   A    They -- I remember them saying, I think it was the April

19   meeting, or was it the January meeting?  You know, at some

20   point, we want to get on to wages, something to that effect.

21   And I -- we responded, you know, let's see it.  You know,

22   we'll -- we'll start looking at this.  You know, it's --

23   usually in these negotiations, it's CE-1, CE-2, CE-3 -- 3 is

24   wages.  You know, 1, 2, 3, and we get it done.

25   Q    And in this case, you said that they -- you testified



1   earlier that you didn't make a propo -- a wage proposal, you

2   chose to wait later.  But why did you choose to wait later in

3   this particular case?

4   A    This was a very high opening proposal from a lot of

5   perspectives.  You know, the one line there that -- in the

6   second paragraph, it says, all employees who have more than ten

7   years of service at KOIN, irrespective of the wage steps, would

8   receive at least $3 per hour raise upon ratification.  You

9   know, right there, that's -- that could be 10 percent, 15

10  percent, at that.  Then you've got the bump-ups of all the

11  minimums, sometimes 35, 40 percent there.  Had not seen those

12  kinds of proposals anywhere, not within the last number of

13  years.

14       If you can scroll down, then -- further.

15       MR. ROBERTS:  Yeah, keep going.

16  A    And then --

17  Q    BY MR. ROBERTS:  (Simultaneous speech).

18  A    So everybody at the beginning who's got 10 years of

19  service or more would get $3 an hour, and then it also, when

20  you read this, they'd get 3.5 every year.  You know, I'm sure

21  they would -- they wouldn't pay my air fare back to Irving if I

22  conferenced that.  That's just way out of line.  So when you

23  get an offer in any negotiations like this, you take great risk

24  in countering at all.

25       The other day I got an offer in a really weak



1    discrimination case, somebody wanted to make -- wanted $4.5

2    million.  You know, and there's no facts to support it.  Do

3    you -- what -- what do you do?  Do you come in and -- well,

4    I'll give -- we'll offer 150, when the case probably isn't

5    worth even 50 thousand at tops.  Just --

6    Q    Mr. Pautsch, let's -- Mr. Pautsch, let me stop you,

7    because you're -- I think you're digressing a bit, here.  Focus

8    on the -- this particular proposal.  What -- what was it

9    about --

10   A    I'm just saying that it was too high.  It was way too

11   high, and when you get a proposal like that, you don't count --

12   you -- I think the first rule of bargaining is you don't

13   counter it immediately.  You -- you give them a hard --

14   Q    Did --

15   A    -- let -- you give them a hard statement.  And I -- you

16   know, this is not the first time this ever happened in my

17   bargaining history.  You know, somebody comes in and wants ten

18   percent.  I'm not going to counter ten percent when -- when I'm

19   expecting to settle at one percent.  That's crazy.  So --

20   Q    Let's -- I think you've answered it.  Subsequently, during

21   the active negotiations of the bargaining, did you make -- did

22   you have any conversations in which you sent signals regarding

23   what you would be willing to settle for on wages?

24   A    Very definitely.  I said, you know, recently, we're on our

25   same juncture in bargaining with your fellow local in Buffalo,



1   after the end of a long set of changes in negotiation there.

2   And they came in at three -- three percent -- two percent --

3   two percent, without any of these other aspects.  Without

4   moving up the minimums, without $3 for everybody at the -- just

5   three, two, two.

6   Q    And what did you (simultaneous speech) --

7   A    And then I told -- you know, hey, maybe that's -- and

8   it -- then I even said, lately, just for your knowledge,

9   Carrie, we've been settling contracts more in the range of 1,

10  on 1.5 issued over three years.  You know, 1, 1, 1, 1.5; I

11  think I even said recently in San Francisco we settled for 1.9,

12  1.1, 1.1.  Because I just settled that in San Francisco at

13  those rates with a much larger (simultaneous speech).

14  Q    Did -- when you provided that information, did you get any

15  response from Ms. Biggs-Adams?

16  A    "I want to see a counter.  I want a counter."  And I just

17  see a danger in that.  The other -- the other reason -- well,

18  okay.  That was her reaction.  "I want a counter."

19  Q    Okay.  I -- I want ask you a -- a question about the

20  scheduling of the January 20, 2020 negotiations.

21       MR. ROBERTS:  And this is Joint Exhibit 51, if we could

22  pull that up.  All right.  This -- this is fine right here.

23  Q    BY MR. ROBERTS:  If you look at that -- the middle part,

24  where she -- Ms. Biggs-Adams to you dated December the 10th.

25  Well, actually move down.  If you scroll down just a bit to the



1   email below that.  All right.  This -- this is an email from

2   you to Ms. Biggs-Adams in which you say there's been a

3   misunderstanding.  I'm not available on January 14 and 15.  Can

4   you explain what happened, or how this misunderstanding

5   occurred, or what your understanding of it is?

6   A    Yes.  It says that -- that year ended.  2019 ended.  We

7   were closing a huge transaction; the whole Tribune transaction.

8   And we bought in stations, but as part of it to comply with FCC

9   rules; we sold one of those stations immediately upon buying it

10  to another company.  And that was in New York, WPIX and (audio

11  interference) and we were going to close on that and there

12  were -- part of that transaction was occurring late in that

13  year.  And I -- I got a numbers of demand order from the Unions

14  there, that they wanted to do in effects bargaining.  So I knew

15  I was -- it looked like you know, I'm going to be in New York

16  meeting with these Unions, and as I'm receiving, I was -- I'm

17  in Buffalo, New York, meeting with NABET.

18       So I agreed to meet with Ron Divulski (phonetic) and the

19  NABET representatives in Buffalo, because I figured I'll be

20  there that week and I'll just -- when I go back to Portland, I

21  explain, you know, that.  We can even meet in New York.  So we

22  can -- that week I'll be -- the week after I'll come out and

23  meet with the -- the -- the NABET group, and at KOIN.  Yes --

24  I -- it's really hard to be in both posts or near both posts on

25  the same week negotiating, so I just moved it a week back, and



1   that was it.

2   Q    Well, in -- in October, were you aware that they had

3   scheduled or you all -- you all had agreed to schedule January

4   14 and 15?

5   A    In October, I was aware of that I was going to meet with

6   KOIN in -- in the NABET at KOIN on January 14th and 15th.

7   But --

8   Q    Okay.

9   A    -- what I -- what I didn't know is that this thing was

10  going to develop hot and heavy in New York, regarding the fact

11  I didn't that they would want to bargain effects with us.  I

12  thought they would bargain effects with Tribune, which was the

13  owner.  We only owned it for a short time, basically.  It was a

14  weird transaction, and it came out of nowhere that I had to be

15  out there to bargain with effects bargaining with them.

16  Q    Okay.  I want to move to what is I think is the final --

17  final question or two.  The record reflects that on or about

18  January 8th, of 2020, the company notified the Union that it

19  was withdrawing recognition from the Union based on --

20  purportedly based on objective evidence.  Do you know what that

21  objective evidence consisted of?

22  A    Yes.  What I put in the position statement, yes.

23  Q    Well, not -- my question is in general, what did it

24  consist of?  What type of evidence?

25  A    A number of statements that were made to us, our -- our



1    supervisors or managers out there; Rick Brown, Pat Nevin, a few

2    others that employees were expressing extensive dissatisfaction

3    with the Union.

4    Q    Were you personally privy to any of those statements or

5    conversations?

6    A    No.  I can say I never talked to any employee there for

7    more than like "hi" in the hall.  You know, I never talked to

8    anybody.

9    Q    Okay.  There's -- the record reflects that after the

10   company withdrew recognition, there was some discussion with

11   employees about a 45-day period in which something would happen

12   or not happen.  Are you aware of what that relates to, or what

13   that's a reference to?

14   A    It was our understanding and you know, this was something

15   that was even read by some -- some of our managers.  They saw

16   the bulletins that came out about the Johnson Controls decision

17   that provided for or would draw recognition to be followed 45

18   days by a period where a Union could file for an election.  And

19   I -- I -- I felt then, and I feel now under that decision

20   that -- that could have -- it should have happened.  Something

21   the Union should have filed.  Some sort of a petition for an

22   election.

23        I've been told -- I mean, the Region took the position

24   that well, that case was an anticipatory withdraw, and from my

25   perspective, that's a distinction without a difference.  I



1     mean, here you know, we -- we had grounds to withdraw

2     recognition, setting in motion the same procedure that was

3     dealt with in Johnson Controls.  You know, came to a different

4     conclusion.  So here we are today, you know, but that was my

5     feeling then, and I think some of the managers that were there

6     came to the same conclusion.  So that's what they were saying.

7     They thought reading a -- an -- an election.

8     Q    All right.  Thank you.

9          MR. ROBERTS:  Your Honor, I don't have any other questions

10    of Mr. Pautsch.  You're muted.

11         JUDGE TRACY:  Yes.  Thank you.  All right.

12         Ms. DeVleming, do you need to take a break at all?

13         MS. DEVLEMING:  That would be ideal.  I haven't had lunch

14    yet --

15         JUDGE TRACY:  Oh.

16         MS. DEVLEMING:  -- but a short one would be fine --

17         JUDGE TRACY:  So let me ask --

18         MS. DEVLEMING:  -- to just get myself together.

19         JUDGE TRACY:  -- yes, let me ask you.  It's 3:48.  I

20    had -- you know, we have Mr. Schiff here.  How long do you --

21         MR. SCHIFF:  Oh.  Don't worry about me.  Don't worry about

22    me.

23         JUDGE TRACY:  Okay.  Well, then that's good.  Ms.

24    DeVleming, do you think that you'll finish today with him, or

25    will you be -- I mean, I know Ms. Yen has to go also.



1        And Ms. Yen, I'm assuming you have questions for him?

2        MS. YEN:  Yes.

3        JUDGE TRACY:  Okay.  So why don't we just take a 15 minute

4    break, and then Ms. DeVleming, do you think you'll need a

5    couple of hours, and hour; how long do you think it'll be?

6        MS. DEVLEMING:  It's always hard to estimate, but I'd say

7    around closer to an hour, then we'll -- we'll --

8        JUDGE TRACY:  Okay.

9        MS. DEVLEMING:  -- right around that.

10        JUDGE TRACY:  All right.  Well, let's see what we can

11    accomplish today.  I know it's a long day for those on the East

12    and then the Midwest area for you guys.  And then if --

13    we'll -- we'll see how it goes, you know, you have to also look

14    at the -- we had technical problems galore today.  And also, I

15    just have to weigh that with all of our mental focus for the

16    hearing.

17        So let's just see how it goes and there's a natural

18    breaking point.  Perhaps you just sort of end there and then we

19    resume tomorrow, because he will have to be called tomorrow

20    anyway with -- with Ms. Yen.  There's no way that we'll get to

21    her today, so it may be good to just do maybe half of it today

22    and then resume tomorrow with the other half.  I think that

23    that would be fair to those guys.  Yes?

24        MR. ROBERTS:  Well, just for you -- just for your

25    information, I -- I expect that the rest of our witnesses will

1    be relatively short, and I would think that even in composite

2    no more than three to four hours for all of them to testify,

3    based on what I know at this point in time.  I don't think it

4    would -- so, I mean I don't-- I don't think even if we carry

5    over a little bit into the morning, I don't think it will

6    impact our ability to at least finish our evidence, unless

7    there's some type of rebuttal.

8        JUDGE TRACY:  And at this point, do you think that there

9    will be any rebuttal; hard to know?

10       MS. DEVLEMING:  At least a little, Your Honor.

11       JUDGE TRACY:  At leads a little.  Okay, so I mean our goal

12   would be to finish up tomorrow.  Hopefully, technology doesn't

13   get in our way and we can do that.  I can't imagine having

14   another internet outage tomorrow.  But let's take a 15 minute

15   break, and let's just resume at maybe 4:05 Pacific time.

16       Ms. DeVleming, just do maybe half of it, and then we'll

17   resume tomorrow with him, Ms. Yen, and then Mr. Robert's

18   remaining witnesses.  And make sure that you have your rebuttal

19   witnesses or witness available.

20       And just to be clear, we also need to put in at some

21   point.  There's the history of this case; the documents that

22   you guys have prepared.  And you know, after the rebuttal, I

23   don't do any other types of rebuttals or anything like that.

24   The rebuttal of General Counsel ends the case -- well, closes

25   the hearing at that point.  Not too bad.  Okay, and I'll set



1    forth the hearing dates as well.  Hopefully, we can finish

2    tomorrow so everybody can wrap of for the rest of the week.  So

3    let's get back on it at about 4:05.  Okay?

4         MS. DEVLEMING:  Okay.

5         MR. ROBERTS:  Okay.

6         JUDGE TRACY:  And we'll go off the record.

7    (Off the record at 3:52 p.m.)

8         JUDGE TRACY:  Go ahead.

9         MS. DEVLEMING:  Okay.  And I don't know if you'd like to

10   do this now, but I am -- I understand from Ms. Burke that the

11   final versions of the four total Joint Exhibits, which have

12   been marked as Joint Exhibits 63 to 66, have been uploaded to

13   SharePoint.

14        These are the four total sets of documents pertaining to

15   the overall history of the charges, appeals, decisions, between

16   the Parties that are relevant to bargaining.

17        JUDGE TRACY:  And what numbers were they?

18        MS. DEVLEMING:  Joint Exhibit 63 through 66.

19        JUDGE TRACY:  Okay.  Okay.  And any objections?

20        MR. ROBERTS:  None from Respondent.

21        MS. YEN:  No objection.

22        JUDGE TRACY:  Okay.  All right.  So Joint Exhibits 63 to

23   66 are admitted into evidence.

24   **(Joint Exhibit Numbers 63 through 66 Received into Evidence)**

25        And again, please use these as evidence to support any



1    arguments that you're making in your -- this hearing please,

2    okay?  Thank you.  So you can go ahead with cross-examination

3    now.

4         MS. DEVLEMING:  Thank you, Your Honor.

5         One quick moment for a sip of water.

6                         CROSS-EXAMINATION

7    Q    BY MS. DEVLEMING:  All right.  Good afternoon, Mr.

8    Pautsch.  I know you've been present as Party representative,

9    but again my name is Liz DeVleming, counsel for the General

10   Counsel, and I hope to not to take up too much of your time

11   today.  But I do have some cross-examination questions for you.

12   A    Thank you.  Good to meet you.

13   Q    You too.  The first, it's just a clarification.  You were

14   asked about what is now in the record as Respondent's Exhibit

15   2, which we could pull up, but let's see if we can avoid.  It

16   was the bargaining proposal cover sheets that were attached, or

17   that at least summarized the back and forth proposals on

18   certain items between the Parties.

19        Do you remember those documents?  Maybe you can repeat the

20   answer again.  Just because we talked over each other I think.

21   A    Yes, I do remember those.

22   Q    All right.  And just to make the record very clear, did

23   you always hand those summary documents across the table to the

24   Union?  Did you provide them to the Union always?

25   A    I think we did, yes.  I think we did.



1    Q    Okay.  Can you recall any occasions where you did not do

2    so?

3    A    No.  And I -- you know, at times there was a lot of

4    transfer of proposals in electronic, so that Carrie could work

5    from our proposal and vice versa.  So there, you know, there

6    was a lot of that.  So I, you know, getting Casey was -- Casey

7    Wenger was handling a lot of that.  So I can't tell you every

8    time something was transferred, but I would -- Casey was good,

9    you know, he -- he was -- he kept great -- great books.

10   Q    And I don't want to waste our time going point by point

11   through the summary document, with each proposal and matching

12   them up and making sure, but hypothetically, if there were any

13   difference between the information on the summary document and

14   the date or details from the proposal itself that we have in

15   the record, we should rely on the proposal in the record as

16   what was handed across the table and when.  Isn't that right?

17   A    I don't know about that.  It's hard to answer that one in

18   the hypothetical.  It certainly is just hard to answer it.

19   I -- you -- you repeat what -- what we're comparing; the

20   proposal and the summary like that verses what was handed

21   across the table?

22   Q    Sure.  Are you -- is it your testimony that there are --

23   if there are differences between the summary documents, which

24   are in evidence as Joint Exhibit 2 -- I'm sorry, Respondent's

25   Exhibit 2, and the proposals themselves, which the witnesses



 1   have been reviewing, and we've been going through for the last

 2   several days?  Do we rely on the substance of these proposals,

 3   or the substance of what's reflected in your summary's

 4   document?

 5   A     I think you'd have to judge each one.  I mean, you -- you

 6   can't you know, to be fair about it.  I mean, I -- I think you

 7   know, if it didn't make into the summary it might not have

 8   really been exchanged.  That could have happened too.  It

 9   maybe -- you know, it -- it was somebodies, you know,

10   somebodies draft that never got exchanged.  Because it -- you

11   know, like I said, Casey would keep these and you know, if

12   there was something missing, Carrie would have called it out.

13   You know, so he's keeping it and then if like that one thing we

14   made a proposal by air and at a part of section.  I think it

15   was sect -- article 3, we made a proposal by air on that that

16   we had already TA'd on.  Carrie called that out and we

17   corrected it, so we had counter checks on it for the summary.

18   So I -- you know, unless I had one in front of me, I

19   couldn't -- I really honestly couldn't say which one I would

20   say is always right.  You know --

21   Q     Okay.

22   A     -- it looks like (audio interference).

23   Q     All right.  Fair enough.  Thank you for that.  Let's move

24   on to another subject.  So Mr. Pautsch, you testified at some

25   length about your career as a labor attorney.  And even at some



1    points talked about per or a recent board law; Johnson

2    Controls, I remember being mentioned among others examples.

3        Is it your testimony, Mr. Pautsch, that as of the time you

4    were serving as KOIN's bargaining representative during these

5    negotiations, your understanding of current board law was that

6    the dues check off forms themselves, meaning the language

7    included in those forms was a mandatory subject in bargaining?

8    A    I would -- you know, that would be a closer question.  It

9    would be -- my opinion would be that if it was being asked to

10   be incorporated in the agreement, then it is.  If it's not

11   asked to be incorporated into the agreement, it wouldn't be.

12   So --

13   Q    Okay.

14   A    -- by virtue of the fact our history had been that it's in

15   the agreement, that it's then part of the agreement.  Then that

16   is a mandatory subject.  That's -- if I were sitting on the

17   board that's all I knew.  Sure.  I mean, it just makes sense

18   that it would be.

19   Q    All right.  And you acknowledge that the level -- on

20   direct you acknowledged the level of the Union's initiation

21   fees became a big problem for the Respondent in terms of hiring

22   and retention.  Is that right?

23   A    Yes.

24   Q    And that emerged as a huge bargaining issue for the

25   Respondent at the table, right?



1    A     The -- the fact that that was all together, that we were

2    required to collect it and fire people if it wasn't collected.

3    And if somehow they lost their membership or didn't keep up

4    with dues, and that that amount was tied to it created a big

5    business issue.

6    Q     So --

7    A     Just like AB 5, 1 and 2.  It's not one or the other.  It's

8    the excessiveness and the fact that it's being forced as part

9    of the Union shop or an Agency shop.

10   Q     So if the Union's initiation fee had not been so high,

11   that would not have been a significant bargaining issue for

12   Respondent?

13   A     If it was -- if it was -- if it was too high you could --

14   and as expressed at the table it could have been $10,000.  If

15   we were required to collect it, and fire people if it wasn't

16   part of a collections in the Union shop process, it wouldn't

17   have been a problem necessarily.  I mean, because then who

18   knows what -- what the Union would do.  Who knows if it wasn't

19   part of a contract?  The Union, you know, could make up a deal

20   with somebody to pay it over 10 years, or 15 years, or

21   whatever.  I mean -- or they could forgive it and certain

22   circles -- circumstances.

23       So it's a combination, and it's always what I stressed

24   there was the combination of the two; that it's collected.

25   We -- if we collect it its -- and it's high, it's our business.



1    If it's high and they -- they collect it, it's their business.

2    Q    But you -- wouldn't you had proposed to cease collecting

3    the initiation fee had it been to your liking, right?

4    A    Well, it doesn't raise any of those issues then.  It

5    doesn't if -- it it's -- if it's -- if it's not the proposal

6    for essentially an illegal bargain, you're not even there.  All

7    the time we -- we enter into the Union shops or Agency shops

8    with -- where were collecting the initiation fees and we're

9    collecting dues.  It's demand.  It's the thing you throw into

10   it.  It's the clinker you throw into it that makes it taunt;

11   makes it illegal, arguably.

12   Q    All right.  I believe you -- you've been here as part of

13   your representative throughout the hearing since last Thursday,

14   right?

15   A    Yes, I have.

16   Q    And do you recall during his opening statement, Mr.

17   Roberts referred to the initiation fee as the elephant in the

18   room.  Do you recall that characterization?

19   A    Yes.

20   Q    Do you agree with that characterization?

21   A    I would only add that there were a couple of elephants in

22   the room, but that was definitely one of them.

23   Q    And then somewhat related, you were asked about an AB 5

24   charge you filed with the Region concerning the level of your

25   allegation that the fee was accepted.  Do you recall --



 1    A    Yes.

 2    Q    -- that testimony?

 3    A    I do.

 4    Q    Do you recall filing that charge?

 5    A    Yes.  We did file it.

 6    Q    What was the outcome?  I'm sorry.

 7    A    The out -- the outcome was that on the basis of the

 8    investigation that was conducted by the Region, that it wasn't

 9    established that the amount was discriminatory or excessive.

10    Q    Okay.

11    A    Which I would disagree with.

12    Q    You've referenced the Region.  So presumably the Region

13    dismissed the charge?

14    A    The Region dismissed it, yes.  And we appealed that, and

15    they upheld it on the basis of the investigation.

16    Q    Okay.  And do you recall the rational set forth by the

17    General Counsel in the appeal denial letter?

18    A    Just -- you know, it speaks for itself.  But I think it --

19    it indicated that there was proof that in the industry and area

20    that the Regions worked that the amounts weren't excessive.

21    Q     That the Region worked?

22    A    That the dues weren't -- I don't recall the exact

23    reasoning.  If you showed it to me I -- I could to come to it,

24    but it came to the conclusion that it wasn't an excessive

25    amount based on their investigation.



1    Q    Okay.  And then similarly, you were asked some questions

2    about Joint Exhibit 40, which was a September 27th, 2019,

3    letter from the Union to a redacted bargaining unit employee,

4    offering to wave the initiation fee for October.  Do you recall

5    those questions?

6    A    Yes.  I recall that document.  Is that the Welcome to

7    NABET letter?

8    Q    Right.

9    A    Yes.  Yes, I do.

10    Q    Okay.  And you were asked whether you filed a Board charge

11    over your concern in that letter?  Do you remember that?

12    A    Yes.  Yes, I did.

13    Q    Did you file a Board charge over that letter?

14    A    I did over the -- if it were a problem, I'd have the

15    welcome to NABET letter we filed the Board charge over that --

16    really that first paragraph that spelled out that the -- it

17    indicated a way that they had to join the Union, even though

18    the contract had lapsed.  And the contract had lapsed in

19    September of 2017.  That was a misleading statement, at best.

20    Q    And maybe Mr. Schiff -- just so we're all on were on the

21    same page about which letter we're talking about.  Can we pull

22    up Joint Exhibit 40?  All right, just so again September 27th,

23    2019, and it's -- okay, that's perfect.  Can you see this on

24    your screen, Mr. Pautsch?

25    A    I can see part of it.  Yes.



1    Q    Can we scroll a little further so Mr. Pautsch can review

2    the letter?

3    A    Oh.  40 is this waiver issue, rather than the Welcome to

4    NABET letter then.  I'm looking at the waiver off of -- okay.

5    I'm sorry.

6    Q    Yes, no worries sir.  Lots of documents.  Do you recall

7    being asked about whether you filed a charge about the waiver

8    of initiation fees?

9    A    Yes.  We did.

10   Q    Yes, you did file a charge?

11   A    We filed a charge over this letter.

12   Q    What was the outcome of that charge?

13   A    The Region dismissed it.  Generally, on the theory that --

14   oh, first of all, our position was that it was a Savair

15   violation, standing alone and independent.  That --

16   Q    Okay.  But just what was the outcome of the investigation

17   of the charge?

18   A    Dismissed it.

19   Q    Okay.  Did you file an appeal?

20   A    Yes.

21   Q    Okay.  And do you recall what the appeal -- what appeals

22   decided?

23   A    Appeals decided that since the off waiver was made at a

24   time when there was not a representational contest going on,

25   that even though it was made it was not part of a



1   representational contest.  So therefore it wasn't a violation

2   of the NLRB v. Savair, which I disagree with.

3   Q    When you use the term representational contact, do you

4   recall the specific letter from the appeal denial, saying that

5   they were not tied or contingent upon an employee expressing

6   their support, or signing a petition in support of the Union?

7   A    Right.  But I think it would -- if you know, obviously,

8   and I think we all know the law of Savair, if it had happened

9   during say an election campaign or period, in the critical

10  period, you know, offering that initiation fee waiver would be

11  a problem.  Because it didn't occur in that context, the --

12  Q    Thanks.

13  A    -- you know, Region --

14  Q    You were --

15  A    -- did other ones.

16  Q    Do you recall though, that the General Counsel, through

17  the office of appeals denial letter, indicated that there was

18  no evidence that these initiation fee waivers were authored

19  contingent upon an employee expressing their support for the

20  Union in any way?

21  A    No, you know, look.  Again, I -- I don't recall that

22  specific statement, but the letter would speak for itself on

23  that.

24  Q    Okay.  And then (simultaneous speech) --

25  A    It is what it is, you know.



1    Q    Sorry.  Do you recall the appeal denial letter indicating

2    that there was no evidence whatsoever that the Union had

3    offered to waive fees in January or February 2020, as your

4    client -- as KOIN had alleged?

5    A    That was their conclusion of the investigation.

6    Q    And also of appeals?

7    A    And also of appeals.  If that what the letter says, then I

8    would agree with it.  I think that's what it did say.

9    Q    Mr. Pautsch, did you assist with crafting the January 8th,

10   2020, withdraw of recognition letter KOIN sent to the Union?

11   A    Yes.

12   Q    Are you aware that that letter -- by that letter, KOIN

13   informed the Union that it was withdrawing recognition based on

14   a good faith, reasonable doubt of a loss of majority support in

15   the two bargaining units?

16   A    Yes.  And I really wanted to say that it was objective

17   evidence as well.  You know, I mean I -- it did say good faith.

18   It was phrased that way, but it -- it -- it -- it is our

19   position and has been our position.  There's objective

20   evidence.

21   Q    And on that subject, you were asked also on direct

22   examination about the position statements you drafted and

23   provided during the investigation?  Do you remember that

24   testimony?

25   A    Yes.



1    Q    And it -- there was at least one position statement that I

2    think you weren't asked about, where you summarized the

3    categories of evidence that KOIN did in fact rely upon in

4    justifying it's decision to withdraw recognition?

5    A    Yes.

6    Q    Do you remember that?

7    A    Yes.  (Indiscernible) --

8    Q    You compiled this information, I assume, through talking

9    to the various managers listed in the position statement about

10   their conversations with employees?

11   A    That's right.  Yes.

12   Q    Okay.  So --

13   A    I had no independent -- I had no independent knowledge of

14   it.

15   Q    Right.  So you spoke in order to draft that section of the

16   position statement you spoke with Rick Brown?

17   A    Yes.  Yes.

18   Q    And did he -- sorry.  Did you speak with Pat Nevins?

19   A    Yes.  I did.

20   Q    Did you speak with Casey Wenger?

21   A    Yes.  I did.

22   Q    Okay.  So in total, as you summarized in the March 26th,

23   2020, position statement, the evidence included -- and let's

24   just see if -- if this is correct, that these categories were

25   at least in part relied upon by a requirement.  Statements made



1    to and or witnessed by those managers over the last few months

2    leading up to the January 8th, 2020, withdraw of recognition?

3    Was that one category?

4    A    That would be.

5    Q    And then those statements led managers to conduct an

6    informal poll of employees about their support of the Union; is

7    that right?

8    A    Yes.

9    Q    And then the company also relied on the facts both that

10   the new employees hired since the contract had expired had not

11   joined the Union or signed up for dues deduction.  Was that

12   part of the calculation of the withdraw that --

13   A    Yes.  That is correct.

14   Q    And also -- and also, in some cases the company counted on

15   the list of employees who it no longer believed supported the

16   Union.  Employees who in fact managers did not talk to

17   directly, but who an employee credibly shared with management

18   those other employees no longer supported the Union.  I'm sorry

19   if that question was confusing.

20   A    Yes.  That's I think accurate.  That's a fair -- fair

21   statement.

22   Q    And the company also considered the attendance at some of

23   the Union's meeting and localization of them in deciding there

24   was no support for the Union?  Or insufficient support?

25   A    That -- that was an issue.



1    Q    And fin --

2    A    -- (simultaneous speech) --

3    Q    -- and finally, your position statement referenced the

4    fact that certain of the employees who served on the Union's

5    bargaining committee no longer did so, or have left the

6    committee upset with the Union.  Is that right?

7    A    That's right.

8    Q    Are there any other categories of evidence that the

9    Employer relied upon in withdrawing recognition from the Union

10   in January 8th, 2020?

11   A    Not that I can think of at this moment.

12   Q    Okay.

13        JUDGE TRACY:  Ms. DeVleming, is that position statement,

14   which is where it seems like you're saying, is that part of the

15   record here?  Is it one of these Exhibits?

16        MS. DEVLEMING:  It is not.  It could be.  I was only going

17   to use it if I needed to impeach, but I didn't.  So it's up to

18   you, Your Honor.  I can offer it if you would like to see it.

19   But --

20        JUDGE TRACY:  Yes.  I mean, I would since there -- it's

21   come up quite a bit during his testimony.

22        MS. DEVLEMING:  Okay.  Mr. Roberts, would you like me to

23   label it a joint exhibit, or how would you like to label that?

24        JUDGE TRACY:  Oh, you're on mute, Mr. Roberts.

25        MR. ROBERTS:   No.  I think it's best if you put it in as



1    a General Counsel Exhibit.  I don't have any objection to it.

2    I would note that I didn't ask him about the position

3    statement.  He did volunteer some response about that, but --

4    But I have no objection to putting it in.  So we're -- you

5    know, it is what we submitted to the -- to the Board, so that's

6    fine with me.

7        JUDGE TRACY:  And Mr. Roberts, you're absolutely right.  I

8    do recall that he volunteered it, but because questions asked

9    and there is a document that relates to that, I would

10   appreciate having that in the record.

11       So you know, since this is going to carry over until

12   tomorrow, you can put it in tomorrow once you get a copy of it

13   and put it into the record.  Thank you.

14       MS. DEVLEMING:  Okay.  And actually, that might be a good

15   stopping point until tomorrow.  Also mark that and share it

16   with Counsel and make sure we're on the same page about what it

17   is.

18       JUDGE TRACY:  Okay.  And then how much more time do you

19   think you'll need tomorrow with him?

20       MS. DEVLEMING:  Not very long.  15 minutes max.

21       JUDGE TRACY:  Okay.  And then Ms. Yen, how much time do

22   you think you'll need?

23       MS. YEN:  Sorry, I had to take myself off mute.  I guess I

24   about estimate about an hour, although it is hard to estimate

25   with cross-examination.  An hour or two.



1      JUDGE TRACY:  Okay.  Well, and make sure you don't repeat,

2  you know, obviously --

3      MS. YEN:  Right.

4      JUDGE TRACY:  -- what General Counsel's already done.  I

5  guess an hour seems fine.  When you mentioned two hours I think

6  well, gosh, she wasn't taking two hours.  But that's fine.  So

7  because I think -- I think that the -- the goal would be to try

8  to best as we might to wrap up the case tomorrow.

9      So hopefully, fingers crossed there's no technological

10  problems.  Unless Ms. DeVleming, do you want to go ahead and

11  finish up 15 minutes and that way we can start with Ms. Yen, or

12  would you -- would you rather -- since I already offered that

13  you would continue on tomorrow, what -- what's your preference?

14      MS. DEVLEMING:  I'd prefer to sleep on it if that's an

15  option.

16      JUDGE TRACY:  Okay.  So this will be sort of the time that

17  you take to think about it.  That's fine.  I noticed that Ms.

18  Burke had sent an email about replacing something.  Mr. Schiff,

19  did you see that replacing JX 63?  There was something missing

20  from that?

21      MR. SCHIFF:  Oh, okay.  So I can delete it.  Okay.  Yes,

22  sorry.  I didn't see it until you spoke.

23      MS. DEVLEMING:  So that was the first of the four total

24  facts or combined PDFs for the exhibits pertaining to the whole

25  history here that we're talking about.



 1          MR. SCHIFF:  Yes.  I should be able to upload it and

 2     I'll -- I'll definitely deal with it.

 3          JUDGE TRACY:  Okay.  All right.  Thank you.  So we'll

 4     resume at 9 a.m.  And fingers crossed about the technology, but

 5     if we can aim, our goal would be to -- to close this hearing

 6     tomorrow.

 7          Again, I don't want to rush anybody but I do think that it

 8     depends on how quickly Mr. Roberts, your -- your witnesses go

 9     tomorrow.  Again, you have -- you know, on the other hand

10     it's -- it's your case, so case-in-chief.  So you take as much

11     time as you need.  As much as the General Counsel has taken of

12     whatever you need, okay?  So but they do seem to have some

13     rebuttal, although rebuttal is probably pretty short.

14     Probably -- usually I might experience whenever there is

15     rebuttal, which is not often, but it's like ten minutes.  Just

16     to clean up some questions or something like that.

17          So hopefully we can finish up tomorrow.  And Mr. Schiff,

18     if needed we'll go maybe past 5:00 tomorrow if needed just to

19     make sure that we can finish up and -- and go off the record,

20     because then everybody can sort of get back to what they need

21     to do and -- and -- and go home for some of our attorneys who

22     have been here for a week or more.

23          All right.  Is there anything else before we resume at 9

24     a.m. tomorrow?

25          MR. ROBERTS:  No, ma'am.



1      JUDGE TRACY:  And hopefully our audio won't be such an

2    issue either.  Mr. Roberts, I think that when you switched to

3    the cell phone, though you could try it again.  I think it

4    might just be the room.  You got a wall behind you, you know,

5    who knows acoustics; how they work.  And it could be just Zoom

6    today, and so --

7      MR. ROBERTS:  I'm sorry, just to let you know, Mr. Davis

8    will be my cocounsel, will be taking most of the other

9    witnesses.  He's actually not in the office, so he will be from

10   a different location.  But presentably, he hopefully will not

11   have the problems that -- that I've had.

12     JUDGE TRACY:  Oh, okay.  And but will -- will you still be

13   appearing on a separate screen as well?

14     MR. ROBERTS:  I will be here.  I just won't necessarily be

15   speaking as much.

16     JUDGE TRACY:  Okay.  That's fine.  So just -- has he been

17   here today?  I -- I never even asked.

18     MR. ROBERTS:  I'm sorry, what?

19     JUDGE TRACY:  Was he here today?

20     MR. ROBERTS:  Mr. Davis was not here today.  I should have

21   noted that for the record.  He was not here today.

22     JUDGE TRACY:  Oh, that's fine.  But just -- if you could

23   just kind of fill him in on our sound problems, and you know,

24   maybe I will definitely try to jump on much earlier tomorrow.

25   I didn't today because I was like, oh, I'm always the first one



1    here and it takes them a while.  And sure enough the day I

2    don't I had all these updates, and then my Wi-Fi.  But you

3    know, just to make sure that he has the proper audio and all of

4    that available for him, just to make sure --

5         MR. ROBERTS:  All right.

6         JUDGE TRACY:  -- and everything.  Okay.  So I'll see you

7    guys tomorrow at 9 a.m. Pacific Time.  Thank you very much.

8    We'll go off the record.

9    **(Whereupon, the hearing in the above-entitled matter was**

10   **recessed at 4:42 p.m. until Thursday, November 18, 2020 at 9:00**

11   **a.m.)**

12

13

14

15

16

17

18

19

20

21

22

23

24

25



1                    **C E R T I F I C A T I O N**

2    This is to certify that the attached proceedings, via Zoom

3    Videoconference, before the National Labor Relations Board

4    (NLRB), Region 19, Subregion 36, Case Numbers 19-CA-248735,

5    19-CA-255180, 19-CA-259398, 19-CA-2622, National Association Of

6    Broadcast Employees & Technicians, the Broadcasting and Cable

7    Television Workers Sector of the Communications Workers of

8    America, Local 51, AFL-CIO and Nexstar Broadcasting, Inc.,

9    d/b/a KOIN-TV, at the National Labor Relations Board, Region

10   19, Subregion 36, 915 2nd Ave., Ste. 2948, Seattle, Washington,

11   on November 17, 2020, at 9:09 a.m. was held according to the

12   record, and that this is the original, complete, and true and

13   accurate transcript that has been compared to the reporting or

14   recording, accomplished at the hearing, that the exhibit files

15   have been checked for completeness and no exhibits received in

16   evidence or in the rejected exhibit files are missing.

17

18

19

20

21

22                    _____

23                    CLAUDINE METOYER
                       Official Reporter

24

25



EXHIBIT 5(e)

OFFICIAL REPORT OF PROCEEDINGS

BEFORE THE

NATIONAL LABOR RELATIONS BOARD

REGION 19, SUBREGION 36

In the Matter of:

| | | |
|---|---|---|
| National Association Of | Case Nos. | 19-CA-248735 |
| Broadcast Employees & | | 19-CA-255180 |
| Technicians, the Broadcasting | | 19-CA-259398 |
| and Cable Television Workers | | 19-CA-262203 |
| Sector of the Communications | | |
| Workers of America, Local 51, | | |
| AFL-CIO, | | |

       Charging Party/Union,

and

Nexstar Broadcasting, Inc.
d/b/a KOIN-TV,

       Respondent.

_____

_____

Place: Seattle, Washington (Via Zoom Videoconference)

Dates: November 18, 2020

Pages:  674 through 860

Volume:  5

OFFICIAL REPORTERS
eScribers, LLC
E-Reporting and E-Transcription
7227 North 16th Street, Suite 207
Phoenix, AZ 85020
(602) 263-0885



www.escribers.net | 800-257-0885

**UNITED STATES OF AMERICA**

**BEFORE THE NATIONAL LABOR RELATIONS BOARD**

**REGION 19, SUBREGION 36**

In the Matter of:

NATIONAL ASSOCIATION OF     Case Nos.   19-CA-248735
BROADCAST EMPLOYEES &                        19-CA-255180
TECHNICIANS, THE BROADCASTING             19-CA-259398
AND CABLE TELEVISION WORKERS            19-CA-262203
SECTOR OF THE COMMUNICATIONS
WORKERS OF AMERICA, LOCAL 51,
AFL-CIO,

        Charging Party/Union,

and

NEXSTAR BROADCASTING, INC.
D/B/A KOIN-TV,

            Respondent.

The above-entitled matter came on for hearing, via Zoom

videoconference pursuant to notice, before **AMITA B. TRACY**,

Administrative Law Judge, at the National Labor Relations

Board, Region 19, Subregion 36, 915 2nd Avenue, Suite 2948,

Seattle, Washington 98174-1006, on **Wednesday, November 18,**

**2020, 9:10 a.m.**



1 <u>A P P E A R A N C E S</u>

2   **On behalf of the Respondent:**

3      **CHARLES P. ROBERTS, III, ESQ.**
        CONSTANGY, BROOKS, SMITH & PROPHETE, LLP
4       100 N. Cherry Street, Suite 300
        Winston Salem, NC 27101
5       Tel. (336)721-6852

6      **TIMOTHY A. DAVIS, ESQ.**
        CONSTANGY BROOKS SMITH & PROPHETE LLP
7       2600 Grand Boulevard, Suite 750
        Kansas City, MO 64108
8
       **CHARLES W. PAUTSCH, ESQ.**
9       Vice President of Labor and Employment
        Nexstar Media Group, Inc.
10      545 E. John Carpenter Freeway, Suite 700
        Irving, TX 75062
11      Email: cpautsch@nexstar.ty

12  **On behalf of the General Counsel:**

13     **ELIZABETH H. DEVLEMING, ESQ.**
       **SARAH BURKE, ESQ.**
14      NATIONAL LABOR RELATIONS BOARD
        915 2nd Ave., Ste. 2948
15      Seattle, WA 98174
        Tel. (206)220-6291 (Burke)
16      Email: elizabeth.devleming@nlrb.gov (DeVleming)

17  **On behalf of the Charging Party/Union:**

18     **ANNE I. YEN, ESQ.**
        WEINBERG, ROGER & ROSENFELD
19      1001 Marina Village Pkwy., Ste. 200
        Alameda, CA 94501
20      Tel. (510)224-7687

21     **CARRIE J. BIGGS-ADAMS, PRESIDENT**
        NABET-CWA, Local 51, AFL-CIO
22      240 2nd St., Ste. 220
        San Francisco, CA 94105
23      Email: carrie@nabet51.org

24

25



1                          **I N D E X**

2

3    | WITNESS | DIRECT | CROSS | REDIRECT | RECROSS | VOIR DIRE |
     |---|---|---|---|---|---|
4    | Charles Pautsch | | 683 | | | |
5    | Lisa Newell | 730 | 736,737 | | | |
6    | Casey Wenger | 743 | 756 | | | |
7    | Douglas Key | 764 | 776 | | | |
8    | Patrick Nevin | 780 | 795 | 801 | 803 | |
9    | Rick Brown | 807 | 820 | | | |
10   | Carrie Biggs-Adams (Rebuttal) | 837 | | | | |
11   | | | | | | |
12   | Ellen Hansen (Rebuttal) | 846 | 851 | 853 | | |

13

14

15

16

17

18

19

20

21

22

23

24

25


www.escribers.net | 800-257-0885

1                        <u>E X H I B I T S</u>

2

3      <u>**EXHIBIT**</u>                              <u>**IDENTIFIED**</u>      <u>**IN EVIDENCE**</u>

4      **General Counsel:**

5          GC-20                                     838              841

6          GC-21                                     850              851

7

8      **Joint:**

9          J-46(a)                                   679              681

10         J-67                                      680              681

11

12     **Respondent:**

13         R-4                                       731              733

14         R-5                                       733              735

15         R-6                                       818              818

16

17

18

19

20

21

22

23

24

25



www.escribers.net | 800-257-0885

1                          P R O C E E D I N G S

2          JUDGE TRACY:  All right, so before the General Counsel

3    continues with her cross-examination of Mr. Pautsch, I think

4    that the parties had -- there are several exhibits that need to

5    be entered into the record.

6          And so I will do those one by one.  Let's start with

7    General Counsel's Exhibit 19.  And -- and well, I'm sorry, I'm

8    doing your work for you.  Ms. DeVleming, if you could start

9    with General Counsel's Exhibit 19?

10         MS. DEVLEMING:  You can do my work for me.  Yes, this is

11   at Your Honor's request.  It's a copy of the March 26th, 2020

12   position statement from Mr. Pautsch that was referred to -- I

13   think that somebody -- I just heard a ding oh, we joined -- we

14   gained somebody -- that was referred to throughout his direct

15   and cross-examination yesterday.  I've marked it as General

16   Counsel's Exhibit 19, and the parties have reviewed it.  So I

17   offer General Counsel's 19.

18         MR. ROBERTS:  No objection.

19         JUDGE TRACY:  Okay.

20         MS. YEN:  No objection.

21         JUDGE TRACY:  All right.  So General Counsel's Exhibit 19

22   is admitted into evidence.

23   **(General Counsel Exhibit Number 19 Received into Evidence)**

24         JUDGE TRACY:  And then also yesterday, after Father

25   McCracken(sic) -- I don't remember exactly his name --



1          MS. DEVLEMING:  Mosbrucker.

2          JUDGE TRACY:  Mosbrucker.  I'm not sure where I got that

3     name from.  Mosbrucker.  There was -- there were a couple

4     stipulations or joint exhibits that you guys were going to

5     consider, and so let's go ahead and -- and offer those.

6          MS. DEVLEMING:  Sure, Your Honor.

7          We have two additional joint exhibits and a factual

8     stipulation that is limited, and I'll -- once I recite it, I'll

9     let Mr. Roberts weigh in with the additional caveats.

10         The two joint exhibits are labeled Joint Exhibit 46(a) and

11    67.  Joint Exhibit 46(a) has been labeled that way because the

12    parties stipulate that this was the November 2019 unit employee

13    earning records that were provided to the Union, attached to

14    Joint Exhibit 46, which is an email from Lisa Newell dated

15    December 11th, 2019 remitting those records.

16         The Joint Exhibit 46(a) though, we also stipulate is the

17    quote, November Payroll Records document referenced at the

18    bottom of Father Mosbrucker's certification letter to KOIN

19    dated February 18th, 2020.  That is in the record as General

20    Counsel's Exhibit 13.

21         In addition to Joint Exhibit 46(a), the parties stipulate

22    that Carrie Biggs-Adams compiled the documents that have been

23    marked as Joint Exhibit 67 and provided that in addition to

24    Joint Exhibit 46(a) to Father Mosbrucker to compare the names

25    with the signatures on the petition he had in order to



1    determine which employees were in which bargaining unit.

2         For -- note also, for employee privacy reasons, we

3    redacted out the Social Security numbers and wage information

4    from Joint Exhibit 46(a), all those -- although those were

5    originally included in the version Ms. Newell provided to the

6    Union.

7         JUDGE TRACY:  Okay.  And so you're offering in?

8         MS. DEVLEMING:  Yes, the General Counsel offers -- well,

9    parties offer Joint Exhibits 46(a) and Joint Exhibit 6 --

10        JUDGE TRACY:  Oh, you just went on mute for some reason.

11        MS. DEVLEMING:  Oh, sorry, I thought I finished my thought

12   before I did.  With that explanation, the parties offer Joint

13   Exhibit 46(a) and 67.

14        JUDGE TRACY:  Okay.

15        MR. ROBERTS:  And Your Honor, we don't have any objection.

16   The only caveat that I would add is that we did not stipulate

17   to Joint Exhibit 67.  Well, I -- which -- which one was the one

18   that was the -- the payroll roster?

19        JUDGE TRACY:  46(a); is that correct?

20        MS. DEVLEMING:  67, the -- right, the November 2019

21   payroll records are 46(a).  Carrie's document specifying who's

22   in which unit is 67.

23        MR. ROBERTS:  We have no objection to 67.  We have no

24   objection to 46(a) as representing what was in the Father's

25   possession and what he compared.  We only note that that's as



1    of November.  We did not stipulate that that remained accurate

2    as of January 8th, so that -- I just wanted to make that clear

3    that we weren't stipulating to that.  We will have our own

4    exhibit in there, but we have no objections to the documents

5    coming in.

6        JUDGE TRACY:  And then how about any of -- you agree with

7    the stipulations that she read or stated into the record?

8        MR. ROBERTS:  I do.

9        JUDGE TRACY:  Okay.  Ms. Yen, any objections?  And do you

10   agree with the stipulations that Ms. DeVleming entered into the

11   record or spoke into the record?

12       MS. YEN:  No objection, and I do agree with the

13   stipulations.

14       JUDGE TRACY:  Okay, great.  So Joint Exhibits 46(a) and 67

15   are admitted into evidence.

16   **(Joint Exhibit Numbers 46(a) and 67 Received into Evidence)**

17       JUDGE TRACY:  And Ms. DeVleming, you might want to see, I

18   don't know, for some reason today your audio and your internet

19   strength is not as good as it has been.

20       I know that the first day, you had to switch things

21   around, so.

22       MS. DEVLEMING:  Yeah, I'm going to try to go back on the

23   Xfinity hotspot, even though first thing this morning, it was

24   not good.  But that has been the better option every day so

25   far, so let's try it again.  Just give it a minute.



www.escribers.net | 800-257-0885

1      JUDGE TRACY:  Okay.

2      MS. DEVLEMING:  Okay, I am back on the Xfinity hotspot,

3   and hopefully, that will be at least somewhat clearer.

4      JUDGE TRACY:  Yeah, let's see if it refreshes, because

5   right now you are frozen but we can hear you.

6      MS. DEVLEMING:  And you are all frozen, but I can hear

7   you.

8      JUDGE TRACY:  Okay.  You're moving now, so hopefully,

9   that's a little bit better.  You know what I might suggest for

10  you is, why don't you leave the meeting and rejoin with this

11  hot spot, and that might help.

12     MS. DEVLEMING:  Okay, I can do that.  Okay, I'm back.

13     JUDGE TRACY:  All right, hopefully it's better now.

14  You -- yes, let's try that.  All right, so we're going to

15  resume with the cross-examination of Mr. Pautsch.

16     I just want to ask you again, Mr. Pautsch, is there

17  anybody present in the room with you?

18     MR. PAUTSCH:  No, ma'am.  No, Your Honor.

19     JUDGE TRACY:  Okay.  And do you have anything in front of

20  you as you're about to testify?

21     MR. PAUTSCH:  No, just a notepad and my mask.

22     JUDGE TRACY:  Okay.  And please don't use any devices to

23  communicate with anyone during the course of your testimony.

24     MR. PAUTSCH:  I understand that.

25     JUDGE TRACY:  All right.  Thank you so much.



1        Please continue, Ms. DeVleming.

2        MS. DEVLEMING:  Your Honor, with the introduction of

3    General Counsel 19 and having slept on it, I have no further

4    questions for this witness.

5        JUDGE TRACY:  Oh, okay.  All right, so Ms. Yen.

6        Thank you.

7    Whereupon,

8                         **CHARLES PAUTSCH**

9    having been previously sworn, was called as a witness herein

10   and was examined and testified, telephonically as follows:

11                        **CROSS-EXAMINATION**

12   Q    BY MS. YEN:  All right, good morning, Mr. Pautsch.

13   A    Good morning, Ms. Yen.

14   **MS. YEN:  Can we start with looking at Joint Exhibit 21?  If**
     **the witness can be shown Joint Exhibit 21, please?**
15   A    Yes, I see it.

16        MS. YEN:  I don't think that's 21.  Oh, there it is.

17   Q    BY MS. YEN:  So I take it from your testimony yesterday,

18   that you participated in writing these memos to the KOIN Local

19   51 bargaining unit members from Pat Nevin in 2019; is that

20   right?

21   A    Yes, that's right.

22   Q    Okay.  And you participated in writing this March 5, 2019

23   memo?

24   A    Yes, that's right.

25   Q    Okay.  Taking a look at the second paragraph and the last



1    line of that paragraph, it says, "As such, we find your current

2    union dues and fee structure to be exorbitantly high and we are

3    doing everything we can to reduce your out-of-pocket expenses."

4    So at that point in time, as of March of 2019, were you trying

5    to get the Union to agree to bargain about the amount of

6    initiation fees and dues?

7    A    No.  No, we weren't.

8    Q    Okay.  But this memo was suggesting to the employees that

9    the company was negotiating to reduce fees and dues; is that

10    right?

11    A    It can be interpreted that way.  That wasn't our intent.

12    We were really calling into question the judgment of the Union

13    and its business judgment to charge those fees.  Just as -- as,

14    in fact, the Union called into question the way that we

15    compensated our executives.

16    Q    And then if you take a look at the second page, the second

17    paragraph on the second page.  And in this paragraph -- and you

18    participated in writing this paragraph as well?

19    A    Yes, I did.

20    Q    Okay.  On this page you say, "We find it deeply troubling

21    rather than negotiating and focusing on the remaining

22    outstanding items, your representative instead wastes valuable

23    time at the negotiating table suggesting that our current

24    Company provided benefits plan does not provide adequate

25    coverage for very specific procedures.  As the Plan is a



1    nationwide plan covering thousands of Nexstar employees the

2    discussion of singular coverage issues is quite frankly,

3    counterproductive and a waste of time."

4        So at this time, as of March of 2000-ti -- 2019, was that,

5    in -- in fact, your opinion that negotiating about gender

6    dysphoria treatment coverage and all women's health coverage

7    were a waste of time?

8    A    We were giving our opinion that -- that in -- in the

9    context of these negotiations, it was.  I mean, it -- it -- you

10   know, it's our opinion, we were expressing it, consistent

11   really, with Section 8(c) to, you know, indicate that that's

12   how we felt, you know?  You know, the Union thought otherwise,

13   and we continued to discuss it.

14   Q    And at the bargaining table, were you also expressing that

15   opinion at the bargaining table, that negotiating about gender

16   dysphoria treatment coverage and women's health care coverage

17   was a waste of time?

18   A    I don't know if I used that word directly at the table or

19   that we used those words directly at the table, but I indicated

20   to, you know, Carrie -- Carrie in so many words that, you know,

21   it was sort of out of my lane.  I mean, I can't -- I can't

22   really negotiate major changes, and that it could come down the

23   road.  You know, the -- the changes are -- because if you're

24   dealing with a plan that covers about 15,000 employees, it --

25   it's not even in my realm to make those decisions.  I, you



1    know, I can throw that out there in -- in corporate circles,

2    but that's about it.

3    Q    And -- and let me ask for clarification on that.  Are you

4    saying that you -- that the company cannot offer coverage of a

5    certain type of treatment in one location for the employees of

6    KOIN-TV unless the whole plan nationwide covers those same

7    treatments?

8    A    As it's an ERISA plan, it's structured to cover everyone

9    who is made eligible for it either by corporate resolution or

10   by collective bargaining agreement, and the plan is structured

11   that way.  No other union has asked us to change one element of

12   the plan in -- in the time I've represented Nexstar.  And you

13   know, just in my time representing other large corporations,

14   nobody's ever done that.  So could we have changed it, you

15   know, for one location?  You know, I -- I would have considered

16   it.  We would have considered it, but I thought the better way

17   to look at this was to look at other options, if they really

18   wanted to pursue it like the NABET plan.

19   Q    Okay, and -- and we'll talk about that in a moment, but --

20   so -- so it's -- it's -- it's a possibility, although you felt

21   that it was not preferred, to offer coverage of a certain kind

22   of treatment in one location for the employees of that TV

23   station, even if it's not offered for the entire plan;

24   (simultaneous speech)?

25   A    Right.  I would say it's a -- it might have been possible.



1    I don't know that it would have actually -- could -- it

2    actually could have occurred because the plan is set up to

3    cover everybody in equal -- on equal terms.  It's an ERI -- as

4    an ERSA plan, it -- it needs to comply with federal law.  It

5    doesn't necessarily need to comply with state law typically,

6    unless it, you know, there's some procedures under ERISA where

7    state law can be applied.  But you know, in this circumstance,

8    I thought the better way of -- the more practical way of

9    dealing with it would be to look for some options.

10    Q    So at that point, in the early spring of 2019, what was

11    your response to the Union's proposal that the Union -- I mean,

12    that the company offer coverage of gender dysphoria treatment

13    and all women's health care, including abortion?

14    A    Our response really was what we just said, that we would

15    look, and we were encouraged with the thought that down the

16    road, it might be added to the plan.  It would be difficult or

17    not practical to add it to the plan for jus -- on a one-off

18    basis for Portland when there's 197 other stations that, you

19    know, we -- we have.

20    Q    Okay.  And then late in the year, I believe it was

21    November or December of 2019, the company answered the question

22    that the company was not willing to provide coverage of the

23    gender dysphoria treatment and abortion as far -- as far as the

24    company providing it through its own plans?

25    A    I think that's fair to say, that we -- that that wasn't --



1    that couldn't be done.

2    Q    Okay, so --

3         MS. YEN:  All right, and then if we could turn next to

4    Joint Exhibit 25?  This is the May 31, 2019 memo to bargaining

5    unit members.

6    Q    BY MS. YEN:  All right.  Do you see Joint Exhibit 25 in

7    front of you?

8    A    Yes, I do.

9    Q    Okay, and did you participate in writing this memo as

10   well?

11   A    Yes, I did.

12   Q    Okay.  Now, I know you said in a lot of these memos,

13   you're referring to Carrie Biggs-Adams as your assigned Union

14   representative or your business representative, but you knew

15   that she was president of the Local Union, right?

16   A    I did.

17   Q    And as you -- you didn't want the -- the memo to the

18   bargaining unit members to reflect that the president of the

19   Local Union herself was there at the bargaining table for them,

20   right?

21   A    No, that's not my concern at all.  That's not why it was

22   written that way.  It was written that to not name her to, you

23   know, minimize the personal aspect of it at that juncture.

24   Q    All right.  Well, you do indicate her name in your -- in

25   your memo in the second paragraph, where you're saying that the



1    negotiations have stalled; do you see that?

2    A    I see it down there later, yes.

3    Q    Okay, and then in the third paragraph --

4    MS. YEN:  If we could scroll down to the third paragraph

5    there?

6    Q    BY MS. YEN:  And I don't think we need to read the whole

7    paragraph aloud, but in -- in this paragraph, you're still

8    imparting the message to the bargaining unit members that you

9    were negotiating the amount of the union's dues and fees,

10   weren't you?

11   A    Well, we're addressing the issue, but we're not

12   negotiating the amount.  We're addressing it with productive

13   discussions.

14   Q    Okay.  Well, in this paragraph, you indicate to the

15   bargaining unit members that you were trying to discuss with

16   the Union bargaining team the amount of the initiation fees and

17   the dues; is that right?

18   A    Raising the issue, we're trying to deal with it through

19   productive discussions.  We're calling into question, really,

20   the Union's business administration practice, very similar to

21   the way the Union calls into question our corporate practices.

22   We pay our executives too much.  We don't provide enough in

23   terms of wage increases and other things.  We're -- we're --

24   we're just arguing those points.

25   Q    Okay.  But this memo isn't about the pay of your corporate



1    executives, so it's not directly responding to that argument,

2    is it?

3    A    No, but Ann -- Ms. Yen, those are out there.  Those are

4    out there, and you know, with -- with those (audio

5    interference) kinds of thoughts.  We're talking about your

6    business administration practices, the Union's business

7    administration practices as compared to the company's.

8    Q    Okay.  And let's just take a look at Joint Exhibit 26.  I

9    promise you, I'm not going to go through all these Nevin

10   memos --

11   A    Okay.

12   Q    -- but just a few of them.  So Joint Exhibit 26, let's

13   take a look at that one.  Okay.  And this one is dated June 20

14   of 2019 to all KOIN employees, and did you participate in

15   writing this memo?

16   A    Yes, I did.

17   Q    Okay.  And in the second paragraph, it says that the

18   assigned Union representative was, according to this memo,

19   "using stall tactics to avoid discussing the items that matter

20   to our employees the most, such as hourly wages and as we

21   believe to be, exorbitant initiation fees and monthly dues."

22       And so with respect to wages, isn't it true that, at this

23   point, the Union had made a wage proposal; is that right?

24   A    As of that point in time, they had, finally.

25   Q    And the company didn't -- never did make a wage proposal;



 1    is that right?

 2    A    As we discussed yesterday in much more detail, we gave

 3    some indications of what we would offer.  And didn't -- had --

 4    had not yet made a formal wage proposal, but indicated that in

 5    a certain range, the whole thing could be settled, essentially.

 6    Q    And as of this time, in June of 2019, were you still

 7    trying to persuade the Union to negotiate the amount of dues

 8    and fees?

 9    A    Not at all and never were.  We were never doing anything

10    in -- in the realm of doing that.  It was always a question of

11    what would we collect on behalf of the Union.

12    Q    And in your mind, wa -- was the subject of wage

13    negotiations linked to the subject of negotiating initiation

14    fees and monthly dues?

15    A    We weren't negotiating initiation fees and monthly dues,

16    period.  Okay?  I don't know how many times I need to state

17    that it was not being negotiated.  What we were negotiating was

18    whether we would check off these exorbitant initiation fees in

19    a way which would essentially, when couple with a Union shop,

20    would violate Section 8(b)(5).  We were going to -- that --

21    that's the one-two punch that we were not going to engage in.

22    Q    Okay.

23    A    I don't -- as I said yesterday, I don't care what they

24    charge, and we didn't care what they charged.

25    Q    So in any event, in your messaging to the employees, you



1    didn't link those two subjects, the wages and the Union's

2    initiation fees and monthly dues; is that right?

3    A    Only in the sense that it was one of the outstanding

4    issues.  And if you read the full statement there, as we

5    believe -- "exorbitant initiation fees and monthly dues that

6    the Union requires" -- "our employees to pay here in Portland."

7    So it -- right there, I'm -- I'm acknowledging and tying the

8    two together.  It's the one-two aspect of this, Union shop,

9    collection of them, exorbitant fees.  We're not going to be a

10   part of that.  Whether it was (audio interference) it was

11   another open subject that happened to be open.

12   Q    All right.

13        MS. YEN:  And then if we could next look at Joint Exhibit

14   43, October 14, 2019?  And if we can scroll down?

15   Q    BY MS. YEN:  Did you participate in writing this memo

16   dated October 14, 2019?

17   A    You say -- you have been using the phrase participate, I

18   wrote the memos.

19   Q    Okay.

20   A    Yeah, that's what -- and I have no problem verifying that

21   fact.  Which one do you want me to address?

22   Q    Okay, let's see.  So let's take a look at the second page,

23   the first Q&A on that page.

24        JUDGE TRACY:  Just one second, though.

25        Mr. Pautsch, this Joint Exhibit 43, if you could take a



1   look at, did you -- and I just want to clarify it for the

2   record -- did you write this memo?

3   THE WITNESS:  Yes.  Yes, I did, Your Honor.

4   JUDGE TRACY:  I just want to ask because it looks a little

5   bit different than the other ones did.  Thank you.

6   THE WITNESS:  Okay.  Yes, which -- which -- what do want

7   me to look at?

8   Q   BY MS. YEN:  Yes, the first Q&A on this page.  Okay, so --

9   so you indicated, referring to what you felt were the high

10  initiation fees, "This is precisely why we have continued to

11  raise this issue with Ms. Biggs-Adams."

12  So as of this time, were you demanding to negotiate the

13  amount of the initiation fees?

14  A   Well, right there in the next sentence, it says in line,

15  "We will continue to resist her attempts to require it in a new

16  contract."  Again, that one-two.  Again, I don't care if that's

17  her policy and she has it out there somewhere else, but she's

18  wanting us to agree to it by saying, okay, it'll be in the

19  contract.  It'll be checked off.  And if you -- you know, also,

20  in -- in the checkoff authorization form that was attached to

21  that old contract, it laid all of this out.  It laid out that

22  there is an initiation fee.  It laid out that it's paid over

23  time.  So that's what we were saying.  We're just not going to

24  agree to check it off again.

25  Q   All right.  And this memo is referring to the analysis --



1      MS. YEN:  And I guess we should go back to the first page.

2    Let's go back to the first page.

3    Q    BY MS. YEN:  So it's -- it starts out with, in all caps,

4    "Beware:  Carrie Biggs-Adams' October Trick"; you wrote this?

5    A    Yes.

6    Q    Okay.  And -- and it says, "We have been told that Local

7    President Biggs-Adams has sent out a letter to some KOIN

8    employees who have not joined the Union, telling them that

9    NABET Local 51's Executive Board unanimously voted to waive the

10   excessive initiation fees the Union routinely charges."

11      So isn't it true that you have no evidence to the contrary

12   as far as it being a decision of the Local's Executive Board?

13   A    Well, that's what I wrote there, that we were told that it

14   was agreed upon by the Local Executive Board, and that's what

15   the letter itself sated -- stated.

16   Q    Okay.  And you didn't have any evidence to the contrary,

17   right?

18   A    I didn't at that time.

19   Q    Okay.  And yet the memo portrays the Union's decision as a

20   trick by Carrie Biggs-Adams; did you have any evidence of -- of

21   it being some kind of a false representation that the Executive

22   Board had made this decision?

23   A    Well, that wasn't the aspect of it that I was alluding to

24   that it was a trick.  When I was alluding to, and I didn't --

25   that's not spelled out there, is that we felt -- our opinion



 1    was that it was a sort of waiver in violation of Savair.  And

 2    you know, as we talked about yesterday, you know, the Supreme

 3    Court has held that the grant of an initiation waiver can be,

 4    in certain circumstances, viewed as coercive, especially here

 5    where coupled with the earlier misrepresentation in the Welcome

 6    to NABET letter that had indicated -- basically, misled people

 7    to think they had to join the Union even though the contract

 8    had expired.  The two -- one-two was very misleading, so I, you

 9    know, we wrote, basically, was that trickery was at play.  And

10    I'd stand by that today, it was at play, as the Board did

11    issue -- issued a complaint on the Welcome to NABET letter.

12    Q    All right, but isn't it true that in this memo, you're

13    portraying this decision by the Executive Board as if it is

14    a -- as if it was a device that Carrie Biggs-Adams individually

15    has decided upon?

16    A    You're picking it apart that -- to say that.  I don't

17    interpret it that way at all.

18    Q    All right.  So in the withdrawal of recognition on January

19    8th of 2020, in preparation for that, did you discuss with Mr.

20    Nevin what to tell the employees?

21         MR. ROBERTS:  I'm going to object to any inquiry into Mr.

22    Pautsch's conversations with supervisors and managers.  I mean,

23    he was in-house counsel, and advising them on it.  So I'm going

24    to object on attorney-client privilege basis.

25         JUDGE TRACY:  Okay, so all right.  Mr. Pautsch, as I



1  understand it, has been the negotiator here for the contract.

2  So simply because he is in-house counsel does not mean that

3  everything that he discussed is going to be privileged.  Now,

4  if there was some legal advice that he was offering as an

5  attorney that is separate and apart from his conversations that

6  he may have had with, you know, part of this bargaining team

7  that was there.  So I'm not -- you know, you asked him a lot of

8  questions yesterday.  And suddenly now, he is not -- you're

9  objecting to him answering questions about these conversations.

10  So if there are specific instances, then sure.  But just

11  to kind of broadly say, you know, he's not going to answer

12  these questions, I am going to objection on this basis, I will

13  overrule them.

14  Mr. Pautsch, if there are some specific instances where

15  you acted with an attorney hat on, where you're giving legal

16  advice, which is separate and apart from the bargaining,

17  because you were part of the bargaining, so you cannot shield

18  yourself from some sort of attorney-client privilege here by

19  saying, oh, no, I'm his attorney.  Okay?  So if there are

20  specific instances of legal advice given, then that's attorney-

21  client privilege.

22  But the rest of it, with the bargaining, that is just not.

23  And I'm going to, you know, overrule the objection.

24  So Ms. Yen, ask the question again, please.

25  Q    BY MS. YEN:  In preparation for withdrawing recognition of



1    the Union, did you discuss with Mr. Nevin what to tell the

2    employees about the withdrawal of recognition?

3    A    I gave him legal advice about what to tell them.

4    Q    Okay, did -- was there a -- a joint decision on -- on the

5    part of management to tell the employees that there won't be

6    raises until 45 days had passed?

7    A    I gave him legal advice about that.

8    Q    Okay, so in preparation for Mr. Nevin's discussions with

9    the (audio interference) employees, you gave him legal advice

10   about whether to tell them there won't -- won't be raises until

11   45 days had passed after the company withdraws recognition?

12   A    I gave him legal advice about the whole conversation.

13   Q    Okay.

14        MS. YEN:  Let's take a look at -- I'm going to change

15   subjects now -- Joint Exhibit 18.  This is a request for

16   information relate -- related to the healthcare proposals.

17   Q    BY MS. YEN:  Okay, so this is a January 24 of 2019 email;

18   do you recall this email?

19   A    Yes, I do.

20   Q    Okay.  And -- and do you recall the Union asking for the

21   information of the COBRA rates and what the Employer

22   contributions are on the health plan?

23   A    Yes, I do.

24   Q    Okay.  And -- and at that time, isn't it true that the

25   Employer contributions were not provided to the Union?



1    A    The COBRA rates were, but not Employer contributions.

2    Q    Okay.  And then if we go to -- well, maybe we don't need

3    to -- to go to the document itself, but isn't it true that it

4    wasn't until December 9 of 2019, that the company provided to

5    the Union the Employer contribution rates?

6    A    I really don't recall that that well.

7    Q    Okay.

8    A    It may -- that may be true that -- I do know that that

9    number has, as time gone on, been more calculable in other --

10    in other contexts.  Other unions have asked for that number.

11    So outside of that, I don't recall when we provided it.

12    Q    Okay.

13        MS. YEN:  So if we could go to -- okay.  If we could go to

14    Joint Exhibit 47.

15    Q    BY MS. YEN:  Okay, does that refresh your recollection

16    regarding when the company provided the Union with the Employer

17    contribution rates?

18    A    Yes, that's accurate.

19    Q    Okay.

20    A    But I don't know if we did before that, we may have.

21    Because yesterday, when -- or when Ms. Biggs-Adams testified,

22    it was being presented that we hadn't presented the COBRA

23    rates.  And when we double-checked, we had done that the same

24    day, on January 24th.  And then she testified that, really,

25    that told her quite a bit, because it's really 102 percent of



1    the whole -- whole picture.  So with 102, you can figure out

2    what 100 percent is, and figure out what the cost is.

3        So this one here lays it out.  And maybe I -- you know,

4    for all I know, if we -- if she dug around, she'd find the

5    email that -- that -- that laid that out earlier.  I don't

6    know.  I don't recall.  I do know -- let me -- I'll let you ask

7    a question.  Go ahead.

8    Q    Okay.  Well, if the -- if the company had provided the

9    Employer contribution rates earlier than December 9, 2019, that

10   would have been provided to -- to us for this -- for this

11   record, wouldn't it?

12   A    Look, I'm just saying that the COBRA rate that we provided

13   wasn't in the record.  I -- we had to put -- find that and put

14   that in there, and that was given the same date, January 24th,

15   2019.  So for all I know, this could be in there too, so.  I

16   don't recall exactly when all of these were presented.  I -- I

17   do -- I can add one thing, that this number was not always so

18   easily calculated.  As time went on, our accounting or our

19   pay -- our finance vice president has been able to figure this

20   number out better -- that -- that second column, what our

21   contribution is.  And if you want me to elaborate on that, I

22   can.

23   Q    All right.  When did the -- when did the finance

24   department do that?

25   A    He did that as -- as time has gone on with -- it's a --



1    that number tends to be a moving number, you know, so I'm

2    sure -- yeah.  Because when you have a self-insured plan,

3    you're -- you're funding -- funding it based upon experience in

4    the previous year.  And with our acquisitions, that number has

5    fluctuated.  And they've had, you know, some difficulty

6    figuring out what that number is because experience has vary --

7    varied greatly.

8         So before we want to put something out to the Union on

9    what that number is, we're -- you know, we want to be careful.

10    So that's been a problem in numbers of negotiations because

11    they want to -- they do want to know, typically.  The Union

12    wants to know what's the contribution of the Employer, so

13    what -- what's this really costing.  In a self-insured, you

14    have to understand, I think they -- you know, I think Carrie

15    does -- that a self-insured plan, you're not paying a premium

16    to anybody.  You know, you're not running out to the insurance

17    company and paying a premium.

18         What you're doing is, you're seeing how much it cost and

19    assessing a number to that based on the experience the prior

20    year.  And our number was going up and down because what

21    happens, if I get to address a little bit more, what happens

22    when you acquire a company and you have a better health plan

23    than they did, is people use it heavily in the next year.  So

24    when we acquired Media General, people all came out and used it

25    because it was a great health plan, better than Media

1    General's.  So up went the number and up went the cost.  So

2    that's -- that's why that number is hard to obtain.  And the

3    other number that Carrie had, COBRA rates, you know, you have

4    to have a number for that, there that is; there it was, so we

5    gave them that.

6    Q    And wouldn't you agree that if the parties are looking for

7    other alternative health plans or health coverage options, it's

8    relevant to know what the Employer -- how much the Employer is

9    willing to dedicate to the cost of healthcare?

10   A    Yes, and that's why the COBRA gives you guidance on that.

11   And this gives you guidance on it.  And that's why I knew we

12   were entering, certainly, into that phase where, you know, that

13   might be a possibility.  That's why we wanted to make sure the

14   number was out there.

15   Q    Now, I want to go back to a few of the things you said

16   during your testimony.  And -- and I apologize that -- that I

17   may be jumping around a little bit in terms of subject, but --

18   but just to go back in the order -- backwards order my notes.

19       So you testified that one of the considerations that the

20   company was relying upon when withdrawing recognition was that

21   new employees had not signed up for dues checkoff.  But isn't

22   it true that the company had not been honoring dues checkoff

23   anyway since the -- I think it was either August or September

24   of 2019?

25   A    Un -- until then, there still were many, many people who



1  hadn't signed up even though -- even though they were being

2  misled to believe that they had to in violation of the Act, and

3  as the NLRB has charged.

4  Q    Well, so Mr. Pautsch, let me cut you off to ask you to

5  answer my question.  So isn't it true that the company wasn't

6  honoring dues checkoff since, I guess, it was August or

7  September of 2019?

8  A    After August of 2019 or the date, whenever it, that

9  checkoff was withdraw, that would be true.  But before that,

10  for two years, it wasn't true.  We were still checking off.

11  Q    Okay, and then -- okay.  And then you -- you indicated

12  during your direct testimony yesterday, that the initiation fee

13  was -- and -- and I may be mis -- misparaphrasing your

14  testimony, but -- but I believe you were saying something to

15  the effect that the initiation fee was a problem with respect

16  to hiring and retaining new employees?

17  A    Yes, as one can imagine from the fact that people have to

18  pay $3,000 their first year of employment.

19  Q    Well, and I just want to clarify, isn't it true that there

20  weren't employees who were being dismissed because of failure

21  to pay the initiation fee, right?

22  A    Well, (simultaneous speech) --

23  Q    That was not actually something that was actually

24  occurring?

25  A    It couldn't occur because the Union shop wasn't place,



1    that's true.  Yes.

2    Q    That -- I'm sorry, the Union shop what?

3    A    Was not in place after September of 27 -- 2017.  If the

4    Union had asked us to discharge somebody, it would have been a

5    violation of the Act.

6    Q    So what about before the contract expired?  Isn't it true

7    that you didn't have a problem with the company losing new

8    employees because they couldn't make the initiation fee payment

9    and were therefore being dismissed under the unit's trade

10   clause; is that correct?

11   A    I have no knowled -- I have no real knowledge of that, and

12   that would be real speculation.  I'm sure they didn't.

13   Q    Okay.

14   A    I guess that would be speculative.

15   Q    And -- and when you were looking at that phenomenon of --

16   are you saying that there were new employees who were leaving

17   for other companies?

18   A    My -- my speculation would be that there.  You --

19   Q    And --

20   A    -- you know, and others who were there at the time -- I

21   wasn't there in --in 2016.  We didn't own the company in 2016,

22   but I'd suspect that they had problems then as well.

23   Q    Okay.  Well, in 2000 -- and let me -- let me actually back

24   up and clarify.  When you were testifying that -- that the

25   managers were looking at a problem with retaining new



1   employees, was that in 2019?

2   A    It started to crop up in '18.

3   Q    Okay, so --

4   A    I recall that it -- it, you know, was evident.  You know,

5   there -- it was evident that there was some sort of problem

6   here about dues payment in prior ownership.  All -- all one has

7   to do is look at the Board register, and you'll see CB charge

8   after CB charge filed against NABET in 2015.  Something was

9   going on then with this issue.

10  Q    Okay, but I'll come back to that in a minute.  So with

11  respect to the company management considering it some kind an

12  issue with retaining new employees, are you saying that there

13  actually was a trend of new employees leaving the company?

14  A    Yes, that -- that I can say.

15  Q    In 2018/2019?

16  A    That I can say for sure, yes.

17  Q    So as you play it out, there was no -- there couldn't be

18  any enforcement of any Union security clauses and during that

19  period of time, right?

20  A    And really through -- from September 2017 on, there really

21  could be.

22  Q    Okay.  And did you -- did the company have any data about

23  where those employees were going?  You know, what competitors

24  they were going to work for; that kind of thing?

25  A    I think that exists.  I think they're -- there are



1    turnover statistics that exist, but -- and exit interviews are

2    conducted.

3    Q    Right.  Okay, and so -- and did the company consider the

4    salaries that the employees were leaving for at other

5    companies?

6    A    There was some dis -- you know, there would be individual

7    cases that, you know, could exist, but I -- I'm not aware of

8    the specifics of them.

9    Q    So isn't it true that if you weren't aware of the

10   specifics of what -- why employees were leaving when they were

11   getting paid better salaries at -- at competitors, that you

12   couldn't definitively say that the reason employees were

13   leaving was because of the initiation of the Union; isn't that

14   fair?

15   A    Well, I'm not -- I'm not aware of all the specific --

16   specifics you're talking about, like where did they go next.

17   But I'm aware of -- and some of the commentary is in my

18   position statement regarding certain people leaving that were

19   former employees.  I remember one name, Jordan Aleck, you know,

20   she left.  And there were different people that left and

21   mentioned this on the way out the door.  You know, that this

22   was an issue, and even before they went out the door.  And

23   it's -- you know, I mean, my goodness, it's human nature that

24   it would be an issue.

25   Q    Okay.  And I think Ms. DeVleming covered this yesterday,



1    but you didn't personally speak to those employees; is that

2    correct?

3    A    No, but other management did, and we included it in the

4    position statement.

5    Q    Okay.  All right, and then I'd like to ask you to take a

6    look at one of the exhibits you discussed during your direct

7    examination yesterday, with respect to -- I think it was Joint

8    Exhibit 28.  Okay, so this June 26th, 2019 letter is addressed

9    to Pat Nevin, because the request for information came from

10   him, but did you -- do recall seeing this response to Mr.

11   Nevin's letter?

12   A    Yes.

13   Q    Okay.

14      MS. YEN:  Scroll a bit so that we can see the -- the text

15   of the 1, 2, 3, 4, et cetera.  Okay.

16   Q    BY MS. YEN:  So in each of these categories, Ms. Biggs-

17   Adams wrote, "I am not aware of any reason to believe that" --

18   that -- the -- the category reflects this -- "are relevant to

19   bargaining.  If you disagree, please explain why."  Do you

20   recall that?

21   A    (Indiscernible).  Yes, I do.

22   Q    Okay.

23      MS. YEN:  And then there's a -- there is a letter

24   following Joint Exhibit 29; if we could take a look at that?

25   Q    BY MS. YEN:  Okay, so this is a letter from Mr. Nevin to



1    Ms. Biggs-Adams following up on that request for information.

2    And essentially, the memo indicates that, "The information

3    requested by each of the requests is necessary in the company's

4    opinion to our need to negotiate changes to the dues checkoff"

5    authorization forms.  So other than this June 27th, 2019 memo,

6    isn't it true that there was no other explanation provided to

7    the Union about why each of those requests for information were

8    relevant to the bargaining proposals?

9    A    Well, it's pretty -- I mean, this is fairly comprehensive.

10   It says it's all relevant to C-6, and you know -- and that's

11   out there.  And then it points to General Counsel Memorandum

12   19-4, which really takes apart, in my opinion -- I could give

13   the explanation for it -- it really takes apart the current

14   authorization form.  I mean, it pretty much says that most of

15   that -- many things on the authorization form are illegal in

16   the General Counsel's opinion.

17       I didn't go into det -- fur -- further detail, or Mr.

18   Nevin's letter didn't go into further detail, because I figured

19   that it was being written to a lawyer, perhaps yourself.  So

20   it's pretty -- I think it's pretty obvious what we were

21   objecting to.

22   Q    So let me try to ask the question a different way and --

23   and just -- and ask you to just answer my question.

24   A    Okay.

25   Q    Other than Joint Exhibit 29, isn't it true that the



1    company didn't provide any other explanation as to why the

2    information requests were relevant to bargaining?

3    A    Beyond this, we filed the charge on the issue.

4    Q    Okay.  And other than filing a charge and this Joint

5    Exhibit 29 memo, there was no other explanation provided by the

6    company to the Union regarding relevance?

7    A    This was it, and it's C-6.  It's saying it's all relevant

8    to C-6.

9    Q    Okay.  And again, I'm just asking for you to confirm that

10   there wasn't any other explanation?

11   A    Not that I can recall.  Maybe at the table we talked about

12   it.  I would think at the table we had discussions about this

13   at some juncture.

14   Q    Okay.  But do you remember any other explanation other

15   than what's discussed in Joint Exhibit 29?

16   A    I would just say that -- that I -- at the table, I can

17   remember saying that, you know, if the form wasn't attached to

18   the contract, maybe we don't have to go down into the form as

19   much.  But by putting it in the contract, it's -- it makes it

20   all -- we have to look into these things.  I'm not going to

21   sign off on an illegal form.

22   Q    Okay, so other than that, do you recall giving any other

23   explanation for the requests for information?

24   A    I think that would be about it, but that's pretty strong.

25   Q    Okay.  And then going back to your reference to some CB



1    charges in 2015 or -- or during the hiatus between the -- well,

2    it was the hiatus prior to the expired contract that -- do you

3    recall your -- you testified to that -- that there were some CB

4    charges during that prior hiatus?

5    A    I recall reading some and looking them up.  You know, to

6    some extent, the Board's website carries the charge.  Sometimes

7    it doesn't, it just references a charge.  I recall seeing a

8    bunch of them.

9    Q    Okay, and this was pre-Nexstar, right?

10   A    Right, yes.

11   Q    Okay.

12   A    It was.  It was with LIN Media, you know, LIN TV and Media

13   General.

14   Q    Okay.  And so since it was pre-Nexstar, you were not

15   involved with KOIN-TV at that time; is that correct?

16   A    No, but in doing due diligence to try to do this right, I

17   at least looked into the background of what had happened.

18   Q    Okay.  So you -- you have no -- no personal knowledge of

19   what had happened; is that correct?

20   A    I wasn't there, that's for sure.  I was not there, but I

21   can read.

22   Q    Okay, and -- and with respect to your research, you're --

23   you're telling us you've read some information that was

24   publicly available on the NLRB website?

25   A    Um-hum.  Yes.  Yes, I did.



1    Q    Okay.  And did you do anything else with respect to

2    looking into what had happened?

3    A    Well, I did have a conversation with the general manager

4    at the time, former general manager, a woman named Adrienne

5    Roark who was the manager at KOIN-TV for Media General.  And

6    she characterized the negotiations as essentially just an

7    absolute mess for a lot of the same reasons that, you know,

8    we're -- we're discussing here today.

9         There were problems with employees who didn't want to

10    pay -- continue to be members of the Union.  There were --

11    there was disputes over every little thing, a lot of the same

12    issues occurred in those negotiations, she told me.  She works

13    at another station in Portland right now as the general manager

14    there.  She said -- she just described it as a mess.  Two

15    lawyers came in and made it very difficult.

16    Q    Did you discuss with anyone the specific subject of dues

17    deductions without authorizations?

18    A    I don't recall discussing it, going into detail with

19    anybody on it.  That was probably the most detail I did is when

20    I had that conversation with Ms. Adrienne Roark.  I had dinner

21    with her as part of a lawsuit we were filing.

22    Q    All right, so -- okay.  So -- so you -- you can't -- if --

23    if there were -- if there were dues deductions without

24    authorizations, you can't speak to how that happened; is that

25    true?



```
 1   A    I don't know that that -- I don't know enough to say that

 2   that was an issue in the past, dues deductions without

 3   authorization.  Maybe was the case in those cases, I didn't see

 4   that in the charges that I -- you know, any other charges that

 5   I looked at because the charge itself usually wasn't there.  It

 6   was just, you know, the Board website sometimes contains an

 7   attachment, sometimes it doesn't.  But up they popped, a bunch

 8   of C -- CB cases, so I don't know what they were about.

 9   Q    Okay.

10   A    The company was ag -- some of the members were obviously

11   aggravated --

12   Q    Okay.  But so --

13   A    -- because they were filed -- they were filed by members,

14   not by -- by the station.

15   Q    Okay, thank you.  But you don't actually know what the CB

16   charges were about?

17   A    It looked to be about dues issues, continued payment of

18   dues.  That's, you know, what -- what they appeared to be

19   about --

20   Q    Okay.

21   A    -- in the description line.

22   Q    All right.  And that's all you know with respect to what

23   those charges were about; is that correct?

24   A    Only that, and what I told you about what Ms. Roark told

25   me.
```



1    Q    Okay.  And you were referring to -- with respect to the

2    company's proposal to charge the Union a fee for processing

3    dues checkoff, you were referring to having a problem with the

4    software; was -- is that software a spreadsheet?

5    A    I'm not following your question.  What are we talking

6    about that KOIN had the question about?

7    Q    Yeah, sorry.  I've switched subjects again, so -- so you,

8    in your direct testimony yesterday, you were talking about the

9    company's proposal to charge the Union a processing fee for

10   dues checkoff; do you recall that?

11   A    Okay, the -- the charge for the processing.  And with

12   our -- the -- the software for payroll varies from company to

13   company.  We -- we were using one software developer to do our

14   payroll and then transitioned to another.  They all seem like

15   they have a certain way of finding what they can load in.  And

16   it seems like there's a, you know, particular problem when

17   you're computing something on the percentage of the gross.

18   Q    Okay.

19   A    So we actually proposed to some unions that we -- we go to

20   a direct deposit system --

21   Q    Okay.

22   A    -- of their dues, and that's hard to do.  Any time you get

23   into a softball situation where it's a percentage of the gross,

24   appar -- I've been told it's difficult.

25   Q    And under the company's health plan proposal, wouldn't the



1   company need to perform a calculation of the -- a percentage of

2   wages in order to determine the employee contribution --

3   A    Yes, they've got that down.

4   Q    -- to the health plan?

5   A    Yeah.  I'm sorry.  Yes, they've got that down.  That,

6   they -- that's across the Board.  That's relatively easy to do,

7   I'm told.  But for whatever reason, a bunch of other

8   computations where there's sort of a -- I guess the gross is

9   dividing it; that becomes more difficult.  Meaning certain,

10  like, you calculate your gross, your dues on certain a certain

11  gross number that inclu -- that you don't include certain other

12  things.  And it's different than the way we could calculate

13  premium payment contribution by the employees on the gross.

14  That -- that one is massive.  It's 15,000 people or how many

15  are participating.  And they can do that calculation.

16       It's when you fine-tune it in different markets for a

17  bunch of other situations where the gross divides, it's hard.

18  Q    But the -- the percentage of the gross is -- is going to

19  vary from paycheck to paycheck, depending upon what the -- what

20  the -- you know, what hours the employee works, how much

21  overtime an employee works, and so forth; is -- isn't that

22  right?

23  A    That's right.

24  Q    Okay.  And if you know, let us know if you don't know, but

25  does the company use a spreadsheet to calculate percentage of



1    wages?

2    A    I would think it's -- that's all software putout.  I don't

3    think anybody has to do a spreadsheet for that.

4    Q    So it's some kind of -- some kind of software that does

5    automatic calculations using formulas; is that right?

6    A    Yeah -- yes, it's a comprehensive do-all system that can

7    that.

8    Q    Okay.

9    A    And it's -- we just switched over to from one to another,

10   and it -- it can perform that function.

11   Q    Okay.  And then with respect -- --

12       MS. YEN:  Oh, actually, I do have a few more questions

13   about another company information request, but I don't know

14   whether people need a break yet.

15       JUDGE TRACY:  How much more time will you need, do you

16   think?

17       MS. YEN:  I think that this is the las -- this is the last

18   line of questioning.  It's a line of questioning about one of

19   the company's information requests that Mr. Pautsch discussed

20   yesterday, so probably only 15 minutes, 10 minutes.

21       JUDGE TRACY:  Yeah, so let's go ahead and proceed unless

22   Mr. Pautsch, you need a break or something?

23       MS. YEN:  Okay.

24       JUDGE TRACY:  Are -- are you okay, Mr. Pautsch?

25       THE WITNESS:  I'm good, yes.



1      JUDGE TRACY:  Okay.

2      THE WITNESS:  Thanks.

3      JUDGE TRACY:  Okay.  You can go ahead.

4      MS. YEN:  All right, thank you.  All right, so let's take

5  a look at Joint Exhibit 36.  Actually, you know what?  Sorry,

6  Joint Exhibit 33 is the one that I wanted to look at.  Sorry

7  about that, Mr. Schiff.

8  Q    BY MS. YEN:

9      F65:  So Joint Exhibit 33 is this August 15, 2019 "Request

10 for information -- Welcome to NABET-CWA"; do you recall that?

11 A    Yes.

12 Q    Okay.  And is it fair to say that this request for

13 information was asking the Union for all details regarding the

14 membership benefits of all kinds that were listed in the

15 welcome letter; is that right?

16 A    Yes, it was.

17 Q    Okay, so not just health insurance, but also Union member

18 mortgage, legal services plans, travel club; well, all kinds of

19 Union benefits, right?

20 A    Yes, that's right.

21 Q    So not all of these requests were relevant to, at least in

22 your view, relevant to the negotiation about the health plan;

23 is that right?

24 A    Well, it was relevant to -- if you look back at what was

25 it, CE-2?  CE-2, it describes a health plan, dental plan, and



1    it goes on with life insurance.  It goes on with all sorts of

2    company benefits, so yeah, it's relevant to that whole, you

3    know, CE-2 concept.  That basically, if the Union agrees to

4    CE-2, they get all the company benefits across the Board,

5    wherever they might have been, you know, whether it's, you

6    know, health insurance, life insurance, short-term disability

7    insurance, long-term.  You know, when you check off on the

8    company's system, there's like five or six things at open

9    enrollment that you can elect into.

10         The thought was, well, you know, maybe we're going to move

11   the KOIN group, the NABET KOIN group over to the NABET program.

12   So that's what -- let's just see what's out there.

13   Q    Okay.

14        MS. YEN:  And if we could look at the Union response,

15   Joint Exhibit 34?

16        JUDGE TRACY:  Ms. Yen, go ahead and restate that.

17        MS. YEN:  Okay.

18        JUDGE TRACY:  It got a little garbled.  I think that

19   sometimes I've noticed -- I mean, you're towards the end here,

20   but when you move because of the headphones and then the -- the

21   microphone piece right here, it can sometimes make a lot of

22   noise.  So just ask the question again, please?

23        MS. YEN:  If we can look at Joint Exhibit 34, the Union's

24   response?

25   Q    BY MS. YEN:  Now, in response, the Union raised the



1    problem that the Union's not allowed to discriminate against

2    people who choose not to join the Union with respect to

3    negotiating benefits and the collective bargaining agreement;

4    do you recall that?

5    A    I see that.

6    Q    Okay.

7    A    I recall that, too.

8    Q    And if I understood your testimony yesterday, you were --

9    you were saying that -- that you didn't think that was a

10   problem because you could, as part of a collective bargaining

11   agreement, you could offer the Union members-only plan as one

12   option, and then you could offer a stipend or another benefit

13   as another option; is that right?

14   A    No, it's -- you're misstating a little bit -- close, but

15   we could offer the -- the Nexstar package, basically, as one

16   option.  And we could offer the Union affiliation grouping here

17   as the other option.

18   Q    But do you agree that there would be a legal problem if

19   the company offered to employees, well, we can offer you this

20   benefit if you don't join the Union?  Do you agree that would

21   be a problem?

22   A    I think we could have a good legal debate over this.  I

23   think, you know, I think that may have been the day you were

24   there, in fact, that this letter was sent.  But -- and maybe

25   not.  It seems like the problem when you were there at



 1    negotiations.  We could debate that, but I think it's very

 2    debatable that that possibility would work.  Option 1, option

 3    2, and you know, they could pick which they wanted to, you

 4    know?  But that -- I don't think that foreclosed the provision

 5    of the information.  The information still should have been

 6    provided to -- so that we could analyze it.  And you know, for

 7    example, we could look at the documents to see if that acc --

 8    that argument was actually accurate.

 9    Q    But that -- that's not my question though, Mr. Pautsch.

10    What I'm asking is, let's suppose the Employer offers to

11    employees, if you don't join the Union, we can offer you this

12    benefit, you know, whether that be a stipend, like a cash

13    stipend, or -- or some kind of a health benefit or other fringe

14    benefit; wouldn't that be a problem?

15    A    I'd have to give that some thought.  I'm not -- that

16    that's -- that would -- it seems like that could be a problem,

17    I don't know.

18    Q    Okay.

19    A    That's a hypothetical I just never really have thought

20    about or researched.

21    Q    Okay.  And is it your testimony that you -- you believed

22    that the Union might agree to -- that there was a possibility

23    that the Union might agree that in the collective bargaining

24    agreement, you could offer a benefit to people who don't join

25    the Union because it's an alternative to the benefits of Union



1    membership?

2    A    I'm not following on that.  I mean, I guess they -- they

3    would still -- it would be -- you know, they'd still have to,

4    under the contract, pay dues and in -- initiation fees if that

5    was agreed to under -- as an Agency shop, and they could do

6    that, and they could, you know, make a choice on it.

7        Or you know, the other thing is, I don't know the process,

8    but perhaps with your plan, it's a NABET plan, you could have

9    structured it or wrote it the way that people who were Agency

10   shop payers could join.  I -- you know, that was all I thought,

11   something we could debate, discuss, and not just shut the door

12   on it, you know, from the outset, because it's there.  There it

13   is.  You know, there -- there are these commodities existing to

14   provide healthcare, to provide life insurance; is there a way

15   we can facilitate that?

16   Q    Uh-huh.

17   A    But when you didn't respond to the information request,

18   that shut it off right there.  Stop, we're not going to talk

19   about it.

20   Q    Well, what the Union did respond was that these benefits

21   are benefits for members only.  So I mean, it wasn't -- it

22   wasn't something that the -- I mean, the -- the Union was

23   pretty adamant about that, right?  It wasn't -- it wasn't

24   something that was open for debate about whether to offer that

25   to Agency B payers?



1    A    Right.  And the Board decided that you should have given

2    it to them, and they issued a complaint on this issue, so --

3    and now you've settled it.  So I mean, we could go on and on

4    talking about it, but it seems like there's two certain

5    positions here.  I think ours is correct.

6    Q    All right.  And the Board -- the General Counsel didn't

7    decide that the Union has to provide all of the categories of

8    information that the company had requested; isn't that correct?

9    A    Right, but the -- the -- the Board decided that some of

10   them had to be provided.  And the -- and the Union has settled,

11   and it has agreed to provide those now.

12        JUDGE TRACY:  So Mr. Pautsch, I just need to clarify some

13   of your testimony.  You keep saying "the Board decided", and

14   that's just really not clear for the record, because it sounds

15   as though a lot of this is at the General Counsel stage, which

16   is not a Board decision.  And so it -- it makes me a bit

17   confused.

18        Obviously, I have the record to look through, but it's

19   just not an accurate statement.  I've heard this a few times,

20   and so just to be clear, for the record, I need you to state --

21   you have experience in this -- so whether it was the General

22   Counsel at that level where, whatever they decided to authorize

23   a complaint or not.

24        You know, as a reminder to everybody, I'm following what

25   the Board said.  I don't follow what General Counsel memos say;



1    that's not my job.  My job is to follow the Board precedent,

2    and then the Board decides what they want to do.  I follow the

3    Board.  And so I heard this a few times, and it gets a little

4    bit confusing about where, because this case has -- not this

5    case, but the history here -- has a lot of pieces to it.

6         So what I would like is, Ms. Yen, if you could just

7    clarify that, so Mr. Pautsch can, you know, clearly state where

8    this was.  And ob -- obviously, we have the records here to

9    look at as well; there are exhibits.

10        MS. YEN:  Okay.  Yes, you're right, Your Honor.

11   Q    BY MS. YEN:  And -- and Mr. Pautsch, you -- you agree,

12   don't you, that it was the General Counsel that -- that

13   partially sustained your appeal with respect to the information

14   request in Exhibit 33, with respect to some of the categories

15   that the company asked for --

16   A    Right, it was --

17   Q    -- right?

18   A    -- the General Counsel on appeal sustained the appeal,

19   sent it back to the Region.  The Region has subsequently

20   entered into a settlement agreement with the Union on this

21   issue, and that settlement agreement has now been appealed.

22   The unilateral settlement has now been appealed to the General

23   Counsel.

24   Q    Okay.  And that settlement agreement, I mean, we can refer

25   to the document itself since it's in our record now, but -- but



1    it doesn't in -- include a nonadmission clause not -- not --

2    A    It -- it does.  It speaks for itself.

3    Q    Right, right.  Okay.  Okay, thank you very much.  That's

4    all I have on cross-examination.

5    A    Thank you.

6        JUDGE TRACY:  Before we go back to Mr. Roberts, Mr.

7    Pautsch, you just said that reminded me of something that we

8    talked about in all of these days, which it sounds like, Mr.

9    Roberts, that there is still some pending appeal with the

10   settlement agreement or has that period run out or -- or where

11   are we at?

12       MR. ROBERTS:  We -- we did file a appeal to the General

13   Counsel right before the hearing started last week.  It was on

14   Tuesday or Wednesday of last week.  We've not heard on that as

15   of this date, but that was with the -- that was within the time

16   period was allowed to file the appeal.  So as far as I know,

17   it's still -- it's still pending.

18       JUDGE TRACY:  Ms. DeVleming, if you could just add in

19   something about that if you have anything to say?

20       MS. DEVLEMING:  It would be -- but I think we did run it

21   up the chain.  They know that we're in this hearing, so.  But I

22   think it would be pretty unprecedented for them to weigh in

23   quite that quickly.

24       JUDGE TRACY:  So what I would like for you guys to do in

25   the -- in the matter of just completeness, is if between now



1    and the time that the decision is issued, which, you know,

2    after whenever we close, 35 days for the briefs.  And then it's

3    going to fall around holidays, so people might want extensions,

4    and then the decision.

5        Between now and the decision, I'm assuming you'll get a

6    response.  You all, I would recommend jointly, agree to reopen

7    the record and put into evidence whatever the General Counsel

8    decides.  Obviously, if there is some refusal to accept the

9    settlement, well, that's a whole another thing, but at least

10   for my purposes of this record, it goes in.

11       And so I would suggest that, you know, once we're done

12   today, I'm going to close the record.  But you could ask to

13   jointly reopen the record to put in a joint exhibit which will

14   just complete this -- all these outstanding issues that have

15   impact here.  Okay?

16       MR. ROBERTS:  Certainly.  I think that makes sense.

17       JUDGE TRACY:  Okay.

18       All right, so Mr. Roberts, please.  Any questions?

19       MR. ROBERTS:  I don't have any redirect.

20       JUDGE TRACY:  Okay.

21       All right, so Mr. Pautsch, thank you very much for your

22   testimony today.  As you've heard me say, please don't discuss

23   your testimony with anyone until after the close of the

24   hearing.

25       And obviously, you're a party representative, so you're



1    welcome to stay here at the hearing.  And you can go back to

2    join Mr. Roberts in the same room, if you like.  So you can do

3    that, that's up to you guys.

4         Let's -- Mr. Roberts, is your next witness waiting in the

5    waiting room?  Or Mr. Davis is it?

6         MR. ROBERTS:  I don't know if Mr. Davis is on or not yet.

7         MR. DAVIS:  Yes, I'm here, Chuck.  I don't know if you all

8    can hear me from here?

9         MR. ROBERTS:  Yes, we can.  Loud and clear.

10        MR. DAVIS:  And this is my weighing in, and I'm in a

11   different room.  So I can do all the things we need to do about

12   showing my room, and --

13        JUDGE TRACY:  Okay.

14        MR. DAVIS:  -- I'm by myself if needed and everything

15   else.

16        MR. ROBERTS:  Okay.  I think -- I think the judge is going

17   to take a break for right now.  (Audio interference).

18        MR. DAVIS:  Okay.  And that would be beneficial because we

19   need to -- several of the witnesses that are to testify are

20   actively working, so I want to try and schedule them to come

21   down at the station if we can.  We can have the first one ready

22   to go after this break though.

23        JUDGE TRACY:  Okay.  Yeah, so that's what I was going to

24   ask, if anybody was waiting in the waiting room, Mr. Schiff.

25   And there's no one waiting, correct?  Right.  So let's take --



1    is -- is 15 minutes sufficient, Mr. Davis, for you to call that

2    first person to get onto the Zoom?

3        MR. DAVIS:  It absolutely should be.  And I'm going to try

4    and schedule two out, so that we always have a little bit of a

5    buffer here, so I don't run into much technology problems.

6    But -- but that should be fine.  I'll check right now, and when

7    we take the break, and I'll let you know if we need a little

8    more time.

9        JUDGE TRACY:  That's fine.  And then I think you had

10   mentioned it to Mr. Roberts, but you had some issues about the

11   link or just what to do.  So they all use the same link --

12       MR. DAVIS:  Yeah.

13       JUDGE TRACY:  --  to come in, so that -- that's the link

14   that they'll use.  And then if you would like, if you'd let Mr.

15   Schiff know whoever you're calling ahead so he knows that these

16   people should be in waiting rooms.  And then they can be in

17   separate waiting rooms.  Obviously, you know the length of how

18   long your direct questioning will be, and then, you know, so

19   that way, you can gauge the amount of time.

20       MR. DAVIS:  All right.

21       JUDGE TRACY:  Yeah, so let's -- let's go off the record

22   until -- it's 10:30 Pacific Time, so 10:45 a.m. Pacific Time.

23   And then, Mr. Davis, if your witness needs a few more minutes,

24   just hop on in and -- and let us know that, okay?

25       MR. DAVIS:  Yes.  And one point of clarification, the way



1    we had it set up at the -- at KOIN was to set up one camera and

2    one link in a conference room so people could go in without

3    technology risk.  So there won't be people in the waiting room.

4    They would just -- one would leave, and the other would enter

5    the room is kind of how we've set it up, if that's all right?

6        JUDGE TRACY:  Fine.  I don't see any problem with that

7    if -- General Counsel or Union Charging Party can speak up if

8    they feel that -- the only thing, and I'm sure that you've told

9    them, is that when they're going in to testify, they're

10   testifying alone with the door closed, and so then that's their

11   testimony, because of the sequestration order, right?  And then

12   they -- so we'll do that.  And then I, of course, will -- when

13   we go back on the record, I'll just ask you -- I mean, I'll

14   just ask you for the record if there's anybody else there, but

15   you're not testifying, so it doesn't matter who's in the room

16   with you, frankly.

17       MR. DAVIS:  I'm a room by myself, just for the -- just so

18   you know, and it's hot in here.  I don't know how to control

19   the heat, so it's going to be a quick -- as quick as I can do

20   the examination and not overheat.

21       JUDGE TRACY:  Oh, okay.  Well, maybe you can open the

22   door, because again, it doesn't matter for your -- it's -- it's

23   about the witnesses.  So let's go on at 10:45.  If you need

24   some more time, then just let us know, okay?

25       MR. DAVIS:  Thank you.



1      JUDGE TRACY:  Let -- we're off the record.  Thank you.

2    (Off the record at 10:33 a.m.

3      JUDGE TRACY:  And I'm assuming you're now handing it off

4    to Mr. Davis.

5      So Mr. Davis, if you could call Respondent's next witness,

6    please.

7      MR. DAVIS:  Yes, Your Honor.  Thank you.  The Respondent

8    would call Lisa Newell.

9      JUDGE TRACY:  Okay.  All right.  And Mr. Davis, I see that

10   you're in a different room now.  Is there anybody with you?

11     MR. DAVIS:  No, I'm by myself in the same room I was in

12   before.  If you want me to toggle the camera around, a little

13   bit.  And I do have the door shut, so I am by myself.

14     JUDGE TRACY:  Yeah, you're fine.  And you can open the

15   door.  As I said, set you off the record, you're the attorney,

16   so I don't -- it doesn't matter as much, but I just like to

17   know, at least for the purposes of the record, if there's

18   somebody else like another attorney or so and so -- or so forth

19   with you, just as much as we would see in an in-person hearing

20   who's sitting next to you.

21     And Mr. Roberts, you have Mr. Pautsch in the room with

22   you, along with your legal assistant that's in there? .

23     MR. ROBERTS:  That is correct.  Thank you.

24     JUDGE TRACY:  Okay.  And then I'm assuming everybody else

25   is by themselves, as they have been for the entire hearing.



1    All right.

2        So Ms. Newell, if you could just state your name for the

3    record, please.

4        MS. NEWELL:  My name is Lisa Newell, N-E-W-E-L-L.

5        JUDGE TRACY:  Perfect.  And could you raise your right

6    hand, please?

7    Whereupon,

8                           **LISA NEWELL**

9    having been duly sworn, was called as a witness herein and was

10   examined and testified, telephonically as follows:

11       JUDGE TRACY:  Okay, great.  So let me just give you some

12   instructions here.  During the course of this hearing, you'll

13   be testifying, obviously.  The different attorneys will be

14   asking you questions.  Please be sure to provide verbal

15   responses.  It's also very important for you to wait until the

16   question is finished being asked before you start responding.

17   We have a tendency to do that.  And at the end of this, we're

18   making a transcript, and so we need to make sure that the

19   transcript clearly reflects the question asked and your

20   response.

21       If there are any objections, please just wait for me to

22   rule on the objection and let you know whether you should

23   answer the question or not.  If you're having any at any point,

24   any audio or video problems, please let us know.  And I think

25   that that's it.  So -- and then also, by the way, I wanted to



1    know, is there anybody else in the room with you?

2        THE WITNESS:  No one is in the room with me.

3        JUDGE TRACY:  Okay.  And then do you have anything in

4    front of you?

5        THE WITNESS:  I have Exhibit RX-4, RX-5, RX-6, and then

6    the Zoom instructions, water, hand sanitizer, mask, and

7    cheaters.

8        JUDGE TRACY:  Okay.  So what I would like for you to do is

9    if you could just turn over those documents and wait for the

10   attorneys to ask you to turn them over to look at them?  I do

11   that simply because we have a tendency then to start focusing

12   and reading documents instead of listening to the questions.

13   So I just want you to be able to focus on that.  And please be

14   certain that you do not correspond with anybody else,

15   communicate with anyone during the course of this hearing,

16   during your testimony, via email, text messaging, anything like

17   that.

18       We also have a sequestration order in effect in this case.

19   And what that means is that you are not to discuss your

20   testimony with anyone until after the hearing closes.  And then

21   I'm sure that the attorneys for the Respondent, KOIN TV,

22   Nexstar can let you know when the hearing has completed.  All

23   right?

24       THE WITNESS:  Yes.

25       JUDGE TRACY:  Okay.  Thank you so much.



1       Mr. Davis, go ahead, please.

2       MR. DAVIS:  All right.

3                          **DIRECT EXAMINATION**

4   Q    BY MR. DAVIS:  Thank you very much for joining, Lisa.  And

5   I know this is somewhat of an unusual process.  There's various

6   individuals here.  You've obviously met the judge, as well.

7   Ms. Yen is counsel for the Union.  And on your screen as well,

8   there are two attorneys there for the counsel for the General

9   Counsel.  So there's going to be a lot of screens in front of

10  you.  So we'll just try to do the best we can.

11      I just have a few questions for you, actually, and

12  hopefully it won't take long.  So if -- if I ever state

13  something wrong that you don't understand, just let me know and

14  I'll try to rephrase the question.

15      So obviously, you work at KOIN.  Could you tell us what

16  your position is?

17  A    I'm the business administrator.

18  Q    Okay.  How long have you been at KOIN?

19  A    I've been with KOIN for a little over one year.

20  Q    Okay.  Tell us a little bit about what the business

21  administrator's responsibilities are.

22  A    We do human resources, accounts payable, basically office

23  management positions, administrative, finance, and human

24  resources are the main functions.

25  Q    Does that involve, then, managing the human resources



1    information systems?

2    A    That is correct.

3    Q    I'd like you to take a look, if you wouldn't mind, at --

4    turnover RX Exhibit Number 4.

5        MR. DAVIS:  And if -- Mr. Schiff, if you could put that up

6    as well, that would be great.

7    A    All right.

8    Q    BY MR. DAVIS:  Just give me a minute, I think Mr. Schiff

9    is going to put it up so everyone can see it.

10        JUDGE TRACY:  Yes, so one thing -- Ms. Newell, one -- we

11    used the share  screen function on Zoom, so that way all the

12    attorneys and myself can see the document that Mr. Davis is

13    referring to.  So you're free to use the one that's on the

14    screen, the share screen, or the one that's in front of you.

15    But just please confirm that the document you're looking at, if

16    you look at the paper document, is the same as the one that's

17    on the screen, so we're sure that you're -- we're all literally

18    on the same page.  Okay?

19        THE WITNESS:  Yes, ma'am.

20        JUDGE TRACY:  All right.  Thank you.

21        Mr. Davis, go ahead.

22    Q    BY MR. DAVIS:  Yeah, and that was actually my first

23    question.  The exhibit that you've got in your hand, presumably

24    RX-4, is it the same as the one you're looking at on the screen

25    today?



1    A    Yes, sir.

2    Q    Okay.  Could you take a minute to review that document and

3    let me know when you get a chance to look it over?

4    A    I have reviewed the document.

5    Q    All right, can you identify what this document is?

6    A    It's a document listing the names, positions, date of

7    hire, bargaining unit number, and dues checkoff as of January

8    2020 of all the active employees who were part of the NABET

9    bargaining unit as of January 7th, 2020.

10    Q    Did you put this document together?

11    A    Yes, I did.

12    Q    And where did you obtain the data that is used for this

13    document?

14    A    I have a spreadsheet with employee data on my computer,

15    here at work.

16    Q    So I guess it goes without saying that -- that -- would

17    you say this is a -- a fair and accurate reflection of the data

18    by the columns, by the names, position, bargaining unit, date

19    of hire, and dues checkoff?

20    A    Yes, sir.

21        MR. DAVIS:  We would move for admission of RX Number 4,

22    Your Honor.

23        JUDGE TRACY:  Any objections?

24        MS. DEVLEMING:  Likely not, but first, can we scroll to

25    the bottom so we can see the rest of it?  And then I assume



1    that right now this will be uploaded to SharePoint and, or

2    emailed to everyone so we have a copy.

3        JUDGE TRACY:  Okay.  It's not onto SharePoint yet?

4        MS. DEVLEMING:  I --

5        MR. DAVIS:  Yes, it is.

6        MS. DEVLEMING:  Oh, it is.  It is.  Okay, I just have to

7    hit refresh.

8        MR. DAVIS:  I assume so.  Mr. Schiff advised me earlier

9    that it had been.

10       MS. DEVLEMING:  I see it now.  Okay, let me just open it

11   and make sure it's the same.  Okay.  I do have a copy.  No

12   objection.

13       MR. DAVIS:  All right.

14       JUDGE TRACY:  Any objections, Ms. Yen?

15       MS. YEN:  No. --

16       JUDGE TRACY:  Okay.  All right.  Thank you.

17       So Respondent's Exhibit 4 is admitted into evidence.

18   **(Respondent Exhibit Number 4 Received into Evidence)**

19       MR. DAVIS:  All right, Mr. Schiff, if you could now please

20   put Respondent's Exhibit Number 5?

21   Q    BY MR. DAVIS:  And Lisa, I would ask you to do the same

22   thing with regard to this document.

23       Did you put this document together?

24   A    Yes, I did.

25   Q    And could you briefly explain what is on this document?



1    A    This would be the names of the employees who were

2    terminated or left the -- or resigned, no longer with the

3    company since 2017 through 2019.  It's employee name, the

4    position they held, what bargaining unit they were with, their

5    date of hire, if they signed the form agreeing to join the

6    Union and then their date of termination.

7    Q    And I think you already said this, but did you -- you put

8    this document together, correct?

9    A    Yes, I put this document together.

10    Q    And you did that -- did you do that based on information

11    contained in the Employer's HR information systems?

12    A    This was based on information housed in my computer.  The

13    current HR administration system did not have the past data

14    available, but there was an extensive database of terminated

15    employee information available for me to compile the list from.

16    Q    All right.  And then I assume you would testify that the

17    date of termination that you pulled the data from is true and

18    accurate to the best of your knowledge for each person?

19    A    It is accurate to the best of my knowledge, yes.

20        MR. DAVIS:  All right.  I would move for admission of RX

21    Number 5, please.

22        JUDGE TRACY:  Any objections?

23        MS. DEVLEMING:  No objection from General Counsel.

24        MS. YEN:  No objection.

25        MR. DAVIS:  I have no further questions --



1      JUDGE TRACY:  Hold on.  I've got to put it into the

2  record.

3      So Respondent's Exhibit 5 is admitted into evidence.

4  **(Respondent Exhibit Number 5 Received into Evidence)**

5      JUDGE TRACY:  And certainly, though, I hope with questions

6  or even in the -- in your brief, you explained the relevance of

7  the documents -- of this document in particular.

8      Ms. Newell.  Now, you testified that -- you said that this

9  is from 2017 to 2019, those who left KOIN TV; is that correct?

10      THE WITNESS:  Correct.

11      JUDGE TRACY:  But then the last column says date of

12  termination.  So were these employees who voluntarily left or

13  were terminated?  I'm not sure what you mean by that.

14      THE WITNESS:  Date of termination is just a basic human

15  resources term.  It's basically the date of their end of

16  employment.

17      JUDGE TRACY:  Okay.

18      THE WITNESS:  There is no notification whether or not they

19  were terminated on their own accord or if the station

20  terminated them.  It's just the end -- their end of employment.

21      JUDGE TRACY:  Okay, so they weren't, you know, fired for a

22  reason from their jobs.  This is just their end of employment?

23      THE WITNESS:  Just the end of employment.

24      JUDGE TRACY:  Okay.  Thank you so much.

25      All right, Mr. Davis, go ahead, please.



1    MR. DAVIS:  I have no further questions.  Thank you.

2    JUDGE TRACY:  Okay.

3    Who, for the General Counsel, will be questioning?

4    MS. DEVLEMING:  I -- I will, Your Honor.

5    JUDGE TRACY:  Go ahead.

6    MS. DEVLEMING:  Okay, thank you.

7                    **CROSS-EXAMINATION**

8    Q    BY MS. DEVLEMING:  Just one question or set of questions,

9    Ms. Newell.

10    Hi, my name is Liz DeVleming.  I'm one of the two counsels

11    here for the General Counsel.

12    And I just want to ask you briefly about what's been

13    admitted as Respondent's Exhibit 4.  Let me pull that one back

14    up.

15    So Ms. Newell, if you know, can you walk us through

16    which of these job titles are in which of the two bargaining

17    units that NABET Local 51 represented prior to the withdrawal

18    of recognition?

19    A    My understanding is that the assignment editors, creative

20    services producers, and the digital content producers were in

21    the second unit.  The directors, editors, broadcast and

22    maintenance engineers, and technicians, videographers, they're

23    in the unit number 1.

24    Q    Okay.  And what about the graphic artist Rocky Lindgren?

25    A    And the graphic artist, I'm sorry, yes.



1    Q    Okay.  He's in unit 1, as well?

2    A    Yes.

3    Q    Okay.  And then the chief videographer is also a unit

4    position in the first unit?

5    A    That is correct.

6        MS. DEVLEMING:  Okay.  No further questions, thanks.

7        JUDGE TRACY:  Ms. Yen?

8        MS. YEN:  Okay, thank you.

9                        **CROSS-EXAMINATION**

10   Q    BY MS. YEN:  Ms. Newell, when did you prepare Respondent

11   Exhibit 4?

12   A    I'm sorry, I'm having a hard time hearing.

13   Q    Can you hear me now?

14   A    Yes.

15   Q    Okay.  Don't know what happened there.  When did you

16   prepare Respondent Exhibit 4?

17   A    I believe it was close to the January 7th date.

18   Q    That's 2020?

19   A    I don't have the specific date that I created this

20   document.

21       JUDGE TRACY:  And Ms. Yen, maybe restate your -- ask your

22   question again.  I'm not sure if she heard that second part of

23   it.

24   Q    BY MS. YEN:  Okay.  You prepared the document close to

25   January 7 of 2020?



1    A    Yes.

2    Q    Okay.  And then what about Respondent Exhibit 5?  When did

3    you prepare that?

4    A    Sometime within the past two weeks, I believe.

5    Q    And -- and you know, I maybe there's a -- there's an

6    explanation.  But one thing that I don't understand, or is

7    possibly a discrepancy, obviously, I don't know all of these

8    employees in the bargaining unit.  But number 33, Michael Soe,

9    my understanding is that he was still employed earlier this

10    year.  But your termination date here is December 17, 2018.  Do

11    you have any explanation for that discrepancy?

12    A    Yes, ma'am.  He -- he resigned and then he was rehired.

13    Q    Okay.  So this chart does not reflect rehire dates?

14    A    The -- no, it doesn't, because we're -- he was rehired

15    within a time frame where the company allows you to keep your

16    initial -- your original higher due date for benefits and

17    vacation consumption.

18    Q    Okay.

19         MS. YEN:  Judge Tracy, I have just a moment in a breakout

20    room with my client, just to check whether there's any other

21    question about this document?

22         JUDGE TRACY:  Sure.  So let's go ahead and go off the

23    record.  And Mr. Schiff, if you could just put Ms. Yen and Ms.

24    Biggs-Adams in a breakout room.  Does the counsel for the

25    General Counsel want to join in there?



1          MS. DEVLEMING:  If invited, I wouldn't mind.  But up to

2     you, Ms. Yen.

3          MS. YEN:  That's fine.

4          JUDGE TRACY:  And I would, I guess, put Ms. Burke in

5     there, too.  Why not?

6          Ms. Newell, they're just going confer and then we'll come

7     back on the record and they'll ask you, perhaps, more

8     questions, okay?  So if you could just stand by there, it

9     should only be a few minutes.

10         THE WITNESS:  Yes, ma'am.

11         (Off the record at 11:05 a.m.)

12         JUDGE TRACY:  Okay, Ms. Yen, go ahead, please.

13         MS. YEN:  No further questions.  Thank you.

14         JUDGE TRACY:  Okay.  Thank you.

15         Mr. Davis, any further questions?

16         MR. DAVIS:  No, thank you.

17         JUDGE TRACY:  Okay.  Well, Ms. Newell, you're done.  Thank

18    you so much.  Please don't discuss your testimony with anyone

19    until after the close of the hearing.

20         Now, they're all sharing that room, Mr. Davis.  Shall she

21    just leave the documents there?

22         MR. DAVIS:  Yes, if she could leave the -- the three

23    exhibits that are there and the instructions about the Zoom,

24    just in case something happens, that would be great.

25         JUDGE TRACY:  Okay.



1      MR. DAVIS:  Lisa, I don't know if Casey Wenger is outside

2   the door, or if he's somewhere, but if you could ask him to --

3   to step into the room when you leave, that would be great.

4      THE WITNESS:  I will do so.  Thank you very much,

5   everyone.

6      JUDGE TRACY:  Thank you so much.  Let's go off the record

7   until the next person comes in.

8      (Off the record at 11:13 a.m.)

9      JUDGE TRACY:  Mr. Davis, if you could call your next

10   witness, please.

11      MR. DAVIS:  Yes.  We'd like to call Casey Wenger.

12      JUDGE TRACY:  Okay.  Mr. Wenger, if you could just state

13   your name for the record?

14      MR. WENGER:  Sure, it's Casey Wenger.

15      JUDGE TRACY:  Okay.  And if you could raise your right

16   hand, please.

17   Whereupon,

18                           **CASEY WENGER**

19   having been duly sworn, was called as a witness herein and was

20   examined and testified, telephonically as follows:

21      JUDGE TRACY:  All right, thank you.  Let me just give you

22   a few instructions here before your testimony commences.  I

23   understand you still have some documents in front of you; is

24   that correct?

25      THE WITNESS:  No, I just have instructions on the Zoom



 1   meeting.  Should I have -- I don't that I -- well, the only

 2   thing in front of me, I guess, is on my computer screen.  It

 3   looks like a roster for the employees.

 4        JUDGE TRACY:  Okay, well, I think that she -- the last

 5   witness was supposed to leave the exhibits.

 6        THE WITNESS:  Okay.  Oh, wait, yes.  They're all face-down

 7   here.  Yes.

 8        JUDGE TRACY:  Okay.

 9        THE WITNESS:  I'm guessing these are --

10        JUDGE TRACY:  Okay.

11        THE WITNESS:  Yeah, yeah.

12        JUDGE TRACY:  Okay, so keep them face down.

13        THE WITNESS:  Okay.

14        JUDGE TRACY:  And do you have anything else in front of

15   you, before you testify?  I just want to ensure that -- the

16   integrity of your testimony, essentially.  Is there anything

17   else there in front of you?

18        THE WITNESS:  Looks like just information on how to do the

19   Zoom meeting and an order for a Zoom hearing.  And then on the

20   computer screens, it looks like it's a roster of -- I'm -- I'm

21   guessing -- yeah, of the NABET employees.

22        JUDGE TRACY:  Okay.

23        MR. DAVIS:  And Mr. Schiff, we can take that down.

24   That's -- that was --

25        JUDGE TRACY:  Yeah, the screen, the screen.  But you've



1    got other papers in front of you, right, that are turned over?

2    You can keep them turned over.

3        THE WITNESS:  Yes, definitely.

4        JUDGE TRACY:  Okay.  And when you are responding to the

5    questions -- you're going to have questions that are asked of

6    you by the various attorneys involved here.  Please be sure to

7    give verbal responses.  Please also wait for the question to be

8    finished being asked before you respond.  We are creating a

9    transcript of this hearing.  And so we want to make sure that

10   we get the full question and your full response transcribed

11   after this hearing.

12       THE WITNESS:  Okay.

13       JUDGE TRACY:  And I want to make sure that you don't have

14   a cell phone or anything else on you, that you'll be --  I

15   don't -- I'm telling you not to communicate with anyone else

16   during the course of your testimony, in terms of text messaging

17   or anyone else communicating when you provide your testimony,

18   correct?

19       THE WITNESS:  Yes, yes.

20       JUDGE TRACY:  Okay.  And the other thing is, if there are

21   objections, I need you to wait to respond before I tell you

22   whether to respond or not.  And if there are any questions that

23   you have, in terms of audio or video problems, please let us

24   know so we can correct that if there's any trouble that you're

25   having.  Okay?



1          THE WITNESS:  Okay.

2          JUDGE TRACY:  All right.

3          Mr. Davis, go ahead, please.

4          MR. DAVIS:  All right, thank you.

5                          **DIRECT EXAMINATION**

6     Q     BY MR. DAVIS:  Thank you for coming in, Mr. Wenger.  My

7     understanding is that you are currently not employed; is that

8     correct?

9     A     Yes.

10    Q     And why is that?

11    A     I retired.

12    Q     All right.  When did you retire?

13    A     November 15th of 2019, last year.

14    Q     Prior to that, where did you work?

15    A     I worked at KOIN-TV.

16    Q     What was your position at KOIN?

17    A     I was the business administrator.

18    Q     What role or what are the duties of the business

19    administrator at KOIN?

20    A     You know, the duties involve an array of things, ranging

21    from the local HR administrator to taking care of a lot of the

22    FCC compliance, local payables, pretty much that array of

23    things.

24    Q     Who replaced you in that role?

25    A     Lisa Newell.



1       JUDGE TRACY:  And Mr. Winger, could I ask you, I'm not

2    sure how the camera is positioned, but are you able to look

3    directly into the camera?  You seem to be looking -- --

4       THE WITNESS:  Oh, only because the volume's not so loud,

5    so I'm trying to have my ears down.  There's a bunch of noise

6    out here on the sidewalk.  I'll try to just look in the camera.

7    I'll get a little closer, here.

8       JUDGE TRACY:  Yeah.  And you might have to just lean in.

9    And Mr. Davis, what we should do after this witness is maybe

10    sort of troubleshoot over there what's happening.  It could be

11    that there's something on the -- the Zoom audio that needs to

12    be turned up, because this is the second witness who's sort of

13    had to lean in to the system.

14       So as long as Mr. -- Mr. Wenger, that if you can hear by

15    leaning in and looking in, because I just would like to see

16    your face.

17       THE WITNESS:  Okay.  All right.  (Indiscernible) there we

18    go.

19       JUDGE TRACY:  There you go.  There you go.

20       THE WITNESS:  Okay.

21       JUDGE TRACY:  All right.  Thank you.

22       THE WITNESS:  Sorry about that.

23       JUDGE TRACY:  That's okay.

24       Mr. Davis, go ahead, please.

25       MR. DAVIS:  Yes.  Thank you.



1    Q    BY MR. DAVIS:  I'm not sure if I asked you yet, this, Mr.

2    Wenger, but how long were you in that position prior to your

3    retirement?

4    A    About 11 years, almost 12 years.

5    Q    Were you in any other positions before you retired?

6    A    No.

7    Q    I know this is going to be a difficult question, but I to

8    draw your attention to the period shortly before you retired.

9    It would have been about November -- about this same time last

10   year.  During that time period, do you recall any conversations

11   with any people in -- in the two bargaining units about whether

12   or not they wanted to remove NABET as their bargaining

13   representative?

14        MS. DEVLEMING:  Objection, Your Honor.  Calls for hearsay.

15        JUDGE TRACY:  Sustained.

16        MR. DAVIS:  Your Honor, I -- I believe in these kinds of

17   cases that the witness is allowed to testify and provide the

18   oral testimony of those who've indicated they no longer want to

19   be represented.  And there's prior Board cases, and I'll

20   withdraw, where that kind of testimony is allowed.  It goes to

21   the weight maybe, but it's allowed to develop what the Employer

22   knew about at the time they made the decision to withdraw,

23   whether it's in a written statement or an oral statement, such

24   as what he would testify to.

25        MS. DEVLEMING:  Your Honor, I'm aware of no Board cases



1    that overturn hearsay rules.  This is an out-of-court statement

2    offered for the truth of the matter asserted as hearsay.

3         MR. DAVIS:  Your Honor, the Board cases that we are aware

4    of, where the Board has allowed this type of testimony and

5    statements, where it was the oral statements of a bargaining

6    unit employee made to a member of management.  The one that

7    comes to mind is Green Oak Manor is one 215 NLRB 658.  That --

8    that is also referred to in Pacific Coast Supply, which is 360

9    NLRB number 67, page 538.

10        And in addition to that, when there was guidance issued

11   after the Levitz decision, that is obviously the focus, the

12   General Counsel did instruct -- provide guidance that when

13   hearsay is the information that would be utilized to determine

14   whether or not there was an appropriate withdrawal, that the --

15   the Regional Counsels are to reach out to the General

16   Counsel --counsel for General Counsel to discuss what they

17   would do in that scenario.  So (simultaneous speech) --

18        MS. DEVLEMING:  Your Honor, that is absolutely incorrect.

19        JUDGE TRACY:  Okay, okay.  So wait for him to finish,

20   please.

21        MR. DAVIS:  Those are -- yeah.

22        JUDGE TRACY:  Could I hear, Mr. Davis, again, what -- that

23   last part of what do you just said?

24        MR. DAVIS:  Yeah, the last item that we're aware of is --

25   is General Counsel 2-01, issued October 22nd of 2001, after



1    Levitz was issued.  And it addresses if hearsay is the basis

2    of -- of the evidence to an employer would like to put in, that

3    they would --  counsel for General Counsel could seek advice

4    from compliance, or from advice, excuse me.

5         MS. DEVLEMING:  Counsel for the General Counsel does not

6    seek advice from the division of advice for trial strategy.

7    Either way, Your Honor, under current board law, the only

8    relevant testimony would be the truth of the matter asserted,

9    meaning whether these employees, in fact, preferred for the

10   Union to no longer represent them.  The impact on Mr. Wenger or

11   any other witness of what they had to say is irrelevant, under

12   Board law.

13        What -- besides that, at this point Mr. Davis seems to be

14   trying to get the hearsay testimony for the truth of the matter

15   asserted, which is absolutely hearsay and not allowed.

16        JUDGE TRACY:  So obviously, this is coming up and I don't

17   have time to do any research at this point.  So what I'm going

18   to do is I'm going to overrule the objection, allow the

19   testimony, but I do so only to essentially reserve my ruling

20   for the decision, so that way I can take a look at these

21   things.  Because at this point, I am in agreement with the

22   General Counsel.

23        However, you know, I don't have time to look at these

24   cases which say the opposite.  So I'm going to allow it, but

25   also note that it -- it will go to the weight of whether -- the

 1    weight of his testimony, because, you know, you all could've

 2    just called these employees in to testify if you wish.  So --

 3    but we're going to leave it at that.

 4         The other thing is, is that, as I've said before, the

 5    General Counsel memos do not apply to me.  I must follow Board

 6    law.  So to the extent that you're relying upon that, that --

 7    that's fine.  But I'm going to look specifically at these

 8    cases.  But again, I want to put you on notice that my decision

 9    may reflect that I haven't given any weight to this testimony

10    about what other employee -- what the employees -- bargaining

11    unit employees have told him.  They're not party

12    representatives in this case.  And so I -- I may just say,

13    yeah, you know what, it is hearsay and  I don't give it weight,

14    okay?

15         MS. DEVLEMING:  Your Honor, if I may?  Just so I don't

16    waste a lot of our time, General Counsel will have a standing

17    objection on both hearsay and relevance grounds to all such

18    questions.  And I'm perfectly happy to break to give you a

19    chance to read the cases, which have nothing to do with the

20    hearsay rule.

21         JUDGE TRACY:  Well, again, I just kind of move on with it,

22    so we'll just let it in.  But again, as I said before, I am

23    inclined strongly to -- to agree with the General Counsel's

24    basis for the objection.  But I'm just going to allow it in

25    just to -- just to move this along.  Okay?



1        So Mr. Davis, go ahead.

2        MR. DAVIS:  Thank you.

3        MS. YEN:  Can I just state for the record, I want to join

4    in the standing  objection.

5        JUDGE TRACY:  Oh, yes.  I'm -- I apologize.  Yes.

6        I -- so go ahead, Mr. Davis.

7        MR. DAVIS:  Okay.

8    Q    BY MR. DAVIS:  The question that I'd ask you is, if you'd

9    had any conversations with employees, were they advised you

10   that they wanted to remove NABET as the representative, in some

11   time about this period last year?

12   A    I did have conversations with employees.  Probably not

13   right directly at this period, but within months of this area

14   where they came in and talked with me.

15   Q    Okay.  Do you recall any employees in particular?

16   A    You know, yeah.  I can think of a few names.  And again, I

17   hate to say -- I don't have my notes and I've been gone for a

18   year, but there were a few that came in I can think of right

19   offhand.  Cambrie, again, I can't remember last name, just

20   because I haven't been here for a while.  Boy, there's probably

21   four or five people.  And I don't know if you're allowed to

22   share names to refresh my memory and then I can tell you.

23   Sorry.

24   Q    Well -- well, you said Cambrie.  Would it be Cambrie

25   Juarez?



1    A    Yes, yes.

2    Q    Is that her last name?  Or I don't know if that's a man or

3    a woman, actually, from that name.

4    A    Cambrie was one of our digital web producers.

5    Q    Okay.  What do you remember about that conversation?

6    A    I mean, she came into me and she was -- I know she was

7    upset because she didn't want to have to pay Union dues and

8    fees and she came to talk to me about that.  She felt

9    threatened that if she didn't pay them, that she can be

10   terminated.

11   Q    Did she tell you anything else about wanting to remove the

12   Union?

13   A    Yeah, she asked, how can I get out of the Union or not be

14   in the Union?

15   Q    What did you tell her?

16   A    I provided her some information to the National Right to

17   Work group and said you should call them.  They have attorneys

18   that you can work with.

19   Q    Do you recall about when that conversation occurred?  If

20   it was just one, I should say.

21   A    Yeah.  You know, I -- I can't remember dates or anything.

22   Q    Was it close to the time you retired?

23   A    Yeah.  Beings that we had been in negotiations in -- it

24   was kind -- I know it was towards the end of the summer, if I

25   remember right, that the Union had offered the employees they



www.escribers.net | 800-257-0885

1    would waive dues and fees -- or not dues and fees, but waive

2    the initiation fee if they signed up at that time.  And that's

3    kind of when fired people up.  They -- they knew something was

4    going on.  She didn't want to pay dues, just because they were

5    very expensive and she was on a tight budget.

6    Q    So -- so that's Cambrie.  Do you recall anybody else?

7    A    I mean, there's four or five other people.  I don't

8    remember names.  Sorry.

9    Q    I'll give you some names that are on the list.

10   A    Sure.

11   Q    Did you talk to Levan Funes (simultaneous speech) --

12        MS. DEVLEMING:  Objection, Your Honor.  Objection, Your

13   Honor.  Leading.

14        JUDGE TRACY:  Sustained.  Sustained.  Please don't answer

15   that question.

16        THE WITNESS:  Okay.

17   Q    BY MR. DAVIS:  Is there anything that might refresh your

18   recollection on who you might have talked to?

19   A    I mean, I -- I documented, had notes on all the people I

20   talked with and what our conversations were.

21   Q    All right.  And I -- you don't have those with you at all,

22   I assume?

23   A    No.

24   Q    Okay.  Would a list -- would looking at the list of the

25   bargaining unit people help refresh, in any way, who you spoke



1    with?

2        MS. DEVLEMING:  I'm going to object again to leading.

3        THE WITNESS:  Yeah --

4        JUDGE TRACY:  Ov -- hold on.  Hold on.  Overruled.  Go

5    ahead.

6    Q    BY MR. DAVIS:  All right.

7        MR. DAVIS:  If we could, Mr. Schiff, put, I think General

8    Couns -- or Respondent's Exhibit Number 4 up on the screen.

9    Q    BY MR. DAVIS:  And Mr. Wenger, if you could look at --

10   turn over.  It may be the top sheet.  I'm not sure what's in

11   front of you, but turn that over and look at Respondent's

12   Exhibit Number 4, please, at the same time.

13   A    Yeah.  The list of employees.

14   Q    Does it say RX-4 at the top of it?

15   A    Yeah, RX-4.

16   Q    All right.  It's going to be on the screen, as well, in a

17   second, I believe, so.

18   A    Okay.

19   Q    All right, could you take a moment just to look at that

20   and refresh your recollection, if you recall talking to any of

21   those individuals?

22   A    Sure.  Yeah, I mean, seeing some of these names, I

23   definitely talked to some of these folks.

24   Q    And I'll just give you a few minutes.

25   A    So am I okay to start naming the ones I --



1    Q    Yeah, just -- if you wouldn't mind, yes.

2    A    Okay, yes.  So Derric Crooks is a creative service

3    producer.  Kelly Doyle, digital content producer.  We talked

4    about Cambrie Juarez.  Levan Funes, I know he came in and

5    talked with me.  Brian Watkins was another one who talked with

6    me.  I think that's the main folks.

7    Q    All right.  Well, let's start with the first one.  What do

8    you recall from your conversation with Derric Crooks, was the

9    first time I believe you gave.

10   A    So Derric Crooks, I don't know if he had a background.

11   When I -- when we first hired him and I met him as a new hire

12   at his new hire orientation, he did not like having to be in a

13   Union.  And he told me he was not going to (audio

14   interference) -- he also at that time wanted to know what is it

15   he needs to do not to be in the Union.  And as always, I

16   referred him to the National Right to Work group.  He was a new

17   employee, so again, he just came in asking me about the Union

18   and not wanting to join into the Union.

19   Q    Anything else?

20   A    No, that's pretty much it for him.

21   Q    All right.  I think the next thing you gave was Kelly

22   Doyle.

23   A    Yeah.  Kelly was also a digital content producer with

24   KOIN.  She was, again, as a new hire, not wanting to join into

25   the Union.  She was a young -- young lady out of college,



1    didn't want to have to pay the expensive dues and fees.  And

2    she felt like she couldn't afford to work here if -- if she was

3    going to get hit with those charges.  And again, she wanted to

4    know the same thing.  What does she need to do to not join the

5    Union?

6    Q    Okay.  Anything else that she told you?

7    A    No.

8    Q    All right.  I might have these out of order, but I think

9    the next person you mentioned was Brian Watkins.

10   A    Yes, Brian Watkins.  So Brian is one of the photographers

11   or videographers here, at KOIN.  He's been here quite a while.

12   His story was a little bit longer because Brian was on the

13   negotiation team when we were negotiating for a new contract.

14   Brian also removed himself from the negotiation team and then

15   came and visited with me on how do I get out of the Union?  He

16   did not like what had happened in negotiations and he did not

17   want to be part of it any longer.

18   Q    Did he say anything else that you recall?

19   A    Again, he wanted to know how to -- how to work or how to

20   get out of it and that was about it.

21   Q    I think the -- maybe the last one you gave was Levan

22   Funes.

23   A    Yeah.  And Levan, as a new hire here at KOIN, he came from

24   a previous station that he had been in the NABET Union and he

25   disliked it very much.  And when he sat down with me to do a



 1  new hire orientation, he refused.  He was not going to join the

 2  Union and he was not going to pay dues and fees.  He just made

 3  it clear to me, that he wanted no part of the Union.

 4  Q    And did I miss any of the names that you just gave there?

 5  I tried to write them down, but I didn't --

 6  A    Yeah, let me look through.  I think -- I think we got them

 7  all.  Let me double-check here.  Yes, I think that's -- that's

 8  all that I gave you.

 9  Q    Okay.  Did you ever talk to any other employees who are

10  not on that list -- maybe they terminated and are gone -- about

11  this issue?

12  A    You know, over the years, there's no doubt I talk to

13  people with the same type of questioning on how to get out of

14  the Union in the same information was provided to them.  Again,

15  I can't recollect names, but 100 percent know that, yes, people

16  did come in to me and ask that same question, and shared their

17  concern about paying Union dues and fees and how to be removed

18  from the Union.  Again, I don't remember names these people.

19  Q    And these people, would they have been departed by January

20  7th anyway?

21  A    Yeah, yeah.

22  Q    Yeah, okay.  Did you talk to anyone about these

23  conversations with these employees?

24  A    Yes.  So I took that information to the general manager of

25  KOIN, which was Pat Nevin, and also with Chuck Pautsch, the --



1    our labor attorney.

2    Q    Okay.  Do you remember when about -- was that before you

3    retired or after?

4    A    That was before I retired.

5    Q    Okay.

6    A    In general -- yeah.

7         MR. DAVIS:  I think that's all the questions that I have

8    for this witness, then.

9         JUDGE TRACY:  Ms. DeVleming?

10        MS. DEVLEMING:  Thank you, Your Honor.

11                      **CROSS-EXAMINATION**

12   Q    BY MS. DEVLEMING:  Hi there, Mr. Wenger.  My name is Liz

13   DeVleming.  I am one of the two counsels here in the Zoom

14   conference for the General Counsel, along with co-counsel Sarah

15   Burke.  And I just have a couple of questions about your

16   testimony just now.

17   A    Okay.

18   Q    So Mr. Wenger, I believe you named five employees on your

19   direct examination just now that you allegedly spoke to about

20   their feelings on the Union; is that right?  I can give you

21   those names:  Cambrie Juarez, Derric Crooks, Kelly Doyle, Levan

22   Funes, and Brian Watkins.

23   A    Yes.

24   Q    Are you aware, Mr. Wenger, that other managers at KOIN

25   also talked to some of those specific employees about their



1    feelings about the Union?

2    A    Yes.

3    Q    Are you aware, for example, that Pat Nevin (audio

4    interference) Watkins?

5    A    Yes.

6        JUDGE TRACY:  Sorry, Ms. DeVleming, I couldn't hear that

7    question.  It sort of cut out in the middle of it.

8        MS. DEVLEMING:  Oh, I'm so sorry.  And I hope my internet

9    connection sticks with us today.  Please do let me know, Mr.

10    Wenger, or anyone else, if there's trouble hearing me.

11    Q    BY MR. DAVIS:  Are you aware that Pat Nevin, for example,

12    spoke with Brian Watkins?

13    A    Yes, I was aware.

14    Q    Are you aware that Rick Brown also spoke with Levan Funes?

15    A    Yes.

16    Q    And I believe you testified pretty clearly on direct that

17    all of these conversations occurred months before your November

18    2019 retirement from KOIN; is that correct?

19    A    Yes.

20    Q    And in fact, all of them occurred months, if not even

21    years prior to the January 8th, 2020 withdrawal of recognition;

22    is that right?

23    A    Can you state that one more time?

24    Q    Sure.  All of the conversations you described with those

25    five employees occurred between several months to up to a



1  couple of years before the January 2020 date at issue in our

2  hearing today, where the withdrawal of recognition was done; is

3  that right?

4  A    Yes.

5  Q    Some of these conversations with employees about their

6  lack of support for the Union happened as early as 2017/2018,

7  when the parties had just begun bargaining; is that right?

8  A    You know, I hate to say it.  I can't recollect the date.

9  Again, I've been gone and haven't looked at notes or anything.

10  Q    Okay.

11      MS. DEVLEMING:  Your Honor, I think I'm going to leave it

12  at that.  No further questions for Mr. Wenger.

13      JUDGE TRACY:  Okay.

14      Ms. Yen?

15      MS. YEN:  No questions.

16      JUDGE TRACY:  Okay.  Mr. Davis?

17      MR. DAVIS:  I have no rebuttal -- or further questions.

18      JUDGE TRACY:  Okay.  All right.  Mr. Wenger, thank you

19  very much for your testimony today or your participation,

20  rather.

21      Please leave all the documents in front of you, right, Mr.

22  Davis?  He should leave him there, correct?

23      MR. DAVIS:  Yes, that'd be great.  I think there's another

24  witness lined up.  I had two lined up, so I might need to

25  double-check on who's next, if they'd be in the same room.



1      JUDGE TRACY:  Okay.  And Mr. Wenger, I just want to direct

2    you that you are not to discuss your testimony with anyone

3    until after the close of the hearing, which may be today.  But

4    you don't you'll find out confirmation of that, if you'd like,

5    from Respondent's attorneys.  So just until that time, you're

6    not to discuss your testimony with anyone else.

7      THE WITNESS:  Okay.

8      JUDGE TRACY:  And thank you very much.  And you can -- --

9      THE WITNESS:  Thank you.

10      JUDGE TRACY:  I think what they're having you guys do is

11    just leave the room.

12      And Mr. Davis just you need to find the next witness?

13      MR. DAVIS:  Unless -- Mr. Schiff, if he can confirm, did

14    anybody dial into the waiting room who is not at that location?

15      THE WITNESS:  I don't see anything on here.

16      JUDGE TRACY:  Yeah, you're not going to know.  You're not

17    going to know.

18      MR. SCHIFF:  No one in the waiting room.

19      MR. DAVIS:  Okay.  If we might go off the record, I can

20    double-check to see who the next person that would be stepping

21    in would be thought.

22      JUDGE TRACY:  Sure.  Let's go off the record.  And also,

23    Mr. Davis, you're going to want to figure out if there's

24    anybody -- well, it's a television station, goodness sakes --

25    but fixing the Zoom -- the computer audio there, and if there



 1    is a way to increase it so they can hear the sounds.

 2         MR. DAVIS:  You're exactly right.  There should be

 3    somebody here that can figure that out.  And I will get

 4    somebody on that right away.

 5         JUDGE TRACY:  Okay.

 6         MR. DAVIS:  Yeah, if we might take a few minutes, just

 7    make sure I get somebody there, if you wouldn't mind.  The --

 8    the next witnesses should be fairly quick, so we could move

 9    fairly quickly through them.  And I want to make sure I've got

10    several scheduled.

11         JUDGE TRACY:  And now, how many more witnesses you guys

12    have?

13         MR. DAVIS:  I think just -- I just -- I don't know that my

14    cocounsel has any others, but I have two or three additional

15    ones.

16         JUDGE TRACY:  Okay.  Mr. Roberts, anybody else?

17         MR. ROBERTS:  No.  Sorry, I -- I was on mute.

18         JUDGE TRACY:  Okay.  I just wonder -- it's, like, 11:40,

19    if we want to do one more of those witnesses and then -- or if

20    they're going to be really brief, like your other two have

21    been, we can kind of get through them and then take a lunch

22    break.  Or I don't know.  I -- you know, the General Counsel

23    might have rebuttal.

24         So I'm just wondering, are your -- are your remaining

25    witnesses, Mr. Davis, quick, too?  Or are they going to be


www.escribers.net | 800-257-0885

1    longer?

2        MR. DAVIS:  A couple of them should be pretty quick, Your

3    Honor.  One individual who -- Pat Nevin, he doesn't work here

4    anymore and he asked if I could schedule a start and stop, or

5    at least a start time with him, because he's not available

6    until 1 p.m.  So if we could try and get through a few of the

7    short ones, maybe then schedule him, that would be great.

8    And -- and then that -- then I would know if I've even got any

9    additional ones.

10       JUDGE TRACY:  All right.  So how about we do this?  Please

11   confirm him for 1 p.m.

12       MR. DAVIS:  Okay.

13       JUDGE TRACY:  And what we'll do is whoever you have ready,

14   we'll go through and then we can just take a quick lunch break,

15   just to make sure that we can finish up.  It sounds like we can

16   really finish up this hearing today.  So let's -- let's aim for

17   that, if we want to do that.

18       Any problems that anybody has with that?

19       MS. DEVLEMING:  No, Your Honor.

20       JUDGE TRACY:  So let's take a five-, ten-minute break.  I

21   say five to ten minutes so that you can see if anybody can fix

22   the audio, you could find the next witness.  So it'll be five

23   to ten minutes, okay?

24       MR. DAVIS:  Okay.

25       JUDGE TRACY:  All right.  Thank you.



1          MR. DAVIS:  Thank you.

2          (Off the record at 11:44 a.m.)

3          JUDGE TRACY:  All right.  Mr. Davis, if you could call

4     your next witness, please.

5          MR. DAVIS:  Yes, (audio interference) Douglas Key.

6          JUDGE TRACY:  Okay, all right.  So if you could state your

7     name for the record,

8          MR. KEY:  My name is Douglas Jacob Key, K-E-Y.

9          JUDGE TRACY:  If you could go ahead and raise your right

10    hand, please.

11    Whereupon,

12                              **DOUGLAS KEY**

13    having been duly sworn, was called as a witness herein and was

14    examined and testified, telephonically as follows:

15         JUDGE TRACY:  Okay, great.  So let me give you some

16    instructions there.  If you have any trouble hearing or have

17    any video troubles, please let us know.  But during the course

18    of your hearing, you're going to be asked questions by the

19    various attorneys here in this case.  Please give verbal

20    responses to their questions.  Please also wait for their

21    questions to finish being asked before you respond

22         If there is an objection, please don't answer the

23    question.  Wait for me to make a ruling on the objection and

24    let you know whether you should answer the question or not.  Do

25    you have anybody there present with you in the room?



 1        THE WITNESS:  No, I'm by myself.

 2        JUDGE TRACY:  Okay.  And do you have anything in front of

 3   you that you've brought in?

 4        THE WITNESS:  No, I just have a bottle of water and my

 5   mask.

 6        JUDGE TRACY:  Okay.  There are some documents there in

 7   front of you; is that correct?

 8        THE WITNESS:  There is a piece of paper that's upright and

 9   then like three pieces of paper that are turned over that I

10   can't see, so --

11        JUDGE TRACY:  Okay.

12        THE WITNESS:  -- (simultaneous speech) looked at those.

13        JUDGE TRACY:  Yes.  So those are probably documents that

14   perhaps the attorneys will ask you to take a look at and maybe

15   not.  I'm not sure.

16        THE WITNESS:  Okay.

17        JUDGE TRACY:  Just wait for them to do that.  And it's

18   important that during this hearing that you do not communicate

19   with anyone else during the course of your testimony via any

20   cell phone or emails or text messages or anything like that.

21   Okay?

22        THE WITNESS:  Yes, I left my cell phone out of the room.

23        JUDGE TRACY:  Okay.  All right.  Well, thank you.

24        Mr. Davis, go ahead, please.

25   ///



1                              **DIRECT EXAMINATION**

2     Q    BY MR. DAVIS:  All right, Mr. Key, good morning.  How are

3     you today?

4     A    Hi, not too bad.

5     Q    Good, good.  Could you tell us, are you an employee of

6     KOIN?

7     A    Yes, I am.  I'm a photojournalist.

8     Q    Okay.  How long have you been employed by KOIN?

9     A    12 years and, like, 10 months.

10    Q    Okay.  And as a photojournalist, are you in the bargaining

11    unit that is represented by NABET?

12    A    Yes, I am.

13    Q    And are you a Union member of NABET?

14    A    Yes, I am.

15    Q    What do you do as a photojournalist?  Just to kind of give

16    us a little background, because we're going to be talking about

17    some other, I think you call them photogs, is what you refer to

18    commonly.

19    A    Yeah, laymen's terms we are -- is photog.  I go out and

20    shoot news daily, shoot ahead sometimes, get with the reporter,

21    do live shots, edit the story, put the story together.

22    Q    Is that it?  Is that all?

23    A    I think so, yeah.

24    Q    Okay.

25    A    We would edit, do live shots, drive around, get video.



1    Q    Do -- do you recall -- I want to draw your attention to

2    approximately a year ago today, let's just say.  Were you part

3    of any effort to try and remove NABET as your bargaining

4    representative?

5    A    Me and another person who works here were discussing that,

6    yes.

7    Q    Who is that other person?

8    A    Brian Watkins.

9    Q    And what was your goal?

10    A    To get rid of NABET and bring in a better Union.  That was

11    our goal.

12    Q    And -- and what did you do as part of that effort?

13    A    Me and Brian talked about other unions that were in the

14    area and talked about what employees that we knew were unhappy

15    with the Union.

16    Q    Did you talk to any other employees about this?

17         MS. DEVLEMING:  Just for the record, one time I'm going to

18    reiterate my standing objection to hearsay.

19         MS. YEN:  Yes, and I will also object.  It appears to have

20    no purpose, other than the fact of the matter asserted and is

21    therefore, inadmissible.

22         THE WITNESS:  I did not understand what Anne just said.  I

23    couldn't hear her.

24         JUDGE TRACY:  So basically, she was just explaining the

25    basis for her objection.



1    THE WITNESS:  Oh, okay.

2    JUDGE TRACY:  Okay, so I will overrule the objection, but

3    I will say it's premature.  He was just asked if he had spoken

4    to anybody and there wasn't a question yet about what someone

5    had said.  And that is the hearsay problem of it.  So I would

6    recommend that if it gets to that point, then then you can

7    state your objection, because we're still a little bit before

8    that has happened, if at all.  Maybe he doesn't even ask that.

9    Go ahead, Mr. Davis.

10    Q    BY MR. DAVIS:  Actually, that was going to be my next

11    question.  Mr. Key, do you remember names of the individuals

12    you spoke to in that time period?

13    A    Directly or in groups?

14    Q    Well --

15    A    Because sometimes we would talk as a group of

16    photographers and editors and you -- people would voice their

17    opinion.

18    Q    Well, let's say both.  I mean, meetings where you were

19    present is what I'm asking about, whether it was a one-on-one

20    conversation or in a group setting.

21    A    Okay, so what was your question, again?

22    Q    Do you recall talking to other individuals about that,

23    whether they wanted to remove the Union?

24    A    Yes, I do.

25    Q    And who do you recall off the top of your head?



1    A    Chris, from engineering, Brian Watkins, photographer, Bill

2    Cortez.  Those are the three people that I talked to about

3    getting rid of the Union that we currently have.

4    Q    And did those three tell you they wanted to remove the

5    Union?

6         MS. DEVLEMING:  Objection.  Calls for hearsay.

7         MS. YEN:  I join in that objection.

8         JUDGE TRACY:  Yes, so the objection is overruled, only

9    because I'm going to allow the testimony.  But I will note that

10   at this point I do find it to be hearsay and -- but I'm going

11   to allow it.  It just really goes the weight of how much I

12   afford it in -- in the decision.

13        MR. DAVIS:  Okay, thank you.

14        That means you can answer.

15        JUDGE TRACY:  Oh, yeah.  I'm sorry.  Go ahead.

16        THE WITNESS:  Can I hear the question again?

17        JUDGE TRACY:  Yeah, Mr. Key, you can answer the question.

18   But actually, before you even get there, I don't know what time

19   period this is.  So could you please establish for the record

20   when these conversations are going on?

21        THE WITNESS:  These were going on from October 2019 to,

22   like, January 2020.

23        JUDGE TRACY:  Okay.

24        Go ahead, Mr. Davis.

25   Q    BY MR. DAVIS:  All right.  And I don't know that I got all



 1    the names correct, but I think you said Chris, Brian, and Bill.

 2    Were those the three names of the people that you said you were

 3    coordinating --

 4    A    Yes, those are the three people that I directly talked to

 5    and they said they wanted a better Union --

 6    Q    Okay.

 7    A    -- and to get rid of NABET.

 8    Q    All right.  Did you talk to anyone else?

 9    A    Not directly, one on one.

10    Q    Well, in a group setting, then?

11    A    In a group setting, we -- a lot of us would talk about the

12    Union and the issues we were having.  And other people voiced

13    their concerns and reasons for not wanting the Union or not

14    understanding what is the Union actually doing for us.

15    Q    And I want to make sure I've got the names correct.  You

16    said Chris, Brian, and Bill?

17    A    Yes.

18    Q    What is Chris' last name?

19    A    It's, like, Thibodaux.

20    Q    Okay.

21    A    He's an engineer.

22    Q    And Brian is Brian Watkins?

23    A    That is correct.

24    Q    And was it Bill or William was the last one?

25    A    It is Bill Cortez.  I believe his full name is William,



1    though.

2    Q    Okay.  All right.  In these group settings with -- do you

3    recall that -- some of the names of the other individuals you

4    would've spoken to in those settings?

5    A    Other people said they didn't want the Union or didn't

6    understand what the Union was doing for us.  And yes, I do know

7    the people who said things.

8    Q    Okay.

9    A    Karl is the morning photographer.  Actually, you probably

10   know by a different name.

11        JUDGE TRACY:  Well, don't look at anything unless somebody

12   asks you to do that, please.

13        THE WITNESS:  Sorry.

14        MR. DAVIS:  Yeah --

15        THE WITNESS:  This is a list of the photographers.  I was

16   just -- it's a piece of paper sitting here, because I don't

17   know what --

18        JUDGE TRACY:  No, again, I'm directing you not to look at

19   any documents, okay?

20        THE WITNESS:  Okay.

21        JUDGE TRACY:  (Simultaneous speech) --

22        THE WITNESS:  Karl -- last name is --

23        JUDGE TRACY:  Hold on a minute.  Can you please wait?

24   Wait for me to tell you that it's time to answer the question.

25        THE WITNESS:  Okay.



1        JUDGE TRACY:  So Mr. Davis, let's restart.

2        MR. DAVIS:  Okay.

3        JUDGE TRACY:  Thank you.

4   Q    BY MR. DAVIS:  I'd ask you if you've talked to any other

5   people and you had said Karl was the name, but we might know by

6   some other name.  What one other name does he go by?

7   A    His last name is -- his -- he goes by Karl, but his last

8   name is Peterson, Karl Peterson.  That's what we know him as.

9   But I don't know what his real last name -- his real first name

10  is, because I think Karl's his middle name.

11  Q    John Karl Peterson.  Would that --

12  A    That does ring a bell, yes.

13  Q    Okay.  And what is Mr. Peterson tell you?

14  A    He did not want the Union here no more.

15  Q    And any other names that you recall?

16  A    There was a few that we talked about that talked about

17  their discomfort and not wanting the Union here.  Cambrie was

18  one of them.  She's a web designer or web producer.

19  Q    Anyone else?

20  A    I also believe Richie, and Robby, and Jay (phonetic).  He

21  works the morning show, also.

22  Q    I don't know -- let me pause you there a little bit.  When

23  you say Richie --

24  A    Richie --

25  Q    Could you do the last names, if you recall them?



www.escribers.net | 800-257-0885

1    Because --

2    A    Yeah, Richie Robertson (phonetic).

3    Q    Okay.  And you said Robby?

4    A    Robby -- God, I can't remember Robby's last name off the

5    top of my head.

6    Q    Okay.  Robert Sherman is the only Robby --

7    A    Sherman, that's what it is, yeah.

8        MS. DEVLEMING:  Objection, Your Honor.  I allowed it once,

9    but this is leading.

10       JUDGE TRACY:  You know --

11       THE WITNESS:  Sorry, I --

12       JUDGE TRACY:  -- I'm not going to overrule it, but go

13   ahead, to the extent that he can recall from his memory.  You

14   know, I can understand also that last names may not be known to

15   one another.  So let's just kind of move this along, so we can

16   keep going.

17       MR. DAVIS:  All right, thank you.

18   Q    BY MR. DAVIS:  And I'll try to move quickly through this.

19   And if you don't remember names, we can try and refresh you.

20   But any other names that you remember specifically involved in

21   these conversations?

22   A    Andrew Bisset.  He was another one that wanted the Union

23   gone, too.  From the conversations that we had in groups.

24   Q    Okay.  Do you remember any other names?

25   A    Not in those groups, no.



1     Q     Okay.

2     A     Those are the main people that I remembered that voice

3     their opinion.

4     Q     All right.  Did you -- would anything refresh your

5     recollection of these conversations, if you -- if you can't

6     remember the names?

7     A     Well, those are the people that I know -- I heard them say

8     that they didn't want the Union here no more --

9     Q     Okay.

10    A     -- or they didn't understand what the Union was doing for

11    us or why they were in the Union.

12    Q     Okay.  And is that all you remember at this time?

13    A     Those are the people that I heard directly from, yes.

14    Q     Okay.  Would -- would anything refresh your recollection

15    as to any other people you might have had conversations --

16          MS. DEVLEMING:  Objection, Your Honor.  Asked and

17    answered.

18          JUDGE TRACY:  Sustained.

19    Q     BY MR. DAVIS:  Okay.  All right.  Let me take a second,

20    here.

21    A     Are you familiar, Mr. Key, with the two separate units

22    that are at KOIN right now?

23    A     You mean like the separation between the photographers,

24    editors, directors, and then the web and the assignment desk?

25    Q     Yeah.  I think you commonly refer to them as unit 1 and 2,



1    but yes.

2    A    Yeah, yeah.

3    Q    And you're in the group with the other, obviously -- the

4    photogs and the directors, editors, but you're not in the group

5    with the digital content folks.  Is that how you guys separate

6    them?

7    A    That is what I believe, yes, that the assignment desk and

8    the web people are in a different -- they're, like, number 2.

9    They're in group 2.

10    Q    And like the -- the editors, are they in your group?

11    A    I believe so, yes.

12    Q    Okay.  Like -- and by the editors, I mean, like James

13    Boehme --

14    A    Yes.  He's an editor.

15    Q    Nathaniel Hartwig, Christian Montes, Michael Moore?

16    A    Yeah, they're all editors.

17    Q    Okay.  In your conversations, did you talk with the

18    editors about the Union?

19        MS. DEVLEMING:  Objection, Your Honor.  His recollection

20    of events has been thoroughly exhausted.  He's testified

21    multiple times that he has shared all the names and details of

22    the conversation he's had with other employees about the Union.

23        MR. DAVIS:  Well, I disagree.  I'd asked if he's -- if

24    there was anything that would refresh and then I'm trying to go

25    over the list of names to see if you had conversations with



www.escribers.net | 800-257-0885

1    these individuals, to see if that does.

2        MS. DEVLEMING:  And Your Honor, he answered that nothing

3    would refresh him.  He is confident that he has testified to

4    the list of names.

5        JUDGE TRACY:  Sustained.

6        MR. DAVIS:  Okay.

7        JUDGE TRACY:  And -- and just for the record, I want to

8    add that that's -- that is -- from his testimony, these are the

9    people that he directly heard from as to who he spoke with in

10   these individual and group conversations.  And so that's all he

11   recalls and going through the names, I'm just not going to

12   allow it.

13       MR. DAVIS:  Okay, fair enough.

14   Q    BY MR. DAVIS:  You've testified that these were individual

15   and group conversations.  I'm assuming there was no other

16   communications you had, whether it was in writing or any other

17   type of communication with any individuals?

18   A    No.

19   Q    So you didn't send text, you didn't send email?

20   A    No.

21   Q    You didn't hear from other people (simultaneous speech) --

22   A    No text messages.  It was all --

23       JUDGE TRACY:  Okay --

24   A    -- conversation in the group or one-on-one, like me and

25   Brian Watkins had, and Chris.



1          JUDGE TRACY:  So you guys should just be careful that, you

2     know, Mr. Key, wait for Mr. Davis to finish asking a question

3     before you start responding.

4          And Mr. Davis, you do the same with his responses.  Okay?

5          MR. DAVIS:  Okay, sure.  Thank you.

6     Q     BY MR. DAVIS:  Did you ever talk to any number of

7     management about these conversations you were having with your

8     coworkers?

9     A     Yes.

10    Q     Who was it that you spoke to?

11    A     Rick Brown.

12    Q     And what do you recall -- well, let's say when do you

13    recall talking to Mr. Brown about that?

14    A     Pretty much from October to, like, January.  It was the

15    same time that I was talking to the other photographers and

16    other people that were unhappy with the Union.

17    Q     Right.  What do you recall telling Mr. Brown?

18    A     In what aspect?

19    Q     About the -- your efforts to remove the Union?

20    A     I -- well, I remember asking him about other unions in the

21    market and what he thought of them, and other things about the

22    people who I knew that were unhappy with the Union, that wanted

23    the Union gone.

24    Q     Was this one conversation with Mr. Brown or was it more?

25    A     No, this was multiple conversations.



1    MR. DAVIS:  All right.  I have no further questions at

2    this time, Mr. Key.  Thank you.

3    THE WITNESS:  Okay.

4    JUDGE TRACY:  Ms. DeVleming?

5    MS. DEVLEMING:  Yes, Your Honor, just one.

6    **CROSS-EXAMINATION**

7    Q    BY MS. DEVLEMING:  Hi, Mr. Key.  My name is Liz DeVleming.

8    I'm one of the two counsels for the General Counsel here, along

9    with my cocounsel, Sarah Burke.  Thanks for being with us.

10    Just a quick question.  Isn't it true, Mr. Key, that in

11    the conversations you described with these other employees,

12    some of those other employees expressed their concern with not

13    wanting to join the Union, meaning not wanting to pay the dues,

14    not wanting to pay the fees, but in fact, did not express that

15    they wanted to remove the Union as the collective bargaining

16    representative of the units?

17    A    Yes.  They were unhappy about having to pay the dues.  But

18    I think every single one of the names that I mentioned,

19    mentioned getting rid of the Union, also, or not wanting the

20    Union.

21    Q    Okay.  Thank you very much.

22    MS. DEVLEMING:  No further questions, Your Honor.

23    JUDGE TRACY:  Ms. Yen?

24    MS. YEN:  No questions.

25    JUDGE TRACY:  Okay.  Mr. Davis?



1      MR. DAVIS:  I have no further questions of this witness.

2   Thank you.

3      JUDGE TRACY:  Mr. Key, thank you very much for your

4   testimony today.  If you could just leave all the documents

5   that were already there in the room.  And please, don't discuss

6   your testimony to anyone until after the hearing has completed.

7   And you will be able to find out from the Employer's attorneys

8   when this hearing will have ended, okay?

9      THE WITNESS:  Okay.

10      JUDGE TRACY:  All right.  Well, thank you very much.  And

11   I think that you can leave.

12      Do you need him to grab somebody else or --

13      MR. DAVIS:  Now might be a time -- are we going to take a

14   lunch break?  I don't know who's available right now, because I

15   wanted to space it out so that we could get Mr. Nevin in at 1.

16   Is it -- what is it, two -- noon?  I can see if somebody else

17   quick is available, because I do have a few that are very, very

18   quick, if you want me to try and check with the representatives

19   at KOIN?

20      JUDGE TRACY:  Yeah.  If that's okay with everybody.  And

21   then, you know, it's 12:15.  Well, okay, let's go ahead and

22   just take a break until 1 p.m. and then I'm assuming you'll

23   have your next witness on at 1 p.m.?

24      MR. DAVIS:  Yes.  And then I can schedule everybody back-

25   to-back so that everybody is ready to go.  So there'll be no



1    need for further -- further breaks.

2        JUDGE TRACY:  Okay.  And then we're aiming to have any

3    rebuttal by the General Counsel today as well.  So these other

4    quick witnesses, how long should they take?

5        MR. DAVIS:  There's two that'll maybe take 20 minutes and

6    one that'll take less than 5.

7        JUDGE TRACY:  Okay.  And then Mr. Nevin will take much

8    longer?

9        MR. DAVIS:  No, here's one that I think would probably

10   take 25 to 30 minutes.  I'm not going to drag him through all

11   the bargaining history stuff, I don't believe so.

12       JUDGE TRACY:  Okay, so you're saying -- including him,

13   there's a total of --

14       MR. DAVIS:  I think three, maybe four, but probably three.

15   One individual, Brian Watkins, is apparently on medical leave

16   and is unavailable.  So he would have been a longer one, like

17   Mr. Key would be, but he's not available.  So I've got 2 fairly

18   medium-length ones, 30 minutes, and maybe 1 to 2, 5 to 10

19   minutes each.

20       JUDGE TRACY:  Okay.  Okay.  All right.  So Mr. Key, thank

21   you.  You can leave.  You can leave now.  You don't have to

22   hang out with us anymore.

23       And let's just take a break until 1 p.m. Pacific Time and

24   then we'll kind of get through the rest of the afternoon.  Ms.

25   DeVleming, Ms. Burke, if you're going to have any -- if you're



1    going to have rebuttal, to have that ready to go by the end of

2    the day.  Okay?

3        MS. DEVLEMING:  Yes, Your Honor.

4        JUDGE TRACY:  Thank you very much.  We'll go off the

5    record.

6        (Off the record at 12:15 a.m.)

7        JUDGE TRACY:  All right, Mr. Davis, you want to call your

8    next witness, please?

9        MR. DAVIS:  Yeah, our next witness is Pat Nevin, Patrick.

10       JUDGE TRACY:  All right.  Mr. Nevin, if you could go ahead

11   and state your name for the record.

12       MR. NEVIN:  Sure.  Hello, everyone.  It's Patrick Nevin.

13   Whereupon,

14                          **PATRICK NEVIN**

15   having been duly sworn, was called as a witness herein and was

16   examined and testified, telephonically as follows:

17       JUDGE TRACY:  Okay, great.  All right.  So Mr. Nevin, I

18   just want to run through some quick instructions for you.

19   First of all, do you have anything in front of you -- in -- in

20   front of you basically??

21       THE WITNESS:  Basically just the computer about.  No.

22       JUDGE TRACY:  Okay.  So during the course of this, your

23   testimony, you may be asked to look at documents they're going

24   to use likely to share screen document our shared screen views

25   so that you can see that please don't use any electronic



1    devices or any communications to communicate with anyone else

2    during the course of your testimony.  Okay.  And is there

3    anybody else present in the room with you?

4        THE WITNESS:  No, there's not.

5        JUDGE TRACY:  Okay.  And then also during the course of

6    your testimony, please be sure to give verbal responses and

7    please wait for the question to finish being asked before you

8    start responding that way.  We're creating a transcript of this

9    hearing and we want to make sure that we can accurately reflect

10    the question that was asked and the question.  Your response to

11    that question.

12        If there is an objection.  Please wait for me to rule on

13    that objection before you start responding.  And if at any

14    point you have any difficulty hearing us seeing us, please do

15    let us know.  Okay.

16        THE WITNESS:  Okay.

17        JUDGE TRACY:  All right.  Mr. Davis, go ahead, please.

18                          **DIRECT EXAMINATION**

19    Q    BY MR. DAVIS:  Oh, yes.  Thank you.  Good afternoon, Mr.

20    Nevin.  How are you?

21    A    I'm fine, thank you.  Good.

22    Q.    I want get a few background questions.  Let's start with.

23    Where are you currently employed?

24    A.    I'm employed with Cox Media Group, Cairo Television, which

25    is the CBS affiliate in Seattle, Washington.



 1   Q.   All right.  Is that in any way affiliated with your prior

 2   employer Nexstar?

 3   A.   It is not.

 4   Q.   You used to be employed by Nexstar though, at KOIN.

 5   A    That's correct.

 6   Q    What was your position there?

 7   A.   I was vice president and general manager of KOIN from

 8   January of 2017 through June -- early June of 2020.

 9   Q    What -- what -- just briefly describe what your duties

10   were in that position.

11   A.   I had oversight of all operations of the station, sales

12   programing, finance, news, promotion, and engineering.

13   Q    Did that -- did your duties include participating on the

14   bargaining committee with NABET?

15   A    Yes, they did.

16   Q.   I wanted -- I want to talk just a little bit about that

17   process.  Were you involved throughout the process?

18   A    I was.  I was, again, just about every negotiation, every

19   meeting at the bargaining table from the time that we started

20   bargaining towards a -- a new contract in, I believe, June of

21   2017 all the way through the time that I left in --in June of

22   2020.

23   Q    How would you describe the general tone of that bargaining

24   process?

25   A.   The tone of the -- the process to me was -- I would say



1    hostile, contemptuous.  It was very slow to materialize in

2    terms of activity.  It was -- it was -- it was difficult,

3    difficult to move the process along.  I would say that it was

4    it was better or perhaps slightly improved once the FMCS

5    representative was involved.  But early on, it was -- there was

6    vulgarity.  There were -- there were picketing events,

7    mobilization events happening at advertisers, multiple

8    locations at the station.  I was demanded to -- to come to the

9    entry way of the -- of the station and meet with a priest.  It

10   was -- it was very bizarre.  The -- the whole process was

11   bizarre, not just at the negotiation table, but -- but

12   everything that was happening outside of the negotiation room

13   as well.

14   Q    You mentioned vulgarity, vulgarity by whom?

15   A    Only Mr. Biggs Adams.

16   Q    And what -- what do you mean, what terms were used that

17   you would describe as vulgarity?

18   A    Well, she -- she referred to me as a dick and as a

19   dickhead.  She told me I was full of shit, and told me that my

20   proposal was bullshit.  She is F-bombs.  She made her rogatory

21   comments towards the president of Nexstar, Tim Bush; referred

22   to him as Mr. Trump, Mr. Shrub.  It was very hostile.

23   Q    Did anyone from the companies or the Employer's side of

24   the table engage in similar conduct?

25   A    Never.



1    Q    What -- what would typically prompt these kind of -- of --

2    I'll label them outbursts by Ms. Biggs-Adams?

3    A    Generally, it was a response to either a proposal or a

4    request for a proposal from the Union.  Oftentimes, their

5    fallback position when we would make a counterproposal was to

6    revert back to the original language.  And it became very

7    apparent that the negotiations were really at a standstill.

8    They -- they had come to a screeching halt.  And -- and Ms.

9    Biggs-Adams was not engaged in -- in progressive negotiations,

10   and when she was called out on that, primarily by Mr. Tim

11   Busch, she took offense to it and -- and had a very pronounced

12   negative reaction to -- to his reaction of asking her to move

13   the process forward.  At one point, she even asked for a

14   definition of what progressive negotiations look like, and we

15   provided her that definition.

16   Q    I -- I want to draw your attention now a little bit away

17   from the bargaining and -- and talk about the withdrawal of

18   recognition on or about January 7th.  What was your belief at

19   that time, if any, about whether or not the Union had a

20   majority support?

21   A    So you know, it -- it had been a long process.  At that

22   point, we were two-and-a-half years into the negotiations

23   and -- and had a long way to go towards ratifying an agreement.

24   And internally, there were a number of -- of both Union members

25   and -- and nonrepresented employees that - that came forward



1    and -- and spoke up to me directly into other department heads,

2    other members of the negotiation committee about their

3    dissatisfaction with this particular Union, their

4    dissatisfaction with the process.  I had a number of

5    conversations with employees that were extremely frustrated

6    with the areas that the Union was -- was really struggling to

7    move past, for example.  It took almost a year to get the word

8    still store removed from the contract.  Most Union employees

9    thought that was a ridiculous waste of time.  The amount of

10   time it took to remove the requirement to have Social Security

11   numbers acquired by the station and then transmitted

12   electronically to the Union; most -- most -- most Union members

13   were frustrated that that's -- that we were spending that

14   amount of time negotiating what should be just a simple -- a

15   simple change.

16       MS. DEVLEMING:  I don't get why the record, I would

17   reiterate General Counsel's standing objection -- objection to

18   this hearsay testimony, and in this case, move to strike.

19       JUDGE TRACY:  Well, again, I'm going to overrule the

20   objection because, you know, I -- I will give it the weight

21   that -- that it -- it's -- that I will afford it in -- in the

22   decision, but I would also say that, you know, he's just

23   speaking and testifying, and he isn't specifying who said what.

24   It's sort of this generalization and that's -- that -- for what

25   it's worth, he's stating that.  So I can't say that at this



1    point that that is hearsay.  It's just some generalized

2    statements of -- in -- in his testimony.

3          So go ahead, Mr. Davis.

4          MR. DAVIS:  All right.

5    Q    BY MR. DAVIS:  Pat, again, drawing your attention to

6    January 7th.  Based on what you just said, did you believe a

7    more majority of your employees, in either of the two

8    bargaining units, wanted the Union to continue representing

9    them?

10   A    I did not believe that.  I believed firmly that both

11   bargaining units had a strong preference to either have that

12   Union removed and replaced with a different Union or have the

13   Union removed completely.

14   Q    I don't want to restate testimony, but I believe you said

15   that you were hearing comments from employees about this time

16   about this time about what was going on in bargaining.  What --

17   what was being said to you and by whom?

18   A    So there are a number of, you know, folks that I would

19   consider to be newsroom leaders.  Jeff Gianola for one.  He --

20   he's a main anchor.  He's involved in the editorial process.

21   He's involved with the reporters and photographers and the

22   editors, and -- and had been at the station for a long time.  A

23   number of folks went to Jeff to talk about their frustration

24   with the -- the progress or lack of progress that has been made

25   and the fact that they hadn't had raises in over three years.



1      JUDGE TRACY:  And so I just going to make a comment here,

2  Mr. Davis.

3      That portion of the testimony, I would say, is hearsay,

4  and I'm not going to give it any weight because it's one thing

5  if he's testifying about what was told to him and allowing that

6  sort of testimony.  But the stuff that's coming out third-hand

7  from somebody else.

8      MR. DAVIS:  Sure.

9      JUDGE TRACY:  I'm going to just disregard it.  So I just

10  want the record to be clear so that you, as he Employer's

11  attorneys understand.  Okay?

12      MR. DAVIS:  Understood.

13  Q    BY MR. DAVIS:  What, if anything, during this period of

14  bargaining, Mr. Nevin, were you hearing about employee

15  attendance at Union meetings?

16  A    So typically, I was told if after the first day of

17  bargaining, the Union would hold an offsite event to recap what

18  was discussed and to -- and to make sure that -- the -- the

19  Union members had information about what was being discussed

20  and what was coming up the next day in -- in negotiations.  And

21  my understanding is, those meetings were lightly attended to

22  begin with, and as time went on, the attendance dwindled.

23  Q    But you testified earlier about something the Union did

24  with regard to customers or advertisers.  Did you hear about

25  attendance at those kind of events?



1    A    I -- I not only heard about attendance, I actually went to

2    the advertiser during those events to meet with the store

3    president and general manager and assure them that the -- that,

4    you know, there was nothing we could do as a station to prevent

5    that kind of action from happening.  But, yes, I -- I saw those

6    events happening in real time five or six times over the course

7    of that summer.

8    Q    How many employees typically attended those events?

9    A    Current KOIN employees, I would say three.

10    Q    You know, those three were.

11    A    El -- I do.

12    Q    Who are they?

13    A    Ellen Hansen was typically there.  Robert Dingwall was

14    typically there.  James Boehme may have been there, not to

15    every event, but at least to a couple.

16    Q    Okay.  My understanding -- or -- or let me ask you this,

17    were you aware of a Union picnic scheduled for this time

18    period?

19    A    I was.  I was told that there was going to be an -- an

20    offsite picnic taking place at a park right off of the

21    Willamette River on a Saturday afternoon.  And offsite event

22    that was eventually canceled.  We were told it was due to lack

23    of participation.  And also heard that the Union said it was

24    canceled because there was fear of a protest happening in

25    downtown Seattle.



1    Q    During -- during this period of -- of bargaining, were you

2    always bargaining with the same people on the Union bargaining

3    committee, or was there turnover on that committee?

4    A    No, there was turnover from the very beginning.  The --

5    the very first representative was only there for, maybe, a

6    couple of sessions and then he was removed.  He was replaced by

7    Brian Watkins, another photographer.  Brian Watkins was only at

8    the bargaining table, I believe, for one two-day session, and

9    then he removed himself after a -- a very uncomfortable display

10   from Ms. Biggs-Adams that I personally witnessed and Brian

11   Watkins and I talked about after the fact.

12   Q    What was that actions that you're talking about?

13   A    So this was that particular meeting the president of the

14   company, Tim Busch, was in -- was in the room and was

15   attempting to move the negotiations along in a positive and

16   productive manner.  And Carrie Biggs-Adams, again, used

17   profanity.  She made some degrading comments about his name.

18   And -- and Brian Watkins said he was deeply offended by how she

19   was treating the president of the company.

20       MS. DEVLEMING:  I object again.  Just -- this is a little

21   bit different from the other hearsay testimony that I routinely

22   objected to.  So just for the record, Your Honor, I object and

23   move to strike as hearsay.

24       MR. DAVIS:  I don't believe we're offering that for the

25   truth of the matter asserted, just what was expressed to him



1    about -- from this employee about what the employees take on it

2    was.

3        MS. DEVLEMING:  Well, Your Honor, then I would object to

4    the relevance of the testimony since current Board law requires

5    an, in fact evidence (indiscernible) support, not any impact on

6    the listener.

7        MR. DAVIS:  It also goes to the -- the what was going on

8    during the bargaining of that day.

9        MS. DEVLEMING:  Then it's hearsay and not for the truth of

10    the matter asserted.

11        JUDGE TRACY:  So again, as I said before, I'm going to

12    overrule the objection, allow the testimony, but again, the

13    weight of that evidence and its impact in this decision will

14    be -- will be, hopefully, clearer in my decision.

15        MR. DAVIS:  Okay.  Fair enough.

16    A    And then Brian was replaced by Ellen Hansen, who was the

17    3rd employee that participated as (indiscernible) during

18    negotiations.  And Ellen was there for the rest of the time.

19    Q    BY MR. DAVIS:  Just for the sake of the record, who was

20    the first person that -- that you said was either replaced or

21    left?

22    A    I would have to look at an employee roster to refresh my

23    memory on his name.  He left the station a couple of years ago,

24    and I -- I don't recall his name, but I could -- I could pick

25    it out of a list of names if you had one available.



1    Q    All right.  We'll -- we'll come back to that if we need

2    to.

3    A    Okay.

4    Q     At this time, when -- during the bargaining process, what

5    was turnover like at the at the station?

6    A    Our turnover was high, higher than I have historically

7    seen in other television stations that I've managed.  We were

8    averaging somewhere around 15 to 20 employees leaving per year,

9    which on a percentage basis is, you know, roughly 15 percent of

10   the -- of the workforce was turning over every year.  that was

11   high, and that -- that continued over a three-year period.

12   Q    Did you -- do you do exit interviews when people depart?

13   A    We did.  We -- we always did.  When -- when employees were

14   available and accessible, we would always sit down, find out

15   how their overall experience has been.  What can be done, if

16   any, to keep that employee on our staff.  And if there was any

17   feedback that that employee had for anything, as management

18   team, we should be aware of to make, you know, working

19   conditions better -- better experience overall.

20   Q    Do -- do you recall, in particular, any of the exit

21   interviews where people might have mentioned the Union?

22   A    I do.  Several.

23   Q    Who?

24   A    Chelsea Wicks was one.  Chelsea Works cited one of the

25   reasons for her departure is the lack of Union representation



1    and the fact that an agreement had not been reached and the

2    fact that she had not had a raise in over three years.

3    Q    Anyone else?

4    A    Ben Moore.  Ben Moore was a photographer who relocated to

5    a another Nexstar station.  It was his first experience with a

6    Union.  He was harassed.  He brought those issues forward, and

7    we dealt with that harassment issue internally.  But he -- he

8    cited the initiation fees and the high dues and just the

9    contentious nature of the Union as some of the reasons for his

10   request to transfer to another market.

11   Q    Anybody else come to mind?

12   A    Jordan Aleck.  I had several conversations with Jordan

13   Aleck about her role, and she was very concerned about the

14   divisive nature of the Union.  She -- she described the -- the

15   newsroom as a divided newsroom and said that she just didn't

16   want to be a part of it.

17   Q    Now, I -- I know you've been gone a while, so I apologize

18   for this.  But -- but do you recall having any conversations

19   you -- that you personally had with any members of the bar --

20   either of the two bargaining units about whether or not they

21   wanted the Union removed during this time period?

22   A    So --

23        JUDGE TRACY:  Hold on one second.  What is this time

24   period, if you can please define that?

25        MR. DAVIS:  Well, yeah.  Thank you.  Let me narrow it



1    to -- to a more relevant time period.

2    Q    BY MR. DAVIS:  Let's say, from roughly October of 2019

3    through when the -- the date you went through recognition on

4    January 7.

5    A    So I -- I had a number of conversations.  A number of --

6    of current employees came forward to express their concern, to

7    ask for advice, help or guidance on what could be done.  We had

8    passed the three-year mark where employees had not had a raise

9    in three years, and there was growing tension and concern.

10    Brian Watkins, who was -- I mentioned earlier, was a part

11    of the -- the second bargaining team that was assembled.  He

12    came forward several times and -- and shared with me directly

13    that -- that they were going to take a vote, and that they --

14    they felt strongly that there was not majority support of the

15    Union.  And he had questions on how a vote would actually take

16    place.

17    He asked for some legal advice, which we did not provide

18    him.  We said we could not give legal advice, but I did provide

19    him with the name and phone number of the National Right to

20    Work Foundation.

21    Q    Anyone else that you recall talking to during that time

22    period?

23    A    Yeah.  I talked with Paul Brimele, who ultimately ended up

24    leaving the station.  Paul was very concerned about the Union

25    representation.  He said they had done some internal polling on



1    their own, and that he had heard that there was likely going to

2    be a vote and that his feeling was that the -- that the Union

3    did not have majority support, and most people wanted the Union

4    out.

5        Tom Westarp, who has been at the station a long time.  Tom

6    is a 25-plus year employee.  He came to me on a weekend.  He

7    called me on my cell phone and said, hey, I need to talk to you

8    about what can be done to remove the Union.  And I said, what's

9    going on?  And he said -- he had heard that there was likely

10   going to be a vote, but he said he'd been through this process

11   before and he didn't -- he personally did not think that a vote

12   was going to happen.

13       He said that he was of the belief that the Union did not

14   enjoy majority support, and that his coworkers were asking him

15   to lead the charge on a vote, and he said he would not do that.

16   He was not comfortable in that role, but asked for legal

17   advice.  And I said, again, we can't provide legal advice, but

18   I gave him the National Right to Work Foundation phone number,

19   and he said that during prior negotiations, that number had

20   been used, and that they'd had limited success getting any

21   relief during negotiations.

22   Q    Just to be clear, when you're -- in your conversation with

23   Mr. Westarp, did he say to you that he wanted the -- excuse me,

24   I dropped my pen -- anything about wanting the Union removed or

25   wanted out of the Union?



1    A    He -- he said he -- he had been asked to lead the charge

2    to remove the Union.  And he said that -- that that was not

3    something he was comfortable doing and didn't know that anybody

4    else would, but did say that he felt that, based on feedback

5    from others to the Union, no longer had a majority support.

6    Most people wanted that particular Union out.

7    Q    Did he want that Union out?

8    A    He did.

9    Q    Did you have any conversations with other members of

10   the -- of the management team or your bargaining committee

11   about these conversations you were having with employees?

12   A    I did.  We had many conversations with the department head

13   team and with the bargaining unit team.  And we actually listed

14   both bargaining units and tried to determine where everybody

15   sat, whether they were for this Union, whether they were

16   against this Union, how -- how they would potentially vote.

17   We'd heard so many people come forward that a vote was pending.

18   We were trying to anticipate how that vote may turn out.

19   Q    Did you talk with Rick Brown about this?

20   A    Many times.

21   Q    And Chuck Pautsch?

22   A    Many times.

23   Q    Again, time period, when -- when were these conversations?

24   A    November, December, January.  November, December of 2019,

25   in January of 2020.



1    Q    Okay.  All right.  I have no other questions, Mr. Nevin.

2    Thank you.

3          JUDGE TRACY:  Ms. DeVleming?

4          MS. DEVLEMING:  Yes, Your Honor.

5                        **CROSS-EXAMINATION**

6    Q    BY MS. DEVLEMING:  Hi there.  I lost you in my corner.

7    Where did you go?  There you are on the bottom middle.

8          Hi, Mr. Nevin.  My name is Liz DeVleming, and I'm one of

9    the two attorneys here representing the General Counsel along

10   with my cocounsel, Sarah Burke.

11         Just a couple of questions about your testimony.

12   Specifically, I think the first name on the list of employees

13   you provided about talking to them about their feelings about

14   the Union was Jeff Gianola.  Do you remember that name?

15   A    I do.

16   Q    And Mr. Gianola is an anchor; is that right?

17   A    That is correct.

18   Q    And that's not a bargaining unit position?

19   A    That's correct.

20   Q    So he -- Mr. Gianola is not and never has been a member of

21   the bargaining unit's represented by NABET Local 51?

22   A    That -- that's my understanding, correct.

23   Q    Okay.  And you also spoke about to -- Chelsea Wicks.  Do

24   you remember her?

25   A    I do.



1    Q    And she even testified on direct examination that she told

2    you about her feelings about the Union during her exit

3    interview, right?

4    A    Correct.

5    Q    Meaning she's no longer with KOIN-TV?

6    A    That's correct.

7    Q    And she was not with KOIN-TV as of January 8th, 2019 --

8    sorry, 2020?

9    A    I -- I -- I don't know when she left.

10    Q    Okay.

11    A    I'd have --

12    Q    She --

13    A    -- to look at my notes.  I -- I don't -- I don't know

14    whether she was employed in January of 2020 or not.

15    Q    All right.  And what about Ben Moore?  You also testified

16    about talking to him about this during his exit interview

17    with -- he was not employed as of January 2020, was he?

18    A    He was not employed at KOIN, no.  But he -- he was still

19    employed Nexstar.  Correct.

20    Q    Okay.  But not a member of either of the two bargaining

21    units represented by NABET Local 51 at KOIN-TV?

22    A    Correct.

23    Q    And Jordan Aleck.  Same questions.  You testified about

24    speaking with her during her exit interview.  She was not with

25    KOIN-TV in either of the two bargaining units we're discussing



1    as of January 8th, 2020?

2    A    Again, I'd have to look at my notes on when Jordan left,

3    but she's -- by the time I left the station, Jordan had left.

4    I just don't know what month.

5    Q    When was it that you left the station?

6    A    I left in June of 2020.

7    Q    Okay.  Another one, Paul Brimele -- is it [Bree-mell] or

8    [Bur-mell]?  I've seen two different spellings.  B-I-R or

9    B-R-I?

10    A    It's [Brem-lee] is hoe it's pronounced.

11    Q    [Brem-lee], okay.  So B-R-I-M-E-L-E?

12    A    That's my understanding.

13    Q    All right.  And for Mr. Brimele, he also told you about

14    his feelings during his exit interview.  Are you aware that he

15    was not employed by KOIN-TV in your bargaining unit as of

16    January 8, 2020?

17    A    Again, I -- whether he left in November, December,

18    January, or February, I -- I -- I'm not sure what period of

19    time he left.

20    Q    All right.  Fair enough.  You were also asked if any

21    employees came to you in the defined period post October 2019,

22    leading up to the January 2020 withdrawal of recognition.  And

23    do you recall answering on direct, Mr. Nevin, that a number of

24    employees did so during that period of time?

25    A    That's correct.



1   Q    Okay.  Are you aware -- so does that continue to be your

2   testimony today?

3   A    That continues to be my testimony.

4   Q    All right.  Are you aware that KOIN Attorney Chuck Pautsch

5   provided the region with a series of position statements during

6   the investigation into the incident matters?

7   A    Am I aware that Chuck Pautsch provided -- what was the

8   question?

9   Q    A series of position statements, meaning, summaries of

10  facts and applications of law to the Board investigator looking

11  into these charges.

12  A    I'm aware that a document was provided.

13  Q    Okay.  And did you consult with Mr. Pautsch, specifically,

14  about this subject, who you talked to and when in order to help

15  him craft one of those position statements?

16  A    I don't understand the question.

17  Q    Did you consult with Mr. Pautsch about the conversations

18  you had with these employees, and when and the details of those

19  conversations in order for Mr. Pautsch to include that summary

20  in the employer's position statement?

21  A    I'm -- I'm certain Chuck and I talked about the sequence

22  of events.

23  Q    Okay.  Are you aware that the only conversation addressed

24  in the position statement within the conversations you

25  purportedly had with employees -- only conversation with a unit



1    employee that post-dated October 2019, was the exit interview

2    you described with Ms. Chelsea Wicks in November of 2019?

3    A    I -- I haven't reviewed the documents.  So I -- I -- I --

4    I can't comment on that.

5    Q    Okay.  Well, we already have it in the record.  So I guess

6    I'll just let that speak for itself.

7         MS. DEVLEMING:  No further questions, Your Honor.  Oh, I'm

8    sorry.  Famous last words, can I retract?

9         JUDGE TRACY:  Yes, go ahead.

10   Q    BY MS. DEVLEMING:  Just one brief thing unrelated, kind of

11   circling back, I guess, to bargaining, Mr. Nevin.

12        Is it your -- was it your position at bargaining that rate

13   of the union's initiation fee and dues was inextricably tied to

14   your dues checkoff provision proposals?

15   A    Can you repeat the question, please?

16   Q    Sure.  Was your position -- the company's position, but

17   also your personal position during bargaining that the

18   company's dues checkoff proposals were inextricably tied to the

19   rate of the Union's initiation fee and dues?

20   A    My -- my personal opinion and feeling is the dues and fees

21   were exorbitantly high.  Were they inextricably tied to the

22   dues checkoff procedure?  We didn't -- the company and the

23   station didn't feel that it was our obligation to continue to

24   collect those exorbitant dues.

25   Q    So is it your testimony today that they were inextricably



1    tied to dues checkoff or that they were not inextricably tied

2    to dues checkoff?

3    A    Again, I guess I'm -- I'm unsure of the question of being

4    inextricably tied to the dues checkoff.  You asked me my

5    personal feeling on that matter, and I gave you the answer.

6    Q    Do you -- have you used that term before to describe the

7    company's position on dues checkoff as compared to the rate of

8    the union's initiation fee and dues?

9    A    It's possible.  I don't -- I don't recall it.

10    Q    Okay.  Would there be something that would refresh --

11    well, if I --

12    A    If you have --

13    Q    -- were to tell you --

14    A    If you have something to refresh my memory, sure.  Let's

15    have a look.

16    Q    Sure.  Do you recall providing a -- an affidavit to the

17    Board agent, Jennifer Schulze in this matter?  And I think

18    in -- on December 13th, 2019?

19    A    I do.

20    Q    Okay.  And do you remember being given an opportunity to

21    review that document, make edits before you signed it?

22    A    I do.

23    Q    Do you recall being asked to swear that the testimony

24    provided in the affidavit was true and correct, a normal oath?

25    A    I do.



1    Q    Okay.  And did you sign?

2    A    I did.

3    Q    Okay.  Okay.  Isn't it true, then, that in your December

4    13th, 2019 affidavit, you indicated that the company believed

5    that Employer's dues checkoff proposal was inextricably tied to

6    the Union's initiation fees and dues?

7    A    I -- I believe that to be the case.  Yes.

8    Q    Okay.

9         MS. DEVLEMING:  Thank you, Your Honor.  No further

10   questions.

11        JUDGE TRACY:  Ms. Yen?

12        MS. YEN:  No questions.

13        JUDGE TRACY:  Mr. Davis?

14        MR. DAVIS:  Yes.  Just one brief follow-up.

15                      **REDIRECT EXAMINATION**

16   Q    BY MR. DAVIS:  Did you recall -- during this time period,

17   did you ever talk to an employee named Christian Montes?

18   A    I did.

19        MS. DEVLEMING:  Objection.  Leading.

20        JUDGE TRACY:  Well, you know, I'm not sure where this is

21   going because it might go beyond the scope of the cross, but

22   I'm going to allow it.  Go ahead.

23        MR. DAVIS:  I just have one follow-up.

24   Q    BY MR. DAVIS:  What -- what did Mr. Montes tell you in

25   addition to the others about his thoughts on the Union.



1          MS. DEVLEMING:  Objection, Your Honor.  Hearsay, leading,

2     and beyond the scope of the cross-examination.

3          MS. YEN:  I join in those objections.

4          JUDGE TRACY:  Okay.  And again, I'm going to go ahead and

5     overrule the objections.  I've already explained why I'm

6     allowing this hearsay testimony to come into the record.  So

7     Mr. Nevin, go ahead and please respond.

8     A    Christian Montes came to me late in the year of 2019 and

9     asked for a individual conversation about compensation, about

10    wages.  He made his case that he had taken on some additional

11    duties for the morning show and asked for a increase in pay.

12    And I informed Christian that we were not in a position to

13    offer anybody an increase in pay that was in the Union.

14         I said that is something that's negotiated at the Union

15    table.  And he said, well, I -- you know, I haven't had a raise

16    in three years and nobody else has, you know, what can we do to

17    get this Union out?  And I said -- again, I handed him the

18    phone number for the National Right to Work Foundation and said

19    that we could not give him any legal advice.

20         He asked if he was under any obligation to pay dues.  He

21    said there had been some misinformation about requirements for

22    paying dues, and whether he could -- if he stopped paying dues

23    or didn't pay dues, could he be sued and sent to collections?

24    And I said, I don't know.  That's something you're going to

25    have to take up with an attorney, and he left.



1      MR. DAVIS:  All right.  I have no additional questions.

2  Thank you.

3      MS. DEVLEMING:  I do have a question on recross since that

4  was a brand new subject.

5      JUDGE TRACY:  Yeah.  I'm going to just allow it for that

6  limited purpose.  Go ahead.

7                    **RECROSS-EXAMINATION**

8  Q    BY MS. DEVLEMING:  Mr. Nevin, we already talked about,

9  previously, the position statement provided by Mr. Pautsch

10  during the investigation.  Are you aware that that March 2020

11  position statement included no reference whatsoever to any such

12  conversation with Christian Montes?

13  A    Again, I'm -- I'm not familiar with what's in that

14  document.

15  Q    Okay.

16      MS. DEVLEMING:  Thank you, Your Honor.

17      JUDGE TRACY:  Ms. Yen?

18      MS. YEN:  No question.

19      JUDGE TRACY:  You know, I just have one question.  At any

20  time, did -- Mr. Nevin, you refer anyone to go speak to the

21  Union when they brought all these questions to you?

22      THE WITNESS:  Oh, many times.  And -- and the -- the

23  answer was that they were -- that they were completely

24  dissatisfied with the -- the Union representation, both at the

25  bargaining table and after the fact.  They were -- they were


www.escribers.net | 800-257-0885

1    seeking outside counsel and help.

2        JUDGE TRACY:  Okay.  All right.  Thank you.  All right.

3    Mr. Nevin, thank you for your testimony today.  If -- please

4    don't discuss your testimony with anyone until after the close

5    of the hearing.  And the attorneys for Respondent can let you

6    know when the hearing is completed.  All right?

7        Thank you so much, and you can be the leave the -- leave

8    the meeting.

9        THE WITNESS:  Okay.  Thank you.

10       JUDGE TRACY:  Thank you.  Mr. Davis?

11       MR. DAVIS:  Yes, Your Honor.  I'm going to double-check

12   and see if the others are available that would be coming in for

13   the KOIN link.  So if you give me a second to just drop off, I

14   will -- I will double-check.  The witness should be in there,

15   but I'm not sure.

16       JUDGE TRACY:  And how many more do you have, do you think?

17       MR. DAVIS:  I believe I might only have one.

18       JUDGE TRACY:  Okay.

19       MR. DAVIS:  This would be the last one, maybe 30 minutes.

20   It'll be shorter than Mr. Mr. Nevin was.

21       JUDGE TRACY:  Okay.  All right.  So let's just go off the

22   record and see if that person if there.

23       Mr. Schiff, can you see into the waiting room if somebody

24   is there?

25       MR. SCHIFF:  I can't.  I just see the KOIN-TV.



 1          JUDGE TRACY:  Okay.

 2          MR. DAVIS:  I'll -- I'll make a quick call, then, if -- if

 3    you want me the drop off so (audio interference) on the record.

 4          JUDGE TRACY:  Mr. Schiff, go ahead and -- and remove --

 5    move that person from the waiting -- or that screen from the

 6    waiting room into our --

 7          MR. SCHIFF:  Okay.

 8          JUDGE TRACY:  -- our view.  And then you -- you can see if

 9    anybody --

10          MR. SCHIFF:  I can see.

11          JUDGE TRACY:  -- there or not, then you can call -- call

12    in.

13          (Off the record at 1:41 p.m.)

14          JUDGE TRACY:  Okay.  All right.  So let's go ahead and go

15    on the record.

16          THE COURT REPORTER:  We're on the record.

17          JUDGE TRACY:  Okay.  All right.  Mr. Davis, if you want to

18    call your next witness, please?

19          MR. DAVIS:  Yes.  Our next witness is Rick Brown.

20          JUDGE TRACY:  All right.  Mr. Brown, can you state your

21    name for the record, please?

22          MR. BROWN:  Rick Brown.

23          JUDGE TRACY:  Okay.  And if you could raise your right

24    hand, please?

25    ///



1    Whereupon,

2                                **RICK BROWN**

3    having been duly sworn, was called as a witness herein and was

4    examined and testified, telephonically as follows:

5        JUDGE TRACY:  Thank you.  You can put your hand down now.

6    Mr. Brown, is there anybody else present in the room with you?

7        THE WITNESS:  No.

8        JUDGE TRACY:  Okay.  Again, today, you'll be providing

9    testimony.  So answering some questions that are presented by

10   the attorneys for the different parties in this case.  In that

11   regard, please don't use any -- you know, please don't

12   communicate with anyone during the course of your testimony,

13   text messaging, emailing while you are testifying.  Okay?  And

14   say yes or no for the record, please.

15       THE WITNESS:  Oh, yes.

16       JUDGE TRACY:  Okay.  And then also, please, in that same

17   vein, please provide verbal responses during the course of your

18   testimony.

19       THE WITNESS:  Okay.

20       JUDGE TRACY:  And also, we will be -- you'll be asked

21   questions.  And so wait till the question is finished being

22   asked before you respond.  We are creating a transcript of this

23   hearing after -- afterwards.  And so we want to make sure that

24   the transcript fully captures the question and your answer.  So

25   it's very important to wait until the question has finished



1   being asked before you respond and not to interrupt any of the

2   attorneys speaking.  And they should do the same for yourself.

3        If there is an objection, please wait for me to respond

4   and rule on that as to whether you can answer the question or

5   not.  And do you have any papers or documents in front of you

6   there?

7        THE WITNESS:  Yes.

8        JUDGE TRACY:  Okay.  And so are they turned over?

9        THE WITNESS:  Two out of the three are, then these are

10   just the Zoom appearings -- the Zoom information.

11        JUDGE TRACY:  There should be three sets of documents, if

12   I recall correctly.

13        THE WITNESS:  Correct.

14        JUDGE TRACY:  Okay.  And just make sure they're all turned

15   over.  Is there anything else that is in front of you?

16        THE WITNESS:  No, just my glasses.

17        JUDGE TRACY:  Okay.  All right.  Great.  Thank you so

18   much.

19        Mr. Davis, go ahead, please.

20        MR. DAVIS:  All right.  Thank you.

21                     **DIRECT EXAMINATION**

22   Q    BY MR. DAVIS:  Rick, good afternoon.  How are you doing

23   today?

24   A    I'm doing good.  Thank you.

25   Q    Good.  Good.  I -- I don't think your name needs spelling



1    necessarily, but could you spell your last name?  Does it have

2    an E on the end or is it a normal spelling of Brown?

3    A    Normal spelling.  B-R-O-W-N.

4    Q    Okay.  And are you employed at -- at KOIN?

5    A    Yes, I am.

6    Q    What is your position?

7    A    Director of technical -- technology.

8    Q    What -- what is involved with that position?

9    A    That includes every piece of technical equipment in the

10   station.  I'm -- I supervise and make sure it's all working.

11   I'm also a supervisor of the photographers, news editors, news

12   directors of the night directors and the engineering staff.

13   Q    There's been some -- some testimony throughout the process

14   that used the term photogs.  Could you tell us what that group

15   is?

16   A    That's the news photographers.

17   Q    Are they also referred to as videographer's?

18   A    Sometimes, yes.

19   Q    And you supervise them.  Do you supervise any others?

20   A    No.

21   Q    I think I just want to draw your attention to the time

22   period of let -- let's just start with 2019 being the relevant

23   time period that -- that I want to try and focus on.  Up until

24   January 7 of 2020.  And what I want to ask you is if -- if you

25   recall any conversations you were having with members of the



1  bargaining unit about their position on the Union during that

2  time period?

3  A    Yes, I did.

4  Q    Okay.  Who do you recall talking to?

5  A    One of them was Douglas Key.

6  Q    Okay.  Let -- let's start with him.  What -- what do you

7  recall from that conversation?

8  A    Well --

9      MS. DEVLEMING:  Just for the record, Your Honor, I will,

10  again, reiterate our standing hearsay objection.

11     MS. YEN:  And I as well.

12     JUDGE TRACY:  And as I said previously, I'm going to

13  overrule the objection.  And it's just, again, the weight of

14  it, if any will be allocated in the decision.

15     Mr. Brown, go ahead and answer the question, please.

16  A    I -- I always check in and see how people are doing.  And

17  Douglas walked by my office, and I asked him how he was doing.

18  He seem very frustrated about some things, and it was about the

19  negotiations and how they were not working very well for him.

20  And that he told me that he also contacted Carrie

21  Biggs-Adams -- Adams-Biggs -- excuse me, I don't remember what

22  it is -- and I knew that he was very frustrated and was looking

23  to remove NABET from KOIN-TV.

24     He -- he knew that if they did vote to get the -- NABET

25  out of KOIN-TV, that it was going to be a year before they



1   could do anything.  And he knew that because he had talked to

2   me about -- he was looking at -- in the years down the road

3   that possibly IATSE would be representing them.  And so he --

4   he -- he told me that.  He also told me that he had -- what was

5   it -- 12 yes votes at the time, and that he needed 19 to be

6   certified in the Union.

7       He also -- he was -- I'm trying to think, he --he was also

8   telling me that without having the Union here, that there

9   would -- the people -- there would be protection that was

10  happening for some of the lower performer employees would not

11  be there, and that they should basically leave, that there was

12  a very frustration about that.

13  Q    Is that all you remember about these conversa- -- your

14  conversation with him?

15  A    Well, I had a follow-up conversation with him also, just

16  to see, you know, and to kind of get -- to see how he was doing

17  more because I -- he -- I knew he was very frustrated.  I -- I

18  followed up with him again.  And I'm sorry, I just saw the

19  screen that came up with the telephone on it.  That he -- him

20  and Brian Watkins were working together to have a vote to

21  decertify the Union to get them out of the building in January,

22  and that they were working together.

23      And they had like ten, 11 of the photographers against the

24  Union.  And a lot of them were the -- the newer photographers

25  that had started in that year.  And that he -- that the only



1    two that he really knew that he told me about that was real

2    strong was Ellen Hansen and Robert Dingwall that didn't want

3    the Union out.

4    Q    Anything else you recall from that conversation?

5    A    Not off the top of my head.

6    Q    Did you talk to any other employee members of these

7    bargaining units during that time period?

8    A    Yes.

9        JUDGE TRACY:  Excuse me.  One second, though.  What is

10    unclear to me, because the time frame is pretty large, that you

11    began with there Mr. Davis.

12        MR. DAVIS:  Yes.  Thank you.  I was going to follow up

13    with the -- the right date for that one.  My apologies.

14        JUDGE TRACY:  Okay.  That's fine.  Mr. Brown, that first

15    conversation that you just testified about that was with

16    Douglas Key, when was that?

17        THE WITNESS:  That was in December of nine -- I'm looking

18    track here -- '19 I think it was, in December.

19        JUDGE TRACY:  Okay.  And then the second conversation?

20        THE WITNESS:  It was like a day or two or that -- the next

21    day that I had with him.

22        JUDGE TRACY:  Okay, thank you.

23        MR. DAVIS:  All right.  Thank you for that clarification.

24    I forgot that question on my list.

25    Q    BY MR. DAVIS:  Did you talk to any other employees?



1    A    Yes.  I spoke with Tom Westarp.  He came to me very upset

2    about the Union and wanted it -- wanted it out.  You know,

3    what -- you know, he would -- he was -- he has been, you know,

4    for a while wanted the Union out.  He felt that it was

5    prohibiting what was happening in his department.

6    Q    All right.  Anyone else that you recall?

7    A    Yeah.  James Boehme.  He came to me.  He was very, very

8    frustrated about the Union and --

9    Q    Just give me one second before you -- when was the

10    conversation with Mr. Westarp, if you recall?

11    A    It was in '19, and I'm sorry, I don't have the exact date

12    with me.

13    Q    All right.

14        JUDGE TRACY:  Well, do you have an idea of what month?

15        THE WITNESS:  Man, that was a years -- a year ago.  It was

16    probably towards the -- everybody was getting really frustrated

17    towards the end of '19 because they felt -- because the

18    negotiations were really stalling and people were wanting to

19    find out what was going on, and they were getting really,

20    really frustrated.

21        JUDGE TRACY:  Go ahead, sir.

22    Q    BY MR. DAVIS:  Okay.  Yeah.  Sorry I cut you off.  You

23    said the name Boehme or -- I didn't quite hear that one.

24    A    James Boehme.  He's a news editor.

25    Q    What -- what do you recall from that conversation?  Well,



 1    first off, when was that conversation, and what do you recall?

 2    A    It was --- it would have been earlier on in the

 3    negotiations when they started.  It was when -- Adam Thompson,

 4    I believe, was the -- negotiating on the negotiating team with

 5    the Union.  Adam Thompson at the time was a news photographer,

 6    and Adam didn't agree with what was happening in the

 7    negotiations and wanted out of the negotiating team.  The --

 8    Kevin Wilson, who was the president at the time, he was

 9    basically attacking Adam, and -- and James didn't like it.

10         James called him up and basically, the frustration level

11    for James after his conversation with Kevin is, he quit being

12    the -- the shop steward.  At that time, he came to me and said,

13    how do we get this Union out of here?  I then gave him the

14    number to the National Right to Work attorney that had -- was

15    handed.

16         MS. DEVLEMING:  Your Honor, here, I would just note

17    through my objection that this is not only hearsay, but hearsay

18    within hearsay as to Adam Dalton's (sic) perspective on the

19    Union.

20         JUDGE TRACY:  Yes.  Again, I'm going to overrule the

21    objection for the reasons that I've stated earlier.  I'm also a

22    bit confused about the time period.

23         So -- so again, Mr. Brown, when was this conversation that

24    you're just testifying about -- when did that occur?

25         THE WITNESS:  Probably was in '18, 2018.



 1          JUDGE TRACY:  And -- and you -- and you mentioned the

 2    name, was it Adam Thompson?

 3          THE WITNESS:  Yes.

 4          JUDGE TRACY:  You've just sort of thrown out a lot of new

 5    names that I've not heard yet.

 6          THE WITNESS:  Okay.

 7          JUDGE TRACY:  (Unintelligible) these days.  So anyway --

 8    okay.  So that was in 2018.  Okay.  Thank you.

 9          Mr. Davis, go ahead please.

10    Q    BY MR. DAVIS:  Yeah.  I don't -- I don't know where we

11    were.  Have you talked to anybody else, other than I think

12    you've named.  Westarp, Boehme.

13    A    Yes.

14    Q    Anyone else other than those three that you can recall?

15    A    Vivian Coday.  She's an engineer that I supervise.  She

16    was very upset about having the Union here.  She came to me in

17    '19 right after she started and just through all of '19, of how

18    to get the Union out of KOIN-TV.  She wanted to know how to,

19    you know, to set up a vote to, you know, get the cards or

20    whatever they wanted to do to -- to get the members to sign to

21    get it out.  I didn't give -- I gave her they gave her also the

22    telephone number for the National Right to Work attorney.  And

23    this was in '19.

24          All right.  Levan Funes, also a new -- a broadcast

25    engineer.  Very adamant that this Union should not be in KOIN-



1   TV.  He's dealt with it before.  And when he started, he knew

2   the NABET was here, and he does not want it in here.  He said

3   that there's nothing good with it, and  that he wanted that

4   Union out of KOIN-TV.  He also was given the number to the

5   National Right to Work attorney.

6       Chris Thibodaux, also a broadcast engineer.  Same story,

7   does not want it here, does not feel like it's needed here,

8   wants it out of KOIN-TV, feels that it's inhibiting what we

9   need to be moving forward on at KOIN.  He also has mentioned to

10  me that he want -- you know, he's mentioned to me that he wants

11  it out.  I, too, have given him the number to the National

12  Right Labor attorney.

13      Karl Peterson came to me last year in '19 -- and I am

14  sorry, I apologize, I don't know the exact month -- asking for

15  a raise.  And I said, I -- you know, during negotiations we are

16  not giving out raises.  He got very upset and asked how -- you

17  know, I mean, why?  And I said, well, we're in negotiations;

18  we're not going to do it.  At that time, he says, I wish the

19  Union was not here.  I want it out.  How do we get it out?

20  Just going through my head on -- on that.  I'm trying to

21  figure -- figure out who else, if I missed anybody.  Is there a

22  way that I can kind of look at something just to refresh my

23  mind?

24  Q   Well, let -- let's finish, if you remember, and then I'll

25  see if there's anything that would refresh your recollection.



1    Is there any other names that you do remember?  That we're --

2    A    Oh, Jahan Harvey.  Jahan Harvey.  When he first was hired,

3    came to me after he -- he's a news photographer, came to me

4    after he got his welcome letter to the Union and said, I don't

5    have to join this, do I?  And I said, no, you don't because

6    there's no contract at the time.  And he was very intimidated

7    by the Union.  He did not want to join it, did not want it to

8    be here at KOIN.

9        And then, again, I believe it was October of '19 when -- I

10   think that's when that other letter was sent out by the Union

11   stating that they didn't have to pay any initiation fee for

12   that month.  He came to me again and very upset about that

13   letter.  He said that he had spoke to his parents also that,

14   why would they be doing this?  And they, you know, told him to

15   come and talk to me.  He talked to me and said he did not want

16   to join the Union, even if he had, you know, got that waiver on

17   the initiation fee, and that he wanted the Union out of here.

18   So he was -- he was another photographer.

19   Q    Okay.

20   A    Yeah.  I -- I think that -- I don't of any other ones off

21   the top of my head.

22   Q    Is there anything that would refresh your recollection as

23   to any conversations you had with anyone?

24   A    If I had a list -- is there a list I could look at or

25   something just so I can -- of names?  I'm -- I'm just trying to



 1    remember.

 2    Q    Yes.

 3        MR. DAVIS:  Mr. Schiff, could we put up Company Exhibit

 4    Number or RX Exhibit Number 4?

 5    Q    BY MR. DAVIS:  And by the way, Mr. Brown, that -- if you

 6    turn over one of those documents, one of them should be the

 7    exact same thing you're looking at there.

 8    A    Can I turn it over?  Because this isn't all the way down.

 9    Q    Yes, at this time.  It should be marked at the top.  As

10    you can see this one is with an RX 4?

11    A    Yes, I have that.

12    Q    Can you just take a minute, and if this reminds you of

13    anybody else you talked to, that's great.  If not, that's great

14    as well.

15    A    Those are the ones that I've --

16    Q    Okay.  All right.  All right.  Thank you.  After you had

17    these conversations with anybody, did you talk to anybody else

18    on the management team about these conversations?

19    A    Yes, I spoke to Pat Nevin, who was the general manager at

20    the time, and Casey Wenger, who was our HR person, and

21    sometimes Chuck Pautsch.

22    Q    Did you -- did you notify anybody by email or in writing?

23    A    Yes, I wrote down my conversations I had and sent those to

24    Pat Nevin.

25    Q    And do you recall about when you did that?



1    A    That was in December of '19.

2        MR. DAVIS:  Could we put what I think is RX 6, if I've got

3    the correct numbers up on the screen?  Thank you, Mr. Schiff.

4    Q    BY MR. DAVIS:  Take a look at -- to -- a second to look at

5    that, if you wouldn't mind, Mr. Brown.

6    A    Yes.

7    Q    And I believe if we --

8        MR. DAVIS:  -- can we scroll down, or how is this

9    paginated here?

10   Q    BY MR. DAVIS:  You can just take a few seconds again to

11   look at that.  Can you identify this document?

12   A    Yes, I can.  That is what I wrote to Pat Nevin.

13   Q    All right.

14       MR. DAVIS:  I'd like to request the admission of this --

15   of RX 6 into the record, please.

16       JUDGE TRACY:  Any objections?

17       MS. YEN:  No objection.

18       MS. DEVLEMING:  Sorry.  Just the same standing hearsay

19   objection.

20       JUDGE TRACY:  Yes.  So again, I'm going to overrule the

21   objection and admit Respondent's Exhibit 6.  But again, you

22   know, a lot of this is hearsay.  So again, it'll go to the

23   weight of the evidence in this case.

24   **(Respondent Exhibit Number 6 Received into Evidence)**

25   Q    BY MR. DAVIS:  And -- and Mr. Brown, just -- just glancing



1    at this, I -- you've testified as to some other names that are

2    not on this document.  How do you explain that?

3    A    I forgot about their names until I started looking over

4    this again.  And that --

5    Q    You --

6    A    -- the conversation.

7    Q    Oh, sorry.  I didn't let you finish.  My -- my apologies.

8    A    I -- after looking at this document again, and realizing I

9    forgot their name, it was just total -- after really thinking

10   about it and missed their -- their names on it.

11        MR. DAVIS:  I -- I have no further questions at this time.

12        JUDGE TRACY:  Ms. DeVleming, go ahead.

13        MS. DEVLEMING:  Might I have just two or three minutes to

14   get a couple papers together here to prepare for cross?

15        JUDGE TRACY:  Oh, sure.  Do you need a breakout room or

16   anything?

17        MS. DEVLEMING:  I don't think so.  Just a moment to

18   organize my life over here.

19        JUDGE TRACY:  Okay.  So let's go off the record for a

20   moment.

21        So we're just -- they're -- she's preparing for your

22   cross-examination, Mr. Brown.  So if you could just kind of

23   standby.  Okay?

24        THE WITNESS:  Yes.

25        JUDGE TRACY:  Thank you.



1        (Off the record at 2:09 p.m.)

2        THE COURT REPORTER:  We're on the record.

3        JUDGE TRACY:  Ms. DeVleming, go ahead, please.

4        MS. DEVLEMING:  You'll hear the sound of my printer as I

5    print it off.

6                        **CROSS-EXAMINATION**

7    Q    BY MS. DEVLEMING:  All right.  Hi there, Mr. Brown.  My

8    name is Liz DeVleming.  I am one of the two attorneys

9    representing the General Counsel here today, along with

10   cocounsel, Sarah Burke, which you will find also (audio

11   interference).  Thank you for your time.  I hope I just have a

12   few questions about some of your testimony on direct.

13   A    Okay.

14   Q    So first, you -- on direct examination, you testified

15   about a conversation you allegedly had with Douglas Key in, I

16   believe, you said about December 2019 about some signatures he

17   had purportedly gathered.  Do you remember that testimony?

18   A    Yes.

19   Q    Okay.  Did you, Mr. Brown, provide an affidavit to a Board

20   investigator in these cases on the -- on the subject of the

21   employees you spoke to?

22   A    I never have, no.

23   Q    You haven't provided an affidavit to a Board agent during

24   the investigation into these charges where you summarized

25   conversations you had with employees about their feelings about



1    the Union?

2    A    About that conversation?

3    Q    About all of your conversations with employees, about the

4    Union leading up to the withdrawal of recognition.

5    A    I've had affidavits done on -- what was that affidavit on?

6    But I don't remember it was that one, unless somebody can give

7    me something that can refresh my memory.

8    Q    Sure.

9        MS. DEVLEMING:  And Your Honor, I don't know how -- this

10    will be the first time I'll be sharing an affidavit.  Would you

11    like me to email it to everyone here?  So we have a copy or

12    just to Mr. Schiff?

13        JUDGE TRACY:  No,  I -- go ahead and email -- or you can

14    use the -- the -- or no, I said not to do that.  Yeah, go ahead

15    and email it -- or you know what you can do?  You can also --

16    because you're not putting it into the record; is that right?

17        MS. DEVLEMING:  We'll see how the testimony goes.  I mean,

18    if he's going to deny it, then I probably will.

19        JUDGE TRACY:  Okay.  So how about you can email it just

20    everybody has a copy of it.  Go ahead and do it right now.  Do

21    you have -- do you guys have access, Mr. Davis, there to your

22    email?

23        MR. DAVIS:  Yeah.  I should.  I haven't been on it in a

24    while, so I don't know if it's been deleted or anything as

25    we're doing this.  But it looks like I do still have access.  I



1    don't know if (simultaneous speech) --

2    JUDGE TRACY:  I think she's going to email it, not put it

3    on SharePoint yet.

4    MS. DEVLEMING:  Yes.  I'm so sorry.  I had queued up and

5    just hit send on the email, which only included Mr. Roberts.

6    My mistake.  Let me forward this to you, Mr. Davis.  I had

7    gotten so used to typing a certain list of names.  Okay.  There

8    we go.

9    JUDGE TRACY:  So, Mr. Davis, you can get your email in

10    that room?

11    MR. DAVIS:  It looks like I can.  I'll know -- I've had

12    some earlier today, but it sometimes kicks me off.  I haven't

13    been on it for a while, so I've rebooted it, and I should be

14    able to, hopefully get -- once -- it has not arrived yet.

15    That's all I can tell you.

16    JUDGE TRACY:  Okay.  And -- and go ahead and share it with

17    Ms. Yen.

18    Ms. DeVleming, I -- in this -- the way that these usually

19    work for myself is that I don't need to see them.  It's you

20    know, I want the parties to be able to see it.  And then if

21    you're going to put it in the record, then that's, then, of

22    course I'll see it.  But if it's just for the purposes of

23    refreshing memory, impeachment, go ahead and just do it this

24    way, and I don't need to see it at this point.

25    MS. DEVLEMING:  Okay.  Well, then, I apologize again



1    because, again, I queued up an email that I a little too

2    abruptly hit send on.  So don't check your email, Your Honor,

3    or delete it if you wish.

4        JUDGE TRACY:  Oh, I will.

5        MS. DEVLEMING:  And maybe I also sent it to Mr. -- so do

6    you not want this to be screenshared if I'm going to ask the

7    witness if he recognizes it?

8        JUDGE TRACY:  Oh, yeah.  That's true.  You can go ahead

9    and -- and screenshare it.  I mean, I -- like, so if we were in

10   person, the way that I do this is, I -- I'm sitting at the

11   bench.  You hand it to the witness.  The parties have a copy.

12   And I'm just listening, and I don't have it.  But really, the

13   only way for this to work properly so your witness can see it

14   is you're going to have to do the screenshare.  So go ahead and

15   do that.  And I think you can just screenshare it.  You don't

16   need to have Mr. Schiff do it.

17       MS. DEVLEMING:  I can do that.

18       THE WITNESS:  The document has arrived.  I've got my

19   email.  So I do have that.

20       JUDGE TRACY:  Okay.  Good.  And I'm assuming Mr. Roberts

21   has it, too.

22       THE WITNESS:  Looking at it, though, I will tell you, I

23   lose my entire view of all of you.  So I'm -- I'm -- I'm

24   looking at that right now, and I can't see anything else on my

25   screen.  So it might take a second.



1     JUDGE TRACY:  Well, take a look at it, you know, and then

2     let us know when you're ready.  It sounds like also Mr. Fleming

3     is going to point you to a specific section of that.

4     THE WITNESS:  Okay.

5     MS. DEVLEMING:  Okay.  I think I have shared my screen.

6     Can we all see it?

7     THE WITNESS:  Yes.

8     MS. DEVLEMING:  And in particular, Mr. Brown, can you see

9     the shared screen?

10     THE WITNESS:  Yes.

11     MS. DEVLEMING:  All right.  Let's just scroll to the

12     bottom.

13     Q    BY MS. DEVLEMING:  Okay.  So this is a March 12th, 2020

14     affidavit.  And is that your signature?

15     A    Yes, it is.

16     Q    Okay.  And when you provided this affidavit, do you

17     recall -- and I guess we'll have to refresh your recollection

18     about what this affidavit was about.  But do you recall when

19     giving an affidavit, you were given an opportunity to review

20     the draft and make any edits or changes, as we can see

21     throughout?

22     A    Yes.

23     Q    Okay.  And you were then -- were you informed that this

24     would be under oath and then, in fact, administered an oath

25     toward the end before you signed?



 1    A    Yes.

 2    Q    Okay.  And this is dated March 12th, 2020.  So just about

 3    two months after the withdrawal of recognition, right?  Do you

 4    see that?

 5    A    Um-hum.  Yes, I do.

 6    Q    Okay.  So before we dive in, I guess, we'll just scroll

 7    just so you get a sense and maybe this will refresh your

 8    recollection.  Here on page 2, it dives into some conversations

 9    with employees about their feelings about the Union.  Do you

10    see this conversation?

11    A    Yes.

12    Q    Okay.  So do you now recall if this affidavit covered the

13    subject of -- as of that March 2020, the conversations you had

14    had with unit employees about their feelings about the Union

15    prior to withdrawing recognition?

16    A    But this affidavit, if I remember correctly, was for the

17    second letter in October of 2019 that they spoke about not

18    having to pay the Union fees or -- or they were going to where

19    the Union fees.

20    Q    And isn't it true that that was the substance of many of

21    your conversations with the employees, whether or not they

22    would have to pay their Union fees?

23    A    Yes.

24    Q    And maybe we'll pull this down just for now.  I'm probably

25    going to need it again, so maybe I'll continue -- oh, you don't



1    want to see that.  Sorry.  Hope you didn't see that.  Do you

2    see anything right now when I minimize that?

3         JUDGE TRACY:  I still see the affidavit up there.

4         MS. DEVLEMING:  Oh, you do.  Okay.  Well, I will stop

5    screen sharing, then.

6         JUDGE TRACY:  Okay.

7    Q    BY MS. DEVLEMING:  Okay.  Where was I?  Mr. Brown, are

8    you -- do you recall today that during this March 2020

9    affidavit, you made absolutely no reference about your

10   conversation with Mr. Key about his alleged petition or

11   signatures he was gathering?

12   A    But that conversation -- that affidavit was set for

13   the -- the -- the letter that was sent to them regarding -- if

14   I remember right, if this is correct -- that the affidavit was

15   for the initiation fee being waived, not about Mr. Key talking

16   to me about the -- the conversation that we had.

17   Q    That wasn't Mr. Key's concern, and the concerns of the

18   employees signing the alleged petition that the initiation fees

19   and dues were so high?

20   A    Some are, yes.  Some were upset about how high the

21   initiation fees were.  But again, this was about how the Union

22   was trying to waive all of the rights or waive all of the

23   initiation fees to the members that want -- that they wanted to

24   join.

25   Q    Okay.  And what about you testified on direct examination



1    about a conversation you allegedly had in 2018 with James -- is

2    it Boehme?  I always struggle with -- (unintelligible) how you

3    pronounce his last name?

4    A    James Boehme, yes.

5    Q    Boehme.  And do you recall that that conversation is not

6    addressed at all in your March 2020 affidavit?

7    A    No.  Again, because that affidavit was all for the letter

8    that was sent to the employees waiving the initiation fee.

9    Q    Okay.  But was one of Mr. Boehme's concerns or his primary

10   concern, the level of the Union's initiation fee?

11   A    At his time, no.  Mr. -- that was not Mr. Boehme's

12   concern.  He was more concerned about how the Union members

13   were being treated by Kevin Wilson and that they wanted to

14   have -- you know, they were frustrated about how the Union

15   negotiations were going, not anything to do with the initiation

16   fees.

17   Q    He was frustrated about the pace of bargaining?

18   A    Pace of bargaining, how the Union was handling it, and how

19   that they were handling the -- the unit members.

20   Q    And did Mr. Boehme participate in bargaining, did he sit

21   in nonbargaining sessions?

22   A    No, he did not.

23   Q    Okay.  And then similar question.  You testified at an --

24   about an alleged conversation you had with Karl Peterson?  Same

25   reason that's not addressed at all in your May 2020 affidavit?



1    A    That is correct.

2    Q    Did Mr. Peterson not express a concern about whether he

3    needed to pay the Union's initiation fee?

4    A    He did not express that to me.

5    Q    And do you recall that with the exception of Vivian

6    Coday -- who you did testify about on direct examination -- in

7    summarizing all of the conversations that you did, in fact,

8    summarize in the March 2020 affidavit -- with the exception of

9    Ms. Coday, none of those employees relayed to you that they

10   wanted to be out -- to get rid of the Union as a collective

11   bargaining representative.  Is that true?

12   A    Can you repeat that question?  It -- it didn't make sense

13   to me.

14   Q    Sure.  Your aff- -- do you recall that your affidavit,

15   testimony about Vivian Coday from the March 2020 affidavit is

16   that Ms. Coday, in fact, did ask, how do we decertify the

17   Union?  And you provided her with the National Right to Work

18   Foundation's contact information.  Do you remember your

19   testimony on direct and your testimony in the March 2020

20   affidavit to that effect?

21   A    That's correct.

22   Q    Okay.  With the exception, though, of Ms. Coday, do you

23   recall that in your various summaries of conversations with

24   various other unit employees in the March 2020 affidavit, at no

25   point did any of those employees indicate they would no longer



1    like to be represented by the Union for the purposes of

2    collective bargaining?

3    A    If you're -- if you're referring to the affidavit, that

4    was -- their concerns is that they didn't want to have to --

5    what was going on.  Why were -- what was going on with the --

6    you know, why was the Union coming back to them and saying,

7    hey, you know, we're gonna waive this, and then they still do

8    not want the Union in here.  They told me multiple times that

9    they did not want the Union in KOIN-TV.

10   Q    And yet, in your summaries of those conversations, you

11   make no reference to any mention by any of those employees,

12   with the exception of Ms. Coday, to wanting to get rid of the

13   Union, meaning wanting to remove the Union as the employee's

14   collective bargaining representative.

15   A    But at that time, in that affidavit, again, that was --

16   there -- there was more concern of what was going on.  Why was

17   that happening?  And that's where that conversation came from.

18   Not one time -- at no time was anybody ever asked me about

19   that -- the other people on those questions.

20   Q    Okay.

21   A    It was more of just on that letter -- the letter and the

22   evidence that was submitted with the letter that showed the

23   letter from the NABET stating that they were going to waive the

24   initiation fee.

25   Q    Okay.  And just to circle and make sure the record is



1    clear so I don't have to offer your affidavit, Mr. Brown.  It

2    is your testimony today that the March 2020 affidavit, to the

3    extent it summarized your conversations with unit employees

4    about the fee issue.  Your affidavit does not suggest that any

5    of those employees except Mr. Vivian Coday referenced to

6    wanting to get rid of the Union entirely?

7    A    If you want to reference my -- my affidavit, that is

8    correct.  I stand by my affidavit.

9    Q    Okay.  But my question for you, Mr. Brown, is if you

10   recall today that that is, in fact, what your affidavit does

11   and does not say, it does not include any details of any other

12   employees expressing their interest in getting rid of the

13   Union?

14   A    I'll say that's correct.

15   Q    Okay.  And in fact, Mr. Brown, you spoke about on direct

16   examination, you talked about your conversation with Jahaad

17   Harvey.  Do you remember that testimony?

18   A    Yes.

19   Q    And isn't it true that when you spoke with Mr. Harvey, you

20   shared your personal opinion about how, in fact, you believe

21   the Union's dues and fees are excessively high?

22   A    I did not.

23   Q    Okay.  Let's open up the affidavit again, if I might.

24   Okay.  And maybe if you can, Mr. Brown, again, I have put on

25   the shared screen your March 12, 2020 sworn Board affidavit



1    that we just referenced.  And if you could maybe silently read

2    through this first paragraph, and let me know if that refreshes

3    your recollection about your conversation with Mr. Harvey.

4    A    If you could stop scrolling for second, please.  Okay.

5    Q    Okay.  So is it still your testimony today that you did

6    not share your personal belief that you agreed that the Union's

7    dues and fees were excessively high?

8    A    In my statement, it says that -- that they were -- there

9    was no fees, never said that -- if they meant waiving their

10   fees.  In no way does it say that I said that their fees were

11   outrageously high.  Yes, I agreed with his mother, but it was

12   never said that they were just that -- it was just meant that

13   they were waiving their fees.

14   Q    Okay.  So -- and thank you for the clarification.  So his

15   mother had said -- do you recall his mother saying the Union

16   was starting to get desperate and needed everyone to sign up

17   even if it meant waiving their fees?  And do you recall then

18   agreeing -- verbally agreeing with Mr. Harvey's mother on that

19   specific point?

20   A    Yeah, but waving their fees is totally different than

21   saying that I said that their fees are really high, and their

22   fees could be $600.

23   Q    Fair enough, Mr. Brown.  But now I'm asking, did you

24   verbally agree that the Union was starting to get desperate and

25   needed everyone to sign up, even if it meant waiving their



1    fees?

2    A    Yes, I did.

3    Q    Too many papers.  One minute here.  Oh, and I'm sorry, I'm

4    going to pull it up one more time because I have one more

5    piece.  Oh, well, I guess, no.  It's not pulled up yet.  First,

6    do you recall testifying in your March 2020 affidavit that you

7    all warned Mr. Harvey that even if your initiation fee was

8    waived, you'd still have to pay the Union dues?

9    A    Yes.

10   Q    And then you took pictures of the letter Harvey had

11   received from the Union?

12   A    I -- I'm -- I'm sorry.  I don't recollect that.  I'd have

13   to, you know, if you have those, I could take a look at them.

14   Q    Sure.  Do you recall Mr. Harvey showing you a letter from

15   the Union offering to waive his initiation fee?

16   A    He had the paperwork in his hand when he were -- when he

17   came to my office.

18   Q    Okay.  And do you recall during that conversation taking a

19   picture of that letter?

20   A    I -- I don't recall off the top of my head.  No, I don't

21   remember that.  I know that I -- I saw some other ones that I

22   had taken a picture of.

23   Q    Okay.  I guess just very briefly we'll pull it up again.

24   And if you can see my screen again, again, this is your March

25   12th, 2020 affidavit.  The very last line, very left couple



1    lines here, lines 16 to 17.  Does that refresh your

2    recollection about whether you took pictures of Mr. Harvey's

3    letter?

4    A    No, if you look at it, it says "Funes asked me if I wanted

5    the letter from the Union about waiving the initiation fee."

6    And I told him I didn't want it, but if I didn't mind -- if he

7    didn't mind, I'd take pictures of it.  It was not Jahan

8    Harvey's.

9    Q    Oh, thank you.  I'm sorry about that confusion.  Okay.  So

10   you took a picture of Mr. Funes' letter?

11   A    Yes, I did.

12   Q    I'm sorry for that confusion.  It was all one paragraph.

13        MS. DEVLEMING:  Okay.  I have no further questions for Mr.

14   Brown.

15        Thank you, Your Honor.

16        JUDGE TRACY:  Ms. Yen?

17        MS. YEN:  Can I just take a quick moment in the breakout

18   room with my client just to check whether there any questions

19   for this witness?

20        JUDGE TRACY:  Sure.  Okay.  So let's go off the record.

21        Mr. Schiff, if you could just create a breakout room, and

22   we'll all just sort of standby and wait.

23        (Off the record at 2:34 p.m.)

24        THE COURT REPORTER:  All right.  We're on the record.

25   We're on the record.  Sorry.



1        JUDGE TRACY:  That's okay.  Ms. Yen, any questions?

2        MS. YEN:  No, I think Ms. DeVleming covered everything.  I

3   have no questions.

4        JUDGE TRACY:  All right.

5        Mr. Davis, any redirect?

6        MR. DAVIS:  I have no redirect.  Thank you.

7        JUDGE TRACY:  All right.  Well, Mr. Brown, thank you very

8   much for your testimony today.  Please don't discuss your

9   testimony until after the close of the hearing.  And so you are

10  free to leave now.  Just leave all the documents and everything

11  there that was already present, just leave those in the room,

12  okay?

13       THE WITNESS:  Okay.

14       JUDGE TRACY:  Thank you so much.

15       THE WITNESS:  All right.  Thank you.  And I'll go ahead

16  and mute this out.

17       JUDGE TRACY:  Yeah, you can mute it and --

18       MR. DAVIS:  Yeah.  We have no one further that would be in

19  that room.  So we will be done in there.

20       JUDGE TRACY:  Okay.

21       THE WITNESS:  So should I just cancel this one out, then

22  and close up?

23       MR. DAVIS:  Why don't you just leave it up just in case?

24  I don't know how that works when somebody exits.  I think we

25  had issues with -- with the rest of us not exiting.  So I would



 1    just say leave it for now and you can turn it off later, if

 2    that works.

 3         JUDGE TRACY:  All right.  That looks like he was just put

 4    waiting room.  So that's fine.

 5         All right, Mr. Davis, Mr. Roberts, your next witness.

 6         MR. DAVIS:  I have none further here, so I'm going to turn

 7    it back to my cocounsel, Chuck Roberts.

 8         JUDGE TRACY:  Okay.

 9         MR. ROBERTS:  Yes.  We -- we did not have any further --

10    further witnesses, so Respondent rests.

11         JUDGE TRACY:  Okay.  All right.  Ms. DeVleming, Ms. Burke,

12    are there -- is there any rebuttal by the General Counsel?

13         MS. DEVLEMING:  Yes, Your Honor.  Just a bit.  And we'll

14    first call Ms. Biggs-Adams on rebuttal.

15         JUDGE TRACY:  Okay.

16         MS. DEVLEMING:  And Your Honor, before we do so, now that

17    Respondent has rested, I would -- General Counsel would ask

18    that you draw an adverse inference from the fact that none of

19    the employee witnesses were called to testify firsthand about

20    their perspective one way or another on the Union, other than

21    Mr. Key.

22         MR. ROBERTS:  We are will -- we would -- will address that

23    issue in the brief.  I don't think it's appropriate to draw one

24    right now.  I think that's something subject to argument.  Mr.

25    Key did testify, and I think there's a question as to whether



1    employees could even come and give their subjective opinion.

2    But in any event, I would ask you to reserve ruling on that,

3    and leave that issue for the brief.

4        JUDGE TRACY:  Sure, yes.  That's what I -- I note your

5    request.  Again reiterate it, please, in the brief.  And then I

6    will incorporate that into the decision.

7        MS. DEVLEMING:  Thank you.

8        JUDGE TRACY:  Yeah.  Are you -- are you ready to begin the

9    rebuttal?

10       MS. DEVLEMING:  Yes, we are.

11   Whereupon,

12                       **CARRIE BRIGGS-ADAMS**

13   having been previously sworn, was called as a witness herein

14   and was examined and testified telephonically as follows:

15       JUDGE TRACY:  Okay.  Ms. Biggs-Adams, I just want to

16   remind you that I administered an oath on our first day of the

17   hearing.  And so I would remind you that you will be testifying

18   under that same oath that was administered to you.  Again, same

19   questions that I had asked previously.  Is there anybody in the

20   room with you?

21       THE WITNESS:  No, there is not.

22       JUDGE TRACY:  Okay.  And then what do you have in front of

23   you there?

24       THE WITNESS:  My laptop and a pad of paper I've been

25   taking notes on.



1        JUDGE TRACY:  Okay.  And so please be sure, like I said

2    before, not to communicate with anyone during the course of

3    your testimony, that your testimony is -- is your own.  And

4    please just wait for the questions to finish being asked before

5    you respond.  And if there are any objections, wait for me to

6    rule on them before -- to let you know whether you should

7    respond or not.  Okay?

8        THE WITNESS:  Yes, ma'am.

9        JUDGE TRACY:  All right.  Thank you.  Ms. DeVleming, go

10   ahead, please.

11       MS. DEVLEMING:  Thank you, Your Honor.

12                    **(REBUTTAL) DIRECT EXAMINATION**

13   Q    BY MS. DEVLEMING:  Hi, again, Ms. Biggs-Adams.  And just

14   for the record, I guess we can confirm, Carrie, that you have

15   been present throughout the hearing as the party

16   representative.

17   A    Yes, I have.

18   Q    And Carrie, do you recall then, when Mr. Charles -- Chuck

19   Pautsch was testifying?

20   A    Yes, I do.

21   Q    And do you recall his testimony that with respect to Joint

22   Exhibit 2, which were the bargaining proposal cover sheets

23   offered by -- I'm sorry, Respondent's Exhibit 2, which were the

24   bargaining proposal a cover sheets, KOIN always provided the

25   Union with those cover sheets when they handed proposals across



1    the table?

2    A    I heard him say that.  Yes, ma'am.

3    Q    Is that your recollection of events?

4    A    No, it's not.  I did see them from time to time, most

5    often if the federal mediator had them.  She might share a copy

6    with me that had those notes on the front, but they were not in

7    the documents that were emailed to me when the company sent me

8    the proposals.  So I did not get them every time.

9    Q    And how do you recall that they weren't in all the emails

10    with the proposal sent you?

11    A    I -- I went back and looked at the proposals, and sent to

12    you some of the ones from 2019 to show you what documents had

13    been emailed to me.

14    Q    Okay.  And I've just now hit send on an email to everybody

15    involved, including Mr. Schiff, with what I've marked for

16    identification as General Counsel Exhibit 20.

17    **(General Counsel Exhibit Number 20 Marked for Identification)**

18        MS. DEVLEMING:  It may take a minute to come through.

19        JUDGE TRACY:  Yeah.  Have you uploaded that one yet?

20        MS. DEVLEMING:  I haven't yet, since it hasn't been

21    admitted, and it seems like that's been our pace.  But I can do

22    that now, or I can share my screen or whatever you prefer.

23        JUDGE TRACY:  Well, why -- why don't you give everybody a

24    moment to open them up.  I just want to make sure that they're

25    part of the SharePoint.  So anybody who wants to have access to



1   these that are part of this case, aside from the official

2   transcript, it's fair since we've -- just for the rules of

3   completeness.

4        Mr. Roberts, are you saying something?

5        MR. ROBERTS:  I'm sorry.  I forgot I was not on mute.  I

6   was speaking with someone in here.

7        JUDGE TRACY:  Okay.  Okay.  So yes, go ahead, and Ms.

8   DeVleming, share your screen.  And I also have to note, that

9   that was my failure.  I will be deleting Mr. Brown's affidavit

10  that was sent to my email, and I will be destroying it.  And I

11  have not looked at it.  Just so the parties know that that is

12  not part of the record.  And so it will not be -- I -- I will

13  not be reviewing it.

14       MS. DEVLEMING:  Okay.  I will share my screen before I hit

15  upload on the document in SharePoint, make sure it gets

16  admitted before I do that.

17  Q    BY MS. DEVLEMING:  All right.  Carrie, let me know when

18  you can see the document marked as DCX 20 on the screen.

19  A    Yes, I see it.

20  Q    Okay.  And I'll kind of scroll through it here.  It's a

21  19-page document.  Well, let's talk about -- do you recognize

22  this first page?

23  A    Yes.

24  Q    And what is it?

25  A    So this is a note from me to you and the other attorneys



1    for the General Counsel, and Ms. Yen, that there were no cover

2    sheets included in these attachments.  And then I sent you a

3    series of emails out of my records.

4    Q    Okay.  So here on the first page, though, it says

5    attachment and has a named document.  Do you see that?

6    A    Yes.

7    Q    Okay.  And now we're -- I've scrolled to page 2.  Is this

8    the document that was attached to that email?

9    A    Yes, it is.

10   Q    And then here, we are now on page 4 of the exhibit, and

11   I'm -- I neglected to Bate stamp this one.  I apologize.  But

12   page 4 of Joint Exhibit -- sorry, General Counsel 20, it

13   reflects two attachments here, 9C5 and 11C6?

14   A    Correct.

15   Q    And from pages 6 through 9.  Are those the attachments?

16   A    Yes, they are.

17   Q    And then, similarly, if we go through this, we can line up

18   the attachment below the email.

19   A    Yes.

20   Q    And again, what -- what is the relevance of this set of

21   documents?

22   A    Again, another proposal from the Employer without any

23   cover sheet.

24        MS. DEVLEMING:  Okay.  Your Honor, General Counsel would

25   move for the admission of General Counsel Exhibit 20.



1        JUDGE TRACY:  Any objections?

2        MR. ROBERTS:  None.  I'm sorry.

3        JUDGE TRACY:  That's okay.  That's okay.  And Ms. Yen?

4        MS. YEN:  No objection.

5        JUDGE TRACY:  All right.  So General Counsel's Exhibit 20

6    is admitted into evidence.

7    **(General Counsel Exhibit Number 20 Received into Evidence)**

8        MS. DEVLEMING:  Thank you.  And I'm hitting upload as we

9    speak, putting it into SharePoint.  Okay.  It should now be

10   there.  All right.

11   Q    BY MS. DEVLEMING:  And also, Carrie, we included in the

12   record the documents that you used to provide to Mr.

13   Mosbrucker -- or sorry, Father Mosbrucker to confirm the

14   employee's signatures against a list of employees in the

15   bargaining units at the times?  Do you recall that?

16   A    Yes, ma'am.

17   Q    And why is it -- so we have Joint Exhibit 67, which is

18   your kind of list of who was in what unit.  And we also have

19   Joint Exhibit 46(a), which was the November 2019 payroll

20   records.  Why did you use those documents instead of something

21   newer?

22   A    So since the company had stopped the dues checkoff at the

23   beginning of August, I had written them monthly for the most

24   recent earnings, and that's how I would get a list of who was

25   working, who -- and what their earnings were in the preceding



1    month.  It was usually two pay periods.  And I had asked again

2    monthly from Lisa Newell when she took over from Casey Wenger

3    when he departed.  He sent me the November earnings -- she sent

4    me the November earnings.  But although, I requested it

5    repeatedly, she never sent me the December or any subsequent

6    earnings.  So the most recent document I had from the Employer

7    was the November earnings, which I believe is the Exhibit

8    46(a)?

9    Q    Good memory.  The -- I believe the Father Mosbrucker's

10   certification letter, which for the record is General Counsel

11   13, had some names that you then added and contracted from the

12   November 2019 list at the bottom.  Why is that?

13   A    Correct.  There were people who have left the employ of

14   the company since the November earnings statement.  I knew they

15   had left, some who had been added since then.  So all I could

16   do was update the list I had from a company, add in and -- and

17   delete those who had departed.

18   Q    And then Carrie, I believe -- I know it's been a few days.

19   But I believe on direct, you made clear, but just for the

20   record, was it you that directed Ms. Hansen, Mr. Dingwall, and

21   Mr. Rashleigh to collect the signatures on the Union's petition

22   that Father Mosbrucker reviewed?

23   A    Yes, it was.

24   Q    And what -- what type of instructions did you give to

25   those three:  Ms. Hansen, Mr. Dingwall, and Mr. Rashleigh?



1   A    So they were to go with the petition to each worker

2   personally and be there while it was being signed.  These

3   petitions were never to be out of people's control.  They

4   weren't to be left somewhere or abandoned in any way.  They

5   were to talk to the people.  They all work there.  They knew

6   all the workers.

7        So they would know who they were talking to and which

8   lists they should sign on because there were two separate

9   petitions.  So they needed to give the one for the desk people

10  and the -- and the producers that need to give -- and creative

11  services, they need to give them that petition and the

12  engineering folks needed the technical petition.

13  Q    Did you explain to Ms. Hansen, Mr. Dingwall, and Mr.

14  Rashleigh the importance of having the employee sign in their

15  presence?

16  A    Yes.

17  Q    And to the best of your knowledge, did the three stewards

18  do that?

19       MR. ROBERTS:  Objection.  Object -- objection.  There's no

20  way she would know.  Unless they just told her, which would be

21  hearsay.  So I -- I don't think -- I don't think that's a

22  proper question.

23       JUDGE TRACY:  If you could rephrase the question, please.

24  Q    BY MS. DEVLEMING:  Ms. Biggs-Adams, have you any

25  information to indicate that they did not, in fact, secure



1    signatures in person?

2    A    No, ma'am, I do not.

3        MS. DEVLEMING:  I'll leave it there, Your Honor.  No

4    further questions for Carrie.

5        JUDGE TRACY:  Ms. Yen?

6        MS. YEN:  No -- no questions.

7        JUDGE TRACY:  Mr. Roberts?

8        MR. ROBERTS:  No, I don't have any.

9        JUDGE TRACY:  Okay.  All right.  Ms. Biggs-Adams, thank

10   you very much.  Any other --

11       MS. DEVLEMING:  Sorry.

12       JUDGE TRACY:  Ms. DeVleming, any further witnesses for the

13   General Counsel's rebuttal case?

14       MS. DEVLEMING:  Yes, Your Honor.  We're going to recall

15   Ms. Ellen Hansen very briefly, but I believe we might need to

16   give her a call, unless she's in the waiting room already.  Mr.

17   Schiff, do you know?  Not there?

18       MR. SCHIFF:  KOIN-TV is in the waiting room.

19       MS. DEVLEMING:  Okay.  So yeah, we might need to give her

20   a call to let her know that we are to the point that it's time

21   to call in.

22       JUDGE TRACY:  Okay.  Let's go ahead and go off the record.

23   If you can give her a call and -- does she know that this is

24   about the time?  So she's standing by?  So it shouldn't be more

25   than just a couple of minutes?



1    MS. DEVLEMING:  Right.

2    JUDGE TRACY:  Okay.  So let's go off the record, like I

3    said.  And you know, if anybody needs a quick break, but

4    hopefully it will be a brief interlude here.

5    (Off the record at 2:55 p.m.)

6    JUDGE TRACY:  All right.  Let's -- let's go ahead and go

7    back on the record.

8    THE COURT REPORTER:  We're on the record.

9    JUDGE TRACY:  Okay.  Ms. DeVleming, if you could call your

10   next witness.

11   MS. DEVLEMING:  I will turn it back over to my cocounsel,

12   Sarah Burke for this one.

13   JUDGE TRACY:  Oh, we can't hear you at all.

14   MS. BURKE:  Can you hear me now?

15   JUDGE TRACY:  Oh, yes, we can.

16   MS. BURKE:  Okay.  I apologize if you can hear some kind

17   of rumbling in the back.  I don't know what they're doing.

18   Anyway, counsel for the General Counsel would recall Ellen

19   Hansen to the stand, please.

20   Whereupon,

21                        **ELLEN HANSEN**

22   having been previously sworn, was called as a witness herein

23   and was examined and testified, telephonically as follows:

24   JUDGE TRACY:  Ms. Hansen, I just want to remind you of the

25   oath that I administered.  I believe it was Monday of this week



1   in which you testified, and you're still going to be testifying

2   under that oath.  Let me ask you again, is there anybody

3   present in the room in which -- from which you're testifying?

4        THE WITNESS:  No.

5        JUDGE TRACY:  And do you have any documents or anything?

6   What's -- what's in front of you?

7        THE WITNESS:  I don't have any documents this time.  I

8   just have me.

9        JUDGE TRACY:  Okay.  All right.  And I just want to remind

10  you to testify -- to not use any electronic devices, any

11  communication texting or email during the course of your

12  testimony that your testimony is coming directly from yourself.

13  And just to remember to wait for the questions being asked

14  before you -- completely before you answer.  If there are any

15  objections, just wait for me to rule on the objections telling

16  you whether you should answer the question or not.  Okay?

17       THE WITNESS:  Okay.

18       JUDGE TRACY:  All right.  Thank you.  Ms. Burke, please?

19       MS. BURKE:  Thank you.

20                  **(REBUTTAL) DIRECT EXAMINATION**

21  Q    BY MS. BURKE:  Hi, again, Ellen.

22  A    Hi.

23  Q     hanks -- thanks for rejoining us again today.  It should

24  be much quicker than your previous testimony.  You testified on

25  direct.  How you, Mr. Rashleigh, Mr. Dingwall, the other Union



1  stewards would collect signatures for a petition supporting the

2  Union in about January, February 2020.  Do you recall that?

3  A    Yes.

4  Q    And just to be clear for the record, did these employees

5  sign a petition in front of you?

6  A    Yes.

7  Q    Okay.

8      MS. BURKE:  Now, if I can have Mr. Schiff, if we could

9  call what was marked and admitted as Respondent's Exhibit 4?

10  Q    BY MS. BURKE:  All right.  Ellen --

11  A    I can see --

12  Q    -- do you see the document?  Okay.

13  A    Yes.

14  Q    Now, take a -- take a moment --

15      MS. BURKE:  And perhaps you can scroll down so Ms. Hansen

16  can review all of the document.

17  Q    BY MS. BURKE:  But this a document that purports to be a

18  document that reflects the employees that were in the two

19  bargaining units as of about early January 2020.  And I'll

20  defer to the earlier testimony in the record on the specific

21  date that was created.  But are you aware of any bargaining

22  unit who are -- bargaining unit employees who were working for

23  the KOIN as of January 8, 2020, who should be on this list?

24  A    Let's see.  Can you scroll it down again?  I don't think I

25  see Christy Kenworthy (phonetic, throughout).



1    Q    And who is Christy Kenworthy?

2    A    She works in the promotions -- commercial production.

3    Q    And which bargaining unit would she be in?

4    A    I think she would be in Unit -- Unit 2.  But I don't --

5    I -- we didn't really go by the unit numbers very much in the

6    differentiating of it.  It's such a small group.

7    Q    But it's your understanding she would be in -- in the

8    bargaining unit?

9    A    Oh, yes.  Yes, she was.

10    Q    And how do you know that?

11    A    I remember when she came on to the bargaining unit.  She

12    had been working at KOIN, and one of the then managers at the

13    time let it slip that she should -- that she shouldn't be in

14    the unit because she was editing production, and we had missed

15    her in our initial organization.  And so we included her into

16    the unit.

17    Q    And to your knowledge, she was still working for KOIN in

18    the bargaining unit as of January 8th, 2020?

19    A    Yes.

20    Q    Okay.  And when was she added into the bargaining unit,

21    the conversation you were just testifying to?

22    Q    Oh, I don't remember exactly, but it was -- it's been

23    quite a few years now.  You know, it could be six, seven years

24    or more.  She was in for a long time.

25    Q    And to your knowledge, did KOIN and the Union agree that



1    she was properly in the bargain?

2    A    Yes.

3    Q    And to your knowledge, she was still working as of January

4    8th, 2020?

5    A    Yes, as a freelancer.

6    Q    Okay.  And as of today, to your knowledge, is Ms.

7    Kenworthy still employed with the employer?

8    A    Yes, I saw an email congratulating her on a recent project

9    that's going on,  that she's still doing work for KOIN.

10   Q    Do you recall on or about when you would have received

11   this email?

12   A    I think it was in October, and it was about a special

13   program, a harvest festival or something like that where they

14   listed the people that worked -- worked on it.

15   Q    And you said October.  Would that be of this year?

16   A    Yes.

17        MS. BURKE:  And then, Your Honor, I have to preemptively

18   uploaded, because I am nervous about my own share screen

19   abilities, GC-21?  If you want to take a moment for everyone to

20   look at it, and if Mr. Schiff could pull it up.

21   Q    BY MS. BURKE:  Ellen, are you able to see the document?

22   A    I am.  Although the -- I think there's a bottom part.

23   Q    And do you recognize this document?

24   A    I don't -- let's see.  I kind of saw -- yes, I -- I do

25   recognize that I -- I -- I forwarded it -- it to you.  And --



1    Q    Perhaps we can scroll down to page 2, Mr. Schiff, Ms.

2    Hansen.

3    A    Yes.  Yes.

4    Q    Okay.  And what is that document?

5    A    This is what we would call a shout out.  You know, giving

6    everybody -- letting everybody know that somebody did good work

7    and Christie is listed in there for the show.

8    Q    And what are these shout outs?

9    A    Oh, a shout out is, you know, just a -- an email to

10    everybody to say, hooray, thank you for doing a good job.

11    Q    And the document references that Ms. Kenworthy helped

12    produce a show.  Would that be bargaining unit work?

13    A    Yes.  I don't know the specifics, but it definitely --

14    when it says edit at the end -- edit writing, and setting up

15    the shoots and editing several segments is definitely

16    bargaining work.

17    Q    And to your knowledge, was Ms. Kenworth performing that

18    type of work as of January 8th, 2020?

19    A    I -- my understanding is that she was doing some

20    freelance.  I don't know what, but she was still listed in the

21    Union emails, et cetera.

22    Q    And to be clear, does being a freelancer change her status

23    as a member of the bargaining unit?

24    A    No.

25    Q    Okay.



1    MS. BURKE:  Your Honor, I would offer GC Exhibit 21 into

2    evidence.

3    JUDGE TRACY:  Any objections?

4    MR. ROBERTS:  None.

5    JUDGE TRACY:  All right.  Ms. Yen?

6    MS. YEN:  No.

7    JUDGE TRACY:  Okay.  So General Counsel Exhibit 21 is

8    admitted into evidence.

9    **(General Counsel Exhibit Number 21 Received into Evidence)**

10    MS. BURKE:  I have no further questions, Your Honor.

11    JUDGE TRACY:  Mr. Roberts -- or Ms. Yen.  Ms. Yen.  First

12    is Ms. Yen.

13    MS. YEN:  No. questions.

14    JUDGE TRACY:  Okay.  Mr. Roberts?

15    MR. ROBERTS:  Yes.

16                    **CROSS-EXAMINATION**

17    Q    BY MR. ROBERTS:  Ms. Hansen, you indicated that Christie

18    was a freelancer.  And I take it that means that she worked on

19    and off.  She did not work consistently as a -- in any kind of

20    regular, full-time position?

21    A    Correct.

22    Q    And so it was -- is it fair to say she -- she might go

23    months without ever working on anything for KOIN at all?

24    A    I have no idea.

25    Q    So you have no idea how frequently she worked during 2019?



 1     A     No.

 2     Q     You say that the company and the Union agreed that she was

 3     in the unit.  Where is that reflected that they made that

 4     agreement?

 5     A     I don't know.  It was a long time ago, but I remember we

 6     negotiated that.

 7     Q     Is it in the contract somewhere?

 8     A     I believe her current job is listed in the jobs and

 9     duties.  Maybe not her specifically, but the work that she

10     does.

11     Q     Are you saying that the freelance position is listed in

12     the contract as bargaining unit work?

13     A     Freelancers are included in the contract.  Yes.

14     Q     You're saying that that's actually written into the

15     contract somewhere?

16     A     Yes, we have freelancers in the contract.

17     Q     Okay.  So if we look -- I'm not going to do it right now.

18     But if we look at the collective bargaining agreement, we will

19     find references to freelancers being included in the unit?

20     A     Yes.

21     Q     Okay.  And that's -- but that's the basis for your

22     position that you -- that -- that her job, as a freelancer, is

23     part of the bargaining unit?  Is that the -- is that your basis

24     for that?

25     A     Yes.



 1          MR. ROBERTS:  I don't have any other questions.  Ms.

 2    Burke?

 3                        **REDIRECT EXAMINATION**

 4    Q    BY MS. BURKE:  Just one -- Ms. Hansen, you testified that

 5    Ms. Kenworthy was not performing work regularly.  But it was

 6    your testimony that she was performing work as of January 8th,

 7    2020; is that correct?

 8    A    I believe -- I believe that she was.  But specific --

 9    Q    Sorry.  Go ahead.

10    A    I don't --

11          MR. ROBERTS:  I don't -- I'm sorry I didn't hear the end

12    of that answer.

13          JUDGE TRACY:  Ms. Hansen, if you could just repeat your

14    answer.  I think you got a little bit cut off.  So if you could

15    just repeat your answer to the best of your ability.

16    A    Yes, I -- I believe that she was still performing work.

17          MS. BURKE:  I have no further questions, Your Honor.

18          JUDGE TRACY:  Okay.  Mr. Roberts?

19          MR. ROBERTS:  No, I have nothing else.

20          JUDGE TRACY:  Sorry, Ms. Yen?

21          MS. YEN:  No questions.  Thank you.

22          JUDGE TRACY:  Okay.  All right.

23          Well, Ms. Hansen, thank you very much for participating

24    again.  Again, please don't discuss your testimony until after

25    the close of this hearing.



1          THE WITNESS:  Okay.

2          JUDGE TRACY:  Okay.  And you can sign off or leave the

3     meeting.

4          THE WITNESS:  Okay.  I will leave.

5          JUDGE TRACY:  All right.  Ms. DeVleming, Ms. Burke, any

6     further witnesses for the General Counsel?

7          MS. DEVLEMING:  No, Your Honor.  The General Counsel rest.

8     I do have one comment to make, which is, we would remind Your

9     Honor of the counsel for the General Counsel's position stated

10    Thursday morning and restated on Friday that we move to

11    withdraw paragraph 9 and 11 from the complaint.  But with that

12    exception, I would also move to conform the pleadings to the

13    proof.

14         JUDGE TRACY:  Okay.  That's noted for the record.

15         And anything further, Mr. Roberts?

16         MR. ROBERTS:  Nothing from Respondent.

17         JUDGE TRACY:  Okay.  Ms. Yen?

18         MS. YEN:  No, nothing further.  We did get the -- I'm

19    sorry, I lost track.  We did get the final version of the

20    history documents in the record, right?

21         MS. DEVLEMING:  Yes.

22         MS. YEN:  Okay.

23         MS. DEVLEMING:  That should be General -- or sorry, Joint

24    Exhibits 63 through 66.

25         MS. YEN:  Okay.  Great.  Yes.  Nothing further from the



1    Charging Party.

2        JUDGE TRACY:  Okay.  And does the Court Reporter have all

3    of the documents at this point?

4        THE COURT REPORTER:  I haven't downloaded anything yet,

5    but I will be in touch with Mr. Schiff if I can't get anything.

6        JUDGE TRACY:  Have you tried to do that yet?

7        THE COURT REPORTER:  No, ma'am.

8        JUDGE TRACY:  Okay.  Well, yeah.  I mean, obviously,

9    that's important that that be included in the record, all the

10    documents.  So I -- I've really never closed a hearing without

11    make sure that you have all the documents, but I will -- I will

12    rest assured that you all will make sure that all of these

13    admitted exhibits make it into the transcripts and the record

14    here.  So with that being said, I will go ahead and -- we're at

15    the end of the hearing.

16        I will prepare and file with the Board my decision in this

17    proceeding.  A copy will be served on each of the parties.  You

18    know, again, the -- the thing that keeps coming up, which, you

19    know, counsel for the General Counsel, again, renewed the

20    request for the -- the withdrawal of paragraphs 9 and 11 and --

21    which I declined to do.  And I set forth my reasons for doing

22    that.

23        Frankly, the course of this hearing makes it all the more

24    important why I wanted to hear all of this evidence in this

25    case.  And in particular, you will be filing briefs.  And so,



1    what I'm asking is that there -- it's evident to me that

2    there -- a lot of this, there's new Board law.  There's General

3    Counsel's memos, which I've already said are not bound -- I'm

4    not bound by them.

5         So whoever wants to make new law, go for it.  That's not

6    my job.  My job is to follow what the Board says, and you can

7    argue it and maybe the Board will reverse things that I write,

8    and that's fine.  I have no ego in this.  But I want to be

9    clear that in the briefs you can argue what you want.  But I

10   need to see what is the -- the precedent?  What is the Board

11   law on it?

12        And for the General Counsel, you may, again, renew the

13   request in the brief to say, we are withdrawing paragraphs 9

14   11.  Notwithstanding that, I need the arguments for that.

15   Like, substantive arguments or -- not just the withdrawal and

16   how, you know, perhaps it's inappropriate for me not to have

17   accepted your withdrawal, but substantive arguments on the

18   allegations that are both in paragraphs 9 and 11.

19        And I'm ordering that as the judge.  The General Counsel

20   disagrees.  That's fine.  But my job is to follow what the --

21   what the Board says, and I don't make law.  So that being said,

22   I will allow until -- I calculate it is 35 days.  So that would

23   make it December 23rd, 2020, in which the briefs are due in

24   this case.

25        These -- the -- the briefs and any proposed findings and



1  conclusions of law should be filed directly with the judge's

2  division in San Francisco, regardless of whether they are

3  mailed or e-filed.  And any requests for extensions of time for

4  the filing of briefs must be made in writing to the Associate

5  Chief Judge in San Francisco and served on the other parties.

6      If there is a request for an extension of time, the

7  positions of the other parties need to be included in that

8  motion.  And it's the policy of the division of judges to grant

9  discretionary extensions only when they are clearly justified.

10  Requests for extensions must contain specific reasons and show

11  that the requesting party cannot reasonably meet the current

12  deadline.

13      I also had indicated at some point -- I think today, in

14  fact -- that there is still little bits of this case that are

15  out there with appeals.  And so I certainly hope that once you

16  all receive word on the appeal that you can file, hopefully, a

17  joint motion to reopen the record to include the -- the -- the

18  decision made on the -- the unilateral or, you know, settlement

19  and to put that into the record, and complete the joint motion.

20  And then we can have the court reporter include that as a

21  separate transcript piece.  So that will complete the -- the

22  story here, I suppose, I would say.

23      And if there's nothing further, the trial is now closed.

24  I want to thank you guys for your cooperation.  This was --

25  it's not easy to do this type of detailed case, and then to do

1    it over Zoom is even more of a challenge.  And so I appreciate

2    you all.

3        Yesterday, we had a lot of technological problems that

4    hopefully that was -- that was -- that was it.  And that was

5    quite amazing, actually.  And all the witnesses were able to

6    testify, and they didn't have problems, and the documents were

7    there.

8        And I also really want to applaud you all for working

9    together.  I know that there is -- clear from this case that

10   there is a lot of disagreements.  But in the end, the attorneys

11   and the parties came together to work together to just put

12   forth the case and to make the record and -- and -- and without

13   adding that -- that -- you know, too much of an adversarial

14   nature to this proceeding.  So I do appreciate that that made

15   it go much more smoothly than I can imagine -- other hearings

16   where they fight over everything.

17       So I do appreciate you guys for that.  So normally, I

18   would shake your hands.  I can't do that.  I'll just wave to

19   you guys.  And thank you all very much for all of your hard

20   work.  You've done a great job, and we're going to go off the

21   record.

22       MR. ROBERTS:  Thank you.

23       MS. YEN:  Thank you, Your Honor.

24       MR. DAVIS:  Thank you.

25       MS. YEN:  And thank you --



1          MR. DAVIS:  Thank you, Your Honor.

2          MS. YEN:  -- Mr. Schiff.

3          JUDGE TRACY:  Thank you, everyone.

4      **(Whereupon, the hearing in the above-entitled matter was closed**

5      **at 3:21 p.m.)**

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



1                   **C E R T I F I C A T I O N**

2    This is to certify that the attached proceedings, via Zoom

3    Videoconference, before the National Labor Relations Board

4    (NLRB), Region 19, Subregion 36, Case Numbers 19-CA-248735,

5    19-CA-255180, 19-CA-259398, 19-CA-2622, National Association Of

6    Broadcast Employees & Technicians, the Broadcasting and Cable

7    Television Workers Sector of the Communications Workers of

8    America, Local 51, AFL-CIO and Nexstar Broadcasting, Inc.,

9    d/b/a KOIN-TV, at the National Labor Relations Board, Region

10   19, Subregion 36, 915 2nd Ave., Ste. 2948, Seattle, Washington,

11   on November 18, 2020, at 9:10 a.m. was held according to the

12   record, and that this is the original, complete, and true and

13   accurate transcript that has been compared to the reporting or

14   recording, accomplished at the hearing, that the exhibit files

15   have been checked for completeness and no exhibits received in

16   evidence or in the rejected exhibit files are missing.

17

18

19

20                          _____

21                          CLAUDINE METOYER
                            Official Reporter

22

23

24

25

